UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| SPIRIT AVIATION HOLDINGS, INC., *et al.*, | Case No. 25-11897 (SHL) |
| Debtors.[1] | Jointly Administered |

**DECLARATION OF FRED CROMER IN SUPPORT OF (A) THE MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER (I) APPROVING THE GLOBAL RESTRUCTURING TERM SHEET WITH AERCAP IRELAND LIMITED, (II) AUTHORIZING AND APPROVING ASSUMPTION AND REJECTION OF CERTAIN AIRCRAFT AGREEMENTS, (III) AUTHORIZING ENTRY INTO THE NEW LEASE AGREEMENTS AND DEFINITIVE DOCUMENTS, AND (IV) GRANTING RELATED RELIEF AND (B) THE RELATED SEALING MOTION**

**Fred Cromer declares and says:**

1. I am the Executive Vice President and Chief Financial Officer of Spirit Aviation Holdings, Inc. ("**Holdings**"), a Delaware corporation that owns 100% of a certificated air carrier, Spirit Airlines, LLC (formerly Spirit Airlines, Inc.). Holdings and each of its direct and indirect subsidiaries (collectively with Holdings, "**Spirit**," the "**Debtors**," or the "**Company**"), is each a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"). I have served as Spirit's Executive Vice President and Chief Financial Officer since July 2024 and have more than three decades of experience in the aviation industry.

2. As Spirit's Chief Financial Officer, I am generally familiar with its day-to-day operations, businesses, and financial affairs, and the circumstances leading up to the Chapter 11 Cases. I am over the age of 18 and authorized to submit this declaration (the "**Declaration**"),

---

[1] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

pursuant to rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), on behalf of the Debtors in support of the *Motion of the Debtors for Entry of an Order (I) Approving the Global Restructuring Term Sheet with AerCap Ireland Limited, (II) Authorizing and Approving Assumption and Rejection of Certain Aircraft Agreements, (III) Authorizing and Approving Entry into the New Lease Agreements and Definitive Documents, and (IV) Granting Related Relief* (together with the exhibits and other attachments thereto, the "**AerCap Motion**") and the *Motion of the Debtors for Entry of an Order Authorizing the Debtors to Redact Commercially Sensitive Information* (the "**Sealing Motion**" and, together with the AerCap Motion, the "**Motions**"),[2] each filed with the Court contemporaneously herewith, which I reviewed or had their contents explained to me.

3. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents, information prepared or provided to me by employees of and/or professional advisors to the Company, and/or my opinion based upon experience, knowledge, and information concerning Spirit's operations. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4. After engaging in good-faith negotiations at arm's length with sophisticated counsel, the Debtors and the AerCap Parties reached agreement on the Global Restructuring Term Sheet. After weeks of negotiations with AerCap, AerCap has committed to (i) injecting a significant $150 million liquidity infusion, which will provide significant funding to the Debtors in these Chapter 11 Cases and permit the Debtors to operate their business while they finalize and implement their business plan and fleet rationalization process, (ii) providing significant cost

---

[2] Capitalized terms used but not immediately or otherwise defined herein shall have the meanings ascribed to them elsewhere here or in the Motions, as applicable.

savings to the Debtors and their estates and (iii) resolving claims and disputes among the parties. The Debtors have thus concluded that approval of the Global Restructuring Term Sheet is in the best interests of the estates.

## Background

5. As explained in the *Declaration of Fred Comer in Support of the Chapter 11 Proceedings and First Day Pleadings* [ECF No. 19] (the "**First Day Declaration**"), Spirit operates a leading value airline committed to delivering value to its guests by offering an enhanced travel experience with flexible, affordable options. Spirit flies only single-aisle Airbus aircraft, which are commonly referred to as "A320 family" aircraft. A320 family aircraft include the A319, A320, and A321 models, which have broadly common design and equipment but differ most notably in fuselage length, service range, and seat capacity.

6. In December 2019, Spirit entered into an A320 NEO Family Purchase Agreement (as amended, supplemented, or otherwise modified from time to time in accordance with its terms, the "**Spirit Purchase Agreement**") with Airbus S.A.S. ("**Airbus**") for the purchase of dozens of new Airbus A320 family aircraft, with options to purchase dozens more, in each case, scheduled for delivery between ▇▇▇▇▇▇. As of the Petition Date, the firm aircraft orders consisted of A320 family aircraft with Airbus, including A320neos and A321neos (collectively, the "**Additional Aircraft**"), and the option to purchase more (collectively, the "**Option Aircraft**").

7. AerCap is Spirit's largest source of leased aircraft. As of the Petition Date, Spirit's fleet of 214 Airbus A320 family aircraft included 166 leased aircraft, 37 of which were leased from AerCap (collectively, the "**Existing Aircraft**" and, the underlying leases, the "**Existing**

**Leases**").[3]  Of the 37 Existing Aircraft, 25 aircraft are outfitted with the new generation Pratt & Whitney geared turbofan ("**GTF**") engine and suffered from powdered metal-related issues.

8.   On July 30, 2024, the Debtors and AerCap amended, supplemented, or otherwise modified each of the 37 Existing Leases ████████████████████████████████████████████████████████████████████████████████████.

9.   On July 30, 2024, Spirit entered into a committed direct lease transaction with AerCap covering 36 aircraft that were originally part of Spirit's order book with Airbus and were assumed by AerCap (the "**Undelivered Aircraft**" and, together with the Leased Aircraft, the "**AerCap Aircraft**").  The Undelivered Aircraft were slated to be delivered to Spirit in 2027 and 2028.  This transaction further provided for the return of certain pre-delivery payments previously made by Spirit to Airbus in respect of the Undelivered Aircraft.

10.   On July 29, 2024, the Debtors and certain of the AerCap Entities executed that certain Framework Agreement (the "**Framework Agreement**") which purported to, among other things, integrate the leases for the 36 Undelivered Aircraft, the Existing Leases, and certain other agreements amongst Spirit, AerCap, and certain other parties into a single agreement.

11.   On August 25, 2025, AerCap Ireland Limited sent written notice to the Company asserting certain events of default under the lease agreements for the Undelivered Aircraft (the "**Undelivered Leases**") and that it had terminated all of such lease agreements (the "**Lease Termination**").  Concurrently, AerCap sent written notice to the Company asserting identical

---

[3] Each leasing arrangement is structured so that the aircraft is held in trust, with Wilmington Trust as the "owner trustee" and a controlled affiliate of AerCap as the beneficial owner of the aircraft.  Under each lease, Wilmington Trust Company ("**Wilmington Trust**") is the lessor, acting in its capacity as "owner trustee" of the aircraft.  AerCap controls, through instructions to Wilmington Trust, all material decisions regarding the lessor's performance under each lease.

events of default under the leases related to the Existing Aircraft (the "**Default Notice**"). Spirit disputes the validity of the Lease Termination and the Default Notice

### The Global Restructuring Term Sheet Will Further the Debtors' Overall Restructuring Strategy

12. As explained in the First Day Declaration, Spirit intends to use the tools of chapter 11 to realize hundreds of millions of dollars in annual savings and lighten its balance sheet by shedding billions of dollars of liabilities. Spirit is committed to redesigning its network to focus its flying on key markets to provide more destinations, frequencies and enhanced connectivity in certain of its focus cities, while simultaneously reducing its presence in certain other cities. To do so, Spirit must right-size its fleet to match capacity with profitable demand, which will materially lower Spirit's debt and lease obligations and realize hundreds of millions of dollars in annual operating savings.

13. Optimizing Spirit's fleet is critical and time-sensitive, as manufacturer defects in a type of aircraft engine installed on many Spirit planes has led to a costly and extended grounding of many aircraft. As discussed further in the First Day Declaration, Spirit's fleet relies heavily on the new generation GTF engine. As of the Petition Date, Spirit had 38 GTF-powered aircraft (25 of which are Existing Leases leased from AerCap) that are grounded and awaiting slots for engine repairs, and it could be more than two years before all repairs have been completed. In addition, Spirit expects that nearly all 79 of its GTF engines will become grounded over the next two years due to these issues.

14. The assumption and rejection of leases as set forth in the Global Restructuring Term Sheet are an integral component of the restructuring strategy. Entering into the proposed Global Restructuring Term Sheet will allow Spirit to assume or reject leases on certain of these and other

5

aircraft, positioning Spirit for a rightsized fleet of operating aircraft that will allow Spirit to reduce its operating costs by hundreds of millions of dollars.

15. Spirit will assume the lease agreements related to the Existing Aircraft set forth on Schedule 1 to the Global Restructuring Term Sheet (the "**Assumed Leases**"). This would allow Spirit to cure all payment defaults in respect of each Assumed Lease and ensures that all other defaults are waived upon payment of such cure amounts.

16. Spirit will also reject the lease agreements relating to Existing Aircraft set forth on Schedule 2 to the Global Restructuring Term Sheet (the "**Rejected Leases**")—a number of which suffer from powdered metal-related issues and have the potential to carry up to ███████ in maintenance costs. The ability to reject such lease agreements, which account for a large portion of Spirit's inoperable aircraft, represents significant value standing alone. The Global Restructuring Term Sheet further contemplates agreement with respect to any damages claims arising from Spirit's rejection of the Rejected Leases and the return of the underlying aircraft. This avoids another potentially costly negotiation and achieves certainty with respect to the cure amounts now.

17. As to the Undelivered Leases covering the 36 lease agreements set forth on Schedule 3 to the Global Restructuring Term Sheet, the settlement contemplates that, to the extent that the Debtors retained any legal or equitable interests in the Undelivered Leases as of the Petition Date, such interests are deemed rejected as of the Petition Date.

18. Additionally, AerCap will consent to Spirit's entry into one or more amendments to the Spirit Purchase Agreement with Airbus to remove from it the aircraft identified on Schedule 4 to the Global Restructuring Term Sheet. To do so, Spirit and Airbus will modify the applicable purchase agreements, and Airbus and AerCap will amend their applicable purchase agreements to

reflect such changes in AerCap's order book. ███████████████████████

███████████████████████████████████████████████████████

███████████████████████

19. AerCap and Spirit will also enter into new lease agreements (the "**New Leases**"), on identical terms and conditions as the Undelivered Leases, except as set forth on Schedule 6 to the Global Restructuring Term Sheet. The delivery of the Aircraft in the New Leases will be ████████████████████████████████ with any changes to be mutually agreed. Entry into the New Leases will provide significant value to the Debtors, and will appropriately fit the needs of the Debtors and their reorganized fleet.

20. AerCap will be entitled to assert a general unsecured claim in the total aggregate amount of $696,461,890 against Spirit Airlines, LLC, which shall not be subject to setoff, subordination, or reduction. In consideration for the terms and conditions agreed by AerCap and Spirit, AerCap will also immediately make a liquidity payment to Spirit in an amount equal to $150.0 million.

21. The Global Restructuring Term Sheet represents a significant step forward in the Debtors' fleet optimization efforts by eliminating leases that are not cost-effective and assuming numerous favorable leases.

**The Global Restructuring Term Sheet Settles Claims and Disputes Between the Debtors and AerCap**

22. As explained in the First Day Declaration, the Debtors have been actively engaged with certain of its largest lessors as they work to optimize their fleet size and composition. While the Debtors intend to continue to work productively with all interested parties throughout the chapter 11 process, I understand that there is a risk of protracted litigation on key issues affecting

Spirit's fleet. Proceeding to litigation would be extremely costly to the estates and force the Debtors to expound substantial resources without a certain path to resolution.

23. First, the Global Restructuring Term Sheet contemplates settling all claims and disputes between the Debtors and AerCap, including, without limitation, claims that the Debtors believe to be viable on account of the AerCap's issuance of the Lease Termination and Default Notice, the validity of which Spirit disputes, and certain rejection damages claims of AerCap.

24. In addition to the above, Spirit faced potentially significant litigation related to (a) its ability to assume or reject some or all of these lease agreements for the AerCap Aircraft, (b) the enforceability of any cross-default provisions resulting therefrom, and (c) the impact of the Framework Agreement on assumption or rejection of a portion of AerCap's leases. After conferring with counsel, I am aware that the issues related to assumption or rejection of a portion of AerCap's leases implicated issues of first impression with an uncertain range of outcomes. Executing the Global Restructuring Term Sheet is in the best interest of the estates as it resolves these potential issues.

25. In my experience, any litigation is unpredictable, expensive, inconvenient, and time consuming. I have no reason to believe that above-referenced disputes would be any different. Weighing the uncertainty of success on the merits against the value provided by the transactions contained in the Global Restructuring Term Sheet, the Debtors believe that the Global Restructuring Term Sheet is highly favorable for the Debtors and their estates.

26. For these reasons, entering into the Global Restructuring Term Sheet will assist Spirit in realizing significant cost savings, and resolve various disputes and potential litigation, while simultaneously reducing its fleet and shedding associated embedded maintenance and return costs. In addition, through optimization of its fleet size, Spirit expects to significantly decrease its

costs associated with aircraft that are grounded due to engine and other equipment issues. The Global Restructuring Term Sheet, therefore, achieves the twin goals of realizing savings by optimizing the fleet count and shedding embedded maintenance and return costs and planes grounded.

**Sealing Motion**

27. While the Debtors recognize the need to disclose sufficient information and details when seeking the relief requested in the AerCap Motion, the Debtors must ensure that they protect certain key economic and commercial terms contained or referenced in the various aircraft lease agreements contemplated by the Global Restructuring Term Sheet (the "**Confidential Information**"). The Confidential Information includes, among other things, commercially sensitive financial terms and information. As a result, by this Motion, the Debtors seek to redact the Confidential Information from any publicly filed court documents.

28. Disclosure of the Confidential Information could reasonably be expected to cause harm to the Debtors and jeopardize their goals at a critical juncture in the Chapter 11 Cases in various ways. <u>First</u>, disclosing the Confidential Information would provide other aircraft counterparties insight into the Debtors' cost structure, negotiating positions, and fleet strategy. Counterparties that are currently negotiating with the Debtors over long-term leases, some for aircraft equipment similar to equipment discussed in the AerCap Motion, will insist on obtaining the most favorable economic terms provided to any other lessor. Moreover, the Debtors anticipate further negotiations with existing equipment and aircraft counterparties (and potential new counterparties) regarding the terms of long-term lease agreements, and the Debtors' negotiating position would be harmed if equipment and aircraft counterparties know the Confidential Information. Further, if the Debtors are not successful in protecting sensitive information and

commercial accommodations made by AerCap, it would hinder the Debtors' ability to enter into further agreements with, and obtain beneficial economic terms from, AerCap and other counterparties necessary to the Debtors' ongoing business.

29. <u>Second</u>, disclosure of the Confidential Information would provide rarely disclosed information to the Debtors' industry competitors. Given that fleet strategy is a core component of any commercial airline's business model, disclosure of this sensitive information would provide the Debtors' competitors with unique insight into the Debtors' costs and business strategy, which insight the Debtors themselves do not have respecting their competition. In an already challenging marketplace, this informational asymmetry would leave the Debtors at a competitive disadvantage relative to their peers.

30. <u>Finally</u>, disclosure of the Confidential Information could negatively implicate the relief requested in the AerCap Motion because AerCap may be unwilling to proceed with the transactions contemplated thereby if it is required to publicly disclose certain highly confidential commercial terms in the context of the recent negotiations with the Debtors. AerCap is an active participant in the airline industry and seeks to ensure that it is not disadvantaged by disclosure of commercial terms in this proceeding that could be used by other customers to disadvantage it in future business negotiations. For this reason, AerCap agrees with filing the Confidential Information under seal.

31. Based on the foregoing, because disclosure of the Confidential Information would likely harm the Debtors and their estates, the Debtors should be permitted to redact such Confidential Information from the filed versions of the AerCap Motion and this Declaration and submit unredacted versions thereof to the Court under seal.

32. Importantly, the proposed redactions are limited and tailored to protect only specific information whose publication could reasonably be expected to adversely affect the Debtors' ongoing and future negotiations or competition with their peers. The narrowly tailored nature of the redactions will serve to both minimize the quantity of redacted information while maximizing value for the Debtors' estates and economic stakeholders.

## Conclusion

33. For the reasons set forth above, I believe that (a) the relief requested in the Motions is fair, equitable, and reasonable and represents a sound exercise of the Debtors' business judgment and (b) the Court's authorization for the Debtors to (i) assume or reject various aircraft leases, (ii) enter into new aircraft leases, and (iii) receive an infusion of $150.0 million in new capital into the Debtors' businesses, is in the best interest of their estates and economic stakeholders and will further serve to maximize value for the benefit of all creditors

[*Signature page follows*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:   September 23, 2025
         New York, New York

*/s/ Fred Cromer*
Fred Cromer
Executive Vice President and Chief Financial Officer
Spirit Aviation Holdings, Inc.