**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **SPIRIT AVIATION HOLDINGS, INC.,** *et al.*, | Case No. 25-11897 (SHL) |
| Debtors.[1] | Jointly Administered |

**DECLARATION OF
FRED CROMER IN SUPPORT OF
THE DEBTORS' MOTION FOR ENTRY OF
(I) AN ORDER (A) APPROVING BIDDING
PROCEDURES AND BID PROTECTIONS
IN CONNECTION WITH THE SALE
OF CERTAIN AIRCRAFT, (B) APPROVING
THE FORM AND MANNER OF APPLICABLE
NOTICES AND (C) SCHEDULING AN AUCTION AND
SALE HEARING AND (II) AN ORDER (A) AUTHORIZING
THE SALE OF AIRCRAFT AND RELATED ASSETS FREE
AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES
AND OTHER INTERESTS AND (B) GRANTING RELATED RELIEF**

**Fred Cromer declares and says:**

1. I am the Executive Vice President and Chief Financial Officer of Spirit Aviation Holdings, Inc. ("**Holdings**"), a Delaware corporation that owns 100% of a certificated air carrier, Spirit Airlines, LLC (formerly Spirit Airlines, Inc.). Holdings and each of its direct and indirect subsidiaries (collectively with Holdings, "**Spirit**," the "**Debtors**," or the "**Company**"), is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"). I have served as Spirit's Executive Vice President and Chief Financial Officer since July 2024 and have more than three decades of experience in the aviation industry.

---

[1] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

2. As Spirit's Chief Financial Officer, I am generally familiar with its day-to-day operations, businesses, and financial affairs, and the circumstances leading up to the Chapter 11 Cases. I am over the age of 18 and authorized to submit this declaration (the "**Declaration**"), pursuant to rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), on behalf of the Debtors in support of the *Debtors' Motion for Entry of (I) An Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Certain Aircraft, (B) Approving the Form and Manner of Applicable Notices and (C) Scheduling an Auction and Sale Hearing and (II) An Order (A) Authorizing the Sale of Aircraft and Related Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests and (B) Granting Related Relief* (together with the exhibits and other attachments thereto, the "**Sale Motion**"), filed with the Court contemporaneously herewith, which I reviewed or had its contents explained to me.[2]

3. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of the relevant documents, information prepared or provided to me by employees of and/or professional advisors to the Company, and/or my opinion based upon experience, knowledge, and information concerning Spirit's operations. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

4. After thoroughly analyzing Spirit's fleet rationalization plan, business operations, and customer needs, Spirit has decided to sell the Aircraft as part of a competitive sale process. Selling the Aircraft will (i) enable Spirit to right-size its fleet to match its go-forward business and commercial strategy, (ii) significantly reduce costs associated with the Aircraft and (iii) improve

---

[2] Capitalized terms used but not immediately or otherwise defined herein shall have the meanings ascribed to them elsewhere here or in the Sale Motion, as applicable.

2

Spirit's financial position at this critical stage of the Chapter 11 Cases. I therefore believe that the Sale is in the best interest of the Debtors' estates and that the Court should grant the requested relief.

**Background**

5.  As explained in the *Declaration of Fred Cromer in Support of the Chapter 11 Proceedings and First Day Pleadings* [ECF No. 19] (the "**First Day Declaration**"), Spirit operates a leading value airline committed to delivering value to its guests by offering an enhanced travel experience with flexible, affordable options. Spirit flies only single-aisle Airbus aircraft, which are commonly referred to as "A320 family" aircraft. A320 family aircraft include the A319, A320, and A321 models, which have broadly common design and equipment but differ most notably in fuselage length, service range, and seat capacity.

6.  As explained in my First Day Declaration, Spirit intends to use the tools of chapter 11 to realize hundreds of millions of dollars in annual savings and lighten its balance sheet by shedding billions of dollars of liabilities. Spirit is committed to redesigning its network to focus its flying on key markets to provide more destinations, frequencies and enhanced connectivity in certain of its focus cities, while simultaneously reducing its presence in certain other cities. To do so, Spirit must right-size its fleet to match capacity with profitable demand, which will materially lower Spirit's debt and lease obligations and realize hundreds of millions of dollars in annual operating savings. To that end, Spirit, together with its advisors, has been actively analyzing its operations and fleet to determine the best course of action for the estates.

7.  In accordance with this analysis, Spirit has decided to sell the Aircraft, and related equipment, as set forth in Exhibit A to the Aircraft Sale Agreement. The Aircraft, are, I believe, not necessary for Spirit's continued operation or successful reorganization. The removal of the

3

Subject Aircraft from the fleet will significantly reduce related labor, maintenance, storage, flying, and other costs associated with each Aircraft. Importantly, as each of the Subject Aircraft is subject to existing financings, the sale of the Aircraft will eliminate a significant debt service burden, as part of the sale proceeds will be used to pay off these debts in full to release the associated liens on the Aircraft. In sum, I firmly believe the Sale will help Spirit to lower costs and match its commercial and network plan, thereby enhancing the Spirit's long-term viability and profitability.

8. The Sale of the Aircraft came following a robust marketing process. During the second and third quarters of 2024, Spirit conducted a multi-round aircraft marketing process exploring potential sale-leaseback financings and outright sale opportunities for the Aircraft. Spirit approached approximately a dozen active market participants with a goal of focusing on parties who have demonstrated capabilities to close larger-sized transactions on an expedited basis. After receiving offers, Spirit determined that an outright sale would be the preferred transaction structure and began providing feedback on each potential buyer's outright sales offer. In response to the feedback provided, Spirit initially reached an agreement with GA Telesis, LLC ("**GAT**"), under which Spirit agreed to sell 23 Airbus A320ceo/A321ceo aircraft. While some aircraft were delivered to GAT prior to the Petition Date, the purchase and sale obligations under the GAT sale agreement have since terminated in accordance with their terms.

9. Thereafter, Spirit refocused its attention to explore opportunities to expeditiously monetize the Aircraft and conducted a further fulsome marketing process. Based on both these processes, I believe that the transactions reflected in the Aircraft Sale Agreement represent the best offer for the Aircraft, taken as a whole, and are in the best interests of the Debtors based upon (among other factors and without limitation) (a) the foregoing described marketing process, (b) the Purchase Price provided in the Aircraft Sale Agreement, (c) the other terms set forth in the Aircraft

Sale Agreement, (d) the expected execution benefits from placing all Aircraft with a single buyer and (e) the operational right-sizing (including any related cost savings) that Spirit is able to implement based upon the terms of the Aircraft Sale Agreement. I believe that it is imperative that Spirit is able to continue implementation of the Sale and transfer of the Aircraft as soon as possible not only to avail Spirit of the immediate cost savings and financial benefit through the Sale, but also to stay as close to schedule as possible on the extremely complicated logistical exercise of preparing 20 aircraft for delivery in a particular order and timing to assist with technical operating requirements and to meet the inspection and delivery requirements set forth in the Aircraft Sale Agreement.

10. More specifically, the Bidding Procedures, as well as the APA, contemplate the sale of all of the Aircraft to a single buyer, which is critical to maximizing value for the Debtors' estates. Unlike a piecemeal sale to multiple purchasers, the coordinated sale of all Aircraft to one buyer provides substantial execution, logistical, and economic benefits that would otherwise be lost or significantly diminished if the Aircraft were sold piecemeal. By placing all Aircraft with a single purchaser, Spirit is able to coordinate the extremely complicated logistical exercise of, as noted above, preparing these Aircraft for Delivery in a particular order and timing that assists with technical operating requirements and that meets the required inspection and delivery requirements. The expected execution benefits from placing all Aircraft with a single buyer were among the key factors Spirit considered in determining to pursue the Sale of the Aircraft in the manner set forth in the Sale Motion.

11. In addition, I believe that the bid protections provided to the Stalking Horse Buyer and the procedures provided for with respect to the Auction are appropriate and will maximize value for Spirit. The Break-Up Fee provides a crucial incentive to the Stalking Horse Buyer to

5

serve as a stalking horse bidder which guarantees that Spirit will earn at least the Purchase Price agreed to with the Stalking Horse Bidder, which Purchase Price is, I believe, fair and reasonable consideration for the Aircraft under the circumstances. By contrast, if the Stalking Horse Buyer decided not to go forward with the Sale, Spirit would lose the benefits flowing from having the stalking horse bid, including higher bids that, absent such a floor, might not otherwise be realized. The Expense Reimbursement covers the costs and expenses incurred as a result of the extensive analysis, due diligence investigation, and negotiations undertaken by the Stalking Horse Buyer in connection with the Sale. I am also informed by counsel that the Break-Up Fee and Expense Reimbursement are in line with bidding incentives previously approved in other large chapter 11 cases in this jurisdiction. Thus, I believe that the Stalking Horse Buyer and the associated Break-Up Fee and Expense Reimbursement represent a material benefit to Spirit and its estates by increasing the likelihood that the best possible price for the Aircraft will be received. Moreover, notwithstanding the Stalking Horse Buyer and the Break-Up Fee and Expense Reimbursement, the Auction will ensure that other parties retain the opportunity to bid for the Aircraft to ensure that Spirit is able to obtain the best possible price for the Aircraft.

12. Moreover, I believe that the Aircraft Sale Agreement was negotiated at arms' length and in good faith, during which both parties were represented by sophisticated counsel. I am not aware of any indication of any fraud, collusion, or any attempt to take grossly unfair advantage of the negotiation process or of any similar conduct.

13. Overall, as the Court is aware, I believe that based on current market conditions, a significant reduction in Spirit's fleet size and related expenses is required to improve Spirit's financial position and flexibility. Selling the Aircraft will eliminate the significant costs associated

6

with retaining such aircraft that are not included in Spirit's revised business plan and will improve the Debtors' financial position for the benefit of all of the Debtors' stakeholders.

14. Spirit is also continuing to evaluate its fleet needs. As part of that ongoing analysis Spirit may determine that it is appropriate for additional aircraft and related equipment to be retired in the future.

## Conclusion

15. For the reasons set forth above, I believe that (a) the relief requested in the Sale Motion is fair, equitable, and reasonable and represents a sound exercise of the Debtors' business judgment and (b) the Court's authorization for the Debtors to enter into the Aircraft Sale Agreement, subject to the Auction, is in the best interest of their estates and economic stakeholders and will further serve to maximize value for the benefit of all creditors.

[*Signature page follows*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:   February 11, 2026
        New York, New York

                                      */s/ Fred Cromer*
                                      Fred Cromer
                                      Executive Vice President and Chief Financial Officer
                                      Spirit Aviation Holdings, Inc.