| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**SOUTHERN DISTRICT OF NEW YORK** | **Chapter 11** |
| In re: | **Case No. 25-11897 (SHL)** |
| **SPIRIT AVIATION HOLDINGS, INC.**, *et al.*, | **Jointly Administered** |
| Debtors.[1] | |

## ORDER (A) APPROVING BIDDING
## PROCEDURES AND BID PROTECTIONS IN
## CONNECTION WITH THE SALE OF CERTAIN AIRCRAFT,
## (B) APPROVING THE FORM AND MANNER OF APPLICABLE
## NOTICES AND (C) SCHEDULING THE AUCTION AND SALE HEARING

Upon the *Motion for Entry of (I) An Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Certain Aircraft and Related Assets, (B) Approving the Form and Manner of Applicable Notices and (C) Scheduling the Auction and Sale Hearing and (II) An Order (A) Authorizing the Sale of Aircraft and Related Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests and (B) Granting Related Relief* (the "**Motion**")[2] of Spirit Aviation Holdings, Inc. and its direct and indirect subsidiaries (collectively, the "**Debtors**" or "Spirit"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), for entry of an order (this "**Order**"): (i) establishing bidding procedures as set forth in Exhibit 1 hereto (the "**Bidding Procedures**") to govern the sale (the "**Sale**") of Spirit's ownership interests in the Aircraft, as such assets are identified in the certain Aircraft Sale Agreement, dated February 9, 2026 (the "**Aircraft Sale Agreement**"), by and among Spirit and the Stalking Horse Buyer, a copy of

---

[1]   The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752).  The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

which is attached hereto as <u>Exhibit 2</u>; (ii) approving, as bid protections in connection therewith, the Break-Up Fee and the Expense Reimbursement (each as defined in the Aircraft Sale Agreement, and collectively, the "**Bid Protections**") to be paid to the Stalking Horse Buyer pursuant to, and solely to the extent required by, the terms and conditions set forth in the Aircraft Sale Agreement; (iii) scheduling an auction to sell the Aircraft (the "**Auction**"); (iv) scheduling a hearing to approve the sale of the Aircraft to the Stalking Horse Buyer or the maker(s) of the highest or otherwise best Qualifying Bid(s) at the Auction in accordance with the Bidding Procedures (the "**Sale Hearing**"); and (v) approving the form and manner of notice of the Sale, the Bidding Procedures, the Auction and the Sale Hearing (as described below, respectively, the "**Sale Notice**" and the "**Publication Notice**"); and after due deliberation and the Court having determined that the relief requested in the Motion is in the best interests of Spirit, the Debtors and their respective estates,

### THE COURT HEREBY FINDS THAT:[3]

I.      This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.   This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

II.      The bases for the relief requested herein are sections 363(b), 363(f) and 363(m), 503 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**"), Rules 2014-1, 6004-1 and 6006-1 of the Local Rules for the United States Bankruptcy

---

[3]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Court for the Southern District of New York (the "**Local Rules**") and the *Amended Guidelines for the Conduct of Asset Sales, General Order M-383 of the Bankruptcy Court for the Southern District of New York* (the **"Sale Guidelines"**).

III.        Notice of the Motion has been provided to the following parties (or their counsel) (collectively, the "**Sale Notice Parties**"): (a) the U.S. Trustee; (b) the Committee; (c) the Securities and Exchange Commission; (d) the Internal Revenue Service; (e) the United States Attorney's Office for the Southern District of New York; (f) the Department of Transportation; (g) the Stalking Horse Buyer and its counsel; (h) certain holders of the Debtors' secured notes; (i) each agent or trustee under the Debtors' secured notes indenture or revolving credit facility; (j) all entities known to have expressed a bona fide interest in a transaction with respect to the Aircraft; (k) all entities known to have asserted any lien, claim, or encumbrance in or upon any of the Aircraft; and (l) any other party that is entitled to notice under the *Court's Order Implementing Certain Notice and Case Management Procedures* [ECF No. 61].  A copy of the Motion was also be made available on the Debtors' case information website located at https://dm.epiq11.com/SpiritAirlines.

IV.        Spirit has articulated good and sufficient reasons for this Court to grant the relief requested in the Motion, including without limitation, approval of the Bidding Procedures, the Break-Up Fee and the Expense Reimbursement, subject to the terms and conditions set forth in the Aircraft Sale Agreement.

V.        The Bid Protections, which shall only be payable if a Qualifying Bid Protections Event or a Seller Cancellation Event (each as defined in the Aircraft Sale Agreement) has occurred, are (i) actual and necessary costs and expenses of preserving Spirit's estate, within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code, (ii) commensurate to the real

and substantial benefit conferred upon Spirit's estates by the Stalking Horse Buyer, (iii) reasonable and appropriate, in light of the size and nature of the proposed sale transaction and comparable transactions, the commitments that have been made and the efforts that have been and will be expended by Spirit and (iv) necessary to induce the Stalking Horse Buyer to continue to pursue the Sale contemplated in the Aircraft Sale Agreement and to continue to be bound by the Aircraft Sale Agreement.

VI.    Spirit's agreement to provide the Bid Protections also induced the Stalking Horse Buyer to submit a bid that will serve as a minimum floor bid on which Spirit, its creditors and other bidders may rely.  The Stalking Horse Buyer has provided a material benefit to Spirit and its creditors by increasing the likelihood that the best possible price for the Aircraft will be received.  Accordingly, the Bid Protections are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtors' estates.

VII.    The Sale Notice and the Publication Notice are reasonably calculated to provide all interested parties with timely and proper notice of the Sale, the Sale Hearing and the Auction.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    The Bidding Procedures attached hereto as Exhibit 1 are hereby approved and incorporated herein by reference.  Spirit is authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

2.    All objections to the relief requested in the Motion that have not been withdrawn, waived or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled.

3.    The following dates and deadlines are hereby approved, subject to the right of the

4

Debtors to modify the following dates so long as notice is given in accordance with the terms of

the Bidding Procedures:

| Action | Description | Deadline |
|---|---|---|
| **Filing of the Sale Notice** | The deadline by which the Debtors will file the Sale Notice with the Bankruptcy Court. | Within two business days after entry of the Bidding Procedures Order |
| **Filing of the Publication Notice** | The deadline by which the Debtors will publish the Publication Notice. | Within three business days after entry of the Bidding Procedures Order, or as soon as reasonably practical thereafter |
| **Potential Bid Package Deadline** | The deadline by which a Potential Bidder must deliver (unless previously delivered or otherwise waived by the Debtors) its Potential Bid Package to be actually received by Counsel to the Debtors and the Financial Advisor to the Debtors pursuant to the Bidding Procedures. | **Wednesday, March 25, 2026** |
| **Bid Deadline** | The deadline by which all binding Bids must be actually received by Counsel to the Debtors and the Financial Advisor to the Debtors pursuant to the Bidding Procedures. | **Wednesday, April 1, 2026** |
| **Determination of Qualified Bids** | The deadline by which the Debtors will determine which Bids are Qualified Bids and will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder. | **Monday, April 6, 2026** |
| **Notification and Provision of Qualified Bids and Baseline Bid** | The deadline by which Spirit shall provide each Qualified Bidder (including the Stalking Horse Buyer), the Committee and the DIP Lenders with (i) written notice of the Auction, (ii) a copy of each Qualified Bid and (iii) notice of which Qualified Bid Spirit has determined constitutes the Baseline Bid. | **Wednesday, April 15, 2026**<br><br>At least two business days before the Auction |
| **Auction** (if necessary) | The date and time of the Auction, which will be held on April 20, 2026 at the office of Debevoise & Plimpton LLP (66 Hudson Boulevard East, New York, NY 10001) at 10:00 a.m. (prevailing Eastern Time) | **Monday, April 20, 2026**<br><br>At least two business days after Notification and Provision of Qualified Bids and Baseline Bid |

| **Notice of Successful Bidder** | The deadline by which the Debtors will file on the docket a notice identifying the Successful Bidder and the key terms of the applicable agreements. | **Tuesday, April 21, 2026**<br><br>Within two business days following the closing of the Auction (if any) |
|---|---|---|
| **Sale Objection Deadline** | The deadline for any objections to the proposed Sale to the Successful Bidder. | **Wednesday, April 22, 2026 at 4:00 p.m. (prevailing Eastern Time)** |
| **Sale Hearing** | The hearing before the Bankruptcy Court on whether to grant the relief sought in the Sale Motion. | **Thursday, April 23, 2026 at 11:00 a.m. (prevailing Eastern Time)** |

4.     The Sale Notice, substantially in the form attached hereto as Exhibit 3, is hereby approved and, as provided above, will be provided within two business days of entry of this Order to the Sale Notice Parties.  A copy of Sale Notice will also be made available on the Debtors' case information website located at https://dm.epiq11.com/SpiritAirlines.

5.     As provided above, on or before three business days of entry of this Order, Spirit shall publish the Publication Notice, substantially in the form attach hereto as Exhibit 4, in the international edition of the *New York Times* or equivalent international publication, with any modifications necessary for ease of publication.

6.     As further described above and in the Bidding Procedures, Spirit shall conduct the Auction on April 20, 2026 at 10:00 a.m. (prevailing Eastern Time) if at least one Qualifying Bid (as defined in the Bidding Procedures) in addition to the Bid of the Stalking Horse Buyer is timely received.

7.     The Break-Up Fee, in an amount equal to 3% of the Purchase Price (which amount equals $16,005,000), and the Expense Reimbursement, up to a cap of $2,500,000, are hereby approved solely in accordance with the terms and conditions set forth in the Aircraft Sale Agreement.  If the Stalking Horse Buyer Overbids at the Auction, a "credit" for the amount of

the Bid Protections will automatically be added to such Overbid amount.  For the avoidance of doubt, (i) the Stalking Horse Buyer is not deemed to waive the Bid Protections by Overbidding (as defined in the Bidding Procedures) at the Auction and (ii) the full amount of the $2,500,000 Expense Reimbursement shall be utilized to calculate any Overbid amount.

8.      If the Stalking Horse Buyer becomes entitled to receive the Bid Protections in accordance with the terms described in the Aircraft Sale Agreement and this Order, then the Stalking Horse Buyer shall be, and hereby is, granted an allowed administrative claim in Spirit's Chapter 11 Cases equal to such amount and such amount shall be paid, in cash, as provided in the Aircraft Sale Agreement.

9.      In the event of a Qualifying Bid Protections Event or a Seller Cancellation Event, upon the actual payment of the Bid Protections to the Stalking Horse Buyer pursuant to section 5.6 of the Aircraft Sale Agreement, such payment shall be the sole and exclusive remedy of the Stalking Horse Buyer or its Affiliates against the Debtors in connection with such termination. For the avoidance of doubt, in no event shall the Debtors have any liability to the Stalking Horse Buyer or its Affiliates in excess of the Bid Protections in the event of a Qualifying Bid Protections Event or a Seller Cancellation Event, and any claim, right or cause of action by the Stalking Horse Buyer against Spirit or its respective Affiliates for any termination of the Aircraft Sale Agreement in excess of these amounts is hereby fully waived, released and forever discharged.  Similarly, the Debtors' sole remedy against the Stalking Horse Buyer for the Stalking Horse Buyer's default with any of the Aircraft shall be up to the amount of the Good Faith Deposit allocable to such Aircraft and in no event shall the Stalking Horse Buyer have any liability to the Debtors or any party for any amounts above such allocable portion of the Good Faith Deposit and any claims for amounts in excess of such allocable portion of the Good Faith

Deposit are fully waived, released and discharged.

10.     No person or entity other than the Stalking Horse Buyer shall, pursuant to the Bidding Procedures or otherwise, be entitled to any expense reimbursement, break-up fees, "topping," termination or other similar fee or payment in connection with the sale of the Aircraft pursuant to the terms of this Order.

11.     As provided above, the Sale Hearing will be conducted on April 23, 2026 at 11:00 a.m. (prevailing Eastern Time) before the Honorable Sean H. Lane.  At the Sale Hearing, Spirit will seek the entry of an order of this Court approving and authorizing the Sale to the Stalking Horse Buyer or the maker of the highest or otherwise best offer for all of the Aircraft determined at the Auction pursuant to the Bidding Procedures, as applicable.  Absent irregularities in the conduct of the Auction, or reasonable and material confusion during the bidding process, the Court will not consider bids made after the Auction has been closed.  The Sale Hearing may be adjourned or rescheduled without notice other than by an announcement of the adjourned date at the Sale Hearing.

12.     Objections, if any, to the relief requested at the Sale Hearing must comply with the Bankruptcy Rules and the Local Rules, and shall be filed with the Bankruptcy Court and shall be served upon the Sale Notice Parties, so as to be actually received no later than April 22, 2026 at 4:00 p.m. (prevailing Eastern Time).

13.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

14.     This Court shall retain jurisdiction to resolve any dispute relating to the interpretation of the terms and conditions of the Aircraft Sale Agreement and this Order.  To the extent any provisions of this Order shall be inconsistent with the Motion, the terms of this Order

8

shall control.


Dated: March 12, 2026
White Plains, New York

_**/s/ Sean H. Lane**_

THE HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE

## Exhibit 1

**Bidding Procedures**

DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard East
New York, New York 10001
Tel.: (212) 909-6000
Jasmine Ball
Elie J. Worenklein

*Fleet Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **SPIRIT AVIATION HOLDINGS, INC.**, *et al.*, | **Case No. 25-11897 (SHL)** |
| **Debtors.**[1] | **Jointly Administered** |

## BIDDING PROCEDURES FOR THE SALE OF AIRCRAFT

On August 29, 2025, Spirit Aviation Holdings, Inc. and its direct and indirect subsidiaries (collectively, the "**Debtors**" or "**Spirit**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Court**").

On [ ], 2026, the Court entered that certain *Order (A) Approving Bidding Procedures and Bid Protections in Connection With the Sale of Certain Aircraft, (B) Approving the Form and Manner of Applicable Notices and (C) Scheduling an Auction and Sale Hearing* (the "**Bidding Procedures Order**"), which approved, among other things, (a) the following procedures (the "**Bidding Procedures**")[2] which will govern the sale (the "**Sale**") of Spirit's ownership interests

---

[1]   The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752).  The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

[2]   All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order or the *Debtors' Motion for Entry of (I) An Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Aircraft and Related Assets, (B) Approving the Form and Manner of Notice of the Sale, the Bidding Procedures, the Auction and the Sale Hearing  and (C) Scheduling an Auction and Sale Hearing and (II) an Order (A) Authorizing the Sale of Aircraft and Related Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests and (B) Granting Related Relief* (the "**Sale Motion**") [ECF No. [  ]], as applicable.

in the Aircraft, as such assets are defined in the Aircraft Sale and Purchase Agreement, dated February 9, 2026 (the "**Aircraft Sale Agreement**" or the "**APA**"), by and among Spirit Airlines, LLC and CSDS Asset Management LLC (the "**Stalking Horse Buyer**"), a copy of which is attached hereto as <u>Exhibit 2</u> to <u>Exhibit A</u>; (b) approving as bid protections in connection with the Sale, the Break-Up Fee and the Expense Reimbursement (collectively, the "**Bid Protections**"); (c) scheduling an auction to sell the Aircraft (the "**Auction**"); (d) scheduling a hearing to approve the Sale of the Aircraft free and clear of all liens (excluding any Buyer's Liens), claims, encumbrances and other interests (collectively, the "**Claims**"); and (e) approving the form and manner of notice of the Sale, the Bidding Procedures, the Auction and the Sale Hearing, substantially in the forms attached hereto as <u>Exhibit 3</u> to <u>Exhibit A</u> (the "**Sale Notice**") and <u>Exhibit 4</u> to <u>Exhibit A</u> (the "**Publication Notice**").  *All interested bidders should carefully read the Bidding Procedures Order and these Bidding Procedures in their entirety.*

## <u>Bidding Procedures</u>

These Bidding Procedures set forth the process by which the Debtors are authorized to conduct a marketing process and, if necessary, an Auction, for the Sale of the Aircraft. Following entry of the Bidding Procedures Order, Spirit is authorized to engage in any and all discussions, direct and indirect, with third parties regarding such Sale of the Aircraft.

The Debtors will consider each Bid (as defined below) for the purchase of all of the Aircraft to the person or entity making the highest or otherwise best Bid for all of the Aircraft through the process contained in these Bidding Procedures.  As contemplated by and incorporated in the Bidding Procedures Order, the Bidding Procedures provided herein shall be the exclusive mechanism governing the Sale.  Throughout the process, the Debtors and their advisors will consult with the official committee of unsecured creditors (the "**Committee**") and their advisors and the lenders providing debtor-in-possession financing for the Debtors (the "**DIP Lenders**") and their advisors (the Committee and the DIP Lenders, each a "**Consultation Party**" and collectively, the "**Consultation Parties**") as provided in Section IX of these Bidding Procedures.

**The Stalking Horse Purchase Agreement.**

On February 9, 2026, the Debtors entered into the Aircraft Sale Agreement with the Stalking Horse Buyer (such bid, the "**Stalking Horse Bid**").  Subject to court approval, pursuant to the Aircraft Sale Agreement, the Stalking Horse Buyer has committed to pay the Purchase Price (as defined in the Aircraft Sale Agreement) to acquire the Aircraft free and clear of all liens, claims or encumbrances (other than Buyer's Liens, as defined in the Aircraft Sale Agreement).  In the event of a Qualifying Bid Protections Event or a Seller Cancellation Event, each as defined in the APA, the Debtors will pay the Stalking Horse Buyer (at the time required under the APA) a break-up fee in the amount equal to 3% of the Purchase Price (which amount equals $16,005,000) (the "**Break-Up Fee**"), and reimburse the Stalking Horse Buyer for its reasonable and documented expenses in conjunction with the Stalking Horse Bid up to a maximum amount of $2,500,000 (the "**Expense Reimbursement**," and together with the Break-Up Fee, the "**Bid Protections**").

I.      **KEY SALE PROCESS DATES**

These Bidding Procedures provide interested parties with the opportunity to qualify for and participate in the Auction to be conducted by the Debtors and to submit competing Bids for the Aircraft.  Upon entry of the Bidding Procedures Order, the Debtors shall assist interested parties in conducting their respective due diligence investigations and shall accept bids until April 1, 2026 (the "**Bid Deadline**").  The other key dates for the marketing process are as follows:

| Action | Description | Deadline |
|---|---|---|
| **Filing of the Sale Notice** | The deadline by which the Debtors will file the Sale Notice with the Bankruptcy Court. | Within two business days after entry of the Bidding Procedures Order |
| **Filing of the Publication Notice** | The deadline by which the Debtors will publish the Publication Notice. | Within three business days after entry of the Bidding Procedures Order, or as soon as reasonably practical thereafter |
| **Potential Bid Package Deadline** | The deadline by which a Potential Bidder must deliver (unless previously delivered or otherwise waived by the Debtors) its Potential Bid Package to be actually received by Counsel to the Debtors and the Financial Advisor to the Debtors pursuant to the Bidding Procedures. | **Wednesday, March 25, 2026** |
| **Bid Deadline** | The deadline by which all binding Bids must be actually received by Counsel to the Debtors and the Financial Advisor to the Debtors pursuant to the Bidding Procedures. | **Wednesday, April 1, 2026** |
| **Determination of Qualified Bids** | The deadline by which the Debtors will determine which Bids are Qualified Bids and will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder. | **Monday, April 6, 2026** |
| **Notification and Provision of Qualified Bids and Baseline Bid** | The deadline by which Spirit shall provide each Qualified Bidder (including the Stalking Horse Buyer), the Committee and the DIP Lenders with (i) written notice of the Auction, (ii) a copy of each Qualified Bid and (iii) notice of which Qualified Bid Spirit has determined constitutes the Baseline Bid. | **Wednesday, April 15, 2026**<br><br>At least two business days before the Auction |

| | | |
|---|---|---|
| **Auction** (if necessary) | The date and time of the Auction, which will be held on April 20, 2026 at the office of Debevoise & Plimpton LLP (66 Hudson Boulevard East, New York, NY 10001) at 10:00 a.m. (prevailing Eastern Time) | **Monday, April 20, 2026**<br><br>At least two business days after Notification and Provision of Qualified Bids and Baseline Bid |
| **Notice of Successful Bidder** | The deadline by which the Debtors will file on the docket a notice identifying the Successful Bidder and the key terms of the applicable agreements. | **Tuesday, April 21, 2026**<br><br>Within two business days following the closing of the Auction (if any) |
| **Sale Objection Deadline** | The deadline for any objections to the proposed Sale to the Successful Bidder. | **Wednesday, April 22, 2026 at 4:00 p.m. (prevailing Eastern Time)** |
| **Sale Hearing** | The hearing before the Bankruptcy Court on whether to grant the relief sought in the Sale Motion. | **Thursday, April 23, 2026 at 11:00 a.m. (prevailing Eastern Time)** |

## II.    PUBLIC ANNOUNCEMENT OF AUCTION

Within two business days after entry of the Bidding Procedures Order, the Debtors shall serve the Sale Notice on the Sale Notice Parties. In addition, within three business days after entry of the Bidding Procedures Order (or as soon as reasonably practical thereafter), the Debtors shall (a) publish the Publication Notice in the international edition of the *New York Times* or equivalent international publication, with any modifications necessary for ease of publication, to provide notice to any other potential interested parties and (b) post the Sale Notice, the Bidding Procedures Order (as entered) and the Bidding Procedures on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/SpiritAirlines.

## III.    APPLICATION OF POTENTIAL BIDDERS

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, each interested person or entity (other than the Stalking Horse Buyer) (the "**Potential Bidder**") must deliver (unless previously delivered or otherwise waived by the Debtors) the following materials (the "**Potential Bid Package**") to be actually received by Counsel to the Debtors and the Financial Advisor to the Debtors (each as defined below) on or before March 25, 2026 (the "**Potential Bid Package Deadline**"):

     i.    an executed non-binding indication of interest (an "**Indication of Interest**"), which shall include the following information, in addition to certain indicative information as set forth in a separate schedule to be provided by Spirit upon request: (a) confirmation that the party is interested in acquiring all of the Aircraft, (b) the proposed purchase price for the proposed transaction for all of the Aircraft, including by identifying separately any cash and non-cash components

of the proposed transaction consideration, which non-cash components shall be limited only to assumption of liabilities and/or credit bids, and (c) any proposed conditions to consummating the transaction;

ii.  an executed confidentiality agreement (a "**Confidentiality Agreement**") in a form and substance reasonably acceptable to Spirit;

iii.  evidence, including audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement reasonably acceptable to Spirit), sufficient to establish the financial wherewithal of the interested party to complete the contemplated transactions and, to the extent the interested party will rely upon the financial wherewithal of an affiliate, bid partner or other sponsor (the "**Sponsor**"), evidence sufficient to establish the financial wherewithal and intent of the Sponsor to provide appropriate financial support; and

iv.  any other evidence that Spirit may reasonably request to evaluate the person's or the entity's fitness to participate in the bidding process or ability to timely acquire the Aircraft.

Each Potential Bid Package must be sent via email to:

i.  <u>**Counsel to the Debtors**</u>.
   Debevoise & Plimpton LLP
   66 Hudson Boulevard East
   New York, NY 10001
   Attn: Jasmine Ball (jball@debevoise.com), Elie Worenklein (eworenklein@debevoise.com).

   Davis Polk & Wardwell LLP
   450 Lexington Avenue
   New York, NY 10017
   Attn: Marshall S. Huebner (marshall.huebner@davispolk.com), Darren S. Klein (darren.klein@davispolk.com), Christopher S. Robertson (christopher.robertson@davispolk.com), Joseph W. Brown (joseph.w.brown@davispolk.com).

ii.  <u>**Financial Advisor to the Debtors**</u>
   FTI Capital Advisors
   1301 McKinney St, Suite 3500
   Houston, TX 77010 USA
   Attn: Marc Bilbao (Marc.Bilbao@fticonsulting.com), David Fowkes (David.Fowkes@fticapitaladvisors.com), Michael Yoshimura (Michael.Yoshimura@fticonsulting.com), Stephen Strange (Stephen.Strange@fticonsulting.com), Scott Farnsworth (Scott.Farnsworth@fticonsulting.com).

The Debtors shall provide the Consultation Parties, within one business day of receipt, copies of all Potential Bid Packages received by the Debtors on a "professional eyes only" basis; *provided* that they agree to treat such Potential Bid Packages and any related information as confidential and shall not publicly disclose such information without the written consent of the Debtors, which shall not be unreasonably withheld.

## IV.    DETERMINATION AND NOTIFICATION OF POTENTIAL BIDDERS

### A.    Determination of Potential Bidders

Spirit, after consultation with the Consultation Parties, shall determine whether a Potential Bidder (other than the Stalking Horse Buyer) may participate in the auction (the "**Auction**") based upon Spirit's evaluation of the content of the Potential Bid Package for all of the Aircraft submitted by such party as well as other commercial and competitive considerations.

Notwithstanding anything to the contrary in these Bidding Procedures, all substantive communications related to Bids or the Sale between or amongst Potential Bidders (including the Stalking Horse Buyer) shall be conducted exclusively through the Debtors and the Debtors' advisors.  Communications between and amongst Potential Bidders (including the Stalking Horse Buyer) is expressly prohibited unless the Debtors expressly consent in writing to such communication; *provided* that, if such consent is given, a representative of the Debtors shall be present for or party to any such communications (unless otherwise agreed by the Debtors in their sole discretion).  There shall be no communications regarding the Debtors' sale process between Potential Bidders, on the one hand, and the Consultation Parties, on the other hand, unless the Debtors have previously authorized such communication in writing (email being sufficient).  The Debtors reserve the right, in their reasonable business judgment and in consultation with the Consultation Parties, to disqualify any Potential Bidders that have communications between and amongst themselves, or with a Consultation Party, without the Debtors' written consent.

### B.    Notification of Potential Bidders

Upon the determination by Spirit, after consultation with the Consultation Parties, that a party qualifies as a Potential Bidder, Spirit shall immediately notify the party in writing, with a copy to the advisors to Consultation Parties, and provide such Potential Bidder with access to (i) the same confidential evaluation materials and information provided by Spirit to each other Potential Bidder and (ii) such other financial information and other data related to Spirit and the Aircraft as the Potential Bidder may reasonably request, *provided*, *however*, that, unless reasonably requested by a Potential Bidder, Spirit shall not be obligated to provide to any Potential Bidder more information or more extensive due diligence access than that provided to the Stalking Horse Buyer before the Stalking Horse Buyer's entry into the Aircraft Sale Agreement; and, *provided*, *further*, that Spirit shall not be required to provide to any Potential Bidder any information or due diligence access after the Bid Deadline.

## V.    BID SUBMISSION; DETERMINING QUALIFIED BIDS AND QUALIFIED BIDDERS

### A.    Submission of a Bid

To submit an offer, solicitation or proposal for the purchase of all of the Aircraft (a "**Bid**"), the Potential Bidder must submit a Bid in writing via email to Counsel to the Debtors and the Financial Advisor to the Debtors, whose contact information is provided in Section III above, so as to be actually received on or before the Bid Deadline, or such other date as may be agreed to by the Debtors and the Stalking Horse Buyer after consulting with the Consultation Parties.[3]

### B.    Terms and Conditions of a Qualified Bid

In order to be deemed a "**Qualified Bid**" and for a Potential Bidder (other than the Stalking Horse Buyer) to be deemed a "**Qualified Bidder**", the Bid submitted by the Potential Bidder must:

(i)    state that the Potential Bidder offers to purchase all of the Aircraft;

(ii)    include a letter stating that the Potential Bidder's offer is irrevocable and binding until the closing of the Sale if such Potential Bidder is the Successful Bidder (as defined below), and that the Potential Bidder agrees to serve as a Back-Up Bidder (as defined below) if such Potential Bidder's Bid is selected as the next highest or otherwise next best bid after the Successful Bid (as defined below);

(iii)    be accompanied by a clean and duly executed and a marked purchase agreement reflecting changes against the Aircraft Sale Agreement, on terms substantially similar to (or better than) the Aircraft Sale Agreement, including Escrow Agent mechanics, Excluded Equipment and removal/reimbursement, Technical Acceptance and Aircraft Non-Sale Event provisions, "AS-IS, WHERE-IS" language, transfer tax allocation and insurance;

(iv)    be accompanied by a deposit, funded to the Escrow Agent, in an amount equal to not less than ten percent (10%) of the aggregate purchase price of the Bid (the "**Good Faith Deposit**") to be held in an escrow account to be identified and established by the Debtors;

(v)    be likely to result in a value for Spirit, in Spirit's reasonable business judgment after consultation with the Consultation Parties, that is, in total,

---

[3]    The Debtors shall share all Bids with the Consultation Parties within one business day of receipt.

more than the sum of (a) the Purchase Price proposed by the Stalking Horse Buyer, plus (b) the Break-Up Fee set at 3% of the Purchase Price (which amount equals $16,005,000), plus (c) the Expense Reimbursement cap of $2,500,000 plus (d) the Initial Overbid Amount of $1,000,000;

(vi)    contain such financial and other information that will allow Spirit in its sole and absolute discretion to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the transactions contemplated by the Sale;

(vii)   represent that the Potential Bidder will not request or assert entitlement to any expense reimbursement, break-up fees, "topping," termination or other similar fees or payments in connection with the sale of the Aircraft;

(viii)  fully disclose the identity of any Sponsor (if any) and each other entity that will be a purchaser of the Aircraft or otherwise participate in connection with such Bid, together with the complete terms of any such participation;

(ix)    be free from any due diligence or financing contingencies of any kind, and include a written acknowledgment and representation that the Potential Bidder: (a) has had an opportunity to conduct any and all due diligence regarding the Aircraft prior to making its offer; (b) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or such assets in making its Bid; and (c) did not and will not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Aircraft or the completeness of any information provided in connection therewith or at an Auction;

(x)     include evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body), as well as the board of directors or comparable governing body of any Sponsor or other bid participant, with respect to the submission, execution, delivery and consummation of the Sale pursuant to the terms of the Aircraft Sale Agreement (as proposed to be modified by the Bid);

(xi)    (a) include a description of all governmental, licensing, regulatory, or other approvals or consents that are required to consummate the proposed Sale, together with evidence satisfactory to the Debtors, of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals; and (b) set forth an estimated timeframe for (I) obtaining any required governmental, licensing, regulatory, or other approvals or consents for consummating

any proposed Sale and (II) the Potential Bidder's expected Delivery Dates for the Aircraft subject to the APA, which must be reasonably likely to be met, if selected, within a timeframe acceptable to the Debtors; and

(xii)    (a) acknowledge in writing that the Potential Bidder has not engaged in any collusion with respect to any Bids or the transactions contemplated herein, specifying that it did not agree with any other Potential Bidders to control price or otherwise with respect to any of the Aircraft and processes contemplated by the Bidding Procedures and (b) contain language agreeing not to engage in any collusion with respect to any Bids, the Auction, or the transaction for the Sale of all of the Aircraft, *provided*, *however*, that this requirement does not restrict Potential Bidder(s) from working with other Potential Bidder(s) with the Debtors' prior written consent (email being sufficient), subject to the submission and receipt of one Bid for all of the Aircraft.

**FOR THE AVOIDANCE OF DOUBT, POTENTIAL BIDDERS SHOULD BE AWARE THAT ANY POTENTIAL BIDDER THAT DOES NOT SUBMIT A QUALIFIED BID BY THE BID DEADLINE MAY NOT BE ALLOWED TO (1) PARTICIPATE IN THE AUCTION OR (2) SUBMIT ANY OFFER AFTER THE BID DEADLINE OR AFTER THE AUCTION.**

## C.    Qualified Bidders

### 1.    Stalking Horse Buyer

Notwithstanding anything in these Bidding Procedures to the contrary, the Stalking Horse Buyer is deemed a Qualified Bidder, and the Stalking Horse Buyer's Bid shall be deemed a Qualified Bid for all applicable purposes under these Bidding Procedures with respect to the Sale, any Auction, or otherwise.  No further action or documentation shall be required from the Stalking Horse Buyer to participate in the Auction.

### 2.    Other Potential Bidders

After Spirit has determined that a Bid satisfies each of the conditions set forth in part III.A., above, Spirit shall promptly notify the Potential Bidder who submitted such Qualified Bid that it has been selected as a Qualified Bidder, which notification shall occur on or before April 6, 2026; *provided*, *however*, that Spirit reserves the right to reject any Bid (other than the Stalking Horse Buyer's offer pursuant to the Aircraft Sale Agreement) if Spirit determines that such Bid is inadequate or insufficient or Spirit determines that such Bid is not in conformity with the requirements of the Bankruptcy Code or any related rules or is otherwise contrary to the best interests of Spirit and its estate; *provided*, *further*, that Spirit reserves the right to accept a Bid as a Qualified Bid if Spirit determines that such Bid substantially complies with the requirements set forth herein.

Promptly after determining that any Potential Bidder who has submitted a Bid does not appear to qualify as a Qualified Bidder, Spirit shall notify such Potential Bidder of this determination and in good faith seek to resolve any impediment to the Potential Bidder becoming a Qualified Bidder.

### 3. Negotiation and Modification of Qualified Bids

Between the Bid Deadline and the Auction, Spirit may discuss, negotiate or seek clarification of any Qualified Bid from a Qualified Bidder. Without the written consent of Spirit a Qualified Bidder may not modify, amend or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of the Qualified Bid for Spirit, during the period that such Qualified Bid remains binding as specified herein; *provided*, *however*, that any Qualified Bid may be improved at the Auction as set forth herein.

### 4. Evaluation of Qualified Bids

The Debtors shall evaluate all Qualified Bids in consultation with the Consultation Parties and identify the Qualified Bid that constitutes the highest or otherwise best Qualified Bid for all of the Aircraft.

When determining the highest or otherwise best Qualified Bid as compared to other Qualified Bids, the Debtors, after consultation with the Consultation Parties, may consider the following factors in addition to any other factors that the Debtors, after consultation with the Consultation Parties, deem appropriate (collectively, the "**Bid Assessment Criteria**"):

i. the number, type and nature of any changes to the form of Aircraft Sale Agreement, if any, requested by the Qualified Bidder;

ii. the amount and nature of the total consideration;

iii. the likelihood of the Qualified Bidder's ability to consummate the Sale for all of the Aircraft and the timing thereof;

iv. the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid;

v. any regulatory requirements applicable to the Sale; and

vi. the tax consequences of such Qualified Bid.

### 5. No Qualified Bids

As the Debtors have entered into the Aircraft Sale Agreement with the Stalking Horse Buyer and under these Bidding Procedures, the Stalking Horse Buyer is deemed a Qualified Bidder and the Stalking Horse Buyer's Bid as provided via the Aircraft Sale Agreement is deemed a Qualified Bid with respect to the Sale, any Auction, or otherwise, if no Qualified Bids

other than the Stalking Horse Buyer's Bid are received in accordance with these Bidding Procedures, the Debtors may cancel the Auction.

In such scenario, the Debtors, shall (i) promptly file with the Court a notice of cancellation of the Auction and (ii) designate the Bid of the Stalking Horse Buyer as the Successful Bid for the Aircraft and pursue entry of the Sale Approval Order approving a Sale of the Aircraft to the Stalking Horse Buyer pursuant to the Aircraft Sale Agreement.

## VI.    THE AUCTION

### A.    Notice of the Auction; Notice of Qualified Bids and the Baseline Bid

If the Debtors receive any Qualified Bids for all of the Aircraft subject to the APA in addition to the Stalking Horse Buyer's Bid (which is deemed a Qualified Bid), the Auction will be held on April 20, 2026 at 10:00 a.m. (prevailing Eastern Time) at the offices of Debevoise & Plimpton LLP (66 Hudson Boulevard East, New York, NY 10001), or at any such other location as Spirit (in consultation with the Consultation Parties) may hereafter designate (with notice of such alternate location given to all Qualified Bidders).

On or before April 15, 2026, which date shall be at least two business days before the Auction, Spirit shall provide each Qualified Bidder (including the Stalking Horse Buyer) and the Consultation Parties with the following: (i) written notice of the Auction; (ii) a copy of each Qualified Bid including all documentation submitted therewith, including the duly executed and marked purchase agreement documenting such Qualified Bid that reflects changes against the Aircraft Sale Agreement; and (iii) notice of which Qualified Bid Spirit has determined constitutes the highest or otherwise best offer among the Qualified Bids and with which it intends to commence the Auction with respect to the Aircraft (such Bid, the "**Baseline Bid**").

### B.    Attendance at and Participation in the Auction

The Debtors and their professionals shall direct and preside over the Auction. The Debtors shall maintain a written transcript of the Auction and all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, the Successful Bid and the Back-Up Bid (each as defined below). The Debtors explicitly reserve the right, in their business judgment in consultation with the Consultation Parties, to exercise their discretion in conducting the Auction, including determining whether to adjourn the Auction to facilitate separate discussions between any Qualified Bidders and the Debtors, as applicable.

In addition to the Debtors and their advisors, the only parties eligible to participate in the Auction shall be: (i) the Stalking Horse Buyer and its representatives and advisors; (ii) representatives and advisors of the Committee; (iii) representatives and advisors of the DIP Lenders; (iv) those Qualified Bidders who have submitted a Qualified Bid to Spirit (as well as such Qualified Bidder's advisors and representatives); and (v) the United States Trustee for the Southern District of New York. The Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative. In addition, each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

**C.      The Auction Process**

The Auction shall be governed by the following procedures, subject to the Debtors' right to modify such procedures in their reasonable business judgment (in consultation with the Consultation Parties):

(i)      Spirit and its professionals shall direct and preside over the Auction;

(ii)     at the commencement of the Auction, Spirit shall announce and describe the terms of the Baseline Bid, as determined by Spirit;

(iii)    only the Stalking Horse Buyer and the other Qualified Bidder(s) shall be entitled to make any Overbids (as defined below) at the Auction;

(iv)     bidding shall commence at the amount of the Baseline Bid plus a minimum initial Overbid increment of $1,000,000 (such initial Overbid amount, the "**Initial Overbid Amount**") included in such bid over the immediately preceding bid (each such bid, an "**Overbid**"), *provided*, *however*, that any Overbid on the bid of the Stalking Horse Buyer must also include the amount of the Bid Protections. Each subsequent Overbid must include an additional increment of at least $1,000,000 over the immediately preceding Bid; *provided*, *however*, that Spirit shall retain the right to modify the bid increment requirements at the Auction;

(v)      after the first round of bidding and between each subsequent round of bidding, the Debtors, after consultation with the Consultation Parties, shall announce the bid that they believe in their reasonable business judgment to be the highest or otherwise best offer for the Aircraft (the "**Leading Bid**") and describe the material terms thereof.  Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent bid with full knowledge of the Leading Bid.  The Stalking Horse Buyer is not deemed to waive the Bid Protections by Overbidding at the Auction.  If the Stalking Horse Buyer Overbids at the Auction, a "credit" for the amount of the Bid Protections will automatically be added to such Overbid amount; and

(vi)     all Qualified Bidders shall have the right to submit additional Overbids and make additional modifications to the Aircraft Sale Agreement at the Auction, provided that each such Overbid must be made within a reasonable period of time, as determined by Spirit, following the announcement of the immediately preceding Overbid.

VII.    **IDENTIFICATION OF THE SUCCESSFUL BIDDER AND ACCEPTANCE OF SUCCESSFUL BID**

A.    **Identification of the Successful Bidder and Back-Up Bidder**

At the close of the Auction, Spirit shall evaluate all Qualified Bids and identify the Qualified Bids that are, in Spirit's business judgment in consultation with the Consultation Parties and in accordance with the Amended Final DIP Order, (i) the highest or otherwise best bid for the Aircraft (the "**Successful Bid**," and such bidder, the "**Successful Bidder**") and (ii) the next highest or otherwise best bid (the "**Back-Up Bid**," and such bidder, the "**Back-Up Bidder**"), both of which will be determined by considering, among other things:

(i)    the number, type and nature of any changes to the Aircraft Sale Agreement requested by each Qualified Bidder and whether such Qualified Bid is on substantially different terms than those set forth in the Aircraft Sale Agreement; it being understood that certain modifications (including those that (a) increase the certainty of consummation the Sale without delay, (b) limit or eliminate seller indemnities, (c) limit or eliminate any restrictions of the sale proceeds, or (d) increase certainty with respect to liquidated damages for a buyer breach] may be viewed as improving the value of a Qualified Bid;

(ii)    the extent to which any requested modifications to the Aircraft Sale Agreement are likely to delay the consummation of the Sale, and the likely cost to Spirit of any such modifications or delay;

(iii)    the total consideration to be received by Spirit under the terms of each Qualified Bid;

(iv)    each Qualified Bidder's ability to timely close a transaction and make any deferred payments, if applicable; and

(v)    the net benefit to Spirit's estate (taking into account, among other things, the requirement that Spirit is obligated to pay the Stalking Horse Buyer the amount of the Bid Protections if a Qualifying Bid Protections Event or a Seller Cancellation Event occurs and the likely timing and amount of distributions to creditors resulting from each Bid.

In announcing the Successful Bid and the Back-Up Bid, Spirit shall announce the material terms of each such Bid, the basis for determining the total consideration offered and the resulting calculated benefit of each such Bid to Spirit's estate.  After announcing the Successful Bidder and the Back-Up Bidder and after the Successful Bidder has submitted a fully executed Aircraft Sale Agreement memorializing the terms of their Successful Bid, Spirit shall declare the Auction closed.

If no Auction is held, then the Bid of the Stalking Horse Buyer as represented by the Aircraft Sale Agreement shall be deemed to be the Successful Bid and the Stalking Horse Buyer

shall be deemed to be the Successful Bidder and Spirit will proceed to effectuate the Sale as set forth in the Aircraft Sale Agreement.

**B.      Acceptance of Bid from Successful Bidder**

**1.   Post-Auction Matters**

The Successful Bidder shall, within one business day after the conclusion of the Auction, submit to the Debtors fully executed revised documentation memorializing the terms of its Successful Bid.  The Successful Bid may not be assigned to any party without the consent of the Debtors.

As soon as reasonably practicable after closing the Auction, and in any event not less than two business days following closing of the Auction, the Debtors shall cause a notice the Successful Bid and the Successful Bidder to be filed with the Court, identifying the Successful Bidder and the key terms of the relevant agreements.

If, and solely to the extent that, the Stalking Horse Buyer shall become entitled to the Bid Protections pursuant to section 5.6 of the Aircraft Sale Agreement, Spirit shall pay such amount in accordance therewith, in cash.

**C.      Sale Hearing**

Spirit shall be bound by the Successful Bid only when such Bid has been approved by the Court at the Sale Hearing.

The hearing (the "**Sale Hearing**") on whether to grant the relief sought in the Sale Motion shall be held on April 23, 2026 at 11:00 a.m. (prevailing Eastern Time) before the Honorable Sean H. Lane, at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601 or as soon thereafter as counsel may be heard.

The Sale Hearing may be continued to a later date by the Debtors (after consultation with the Consultation Parties) by sending notice prior to, or making an announcement at, the Sale Hearing.

At the Sale Hearing, if no other Qualified Bid was received, Spirit will seek entry of an order, *inter alia*, authorizing and approving the Sale of the Aircraft to the Stalking Horse Buyer pursuant to the terms and conditions set forth in the Aircraft Sale Agreement, or, if a Qualified Bid other than the Bid of the Stalking Horse Buyer as set forth in the Aircraft Sale Agreement was identified as the Successful Bid at the Auction, to the Successful Bidder pursuant to the form of the purchase and sale agreement agreed to by Spirit with such Successful Bidder.

## VIII.  **BACK-UP BIDDER AND BACK-UP BID**

Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid as compared to the Successful Bid at the Auction for the Aircraft, as determined by the Debtors in the exercise of their reasonable business judgment after consultation with the Consultation Parties shall be required to serve as the Back-Up Bidder, and each Qualified Bidder shall agree and be deemed to agree to be the Back-Up Bidder if so designated.  For the avoidance of doubt, the Stalking Horse Buyer has agreed to serve as the Back-Up Bidder solely in accordance with the terms of the Aircraft Sale Agreement.  The Back-Up Bidder will be required to keep the Back-Up Bid open, binding and irrevocable until the earlier of (a) the first Delivery Date of the Aircraft pursuant to the Successful Bid and (b) the 30th day after entry of the Sale Approval Order, unless otherwise agreed.

The identity of the Back-Up Bidder and the amount and material terms of the Qualified Bid of the Back-Up Bidder shall be announced by the Debtors at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder.

If for any reason the Successful Bidder fails to consummate the purchase of the Aircraft within the time permitted in the Aircraft Sale Agreement, the Back-Up Bidder will automatically be deemed to have submitted the highest or otherwise best Bid and Spirit will be authorized, and required, to consummate the Sale with the Back-Up Bidder without further order of the Court. At the Sale Hearing, Spirit will seek to be authorized to consummate all transactions contemplated by the Bid of a Back-Up Bidder without further notice or order of the Court.

If the failure to consummate the Sale with a Successful Bidder is the result of a breach by such Bidder, Spirit specifically reserves the right to seek damages from such Successful Bidder and its Sponsors and other Bid participants, if any.  Notwithstanding the foregoing, the Debtors' sole remedy against the Stalking Horse Buyer for the Stalking Horse Buyer's default shall be up to the amount of the Good Faith Deposit allocable to such Aircraft and in no event shall the Stalking Horse Buyer have any liability to the Debtors or any party for any amounts above such allocable portion of the Good Faith Deposit and any claims for amounts in excess of such allocable portion of the Good Faith Deposit are fully waived, released and discharged.

## IX.  **TREATMENT OF GOOD FAITH DEPOSIT**

The Good Faith Deposit of each Successful Bidder shall be applied to the purchase price of the applicable transaction(s) at closing.  The Good Faith Deposits for each Qualified Bidder (other than the Stalking Horse Buyer) shall be held in one or more escrow accounts on terms acceptable to the Debtors in their sole discretion (after consultation with the Consultation Parties) and shall be returned on or before the date that is five (5) Business Days after the Auction (other than with respect to the Successful Bidder and the Back-Up Bidder).  The Stalking Horse Buyer's Good Faith Deposit shall be held and returned in accordance with the terms of the Aircraft Sale Agreement.  The Back-Up Bidder's Good Faith Deposit shall be held in escrow until the earlier of (a) the first delivery date of the Aircraft pursuant to the Successful Bid and (b) the 30th day after entry of the Sale Approval Order, unless otherwise agreed.  In the

event the applicable Successful Bidder fails to close and the Debtors opt to pursue the Sale set forth in the applicable Back-Up Bid, the portion of the Back-Up Bidder's Good Faith Deposit allocable to Aircraft sold and delivered to the Back-Up Bidder shall be applied to the purchase price of such transaction in accordance with the applicable purchase agreement.  In the event of a breach or failure to consummate a Sale by the Successful Bidder or the Back-Up Bidder, as applicable, the portion of the defaulting Successful Bidder's Good Faith Deposit or Back-Up Bidder's Good Faith Deposit, as applicable and allocable to the Aircraft subject to such default, shall be forfeited to the Debtors, as the exclusive remedy for such default.

## X.  RESERVATION OF RIGHTS; DEADLINE EXTENSION

The Debtors reserve their rights, in their reasonable business judgement (and after consultation with the Stalking Horse Buyer and the Consultation Parties), to modify these Bidding Procedures in good faith and in a manner consistent with their fiduciary duties (provided, that for the avoidance of doubt, the Debtors may not modify the consent and consultation rights set forth herein), in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, if any, additional customary terms and conditions on the Sale of the Aircraft, including, without limitation (but subject to the consent and consultation rights set forth herein), (i) extending the deadlines set forth in these Bidding Procedures, (ii) cancelling the Auction, (iii) adjourning the Auction, including at the Auction, (iv) adjourning the Sale Hearing, including in open court, without further notice other than an announcement in open court at the Sale Hearing, (v) modifying the Bidding Procedures, including, without limitation, by adding procedural rules or methods of bidding that are reasonably necessary or advisable under the circumstances for the Auction, or modifying the bidding increments (*provided*, that there shall be no reduction of the Bid Protections in connection therewith, except as provided in the Aircraft Sale Agreement) or (vi) rejecting any or all Bids (other than the Stalking Horse Buyer's Aircraft Sale Agreement), including any other Qualified Bids if, in Spirit's business judgment, no such bid is for a fair and adequate price.  The Stalking Horse Buyer must reasonably approve changes in the Bidding Procedures and may terminate the Aircraft Sale Agreement and immediately receive return of the Good Faith Deposit if the Bidding Procedures are otherwise changed.

## XI.  CONSULTATION BY THE DEBTORS

The Debtors shall consult with the Consultation Parties as explicitly provided for in these Bidding Procedures.  Each reference in these Bidding Procedures to "consultation" (or similar phrase) with the Consultation Parties shall mean consultation in good faith.  Additionally, the Debtors shall consult with the Consultation Parties in good faith regarding the Sale process for the Aircraft, their decision-making on the matters provided in these Bidding Procedures and provide to the Consultation Parties and their advisors prompt reports concerning the Sale process on a recurring basis, including parties contacted, copies of letters of intent, drafts of material definitive agreements received from or provided to Potential Bidders, updates regarding material changes to purchase proposals, and any diligence and other information reasonably requested by the Consultation Parties, subject to the terms of their confidentiality agreements or arrangements with the Debtors.

## XII.    FIDUCIARY OUT FOR ENTERPRISE SALE

Except as otherwise provided in the immediately succeeding paragraph, nothing in these Bidding Procedures or any document filed with or entered by the Court in connection therewith shall restrain the board of directors, board of managers, or such similar governing body (including any special committee thereof) of any of the Debtors from taking any action or refraining from taking any action to the extent that such board of directors, board of managers, or such similar governing body (including any special committee thereof) determines, based on the written advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

Further, notwithstanding anything to the contrary in these Bidding Procedures, the Bidding Procedures Order, or any document filed with or entered by the Court in connection therewith, through the date of the Auction (if held): (a) Debtors may not terminate the Aircraft Sale Agreement or the Auction under the immediately preceding paragraph other than to enter into an agreement to consummate an Enterprise Sale, as contemplated in the Aircraft Sale Agreement; and (b) nothing in these Bidding Procedures or the Bidding Procedures Order shall diminish the right of the Debtors and their respective directors, officers, managers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives solely and exclusively to: (i) consider, respond to, and facilitate an proposals to enter into an agreement to consummate a transaction contemplating the purchase of the equity or assets of Seller Parent and its subsidiaries as a going concern, including the Aircraft (an Enterprise Sale as defined in the Aircraft Purchase Agreement) ( an "**Enterprise Proposal**"); (ii) provide access to non-public information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity solely with respect to Enterprise Proposals; (c) maintain or continue discussions or negotiations with respect to Enterprise Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of Enterprise Proposals; (e) enter into or continue discussions or negotiations with any person or entity regarding any Enterprise Proposal; or (f) determine to declare a Seller Cancellation Event in order to enter into a definitive agreement to consummate an Enterprise Proposal and thereby cancel the Auction and pay the Bid Protections to the Stalking Horse Buyer.

Finally, after enter of the Bidding Protections Order, nothing in these Bidding Procedures or the Bidding Procedures Order shall diminish the right of the Debtors and their respective directors, officers, managers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives solely and exclusively to: (i) consider, respond to, and facilitate any proposals to enter into an agreement to consummate a transaction contemplating the purchase of all (and not less than all) of the twenty Aircraft (an "**Alternative Aircraft Transaction**"); (ii) provide access to non-public information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity solely with respect to Alternative Aircraft Transactions; (c) maintain or continue discussions or negotiations with respect to Alternative Aircraft Transactions; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of

Alternative Aircraft Transactions; (e) enter into or continue discussions or negotiations with any person or entity regarding any Alternative Aircraft Transactions.

Dated:    February 11, 2026
          New York, NY

                              DEBEVOISE & PLIMPTON LLP

                              */s/ Jasmine Ball*
                              Jasmine Ball
                              Elie J. Worenklein
                              66 Hudson Boulevard East
                              New York, NY 10001
                              Tel.: (212) 909-6000
                              jball@debevoise.com
                              eworenklein@debevoise.com

                              *Fleet Counsel to the Debtors and Debtors in Possession*

## **Exhibit 2**

**Aircraft Sale Agreement**

Execution Version

# AIRCRAFT SALE AND PURCHASE AGREEMENT
# (SPIRIT-CSDS 2026)

dated as of February 9, 2026

between

**SPIRIT AIRLINES, LLC**
as Seller

and

**CSDS ASSET MANAGEMENT LLC**
as Buyer

---

20 Used Airbus A320 and A321 Aircraft

---

TABLE OF CONTENTS

**Page**

1.  **Definitions & Interpretation**. ................................................................ 2

    1.1    Definitions. ................................................................................ 2
    1.2    Interpretation. ........................................................................... 8

2.  **Agreements to Sell and Purchase**. ..................................................... 9

    2.1    Sale and Purchase. ...................................................................... 9
    2.2    Deposit; Purchase Price. ............................................................. 9
    2.3    Payments. ................................................................................. 10
    2.4    Inspection and Technical Acceptance. ........................................ 10
    2.5    Removal of Excluded Equipment. .............................................. 11
    2.6    Assignment of Warranties. ......................................................... 11

3.  **Delivery of Aircraft**. ........................................................................ 12

    3.1    Delivery Condition. .................................................................... 12
    3.2    Delivery Location. ...................................................................... 12
    3.3    Delivery. ................................................................................... 12

4.  **Conditions Precedent**. ..................................................................... 12

    4.1    Conditions Precedent. ................................................................ 12
    4.2    No Financing or Other Contingencies. ....................................... 14
    4.3    Post-Closing Recordation Opinion. ............................................ 14

5.  **Bankruptcy Provisions**. ................................................................... 14

    5.1    Court Approvals. ........................................................................ 14
    5.2    Court Filings. ............................................................................. 15
    5.3    Buyer Assistance. ....................................................................... 15
    5.4    Competing Bids. ........................................................................ 15
    5.5    Back-up Bidder. ........................................................................ 16
    5.6    Break-Up Fee and Reimbursement. ............................................ 16
    5.7    Limited Exclusivity. ................................................................... 17
    5.8    Bankruptcy Termination Events. ................................................ 18

6.  **Termination**. ................................................................................... 18

    6.1    Total Loss before Delivery. ........................................................ 18
    6.2    Aircraft Non-Sale Event. ........................................................... 18
    6.3    Default Provisions. .................................................................... 19
    6.4    Effect of Termination. ................................................................ 20

7.  **Representations and Warranties; Disclaimers and Waivers**. ............... 20

    7.1    Seller Representations and Warranties ........................................ 20

Aircraft SPA (SPIRIT-CSDS 2026)

7.2 Buyer Representations and Warranties........................................................ 21
7.3 Disclaimers ................................................................................................. 22
7.4 Waivers ...................................................................................................... 23

8. **Insurance**. ........................................................................................................... 24

8.1 Insurances .................................................................................................. 24
8.2 Certificates, Etc. ........................................................................................ 25

9. **Transfer Taxes**. ................................................................................................... 25

9.1 Diligence..................................................................................................... 25
9.2 Tax Indemnity............................................................................................. 25
9.3 Cooperation................................................................................................. 25
9.4 Procedures, Etc. ......................................................................................... 26

10. **Miscellaneous**..................................................................................................... 26

10.1 Entire Agreement, Amendment, Installment Contract; Time is of the
Essence.................................................................................................................. 26
10.2 [Reserved]. ................................................................................................. 27
10.3 Non-Waiver................................................................................................. 27
10.4 Severability. ................................................................................................ 27
10.5 Notices. ....................................................................................................... 27
10.6 Governing Law & Jurisdiction.................................................................... 28
10.7 Waiver of Jury Trial.................................................................................... 29
10.8 Further Assurances...................................................................................... 29
10.9 Counterparts................................................................................................. 29
10.10 Transaction Costs........................................................................................ 29
10.11 Assignment, Successors and Assigns. ........................................................ 30
10.12 [Reserved]. ................................................................................................. 30
10.13 Third-party Beneficiaries............................................................................ 30
10.14 Limitation of Liability................................................................................. 30
10.15 Force Majeure. ............................................................................................ 30
10.16 Publicity ...................................................................................................... 30
10.17 Relationship of the Parties. ........................................................................ 31
10.18 Brokers and other Third Parties. ................................................................ 31

<u>EXHIBITS</u>

Exhibit A       Description of Aircraft
Exhibit B       Delivery Condition
Exhibit C       List of Excluded Equipment
Exhibit D       Inspection and Technical Acceptance
Exhibit E       Form of Aircraft Acceptance Certificate
Exhibit F       Form of Warranty Bill of Sale
Exhibit G       Assignment Statement

Aircraft SPA (SPIRIT-CSDS 2026)

Exhibit H        Form of Compliance Certification Statement

ANNEXES

Annex X        Estimated Availability Timeline

Aircraft SPA (SPIRIT-CSDS 2026)

## AIRCRAFT SALE AND PURCHASE AGREEMENT
## (SPIRIT-CSDS 2026)

This AIRCRAFT SALE AND PURCHASE AGREEMENT (SPIRIT-CSDS 2026) (the "**Agreement**") is entered into as of February 9, 2026 by and between SPIRIT AIRLINES, LLC, a Delaware limited liability company (hereinafter referred to as "**Seller**") and CSDS ASSET MANAGEMENT LLC, a Nevada limited liability company (hereinafter referred to as "**Buyer**") (Seller and Buyer are each a "**Party**" and, collectively, the "**Parties**").

RECITALS

WHEREAS, Seller owns 20 Airbus model A320 aircraft and Airbus model A321 aircraft (each, as described more fully on Exhibit A, but excluding Excluded Equipment, together with all documents and available records pertaining thereto in Seller's possession or control and set forth on Schedule 1 to Exhibit B (the "**Records**"), an "**Aircraft**" and, collectively, the "**Aircraft**");

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, such Aircraft, in each case upon and subject to the terms and conditions of this Agreement;

WHEREAS, Seller and its affiliates commenced cases (collectively, the "**Chapter 11 Case**") as debtors under the Bankruptcy Code on August 29, 2025 in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") and are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, Seller will seek the entry of order(s) by the Bankruptcy Court approving the transactions contained herein, subject to a court approved auction process; and

WHEREAS, the Parties now desire to enter into this Agreement, provided that consummation of the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Approval Order under, *inter alia*, Section 363 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, the receipt and sufficiency of which are conclusively acknowledged, the Parties hereto agree as follows:

1.      **Definitions & Interpretation**.

1.1      **Definitions.**   In addition to the capitalized terms defined elsewhere herein, the following capitalized terms used herein and not otherwise defined shall have the following respective meanings for all purposes of this Agreement.

"**Affiliate**" means a Person or an entity that directly or indirectly controls, is controlled by, or is under common control with, another Person or entity, including, among the others, executive officers, directors, large stockholders, subsidiaries, parent entities and sister companies.

"**Agreement**" has the meaning given to it in the preamble.

"**Aircraft**" has the meaning given to it in the recitals.

"**Aircraft Acceptance Certificate**" means, with respect to an Aircraft, an aircraft acceptance certificate for such Aircraft substantially in the form provided in Exhibit E and executed by Buyer.

"**Aircraft Non-Sale Event**" means, with respect to any availability date shown in the Estimated Availability Time indicated on Annex X for any "Group" of Aircraft designated therein (each, a "**Group**"), if Delivery of the applicable number of Aircraft in such Group as set forth in Annex X for such availability date (less any Aircraft the purchase and sale of which has previously been terminated under any of the provisions of this Agreement) has not occurred within 60 days following such Estimated Availability Time (such 60th day following an Estimated Availability Time set forth on Annex X, a "**60-Day Delivery Window Deadline**"), an "Aircraft Non-Sale Event" shall be deemed to have occurred with respect to any such one or more undelivered Aircraft, as applicable, selected by Seller corresponding to such shortfall in Deliveries for such Group as of such 60-Day Delivery Window Deadline.  For the avoidance of doubt, there shall be no requirement for any specific Aircraft or Engine (by manufacturer's serial number) to be delivered as part of any "Group".

"**Aircraft Specific Deposit**" has the meaning given to it in Section 2.2.

"**Airframe**" means, with respect to each Aircraft, the related airframe (including the associated APU, but excluding the associated Engines) listed on Exhibit A.  For the avoidance of doubt, the term "Airframe" does not include Records.

"**Alternative Transaction**" has the meaning given to it in Section 5.7.

"**AMM**" means Seller's Customized Airline Aircraft Maintenance Manual.

"**Assignment Statement**" means, with respect to an Aircraft, an assignment statement for such Aircraft substantially in the form of Exhibit G hereto.

Aircraft SPA (SPIRIT-CSDS 2026)

"**Bankruptcy Code**" means the United States Bankruptcy Code, 11 United States Code §§ 101 *et seq*., as amended.

"**Bankruptcy Court**" has the meaning given to it in the recitals.

"**Bankruptcy Court Orders**" has the meaning given to it in Section 5.1.

"**Bidding Period**" has the meaning given to it in Section 5.4

"**Bid Protections**" has the meaning given to it in Section 5.6.

"**Bidding Procedures Order**" has the meaning given to it in Section 5.1.

"**Break-Up Fee**" has the meaning given to it in Section 5.6.

"**Business Day**" means a day other than a Saturday or Sunday on which the banks in New York City, New York, USA are open for the transaction of business of the type required by this Agreement.

"**Buyer**" has the meaning given to it in the preamble.

"**Buyer's Default**" means the occurrence of one or more of the following events:

(i)     with respect to any Aircraft, Buyer's failure to accept the Delivery of such Aircraft when required to do so in accordance with all applicable terms and conditions of this Agreement (including, without limitation, failure by the Buyer to accept the Warranty Bill of Sale for such Aircraft in connection with such Delivery when required to do so in accordance with all applicable terms and conditions of this Agreement) and failure to cure such default within five (5) Business Days of Seller's written notice to Buyer;

(ii)     with respect to any Aircraft, any of the conditions precedent set forth in clauses (e), (f), (g), (j) or (k) of Section 4.1 is not satisfied (or waived by Seller in its sole and absolute discretion) by the Delivery Window Deadline for such Aircraft and such failure is not due to or arising from a breach by Seller of its obligations under this Agreement and failure to cure such default within five (5) Business Days of Seller's written notice to Buyer; or

(iii)     (A) any failure by Buyer to observe or perform any of its other material obligations under this Agreement if such failure continues for fifteen (15) days after written notice thereof is delivered to Buyer from Seller (provided that if the same is not capable of being cured within such 15-day period, subject to Buyer having commenced good faith efforts to cure the same, the material breach has thereafter not been cured within 45 days following receipt of Seller's written notice),

3

or (B) the occurrence of a default by Buyer described in the foregoing clauses (i) or (ii) with respect to four or more Aircraft.

"**Buyer's Liens**" has the meaning given to it in Section 2.1(b).

"**Cape Town Agreements**" means the Cape Town Convention, as supplemented by the Cape Town Aircraft Protocol (in each case, the English language version).

"**Cape Town Aircraft Protocol**" means The Protocol on International Interests in Mobile Equipment, concluded in Cape Town, South Africa, on November 16, 2001 (the English language version).

"**Cape Town Convention**" means The Convention on International Interests in Mobile Equipment, concluded in Cape Town, South Africa, on November 16, 2001 (the English language version).

"**Chapter 11 Case**" has the meaning given to it in the recitals.

"**Civil Aviation Registry**" means the registry of aircraft maintained by the FAA.

"**Competing Bid**" has the meaning given to it in Section 5.4.

"**Delivery**" means, with respect to each Aircraft, delivery and consummation of the sale of such Aircraft pursuant to the terms of this Agreement.

"**Delivery Condition**" means, with respect to an Aircraft, the condition of such Aircraft at Delivery as provided in Section 3.1 and Exhibit B.

"**Delivery Date**" means, with respect to an Aircraft, the actual date on which Delivery of such Aircraft occurs.

"**Delivery Location**" has the meaning given to such term in Section 3.2.

"**Delivery Window Deadline**" means, with respect to any Aircraft, the 60-Day Delivery Window Deadline, as contemplated in the definition of "Aircraft Non-Sale Event".

"**Deposit Amount**" has the meaning given it in Section 2.2

"**Dollars**", "**$**" and "**US$**" mean the lawful currency of the United States.

"**Engine**" means, with respect to an Aircraft, any one of the two aircraft engines associated with the "AC Type" of such Aircraft that are listed on Schedule 1 to Exhibit A, as selected by Seller to be associated with such Aircraft for purposes of this Agreement and the Transaction Documents for such Aircraft.

4

"**Enterprise Sale**" has the meaning given to it in Section 5.8(e).

"**Escrow Agent**" means FAA Counsel.

"**Estimated Availability Timeline**" shall mean, with respect to each Group of Aircraft, as applicable, the schedule for the applicable number of Aircraft in such Group expected to be tendered, delivered and closed in accordance with this Agreement, as indicated on Annex X (subject to each Aircraft in such Group being initially tendered for inspection at least seven Business Days before the end of the applicable Estimated Availability Timeline).

"**Excluded Equipment**" means the list of components, parts, systems and equipment as listed on in Exhibit C, which includes, to the extent set forth on Schedule C, the following: (a) defibrillators, enhanced emergency medical kits and other medical equipment, (b) components or systems installed on or affixed to the related airframe that are used to provide individual telecommunications, Wi-Fi and/or satellite connectivity or electronic entertainment or services to passengers aboard the Aircraft, (c) Spirit branded galley carts, beverage carts, liquor kits, food tray carriers, ice containers, oven inserts, galley inserts (other than any non-branded electrical equipment in the galley and other non-branded galley inserts), and other Spirit branded passenger convenience or service items and (e) cargo containers. Excluded Equipment shall not include any property abandoned pursuant to Section 2.5.

"**Exclusivity Period**" has the meaning given to it in Section 5.7.

"**Expense Reimbursement**" has the meaning given to it in Section 5.6.

"**FAA**" means the United States Federal Aviation Administration.

"**FAA Bill of Sale**" means, with respect to an Aircraft (or, as applicable, an Airframe), an FAA Form AC 8050-2 aircraft bill of sale (or any successor form thereto established and accepted by the FAA).

"**FAA Counsel**" means the law firm of McAfee & Taft, a Professional Corporation, or such other law firm as agreed between the Parties.

"**FAA Registration Application**" means, with respect to an Aircraft (or, as applicable, an Airframe), an FAA Form AC 8050-1 aircraft registration application document (or any successor form thereto established and accepted by the FAA) required to register such Aircraft (or, as applicable, the Airframe) for operation within the United States.

"**Final Order**" shall mean (a) an order or judgment of the Bankruptcy Court or other court of competent jurisdiction, as entered on its docket, that has not been reversed,

stayed, modified or amended, and as to which the time to appeal, petition for certiorari or move for reargument, rehearing or a new trial has expired and no appeal, petition for certiorari or motion for reargument, rehearing or a new trial, respectively, has been timely filed, or (b) if any appeal, petition for certiorari or motion for reargument, rehearing or a new trial that has been or may be filed has been resolved by the highest court (or any other tribunal having final appellate jurisdiction over the order or judgment) to which the order or judgment was appealed or from which certiorari or reargument, rehearing or a new trial was sought, and the time to take any further appeal, petition for certiorari or move for reargument, rehearing or a new trial shall have expired without such actions having been taken; provided, however, the possibility that a party may file a motion for reconsideration of an order or judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure or Bankruptcy Rules 9023 and 9024, or a motion or objection pursuant to 502(j) of the Bankruptcy Code shall not preclude an order from being a Final Order.

"**Government Entity**" means the United States government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to any such government.

"**Inspection**" has the meaning given to it in Section 2.4.

"**Insurance Period**" has the meaning given to it in Section 8.1.

"**International Interests**" has the meaning ascribed to the term "international interests" under the Cape Town Agreements.

"**International Registry**" has the meaning ascribed to the term "international registry" under the Cape Town Agreements.

"**Law**" means any (a) Law, statute, decree, constitution, regulation, order or directive of any Government Entity, (b) treaty, pact, compact or other agreement to which any Government Entity is a signatory or party, (c) judicial or administrative interpretation or application of any of the foregoing or (d) any binding judicial precedent having the force of Law in any Government Entity.

"**Lien**" means any lien, security interest, lease, mortgage, pledge, International Interest on the International Registry (but not any contract of sale registration on the International Registry), title retention or other charge or encumbrance or claim or interest or right of others or agreement the effect of which is the creation of security, including, without limitation, rights of others under the Aircraft, Airframe, or Engine, or parts thereof, interchange, loan, or lease agreement.

"**Party**" has the meaning given to it in the preamble.

"**Pending Aircraft**" has the meaning given to it in Section 6.3(a).

6

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, company, firm, trust, organization, government, or any agency or political subdivision thereof or any other entity, whether or not having a separate legal personality.

"**Purchase Price**" means, for an Aircraft, the amount specified for such Aircraft in the column entitled "Purchase Price" on Exhibit A hereto.

"**Qualifying Bid Protections Event**" has the meaning given to it in Section 5.6.

"**Records**" has the meaning given to it in the recitals.

"**Sale Approval Order**" has the meaning given to it in Section 5.1.

"**Sale Motion**" has the meaning given to it in Section 5.1.

"**Seller**" has the meaning given to it in the preamble.

"**Seller Cancellation Event**" has the meaning given to it in Section 5.8(e).

"**Seller's Default**" means the occurrence of one or more of the following events:

    (i)    with respect to any Aircraft, Seller's failure to consummate the Delivery of such Aircraft when required to do so in accordance with all applicable terms and conditions of this Agreement, and failure to cure such default within five (5) Business Days of Buyer's written notice to Seller.

    (ii)    with respect to any Aircraft, any of the conditions precedent set forth in clauses (a), (d) or (i) of Section 4.1 is not satisfied (or waived by Buyer in its sole and absolute discretion) by the Delivery Window Deadline for such Aircraft and such failure is not due to or arising from a breach by Buyer of its obligations under this Agreement, and failure to cure such default within five (5) Business Days of Buyer's written notice to Seller; or

    (iii)    (A) any failure by Seller to observe or perform any of its other material obligations under this Agreement if such failure continues for fifteen (15) days after written notice thereof is delivered to Seller from Buyer (provided that if the same is not capable of being cured within such 15-day period, subject to Seller having commenced good faith efforts to cure the same, the material breach has thereafter not been cured within 45 days following receipt of Buyer's written notice), or (B) the occurrence of a default by Seller described in the foregoing clauses (i) or (ii) with respect to four or more Aircraft.

"**Seller Parent**" has the meaning given to it in Section 5.8(e).

"**Seller Parties**" means Seller, its subsidiaries and parent organizations, and each of its and their directors, officers, shareholders, members, controlling Persons, agents, employees, subsidiaries, Affiliates, successors, assigns and transferees of the foregoing parties (each, a "**Seller Party**").

"**Surviving Provisions**" has the meaning given to it in Section 3.3(b).

"**Technical Acceptance**" has the meaning given to it on Exhibit D.

"**Technical Acceptance Deadline**" has the meaning given to it in Section 2.4(b).

"**Technical Delivery Walkaway Right**" has the meaning given to it on Exhibit D.

"**Total Loss**" means, as applicable, the actual, constructive or arranged total loss of an Aircraft.

"**Transaction Documents**" means, with respect to any Aircraft, this Agreement and the related Warranty Bill of Sale, the Aircraft Acceptance Certificate, the FAA Bill of Sale, the FAA Registration Application and the Assignment Statement.

"**Transfer Taxes**" has the meaning given to it in Section 9.2.

"**Walkaway Notice**" has the meaning given to it on Exhibit D.

"**Warranty Bill of Sale**" means, with respect to an Aircraft, a warranty bill of sale for such Aircraft substantially in the form of Exhibit F hereto.

       1.2    **Interpretation.**  All references in this Agreement to Exhibits, Sections, paragraphs, subsections, clauses and other subdivisions refer to the corresponding Exhibits, Sections, paragraphs, subsections, clauses and other subdivisions of or to this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any Sections, paragraphs, subsections, or other subdivisions of this Agreement are for convenience only, do not constitute any part of this Agreement, and shall be disregarded in construing the language hereof. The words "this Agreement," "herein," "hereby," "hereunder," and "hereof," and words of similar nature, refer to this Agreement as a whole and not to any particular Section, subsection, or other subdivision unless expressly so limited. The words "this Section," and "this subsection," and words of similar nature, refer only to the Section, or subsection hereof in which such words occur. The word "including" (in its various forms) means "including without limitation". Pronouns in masculine, feminine, or neutral genders shall be construed to state and include any other gender, and words, terms, and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires. Exhibits, Appendices, Schedules and Annexes referred to herein are

attached hereto.  Except as otherwise provided in this Agreement, any reference herein to any Law shall be construed as referring to such Law as amended, modified, codified, or reenacted, in whole or in part, and in effect from time to time, and references to particular provisions of a Law include a reference to the corresponding provisions of any prior or succeeding Law, and any reference herein to a document includes that document as amended from time to time in accordance with its terms, and any document entered into in substitution or replacement therefor.   Any reference to an amendment includes a supplement, novation, or re-enactment, and "amended" is to be construed accordingly.  The word "extent" in the phrase "to the extent" means the degree to which a subject or other theory extends, and such phrase shall not simply mean "if".   Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.  Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day.  Any reference to any federal, state, local, or foreign Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context shall otherwise require.  Reference herein to "federal" shall be construed as referring to U.S. federal.

2.    **Agreements to Sell and Purchase**.

2.1    **Sale and Purchase.**With respect to the Aircraft, Seller agrees to sell and Buyer agrees to buy the Aircraft, upon and subject to the terms and conditions of this Agreement.  Notwithstanding any contrary or conflicting provisions of this Agreement, this Agreement contemplates the sale and purchase of each and all of the Aircraft as an "all or none" package transaction, subject to the provisions of this Agreement that contemplate the acquisition by Buyer of less than all Aircraft, and any related termination of the purchase and sale of certain Aircraft under this Agreement, in certain circumstances as specified herein.

(b)    Upon payment of the Purchase Price in respect of an Aircraft, Seller shall, by execution and delivery to Buyer of a Warranty Bill of Sale, sell to Buyer outright good and valid title in and to such Aircraft, free and clear of all Liens, claims and interests (other than Liens, claims and interests created by, through or on behalf of Buyer, collectively, "**Buyer's Liens**") in accordance with Section 4.1(d). With respect to each Aircraft, concurrently with Seller's delivery to Buyer of an executed Warranty Bill of Sale for such Aircraft, Buyer shall accept delivery of such Aircraft, and Buyer shall execute and deliver an Aircraft Acceptance Certificate in respect of such Aircraft, which shall evidence that Buyer's technical experts have examined and investigated such Aircraft (including the Engines related thereto).

2.2    **Deposit; Purchase Price.**

(a)    Within three (3) Business Days after the execution of this Agreement, Buyer shall pay to the Escrow Agent, in immediately available funds,

Aircraft SPA (SPIRIT-CSDS 2026)

in escrow as provided herein and in a mutually agreeable Escrow Agreement,  a total amount equal to $53,350,000.00 as a purchase deposit with respect to all of the Aircraft (the "**Deposit Amount**").  The Deposit Amount shall be allocated in equal installments across the Aircraft, in an amount equal to $2,667,500.00 per Aircraft (each, an "**Aircraft Specific Deposit**").

(b)      For each Aircraft, the total consideration payable by Buyer to Seller at Delivery for such Aircraft shall be the Purchase Price for such Aircraft.

### 2.3    Payments.

(a)      With respect to each Aircraft, at its Delivery, Buyer shall pay Seller the Purchase Price in respect of such Aircraft (net of the Aircraft Specific Deposit for such Aircraft, which will be applied by Seller after receipt from the Escrow Agent against the Purchase Price of such Aircraft and, following such application, the Aircraft Specific Deposit for such Delivered Aircraft: (i) shall no longer be subject to loss or forfeiture under any provisions of this Agreement, and (ii) need not be reinstated or replenished in any way for purposes of this Agreement), free and clear of and without any deduction or withholding for or on account of tax.

(b)      Payments due under this Agreement to Seller (including payments of Aircraft Specific Deposits by the Escrow Agent to Seller) shall be made in Dollars in immediately available funds to the following account (and/or, in whole or in part, to such other account(s) as Seller may notify Buyer in writing):



**Bank Name:**
**Account Number:**
**Account Name:**
**Wire ABA Routing**
**Address:**
**International Only:**

with payment advice to:

### 2.4    Inspection and Technical Acceptance.

(a)      With respect to each Aircraft, Buyer shall have the opportunity to perform a physical inspection of such Aircraft, including its Records, prior to its purchase, at its own cost (the "**Inspection**"), to the extent and in accordance with the provisions set forth on Exhibit D.

(b)     With respect to each Aircraft, the deadline (the "**Technical Acceptance Deadline**") for Technical Acceptance will be as set forth in the first sentence under the heading "Technical Acceptance" on Exhibit D.

(c)     With respect to any Aircraft, Buyer, in its sole discretion, may elect to perform a physical walk-around inspection of such Aircraft that may include going on board such Aircraft and examining the contents of any open panels, bays or other components of such Aircraft (but shall not include the opening of any unopened panels, bays or other components) on the Delivery Date, prior to Delivery, to confirm that the Aircraft is in materially the same physical condition as of the date of Buyer's Technical Acceptance (ordinary wear and tear excepted).

2.5     **Removal of Excluded Equipment.** All Excluded Equipment items listed in Exhibit C shall be removed from the Aircraft (documented on Seller's task cards or in the aircraft maintenance logbook in a manner customary for Seller and in accordance with industry, regulatory and manufacturer standards) and are excluded from being part of the Aircraft at Delivery, whether or not such items are installed in the Aircraft or present at Delivery.  At Seller's option, as advised to Buyer prior to Delivery, (i) Seller shall remove all or part of the Excluded Equipment (and repair any damage caused by such removal in a workmanlike manner customary for Seller and in accordance with industry, regulatory and manufacturer standards) prior to Delivery, or (ii) Buyer shall remove all or any remaining Excluded Equipment items within seven (7) days following Delivery in accordance with industry, regulatory and manufacturer standards.  If applicable, the Parties shall include the list of outstanding Excluded Equipment to be removed by Buyer on each Aircraft Acceptance Certificate.  To the extent any of the Excluded Equipment items are removed by Buyer after Delivery, Seller will pay or reimburse Buyer for the reasonable and documented out-of-pocket cost (without markup) charged by the service provider at the Delivery Location that accomplishes the removals, including any documented costs required to restore such Aircraft to the serviceable condition following such removal by such service provider, but excluding costs related to repairs necessitated by such service provider's workmanship.  Any interior Excluded Equipment removed by Buyer following Delivery shall be assembled, suitably packed and safely stored for return shipment to Seller at Seller's cost.  Buyer shall in no event market or sell any of the Excluded Equipment. Notwithstanding the foregoing, Seller may, upon delivery of written notice to Buyer, elect to abandon any item of Excluded Equipment, in which case title to the same shall, at Delivery of the Aircraft, transfer to Buyer at no cost or charge to either of Buyer or Seller.

2.6     **Assignment of Warranties.** Seller hereby assigns to the Buyer, effective as of each Delivery Date, any and all existing assignable warranties and service life policies, or other rights, remedies or claims against manufacturers, suppliers, vendors and maintenance and overhaul agencies relating to the applicable Aircraft (in the case of rights, remedies or claims, only with respect to rights, remedies or

claims arising, or based on events, occurrences and circumstances occurring, on or after the Delivery of the applicable Aircraft). Seller makes no representation or warranty as to the existence or assignability of any such warranties and rights.

3.    **Delivery of Aircraft**.

3.1    **Delivery Condition**. Except as expressly described in Exhibit B, each Aircraft will be delivered in "AS-IS, WHERE-IS" and "WITH ALL FAULTS" condition.

3.2    **Delivery Location.**    The delivery location (the "**Delivery Location**") for each Aircraft shall be as set forth on Schedule 2 to Exhibit B.

3.3    **Delivery**.

(a)    With respect to each Aircraft, upon satisfaction or waiver of the conditions precedent for such Aircraft sale and delivery set forth in Section 4.1, Buyer shall pay the Purchase Price for such Aircraft and shall deliver the Aircraft Acceptance Certificate for such Aircraft to Seller, and Seller shall execute and concurrently deliver to Buyer the Warranty Bill of Sale, the FAA Bill of Sale (which FAA Bill of Sale shall be prepositioned with the FAA Counsel) and the Assignment Statement for such Aircraft, whereupon risk of loss to such Aircraft shall transfer to Buyer and title to such Aircraft shall transfer to Buyer.

(b)    For each Delivery, upon title transfer, neither Buyer nor Seller shall have any further obligation or liability to the other in respect of the applicable Aircraft, and the terms and conditions of this Agreement in respect of such Aircraft shall automatically terminate and have no force and effect except with respect to this subsection, Section 2.5 (Removal of Excluded Equipment), Section 8 (Insurance), Section 9 (Transfer Taxes), Section 10.2 (Immunity Waiver), Section 10.3 (Non-Waiver), Section 10.6 (Governing Law and Jurisdiction), Section 10.10 (Transaction Costs), Section 10.13 (Third-party Beneficiaries) and Section 10.14 (Limitation of Liability), and in each case of the foregoing any provisions of this Agreement required to give meaning to the aforementioned sections (the "**Surviving Provisions**").

4.    **Conditions Precedent**.

4.1    **Conditions Precedent.**    Following Technical Acceptance of an Aircraft, Buyer's obligation to purchase such Aircraft and Seller's obligation to sell such Aircraft shall be subject to the following conditions; provided that it shall not be a condition precedent to the obligations of one Party that any document be delivered or action be taken that is to be delivered or be taken by the other Party or by a Person within the control of such other Party:

Aircraft SPA (SPIRIT-CSDS 2026)

(a)     execution and delivery by Seller of the Transaction Documents for such Aircraft to which Seller is to be a party and receipt by Buyer of the confirmation from the FAA Counsel that the FAA Bill of Sale for such Aircraft is in the due form for filing with the FAA (subject to Buyer providing all other documents required by Section 4.1(g)(1) below);

(b)     receipt of all appropriate governmental or regulatory approvals deemed necessary or advisable by Seller and Buyer; regarding which each Party will use commercially reasonable efforts to notify the other Party promptly upon becoming aware thereof;

(c)     the Bankruptcy Court shall have entered the Sale Approval Order approving this Agreement and such order shall (i) unless this requirement is waived by Buyer and Seller in their respective sole discretion, the Sale Approval Order shall have become a Final Order and (ii) not have been stayed, stayed pending appeal, reversed or vacated or materially supplemented in any manner as of the date of Delivery of such Aircraft;

(d)     such Aircraft shall be free and clear of all Liens, claims and interests (but excluding any Buyer's Liens), including any interests on the International Registry, or liens of record at the FAA shall be in the process of being released, with the FAA Counsel filing the appropriate releases with the FAA, and/or discharges of interests on the International Registry shall be in the process of being registered by the FAA Counsel;

(e)     receipt by Seller of the full Purchase Price for such Aircraft;

(f)     receipt by Seller of a duly executed copy from Buyer of the Aircraft Acceptance Certificate with respect to such Aircraft;

(g)     (1) prepositioning by Buyer of a completed and executed FAA Registration Application and such other documentation required for Buyer to register the Aircraft in the United States in the name of the Buyer as owner to be prepositioned with FAA Counsel to be filed concurrently with the Bill of Sale and/or FAA Bill of Sale, (2) Buyer taking all actions required of Buyer in order to cause the sale of the Aircraft from Seller to Buyer pursuant to this Agreement to be registered with the International Registry established pursuant to the Cape Town Agreements, and (3) receipt by Buyer of the confirmation from the FAA Counsel that the FAA Counsel will deliver a post-closing recordation opinion on the form customary for the FAA Counsel as contemplated in Section 4.3;

(h)     there shall be no material adverse change in the physical condition of such Aircraft from the date of Buyer's Technical Acceptance of such Aircraft to its Delivery;

(i)      receipt by Buyer of the compliance certification statement from Seller in the form of Exhibit H;

(j)      receipt by Seller of the compliance certification statement from Buyer in the form of Exhibit H;

(k)      receipt by Seller of certificates from Buyer's insurance broker evidencing Buyer's compliance with the insurance provisions of <u>Section 8</u> hereof; and

(l)      for each Aircraft, with respect to the Airframe and each Engine constituting such Aircraft, receipt by Buyer from the FAA Counsel on the form customary for the FAA counsel of a report (or reports) about lien searches of the FAA records and the International Registry established pursuant to the Cape Town Agreements preformed reasonably in advance of the applicable Delivery Date.

**4.2    No Financing or Other Contingencies.**    The transactions contemplated herein shall not be subject to or contingent on (i) Buyer obtaining any financing in relation to its acquisition of any Aircraft or (ii) the closing of any other transaction.

**4.3    Post-Closing Recordation Opinion.**    Promptly following the re-registration of an Aircraft in the name of Buyer in the United States, the recording of the FAA Bill of Sale and the receipt of appropriate and correct recording information from the FAA, Buyer shall receive an opinion addressed to it from the FAA Counsel, as to the due registration of such Aircraft, the due recording of the FAA Bill of Sale and the lack of filing of any intervening documents with respect to such Aircraft.

5.      **Bankruptcy Provisions**.

**5.1    Court Approvals.**  Promptly, but in no event later than three (3) business days after execution of this Agreement, the Seller shall file with the Bankruptcy Court a motion (the "**Sale Motion**"), which shall be in form and content reasonably acceptable to Buyer, seeking, among other things, entry of (i) an order approving the bidding protections set forth in the Sale Motion (the "**Bidding Procedures Order**"), and (ii) an order approving this Agreement and the transactions contemplated hereby  should the purchase offer made by this Agreement constitute the highest and best offer for the Aircraft pursuant to the Bidding Procedures Order (the "**Sale Approval Order**", and together with the Bidding Procedures Order, the "**Bankruptcy Court Orders**" all of which shall be in form and content reasonably acceptable to Buyer); *provided,*

Aircraft SPA (SPIRIT-CSDS 2026)

*however*, that the Bidding Procedures Order and the Sale Approval Order may include changes and amendments as mutually agreed to by the Seller and the Buyer.

5.2    **Court Filings.**  Unless exigent circumstances make it not feasible, the Seller shall provide Buyer with advance drafts of all Bankruptcy Court filings relating to the Sale Motion (all of which shall be form and content reasonably acceptable to Buyer before filing) and shall comply with the notice requirements set forth in the Bidding Procedures Order for providing notice of the entry of the Bidding Procedures Order and the hearing on the Sale Approval Order. The Seller shall provide the Buyer with copies of all communications from the Bankruptcy Court or third parties relating to the Sale Motion.

5.3    **Buyer Assistance.**    The Buyer shall use its commercially reasonable efforts to assist the Seller in obtaining entry of the Bankruptcy Court Orders, including providing testimony as required at any hearing before the Bankruptcy Court.  Buyer shall not, without the prior written consent of the Seller, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Aircraft, unless such filing relates to an alleged breach by Seller of this Agreement and the Buyer first sought to resolve consensually with the Seller. To the extent Buyer intends to file any motion or other pleading relating to the sale of the Aircraft, Buyer shall provide Seller's counsel with advance drafts of any such filings and a reasonable opportunity to review and comment thereon prior to filing.  For the avoidance of doubt, nothing in this section  shall restrict Buyer and its counsel from appearing at any and all hearings in Seller's bankruptcy proceedings, including without limitation, the hearings to approve the Bidding Procedures and Sale Motion.

5.4    **Competing Bids.**  This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller during the Bidding Period (as defined below) of higher or better competing bids in respect of the purchase and/or financing of all of the Aircraft or an Enterprise Sale (as defined below) (each, a "**Competing Bid**"), as determined in Seller's sole and exclusive discretion in accordance with the Bidding Procedures Order.  For the avoidance of doubt, bids for less than all of the Aircraft, even if combined to apply to all Aircraft, shall not be qualified or considered. The Bidding Procedures Order shall approve the Bid Protections (as defined below) and require an initial overbid amount at the Auction of at least $1 million exceeding the sum of the Purchase Price and the Bid Protections (assuming for this purpose that the Expense Reimbursement is equal to the maximum $2.5 million). After the end of the Exclusivity Period (as defined below) with the entry of the Bidding Procedures Order and thereafter until the completion of the Auction (as defined in the Bidding Procedures Order) (such period, the "**Bidding Period**") with respect to the Aircraft, the Seller is permitted to and to cause its representatives and any Seller's Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any person (in addition to Buyer and its Affiliates and Buyer's Representatives) in connection with a Competing Bid.

Aircraft SPA (SPIRIT-CSDS 2026)

In addition, during the Bidding Period Seller shall have the responsibility and obligation to respond to any inquiries or offers for a Competing Bid and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bidding Procedures Order, or other applicable Law.

5.5 **Back-up Bidder.** Seller and Buyer agree that, in the event that Buyer is not the winning bidder at the Auction, if, and only if, (i) Buyer submits the second highest or otherwise second best bid at the Auction and is named the "Back-Up Bidder" at the Auction, in each case, as determined by the Seller, and (ii) Seller gives notice to Buyer on or before the earlier of (x) the first Delivery Date of one of the Aircraft pursuant to the winning bid and (y) the 30th day after entry of the Sale Approval Order stating that the Seller (A) failed to consummate the sale with the winning bidder, (B) has terminated the purchase agreement with the winning bidder, and (C) intends to pursue the Sale with Buyer as the Back-Up Bidder, Buyer shall, within the time frames provided in this Agreement as they may be reasonably extended by this process, consummate the transactions contemplated by this Agreement upon the terms and conditions as set forth herein, including the aggregate Purchase Price for the Aircraft, as the same may be increased by Buyer at the Auction.

5.6 **Break-Up Fee and Reimbursement.** In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Seller, Seller shall pay Buyer, subject to and in accordance with the terms hereof and the Bidding Procedures Order, a break-up fee in an amount equal to 3.0% of the Purchase Price (the "**Break-Up Fee**"), and an expense reimbursement for Buyer's actual and reasonable legal, technical and other professional or third party expenses incurred in relation to the negotiations and documentation of this Agreement and the performance of the transactions contemplated by this Agreement not to exceed in the aggregate $2.5 million (the "**Expense Reimbursement**"; and collectively with the Break-Up Fee, the "**Bid Protections**"). The Bid Protections shall only be payable on the date of consummation of (x) a Competing Bid (which consummation shall be deemed to have occurred upon the first delivery date of one of the Aircraft pursuant to the Competing Bid) pursuant to sections 363 or 1129 of the Bankruptcy Code that would otherwise constitute or have constituted a Competing Bid at the Auction or any other process initiated by Seller (a "**Qualifying Bid Protections Event**") or (y) a Seller Cancellation Event (as defined below); provided that in the case of each of the foregoing clauses (x) and (y) if a breach by Buyer under clause (iii) of the definition of Buyer's Default has occurred, the Bid Protections shall  not be payable if such breach is not cured prior to such breach maturing into a Buyer's Default or if such breach is not curable. The Parties acknowledge and agree that in the event of a Qualifying Bid Protections Event or a Seller Cancellation Event, upon the actual and full payment of the Bid Protections to the Buyer pursuant to this Section 5.6, such payment shall, notwithstanding anything to the contrary contained herein, be the sole and exclusive remedy of the Buyer and its Affiliates against the Seller and its Affiliates in connection

with such termination.  The Seller shall seek the approval of the Bid Protections as set forth in this paragraph and this Agreement in each of the Sale Motion and the Bankruptcy Court Orders.   For the avoidance of doubt, Seller's obligations to satisfy the Bid Protections set forth in this section 5.6 shall continue to apply even if and after this Agreement is terminated due to a Competing Bid.

5.7     **Limited Exclusivity.**  In consideration of Buyer's time and expense incurred relating hereto, Seller agrees that it and its representatives will (except in all cases for matters exclusively relating to a proposed Enterprise Sale): (a) immediately pause all other discussions, direct and indirect and without regard to the party initiating such discussions, with third parties regarding any transaction involving the transfer or acquisition of all or any portion of the Aircraft other than an Enterprise Sale, as defined below (an "**Alternative Transaction**"); (b) during the periods (i) commencing on the date hereof and ending upon entry of the Bidding Procedures Order; and (ii) commencing on the entry of the Sale Approval Order approving the Sale to Buyer and ending upon the consummation or termination of the transactions contemplated by this Agreement (the "**Exclusivity Period**") shall not furnish or permit or cause to be furnished any information to any Person that Seller knows or has reason to believe is in the process of considering any Alternative Transaction;   and (c) agree that during the Exclusivity Period, Seller and its representatives will not, directly or indirectly, provide information to, engage in negotiations with, solicit, facilitate or otherwise engage in discussions with, or enter into any agreement relating to an Alternative Transaction with any third party other than Buyer and its representatives with respect to the Aircraft. If Seller, any affiliate of Seller, or any Person acting for or on behalf of any of the foregoing, receives from any Person (other than Buyer or a representative thereof) any offer, inquiry or informational request referred to above during the Bidding Period, Seller will promptly advise Buyer of such offer, inquiry or request and comply with its obligations under the Bidding Procedures Order (including without limitation providing documents and information regarding the Qualified Bid that constitutes the Baseline Bid (as those terms are defined in the Bidding Procedures) promptly and at least two Business Days before commencement of the Auction (or similar term, as defined in the Bidding Procedures Order). Provided, however, upon any termination of the Sale of a particular Aircraft pursuant to the terms of this Agreement, (A) Seller shall be authorized to recommence its sale efforts for the applicable Aircraft without any restrictions, and (B) the Parties shall promptly jointly instruct the Escrow Agent to return to Buyer the Aircraft Specific Deposit applicable to such Aircraft the Sale of which has terminated, unless a breach by Buyer under clause (iii) of the definition of Buyer's Default has occurred, in which case (x) if such breach is not cured prior to such breach maturing into a Buyer's Default or if such breach is not curable, the Parties shall promptly jointly instruct the Escrow Agent to pay to Seller the Aircraft Specific Deposit applicable to such Aircraft the Sale of which has terminated, or (y) if such breach is curable and is cured prior to such breach maturing into a Buyer's Default, the Parties shall promptly jointly instruct the Escrow Agent to return to Buyer the Aircraft Specific Deposit applicable to such Aircraft the Sale of which has terminated .

5.8 **Bankruptcy Termination Events.** Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated, and the transactions contemplated hereby may be abandoned at any time prior to the occurrence of the first Delivery Date of an Aircraft hereunder, as follows:

(a) by either the Seller or the Buyer, if the Bankruptcy Court has failed to enter the Sale Approval Order by April 30, 2026;

(b) by either the Seller or the Buyer, if, after their respective entry, either the Bidding Procedures Order or Sale Approval Order ceases to be in full force and effect;

(c) by either the Seller or the Buyer, if (x) the Chapter 11 Case is dismissed, or (y) a trustee under Chapter 11 of the Bankruptcy Code is appointed in the Chapter 11 Case;

(d) by the Seller, if Buyer is not the successful bidder at the Auction and is not named the "Back-Up Bidder" at the Auction; or

(e) by the Seller if the board of directors of Spirit Aviation Holdings, Inc. (the "**Seller Parent**") determines, in consultation with outside legal counsel, in its sole and exclusive discretion to terminate this Agreement in order to enter into an agreement to consummate a transaction (an "**Enterprise Sale**") contemplating the purchase of the equity or assets of Seller Parent and its subsidiaries as a going concern, including the Aircraft (a "**Seller Cancellation Event**").

6. **Termination**.

6.1 **Total Loss before Delivery.** If any Aircraft suffers a Total Loss prior to Delivery, Seller shall, as soon as reasonably practicable after it has become aware of such Total Loss, notify Buyer in writing thereof and, with effect from the date of such Total Loss, the Seller's obligations to sell and the Buyer's obligation to purchase such Aircraft shall terminate, and Buyer shall be entitled to instruct the Escrow Agent to return the Aircraft Specific Deposit for the affected Aircraft held by the Escrow Agent to Buyer.

6.2 **Aircraft Non-Sale Event.** Subject to the remaining terms of this Section 6, if an Aircraft Non-Sale Event occurs with respect to any Aircraft, then all remaining obligations of Seller to sell to Buyer (and to deliver the Warranty Bill of Sale and the FAA Bill of Sale to Buyer), and of Buyer to buy from Seller, with respect to such Aircraft under this Agreement and/or the other Transaction Documents will terminate; provided that, if (and only if) a Buyer's Default has also occurred with respect to such Aircraft, Seller shall be entitled to obtain the Aircraft Specific Deposit for such

Aircraft and instruct the Escrow Agent to pay the Aircraft Specific Deposit for such terminated Aircraft to Seller; provided, further, that, if an Aircraft Non-Sale Event for such Aircraft occurs for any reason other than Buyer's Default, Seller will not obtain the Aircraft Specific Deposit for such Aircraft and will, instead, promptly confirm to the Escrow Agent that the Aircraft Specific Deposit for such terminated Aircraft is to be returned to Buyer.

6.3    **Default Provisions.** (a)  With respect to any Aircraft, if any default described in clauses (i) or (ii) of the definition of "Buyer's Default" should occur in respect of such Aircraft, then Seller shall be entitled, in each case at Seller's sole discretion so long as such default is then continuing, to elect one or more of the following in respect of such Aircraft subject to the default, exercisable by delivering written notice to Buyer: (i) suspend performance under this Agreement with respect to such Aircraft, or (ii) terminate this Agreement immediately with respect to such Aircraft effective upon such written notice to Buyer, and in this case (ii) Seller shall be entitled to obtain the Aircraft Specific Deposit for such terminated Aircraft from the Escrow Agent.  If any default described in clause (iii) of the definition of "Buyer's Default" should occur, then Seller shall be entitled, in each case at Seller's sole discretion so long as such Buyer's Default is then continuing, to elect one or more of the following in respect of all of the Aircraft for which the Delivery hereunder have not yet occurred and the Sale of which hereunder has not previously been terminated hereunder (collectively, as of any time of determination, the "**Pending Aircraft**"), exercisable by delivering written notice to Buyer: (i) suspend performance under this Agreement with respect to either (as specified in such notice) (y) such Aircraft or (z) all of the then Pending Aircraft , and/or (ii) terminate this Agreement immediately with respect to such Pending Aircraft effective upon such written notice to Buyer, and in this case (ii) Seller shall be entitled to obtain the Aircraft Specific Deposit(s) for such Pending Aircraft and instruct the Escrow Agent to pay the Aircraft Specific Deposit for such Pending Aircraft to Seller.

(b)    With respect to any Aircraft, if any default described in clauses (i) or (ii) of the definition of "Seller's Default" should occur in respect of such Aircraft, then Buyer shall be entitled, in each case at Buyer's sole discretion so long as such default is then continuing, to elect one or more of the following in respect of such Aircraft subject to the default, exercisable by delivering written notice to Seller: (i) suspend performance under this Agreement with respect to such Aircraft, (ii) seek enforcement of the Sale Approval Order with respect to any or all such Aircraft, or (iii) terminate this Agreement immediately with respect to such Aircraft effective upon such written notice to Seller.  If any default described in clause (iii) of the definition of "Seller's Default" should occur, then Buyer shall be entitled, in each case at Buyer's sole discretion so long as such Seller's Default is then continuing, to elect one or more of the following in respect of all of the then Pending Aircraft, exercisable by delivering written notice to Seller: (i) suspend performance under this Agreement with respect to either (as specified in such notice) (y) any of such Pending Aircraft or (z) all of the Pending Aircraft, (ii) seek to enforce the Sale Approval Order with respect to all of the Pending Aircraft and/or (ii) terminate this Agreement immediately with

19

respect to any or all of the Pending Aircraft effective upon such written notice to Seller, and in this case (ii) Buyer shall be entitled and instruct the Escrow Agent to pay the Aircraft Specific Deposit for such Pending Aircraft to Buyer.

6.4 **Effect of Termination.** Notwithstanding the foregoing, but subject to the last sentence of this Section 6.4, each Party hereto may exercise any other right or remedy, if any, which may be available to it under applicable law or the Transaction Documents (if they have been entered into) in respect of such Aircraft and each Party shall retain any and all claims, if any, for damages under such Transaction Documents (if they have been entered into) or under applicable law for any breach of any agreement, representation, warranty or covenant contained in this Agreement or such Transaction Documents (if they have been entered into). Notwithstanding any conflicting or inconsistent provisions in this Agreement or the Transaction Documents (if they have been entered into), the Seller's remedy to obtain from the Escrow Agent and retain the Aircraft Specific Deposit(s) for terminated Aircraft shall constitute liquidated damages and Seller's exclusive remedy for Buyer's Default and otherwise against Buyer hereunder.

7. **Representations and Warranties; Disclaimers and Waivers**.

7.1 **Seller Representations and Warranties**.

Seller represents and warrants to Buyer that the following statements are true and accurate as of the date hereof and at each Delivery of an Aircraft:

(a) it is duly organized and validly existing under the Laws of its jurisdiction of formation and, subject to entry of the Sale Approval Order, has the power and authority to carry on its business as presently conducted and to perform its obligations under the Transaction Documents to which it is a party;

(b) subject to entry of the Sale Approval Order, each of the Transaction Documents to which it is a party has been (or will be, when executed) duly authorized, entered into and delivered by it and constitutes the legal, valid and binding obligation of it enforceable against it in accordance with its terms (subject to bankruptcy, insolvency, reorganization or similar Laws of general application affecting the enforcement of creditors' rights generally);

(c) subject to entry of the Sale Approval Order, neither the execution and delivery of the Transaction Documents to which it is a Party, nor the consummation of the transactions contemplated thereby nor compliance by it with any of the terms and provisions thereof will contravene any Law applicable to it or result in any breach of, or constitute a default under any indenture, mortgage, chattel mortgage, deed of trust, conditional sales contract, bank loan or credit

Aircraft SPA (SPIRIT-CSDS 2026)

agreement, partnership agreement, or other agreement or instrument to which it is a party or by which it or its properties or assets are bound or affected;

(d)    subject to entry of the Sale Approval Order, neither the execution, delivery or performance by it of the Transaction Documents to which it is a party, nor the consummation by it of any of the transactions contemplated thereby, will require the consent or approval of, the giving of notice to, or the taking of any other action in respect of, the shareholders, or the trustee or holder of any indebtedness of it, except such as have been or will be obtained or effected, each of which approvals, consents and waivers shall be in full force and effect on the Delivery Date;

(e)    for each Aircraft, Seller has full legal and beneficial title in and to, and at Delivery of such Aircraft Seller shall convey to Buyer good and valid title to, such Aircraft, free and clear of any Liens, claims or interests over such Aircraft other than Buyer's Liens, or liens of record at the FAA that shall be in the process of being released (with the FAA Counsel in advance possession of release instruments and in the process of filing the appropriate releases with the FAA) and/or interests on the International Registry that shall be in the process of being discharged (with such discharges in the process of being registered by the FAA Counsel);

(f)    there are no suits, actions, arbitration proceedings or claims pending or, to the knowledge of Seller, threatened against Seller arising out of or in connection with the Transaction Documents before or by any Government Entity; and

(g)    for the two-year period prior to its Delivery, such Aircraft has been insured under Seller's fleet insurance program, as renewed and in effect from time to time, while operated in commercial revenue service by Seller.

### 7.2    Buyer Representations and Warranties.

Buyer represents and warrants to Seller that the following statements are as of the date hereof and at each Delivery true and accurate:

(a)    it is a Nevada limited liability company and has the power and authority to carry on its business as presently conducted and to perform its obligations under the Transaction Documents to which it is a party;

(b)    each of the Transaction Documents to which it is a party has been (or will be, when executed) duly authorized, entered into and delivered by Buyer and constitutes the legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms (subject to bankruptcy, insolvency,

21

reorganization or similar Laws of general application affecting the enforcement of creditors' rights generally);

(c)    neither the execution and delivery of the Transaction Documents to which it is a party, nor the consummation of the transactions contemplated thereby nor compliance by it with any of the terms and provisions thereof will contravene any Law applicable to it or result in any breach of, or constitute a default under any indenture, mortgage, chattel mortgage, deed of trust, conditional sales contract, bank loan or credit agreement, corporate charter or by-laws, or other agreement or instrument to which it is a Party or by which its or its properties or assets are bound or affected;

(d)    neither the execution, delivery or performance by it of the Transaction Documents to which it is a Party, nor the consummation by it of any of the transactions contemplated hereby or thereby, will require the consent or approval of, the giving of notice to, or the taking of any other action in respect of, the members, or the trustee or holder of any indebtedness of Buyer, except such as have been or will be obtained or effected, each of which approvals, consents and waivers shall be in full force and effect on the Delivery Date; and

(e)    there are no suits, actions, arbitration proceedings or claims pending or, to the knowledge of Buyer, threatened against Buyer arising out of or in connection with the Transaction Documents before or by any other Government Entity.

### 7.3    **Disclaimers**.

(a)    EXCEPT AS EXPRESSLY SET FORTH IN THE BILL OF SALE WITH RESPECT TO AN AIRCRAFT, AND WITHOUT LIMITING ANY OF THE RIGHTS OR REMEDIES OF BUYER UNDER THIS AGREEMENT, EACH AIRCRAFT IS BEING SOLD ON ITS RESPECTIVE DELIVERY DATE (AND UPON BUYER'S EXECUTION OF THE APPLICABLE ACCEPTANCE CERTIFICATE THEREFOR) TO BUYER IN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" CONDITION WITHOUT ANY REPRESENTATION, GUARANTEE OR WARRANTY OF THE SELLER, EXPRESS OR IMPLIED, OF ANY KIND, ARISING BY LAW OR OTHERWISE AS TO THE CONDITION THEREOF; AND

(b)    WITHOUT LIMITING THE GENERALITY OF SECTION 7.3(a), BUYER UNCONDITIONALLY AGREES THAT (UPON BUYER'S EXECUTION OF THE APPLICABLE ACCEPTANCE CERTIFICATE THEREFOR) EACH AIRCRAFT, AND EACH PART THEREOF ARE TO BE SOLD AND PURCHASED IN AN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" CONDITION AS AT THE RELEVANT DELIVERY DATE

Aircraft SPA (SPIRIT-CSDS 2026)

APPLICABLE THERETO, AND NO TERM, CONDITION, WARRANTY, REPRESENTATION OR COVENANT OF ANY KIND HAS BEEN ACCEPTED, MADE OR IS GIVEN BY SELLER, IN RESPECT OF THE AIRWORTHINESS, VALUE, QUALITY, DURABILITY, TITLE (EXCEPT AS EXPRESSLY PROVIDED IN THE APPLICABLE BILL OF SALE), CONDITION, DESIGN, OPERATION, DESCRIPTION, MERCHANTABILITY OR FITNESS FOR USE OR PURPOSE OF THE AIRCRAFT, ANY IN-SCOPE ENGINE OR ANY PART THEREOF, AS TO THE ABSENCE OF LATENT, INHERENT OR OTHER DEFECTS (WHETHER OR NOT DISCOVERABLE), AS TO THE ACCURACY, VALIDITY, TRACEABILITY, COMPLETENESS OR CONDITION OF THE AIRCRAFT RECORDS, OR AS TO THE ABSENCE OF ANY INFRINGEMENT OF ANY PATENT, COPYRIGHT, DESIGN, OR OTHER PROPRIETARY RIGHTS; AND ALL CONDITIONS, WARRANTIES AND REPRESENTATIONS (OR OBLIGATION OR LIABILITY, IN CONTRACT OR IN TORT) IN RELATION TO ANY OF THOSE MATTERS, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, ARE EXPRESSLY EXCLUDED.

(c)     EXECUTION AND DELIVERY OF AN AIRCRAFT ACCEPTANCE CERTIFICATE BY BUYER TO SELLER SHALL BE CONCLUSIVE PROOF THAT THE AIRCRAFT AND EACH PART THEREOF DESCRIBED IN SUCH AIRCRAFT ACCEPTANCE CERTIFICATE ARE IN EVERY WAY SATISFACTORY TO BUYER AND HAVE BEEN ACCEPTED BY BUYER FOR ALL PURPOSES OF THIS AGREEMENT.

(d)     DISCLAIMER OF APPLICATION OF C.I.S.G.  THE PARTIES HEREBY EXPRESSLY DISCLAIM THE APPLICATION OF THE UNITED NATIONS CONVENTION ON THE INTERNATIONAL SALE OF GOODS TO THE EXTENT APPLICABLE TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

7.4    **Waivers**.

(a)     BUYER AND SELLER AGREE THAT EACH SHALL NOT BE ENTITLED TO RECEIVE AND HEREBY DISCLAIMS AND WAIVES ANY RIGHT THAT IT MAY OTHERWISE HAVE TO RECOVER OR SEEK TO RECOVER FROM THE OTHER PARTY PUNITIVE, CONSEQUENTIAL OR EXEMPLARY DAMAGES IN RESPECT OF ANY CLAIM MADE UNDER OR IN CONNECTION WITH THIS AGREEMENT.

(b)     BUYER HEREBY AGREES THAT ITS ACCEPTANCE OF THE AIRCRAFT AT DELIVERY AND ITS EXECUTION AND DELIVERY OF THE AIRCRAFT ACCEPTANCE CERTIFICATE IN RESPECT OF EACH AIRCRAFT CONSTITUTE BUYER'S WAIVER OF ANY WARRANTY OF DESCRIPTION, EXPRESS OR IMPLIED, AND ANY CLAIMS BUYER MAY

23

HAVE AGAINST SELLER OR ANY PARTY ACTING FOR OR ON BEHALF OF SELLER BASED UPON THE FAILURE OF THE AIRCRAFT TO CONFORM WITH SUCH DESCRIPTION.

(c)    DELIVERY BY BUYER TO SELLER OF THE AIRCRAFT ACCEPTANCE CERTIFICATE IN RESPECT OF EACH AIRCRAFT WILL BE CONCLUSIVE PROOF AS BETWEEN SELLER, ON THE ONE HAND, AND BUYER, ON THE OTHER HAND, THAT BUYER HAS UNCONDITIONALLY AND IRREVOCABLY ACCEPTED SUCH AIRCRAFT.

8.    **Insurance**.

8.1    **Insurances**.

(a)    For the period commencing on the Delivery Date for an Aircraft and ending on the earlier of (a) the two-year anniversary of the Delivery Date of such Aircraft and (b) the completion of the next "C-check" due under the AMM for such Aircraft (the "**Insurance Period**"), Buyer will carry or cause to be carried and maintained, comprehensive airline legal liability insurance, including but not limited to third party, passenger, baggage, cargo, mail and products liability insurance including without limitation, war risk and allied perils, in an amount of not less than $700,000,000.  Notwithstanding the foregoing, for any period of the Insurance Period that any Aircraft is in storage and not being operated, Buyer may maintain (or cause to be maintained) with respect to such Aircraft and only for such period of the Insurance Period that such Aircraft is in storage and not being operated, comprehensive aviation liability insurance (including, but not limited to, contractual liability and products liability) in an amount not less than $100,000,000.

(b)    All policies carried in accordance with this Section 8.1 and any policies taken out in substitution or replacement for any such policies, (i) shall include the Seller Parties as additional insureds (but not as manufacturer, repairer or servicing agent of the Aircraft, and without imposing on any such party liability to pay premiums with respect to such insurance) as respects the operation of the Buyer, (ii) shall be maintained with insurers of recognized standing and normally participating in the leading international commercial aviation insurance markets (through reinsurance, if necessary) and reasonably acceptable to Seller, (iii) shall provide that if the insurers cancel such insurance for any reason, or if the same is allowed to lapse for non-payment of premium or if any material change is made in the insurance which adversely affects the interest of the Seller Parties, such lapse, cancellation or change shall not be effective as to the Seller Parties and each of them for thirty days (seven days in the case of war risk and allied perils coverage) after written notice by such insurers of such lapse, cancellation or change, provided, however, that if any notice period specified above is not reasonably obtainable, such policies shall provide for as long a period of prior notice as shall then be

reasonably obtainable, (iv) shall expressly provide that all of the provisions thereof, except the limits of liability, shall operate in the same manner as if there were separate policy covering each insured, (v) provide that the insurers will waive any right to any setoff, recoupment, subrogation or counterclaim or any other deduction, by attachment or otherwise, and (vi) be primary and without right of contribution from any insurance which may be carried by the Seller Parties and any of them.

8.2    **Certificates, Etc.**  On or before the Delivery Date for each Aircraft, Buyer shall provide to Seller a certificate of insurance and letter of undertaking evidencing the coverage required pursuant to this Section 8 and shall provide to Seller, as applicable, an updated certificate of insurance and letter of undertaking upon each renewal or replacement of the coverage required pursuant to this Section 8.

9.    **Transfer Taxes**.

9.1    **Diligence.**  Each Party is responsible for researching its own tax position in relation to the transactions contemplated by the Transaction Documents, at its own cost and for its sole benefit.

9.2    **Tax Indemnity.**  Buyer shall, on an after-tax basis, pay, indemnify and hold Seller and its Affiliates harmless from any and all sales, use, transfer, excise, personal property, ad valorem, value-added, stamp, or other taxes and fees, withholdings, imposts, levies, customs or other duties, charges, monetary transfer fees, or governmental withholdings, together with any penalties, fines, or interest thereon, imposed, levied, or assessed in connection with the sale or Delivery of, or transfer of title to, each Aircraft (including the Engines associated with such Aircraft) to Buyer hereunder, other than (i) taxes imposed on the overall net income, profits or gains of Seller in respect of the sale or Delivery of, or transfer of title to, the Aircraft to Buyer; (ii) taxes to the extent imposed as result of Seller's failure to comply with the terms of this Agreement; (iii) taxes imposed, levied or assessed to the extent arising out of or in connection with the ownership, import, export, possession, operation, use, maintenance, return, or storage of the Aircraft prior to the Delivery Date, except any taxes arising out of or in connection with the sale or Delivery of, or transfer of title to, the Aircraft hereunder, or (iv) taxes to the extent arising as a result of the gross negligence or willful misconduct of Seller or its Affiliates or resulting from any inaccuracy of any representation or warranty of Seller hereunder (any or all of the foregoing, "**Transfer Taxes**").

9.3    **Cooperation.**  The Parties shall reasonably cooperate with one another to deliver to each other such certifications and other documents as may be reasonably requested in order to avail itself of any applicable exemption from Transfer Taxes.  Without limiting the foregoing, at or prior to the Delivery of each Aircraft, Buyer shall either (i) pay any Transfer Taxes imposed, levied, or assessed in connection with the sale or Delivery of, or transfer of title to, such Aircraft or (ii) provide to Seller a duly completed and validly executed exemption certificate, resale certificate, or other

25

documentation satisfactory to Seller establishing a complete exemption from Transfer Taxes with respect to the sale or Delivery of, or transfer of title to, such Aircraft.

### 9.4    Procedures, Etc..

(a)    If any Transfer Taxes for which Buyer is responsible under Section 9.2 are imposed, levied or assessed on Seller or any of its Affiliates, or Seller or any of its Affiliates are required by Law or otherwise to pay any such Transfer Taxes, Buyer shall reimburse Seller and/or its Affiliates for the full amount of such Transfer Taxes within fifteen (15) Business Days after receipt from Seller of written request for such reimbursement, accompanied by original receipts or other sufficient evidence of payment of such Transfer Taxes. If a claim is made against Seller or any of its Affiliates for any Transfer Taxes for which Buyer is responsible under Section 9.2, Seller will promptly notify Buyer in writing of such claim; provided, however, that Seller's failure to provide such notice will not relieve Buyer of its obligations hereunder except to the extent such failure precludes Buyer's ability to contest the claim.  So long as (a) Buyer has provided Seller with an opinion of independent and reputable tax counsel reasonably satisfactory to Seller that a reasonable basis exists for contesting such claim and adequate reserves have been made for such Transfer Taxes or, if required, an adequate bond has been posted, and (b) such contest does not impose any risk on Seller or any of its Affiliates of civil or criminal liability, then Seller and/or its Affiliates, at Buyer's written request and at Buyer's expense, will in good faith contest (or permit Buyer to contest in the name of Buyer or Seller and/or its Affiliates through counsel reasonably acceptable to Seller) the validity, applicability or amount of such Transfer Taxes.

## 10.    **Miscellaneous**.

10.1    **Entire Agreement, Amendment, Installment Contract; Time is of the Essence.**  Except as expressly provided herein, this Agreement together with the other Transaction Documents constitutes the entire agreement among the Parties relating to the subject matter hereof and thereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof.  This Agreement may not be amended except by an instrument in writing signed by or on behalf of each Party.  The Parties acknowledge and agree that although this is an "all or none" agreement for purposes of the overall transaction and bidding at any Auction, thereafter this Agreement is an installment contract solely for the purposes of Delivery and implementation, and accordingly (except in connection with a termination of this Agreement pursuant to Section 6.2 or Section 6.3, as the case may be, for all of the then Pending Aircraft), the inability or failure of the Delivery of any Aircraft, Airframe, or Engine, will not relieve the obligation of the Seller to sell, and the Buyer to buy, the remaining Aircraft, Airframes, or Engines.

The Parties agree that time shall be of the essence of this Agreement with respect to closing and delivering the number of Aircraft set forth in the Estimated Availability Timeline in Annex X by the applicable Delivery Window Deadline for such Aircraft. Additionally, each of the Parties shall act in a commercially reasonable manner to effect the transactions contemplated under this Agreement, including the closing of such transactions through the Delivery of the Aircraft, in a prompt manner and in accordance with the time periods and deadlines provided herein.

10.2    **[Reserved].**

10.3    **Non-Waiver.**    Any of the terms, covenants, or conditions hereof may be waived only by a written instrument executed by or on behalf of the Party hereto waiving compliance. No course of dealing on the part of any Party hereto, or its respective officers, employees, agents, accountants, attorneys, investment bankers, consultants, or other authorized representatives, nor any failure by a Party hereto to exercise any of its rights under this Agreement shall operate as a waiver thereof or affect in any way the right of such Party at a later time to enforce the performance of such provision. No waiver by any Party hereto of any condition, or any breach of any term or covenant contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term or covenant. Except as otherwise provided in this Agreement, the rights of the Parties hereto under this Agreement shall be cumulative, and the exercise or partial exercise of any such right shall not preclude the exercise of any other right.

10.4    **Severability.**    In the event that any provision of this Agreement or the application thereof to any Party shall, to any extent, be invalid or unenforceable under any applicable Law, then such provision shall be deemed inoperative to the extent that it is invalid or unenforceable and the remainder of this Agreement, and the application of any such invalid or unenforceable provision to the Parties, jurisdictions or circumstances other than to whom or to which it is held invalid or unenforceable, shall not be affected thereby nor shall the same affect the validity or enforceability of this Agreement.

10.5    **Notices.**    Any notice, request or information required or permissible under this Agreement will be in writing and in the English language. Notices must be addressed to the Parties as set forth below and delivered in person or sent by electronic mail or by expedited delivery, with a copy sent by e-mail. Any such notice shall be effective when received. In the case of a notice sent by expedited delivery, notice will be deemed received on the date of delivery set forth in the records of the Person which accomplished the delivery. If any notice is sent by more than one of the above listed methods, notice will be deemed received on the earliest possible date in accordance with the above provisions.

Aircraft SPA (SPIRIT-CSDS 2026)

(a)    Seller:

Spirit Airlines, LLC
1731 Radiant Drive
Dania Beach, Florida 33004

Attention: Legal Department
Telephone: (954) 447-7914 (Legal)
E mail: thomas.canfield@spirit.com

Attention: Treasury Department
Telephone: (954) 447-7976 (Treasury)
E mail: treasuryrisk@spirit.com

(with copies to beliu@debevoise.com and jball@debevoise.com)

(b)    Buyer:

CSDS Asset Management LLC
13880 N. Adonis Road,
Marana, Az 85658
Attention: Benedict Sirimanne
E mail: ben@csdsjets.com

With a copy to
Berger Singerman LLP
1450 Brickell Ave; Suite 1900
Miami, FL 33131
Email:singerman@bergersingerman.com
DLampert@bergersingerman.com

### 10.6   **Governing Law & Jurisdiction**.

(a)   This Agreement and all ancillary agreements and documents relating hereto (including without limitation any Aircraft Acceptance Certificate, any Assignment Statement, any FAA Bill of Sale and Warranty Bill of Sale hereunder), shall be governed by and construed in accordance with the Laws of the State of New York, including all matters of construction, validity, and performance, without reference to principles of conflicts of Law other than sections 5-1401 and 5-1402 of the New York general obligations Law.

Aircraft SPA (SPIRIT-CSDS 2026)

(b)    The Bankruptcy Court shall have exclusive jurisdiction in relation to any legal action or proceeding arising out of or in connection with this Agreement, the subject matter hereof or any of the transactions contemplated hereby; provided that, if there remain Aircraft for which the Delivery hereunder has not yet occurred as of the Plan Effective Date (as defined below) and if, following the Plan Effective Date, the Bankruptcy Court declines jurisdiction, each of the Parties hereto, to the maximum extent permitted by applicable Law, hereby (1) irrevocably submits itself to the non-exclusive jurisdiction of each of the Supreme Court of the State of New York, New York County and the United States District Court for the Southern District of New York, and other courts with jurisdiction to hear appeals from such courts and (2) waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof or any of the transactions contemplated hereby may not be enforced in or by such courts.  The term "**Plan Effective Date**" shall mean the effective date of any plan of reorganization filed by the Seller in the Chapter 11 Case that is confirmed pursuant to Section 1129 of the Chapter 11 of Title 11 of the United States Code, as amended.

10.7    **Waiver of Jury Trial.**  Each Party, to the extent permitted by Law, knowingly, voluntarily, and intentionally waives its right to a trial by jury in any action or other legal proceeding for matters, contractual, tortious, or otherwise, arising out of or relating to this Agreement and the transactions contemplated hereby.

10.8    **Further Assurances.**  Each Party hereto will promptly and duly execute and deliver such further documents to make such further assurances for and take such further action reasonably requested by any Party to whom such first Party is obligated, all as may be reasonably necessary to carry out more effectively the intent and purpose of this Agreement.

10.9    **Counterparts.**  This Agreement may be executed in any number of original, electronic or pdf counterparts and by any Party hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which, when taken together, shall constitute one and the same agreement.

10.10    **Transaction Costs.**  Except as otherwise expressly provided herein with respect to the Expense Reimbursement (if any), each Party shall bear its own costs and expenses (including attorney's fees) in relation to the negotiation and documentation of, and consummation of the transactions contemplated by this Agreement, and any other ancillary documents or agreement and the transactions contemplated hereby and thereby.  In respect of the sale of each Aircraft, Buyer and Seller will equally share the costs of FAA Counsel in the filing and registration of the sale of the Aircraft on the FAA's Civil Aviation Registry and on the International Registry, as applicable.

Aircraft SPA (SPIRIT-CSDS 2026)

10.11  **Assignment, Successors and Assigns.**    Neither Seller nor Buyer shall assign or transfer all or any of its rights and/or obligations under this Agreement without the prior written consent of the other Party, which may be withheld, conditioned, or delayed in such other Party's sole and absolute discretion; provided that, no assignment will relieve the assigning Party of any of its rights or obligations.  This Agreement shall bind and inure to the benefit of the Parties and any successors, and in each case permitted hereunder, assigns to the original Parties to this Agreement.

10.12  **[Reserved].**

10.13  **Third-party Beneficiaries.**    This Agreement is not intended to and shall not provide any Person not a Party hereto with any rights, of any nature whatsoever, against any of the Parties hereto, and no Person or entity not a Party hereto shall have any right, power, privilege, benefit, or interest arising out of this Agreement.

10.14  **Limitation of Liability.**    Notwithstanding anything to the contrary in this Agreement, no Party shall be liable to the other Party under this Agreement for any exemplary, special, punitive, indirect, remote, speculative, incidental, or consequential damages of any kind (including, but not limited to, lost profits, loss of sales, loss of revenue or loss of opportunity), in each case whether in tort (including negligence or gross negligence), strict liability, by contract, statute or otherwise, even if a Party has been advised of the possibility of such damages.

10.15  **Force Majeure.**    Neither Buyer nor Seller shall be liable for any failure of or delay in the Delivery of the Aircraft at the Delivery Location, or in any other obligation hereunder for the period that such failure or delay is due to acts of God or the public enemy; war, insurrection or riots; fires, governmental actions; strikes or labor disputes; pandemic, epidemic, or quarantine mandate; inability to obtain materials, accessories, or parts from the vendors; or any other cause beyond a Party's reasonable control.  Each Party shall use commercially reasonable efforts to terminate or mitigate any event of Force Majeure affecting its performance under this Agreement.   Upon the occurrence of any such event, the time required for performance by an affected Party of its obligations arising under this Agreement shall be extended by a period equal to the duration of such event.  In the event that such extension continues for more than one hundred and eighty (180) days, then either Party may terminate this Agreement in respect of the purchase and sale of the Pending Aircraft subject to such delay, and an Aircraft Non-Sale Event shall be deemed to have occurred with respect to such Pending Aircraft.

10.16  **Publicity**.

(a)      Neither Party will issue any press release or make any public announcement relating to the subject matter of this Agreement (other than Bankruptcy Court filings as contemplated hereby) without the prior written approval of the other Party,

Aircraft SPA (SPIRIT-CSDS 2026)

except that either Party may make any public disclosure it believes in good faith is required by applicable Law.  Notwithstanding the foregoing, if either Party, or a third party, makes a public disclosure related to this Agreement that is false or damaging to a Party, the aggrieved Party will have the right to make a public response reasonably necessary to correct any misstatement, inaccuracies or material omissions in the initial and wrongful affirmative disclosure without prior approval of the other Party.  Neither Party will be required to obtain consent pursuant to this section for any proposed release or announcement that is consistent with information that has previously been made public without breach of its obligations under this clause.

(b)     Neither Party will, without the other Party's prior written consent in each instance (x) use in advertising, publicity or marketing communications of any kind the name or other trademarks of the other Party or any of its Affiliates, or any employee of either, or (y) represent, directly or indirectly, that any product or service provided by a Party has been approved or endorsed by the other Party or any of its Affiliates.

10.17   **Relationship of the Parties.**  Nothing contained in this Agreement shall be deemed to create an association, partnership, joint venture, or relationship of principal and agent or master and servant between the Parties, or to grant either Party the right or authority to assume, create or incur any liability or obligation of any kind, express or implied, against, in the name of, or on behalf of, the other Party.

10.18   **Brokers and other Third Parties.**  Each Party represents and warrants to the other that it has not paid, agreed to pay or caused to be paid directly or indirectly in any form, any commission, percentage, contingent fee, brokerage or other similar payments of any kind in connection with this Agreement or the transactions contemplated hereby, to any Person.  Each Party agrees to indemnify and hold the other harmless from and against any and all claims, suits, damages, costs and expenses (including, but not limited to reasonable attorneys' fees and costs) asserted by any agent, broker or other third party for any commission or compensation of any nature whatsoever based upon this Agreement or the Transaction Documents or the Aircraft.

[SIGNATURE PAGE FOLLOWS]

31

IN WITNESS WHEREOF, the Parties hereto have entered into this Agreement as of the day and year first above written.

SELLER:

SPIRIT AIRLINES, LLC

By: _____

Name: _David M. Davis_

Title: _President and CEO_

BUYER:

CSDS ASSET MANAGEMENT LLC

By: _____

Name: _____

Title: _____

IN WITNESS WHEREOF, the Parties hereto have entered into this Agreement as of the day and year first above written.

SELLER:

SPIRIT AIRLINES, LLC

By: _____

Name: _____

Title: _____

BUYER:

CSDS ASSET MANAGEMENT LLC

By: _____

Name: _____

Title: _____

**Exhibit A**

**DESCRIPTION OF AIRCRAFT**

| MSN | AC Type | ESNs | Purchase Price |
|---|---|---|---|
| 8632 | A320-200 CEO | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $26,500,000.00 |
| 6463 | A320-200 CEO | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $26,500,000.00 |
| 6487 | A320-200 CEO | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $26,500,000.00 |
| 7724 | A320-200 CEO | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $26,500,000.00 |
| 7679 | A320-200 CEO | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $26,500,000.00 |
| 7635 | A320-200 CEO | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $26,500,000.00 |
| 6736 | A321-200 CEO | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $27,000,000.00 |

Exhibit A

| MSN | AC Type | ESNs | Purchase Price |
|---|---|---|---|
| 8824 | A320-200 CEO | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $26,500,000.00 |
| 8659 | A320-200 CEO | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $26,500,000.00 |
| 8611 | A320-200 CEO | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $26,500,000.00 |
| 7957 | A321-200 CEO | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $27,000,000.00 |
| 7908 | A321-200 CEO | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $27,000,000.00 |
| 7857 | A321-200 CEO | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $27,000,000.00 |
| 7668 | A321-200 CEO | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $27,000,000.00 |
| 7462 | A321-200 CEO | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $27,000,000.00 |

| MSN | AC Type | ESNs | Purchase Price |
|---|---|---|---|
| 6507 | A320-200 CEO | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $26,500,000.00 |
| 6586 | A320-200 CEO | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $26,500,000.00 |
| 8614 | A320-200 CEO | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $26,500,000.00 |
| 7395 | A321-200 CEO | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $27,000,000.00 |
| 6566 | A320-200 CEO | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $26,500,000.00 |
| Total: | | | **$533,500,000.00** |

Exhibit A
Page 3

**Schedule 1 to Exhibit A**

## ENGINES

| AC Type | ESNs |
|---|---|
| A320-200 CEO | V18891 |
| | V18892 |
| A320-200 CEO | V17579 |
| | V17588 |
| A320-200 CEO | V17626 |
| | V17628 |
| A320-200 CEO | V18570 |
| | V18571 |
| A320-200 CEO | V18466 |
| | V18483 |
| A320-200 CEO | V18426 |
| | V18430 |
| A321-200 CEO | V17844 |
| | V17872 |
| A320-200 CEO | V18936 |
| | V18937 |
| A320-200 CEO | V18897 |
| | V18902 |
| A320-200 CEO | V18881 |
| | V18878 |

Exhibit A
Page 4

| AC Type | ESNs |
|---|---|
| A321-200 CEO | V18670 |
| | V18671 |
| A321-200 CEO | V18648 |
| | V18649 |
| A321-200 CEO | V18594 |
| | V18599 |
| A321-200 CEO | V18479 |
| | V18481 |
| A321-200 CEO | V18452 |
| | V18453 |
| A320-200 CEO | V17639 |
| | V17648 |
| A320-200 CEO | V17669 |
| | V17709 |
| A320-200 CEO | V18888 |
| | V18886 |
| A321-200 CEO | V18413 |
| | V18415 |
| A320-200 CEO | V17693 |
| | V17704 |

Aircraft SPA (SPIRIT-CSDS 2026)

## Exhibit B

### DELIVERY CONDITION

**Delivery Condition**

Except as expressly described in this Exhibit B, each Aircraft will be delivered in "AS-IS, WHERE-IS" and "WITH ALL FAULTS" condition.  There shall be no hard time limits, or cycle, condition or time or other requirements of any kind, applicable to any Aircraft, any Engine, Engine LLP or any other part.

1.  At Delivery thereof:

    a.  Each Aircraft will be delivered in serviceable condition per the Seller's FAA-approved Maintenance Program, the Seller's GMM, and the Seller's 121 Air Carrier Certificated Policy and Procedures, and in the same general condition, configuration (but in each case allowing for the removal of any Excluded Equipment), and modification (but in each case allowing for the WiFi STC demodification described below) as of the time such Aircraft was removed from revenue service, normal wear and tear for an aircraft of a similar age and maintenance status excepted, and such Aircraft will have no open deferrals, MELs, or discrepancies.

    b.  With respect to each Aircraft, the Engines shall be in serviceable condition per the Seller's FAA-approved Maintenance Program, the Seller's GMM, and the Seller's 121 Air Carrier Certificated Policy and Procedures.

    c.  All Aircraft shall be delivered with one APU and two installed Engines; provided that, prior to Delivery, Seller may remove a previously installed plug on any Engine that enabled such Engine to operate, when in Seller's fleet, with a thrust rating for the higher-thrust rate engine model than the corresponding engine model designated in Exhibits E and F and, at the time of Delivery, the two Engines delivered with and installed on an Aircraft shall have the same rated thrust.

2.  Seller shall remove or paint over (or cause to be removed or painted over) any and all uses of the Spirit Airlines name, logo or other identifying marks (both from the interior and exterior) from each Aircraft prior to its Delivery.

3.  Each Aircraft shall have a valid standard Certificate of Airworthiness.

4.  WiFi STC demodification is performed in accordance with the FAA-approved STC demodification instructions. Should Buyer seek STC validation in non-FAA

Exhibit B

jurisdictions, such validation shall be at Buyer's expense and shall not be a condition of sale.

5.  On average, across all landing gears associated with the 20 Aircraft, such landing gears shall have at least 3 years remaining to the next overhaul.

6.  Each Aircraft shall be (a) in compliance with the Seller's FAA-approved Maintenance Program, without maintenance items open past their due date (or with respect to "C" check heavy maintenance, coming due within six months after the Delivery Date of such Aircraft) per the Seller's FAA-approved Maintenance Program; (b) in compliance with all applicable mandatory airworthiness directives issued by the FAA (the "**ADs**") and all applicable mandatory service bulletins issued by the Aircraft manufacturer (the "**MSBs**"), in each case, which require compliance no later than the Specified Compliance Cut-Off Date (as defined below), as and to the extent required by such ADs or MSBs, as applicable, prior to the Specified Compliance Cut-Off Date; (c) without parts, systems or components installed on a temporary loan or exchange basis; and (d) RVSM and ADS-B compliant to the extent required by the FAA.  As used herein, the "**Specified Compliance Cut-Off Date**" means, with respect to an Aircraft, the earlier of (i) 30 days after the Delivery of such Aircraft or (ii) 90 days after the earliest unfulfilled availability date indicated on Annex X.

7.  In accordance with the Seller's FAA-approved Maintenance Program, the Seller's GMM, and the Seller's 121 Air Carrier Certificated Policy and Procedures, any Engine may be subject to a reduced interval inspection; *provided* that such reduced inspection interval is at a minimum equal to 500 flight cycles.  Engines may not have a reduced removal hard time scheduled until an HP turbine performance restoration visit in accordance the Seller's FAA-approved Maintenance Program, the Seller's GMM, and the Seller's 121 Air Carrier Certificated Policy and Procedures.

8.  It being acknowledged that attached to an email from Seller to Buyer, sent on February 5, 2026 around 1:17 p.m., New York time, titled "Avionics List and Mx Details" were (x) a PDF file that contained the general "Avionics List" applicable to each Aircraft (the "**Reference PDF File**") and (y) an Excel file (the "**Reference Excel File**") that contained the number of cycles estimated as of April 15, 2026 for each Airframe and each Engine (and, with respect to each such Engine, each LLP described therein).

    a.  If, at Delivery of an Aircraft, the list of avionics installed on such Aircraft is not the same general list as indicated in the Reference PDF File for such Aircraft or for any other Aircraft with the "AC Type" of such Aircraft that are listed on Schedule 1 to Exhibit A, such Aircraft will be understood not to be in the same configuration as of the time such Aircraft was removed

from revenue service, normal wear and tear for an aircraft of a similar age and maintenance status excepted.

b.   If, at Delivery of an Aircraft, (1) the actual cycles consumed since new on the Airframe or any Engine constituting part of such Aircraft exceed the Updated Estimate (as defined below) for such Airframe or Engine by more than 500 cycles or (2) with respect to any such Engine, the cycles remaining of the manufacturer's published life limit for any applicable LLP installed on such Engine fall short of the Updated Estimate for such LLP by more than 500 cycles, the Purchase Price for such Aircraft will be adjusted downwards by the adjustment amount for each such cycle in excess or each such cycle shortfall, as applicable, which adjustment amount shall be negotiated in good faith by the Parties and, if after negotiating in good faith the Parties cannot agree to a mutually agreeable adjustment amount, the appropriate adjustment amount shall be as determined by the Bankruptcy Court; provided that there shall be credited against such adjustment amount, on a dollar-for-dollar basis, an upwards adjustment for the cycles remaining of the manufacturer's published life limit for any applicable LLP installed on any such Engine in excess of the Updated Estimate for such LLP.  As used herein, with respect to each Aircraft, the term "**Updated Estimate**" means, for its Airframe, each associated Engine and each LLP for such Engine described in the Reference Excel File (in the case of any LLP, described by type, but not by its manufacturer's serial number), the number of cycles to be estimated as of the Delivery Date for such Aircraft using the assumptions stated in the Reference Excel File.

Aircraft SPA (SPIRIT-CSDS 2026)

**Schedule 1 to Exhibit B**

<u>AIRCRAFT RECORDS</u>

<u>DOCUMENTS FROM ORIGINAL DELIVERY (Documents available electronically via AirbusWorld)</u>

1. Export Certificate of Airworthiness
2. Factory AD Status
3. Factory SB Status
4. Original Weighing Report
5. Sanitary Construction
6. Aircraft Inspection Report
7. Detailed Specification
8. Interior Spec
9. Significant Rework Log
10. Landing Gear Brochure
11. Engine VSLs
12. APU Transmittal
13. Electrical Load Analysis
14. Noise Certificate
15. ETOPS / RVSM / CAT / BRNAV Letters
16. Committed Airplane Changes
17. LOPA

<u>CURRENT CERTIFICATES</u>

1. Certificate of Airworthiness
2. Registration
3. Radio License

<u>CERTIFIED STATUS</u>

**(Status may include: Reports/Statements/Task Card)**

1. Airframe Times & Cycles
2. Engines Times & Cycles
3. APU Times & Cycles
4. Ratio of APU to Flt Hours statement (If Applicable)
5. Maintenance Check Status / History
6. Aircraft Modification Status Report
7. Airframe AD Summary
8. Appliance AD Summary

Aircraft SPA (SPIRIT-CSDS 2026)

9. Service Bulletin Summary
10. Deferred Maintenance Items Report
11. Oils & Fluids Used Statement
12. Last Compass Calibration Compliance Card (Last Compliance Card)
13. Aircraft and Landing Gear Accident / Incident Statement
14. Engine Accident / Incident Statement (2)
15. APU Accident / Incident Statement
16. A/C Flight Time Report / Logs (Master Time & Cycle Log)
17. Seller Maintenance Program
18. LDND (Last Done Next Due)
19. Aircraft LLP Status Report (Certified)
20. Aircraft LLP Back to Birth Trace

## INTERIOR

1. LOPA
2. Current Emergency Equipment Drawing (on LOPA)
3. Galley CMM (if available electronically via AirbusWorld)
4. Seat CMM's

## AIRWORTHINESS DIRECTIVES DFP's

1. AD Airframe DFP's **(DFP compliance is a copy of original document or electronic copy showing compliance.)**
2. AD Appliance DFP's **(DFP compliance is a copy of original document or electronic copy showing compliance.)**

## MODIFICATION DFP's

**(DFP compliance is a copy of original document or electronic copy showing compliance.)**

1. In-House
2. STC's
3. STC Data Packages **(Data package includes: MDL, drawings, parts list, manual supplements, instructions for continued airworthiness and Right to Use letter (if applicable)**
4. Service Bulletins
5. Service Letter (If Applicable)

## REPAIRS

1. Dent and Buckle (Repair) Mapping

2. Structural Repairs DFPs **(DFP compliance includes a copy of original document or electronic copy showing compliance (as well as any reference material required for approval (8110-3, RDAS, EO, etc.)**
3. Substantiations /SRM/FAA /EASA Approvals/ RAS, etc. and all correspondence

AIRCRAFT MAINTENANCE RECORDS

1. Historical C Check and Heavy Check Packages
2. Flammability data for consumables used during repairs will be provided only if available

COMPONENTS

1. Hard Time Status Report (Certified)
2. Hard Time Certificates (Tags) **(FAA 8130-3 or EASA Form 1 serviceable tags)**
3. OCCM Installed Components List (Certified) **(OCCM is operator defined. Operator Configuration Control Master - this document is Spirit's list of tracked components as approved by its CASS board)**

NOSE GEAR S/N

1. Last Overhaul Package
2. Last Shop Visit Package
3. LLP Status (Certified)
4. LLP Back to Birth Trace

LEFT MAIN GEAR S/N

1. Last Overhaul Package
2. Last Shop Visit Package
3. LLP Status (Certified)
4. LLP Back to Birth Trace

RIGHT MAIN GEAR S/N

1. Last Overhaul Package
2. Last Shop Visit Package
3. LLP Status (Certified)
4. LLP Back to Birth Trace

#1 ESN

1. Disk Sheet / LLP Status (Certified)
2. LLP Back to Birth Trace
3. AD Status (Certified)

4. SB Status (Certified)
5. Shop Visit Packages
6. List of Historical Shop Visits (Certified)
7. Engine Installation/Removal History (Certified)
8. Engine Accessory Report (Certified)
9. Trend Monitoring for the Last Year
10. Non-PMA/DER Statement for the Engine gas path/internals (substantially in the form of Schedule 1 to this Exhibit B)

#2 ESN

1. Disk Sheet / LLP Status (Certified)
2. LLP Back to Birth Trace
3. AD Status (Certified)
4. SB Status (Certified)
5. Shop Visit Packages
6. List of Historical Shop Visits (Certified)
7. Engine Installation/Removal History (Certified)
8. Engine Accessory Report (Certified)
9. Trend Monitoring for the Last Year
10. Non-PMA/DER Statement for the Engine gas path/internals (substantially in the form of Schedule 1 to this Exhibit B)

APU S/N

1. APU Logbook
2. Shop Visit Packages **(Shop Packages include Engineering Disposition Report (EDR), ARC, and Logbook copies.)**
3. AD Status (Certified) in Log Book **(AD status in the log book is acceptable with signature)**
4. SB Status (Certified) in Log Book **(SB status in the log book is acceptable with signature)**
5. LLP Status (Certified)
6. Listing of APU Installation/Removal History (certified)

MANUALS

**(Manuals may be transferred electronically and will include any supplements required by any modification)**

1. AFM with Supplements
2. Quick Reference Handbook "QRH"
3. Airplane Flight Operation Manual (FCOM)

4. Flight Crew Training Manual
5. AMM
6. IPC
7. WDM & Lists
8. SRM
9. Weight & Balance
10. Fault Isolation (TSM)
11. Power Plant Build Up
12. Dispatch Deviation Guide (DDG)
13. Master Minimum Equip. List (MMEL)
14. Current Cockpit Disk Storage Box **(Originals will be retained.)**

MISCELLANEOUS

1. Tech Logs
2. Weight & Balance Report
3. Avionics Inventory
4. ETOPS & RVSM & CAT (ILS) status (as applicable)
5. Current Aircraft Software List with the available software provided in digital format
6. Non-Incident Statements for Airframes, Engines, Landing Gears, and APU in the forms customary for Seller
7. ADS/B system installation documentation (either factory Mod number or installation Task Card if installed post-delivery via SB or STC)

**Schedule 2 to Exhibit B**

## DELIVERY LOCATION

The Delivery Location for each Aircraft shall be Goodyear, Arizona, or such other location as mutually agreed between the Parties.

Seller shall, at Seller's expense (if the Delivery Location is Goodyear, Arizona) or at Buyer's expense (if the Delivery Location is another mutually agreed location), arrange and pay for all relocation flights and associated flight permits to locate the Aircraft at the Delivery Location prior to Delivery.

Following Delivery of an Aircraft, Buyer shall be responsible for arranging the parking and storage of such Aircraft, and shall be responsible for the payment of all parking and storage fees for such Aircraft following its Delivery.

Aircraft SPA (SPIRIT-CSDS 2026)

## Exhibit C

### LIST OF EXCLUDED EQUIPMENT
(each as documented by Seller's Task Card or maintenance log entry)

| WI-FI PARTS | | | |
|---|---|---|---|
| **COMPONENT NAME** | **PART NUMBER** | **QTY** | **EFFECTIVITY** |
| Tx Antenna | 187303-101/102 | 1 | All |
| Rx Antenna | 187302-101/102 | 1 | All |
| Kandu | 187300-101 | 1 | All |
| Krfu | 187301-101/102 | 1 | All |
| Waps | LV10-150801-102 | 3 | All |
| Modem | E71-200-01 | 1 | All |
| MPS, MULTI PURPOSE SERVER | 186096-103 | 1 | All |
| Radome | 187304-101/102 | 1 | All |
| Fairing | 187305-101/102 | 1 | All |
| Adapter Plate | 187306-101 | 1 | All |
| | | | |

| CABIN & GALLEY PARTS | | | |
|---|---|---|---|
| **COMPONENT NAME** | **PART NUMBER** | **QTY** | **EFFECTIVITY** |
| Emergency Medical Kit (EMK) | FAREMK | 2 | All |
| F/S Trolley | TK500009/ZK101061 | 5 | All |
| H/S Trolley | TL500001/ZL101061 | 1 | All |
| F/S Waste Trolley | TKG720018/ZK101036/TG500007 | 2 | All |
| Waste Bin for F/S Waste Trolley | WA500001 | 2 | All |
| Std Unit | BB015004 | 6 | All |
| | | | |

Exhibit C

Aircraft SPA (SPIRIT-CSDS 2026)

**Exhibit D**

INSPECTION AND TECHNICAL ACCEPTANCE

**Inspection**

With respect to each Aircraft, the Inspection shall include:

1. **Aircraft**: A physical walk-around inspection of the Aircraft that shall be adequate to verify whether the Aircraft satisfies the Delivery Condition and may include going on board such Aircraft and examining the contents of any open panels, bays or other components of such Aircraft (but shall not include the opening of any unopened panels, bays or other components), including, but not limited to:

    a. General visual inspections of the thrust reverser, Engine inlet cowling and nacelles group, including all structures, acoustical coverings, attachment points and fairing surfaces
    b. General visual inspection of engine inlet, fan blades, and exhaust nozzle.
    c. General visual inspection of external repairs to compare to dent and buckle chart;
    d. General visual inspection of cabin and cockpit:
        i. Worn or illegible interior component tags shall not constitute a defect, and shall be considered normal wear and tear;
        ii. Wear and tear to non-structural portions of interior components including but not limited to carpets, seat dress covers, overhead bins, sidewalls, lavatories, and galleys, such as tears, rips, stains, scuffs, and similar, shall not constitute defects and shall be considered normal wear and tear;
        iii. PMA and OOP (Owner Operator Produced) components utilized in, but not limited to, the cabin and cockpit shall be acceptable to Buyer;
    e. General visual inspection of avionics bay;
    f. General visual inspection of cargo compartments;
    g. General visual inspection of THSA compartment;
    h. General visual inspection of installed aircraft software (PNs/SNs and Binder);
    i. General visual inspection of the flaps and spoilers, the flaps shall be lowered, and spoilers extended for inspection; and
    j. a cabin pressure check ground leak test.

    The Aircraft will be required to have ground or APU power during such Inspection to verify functionality of components.

Aircraft SPA (SPIRIT-CSDS 2026)

2.    **Engines**:

In the case of each Engine with a borescope inspection performed within 50 flight cycles prior to the Demonstration Flight (as defined below) for the associated Aircraft, whether or not Buyer's representatives were present at such prior borescope inspection, no further borescope inspection nor, except as otherwise expressly set forth in this Exhibit D, any other inspection of such Engine will be required.

In the case of each Engine fresh out of a shop visit with Pratt & Whitney or any affiliate thereof (i.e. with fewer than 50 flight cycles after such shop visit or 90 days on wing after such shop visit, whichever is more limiting, as of the commencement of the Demonstration Flight for the associated Aircraft), no borescope inspection nor, except as otherwise expressly set forth in this Exhibit D, any other inspection of such Engine will be required.

In the case of any Engine not described in this Clause 2 (Engines) above, upon Buyer's request prior to the Demonstration Flight, a hot and cold section video borescope inspection of such Engine in accordance with the Seller's FAA-approved Maintenance Program will be performed before the Demonstration Flight by a representative of Seller, at Seller's expense, in the presence of a representative of Buyer.

3.    **APU**:

In the case of the APU of any Aircraft, if Seller observes false starts or similar evidence of material malperformance of such APU prior to the Demonstration Flight, upon Buyer's request prior to the Demonstration Flight, Seller will report any such observations to Buyer. If requested by Buyer before the Demonstration Flight, a borescope inspection of any APU with false starts or similar evidence of material malperformance will be performed in accordance with the Seller's FAA-approved Maintenance Program before the Demonstration Flight by a representative of Seller, at Seller's expense, in the presence of a representative of Buyer.

4.    **Demonstration Flight**.

a.    For the avoidance of doubt, the "Return to Service" flight performed by Seller to exit the Aircraft Parking and Storage period shall not be considered a "Demonstration Flight" and only Seller personnel or representatives may be on board for the "Return to Service" flight.

b.    Buyer shall be permitted observation by Buyer's representatives (up to a maximum of three observers) of an acceptance flight (the "**Demonstration Flight**") of no less than two hours duration (following Seller's acceptance flight procedure including a Maximum Power Assurance (MPA) run, take-off performance test, ground checks and Engine ground runs). Buyer's observers and Seller's pilots shall act reasonably to agree upon the

"Demonstration Flight" profile, to be substantially similar to industry standard for such a pre-sale "Demonstration Flight", with Seller's Captain (as Pilot in Command) making final determination of what may or may not be performed during the Demonstration Flight.

c.  Following the Demonstration Flight, Buyer may perform a walk-around inspection of such Aircraft comparable to a pre-flight inspection performed by flight crew, but, during such inspection following the Demonstration Flight, Buyer will not be permitted to perform a borescope inspection of the engines or APU, nor request the opening of such Aircraft to inspect bays, panels, or other areas.

d.  In the event a defect arises during the Demonstration Flight, such defect shall be documented in the Aircraft Maintenance Log and corrected in accordance with the appropriate service document, or Seller's GMM policy and procedure (should Engineering be required), by Seller's or Seller's contracted qualified personnel, unless agreement is made in writing between Buyer and Seller for Buyer to accept the defect on an as-is condition.

5.  **Records**.  Buyer shall have an opportunity to inspect all Records in Seller's possession, which will be provided electronically via FlyDocs and AirbusWorld. It being understood by Seller that Buyer's representative(s) have active accounts at FlyDocs and AirbusWorld prior to execution of this Agreement, Seller will request continued access for Buyer on FlyDocs and AirbusWorld with respect to the Aircraft until the Delivery of such Aircraft through such accounts of Buyer's representative(s) as have been notified to Seller and remain active.

## Technical Acceptance

With respect to each Aircraft, the Technical Acceptance Deadline will be within seven Business Days after the conclusion of the Demonstration Flight and Buyer being given access to the Records for such Aircraft, or such other date as may be mutually agreed by the Parties.

Subject to the immediately following paragraph, if such Inspection results for the Aircraft are reasonably satisfactory to Buyer and do not result in any Inspection Findings with respect to such Aircraft, in each case in Buyer's reasonable determination based upon the Delivery Condition and the terms of this Agreement or the Transaction Documents, then (1) Buyer shall deliver written notice via email to Seller evidencing satisfactory completion of such Inspection ("**Technical Acceptance**") for the Aircraft prior to the expiration of the applicable Technical Acceptance Deadline, (2) the delivery of written notice of such

Technical Acceptance shall not be unreasonably withheld or delayed by Buyer, and (3),if Buyer does not issue Technical Acceptance in accordance with the preceding clause (2) after completion of the Inspection for the Aircraft, then Buyer will have been deemed to have rejected the Aircraft, and an Aircraft Non-Sale Event shall be deemed to have occurred with respect to the Aircraft.

In the event the Inspection of any Aircraft results in a material finding that one or more repairs, modifications or corrections to such Aircraft are needed to cause such Aircraft to be in compliance with the Delivery Condition (with respect to any Aircraft, the "**Inspection Findings**"), the Buyer will, after completion of the Inspection for such Aircraft, issue a conditional technical acceptance requiring correction of the specified Inspection Findings and the Parties shall negotiate in good faith for a mutually agreed resolution to such Inspection Findings which may include an adjustment to the Purchase Price of such Aircraft for an estimated cost of such repair, modification or correction, which may be based on a third-party MRO quote or on Seller's average direct costs from the last 12 months (if repair, modification or correction of such Inspection Findings is mutually agreed to be carried out by or on behalf of Seller) or on another cost determination.  If after negotiating in good faith the Parties cannot agree to a mutually agreeable resolution, the appropriate cost adjustment shall be as determined by the Bankruptcy Court; *provided* that, if costs of having the Inspection Findings rectified are expected by Seller (or are determined by the Bankruptcy Court) to exceed $1,500,000 for an Aircraft, then commencing upon either Party's notice ("**Walkaway Notice**") to the other: (A) Buyer shall have the right by notice to the Seller within five Business Days of the Walkaway Notice to purchase the applicable Aircraft with a $1.5 million reduction in the Purchase Price (without rectification of the Inspection Findings) by paying such reduced Purchase Price to Seller no later than on the sixth Business Day of the Walkaway Notice, and (B) if Buyer does not timely exercise its right under clause (A) immediately above, then Seller shall have the right either (I) to reduce the Purchase Price by the full amount required to rectify the Inspection Findings and require Buyer to close on the purchase of such Aircraft without rectifying the Inspection Findings, in which case Buyer shall pay such reduced Purchase Price no later than on the sixth Business Day of Buyer's notice to Seller of the election pursuant to this sub-clause (B)(I), or (II) to declare that an Aircraft Non-Sale Event shall be deemed to have occurred with respect to such Aircraft (the "**Technical Delivery Walkaway Right**").

For the avoidance of doubt, with respect to an Aircraft, the $1,500,000 threshold for the Technical Delivery Walkaway Right applies solely and exclusively to (i) costs to rectify the Inspection Findings for such Aircraft other than the Excluded Findings, and (ii) the amount of insurance settlement on account of any damage to such Aircraft on the basis of a loss other than a total loss.  The $1,500,000 threshold excludes all costs for work performed by Seller on such Aircraft prior to its being tendered for technical acceptance to Buyer.  The term "**Excluded Findings**" shall mean, with respect to an Aircraft, any Inspection Finding that because of the removal of any parts without their replacement or

reinstallation such Aircraft is not in the same configuration (but in each case allowing for the removal of any Excluded Equipment) and modification (but in each case allowing for the WiFi STC demodification described in Exhibit B) as of the time such Aircraft was removed from revenue service, normal wear and tear for an aircraft of a similar age and maintenance status excepted, which may be rectified by completing the Aircraft to the Delivery Condition by replacing or reinstalling the removed part (for the avoidance of doubt, costs to repair any damage following removal of any Excluded Equipment will not be considered costs to rectify the Excluded Findings).

**Exhibit E**

FORM OF AIRCRAFT ACCEPTANCE CERTIFICATE

Date: [_____]

CSDS ASSET MANAGEMENT LLC ("**Buyer**") hereby confirms, pursuant to the Aircraft Sale and Purchase Agreement (SPIRIT-CSDS 2026), dated February 9, 2026, among SPIRIT AIRLINES, LLC ("**Seller**") and Buyer (the "**Sale and Purchase Agreement**"), that Buyer's execution of this certificate constitutes its confirmation of its absolute, irrevocable and unconditional acceptance of the Airframe and Engines and that pursuant to the Sale and Purchase Agreement, Buyer is satisfied in every way and in all respects (subject to the discrepancies listed on Annex A hereto) with the condition of the following equipment;

     (i)     one (1) Airbus S.A.S. model [A320-232][1] / [A321-231][2] airframe bearing the manufacturer's serial number [number] and U.S. registration mark [N####], in "as is, where is" condition, including all parts, components, appliances, accessories, instruments, furnishings, alterations, and other items of equipment installed in, attached to or related to the Airframe, but excluding the Excluded Equipment ("**Airframe**");

     (ii)     two (2) International Aero Engines AG (IAE) model [V2527-A5 Select One][3] / [V2533-A5 Select One][4] engines, bearing the manufacturer's serial numbers [ESN1 & ESN2], in "as is, where is" condition, including all parts, components, appliances, accessories, instruments, furnishings, alterations, and other items of equipment installed in, attached to or related to the Engines, but excluding the Excluded Equipment (each an "**Engine**"); and

     (iii)     all Records related to the Airframe, including the APU, and each Engine.

---

[1]     Insert for an Airbus A320 model aircraft.

[2]     Insert for an Airbus A321 model aircraft.

[3]     Insert for an Airbus A320 model aircraft.

[4]     Insert for an Airbus A321 model aircraft.

Buyer acknowledges that it is purchasing the Airframe and Engines, in "AS IS", "WHERE IS" and "WITH ALL FAULTS" condition and subject to each and every agreement, exclusion, waiver and disclaimer set forth in the Sale and Purchase Agreement.

Capitalized terms used herein but not otherwise defined shall have the meanings assigned to them in the Sale and Purchase Agreement.

**CSDS ASSET MANAGEMENT LLC**, as Buyer

By: _____

Name: _____

Title: _____

<u>ANNEX A</u>

<u>TO THE</u>

<u>AIRCRAFT ACCEPTANCE CERTIFICATE</u>

**DISCREPANCY LIST**

<u>[To be included as applicable]</u>

**EXCLUDED EQUIPMENT TO BE REMOVED**

<u>[To be included as applicable]</u>

Aircraft SPA (SPIRIT-CSDS 2026)

**Exhibit F**

FORM OF WARRANTY BILL OF SALE

**WARRANTY BILL OF SALE**

**SPIRIT AIRLINES, LLC** ("**Seller**"), in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration in hand paid for by **CSDS ASSET MANAGEMENT LLC** ("**Purchaser**"), the receipt and sufficiency of which is hereby acknowledged by Seller, has granted, exchanged, sold, conveyed, transferred and delivered, and does by these presents hereby grant, exchange, sell, convey, transfer, deliver and set over unto Purchaser pursuant to that certain Aircraft Purchase and Sale Agreement (SPIRIT-CSDS 2026) dated as of February 9, 2026 (the "**Sale and Purchase Agreement**"), between Seller and Purchaser good and valid title to the following described property, with all rights and privileges of ownership thereto:

> (i)      one (1) Airbus S.A.S. model [A320-232][5] / [A321-231][6] airframe bearing the manufacturer's serial number [number] and U.S. registration mark [N####], in "as is, where is" condition, including all parts, components, appliances, accessories, instruments, furnishings, alterations, and other items of equipment installed in, attached to or incorporated into the Airframe, but excluding the Excluded Equipment ("**Airframe**"); and

> (ii)      two (2) International Aero Engines AG (IAE) model [V2527-A5 Select One] [7] / [V2533-A5 Select One] [8] engines, bearing the manufacturer's serial numbers [ESN1 & ESN2], in "as is, where is" condition, including all parts, components, appliances, accessories, instruments, furnishings, alterations, and other items of equipment installed in, attached to or incorporated into the Engines, but excluding the Excluded Equipment (each an "**Engine**");

TO HAVE AND TO HOLD the same unto Purchaser, its successors and assigns forever. The undersigned warrants that the Airframe and Engines hereby sold to Purchaser are free and clear from all liens, claims, interests, encumbrances, and rights of others, other than any Buyer's Lien (as such term is defined in the Sale and Purchase Agreement), and

---

[5]      Insert for an Airbus A320 model aircraft.

[6]      Insert for an Airbus A321 model aircraft.

[7]      Insert for an Airbus A320 model aircraft.

[8]      Insert for an Airbus A321 model aircraft.

covenants and agrees to warrant and defend the title to the Airframe and Engines hereby sold to Purchaser, its successors and assigns, against all claims and demands whomsoever.

EXCEPT AS SET FORTH ABOVE, THE AIRFRAME AND EACH ENGINE IS SOLD TO PURCHASER "AS- IS, WHERE-IS" AND "WITH ALL FAULTS".  SELLER MAKES NO EXPRESS OR IMPLIED WARRANTY INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR PURPOSE, AND NO REPRESENTATION OR AFFIRMATION OF FACT IS MADE, WITH RESPECT TO THE AIRCRAFT.  IN NO EVENT SHALL SELLER BE LIABLE TO PURCHASER FOR ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES SUSTAINED BY PURCHASER AS A RESULT OF THE SALE OF THE AIRCRAFT.

[**SIGNATURE PAGE FOLLOWS**]

IN WITNESS WHEREOF, this Bill of Sale has been executed on behalf of Seller by its authorized representative on _____, 202___.

Seller:

**SPIRIT AIRLINES, LLC**

By: _____

Name: _____

Title: _____

## Exhibit G

FORM OF ASSIGNMENT STATEMENT

Date: [_____]

**SPIRIT AIRLINES, LLC** ("**Seller**"), in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration in hand paid for by **CSDS ASSET MANAGEMENT LLC** ("**Purchaser**"), the receipt and sufficiency of which is hereby acknowledged by Seller, has assigned pursuant to Section 2.6 of that certain Aircraft Purchase and Sale Agreement (SPIRIT-CSDS 2026) dated as of February 9, 2026 (the "**Sale and Purchase Agreement**"), between Seller and Purchaser, and does by these presents hereby assigns, to Purchaser, effective as of the applicable Delivery Date, any and all existing assignable warranties and service life policies, or other rights, remedies or claims against manufacturers, suppliers, vendors and maintenance and overhaul agencies relating to the Aircraft consisting of the Airframe and Engines listed below:

(i)      one (1) Airbus S.A.S. model [A320-232][9] / [A321-231][10] airframe bearing the manufacturer's serial number [number] and U.S. registration mark [N####], in "as is, where is" condition, including all parts, components, appliances, accessories, instruments, furnishings, alterations, and other items of equipment installed in, attached to or incorporated into the Airframe, but excluding the Excluded Equipment ("**Airframe**"); and

(ii)      two (2) International Aero Engines AG (IAE) model [V2527-A5 Select One] [11] / [V2533-A5 Select One][12] engines, bearing the manufacturer's serial numbers [ESN1 & ESN2], in "as is, where is" condition, including all parts, components, appliances, accessories, instruments, furnishings, alterations, and other items of equipment installed in, attached to or incorporated into the Engines, but excluding the Excluded Equipment (each an "**Engine**").

---

[9]     Insert for an Airbus A320 model aircraft.

[10]     Insert for an Airbus A321 model aircraft.

[11]     Insert for an Airbus A320 model aircraft.

[12]     Insert for an Airbus A321 model aircraft.

Exhibit G

Seller makes no representation or warranty as to the existence or assignability of any such warranties and rights.

Capitalized terms used herein but not otherwise defined shall have the meanings assigned to them in the Sale and Purchase Agreement.

Seller:

**SPIRIT AIRLINES, LLC**

By: _____

Name: _____

Title: _____

Purchaser:

**CSDS ASSET MANAGEMENT LLC**

By: _____

Name: _____

Title: _

**Exhibit H**

FORM OF COMPLIANCE CERTIFICATION STATEMENT

========================

**COMPLIANCE CERTIFICATION**

In connection with its activities and other transactions with [Spirit Airlines, Inc.]/[ CSDS Asset Management LLC] ("Recipient") its affiliates, subsidiaries, shareholders, officers, directors, members, managers employees, agents, independent contractors and/or its other representatives, and in further consideration therefor, the undersigned ("Company"), for itself and for and on behalf of its affiliates, subsidiaries, shareholders, officers, directors, members, managers employees, agents, independent contractors and/or its other representatives represents, warrants, certifies and agrees to the following:

1.  The Company, in its dealings with Recipient and otherwise, including without limitation the resale, lease or exchange of parts and other equipment acquired or otherwise received from Recipient, will comply with all applicable laws and regulations, including all of the following as the same are applicable to the transactions and other activities engaged in with Recipient:

    a.  U.S. Foreign Corrupt Practices Act and other applicable anti-corruption laws (collectively, "Anti-Corruption Laws");

    b.  U.S. Government export control laws and regulations including the International Traffic in Arms Regulations (ITAR) and the Export Administration Regulations (EAR); and

    c.  all trade, economic, financial sanctions or export control laws, embargoes or restrictive measures implemented, administered or enforced by any of the following (i) the United States through the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"), the U.S. Department of State, the U.S. Department of Commerce or any other U.S. government entity, and (ii) the European Union (collectively, "Sanctions").

2.  The Company will not, in its dealings with Recipient or otherwise, including without limitation the resale, lease or exchange of parts and other equipment acquired or otherwise received from Recipient, transact or otherwise deal with any Person that is a target or subject of any Sanctions, including, without limitation, any Person or entity: (i) designated on a list of sanctions targets issued by OFAC or the US Department of Commerce or US Department of State and/or subject to US blocking Sanctions; (ii) designated on any list(s) of sanctions targets maintained by the European Union; (iii) located, organized or resident in a country or territory

that is the subject of comprehensive country-wide or territory-wide Sanctions and/or owned or controlled by the government of any such country or territory; and/or (iv) directly or indirectly, owned or controlled, by any Person or entity falling within (i), (ii) or (iii) above, unless the Company shall have obtained prior and effective express authorization from the appropriate agency of the United States Government. The foregoing, in addition to the laws, regulations, etc. set out in paragraph 1, are hereinafter referred to as "Trade Laws". For purposes of this certification, "Person" is defined as any individual, agency, firm, association, partnership, joint venture, bank, financial institution, trust, corporation, company, limited liability company, government entity, committee, department, authority or any body or other entity, incorporated or unincorporated, whether having distinct legal personality or not.

3.   The Company has and will maintain policies and procedures to ensure full compliance with the foregoing provisions in paragraphs 1 and 2.

4.   The Company has in place and will maintain in place such policies, procedures and safeguards to ensure that its agents and contractors, and their respective affiliates, subsidiaries, shareholders, officers, directors, members, managers employees, agents, independent contractors and/or its other representatives adhere to the requirements set forth in this certification in connection with the activities contemplated hereby.

5.   The Company will promptly report to Recipient and will cooperate fully with Recipient to investigate and remediate any violations or alleged violations of the Trade Laws.

6.   The Company hereby certifies that all of the information and certifications the Company has provided to Recipient herein are accurate and complete. The Company agrees that if, after the date of this certification, it becomes aware of any information that would cause such certifications or information to become inaccurate or incomplete, the Company will immediately furnish Recipient with a report detailing such changes in circumstances and will promptly remediate the same.

7.   The Company certifies that all of the facts contained in this statement are true and correct to the best of its knowledge and it does not know of any additional facts that are inconsistent with the above statements. The Company shall promptly send a replacement statement to Recipient, disclosing any material change of facts or intentions described in this statement that occur after this statement has been prepared and delivered to Recipient. Compliance with this statement is the Company's material obligation in order to conduct business with Recipient.

Exhibit H
Page 2

Aircraft SPA (SPIRIT-CSDS 2026)

8.    The undersigned is a responsible official who has personal knowledge of the information included in this certification, and has the authority to bind the Company to the terms herein.

**[NAME OF COMPANY]**

For the Company

By:    _____
        (Name)
        (Title)

                    Date:    _____, 202__

**Annex X**

Estimated Availability Timeline:

| Availability | Group | Number of Aircraft |
|---|---|---|
| The date that is 45 date after the entry of the Sale Approval Order | 1 | 4 |
| The date that is 75 date after the entry of the Sale Approval Order | 2 | 6 |
| The date that is 90 date after the entry of the Sale Approval Order | 3 | 6 |
| The date that is 120 date after the entry of the Sale Approval Order | 4 | 2 |
| The date that is 150 date after the entry of the Sale Approval Order | 5 | 2 |

**Exhibit 3**

**Sale Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| **SPIRIT AVIATION HOLDINGS, INC.,** *et al.,* | **Case No. 25-11897 (SHL)** |
| Debtors.[1] | **Jointly Administered** |

## NOTICE OF PUBLIC AUCTION FOR THE
## SALE OF CERTAIN OF THE DEBTORS' AIRCRAFT

Spirit Aviation Holdings, Inc. and its direct and indirect subsidiaries (collectively, the "**Debtors**," the "**Company**," or "**Spirit**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby files this *Notice of Auction for the Sale of Certain of the Debtors' Aircraft* (the "**Sale Notice**") to provide notice of the following:

**PLEASE TAKE NOTICE** that Spirit Airlines, LLC (the "**Seller**") has entered into an Aircraft Sale and Purchase Agreement, dated February 9, 2026 (the "**Aircraft Sale Agreement**"), with CSDS Asset Management LLC (the "**Stalking Horse Buyer**") to sell (the "**Sale**") 20 Airbus model A320 aircraft and Airbus model A321 aircraft (each, as described more fully in the Aircraft Sale Agreement, an "**Aircraft**", and collectively, the "**Aircraft**") as a package sale, subject to the submission of higher or otherwise better offers in an auction process (the "**Auction**").

**PLEASE TAKE FURTHER NOTICE** that, on [ ], 2026, the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") entered the *Order (A) Approving Bidding Procedures and Bid Protections in Connection With the Sale of Certain Aircraft, (B) Approving the Form and Manner of Applicable Notices and (C) Scheduling an Auction and Sale Hearing* (the "**Bidding Procedures Order**")[2], authorizing the Debtors to conduct the Auction.

---

[1] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order, the Bidding Procedures or the *Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Certain Aircraft, (B) Approving the Form and Manner of Applicable Notices and (C) Scheduling an Auction and Sale Hearing and (II) an Order (A) Authorizing the Sale of Aircraft and Related Assets Free and Clear of All Liens, Claims and Encumbrances and Other Interests and (B) Granting Related Relief* [ECF No. 770] (the "**Sale Motion**").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures Order, any party wishing to participate in the Auction must do so in accordance with the Bidding Procedures and the Bidding Procedures Order, including (i) the submission of a Potential Bid Package to the parties identified in the Bidding Procedures and (ii) if determined to be a Potential Bidder, the submission of a Bid meeting the criteria specified in the Bidding Procedures such that it is actually received on or before the Bid Deadline by the parties identified in the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that, if Spirit receives one or more Qualified Bids (excluding consideration of the Aircraft Sale Agreement with the Stalking Horse Buyer) within the requirements and time frame specified by the Bidding Procedures, Spirit will conduct the Auction on April 20, 2026, at 10:00 a.m. (prevailing Eastern Time) at the offices of Debevoise & Plimpton LLP (66 Hudson Boulevard East, New York, NY 10001), or at any such other location as Spirit may hereafter designate (with notice of such alternate location given to all Qualified Bidders under the Bidding Procedures).

**PLEASE TAKE FURTHER NOTICE** that Spirit will seek approval of the Sale before the Honorable Sean H. Lane of the United States Bankruptcy Court for the Southern District of New York, on April 23, 2026, at 11:00 a.m. (prevailing Eastern Time).

**PLEASE TAKE FURTHER NOTICE** that any objections to the proposed Sale shall be (a) in writing, in English, and in text-searchable format, (b) filed with the Bankruptcy Court electronically, (c) set forth the name of the objecting party, the nature and amount of any claims or interests held or asserted against the Debtor's estates, the basis for the objection and the specific grounds therefor and (d) served on the Debtors and the Sale Notice Parties specified in the Bidding Procedures Order so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on April 22, 2026 (the "**Objection Deadline**"), in each case, in accordance with the Bidding Procedures Order, Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), the Court's *Order Implementing Certain Notice and Case Management Procedures* [ECF No. 61], and the Court's Chambers' Rules (available at https://www.nysb.uscourts.gov/content/judge-sean-h-lane), to the extent applicable.

<u>**CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION**</u>

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS EFFECTED THEREUNDER.**

**PLEASE TAKE FURTHER NOTICE** that copies of the Sale Motion and the Bidding Procedures Order, as well as all related exhibits including the Bidding Procedures and the Aircraft Sale Agreement, may be obtained (i) from the Debtors' notice, claims and balloting

agent, Epiq at its website at https://dm.epiq11.com/case/spirit, by clicking on the "Dockets" link or (ii) for a fee via PACER at https://ecf.nysb.uscourts.gov/.

Dated:    March [  ], 2026
         New York, NY

                              DEBEVOISE & PLIMPTON LLP

                              */s/ [DRAFT]*
                              Jasmine Ball
                              Elie J. Worenklein
                              66 Hudson Boulevard East
                              New York, NY 10001
                              Tel.: (212) 909-6000
                              jball@debevoise.com
                              eworenklein@debevoise.com

                              *Fleet Counsel to the Debtors and Debtors in Possession*

**<u>Exhibit 4</u>**

**Publication Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **SPIRIT AVIATION HOLDINGS, INC.,** *et al.,* | **Case No. 25-11897 (SHL)** |
| **Debtors.**[1] | **Jointly Administered** |

### NOTICE OF PUBLIC AUCTION FOR THE
### SALE OF CERTAIN OF THE DEBTORS' AIRCRAFT

Spirit Aviation Holdings, Inc. and its direct and indirect subsidiaries (collectively, the "**Debtors,**" the "**Company,**" or "**Spirit**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby provides this *Notice of Public Auction for the Sale of Certain of the Debtors' Aircraft* (the "**Publication Notice**") to provide notice of the following:

**Proposed Sale of Aircraft**.  Spirit Airlines, LLC (the "**Seller**") has entered into an Aircraft Sale and Purchase Agreement, dated February 9, 2026 (the "**Aircraft Sale Agreement**"), with CSDS Asset Management LLC (the "**Stalking Horse Buyer**") to sell (the "**Sale**") 20 Airbus model A320 aircraft and Airbus model A321 aircraft (each, as described more fully in the Aircraft Sale Agreement, an "**Aircraft**", and collectively, the "**Aircraft**") as a package sale, subject to the submission of higher or otherwise better offers in an auction process (the "**Auction**").

**Approval of Bidding Procedures Order**.  On [  ], the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") entered the *Order (A) Approving Bidding Procedures and Bid Protections in Connection With the Sale of Certain Aircraft, (B) Approving the Form and Manner of Applicable Notices and (C) Scheduling an Auction and Sale Hearing* (the "**Bidding Procedures Order**"),[2] authorizing the Debtors to conduct the Auction.

---

[1]  The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752).  The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order, the Bidding Procedures or the *Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Certain Aircraft, (B) Approving the Form and Manner of Applicable Notices and (C) Scheduling an Auction and Sale Hearing and (II) an Order (A) Authorizing the Sale of Aircraft and Related Assets Free and Clear of All Liens, Claims and Encumbrances and Other Interests and (B) Granting Related Relief* [ECF No. 770] (the "**Sale Motion**").

**Potential Bids**.  Pursuant to the Bidding Procedures Order, any party wishing to participate in the Auction must do so in accordance with the Bidding Procedures and the Bidding Procedures Order, including (i) the submission of a Potential Bid Package to the parties identified in the Bidding Procedures and (ii) if determined to be a Potential Bidder, the submission of a Bid meeting the criteria specified in the Bidding Procedures such that it is actually received on or before the Bid Deadline by the parties identified in the Bidding Procedures.

**Public Auction**.  If Spirit receives one or more Qualified Bids (excluding consideration of the Aircraft Sale Agreement with the Stalking Horse Buyer) within the requirements and time frame specified by the Bidding Procedures, Spirit will conduct the Auction on April 20, 2026, at 10:00 a.m. (prevailing Eastern Time) at the offices of Debevoise & Plimpton LLP (66 Hudson Boulevard East, New York, NY 10001), or at any such other location as Spirit may hereafter designate (with notice of such alternate location given to all Qualified Bidders under the Bidding Procedures).

**Sale Hearing**.  Spirit will seek approval of the Sale before the Honorable Sean H. Lane of the United States Bankruptcy Court for the Southern District of New York, on April 23, 2026, at 11:00 a.m. (prevailing Eastern Time).

**Filing Objections to the Sale**.  Any objections to the proposed Sale shall be (a) in writing, in English, and in text-searchable format, (b) filed with the Bankruptcy Court electronically, (c) set forth the name of the objecting party, the nature and amount of any claims or interests held or asserted against the Debtor's estates, the basis for the objection and the specific grounds therefor and (d) served on the Debtors and the Sale Notice Parties specified in the Bidding Procedures Order so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on April 22, 2026 (the "**Objection Deadline**"), in each case, in accordance with the Bidding Procedures Order, Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), the Court's *Order Implementing Certain Notice and Case Management Procedures* [ECF No. 61], and the Court's Chambers' Rules (available at https://www.nysb.uscourts.gov/content/judge-sean-h-lane), to the extent applicable.

## CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS EFFECTED THEREUNDER.**

**Obtaining Additional Information**.  Copies of the Sale Motion and the Bidding Procedures Order, as well as all related exhibits including the Bidding Procedures and the Aircraft Sale Agreement, may be obtained (i) from the Debtors' notice, claims and balloting

agent, Epiq at its website at https://dm.epiq11.com/case/spirit, by clicking on the "Dockets" link or (ii) for a fee via PACER at https://ecf.nysb.uscourts.gov/.

Dated: March [ ], 2026
New York, NY

DEBEVOISE & PLIMPTON LLP

/s/ [DRAFT]
Jasmine Ball
Elie J. Worenklein
66 Hudson Boulevard East
New York, NY 10001
Tel.: (212) 909-6000
jball@debevoise.com
eworenklein@debevoise.com

*Fleet Counsel to the Debtors and Debtors in Possession*