**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| SPIRIT AVIATION HOLDINGS, INC., *et al.*[1] | ) | Case No. 1:25-bk-11897 (SHL) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**THE RCF ADMINISTRATIVE AGENT'S OBJECTION TO THE DISCLOSURE
STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF
SPIRIT AVIATION HOLDINGS, INC. AND ITS DEBTOR AFFILIATES**

Citibank, N.A., as the administrative agent under the Debtors' revolving credit facility (in such capacity, the "RCF Administrative Agent"), hereby objects to the *Motion of the Debtors to Approve the (I) Adequacy of Information in the Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and Notice Procedures in Connection Therewith, and (IV) Certain Dates With Respect Thereto* [Dkt. No. 851] (the "Motion").[2]

**PRELIMINARY STATEMENT**

1. The Debtors say they will "reinstate" their revolving credit facility (the "RCF")—but what they actually propose is to dismember it. The Plan would break a single, unified $275 million RCF, secured on a first-lien basis by aircraft engines, spare parts, and slots at LaGuardia Airport, into two separate instruments with different collateral: a $200 million "Reinstated Revolving Credit Facility" secured by Section 1110 collateral and a $75 million "Class 4 Term Loan Facility" secured by non-Section 1110 collateral. Plan Art. I(A)(36), (179) [Dkt. No. 848].

---

[1] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752) (collectively, the "Debtors"). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

[2] Capitalized terms used but not defined herein have the meanings set forth in the Motion.

2.      The existing RCF loan and security documents were the product of extensive arm's-length negotiations and contain key lender protections—covenants requiring "Core Collateral" to always be pledged to secure the RCF, requiring the Borrower to maintain a certain "Collateral Coverage Ratio" based on a consolidated "Borrowing Base," and requiring Required Lender consent for most amendments, which this Court approved in the Debtors' prior chapter 11 proceedings. Credit Agreement §§ 5.06, 6.09, 10.08 (Ex. A). The Plan would fracture this unified collateral package and create two separate instruments with different terms, all without the consent of the RCF Administrative Agent or the Required Lenders (as defined in the Credit Agreement). That is not reinstatement; it is impairment. And it violates Section 1110 and other sections of the Bankruptcy Code.

3.      A primary reason that the Debtors cannot truly reinstate the facility is the constraints imposed by their deal with the DIP Lenders and secured noteholders, who are proposed to become their equity owners. The existing RCF agreement (the "Credit Agreement") is governed by a Collateral Coverage Ratio tested against a single collateral pool with unified covenants. It also requires a mandatory $25 million commitment reduction on September 30, 2026. If the Debtors reinstated the existing RCF, they could not comply with it for any meaningful period. With the DIP Lenders seeking to sweep hundreds of millions of dollars of the Debtors' cash to manufacture paydowns of their debt, the Debtors are being deprived of the financial wherewithal needed to comply with the RCF—a problem compounded by an unprecedented rise in jet fuel prices, which has placed an entirely new and unbudgeted strain on the Debtors' finances.

4.      The ramifications of the Debtors' requested treatment of the RCF Lenders' claims would extend well beyond these cases. Mixed-collateral facilities—secured by both Section 1110

- 2 -

equipment and other assets—are commonplace in aviation finance. Lenders extend credit on the understanding that their collateral packages and covenant protections will be respected as a unified whole. Permitting a debtor to unilaterally bifurcate such a facility would upend the settled expectations of aviation lenders industry-wide and chill the extension of credit to air carriers at a time when access to capital is critical to the industry's stability.

5.      The Debtors' problems do not end with the Plan's impermissible restructuring. The Debtors are already in default under the Credit Agreement. On March 17, 2026, the RCF Administrative Agent, at the direction of the Required Lenders, issued a notice identifying multiple continuing defaults, including the Debtors' failure to deliver conforming appraisals and their improper calculation of the Borrowing Base. The Debtors' subsequent revised appraisals and compliance certificate did not cure these defaults and continued to improperly calculate the Borrowing Base. That prompted the RCF Administrative Agent to issue another notice at the Required Lenders' direction. When properly calculated, the Credit Agreement requires a paydown of more than $35 million or the pledge of additional collateral to cure the shortfall in the Borrowing Base. If these defaults are not timely cured, the right to repossess Section 1110 collateral will be unrestricted by any power of this Court or the Bankruptcy Code. That the Debtors have already defaulted on the very obligations they purport to be "reinstating" speaks volumes about the Plan's feasibility.

6.      The Disclosure Statement is independently deficient. The Plan offers the RCF Lenders a "death trap" with different treatment depending on their vote, but the Disclosure Statement provides no information about the terms of the treatment options—maturity dates, interest rates, and financial covenants are nowhere to be found. The Disclosure Statement must

be revised to adequately disclose the Borrower's existing defaults, the significant risk that the Plan cannot be confirmed in its current form, and the proposed RCF treatment.

7.    The RCF Administrative Agent, the RCF Lenders, and the Debtors are in active dialogue regarding the Plan. The RCF Lenders are also analyzing the Debtors' recently provided financial projections, which raise grave concerns. As drafted, the Plan's treatment of the RCF Lenders' claims is unconfirmable, and the Disclosure Statement provides virtually no information about such treatment. Even if that treatment is revised, serious questions remain as to whether any plan could satisfy the feasibility requirements of Section 1129, given current defaults and the business challenges ahead. Nonetheless, the RCF Administrative Agent and the RCF Lenders intend to continue to engage with the Debtors in good faith leading up to any confirmation hearing. For the Debtors to even proceed with the solicitation of votes on their unconfirmable Plan, however, the disclosure deficiencies identified herein must be rectified.

## ARGUMENT

### I.    THE PLAN IS UNCONFIRMABLE.

8.    Section 1129 of the Bankruptcy Code requires, among other things, that a chapter 11 plan and plan proponent "compl[y] with the applicable provisions of this title" and that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization." 11 U.S.C. § 1129(a)(1), (2), (11). The Debtors have not complied with Section 1110, and confirming this Plan would lead to almost immediate liquidation due to, among other reasons, the RCF Secured Parties having the right to repossess and foreclose upon the numerous engines and spare parts pledged to secure the RCF.

9.    Section 1110 requires a debtor to cure all defaults and perform all obligations under a security agreement pertaining to aircraft equipment within a certain timeframe. 11 U.S.C.

- 4 -

§ 1110. If the debtor fails to do so, the secured party's right to take possession of the equipment "is not limited or otherwise affected by any other provision of [the Bankruptcy Code] or by any power of the court." *Id.* § 1110(1). Because the applicable security agreements here require compliance with the Credit Agreement,[3] an Event of Default under the Credit Agreement would mean that the Bankruptcy Code imposes no bar on the ability to repossess and foreclose upon the Section 1110 collateral.

10.    As the Second Circuit has recognized, Congress enacted Section 1110 to "extend extraordinary protection" to aircraft lenders "to encourage investment in new equipment for air carriers." *In re Air Vermont, Inc.*, 761 F.2d 130, 132 (2d Cir. 1985). It did so "by providing that the power of creditors to repossess aircraft from a defaulting debtor not be restricted in any way by the usual protections afforded debtors-in-possession or trustees by the Bankruptcy Code." *Id.*; *see also* 7 Collier on Bankr. ¶ 1110.04[3][b] (16th ed. 2026) ("Ultimately, unless the secured creditor consents to a modification of its rights, section 1110 leaves the trustee with two choices: either render the rights of the secured creditor unimpaired under the plan, or surrender the collateral."). These protections are strictly enforced. *See In re Air Vermont, Inc.*, 761 F.2d at 134 (Section 1110's "literal meaning must be applied"); *In re Pan Am Corp.*, 125 B.R. 372, 374 (S.D.N.Y. 1991) (same).

11.    Moreover, mixed-collateral facilities—secured by both Section 1110 equipment and other assets—are a standard feature of aviation finance. Lenders structure these facilities expecting their collateral packages and covenant protections will be respected as a unified whole. Bifurcating such facilities would upset investors' settled expectations and chill aviation finance

---

[3]    *See* Mortgage and Security Agreement (Spare Parts), dated as of May 20, 2020, §§ 4.01, 4.02 (Ex. B); Mortgage and Security Agreement (Aircraft and Spare Engines), dated as of March 20, 2020, §§ 4.01, 4.02 (Ex. C).

at a moment when airlines are already bearing the brunt of extremely high jet fuel prices and other operating challenges.

### A. The Credit Agreement includes key covenants with which the Borrower must comply to avoid an Event of Default.

12.     On March 12, 2025, Spirit Airlines, Inc. (the "Borrower"), certain lenders (the "RCF Lenders"), the RCF Administrative Agent, and Wilmington Trust, National Association, as collateral agent, entered into the Credit Agreement, pursuant to which the RCF Lenders provided the Debtors with credit commitments in an initial aggregate principal amount of $275 million.

13.     The first-lien collateral pledged to the RCF consists of engines, spare parts, and slots at LaGuardia Airport. The governing loan agreements contain covenants concerning: (i) the maintenance of certain "Core Collateral"; (ii) the calculation of the "Borrowing Base" and the "Collateral Coverage Ratio"; and (iii) amendments or modifications. Credit Agreement §§ 5.06, 6.09, 10.08. These covenants, negotiated at arm's-length among sophisticated parties, are key lender protections.

14.     *First*, the "Core Collateral" covenants require the Borrower to ensure that the collateral securing the RCF consists of (i) all of the Borrower's slots at LaGuardia Airport; (ii) at least 14 Eligible Engines; and (iii) all Eligible Spare Parts. *Id.* § 5.06 ("So long as any Loans or Letters of Credit are outstanding . . . , the Borrower shall not permit any Core Collateral Failure to occur.").

15.     *Second*, the Credit Agreement imposes a "Borrowing Base" that caps the outstanding RCF exposure based upon a detailed lending formula that applies different advance rates (which depend on the type of collateral) to appraised values. *Id.* § 1.01, at 10–11; *id.* § 2.01. At all times, the ratio of the Borrowing Base to total outstanding RCF obligations—the "Collateral

Coverage Ratio"—must equal or exceed 1.0 to 1.0. *Id.* § 6.09(a). If a reappraisal shows the collateral value has declined such that a "Collateral Coverage Ratio Failure" has occurred, the Borrower must, within forty-five days, cure the shortfall by posting Additional Collateral and/or prepaying the Loans. *Id.* That formula also sets rules for valuing collateral. For instance, engines which are "stored . . . with a low expectation of a return to service within the one year following commencement of such storage" must be valued at zero. *Id.* § 1.01 (definitions of "Stored," "Appraisal").

16.    ***Third***, the Borrower is not permitted to modify or amend the covenants in the Credit Agreement without first obtaining certain required consents, typically from the Required Lenders. *Id.* § 10.08(a).

17.    Failure to comply with any of these terms constitutes an Event of Default under the Credit Agreement, which entitles the RCF Administrative Agent to exercise remedies, including foreclosing upon the Revolving Priority Collateral, at the Required Lenders' direction. *Id.* § 7.01.

**B. The Plan would modify key provisions of the Credit Agreement without obtaining the requisite consent, thus constituting a default under the loan documents.**

18.    The Plan contains a "death trap" under which the RCF Lenders would receive different treatment depending on, among other things, whether they vote to accept or reject the Plan. Those rejecting receive their *pro rata share* of two new, separate instruments carved out of the existing unified RCF: "(x) the Reinstated Revolving Credit Facility . . . and (y) the Class 4 Term Loan Facility[.]" Plan Art. III(A)(4)(c)(ii); Disclosure Statement Art. VII(C)(1)(ii).

19.    The practical effect of this treatment is the dismemberment of the RCF Lenders' single, unified RCF into two instruments with different collateral: the Reinstated Revolving

Credit Facility will be secured by Section 1110 collateral (such as engines and spare parts, which the Debtors appear to concede constitute the vast majority of the value of the Revolving Priority Collateral), and the Class 4 Term Loan Facility will be secured by non-Section 1110 collateral (LaGuardia Airport slots). Plan Art. I(A)(36). This is not a trivial modification—the Plan, if implemented, would fracture the carefully negotiated Core Collateral package in violation of the Credit Agreement and immediately trigger numerous other defaults thereunder.

20.    That the RCF is secured by a mix of Section 1110 and non-Section 1110 collateral does not alter the analysis. Each term described above—Core Collateral, the Borrowing Base, and the Collateral Coverage Ratio—was designed to operate across the *entire* collateral pool as a unified whole. The Borrowing Base formula was carefully constructed giving due consideration to the qualitative and quantitative differences between the categories of collateral to ensure adequate collateral coverage on the basis that a single combined pool secures the loans. These provisions cannot be disaggregated into Section 1110 and non-Section 1110 components. The Debtors' implicit premise—that a mixed collateral package can be separated into its constituent parts, with each part governed independently—is not a feature of the Credit Agreement; it is a rewriting of it. And Section 1110 forecloses this result: it contains no proportionality test and does not ask what *percentage* of a facility's collateral qualifies as equipment under 49 U.S.C. § 40102.[4] It provides that the secured party's right to take possession of or foreclose upon qualifying equipment "is not limited or otherwise affected by any other provision of this title or by any power of the court." 11 U.S.C. § 1110(a)(1). Accepting the mixed nature of the facility as a basis for

---

[4]    Though it is not the case here, if, for example, only a minimal amount of Section 1110 collateral secured a facility, the debtor could pursue cram up of those obligations and simply return the Section 1110 collateral to the secured party.

splitting its collateral would graft onto the statute powers that Congress foreclosed and insert provisions into the contract that the parties did not agree to.

## II. THE DISCLOSURE STATEMENT LACKS ADEQUATE INFORMATION.

21. "At the 'heart' of the chapter 11 process is the requirement that holders of claims in impaired classes be furnished a proper disclosure statement." *In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990). A disclosure statement cannot be approved unless it contains adequate information, 11 U.S.C. § 1125(b), meaning "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, . . . that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan." *Id.* § 1125(a)(1).

22. Section 1125 "requires debtors to prepare a disclosure statement that will explain the relevant terms of a plan of reorganization to creditors." *In re Manhattan Jeep Chrysler Dodge, Inc.*, 602 B.R. 483, 487 (Bankr. S.D.N.Y. 2019). A disclosure statement "must contain all pertinent information bearing on the success or failure of the proposals in the plan," as well as "all material information relating to the risks posed to creditors" under the plan. *In re Avianca Holdings S.A.*, 632 B.R. 124, 130 (Bankr. S.D.N.Y. 2021) (citation omitted). It must also "contain factual support for any opinions contained therein[,]" given that "opinions alone do not provide the parties voting on the plan with sufficient information upon which to formulate decisions." *Id.* (citation omitted).

23. This Court has considered the following non-exhaustive list used in other circuits to identify the kinds of information that should be included in a disclosure statement:

> (1) the events which led to the filing of a bankruptcy petition; (2) a description of the available assets and their value; (3) the anticipated future of the company; (4)

the source of information stated in the disclosure statement; (5) a disclaimer; (6) the present condition of the debtor while in Chapter 11; (7) the scheduled claims; (8) the estimated return to creditors under a Chapter 7 liquidation; (9) the accounting method utilized to produce financial information and the name of the accountants responsible for such information; (10) the future management of the debtor; (11) the Chapter 11 plan or a summary thereof; (12) the estimated administrative expenses, including attorneys' and accountants' fees; (13) the collectability of accounts receivable; (14) financial information, data, valuations or projections relevant to the creditors' decision to accept or reject the Chapter 11 plan; (15) information relevant to the risks posed to creditors under the plan; (16) the actual or projected realizable value from recovery of preferential or otherwise voidable transfers; (17) litigation likely to arise in a non-bankruptcy context; (18) tax attributes of the debtor; and (19) the relationship of the debtor with affiliates.

*Id.* (citation omitted).

24.    Contrary to Debtors' assertions, Motion ¶ 17, the Disclosure Statement is woefully deficient. It fails to disclose the material terms of the treatment the RCF Lenders would receive under any of the Plan's pathways, leaving maturity dates, interest rates, and covenants entirely unspecified. It fails to disclose the Borrower's existing Credit Agreement defaults—a fact of obvious materiality in a plan premised on "reinstating" that very facility. And it contains insufficient disclosure regarding the impact of volatility of jet fuel prices on the Debtors' business. The Disclosure Statement cannot be approved in its current form.

**A. The Disclosure Statement fails to disclose the significant risk that Debtors' plan, which proposes unprecedented treatment of Section 1110 collateral, will not be confirmed.**

25.    The Disclosure Statement skates over the split-facility issue, offering only a generic warning that the Court could "decline to confirm the Plan." Disclosure Statement at 39. The Disclosure Statement must, at a minimum, disclose the significant legal risks inherent in the Debtors' novel and improper treatment of the RCF, particularly in light of the special protections afforded to the RCF under Section 1110.

**B. The Disclosure Statement fails to disclose the material terms of any treatment option available to the RCF Lenders.**

26.    The Plan contemplates four possible outcomes for the RCF Lenders depending on their vote, whether they elect to participate in the Exit Revolving Credit Facility, and whether the Exit RCF Trigger occurs:

27.    *First*, if an RCF Lender accepts the Plan, elects to participate in the Exit Revolving Credit Facility, and the Exit RCF Trigger occurs, its claims are "deemed repaid and refinanced in full" by Exit RCF Loans. Plan Art. III(A)(4)(c)(i).

28.    *Second*, if an RCF Lender rejects the Plan, it receives its pro rata share of (x) a $200 million Reinstated Revolving Credit Facility secured by Section 1110 collateral and (y) a $75 million Class 4 Term Loan Facility secured by non-Section 1110 collateral—the bifurcation discussed at length in Section I above. *Id.* Art. III(A)(4)(c)(ii).

29.    *Third*, if the Exit RCF Trigger does not occur—regardless of vote—every RCF Lender receives the same bifurcated treatment. *Id.* Art. III(A)(4)(c)(iii).

30.    *Fourth*, the Plan reserves to the Debtors the right to provide "such other treatment as permitted or required by the Bankruptcy Code." *Id.* Art. III(A)(4)(c)(iv).

31.    To make an informed judgment about the Plan, a hypothetical investor confronted with these options would need to understand the material terms of the takeback paper or other treatment proposed under each option. Section 1125 demands nothing less. *See* 11 U.S.C. § 1125(a)(1). Yet the Disclosure Statement provides virtually none of this information, stating:

> On the Plan Effective Date, one or more of the Reorganized Debtors will issue, as applicable, either: (a) a $275 million senior secured revolving credit facility, *the material terms of which will be filed in the Plan Supplement*; or (b)(i) a $75 million term loan facility, *the material terms of which will be filed with the Plan Supplement*, and (ii) a $200 million revolving credit facility, which shall be on the same terms as the Prepetition Revolving Credit Facility (as defined in the Plan),

with only such modifications as are necessary to reflect the issuance of the Class 4
Term Loan Facility.

Disclosure Statement at 4 (emphasis added); *see also id.* at 8, 61.

32.    The Disclosure Statement specifies no maturity date, interest rate, financial covenants, events of default, or amortization schedule for the Class 4 Term Loan Facility. It does not explain how the Debtors arrived at the $200 million / $75 million split—a significant question given that the division determines the allocation of value between Section 1110 and non-Section 1110 collateral. It does not disclose the basis for modifying the Reinstated RCF Credit Documents to "reflect the issuance of the Class 4 Term Loan Facility," or what those modifications would entail—even though such modifications would constitute defaults under multiple provisions of the Credit Agreement. Instead, the Debtors simply direct creditors to a Plan Supplement that has not been filed. While detailed debt terms sometimes lag behind disclosure statement approval, the RCF Lenders are being asked to vote with virtually no information about their expected treatment, and it is unclear when the necessary disclosure is forthcoming since the Debtors have not proposed a deadline for filing their Plan Supplement.

33.    The fourth treatment option compounds the problem. The Plan provides that the RCF Lenders may receive "such other treatment as permitted or required by the Bankruptcy Code"—a catch-all encompassing literally any outcome the Bankruptcy Code could authorize. Plan Art. III(A)(4)(c)(iv). The Disclosure Statement offers no guidance as to what this option means, what would trigger it, or what the RCF Lenders would receive if it were invoked. A hypothetical investor cannot make an "informed judgment" about a plan when one of its treatment options is defined as "anything the law allows."

- 12 -

**C. The Disclosure Statement does not include information concerning the Borrower's recent default under the Credit Agreement.**

34.    On March 17, 2026, the RCF Administrative Agent, as directed by the Required Lenders, issued a notice to the Borrower identifying multiple continuing Defaults under the Credit Agreement and the Spare Parts Security Agreement. The Defaults are serious: the Borrower failed to deliver conforming appraisals as required by Section 5.07 of the Credit Agreement—among other things, the March 2026 Appraisals improperly reflect the post-shop visit value of an in-shop engine, rather than its maintenance condition as of the measurement date, and fail to assign a value of zero to three Stored engines as the Credit Agreement requires. Credit Agreement § 5.07(1)(B); *id.* § 1.01 (definitions of "Appraisal," "Maintenance Adjusted CMV," and "Stored"). When the Borrowing Base and Collateral Coverage Ratio are properly calculated, the Collateral Coverage Ratio falls below 1.0 to 1.0—a Collateral Coverage Ratio Failure under Section 6.09(a) of the Credit Agreement.

35.    On April 1, 2026, the Borrower responded with revised appraisals and a revised compliance certificate (the "Revised Compliance Certificate"). But this did not cure all of the Borrower's defaults.

36.    On April 6, 2026, the RCF Administrative Agent issued a Notice of Continuing Default, citing Borrower's continued non-compliance with key provisions of the Credit Agreement. Most notably, the revised compliance certificate still uses incorrect collateral values and admits that the ratio is less than 1.0 to 1.0.[5] *Id.* §§ 5.01(d), 6.09(a). Additionally, the Borrower failed to deliver a certificate as to the existence or absence of any defaults, which is required under Section 5.01(c) of the Credit Agreement. *Id.* § 5.01(c).

---

[5]    Nevertheless, the Revised Compliance Certificate still understates the extent of the Collateral Coverage Ratio Failure.

- 13 -

37.     To date, the Debtors have not cured these Defaults. The Disclosure Statement, filed before the default notices were issued, must be amended accordingly. Creditors should be made aware that the Debtors are in default under the Credit Agreement, and that, upon expiration of any cure periods, the RCF Administrative Agent may exercise remedies on behalf of the RCF Lenders.

38.     This information is critical. The Plan purports to "reinstate" the Credit Agreement—but the Plan's use of that term is misleading. Under Section 1124 of the Bankruptcy Code, reinstatement requires that any default be cured and that the creditor's legal, equitable, and contractual rights remain unaltered. *See* 11 U.S.C. § 1124(2). A truly reinstated creditor whose claim is unimpaired is conclusively presumed to accept the plan. *See* 11 U.S.C. § 1126(f). Here, however, the RCF Class is impaired and entitled to vote, confirming that the Debtors are modifying, not reinstating, the Credit Agreement. The label "Reinstated Revolving Credit Facility" does not change this fact; it only obscures it. If the Borrower cannot cure existing Defaults within the applicable cure periods, the Defaults will ripen into Events of Default, and any theoretical predicate for a true reinstatement will be eliminated altogether. At that point, the RCF Secured Parties' right to take possession of and foreclose on their Section 1110 collateral will be "not limited or otherwise affected by any other provision of this title or by any power of the court." 11 U.S.C. § 1110(a)(1).

39.     Every creditor in these cases—not just the RCF Lenders—is entitled to know these facts before voting. This information goes to the very heart of whether the Plan's proposed "reinstatement" is viable and whether the Plan is feasible. Failing to disclose it violates Section 1125's requirement that the Disclosure Statement contain "adequate information." 11 U.S.C. § 1125(a)(1).

- 14 -

**D. Debtors' projections do not reflect the impact of volatility in jet fuel prices on the business.**

40.     Jet fuel price volatility continues to pose a significant threat to the Debtors' business.[6] In broad terms, the Debtors recognize this:

> [R]ecent fluctuations in the price and availability of fuel arising out of the conflict in the Middle East and Iran could negatively impact the Debtors' financial results. The Debtors' operating results are significantly impacted by changes in the price and availability of aircraft fuel. Periods of high volatility in jet fuel costs, increased jet fuel prices, and significant disruptions in the supply of jet fuel could have a material adverse impact on the Company's business, financial condition, and operating results.

Disclosure Statement at 53. But the financial projections accompanying the Disclosure Statement do not account for these risks—and in fact, assume that prices "return to normal" by mid-May 2026 without basis.[7]

41.     The Debtors fail to provide **any** projections reflecting the possibility that fuel prices do **not** normalize from their elevated levels. They provide no sensitivity analysis and no modeling of the impact of sustained fuel price increases on the Reorganized Debtors' cash flow, liquidity, or ability to comply with post-emergence debt covenants.

42.     This deficiency prevents creditors from evaluating the feasibility of the Plan. If the Debtors cannot demonstrate their viability at current (or possibly higher) fuel prices, they have no basis to represent that the Plan is feasible.

---

[6]   *See* 10-K for Spirit Aviation Holdings, Inc., for the fiscal year ended December 31, 2025, at 27-28 (noting that "[a]ircraft fuel costs represented approximately 22%, 25% and 31% of [the company's] total operating expenses for 2025, 2024 and 2023, respectively" and suggesting that the company may be required to liquidate, as the "recent spike in the price of aircraft fuel resulting from the conflicts in Iran and the Middle East is expected to have an immediate and substantial negative impact on our results of operations").

[7]   Financial Projections [Dkt. No. 933, Ex. B] (assuming, without explanation, that "fuel price volatility subsides and returns to a more normalized pre-war pricing environment in the back half of May 2026").

## CONCLUSION

43.     For the foregoing reasons, the Disclosure Statement should not be approved.

Dated:     April 10, 2026

New York, New York

/s/ Andrew Harmeyer
Atara Miller
Tyson Lomazow
Andrew Harmeyer
Jason Kestecher
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001-2163
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
Email: amiller@milbank.com
        tlomazow@milbank.com
        aharmeyer@milbank.com
        jkestecher@milbank.com

- and -

James H. Weingarten
Anastasia Pastan
**MILBANK LLP**
1101 New York Avenue NW
Washington, DC US 20005
Telephone: (202) 835-7500
Facsimile: (202) 263-7586
Email: jweingarten@milbank.com
        apastan@milbank.com

*Counsel for Citibank N.A., as the Administrative
Agent under the Debtors' Revolving Credit Facility*