WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2
Office of the United States Trustee
Alexander Hamilton U.S. Custom House
One Bowling Green, Rm 534
New York, NY 10004
Tel. (212) 510-0500
By:     Shara Cornell
        Trial Attorney

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------- x
In re                                                        :   Chapter 11
                                                             :
  SPIRIT AVIATION HOLDINGS, INC., *et al*.,                  :   Case No. 25-11897-SHL
                                                             :
                                           Debtors.[1]       :   (Jointly Administered)
                                                             :
----------------------------------------------------------- x

**OMNIBUS OBJECTION OF THE UNITED STATES TRUSTEE TO MOTIONS OF
THE DEBTOR FOR EXPEDITED RELIEF [ECF NOS. 1009, 1010, 1013, and 1014]**

TO:     THE HONORABLE SEAN H. LANE,
        UNITED STATES BANKRUPTCY JUDGE:

        William K. Harrington, the United States Trustee for Region 2 (the "**United States**

**Trustee**"), through his counsel, files this Objection (the "**Objection**") to the:

1. Ex Parte Motion of the Debtors for Entry of an Order Shortening Notice with Respect to the Debtors' Wind-Down Motions and Related Relief (the "**Shortened Notice Motion**") [ECF No. 1014];

2. Motion for Entry of an Order (I) Authorizing the Debtors to Wind Down Operations, (II) Approving the Debtors' Use of Cash Collateral and Amendments to the DIP Credit Agreement and Final DIP Order, (III) Authorizing Modification or Termination of the Debtors' Employee Programs, (IV) Approving Wind-Down Incentive and Retention Plan, (V) Approving Modification of Contract Rejection Procedures, (VI) Approving Non-Fleet Assets Sale Procedures, (VII) Approving Non-Fleet Assets Abandonment Procedures, (VIII) Approving the Use of Certain Third-Party Contractors, (IX) Approving Protections

---

[1] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

1

for Certain Persons Implementing the Wind-Down, (X) Enforcing an Administrative Stay, (XI) Authorizing the Debtors to Take Any and All Actions Necessary to Implement the Wind-Down, (XII) Authorizing the Preemption of Applicable Laws and Ordinances for the Debtors to Effectuate the Wind-Down and (XIII) Granting Related Relief (the "**Wind-Down Motion**") [ECF No. 1009];

3. Motion for Entry of an Order (I) Authorizing the Debtors to Sell or Abandon Their Remaining Owned Aircraft Engines and Other Related Equipment, (II) Establishing Procedures Related Thereto and (III) Granting Related relief (the "**Owned Aircraft Motion**") [ECF No. 1013]; and

4. Motion for Entry of an Order (I) Authorizing the Debtors to Reject their Remaining Aircraft Equipment Leases, (II) Establishing Procedures Related Thereto and (III) Granting Related Releases (the "**Leased Aircraft Motion**") [ECF No. 1010] (the Shortened Notice Motion, the Wind-Down Motion, the Owned Aircraft Motion, and the Lease Aircraft Motion, together, the "**Motions**")

filed on behalf of Spirit Aviation Holdings, Inc. and its affiliated debtor-in-possession (the "**Debtors**"). The United States Trustee respectfully represents as follows:

## I.    PRELIMINARY STATEMENT

"Just weeks ago, the Debtors were poised to implement a comprehensive and sustainable financial and operational restructuring." Wind-Down Motion at ¶ 2. But after the Debtors concluded "there is no longer any viable paths to restructuring or continued operations," Wind-Down Motion at ¶ 1, they pivoted to an immediate cessation of operations and an expedited wind-down in essentially an *ex parte* manner while also providing the broadest possible exculpation to the entities behind creating and implementing the Procedures.[2] [3]

The Debtors filed the Motions fewer than 48 hours after announcing a complete operational shutdown and intention to liquidate. The hearing is noticed on an expedited basis, providing parties in interest—other than the Debtors, DIP Lenders (as defined by the Motions), and Official Committee of Unsecured Creditors (the "**UCC**")—less than one business day to review the

---

[2] As part of the Motions, the Debtors have requested the Court approve emergency wind-down procedures (the "**Procedures**").

[3] President Donald J. Trump and his Administration explored all options to save this airline and its 17,000 American jobs. Upon information and belief, the options presented were not acceptable to certain creditors.

Motions that, if granted, would dictate the administration of the case for the next three to six months and its ultimate conclusion while substantially limiting the rights of all other stakeholders. The Motions request sweeping discretionary authority, prospective releases and exculpations, an administrative stay, and approval of key employee programs with minimal detail—all predicated on complete deference to the Debtors.

Although the Bankruptcy Code often defers to a debtor's "business judgment" for a wide variety of operational decisions during a bankruptcy case, nowhere in the Code, the Rules, or otherwise is there a catchall that provides unlimited, unfettered discretion to a debtor simply because a debtor says it is necessary—which is exactly what these Debtors seek in the Motions. Indeed, the Code and Rules provide safeguards to protect against these exact types of situations, but the Debtors seek to rewrite these statutory and rules-based protections with their custom-made wind-down procedures.[4] But the Code is a comprehensive federal scheme that cannot remain comprehensive if Debtors can proceed as proposed here:

> The Bankruptcy Code is meant to be a "comprehensive federal scheme . . . to govern" the bankruptcy process. *E. Equip. & Servs. Corp. v. Factory Point Nat. Bank*, 236 F.3d 117, 120 (2d Cir.2001). Although flexibility is necessary, *In re Parmalat Sec. Litig.*, 501 F.Supp.2d 560, 578 (S.D.N.Y. 2007) ("Bankruptcy reorganization is an inherently flexible process . . . ."), **the federal scheme cannot remain comprehensive if interested parties and bankruptcy courts in each case are free to tweak the law to fit their preferences**, *RadLAX Gateway Hotel, LLC*, 132 S. Ct. at 2070–71 (referring to the Bankruptcy Code as a "comprehensive scheme [that] has deliberately targeted specific problems with specific solutions" (internal quotation marks omitted)).

*In re Lehman Bros. Holdings Inc.,* 508 B.R. 283, 294 (S.D.N.Y. 2014) (emphasis added).

Moreover, despite terminating tens of thousands of American workers on limited notice

---

[4] These inappropriate Procedures are exacerbated by the lack of a budget and budget safeguards. Parties have no visibility into the cash reserves currently held by the Debtors. To the extent that any professional fees have not been paid, whether Court approved or otherwise, the holdback amount should be revisited in light of the unknown number of administrative creditors (and the value of their claims) who will be getting paid *pari passu*. There is no justification for certain professional fees to be paid in advance and potentially more than others with *pari passu* fees.

3

and eliminating a broad range of benefits, the Wind-Down Motion also proposes to pay a select few "key" employees millions of dollars in bonuses, again on limited notice.  And the Debtors propose to do so based on inadequate information to assess whether the bonuses comply with § 503(c)'s rigorous standards, including whether they are "justified by the facts and circumstances of the case."

Further, the Motions fail to explain why the Procedures, on shortened notice, are a benefit to the Debtors' estate over a conversion to a Chapter 7 liquidation proceeding. We now have an administratively insolvent estate or a likely administratively insolvent estate as the Debtors have admitted.[5] Under the Code, administratively insolvent estates require conversion or dismissal. Through the proposed exculpation and administrative stay provisions, the DIP Lenders would be authorized to limit others' rights in a process solely for the DIP Lenders' benefit (and that of the professionals). The Debtors allege they need to stay in Chapter 11 to maximize value for the estate. But, at this juncture, the Debtors intend to maximize value for only two classes of creditors, the DIP Lenders and professionals. If so, the DIP Lenders should be required to pay the cost of administration and should not be insulated from the ability of other parties in interest, including administrative creditors, to exercise their rights. Nor should the DIP Lenders be provided the broadest possible exculpation. Alternatively, conversion to Chapter 7 would allow for the orderly distribution of assets by an impartial trustee while also reducing the professional costs accruing to the estate during the liquidation process.

Given the likely administrative insolvency of the estate, and the Debtors' admission of the same, the proposed structure appears designed to preserve value solely for the DIP Lenders while insulating them and the Debtors from accountability. Accordingly, for these and the following

---

[5] The Wind-Down Motion states in relevant part, "[T]he Debtors cannot at this time commit to the payment in full of all accrued administrative expense claims." Wind-Down Motion at ¶ 29.

reasons, the Motions should be denied.

1. **The Lack of Proper Notice for Final Relief is a Threshold Issue**

The proposed Procedures fail to provide adequate and meaningful notice, let alone a meaningful opportunity for parties in interest to object and be heard. *See also* § 4 *infra*. The Debtors request final approval despite the abrupt shutdown Saturday morning and the filing of the Motions early Monday morning. Given the compressed timeline, an interim order limited to actions *necessary* to stabilize operations and secure assets is the only appropriate relief on shortened notice. Parties in interest have had less than one business day to digest the Motions that grant Debtors' unfettered discretion over a multi-month liquidation.

The Motions compound the lack of meaningful notice with requested relief that severely curtails parties' rights on a final basis while using short-term emergency conditions to justify long-term structural relief far beyond that needed to secure assets and stabilize operations before an orderly liquidation. The Motions seek authority to conduct major elements of the liquidation outside meaningful Court supervision. The immediate emergency is limited to securing assets and stabilizing the sudden shutdown. The remainder of the wind-down process does not justify emergency treatment. Accordingly, any relief should be limited to true emergency functions and require a second-stage hearing with sufficient notice and a meaningful opportunity to be heard for all other relief.

2. **The Debtors' Administrative Insolvency Challenges the Chapter 11 Feasibility of the Proposed Procedures**

Under the Bankruptcy Code, administratively insolvent estates typically require conversion or dismissal. The Debtors argue that continuing Chapter 11 is necessary to maximize value, but in practice, the wind-down benefits one constituency: the DIP Lenders. If the estate remains in Chapter 11 solely to permit the DIP Lenders to maximize their recovery, then the DIP Lenders—

not administrative creditors—should bear the administrative cost of that process.

The Court should not approve a wind-down structure that (a) prioritizes DIP loan repayment at the expense of administrative creditors or (b) limits administrative creditors' and other parties in interest's rights without statutory authority.

**3.   The Administrative Claims Procedures Create a *De Facto* New "Estate"**

The Motion effectively creates a separate "wind-down" estate for new administrative claims incurred after the shutdown and thus violates the Code's requirements that administrative creditors be paid on a pro rata basis. The Procedures prohibit existing administrative claimants from pursuing any action against the Debtors to have their administrative claims paid. The Procedures also allow the DIP Lenders to determine unilaterally which post-shutdown administrative costs will be paid, while pre-shutdown administrative claims remain stayed and unpaid. *See* Wind-Down Motion at ¶ 65. This structure benefits only the DIP Lenders and Debtors' professionals, and not only is it unfair, but it also violates the Bankruptcy Code's priorities. It attempts to mirror what would happen after conversion to Chapter 7 without actually converting and without Chapter 7's statutory protections (impartial trustee, judicial oversight, and pro-rata treatment). Significantly, these Procedures are  inconsistent with the Code's priority scheme and conversion framework. *See, e.g., Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 469 (2017) (holding that parties could not use a structured dismissal allowing distributions that do not follow the Bankruptcy Code's priority scheme). The Court should deny the administrative stay and require transparency on post-petition liquidity, administrative viability, and creditor payments. Given that Debtors concede the estate is administratively insolvent, they should justify remaining in Chapter 11—for reasons other than preferring certain administrative creditors over others—or convert to Chapter 7.

4. **The Procedures Disregard the Bankruptcy Code, the Bankruptcy Rules, and Fundamental Requirements of Due Process**

The Debtors have determined that the Bankruptcy Code's and Rules' notice requirements seemingly do not apply to myriad provisions within the Motions. Administrative insolvencies or the need for a Chapter 11 liquidation, although not common, are not so unique as to justify deviating from the law because it is beneficial to niche stakeholders rewrites and contradicts the Code's remedies. Deviating in such an extraordinary manner from so many well-established and critically important Bankruptcy Code provisions and Bankruptcy Rules "threatens to turn a 'rare case' exception into a more general rule." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. at 469. Afterall, bankruptcy courts cannot use their equitable powers under 11 U.S.C. §105(a) to contravene specific provisions of the Bankruptcy Code. *Law v. Siegel*, 571 U.S. 415 (2014).

Moreover, adequate notice under the Federal Rules of Bankruptcy Procedure is governed by due process. *See Folger Adam Sec., Inc. v. DeMatteis/MacGregor, JV*, 209 F.3d 252, 265 (3d Cir. 2000). Due process "requires 'notice reasonably calculated, under all the circumstances, to apprize [sic] interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Id.* at 265 (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314-15 (1950)). Due process requires notice and an opportunity to be heard at a "meaningful time in a *meaningful* manner." *In re Temtechco, Inc.,* 1998 WL 887256, at *18 (Bankr. D. Del. Dec. 18, 1998) (citing *Turney v. FDIC,* 18 F.3d 865, 868 (10th Cir. 1994) (emphasis added)).

A. Non-Fleet Asset Sale Procedures

The notice changes requested by the Wind-Down Motion fall well below the standards set by the Bankruptcy Code and Bankruptcy Rules and deny parties in interest and creditors due process. Pursuant to the Motion, the Debtors would sell a significant, but unidentified, amount of

assets for unidentified sums, without any notice or court oversight or, at best, limited notice. *See* Wind-Down Motion at ¶¶ 59-60.

Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Federal Rules of Bankruptcy Procedure 6004 and 2002(a)(2) govern the notice requirements and procedures for sales under Section 363(b)(1). *See Folger,* 209 F.3d at 264-65. Bankruptcy Rule 2002(a)(2) requires 21-days' notice for motions to use, sell, or lease property. Fed. R. Bankr. P. 2002(a)(2). Likewise, Rule 6004 requires that objections to such use, sale, or lease of property is governed by Rule 9014 and allows objections to be filed and served at least seven days before a hearing date. The Federal Rules of Bankruptcy Procedure were amended in 1999 to add subsection (g) to Rule 6004 specifically to protect the rights of the objecting parties and thus eliminate the "rush to the courthouse" to obtain stay orders by those parties adversely affected by entry of orders under 11 U.S.C. §§ 363 or 365. Moreover, Rule 6004 requires a mandatory 14-day stay on orders authorizing the use, sale, or lease of property.

Here, the Debtors request an order that, for any transaction up to $1 million, _no_ notice or hearing is necessary. Wind-Down Motion at ¶ 60(a)(i). Moreover, "[t]he Debtors believe that a significant portion of their Non-Fleet Assets (including any lots thereof) will be sold for a purchase price less than or equal to $1,000,000." *Id*. at ¶ 92. The Debtors also propose a 14-day schedule for the sale of property between $1 million and $5 million. *Id*. at ¶ 60(b). The Bankruptcy Rules, however, provide for 14-days' notice for a motion to sell property valued at less than $2,500. Fed. R. Bankr. P. 6004(d). The Debtors have determined that this Rule's limited exception for *de minimis* property worth less than $2,500 should apply to property sales exceeding $1 million. The Debtors have further requested to waive the 14-day stay in *all* instances. *Id*. at ¶ 113.

B. <u>Fleet Asset Procedures</u>

Like the procedures proposed for the non-fleet assets, the procedures for the liquidation of the Debtors' fleet assets seek to rewrite the Bankruptcy Code and Rules for the sole benefit of the Debtors. For example, despite the Bankruptcy Code not providing any catchall for the sale of an asset without notice or a hearing, the Debtors propose that no notice or hearing will be required for any transaction less than or equal to $1 million. *See* Owned Aircraft Motion at ¶ 21(a). For the sale of fleet assets in excess of $1 million but less than or equal to $15 million, the Debtors propose to simply file a notice with the Court on 14- days' notice. *Id*. at ¶ 21(b). The Debtors could therefore sell an airplane for $15 million free and clear of any liens without either making any showing to the Court pursuant to § 363 or providing the standard 21-days' notice required by the Bankruptcy Rules. Moreover, the Motion would provide the Debtors authority to enter into many sale agreements with unidentified counterparties for unidentified amounts. *See Id*. at ¶ 21(e). This is antithetical to the Code's foundational concepts of disclosure, notice, judicial oversight, and stakeholder rights.

With respect to the proposed procedures for the Debtors' leased fleet, the Debtors intend to cease insurance and maintenance for leased equipment as of the applicable Rejection Effective Date (as defined be the Leased Aircraft Motion). *See* Leased Aircraft Motion at ¶ 18. The Rejection Effective Date (defined by the Leased Aircraft Motion) goes into effect on May 8, 2026, fewer than four business days after the Leased Aircraft Motion was *filed*. *Id*. at ¶ 21. Upon the Rejection Effective Date, the Leased Aircraft Motion provides that, "Aircraft Equipment Counterparty shall be responsible to the Debtors for the subsequent costs of, and all risks attendant to, storing such Leased Equipment and for other attendant costs as determined by the Debtors, including the cost of insuring the Leased Equipment." *Id*.

9

Counterparties cannot be expected to, in five business days or less, recover all of the leased equipment, some of which are airplanes and other equipment. Ceasing insurance and maintenance totally at the whim and control of the Debtors—who have initiated this expedited process for their own benefit and at the expense and risk of counterparties—is wholly inadequate and inappropriate. Additional notice will alleviate this burden on lessors that Debtors created  and ensure that property is adequately insured and maintained.

C.  Abandonment Procedures

The Wind-Down Motion also provides broad abandonment authority without oversight and in contravention of the Bankruptcy Code and Rules. Rule 6007 requires notice of abandonment of property to be served on all creditors. Fed. R. Bankr. P. 6007(a)(1). Rule 6007 further requires that parties be provided 14 days to object after the notice of abandonment is served. *Id*. at 6007(a)(2). The Debtors propose to provide a mere seven days' notice and only to parties with a known interest in the asset to be abandoned for property Debtors deem worth less than or equal to $500,000. Wind-Down Motion at ¶ 61(a). No valuation method is described in the Wind-Down Motion. The remainder of assets to be abandoned will be on 14-days' notice to limited parties (the Transaction Notice Parties as defined by the Wind-Down Motion). *Id*. The Owned Aircraft Motion similarly allows for equipment valued at more than $5 million to be abandoned on  7-days' notice. Owned Aircraft Motion at ¶ 21(b).

D.  Rejection Procedures

Federal Rules of Bankruptcy Procedure 6006 governs the notice requirements and procedures for the assumption and assignment of executory contracts, including the number of executory contracts that may be subject to an omnibus assumption or rejection. The Wind-Down Motion, however, deviates in almost every aspect from the well-settled rules. *See* Wind-Down

Motion ¶¶ 56-58. First, the Wind-Down Motion seeks to expand omnibus rejection notices from the 100-contracts limit in Rule 6006 to as many as 500, making it difficult for counterparties to identify themselves. *Id*. at ¶ 57(a). Second, the Wind-Down Motion also provides only five days to object, which is insufficient given the expanded scope. *Id*. at ¶ 57(b). The Debtors may file replies less than one day before hearings, impairing due process. *Id*. at ¶ 57(c). The Wind-Down Motion also shortens the claims-filing deadline from 35 days to 30 days. *Id*. at ¶ 57(d).

The Procedures should adopt standard rejection procedures, maintain the 100-contract cap, and lengthen objection and claims deadlines for meaningful participation by interested and impacted parties.

### E. DIP Amendment Procedures

The Debtors propose material amendments to the Final Debtor-in-Possession Financing Order [ECF No. 643] ("**DIP Order**") on five days' notice, with the amendments to become effective immediately upon entry of the proposed order. *Id*. at ¶¶ 34-39. The Debtors state that, because the DIP Lenders have consented to the amendment, no other consent is necessary. *Id*. at ¶ 72. But just because the DIP Lenders consent, that does not mean that other parties should be denied a meaningful opportunity to object and be heard on the amendments.

### F. Lack of Broker Procedures

The Wind-Down Motion also seeks to circumvent the need to retain professionals as brokers or auctioneers by waiving Bankruptcy Rule 6005 and Bankruptcy Code § 327. *Id*. at ¶ 61(e). The Debtors have effectively tailored the entire bankruptcy process into a bespoke model to allow the Debtors and their professionals to retain and to pay whomever and whatever they deem necessary for the estate without the Court adjudicating these matters. The Bankruptcy Code and Rules provide detailed requirements for retention and payment of professionals. At bare

minimum, the identity of such professionals should be provided along with disclosures of connections to determine if there are actual and potential conflicts to ensure that the estate is indeed maximizing value in a fair and adequate manner.

**5.** **<u>The Management Compensation Plans Do Not Provide Adequate Information or Notice</u>**

Among the requested expedited relief that Debtors seek with one day's notice is approval for a management compensation plan that proposes to pay millions of dollars to management, despite the company having already ceased all operations and fired over 17,000 employees. *Id.* at ¶¶ 49-55. Not only do the Debtors focus on paying management with what few funds appear to exist, but they also intend to fund the Professional Fee Carve Out and Administrative Claim Carve Out upon the filing of the Wind-Down Motion.[6]

Management and professionals have been well compensated over the past year and in two bankruptcies. Thousands of employees have been terminated, have lost health coverage, and face disruptions to retirement benefits, but senior executives remain protected by vested severance programs. While cutting former employee benefits, the Debtors have requested bonuses in both a Wind-Down KERP and a Wind-Down KEIP. The Wind-Down KERP, which benefits fewer than 150 employees—whom the Debtors do not identify or establish that they are not insiders—includes

---

[6] Both the Professional Fee Carve Out and the Administrative Claim Carve Out are defined in the Final DIP Order, which was entered on December 29, 2025, at ECF No. 643. Specifically, the Professional Fee Carve Out *inter alia* provides that,

> to the extent allowed by the Court at any time, all accrued but unpaid fees and expenses (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and the Creditors' Committee pursuant to sections 328 and 1103 of the Bankruptcy Code (the "Committee Professionals") at any time on and before the date of delivery by the DIP Facility Agent (acting at the direction of the Required DIP Lenders) of a Carve Out Trigger Notice

*Id.* at ¶ 13(b). In addition to funding all accrued but unpaid fees and expenses for professionals, the carve out also includes an aggregation amount of $18 million to be funded upon a trigger notice issued by the DIP Lenders and their agent. The Administrative Claim Carve Out *inter alia* provides that no more than $150 million shall be maintained by the Debtors in a segregated account for the payment of such administrative claims. *Id.* at ¶ 12(i).

almost $10 million for one-time retention payments, which includes an unfettered discretionary stipend of approximately $500,000. *Id*. at ¶ 50.

The Wind-Down KEIP[7] requests to pay three individuals *an unknown amount*[8] with no details on the metrics—which must establish that they are actually incentive payments and not "mere layups"—or on the individual payments. *Id*. at ¶¶ 51-52. Not only, however, is the amount of the KEIP undisclosed and/or still being negotiated, the availability of funds to the Wind-Down KEIP recipients appears to be tied to the asset sale proceeds from the Procedures, so it is unclear why this relief is necessary on less than one days' notice embedded in the Wind-Down Motion and not in its own proper motion. Moreover, the Wind-Down Motion admits that board members will also likely receive compensation: "The Wind-Down KEIP may also ultimately include incentive compensation for remaining board members. In such event, any such proposed incentive compensation will be disclosed in a subsequent filing and the proposed order approving the Wind-Down KEIP as described in paragraph 55 herein." *Id*. at n.14.

The Wind-Down Motion also lacks employee-level detail and prevents parties from evaluating Debtors' compliance with § 503(c)'s rigorous standards. Moreover, the requested approval appears to function as final approval once funding is authorized, limiting Court or creditor oversight. The Court must require full disclosure of participants, metrics, insider status, and justification, or deny without prejudice pending a complete record justifying the relief.

---

[7] It is unclear what relief is sought with respect to the Wind-Down KEIP at this juncture. The proposed order references a future hearing date but also appears to approve certain aspects of the program. Accordingly, in an abundance of caution, this Objection includes the Wind-Down KEIP. The United States Trustee expressly reserves his right to amend, supplement, or otherwise modify this Objection with respect to any additional information, documents, or otherwise provided regarding the Wind-Down KEIP.

[8] "Certain details of the Wind-Down KEIP, including the precise contours of the Liquidation Proceeds and Wind-Down Cost Savings metrics, are currently under discussion with the DIP Lenders. To the extent necessary, a supplemental filing will be made setting forth any material changes to the metrics." Declaration of Martin Kuehne in Support of KERP and KEIP at FN 3, ECF No. 1012.

### 6. The Motion Provides Prospective, Plan-Like Exculpation and Releases

The Wind-Down Motion seeks expansive exculpation (the "**Exculpation Provision**") for "individuals who developed and approved the Wind-Down Plan and/or will be charged with its implementation and oversight, including, without limitation, the Officers and Directors of the Debtors, along with the members of the Creditors' Committee (solely in such capacity), the DIP Lenders (solely in such capacity) and the professional advisors to the Debtors, Creditors' Committee and the DIP Lenders (such individuals, the "**Protected Persons**")." *Id*. at ¶ 63. Essentially, this is a forward-looking exculpation and release for the Debtors, DIP Lender, and their professionals, providing immunity for future conduct carried out with largely unfettered discretion. This is a limitation on liability granted outside a plan process and without the procedural protections of § 1125 (and specifically including § 1125(e)), § 1126, § 1129, and relevant case law. Accordingly, the Exculpation Provision should not be approved because: (a) the definition of Exculpated Parties includes parties that are not estate fiduciaries and (b) there is no statutory provision entitling exculpation outside of § 1125(e).

The only Bankruptcy Code provision that expressly authorizes exculpation is § 1125(e). The statutory language of § 1125 is narrow and exculpates "a person" from liability stemming from such person's participation in the solicitation of a plan or issuance of securities in connection with the plan. Nevertheless, as further discussed below, some courts of appeals have concluded that exculpation may also be ordered as to court-supervised estate fiduciaries who performed services during a chapter 11 case prior to plan confirmation. *See, e.g., In re Highland Capital Mgmt., L.P.*, 48 F.4th 419, 437 (5th Cir. 2022). But even assuming that exculpation can ever properly be imposed beyond the narrow circumstances contemplated by 11 U.S.C. § 1125, the scope of this Exculpation Provision is unjustified.

14

Here, the Exculpation Provision broadly includes non-estate fiduciaries. *Id*. at ¶ 63. Within the Protected Parties definition, Officers and Directors of the Debtors, along with the members of the Creditors' Committee (solely in such capacity), the DIP Lenders (solely in such capacity) and the professional advisors to the Debtors, Creditors' Committee and the DIP Lenders will all be exculpated. *Id*.

Exculpation should not shield anyone who is not a court-supervised fiduciary from liability. *See, e.g.*, *In re Highland Capital Mgmt.,*, 48 F.4th at 437 ("[A]ny exculpation in a Chapter 11 reorganization plan [must] be limited to the debtor, the creditors' committee and its members for conduct within the scope of their duties, 11 U.S.C. § 1103(c), and the trustees within the scope of their duties[.]"); *In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (court considered whether an official committee of unsecured creditors could be exculpated and held that 11 U.S.C. § 1103(c) implies both a fiduciary duty and a limited grant of immunity to members of the unsecured creditors' committee); *Patterson*, 636 B.R. 641, 700-01 ("Exculpation is appropriate when it is solely limited to fiduciaries who have served a debtor through a chapter 11 proceeding." (citing *In re Health Diagnostic Lab. Inc.*, 551 B.R. 218, 232 (Bankr. E.D. Va. 2016))); *Washington Mutual*, 442 B.R. 314, 350-51 ("[An] exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers."); *In re PTL Holdings LLC*, 2011 WL 5509031, at *12 (Bankr. D. Del. Nov. 10, 2011) (stating that "the exculpation clause here must be reeled in to include only those parties who have acted as estate fiduciaries and their professionals"); *see also Blixseth v. Credit Suisse,* 961 F.3d 1074, 1082 (9th Cir. 2020) (exculpation limited to essential participants in the plan process); *Bank of New York Trust Company, NA v. Official Unsecured Creditors' Committee (In re Pacific Lumber Co.)* 584 F.3d 229 (5th Cir. 2009); *In re Aegean*

15

*Marine Petroleum Network Inc.,* 599 B.R. 717, 720 (Bankr. S.D.N.Y. 2019).

Given that much of the relief requested in the Wind-Down Motion provides the Debtors with unfettered discretion to effectuate an unknown number of transfers for unknown sums of dollars to unknown counterparties over the course of an unknown time, providing such broad exculpation removes fundamental statutory safeguards for interested parties. The  consent of the DIP Lenders should carry little weight, as they are included in the broad exculpation but have apparently consented to the Debtors (and likely their own) discretion to sell assets however they see fit. Exculpation must be backward-looking, reflecting actions taken during the case with Court supervision and approval. Section 105 cannot independently authorize prospective non-debtor releases. Because the provisions improperly hinder and enjoin parties from exercising statutory rights, the exculpation and release language should be stricken. If any liability protections should be extended, that must occur through a plan, which is consistent with controlling precedent.

## II. CONCLUSION

The Motions grant sweeping discretionary authority to the Debtors and DIP Lender, prospective liability protection, and significant limitations on creditor and administrative claimant rights—all on minimal and insufficient notice. The Court should deny or, at least limit, final relief consistent with the need to secure assets; permit only narrowly tailored interim authority; require transparency and statutory compliance; and ensure the DIP Lender bears the cost of a Chapter 11 wind-down undertaken solely for its benefit.

## III.RESERVATION OF RIGHTS

The United States Trustee reserves all rights to supplement, amend, or modify this Objection through written supplement or orally during any hearing on the Motions. The United States Trustee further reserves all rights to argue for or move for conversion of this Bankruptcy

16

Case to Chapter 7.

WHEREFORE, the United States Trustee respectfully requests that the Court enter an order (i) sustaining the Objection, (ii) denying the Motions, and (iii) granting such other and further relief as the Court deems just and proper.

Dated: May 5, 2026
New York, New York

WILLIAM K. HARRINGTON
UNITED STATES TRUSTEE, REGION 2

By: */s/ Shara Cornell*
Shara Cornell
Trial Attorney
Office of the United States Trustee
Department of Justice
Alexander Hamilton U.S. Custom House
One Bowling Green
New York, New York 10004