**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **SPIRIT AVIATION HOLDINGS, INC.,** *et al.*, | **Case No. 25-11897 (SHL)** |
| **Debtors.**[1] | **Jointly Administered** |

### SUPPLEMENTAL DECLARATION OF MARTIN KUEHNE IN SUPPORT OF THE KERP AND KEIP

I, Martin Kuehne, pursuant to 28 U.S.C. § 1746, hereby declare that the following is true to the best of my knowledge, information, and belief:

1.      I am a Senior Managing Director at FTI Consulting, Inc. ("**FTI**"). I am over the age of 18, and I am authorized to submit this declaration (this "**Supplemental Declaration**") on behalf of the Debtors in support of the relief requested by the *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Wind Down Operations, (II) Approving the Debtors' Use of Cash Collateral and Amendments to the DIP Credit Agreement and Final DIP Order, (III) Authorizing Modification or Termination of the Debtors' Employee Programs, (IV) Approving Wind-Down Incentive and Retention Plan, (V) Approving Modification of Contract Rejection Procedures, (VI) Approving Non-Fleet Assets Sale Procedures, (VII) Approving Non-Fleet Assets Abandonment Procedures, (VIII) Approving the Use of Certain Third-Party Contractors, (IX) Approving Protections for Certain Persons Implementing the Wind-Down, (X) Enforcing an Administrative Stay,*

---

[1]  The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

*(XI) Authorizing the Debtors to Take Any and All Actions Necessary to Implement the Wind-Down, (XII) Authorizing the Preemption of Applicable Laws and Ordinances for the Debtors to Effectuate the Wind-Down, and (XIII) Granting Related Relief* [ECF 1009] (the "**Motion**") as supplemented by the *Supplement to the Wind-Down Motion* (the "**Supplement**").[2]

2. Except as otherwise indicated, all facts set forth in this Declaration are based upon (a) my personal knowledge of the Debtors' operations; (b) my review of relevant documents; (c) information provided to me by employees of FTI working under my supervision; (d) information provided to me by, or through discussion with, members of the Debtors' management team, other employees, or the Debtors' other advisors; and/or (e) my expertise in executive compensation, workforce planning and analytics, and organizational design based on over thirty years of experience in the field. If called to testify, I could and would testify competently to each of the facts and opinions set forth herein.

## I.   Professional Background and Qualifications

3. I joined FTI in April 2022 after serving as a Managing Director at Seabury Consulting, where I led Seabury Consulting's human capital consulting efforts globally. Prior to this, I founded, and served as the Chief Executive Officer of, Organizational Concepts International, a human resources and management consulting firm. I have held senior positions at American Express, Wells Fargo, and Northwest

---

[2] Capitalized terms used but not immediately or otherwise defined herein shall have the meanings ascribed to them in the Motion or the Supplement, as applicable.

Airlines with responsibility for compensation, benefits, organizational design, and leadership development.

4.      I received a Bachelor of Arts from the University of Minnesota and a Masters of Arts in Human Resources and Industrial Relations from the University of Minnesota. I have extensive experience advising organizations on compensation issues during major financial transitions, including bankruptcies and out-of-court restructurings, and designing and managing related incentive programs and employment agreements.

5.      I am knowledgeable about and familiar with the Debtors' business and financial affairs and the circumstances leading to the commencement of these Chapter 11 Cases. I am also familiar with the Debtors' management team and historical and current compensation programs. I have reviewed relevant market data on incentive and retention plans in Chapter 11 Cases, assisted the Debtors in developing the employee retention and employee incentive plans discussed herein, and analyzed whether these plans are consistent with typical competitive market standards and practice.

6.      I am not being compensated specifically for this testimony other than indirectly through the payments received by FTI for my services in connection with FTI's employment in these Chapter 11 Cases.

## II.   The Need for the Wind-Down KEIP

7.      As set forth in my prior declaration, the *Declaration of Martin Kuehne in Support of the KERP and KEIP* [ECF 1012] (the "**First Kuehne Declaration**"), the Debtors have suffered from high attrition rates with respect to all of their employees, including management personnel and other key employees as a result of the uncertainty surrounding their businesses. Given the significant challenges and complexities associated with the Wind-Down Plan, it also will be mission-critical for the Debtors to motivate and

3

encourage three of their key corporate officers to expeditiously and cost-effectively implement the Wind-Down. *See* First Kuehne Decl. ¶¶ 22–25.

### A.    The Wind-Down KEIP

8.      With the full agreement of the Debtors' senior secured lenders—the DIP Lenders and the RCF Lenders (who together have perfected security interests in virtually all of the Debtors' assets)—the Debtors propose to provide three of their remaining key corporate officers, the (i) Chief Executive Officer (the "**CEO**"), (ii) General Counsel and (iii) Vice President, Special Projects (the "**VP Special Projects**"), (the "**Senior Management Employees**") with an incentive payment (the "**Wind-Down Management KEIP**") tied to gross asset sale proceeds from assets on which the DIP Lenders have a senior lien (the "**Liquidation Proceeds**"), the realized net cost of certain savings ("**Wind-Down Cost Savings**") and the net recoveries from the sale of the operating slots at LaGuardia Airport (the "**LGA Slots**"), on which the RCF Lenders have a senior lien (the "**RCF Recovery Incentive**").

9.      The Wind-Down Management KEIP payments earned on account of the Liquidation Proceeds and Wind-Down Cost Savings will be measured upon the earliest of, (i)(a) with respect to the CEO and General Counsel, November 1, 2026, which date may be accelerated or extended by mutual consent of the board of directors (the "**Board**"), the Required DIP Lenders and the applicable Senior Management Employee, and (b) with respect to the VP Special Projects, January 31, 2027, which date may be accelerated or extended by mutual consent of the Board, the Required DIP Lenders and the VP Special Projects; (ii) substantial completion of the monetization of the estate's assets as determined by the Debtors in good faith and with the consent of the Required DIP Lenders, which consent shall not unreasonably be withheld or delayed; (iii) the effective

4

date of a liquidating chapter 11 plan; or (iv) such other termination of the Wind-Down process as determined by the Debtors in good faith and with the consent of the Required DIP Lenders, which consent shall not unreasonably be withheld or delayed (each such date, the "**Measurement Date**"). In the event the Debtors and the Required DIP Lenders do not agree whether, with respect to clauses (ii) or (iv) of the foregoing sentence, such consent has been unreasonably withheld or delayed, it is further agreed that the Debtors may seek emergency relief from the Court to adjudicate such disagreement. The Wind-Down Management KEIP payments earned on account of the RCF Recovery Incentive will be measured upon the completion of the monetization of the LGA Slots.

10.     The Wind-Down Management KEIP amount earned on account of Liquidation Proceeds is equal to (i) 1.75% of Liquidation Proceeds in excess of the minimum threshold amounts (the "**Threshold Values**") for certain asset categories up to the target values for such categories (the "**Target Values**"), plus (ii) 2.50% of Liquidation Proceeds in excess of the Target Values or for assets for which no Target Value is specified, plus (iii) 5.0% of Liquidation Proceeds for certain asset categories with highly uncertain prospects for monetization. For the avoidance of doubt, no amounts will be paid on account of the cash held by the Debtors as of the commencement of the Wind-Down. For purposes of measuring Liquidation Proceeds, any transaction for which definitive documentation (acceptable to the Required DIP Lenders) has been executed and closed on or prior to the Measurement Date will be included and, for the avoidance of doubt, any transaction for which definitive documentation (acceptable to the Required DIP Lenders) has been executed on or prior to the Measurement Date but has not yet closed will be measured and paid promptly following closing; *provided* that for asset sales of certain long-tailed assets

("**Category 2 Assets**"), any transaction for which there is a documented agreement in principle between counterparties (acceptable to the Required DIP Lenders) on or prior to the Measurement Date, but closes after the Measurement Date, will be measured and paid promptly following closing, so long as the transaction remains substantially consistent with the agreement reached prior to the Measurement Date; *provided further* that for asset sales of certain long-tailed assets for which recoveries will not require definitive documentation ("**Category 3 Assets**"), the attributable amounts will be measured at the time of monetization.

11.     The Wind-Down Management KEIP amount earned on account of Wind-Down Cost Savings is equal to 4.0% of (i) savings against net Wind-Down costs, plus (ii) unused funds in the existing carve-out accounts. For the avoidance of doubt, the budgeted amounts for the Wind-Down KEIP are excluded from the calculation of Wind-Down Cost Savings. The Wind-Down Cost Savings will be calculated on an aggregate basis on the Measurement Date; *provided* that as it relates to measurement, the Debtors will review actual costs and reforecast as of December 31, 2026, to measure aggregate savings achieved against the Wind-Down Budget. For the avoidance of doubt, no amounts will be paid on account of any values related to WARN, unused vacation or unused PTO. This latter point was of great importance to the Debtors and to the remaining Senior Management Employees.

12.     Payment of the Wind-Down Management KEIP earned on account of the Liquidation Proceeds will occur (a) prior to the Measurement Date, promptly following the earlier of (i) the Measurement Date or (ii) the closing of transactions for assets in an asset category for which the aggregate realized Liquidation Proceeds have

6

exceeded the applicable Threshold Value or (b) following the Measurement Date, promptly following the closing of any transaction for which definitive documentation (acceptable to the Required DIP Lenders) has been executed on or prior to the Measurement Date; *provided* that for Category 2 Assets, payment shall occur promptly following closing and receipt of funds, subject to the transaction being substantially similar to the agreement reached prior to the Measurement Date; *provided further* that for Category 3 Assets, payment shall occur promptly upon asset monetization and receipt of funds regardless of employment status so long as the employee has stayed through the Measurement Date. Payment of the Wind-Down Management KEIP earned on account of the Wind-Down Cost Savings will occur promptly following the Measurement Date.

13. Upon termination of a Senior Management Employee's employment by the Debtors other than for cause or resignation for good reason prior to the Measurement Date, subject to the release requirement set forth in paragraph 52 of the Motion, such employee shall remain eligible under the Wind-Down Management KEIP on the same terms and conditions (including payment timing) without regard to any continued service requirement; *provided* that for purposes of determining performance (and payment amount), only asset transactions in which such employee had material involvement shall be counted.

14. The Wind-Down Management KEIP amount earned on account of the RCF Recovery Incentive is equal to 3.50% of Net RCF Recoveries[3] from the monetization of the LGA Slots, whether in one or a series of transactions; *provided* that

---

[3] "**Net RCF Recoveries**" shall be based on a mutually agreed upon present value of the LGA Slots, net of any Debtor or third-party expenses, charges, or other amounts paid or payable from the gross recoveries from the LGA Slots (excluding expenses of the RCF Lenders).

such amount shall equal 4.00% of Net RCF Recoveries if the monetization of the LGA Slots is fully consummated on or before July 10, 2026; *provided further* that such amount shall equal 3.75% of Net RCF Recoveries if the monetization of the LGA Slots is fully consummated after July 10, 2026 but on or before August 9, 2026.

15.     Payments of the Wind-Down Management KEIP earned on account of the RCF Recovery Incentive will occur promptly following the RCF Measurement Date. If a Senior Management Employee is terminated without cause prior to the RCF Measurement Date, such employee shall receive payments following final performance achieved under the program upon the closing of the LGA Slots transaction(s). Terminations for any other reason (e.g., voluntary separation or termination for cause) would result in complete forfeiture of any Wind-Down Management KEIP amounts on account of the RCF Recovery Incentive.

16.     In aggregate, the target amount of the Wind-Down earned on account of the Liquidation Proceeds is expected to be approximately $1.9 million (the "**Target Wind-Down Management KEIP Amount**").[4] The payments earned under the Wind-Down Management KEIP will be distributed as follows: (i) 50.0% to the CEO, (ii) 27.5% to the General Counsel and (iii) 22.5% to the VP Special Projects. Notably, payments under the Wind-Down Management KEIP would replace, and not be in addition to, any payments the Debtors would have historically offered the Senior Management Employees under their prepetition annual incentive and cash incentive plans, and the

---

[4] The Target Wind-Down Management KEIP Amount excludes any potential value from (i) the RCF Recovery Incentive because the ultimate monetization of the LGA slots is highly uncertain and difficult to forecast and (ii) the Wind-Down Cost Savings because any savings that may be achieved against the Wind-Down Budget are unforeseeable.

amount of the potential incentive payments are quite conservative as compared to market practice and comparables. As further described in the Supplemental Kuehne Declaration, the complexity and specialized nature of the proposed Wind-Down and criticality of the Non-Senior Management Employees thereto support the proposed structure and aggregate costs. The expected costs to the secured lenders of the Wind-Down Management KEIP are eminently reasonable in light of the benefit expected to be gained from the provision of services by and incentivization of the Remaining Employees.

17. The Debtors will establish an escrow account initially funded with $3.0 million to provide assurance of payment under the Wind-Down Management KEIP. As asset monetization progresses, the escrow account will be adjusted for amounts projected to be earned over $3.0 million (inclusive of taxes). In connection with the departure of each Senior Management Employee, the Debtors and DIP Lenders will confer in good faith on the incremental amount to be placed in escrow with respect to payments hereunder projected to be earned by such employee post-departure, and if the parties cannot agree on that amount, either party may seek relief from the Court. The Target Wind-Down Management KEIP Amount, or the earned amount, whichever is higher, will be payable in the event of any conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. Moreover, whether or not the escrow account is sufficient, the payments under the Wind-Down Management KEIP shall be made promptly when due notwithstanding any conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code.

18. The Debtors, with the full agreement of and as negotiated by and with the Debtors' senior secured lenders, also propose to provide two of the Debtors'

directors, Timothy Bernlohr and Eugene I. Davis, (the "**Directors**") with incentive payments tied to the performance of the Wind-Down (the "**Wind-Down Director KEIP**" and, together with the Wind-Down Management KEIP, the "**Wind-Down KEIP**"). The payments under the Wind-Down Director KEIP for each Director will consist of (i) $312,500 if the aggregate Liquidation Proceeds are at least $107 million more than the aggregate Threshold Values, plus (ii) 0.25% of the aggregate Liquidation Proceeds above $107 million. The Wind-Down Director KEIP will be governed by terms and conditions similar to those of the Wind-Down Management KEIP.

### B.    The Process for Developing the Wind-Down KEIP

19.    The Wind-Down KEIP was designed with or by the Debtors' senior secured lenders and negotiated to incentivize the Senior Management Employees to expeditiously and cost-effectively execute the Wind-Down Plan and control costs to maximize value for the Debtors' creditors. Because of the challenges and complexities of the Wind-Down Plan, it is critical for the Senior Management Employees to be motivated to contribute their services and best efforts to the Wind-Down Plan by providing appropriate incentives for such employees upon the completion and achievement of certain tasks and goals as to costs and proceeds.

20.    I believe that the design and structure of the Wind-Down KEIP, and the payments to be made thereunder, are generally in line with market standards and practice. In reviewing the Wind-Down KEIP, FTI compared the compensation that may be earned under the Wind-Down KEIP to market comparables and determined that the Wind-Down KEIP is eminently reasonable and very modest in comparison. Even if the participants achieve the full Target Values amount in every category, the CEO's total annual compensation will be 66% below the market median for similar roles, the General

10

Counsel's total annual compensation 25% below median and the VP Special Projects' total annual compensation 22% below median. Furthermore, the CEO's total annual compensation would be 55% below even the 25th percentile for similar roles in the market. The Target Wind-Down Management KEIP Amount is 27% below the 25th percentile for comparable programs, further demonstrating the modest size of the Wind-Down KEIP.

21.     FTI also compared the Wind-Down KEIP with other plans approved by courts in other liquidating chapter 11 cases, which frequently pay out based on sales proceeds, distributable proceeds and/or expense management, and determined it is consistent with these other plans. *See, e.g., see also, In re LSC Communications, Inc.*, No. 20-10950 (SHL) (Bankr. S.D.N.Y. June 5, 2020) [ECF No. 324]; *In re Sears Holdings Corporation*, No. 18-23538 (RDD) (Bankr. S.D.N.Y. Dec. 28, 2018) [ECF No. 1437]; *In re Waypoint Leasing Holdings Ltd.*, No. 18-13648 (SMB) (Bankr. S.D.N.Y. Mar. 1, 2019) [ECF No. 481]; *In re Robertshaw US Holding Corp*, No. 24-90052 (CML) (Bankr. S.D. Tex. June 12, 2024) [ECF No. 637]; *In re NPC International, Inc.*, No. 20-33353 (DRJ) (Bankr. S.D. Tex. Sep. 17, 2020) [ECF No. 636]; *In re Southern Foods Group, LLC (Dean Foods Company)*, No. 19-36313 (DRJ) (Bankr. S.D. Tex. Feb. 19, 2020) [ECF No. 960]; *In re Cobalt International Energy*, No. 17-36709 (MI) (Bankr. S.D. Tex. Jan. 26, 2018) [ECF No. 307]; *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP) (Bankr. E.D. Va. Dec. 8, 2017) [ECF 1192]; *In re TSAWD Holdings, Inc. (Sports Authority)*, No. 16-10527 (MFW) (Bankr. D. Del. Aug. 31, 2016) [ECF 2863]; *In re Abengoa Bioenergy US Holding, LLC*, No. 16-41161 (KSS) (Bankr. E.D. Mo. June 16, 2016) [ECF 403].

22.     Moreover, FTI reviewed key employment incentive programs with uncapped sharing formulae approved in other chapter 11 cases and determined that the

11

average share of proceeds programs with uncapped commission structures is 3.0%. *See, e.g., In re Proterra Inc.*, No. 23-11120 (BLS) (Bankr. D. Del. Oct. 10, 2023) [ECF 346] (3.0% of uncapped proceeds); *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del June 8, 2023) [ECF 1589] (6.0% of uncapped proceeds); *In re Rockall Energy Holdings, LLC*, No. 22-90000 (MXM) (Bankr. N.D. Tex. Apr. 29, 2022) [ECF 348] (1.6% of uncapped proceeds); *In re MobiTV, Inc.* No. 21-10457 (LSS) (Bankr. D. Del. Apr. 14, 2021) [ECF 178] (3.5% of uncapped proceeds); *In re NPC International, Inc.*, No. 20-33353 (DRJ) (Bankr. S.D. Tex. Sep. 17, 2020) [ECF No. 636] (0.7% of uncapped proceeds); *In re Southern Foods Group, LLC (Dean Foods Company)*, No. 19-36313 (DRJ) (Bankr. S.D. Tex. Feb. 19, 2020) [ECF No. 960] (3.0% of uncapped proceeds); *In re Cobalt International Energy*, No. 17-36709 (MI) (Bankr. S.D. Tex. Jan. 26, 2018) [ECF No. 307] (3.0% of uncapped proceeds). Under the Wind-Down KEIP, however, the share paid to Senior Management Employees on account of the most significant component, the Liquidation Proceeds, begins at 1.75%, only increasing to 2.50% for amounts in excess of Target Values. This too is exceedingly modest when compared to similar cases.

23.    Absent the Wind-Down KEIP, Senior Management Employees would not have the opportunity to earn *any* short-term incentive compensation, despite being required to take on additional, more challenging job responsibilities. Accordingly, the Wind-Down KEIP is necessary to incentivize Senior Management Employees to do their utmost to achieve the highest possible Liquidation Proceeds, Wind-Down Cost Savings and recovery on the monetization of the LGA Slots.

24.    I believe that the Wind-Down KEIP is reasonable because, even if the Wind-Down KEIP targets are achieved, the payments made will (i) still result in the

12

Debtors' Senior Management Employees being paid materially less than employees with similar job responsibilities at other airlines or similarly sized companies and (ii) likely be materially less than the Debtors would expect to pay a replacement in the case of a resignation by any of the Senior Management Employees, even prior to accounting for the fact that failing to retain the Remaining Senior Employees would also likely result in materially reduced recoveries for the senior secured lenders in the millions or tens of millions of dollars.

25.     Accordingly, based on my experience and work in these Chapter 11 Cases, in light of the significant benefit to the Debtor's estate, I believe the design, structure, cost, and award opportunities of the Wind-Down KEIP are reasonable and justified.

**III.    The Need for the Discretionary Capacity of the Wind-Down KERP**

26.     The Wind-Down KERP also contemplates a discretionary pool of $500,000 to be allocated based on future Non-Senior Management Employee compensation needs.[5] Due to the uncertainty inherent in the Wind-Down, and the possibility that Non-Senior Management Employee compensation requirements may not fully align with the proposed Wind-Down KERP structure, this pool is necessary to provide some flexibility to ensure a smooth Wind-Down. This relief was adjourned to the June 10 Hearing.

---

[5] For the avoidance of doubt, if an employee receives a promotion or takes on a new role due to the departure of another Wind-Down KERP recipient, (i) any resulting modification in their retention award is a reallocation of the previously allocated Wind-Down KERP amounts and not a draw on the Discretionary Capacity and (ii) any resulting surplus Wind-Down KERP amounts that were previously allocated to individuals are added to the Discretionary Capacity.

27.     Since the shut-down of the Debtors' operations, the need for the Discretionary Capacity has only grown more critically acute, as ten of the originally identified 130 participants in the Wind-Down KERP have already voluntarily departed. Several of these departures were critical to the Wind-Down, including (i) the Key Senior Director, Tech Operations, (ii) a management pilot, (iii) two FAA A&P-qualified mechanics and (iv) two financial planning & analysis employees. Furthermore, since the shut-down of operations the Debtors have had unanticipated resource needs for the processing of DOT-required refunds, protection of GSC assets, aircraft movement, American Express chargebacks and international taxes related to station closures. The Debtors urgently need the Discretionary Capacity to retain and compensate human capital in critical functions, account for unexpected responsibilities which will continue to arise, properly meet regulatory requirements and maximize the monetization of the remaining assets.

28.     I believe the Discretionary Capacity is commercially reasonable and entirely consistent with—and is in fact modest relative to—relief granted in precedent retention programs. While the Discretionary Capacity is only 6% of the Wind-Down KERP, the average discretionary pool is 11% of the overall retention program, and some are over 20%. *See, e.g., In re Wellpath Holdings, Inc.*, No. 24-90533 (ARP) (Bankr. S.D. Tex. Feb. 24, 2025) [ECF 1533] (discretionary pool of 22% of retention program); *In re Reverse Mortgage Investment Trust Inc.*, No. 22-11225 (MFW) (Bankr. D. Del Feb. 22, 2023) [ECF 496] (discretionary pool of 21% of retention program); *In re NPC International, Inc.*, No. 20-33353 (DRJ) (Bankr. S.D. Tex. Sep. 17, 2020) [ECF No. 636] (discretionary pool of 10% of retention program); *In re M&G USA Corporation*, No. 17-

12307 (BLS) (Bankr. D. Del Jan. 5, 2018) [ECF 629] (discretionary pool of 6% of retention program); *In re Frontier Communications Corporation*, No. 20-22476 (RDD) (Bankr. S.D.N.Y. July 17, 2020) [ECF 741] (discretionary pool of 5% of retention program); *In re J.C. Penney Company, Inc.*, No. 20-20182 (DRJ) (Bankr. S.D. Tex. Aug. 24, 2020) [ECF 1302] (discretionary pool of 4% of retention program).

29.     Additionally, as I stated in the First Kuehne Declaration, I believe the discretionary pool is a necessary component of the Wind-Down KERP. Given the indeterminate nature of winding down a business of the Debtors' scope and complexity, it is likely that unanticipated, non-insider retention needs may arise for existing and non-existing Wind-Down KERP participants. The discretionary pool is intended to provide targeted flexibly to address any such unanticipated compensation needs. Discretionary pools have been approved in a number of comparable chapter 11 retention programs, where, as in the Debtors' case, there is heightened execution risk, evolving staffing needs, or elevated attrition risk during a restructuring or wind-down process. All of these risks have only been exacerbated since the shut-down of the Debtors' operations. The size of the discretionary pool contemplated under the Wind-Down KERP is also consistent with market practice, with the discretionary pool falling well below the observed market average of approximately 11 percent of total retention program costs.

[*The remainder of this page is intentionally blank.*]

15

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

is true and correct to the best of my knowledge, information, and belief.

Dated:   May 27, 2026
         New York, New York

/s/ Martin Kuehne
Martin Kuehne
Senior Managing Director
FTI Consulting, Inc.