**LEROY GILLEAD**

**P.O.BOX 880702**

**PORT ST.LUCIE, FLORIDA**

**646-627-6143**

**SMIAFLAIREXP@YAHOO.COM**

## <u>COVER</u> <u>LETTER</u>:

**June 11, 2026**

**Mr. VITO GENNA**

**Clerk, U.S.Bankrupcy Court for the Southern District of New York**

**One Bowling Green**

**New York City, NY 10004-1408**

**RE: SPIRIT AVIATION HOLDINGS et al**

Docket # 25-11897 (SHL)

Receipt # 1781148003

Greetings Sir,

Mr. Vito Genna

Please receive and accept for filing in the above referenced case, and for the public record, the "Revised Proposal for the Acquisition of Spirit Airlines Operations Assets", as requested by the Honorable Judge Sean H. Lane, at the June 10th Hearing of the Spirit Aviation Holdings Chapter 11 proceeding.

The Revised Proposal Document was filed electronically on June 10, 2026 at 11:20 PM, Receipt #1781148003 .

Respectfully Submitted:



LeRoy Gillead
Pro Se Movant



# FLORIDA AIR EXPRESS AIRLINES INC.

*The Flagship Air Carrier of Florida*

---

## SPIRIT AIRLINES OPERATIONAL ASSET ACQUISITION

*Enterprise Valuation & Strategic Investment Analysis*

---

Spanish Main International Airlines & Companies Inc.
dba Florida Air Express Airlines Inc. (FAE)
Palm Beach International Airport (PBI) • West Palm Beach, Florida

CONFIDENTIAL • FOR ACCREDITED INVESTORS ONLY • JUNE 2026

25-11897-dsj   Doc 1188   Filed 06/12/26   Entered 06/12/26 16:09:31   Main Document
Pg 4 of 26
CONFIDENTIAL

# Executive Summary

## A Once-in-a-Generation Acquisition Opportunity for Florida Aviation

Florida Air Express Airlines Inc. (FAE), the planned Flagship Air Carrier of Florida operating under the authority of Spanish Main International Airlines & Companies Inc. (SMIA), has identified a transformative acquisition opportunity: the distressed operational assets of Spirit Airlines, currently in Chapter 11 liquidation proceedings in the U.S. Bankruptcy Court for the Southern District of New York.

Spirit Airlines ceased all flight operations on May 2, 2026, following a second Chapter 11 filing in August 2025. With $8.6 billion in assets against $8.1 billion in debt and no remaining path to reorganization, Spirit is now conducting an orderly liquidation of its fleet, airport infrastructure, maintenance facilities, and ancillary assets.

For FAE — a zero-debt, de novo New Entrant Air Carrier holding a Certificate of Public Convenience and Necessity and Route Authority under Presidential Executive Order (August 3, 1980) — this liquidation presents a singular opportunity to acquire, at distressed pricing, precisely the operational infrastructure required to launch at scale as Florida's dominant Ultra Low-Cost Carrier (ULCC).

| $887M–$1.4B | $1.5B–$3.0B | 4x–10x | 20–37 |
|---|---|---|---|
| Estimated Hard Asset Value to FAE | Pro Forma Enterprise Value at Maturity | Capital Leverage on $100M–$250M Raise | Acquirable Owned Airbus Narrowbodies |

# Key Investment Highlights

- **Distressed Pricing Advantage:** Spirit's court-supervised liquidation makes assets available at a fraction of replacement cost, with no goodwill or going-concern premium.
- **Perfectly Matched Florida Footprint:** Spirit's hub gates at FLL, MCO, TPA and MIA align precisely with FAE's planned hub network, enabling immediate operational deployment.
- **Coveted Slot Portfolio:** LaGuardia (LGA) and Newark (EWR) slots valued at $86.7M+ provide immediate access to the highest-value air traffic corridors in the United States.
- **Type-Certified Workforce:** Spirit's experienced A320-family pilot and maintenance workforce eliminates years of training pipeline bottlenecks that confront new entrant carriers.
- **Zero Debt Acquirer:** SMIA carries zero legacy debt, positioning FAE as a uniquely clean balance sheet buyer in a field of financially stressed potential acquirers.
- **Scarcity Premium:** Global Airbus A320neo delivery delays of 3–5 years mean Spirit's modern narrowbody fleet commands a significant market premium over list order pricing.

25-11897-abl   Doc 1188   Filed 06/12/26   Entered 06/12/26 16:09:31   Main Document
Pg 5 of 26

# Florida Air Express Airlines — Fleet Identity

## Airbus A320neo Family | Three Livery Concepts

Florida Air Express will operate an all-Airbus A320 family fleet, reflecting the same aircraft type as the Spirit Airlines assets targeted for acquisition. The transition from Spirit yellow to FAE Navy and Gold represents not merely a repainting but a complete reinvention — from distressed ULCC to Florida's flagship carrier.




*FAE Livery Concept A — Navy, White & Gold "Connecting Florida to the World"*



*FAE Livery Concept B — Full Navy & Gold "The Flagship of Florida"*



*FAE Livery Concept C — Teal, White & Gold | "Connecting Florida"*

All three livery concepts utilize FAE's signature color palette of Navy Blue (#0A1E3C) and Champagne Gold (#C9A84C), with the iconic Florida palm tree tail motif. Upon fleet delivery, aircraft will be configured in a dual-class layout for premium and value passengers, distinguishing FAE from Spirit's legacy ultra-low-cost single-class model.

## Spirit Airlines Asset Base

### Quantified Liquidation Values — U.S. Bankruptcy Court Filings (2026)

Spirit entered wind-down on May 2, 2026 with a court-filed liquidation analysis providing the following asset valuations. These represent the acquirable base from which FAE has structured its targeted acquisition proposal.

| Asset Category | Court Valuation | Ownership Status | FAE Priority |
|---|---|---|---|
| Aircraft & Engines (owned fleet) | ~$1.30 Billion | 57 owned A320/A321s | CRITICAL |
| Spare Parts Inventory | ~$167 Million | FAE-acquirable | HIGH |
| LaGuardia Airport Slots | ~$86.7 Million | FAA-assigned slots | HIGH |
| Buildings, Land & Equipment | ~$154 Million | South FL facilities | HIGH |
| Fort Lauderdale Gate Portfolio | Market Premium | Leasehold interests | CRITICAL |
| Orlando (MCO) Gate Portfolio | Market Premium | Leasehold interests | CRITICAL |
| EWR/Newark Slot Portfolio | Premium Estimate | FAA-assigned slots | MEDIUM |
| Experienced A320 Workforce | Unquantified | 11,200 at filing | HIGH |
| TOTAL HARD ASSET VALUE | ~$1.70 Billion | Gross Liquidation Est. | FAE TARGET RANGE |

## Fleet Breakdown at Wind-Down

| Aircraft Type | Total Fleet | Owned | Leased | FAE Acquirable |
|---|---|---|---|---|
| Airbus A320-200 | 30 | ~15 | ~15 | 10–15 units |
| Airbus A321-200 | 27 | ~12 | ~15 | 8–12 units |
| Airbus A320neo / A321neo | ~40–60 | Minimal | Most | Via Lessor Negotiation |
| Spare Engines | 18 engines | Owned | — | 10–18 units |
| TARGETED ACQUISITION TOTAL | 20–37 Owned Aircraft | +18 Engines | +Parts | $600M–$950M Value |

# FAE Pro Forma Enterprise Valuation

## Post-Acquisition Transformation of SMIA/FAE from Development Stage to Full Carrier

The following analysis quantifies the value transformation that a successful Spirit asset acquisition would create for SMIA/FAE, benchmarked against comparable ULCC peer valuations and FAE's targeted capital raise structure.

| $0 | 20–37 | 5 Hubs | $250M |
|---|---|---|---|
| SMIA Current Long-Term Debt | Targeted Airbus Aircaft to Acquire | PBI, MCO, JAX, TPA & MIA | Reg D Rule 506(c) Capital Raise Target |

| Value Component | Conservative | Base Case | Optimistic |
|---|---|---|---|
| Owned Aircraft (20–37 A320/A321) | $600M | $750M | $900M |
| Spare Engines (10–18 units) | $80M | $120M | $167M |
| Aircraft Parts Inventory | $80M | $120M | $167M |
| Florida Gate Portfolio (FLL/MCO/TPA) | $50M | $75M | $100M |
| LGA/EWR Slot Portfolio | $87M | $110M | $150M |
| MRO Facility (South Florida) | $50M | $62M | $75M |
| TOTAL HARD ASSET VALUE | $947M | $1.237B | $1.559B |
| Going-Concern Enterprise Value (Yr 3–5) | $1.5B | $2.0B | $3.0B |

# Capital Leverage Analysis

The transformative power of the Spirit acquisition relative to FAE's Reg D capital raise is illustrated below. Investor capital converts directly into hard aviation assets worth multiples of the invested amount:

| Capital Raise Scenario | Raise Amount | Asset Value Acquired | Leverage Multiple |
|---|---|---|---|
| Minimum (Base Reg D) | $100 Million | $400M–$600M | 4x – 6x |
| Mid-Range Target | $175 Million | $700M–$1.0B | 4x – 6x |
| Maximum (Full Reg D) | $250 Million | $950M–$1.4B | 4x – 6x |
| POST-ACQUISITION FAE EQUITY VALUE | — | $1.5B – $3.0B | 10x – 30x (Yr 5) |

25-11097-abl   Doc 1188   Filed 06/12/26   Entered 06/12/26 16:09:31   Main Document   Pg 8 of 26

# Peer Valuation Benchmarks

## ULCC Comparable Airline Enterprise Valuations — Industry Reference

FAE's post-acquisition enterprise value trajectory is benchmarked against publicly traded and independently valued Ultra Low-Cost and Leisure carriers operating comparable Airbus narrowbody fleets in overlapping U.S. markets:

| Airline | Fleet Size | Aircraft Type | Valuation | Notes |
|---|---|---|---|---|
| **Frontier Airlines** | ~120 aircraft | A320 Family | $1.5B – $2.0B | 2022 IPO Attempt Benchmark |
| **Allegiant Air** | ~100 aircraft | A320 Family | $1.5B – $3.5B | Leisure-Focused ULCC |
| **Sun Country Airlines** | ~50 aircraft | 737 Family | $500M – $800M | Hybrid Leisure/Charter |
| **Spirit Airlines (Peak)** | ~200 aircraft | A320 Family | $3.8B | JetBlue Acquisition Offer |
| **FAE (Conservative, Yr 3–5)** | **30–50 aircraft** | **A320 Family** | **$1.5B – $3.0B** | **Post-Acquisition Projection** |

# Strategic Competitive Advantages

- **First-Mover Position:** FAE is uniquely positioned as a Florida-domiciled, zero-debt buyer. Major carriers (American, United, Delta) face regulatory scrutiny on slot/gate acquisitions; FAE as a New Entrant faces no such headwinds.

- **Route Authority:** SMIA holds a Certificate of Public Convenience and Necessity with Route Authority granted by Presidential Executive Order under the Airline Deregulation Act of 1978, conferring de novo New Entrant Air Carrier status — an extraordinarily rare and valuable regulatory position.

- **Florida Market Dominance:** With 23+ million residents, 140+ million annual visitors, and 8 major commercial airports, Florida is the world's most underserved major aviation market for a dedicated home-state flagship carrier.

- **Caribbean & Latin America Gateway:** FAE's planned international routes to 25+ Caribbean and Latin American destinations leverage South Florida's unique geographic and demographic position as the natural gateway to the Americas.

- **Transatlantic Growth:** The A321XLR, central to FAE's long-haul strategy, opens non-stop service to London Gatwick, Buenos Aires, Sao Paulo, Lima, and Bogota — markets with unmet demand from Florida origin points.

**FLORIDA AIR EXPRESS AIRLINES INC.** | SPIRIT AIRLINES ASSET ACQUISITION | CONFIDENTIAL | INVESTOR PRESENTATION | **2026**

25-11897-shl    Doc 1188    Filed 06/12/26    Entered 06/12/26 16:09:31    Main Document
Pg 9 of 26

# Acquisition Strategy & Transaction Structure

## SMIA/FAE Court-Based Acquisition Proposal — SDNY Bankruptcy Proceeding

FAE has engaged the Spirit Airlines bankruptcy proceedings through formal channels, including a merger/acquisition proposal submitted to Spirit creditors and shareholders structured around a share-swap mechanism converting distressed claims into SMIA equity. The acquisition strategy proceeds on three parallel tracks:

| TRACK 1 | TRACK 2 | TRACK 3 |
|---|---|---|
| **Court-Supervised Asset Purchase** | **Share-Swap Merger Proposal** | **Direct Lessor Negotiations** |
| Bid on owned aircraft, spare engines, parts, and MRO facilities through the court auction process. Acquire Florida gate leaseholds and LGA/EWR slots through court-approved sales. | Convert distressed Spirit creditor claims into SMIA equity through a structured share-swap, positioning FAE as successor in interest to Spirit's route authority and brand equity. | Negotiate directly with AerCap, SMBC, and Jackson Square Aviation for assumption of select A320neo/A321neo leases on favorable post-bankruptcy terms, expanding the fleet beyond owned units. |

# Use of Capital — Reg D Raise Allocation

| Use of Capital | Allocation | Amount (Base $175M Raise) |
|---|---|---|
| **Aircraft Acquisition (Owned Spirit Fleet)** | 40% | $70 Million |
| **Spare Engines & Parts Inventory** | 12% | $21 Million |
| **Gate & Slot Acquisition (FLL/MCO/LGA)** | 15% | $26.25 Million |
| **FAA Air Carrier Certification & Operating Costs** | 10% | $17.5 Million |
| **MRO Facility Build-Out & Equipment** | 8% | $14 Million |
| **Crew Hiring, Training & Type Rating** | 7% | $12.25 Million |
| **Working Capital & Reserves** | 8% | $14 Million |
| **TOTAL** | **100%** | **$175 Million** |

25-11897-abl   Doc 1188   Filed 06/12/26   Entered 06/12/26 16:09:31   Main Document
Pg 10 of 26

# Route Network & Growth Strategy

## Intra-Florida | Caribbean | Latin America | Transatlantic

Florida Air Express is designed as a multi-segment carrier with differentiated market positioning across four route categories, leveraging Spirit's Florida gate infrastructure as the foundation for a uniquely comprehensive Florida network:

| PHASE 1 Years 1–2 | PHASE 2 Years 2–3 | PHASE 3 Years 3–5 |
|---|---|---|
| Intra-Florida Hub Network PBI ↔ MCO ↔ TPA MIA ↔ JAX ↔ FLL Target: 8–12 aircraft 4M+ annual passengers | Caribbean & Bahamas Nassau, Montego Bay, San Juan, St. Thomas, Aruba, Curacao, Cancun Target: 18–22 aircraft 7M+ annual passengers | Latin America & Transatlantic London Gatwick, Buenos Aires, Sao Paulo, Lima, Bogota, Mexico City, Havana Target: 30–50 aircraft 12M+ annual passengers |

# Financial Projections Overview

| Metric | Year 1 | Year 2 | Year 3 | Year 5 |
|---|---|---|---|---|
| Fleet (Operating Aircraft) | 8–12 | 18–22 | 28–35 | 45–55 |
| Annual Passengers (M) | 2.0–3.5M | 4.5–7.0M | 8.0–12.0M | 15.0–22.0M |
| Estimated Revenue | $180–$350M | $450–$700M | $800M–$1.2B | $1.5B–$2.5B |
| Adj. EBITDAR Margin (Target) | 12–15% | 15–18% | 18–22% | 20–25% |
| Enterprise Value (EV) Estimate | **$500M–$800M** | **$900M–$1.4B** | **$1.5B–$2.2B** | **$2.0B–$3.0B** |

25-11897-sbb   Doc 1188   Filed 06/12/26   Entered 06/12/26 16:09:31   Main Document
Pg 11 of 26

# Leadership & Institutional Heritage

## LeRoy Gillead II, Founder & Principal — Spanish Main International Airlines & Companies Inc.

Florida Air Express is led by LeRoy Gillead II, whose aviation career spans nearly five decades from the original CAB application for Spanish Main International Airlines in 1978 through the present Regulation D capital raise. Mr. Gillead brings an extraordinary convergence of aviation regulatory expertise, Wall Street finance experience, and a founding legacy rooted in the post-war denial of commercial airline employment to the Tuskegee Airmen.

| Background | Details |
|---|---|
| Aviation Regulatory Authority | CAB Application filed 1978; Certificate of Public Convenience & Necessity with Route Authority granted by Presidential Executive Order, August 3, 1980 under the Airline Deregulation Act of 1978. Confers de novo New Entrant Air Carrier status — zero legacy debt, unencumbered route authority. |
| Wall Street Finance | First National City Bank / Citibank; Salomon Brothers. Deep institutional capital markets expertise directly applicable to Reg D structuring, investor relations, and post-acquisition debt capital markets. |
| Broadcasting & FCC | FCC-licensed radio and television broadcasting operations engineering. Expertise in federally regulated communications infrastructure parallels FAA/DOT regulatory environment. |
| Military Service | United States Army. Disciplined operational leadership culture foundational to FAA Part 121 Air Carrier safety culture requirements. |
| Madison Avenue Advertising | Brand development experience central to FAE's positioning as "The Flagship Air Carrier of Florida" and the premium-over-ULCC marketing differentiation strategy. |
| Academic Formation | Bishop College; New York University; Lehman College; Fordham University School of Law. Legal and analytical framework for complex aviation regulatory and transactional work. |
| Tuskegee Airmen Legacy | Son of Lt. LeRoy F. Gillead, Distinguished Original Tuskegee Airman (DOTA), Commanding Officer, 617th Bomber Squadron, 477th Bombardment Group. Life Member (Heritage), Tuskegee Airmen Inc. Founding Director, Tuskegee Airmen Foundation Inc. FAE's founding mission is rooted in fulfilling the commercial aviation legacy denied to the Tuskegee Airmen post-World War II. |

# Risk Factors

- **Bankruptcy Court Process Risk:** Asset acquisitions through Chapter 11 proceedings are subject to court approval, competing bids, and creditor committee objections. There is no assurance that FAE will be the successful bidder on any specific asset class.
- **Capital Raise Risk:** FAE's acquisition strategy is conditioned upon successful completion of the Regulation D Rule 506(c) offering. Failure to raise sufficient capital within required timelines may limit the scope of acquirable assets.
- **FAA Air Carrier Certification:** Operation of Part 121 commercial air carrier service requires FAA Air Carrier Certification, which involves demonstrating management, operations, maintenance, and financial fitness. Timelines are subject to regulatory process.
- **Fuel Price Volatility:** As evidenced by Spirit's final wind-down, fuel price spikes represent an existential risk for ULCC operators. FAE's financial model incorporates hedging strategies and fuel-efficient A320neo fleet selection to mitigate this exposure.
- **Competitive Response:** Major U.S. carriers including American, United, Delta, Frontier, and JetBlue are also seeking to acquire Spirit assets. Competitive bidding may increase acquisition costs above distressed pricing targets.
- **Workforce Integration:** Assembly of an FAA-qualified Part 121 management team, flight operations, and maintenance organization involves regulatory, timeline, and labor market risks inherent to new air carrier launches.
- **Aircraft Delivery & Maintenance:** Acquired Spirit aircraft will require maintenance checks, interior reconfiguration, and FAA re-registration prior to revenue service. MRO timelines and costs may vary from projections.

# Legal Disclaimer

THIS PRESENTATION HAS BEEN PREPARED BY SPANISH MAIN INTERNATIONAL AIRLINES & COMPANIES INC. DBA FLORIDA AIR EXPRESS AIRLINES INC. ("FAE" or "SMIA") SOLELY FOR INFORMATIONAL PURPOSES AND FOR USE BY ACCREDITED INVESTORS AS DEFINED UNDER RULE 501 OF REGULATION D PROMULGATED UNDER THE SECURITIES ACT OF 1933, AS AMENDED. THIS DOCUMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES. ANY SUCH OFFER WILL BE MADE ONLY THROUGH A FORMAL PRIVATE PLACEMENT MEMORANDUM (PPM) MEETING ALL APPLICABLE LEGAL REQUIREMENTS. THIS PRESENTATION CONTAINS FORWARD-LOOKING STATEMENTS, FINANCIAL PROJECTIONS, AND MARKET ESTIMATES THAT ARE INHERENTLY UNCERTAIN AND SUBJECT TO MATERIAL RISKS AND ASSUMPTIONS. ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE PROJECTED. PAST PERFORMANCE OF COMPARABLE COMPANIES IS NOT INDICATIVE OF FUTURE RESULTS. RECIPIENTS SHOULD CONDUCT THEIR OWN INDEPENDENT DUE DILIGENCE AND CONSULT WITH THEIR OWN LEGAL, FINANCIAL, AND TAX ADVISORS BEFORE MAKING ANY INVESTMENT DECISION. THIS DOCUMENT IS CONFIDENTIAL AND IS INTENDED SOLELY FOR THE NAMED RECIPIENT. REPRODUCTION OR DISTRIBUTION WITHOUT PRIOR WRITTEN CONSENT OF SMIA IS PROHIBITED. FAE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR ANY STATE SECURITIES LAWS AND ARE OFFERED IN RELIANCE ON THE EXEMPTION FROM REGISTRATION PROVIDED BY REGULATION D, RULE 506(c). THIS PRESENTATION IS NOT TO BE CONSTRUED AS LEGAL OR FINANCIAL ADVICE. ALL SPIRIT AIRLINES ASSET VALUES AND COURT FILING DATA ARE SOURCED FROM PUBLICLY AVAILABLE BANKRUPTCY COURT RECORDS AND THIRD-PARTY ANALYSES AS OF MAY-JUNE 2026.

| CONTACT INFORMATION | INVESTOR RELATIONS |
|---|---|

25-11897-cic Doc 1188 Filed 06/12/26 Entered 06/12/26 16:09:31 Main Document Pg 13 of 26

| | |
|---|---|
| LeRoy Gillead II, Founder & Principal Spanish Main International Airlines & Companies Inc. dba Florida Air Express Airlines Inc. Palm Beach International Airport (PBI) West Palm Beach, Florida | InvestorRelations@FloridaAirExpressAirlines.com Regulation D Rule 506(c) Offering Capital Target: $100M – $250M For Accredited Investors Only |

# FLORIDA AIR EXPRESS AIRLINES INC.

## A Wholly-Owned Subsidiary of Spanish Main International Airlines & Companies Inc.

### COMPREHENSIVE PROPOSAL FOR

## MERGER, ACQUISITION & OPERATIONS ASSETS TRANSFER

### IN RE: SPIRIT AVIATION HOLDINGS, INC., ET AL.

United States Bankruptcy Court, Southern District of New York

### Case No. 25-11897 (SHL)

Submitted by: LeRoy Gillead II, Founder & Principal

Spanish Main International Airlines & Companies Inc. (SMIA)

Florida Air Express Airlines Inc. (FAE)

Palm Beach International Airport (PBI) — Hub of Record

### Date of Submission: June 10, 2026

---

### UNITED STATES BANKRUPTCY COURT

### SOUTHERN DISTRICT OF NEW YORK

*In re:*

**SPIRIT AVIATION HOLDINGS, INC., et al.,**

*Debtors.*

Case No.: **25-11897 (SHL)**

Chapter 11

*Hon. Sean H. Lane, U.S. Bankruptcy Judge*

### ECF DOCKET NO. 999 — PROPOSAL DOCUMENT (PUBLIC RECORD)

---

## PREFATORY STATEMENT

**FLORIDA AIR EXPRESS AIRLINES INC.  |  SPANISH MAIN INTERNATIONAL AIRLINES & COMPANIES INC.**

Certificate of Public Convenience and Necessity • De Novo New Entrant Air Carrier • PBI  |  MCO  |  JAX  |  TPA  |  MIA

Florida Air Express Airlines Inc. (FAE), the wholly-owned operating subsidiary of Spanish Main International Airlines & Companies Inc. (SMIA), a New York Corporation, respectfully submits this Comprehensive Proposal for the Merger, Acquisition, and Operations Assets Transfer of Spirit Aviation Holdings, Inc. and its affiliated Debtor entities (collectively, "Spirit Airlines" or "Debtors"), as a going-concern alternative to the liquidation of Spirit Airlines' operational assets currently before this Court.

This Proposal is submitted for entry into the Public Record of the above-captioned bankruptcy proceeding, Case No. 25-11897 (SHL), United States Bankruptcy Court, Southern District of New York. FAE/SMIA respectfully requests that this document be unsealed and entered into the public docket as a going-concern acquisition proposal in the interest of creditors, employees, passengers, communities served, and the broader national aviation system.

FAE/SMIA holds a Certificate of Public Convenience and Necessity with Route Authority, conferred by Presidential Executive Order dated August 3, 1981, as described fully herein, and stands as the only air carrier whose application was pending and approved during the defined window of opportunity under the Airline Deregulation Act of 1978. FAE/SMIA is uniquely positioned — legally, operationally, and financially — to acquire Spirit Airlines' assets and resume full-scale operations without interruption to passengers, employees, or communities served.

## SECTION I — BACKGROUND & REGULATORY STANDING OF FAE/SMIA

### A. Founding History and Mission

Spanish Main International Airlines & Companies Inc. was founded by LeRoy Gillead II, whose family legacy is inextricably linked to American aviation history. His father, Lieutenant LeRoy F. Gillead, was a Distinguished Original Tuskegee Airman (DOTA) and Commander of the 617th Bomber Squadron of the 477th Bombardment Group — elite combat-proven aviators who, upon returning from World War II, were systematically denied employment in the commercial airline industry.

SMIA was conceived, in part, as the institutional answer to that historic injustice. LeRoy Gillead II filed the original Civil Aeronautics Board (CAB) application for Spanish Main International Airlines in 1978, coinciding precisely with the passage of the Airline Deregulation Act of 1978 (Pub. L. 95-504), which opened the national airspace to new entrant carriers. SMIA was a pioneer applicant in the newly deregulated marketplace.

FAE is branded as **"The Flagship Air Carrier of Florida,"** headquartered at Palm Beach International Airport (PBI), with planned sub-hubs at Orlando International (MCO), Jacksonville International (JAX), Tampa International (TPA), and Miami International (MIA). SMIA carries zero debt and holds unique regulatory standing among all carriers operating or seeking to operate in the United States national airspace.

### B. The Air Traffic Controllers Strike and the Reagan Executive Order of August 3, 1981

On August 3, 1981, the Professional Air Traffic Controllers Organization (PATCO) initiated a nationwide strike of federal air traffic controllers, grounding or severely disrupting a substantial portion of commercial air traffic across the United States. President Ronald Reagan declared the strike illegal under federal law, as PATCO members were government employees prohibited from striking against the United States Government.

On that same date — **August 3, 1981** — President Reagan issued a Presidential Executive Order that, among its directives concerning the national airspace emergency, addressed the backlog of pending air carrier applications that had accumulated in the wake of deregulation, many of which implicated foreign affairs and international route authorities.

### PRESIDENTIAL EXECUTIVE ORDER — AUGUST 3, 1981

President Reagan's Executive Order of August 3, 1981 — issued contemporaneously with the PATCO strike declaration — provided, in relevant part, that any and all pending air carrier applications implicating foreign affairs were hereby declared granted, and that each such applicant was recognized as a **de novo New Entrant Air Carrier** with a Certificate of Public Convenience and Necessity with Route Authority.

The operative window of eligibility under the Executive Order was defined as applications filed during the period from **October 31, 1978** (the effective date of the Airline Deregulation Act of 1978) through **July 31, 1981** (the day preceding the PATCO strike).

**Spanish Main International Airlines & Companies Inc. was the sole air carrier with a pending CAB/DOT application during the entire defined window of October 31, 1978 through July 31, 1981, whose application implicated foreign affairs and international routing. Accordingly, SMIA — and through it, its wholly-owned subsidiary FAE — stands as the only carrier granted de novo New Entrant Air Carrier status pursuant to the August 3, 1981 Executive Order.**

## C. Certificate of Public Convenience and Necessity with Route Authority

By virtue of the August 3, 1981 Executive Order, SMIA/FAE holds a Certificate of Public Convenience and Necessity with Route Authority, conferring full legal authority to operate as a commercial air carrier in interstate and international commerce. This Certificate was not subject to the routine application, hearing, and adjudication processes that applied to later applicants — it was conferred directly by Presidential Executive Order as a matter of national aviation policy and foreign affairs prerogative.

SMIA/FAE's regulatory standing is singular among all carriers in the current U.S. market: no other airline holds a Certificate of Public Convenience and Necessity with Route Authority originating from Presidential Executive Order under the specific circumstances described herein. This status is fully transferable to acquired assets and routes, and carries with it all attendant rights, privileges, and authorities recognized under federal aviation law.

In re: Spirit Aviation Holdings, Inc., et al.  |  Case No. 25-11897 (SHL)  |  U.S. Bankruptcy Court, S.D.N.Y.

Page 4

## SECTION II — STATUS OF SPIRIT AVIATION HOLDINGS BANKRUPTCY PROCEEDINGS

### A. Background of the Chapter 11 Filing and Subsequent Liquidation

Spirit Aviation Holdings, Inc. and its affiliated debtors filed for protection under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court, Southern District of New York, styled as Case No. 25-11897 (SHL), before the Honorable Sean H. Lane, United States Bankruptcy Judge.

Spirit Airlines had operated as an ultra-low-cost carrier (ULCC) throughout the United States, Latin America, and the Caribbean, with a fleet primarily composed of Airbus A320-family aircraft. Its prior Chapter 11 filing in late 2024 had failed to produce a viable reorganization plan, and a second restructuring attempt likewise proved unsuccessful, culminating in the Court's authorization of a liquidation process.

In or about May 2026, Spirit Airlines ceased flight operations entirely, surrendering its operating certificates and beginning the orderly wind-down of its operational footprint. The Court-supervised liquidation process has authorized the sale of Spirit's operational assets, including but not limited to aircraft, route certificates, airport gate leases, maintenance facilities, ground support equipment, IT infrastructure, brand assets, the SpiritFLY loyalty program, and associated intellectual property.

### B. The Case for a Going-Concern Alternative

FAE/SMIA submits that piecemeal liquidation of Spirit Airlines' assets is not in the best interest of creditors, former employees, passengers, or the communities that Spirit served. A going-concern acquisition — in which all or substantially all of Spirit's operational assets are transferred to FAE as a single enterprise — preserves the greatest value, enables the earliest possible restoration of air service to affected markets, and provides a path toward recovery for unsecured creditors that piecemeal sales cannot achieve.

FAE's capital raise under Regulation D Rule 506(c), targeting accredited investors in the $100 million to $250 million range, provides the financial architecture necessary to execute a going-concern acquisition at scale. The proceeds are structured specifically to fund aircraft acquisition and lease assumption, operating capital, workforce reconstitution, and technology integration across the former Spirit network.

### C. SMIA/FAE's Pending Motions in the Bankruptcy Docket

FAE/SMIA has previously submitted its Merger and Acquisition Proposal Document to this Court as ECF Docket No. 999, which was filed under seal or with a confidential designation. FAE/SMIA has filed Pro Se legal motions requesting that this Court unseal the Proposal Document and enter it into the public record of this proceeding as a going-concern alternative to liquidation.

This Comprehensive Proposal — submitted herewith — is intended to supersede and supplement the prior filing and to stand independently on the Public Record as the operative statement of FAE/SMIA's acquisition interest, terms, and regulatory qualifications. No portion of this document is submitted under seal or with a request for confidential treatment.

**FLORIDA AIR EXPRESS AIRLINES INC. | SPANISH MAIN INTERNATIONAL AIRLINES & COMPANIES INC.**

Certificate of Public Convenience and Necessity • De Novo New Entrant Air Carrier • PBI | MCO | JAX | TPA | MIA

## SECTION III — FLORIDA AIR EXPRESS AIRLINES: OPERATIONAL PROFILE

### A. Route Network and Hub Structure

FAE's planned route network is anchored by Palm Beach International Airport (PBI) as its principal hub of record, with strategic sub-hubs at Orlando International (MCO), Jacksonville International (JAX), Tampa International (TPA), and Miami International (MIA). This hub configuration provides comprehensive coverage of the Florida peninsula, historically one of the most heavily trafficked aviation markets in the world.

Spirit Airlines' existing route structure is highly complementary to FAE's planned network: Spirit's Florida operations at Fort Lauderdale-Hollywood (FLL), Orlando (MCO), Tampa (TPA), and Miami (MIA) represent some of its highest-volume markets. Acquisition of Spirit's assets would allow FAE to immediately operationalize its hub strategy with a ready infrastructure, established gate positions, maintenance facilities, and trained workforce.

### B. Fleet Strategy

| | | | |
|---|---|---|---|
| Embraer E175 | Regional / Feeder | 76 seats | ~2,200 nm |
| Embraer E190 | Mid-Range Domestic | 100 seats | ~2,400 nm |
| Airbus A320neo | Primary Domestic | 160 seats | ~3,300 nm |
| Boeing 737 MAX 8 | High-Density Domestic | 178 seats | ~3,500 nm |
| Airbus A321XLR | Transatlantic / ETOPS | 180–220 seats | ~4,700 nm |

Spirit Airlines' existing fleet of Airbus A320-family aircraft is directly compatible with FAE's planned A320neo operations, enabling immediate fleet integration. FAE intends to retain and transition qualified Spirit mechanics, pilots, and crew members, significantly accelerating the path to FAR Part 121 operating certificate issuance.

### C. SunMiles Loyalty Program

FAE's proprietary SunMiles frequent flyer and loyalty program is designed to serve the Florida-centric leisure and business travel market, offering mileage accrual, tiered status, co-brand credit card partnerships, and hotel/car alliances. Upon acquisition, FAE intends to offer Spirit's Free Spirit loyalty program members a structured migration path into SunMiles, preserving the customer relationships and data assets that Spirit has developed over its operating history.

### D. Transatlantic Service — London Gatwick

FAE's long-term network plan includes transatlantic service from Florida hubs to London Gatwick Airport (LGW), operated with the Airbus A321XLR. This service — the first Florida-based ultra-low-cost transatlantic operation — would leverage FAE/SMIA's Certificate of Public Convenience and Necessity with international Route Authority conferred by the August 3, 1981 Executive Order, which specifically encompassed foreign affairs and international routing.

## SECTION IV — ACQUISITION TERMS AND PROPOSED TRANSACTION STRUCTURE

### A. Transaction Overview

FAE/SMIA proposes to acquire all or substantially all of the operational assets of Spirit Aviation Holdings, Inc. and its affiliated Debtors through a Section 363 sale under the Bankruptcy Code, or through a confirmed Chapter 11 plan of reorganization providing for the transfer of Spirit's assets to FAE as a reorganized going-concern entity.

The proposed transaction is structured as a going-concern transfer, preserving Spirit's operational infrastructure, workforce, route certificates, airport authorities, and intellectual property as a unified enterprise to be operated by FAE under FAE's Certificate of Public Convenience and Necessity with Route Authority.

### B. Assets Proposed for Acquisition

- All Airbus A320-family aircraft owned, leased, or subject to lease assumption by the Debtors, including A319, A320, and A321 variants, together with associated engines, avionics, and airframe logbooks
- All airport gate leases, terminal use agreements, ramp access rights, and slot holdings at all airports in Spirit's network, to the extent assignable or assumable under applicable law and lease terms
- All FAR Part 145 maintenance, repair, and overhaul (MRO) certificates, facilities, tooling, and ground support equipment
- Spirit Airlines' operating certificate (FAR Part 121 Air Carrier Certificate), or in the alternative, FAE's accelerated path to its own Part 121 certificate utilizing Spirit's retained workforce and documentation
- The Free Spirit loyalty program database, customer records (subject to applicable privacy law), co-brand credit card partnerships, and all associated intellectual property
- Spirit's IT infrastructure, reservation systems, yield management platforms, crew scheduling systems, and dispatch operations technology
- All Spirit Airlines branding, trademarks, trade dress, domain names, and digital assets, to be retired or transitioned under FAE's brand identity
- Ground handling equipment, vehicles, de-icing equipment, and all ancillary operational assets at Spirit's hub and focus city stations
- All contracts, agreements, and vendor relationships necessary to the continuous operation of the acquired enterprise, to the extent assumable under 11 U.S.C. Section 365
- All simulator and pilot training assets, including FAA-approved Training Device (ATD/FTD/FFS) certifications

### C. Capital Structure and Financing

FAE/SMIA is executing a Regulation D Rule 506(c) private placement capital raise targeting accredited investors, with a target capitalization range of **$100 million to $250 million**. The offering is structured in tranches calibrated to the sequential milestones of the Spirit asset acquisition process.

| | | |
|---|---|---|
| Tranche A | Acquisition Deposit / Stalking Horse Bond; Legal &amp; Advisory Costs | $10M – $25M |
| Tranche B | Aircraft Lease Assumption; Initial Fleet Activation; MRO Readiness | $30M – $75M |
| Tranche C | Working Capital; Workforce Reconstitution; IT Integration; Marketing | $30M – $75M |
| Tranche D | Route Expansion; Fleet Growth; A321XLR Transatlantic Launch | $30M – $75M |

## D. Workforce and Labor Commitments

FAE/SMIA commits to offer re-employment to qualified Spirit Airlines employees across all operational categories — pilots, flight attendants, mechanics and maintenance technicians, dispatchers, gate and ramp agents, customer service representatives, and administrative personnel — on a priority basis. FAE will engage in good-faith negotiations with any recognized collective bargaining unit representing Spirit employees regarding the terms of employment transition.

The retention of Spirit's experienced, certificated workforce is not merely a social commitment; it is an operational imperative. The fastest path to FAA Part 121 operational readiness for FAE is through the absorption and retention of a workforce that already holds Spirit's type ratings, route authorities, and institutional knowledge.

## SECTION V — LEGAL AUTHORITY AND REGULATORY COMPLIANCE

### A. Authority Under 11 U.S.C. Section 363

FAE/SMIA's proposed acquisition is structured to proceed under 11 U.S.C. Section 363(b), which authorizes a Chapter 11 debtor to sell property of the estate outside the ordinary course of business, subject to court approval following notice and a hearing. A Section 363 sale to FAE would convey Spirit's operational assets free and clear of liens, claims, encumbrances, and interests pursuant to Section 363(f), providing FAE with clean title to the acquired enterprise.

FAE/SMIA further submits that the acquisition qualifies as a transaction that is in the best interests of creditors and the estate within the meaning of Section 363, in that: (i) a going-concern sale preserves the aggregate enterprise value of Spirit's assets at a level substantially above piecemeal liquidation values; (ii) the reconstitution of air service to Spirit's markets serves the public interest; and (iii) the employment of Spirit's workforce avoids or mitigates priority employee claims against the estate.

### B. Department of Transportation and FAA Authorization

FAE/SMIA's Certificate of Public Convenience and Necessity with Route Authority, conferred by Presidential Executive Order on August 3, 1981, constitutes the predicate economic authorization required for domestic and international air carrier operations under 49 U.S.C. Section 41101 et seq. FAE will file any required notifications, transfer applications, or amended certificates with the U.S. Department of Transportation's Office of Aviation Consumer Protection as required in connection with the Spirit asset acquisition.

FAE will simultaneously pursue issuance of its FAR Part 121 Air Carrier Operating Certificate from the Federal Aviation Administration, utilizing the accelerated path available through the retention of Spirit's type-certificated workforce, maintenance procedures, manuals, and approved training programs.

### C. Antitrust Considerations

FAE/SMIA is a de novo New Entrant Air Carrier and currently holds no market share in any domestic or international aviation market. The proposed acquisition of Spirit's assets by FAE is therefore not a merger between competitors; it is the entry of a new carrier into markets currently *without service* following Spirit's cessation of operations. Accordingly, the transaction presents no horizontal competitive overlap, and FAE/SMIA anticipates expedited Hart-Scott-Rodino review or exemption, as applicable.

### D. International Route Authority

SMIA's founding application and the August 3, 1981 Executive Order specifically addressed applications implicating foreign affairs and international route authority. FAE/SMIA's Certificate of Public Convenience and Necessity with Route Authority therefore encompasses international as well as domestic routes, conferring authority to operate the Caribbean, Latin American, and transatlantic services that formed part of Spirit's network and that FAE intends to operate or restore.

## SECTION VI — PRO FORMA FINANCIAL PROJECTIONS

### A. Spirit Airlines Asset Valuation

Based on FAE/SMIA's analysis of Spirit's operational asset base, the following summarizes the estimated going-concern value of principal asset categories as of the date of this Proposal. These figures are derived from publicly available information, Court filings in the bankruptcy proceeding, and aviation industry valuations.

| | | |
|---|---|---|
| Aircraft Fleet (A320 Family) | $180M – $240M | $120M – $160M |
| Airport Gate Leases &amp; Slots | $45M – $75M | $20M – $35M |
| MRO Facilities &amp; Equipment | $25M – $40M | $10M – $20M |
| IT Infrastructure &amp; Systems | $15M – $25M | $5M – $10M |
| Loyalty Program (Free Spirit) | $20M – $35M | $5M – $12M |
| Brand / IP / Domain Assets | $8M – $15M | $2M – $5M |
| GSE / Ground Equipment | $12M – $20M | $6M – $12M |
| **TOTAL (Estimated)** | **$305M – $450M** | **$168M – $254M** |

The delta between going-concern value ($305M–$450M) and liquidation value ($168M–$254M) represents **$137M–$196M** in incremental value available to creditors exclusively through a going-concern acquisition of the type proposed by FAE/SMIA. This Court, creditors' counsel, and the Official Committee of Unsecured Creditors are respectfully urged to weigh this value differential in evaluating FAE/SMIA's Proposal.

### B. Five-Year Operating Projections (Post-Acquisition)

| | | | | |
|---|---|---|---|---|
| Year 1 (2026) | 30–45 aircraft | $480M – $620M | $42M – $68M | $(15)M – $8M |
| Year 2 (2027) | 50–70 aircraft | $820M – $1.05B | $95M – $135M | $28M – $55M |
| Year 3 (2028) | 70–95 aircraft | $1.15B – $1.45B | $145M – $195M | $72M – $105M |
| Year 4 (2029) | 95–120 aircraft | $1.55B – $1.90B | $210M – $265M | $115M – $155M |
| Year 5 (2030) | 120–150 aircraft | $2.0B – $2.45B | $280M – $345M | $160M – $210M |

*Note: Projections are forward-looking estimates based on ULCC industry benchmarks, Spirit's historical load factors and yield data, and FAE's planned route network. Actual results will vary. These projections are provided for illustrative purposes to demonstrate the financial viability of FAE's going-concern acquisition proposal.*

## SECTION VII — LEADERSHIP QUALIFICATIONS AND STRATEGIC VISION

### A. LeRoy Gillead II — Founder and Principal

LeRoy Gillead II is the Founder and Principal of Spanish Main International Airlines & Companies Inc. and Florida Air Express Airlines Inc. His background spans Wall Street finance (Citibank, Salomon Brothers), U.S. Army service, Madison Avenue advertising, and New York City radio broadcasting, with FCC licensure as a Radio/TV Broadcasting Operations Engineer. He studied at Bishop College, New York University, Lehman College, and Fordham University School of Law.

Mr. Gillead is a Life Member (Heritage) of Tuskegee Airmen, Inc. (TAI), served on the TAI National Board from 1996 to 2006, and is the Originator and Founding Director of the Tuskegee Airmen Foundation Inc. The founding of SMIA is, in the most personal sense, a continuation of the mission of the Tuskegee Airmen — to claim, by demonstrated excellence and legal right, a full and equal place in American commercial aviation.

### B. Tuskegee Airmen Legacy

**THE TUSKEGEE AIRMEN CONNECTION**

*Lieutenant LeRoy F. Gillead — Distinguished Original Tuskegee Airman (DOTA) — served as Commander of the 617th Bomber Squadron of the 477th Bombardment Group. He and his fellow Tuskegee Airmen proved beyond question their fitness and excellence as aviators, yet were systematically excluded from employment in commercial aviation upon their return from World War II. SMIA was born from that injustice — and this acquisition proposal is the living expression of that mission, four decades in the making.*

### C. Strategic Vision

FAE/SMIA's strategic vision is to build "The Flagship Air Carrier of Florida" — a full-service, Florida-centric airline combining the accessibility of ultra-low-cost fares with the service standards of a premium carrier. The acquisition of Spirit's operational assets is the foundational step: inheriting a ready fleet, trained workforce, gate infrastructure, and route network eliminates years of build-up time and billions in startup cost.

Florida is the largest single-state aviation market in the United States by passenger volume, and the communities that Spirit served — particularly working-class travelers who depend on ultra-low fares — have been left without service since Spirit's cessation of operations. FAE commits to restoring affordable air service to those communities as its first operational priority.

## SECTION VIII — REQUEST FOR RELIEF AND CONCLUSION

### A. Relief Requested

Florida Air Express Airlines Inc. and Spanish Main International Airlines & Companies Inc. respectfully request that this Court:

1. Accept and enter this Comprehensive Proposal into the Public Record of Case No. 25-11897 (SHL) as a going-concern acquisition alternative to the liquidation of Spirit Aviation Holdings, Inc.;

2. Direct the Debtors, their counsel, and any Court-appointed liquidating agent or trustee to engage in good-faith negotiations with FAE/SMIA regarding the terms of a Section 363 sale or plan-based transfer of Spirit's operational assets;

3. Unseal and enter into the public record ECF Docket No. 999 — FAE/SMIA's prior Merger and Acquisition Proposal Document — as a public document in this proceeding;

4. Schedule a hearing at the Court's earliest convenience to consider FAE/SMIA's going-concern acquisition proposal, at which FAE/SMIA will be prepared to present testimony, financial documentation, and regulatory authority in support thereof;

5. Grant such other and further relief as this Court deems just and proper.

### B. Conclusion

The cessation of Spirit Airlines' operations has left millions of passengers without affordable air service, thousands of aviation professionals without employment, and dozens of communities without the connectivity on which their economies depend. Piecemeal liquidation will not restore that service. A going-concern acquisition by FAE — a properly certificated, legally authorized, and fully capitalized new entrant air carrier — can and will.

FAE/SMIA stands ready to proceed with due diligence, bid deposit, and documentation on the timeline directed by this Court. The regulatory standing conferred by the August 3, 1981 Presidential Executive Order, the capital raise currently in progress, and the operational blueprint detailed herein position FAE as the most viable and legally unencumbered acquiror of Spirit's assets in the current marketplace.

*This proposal is submitted in good faith, under no seal, with no request for confidential treatment, and with the express intent that it stand as a permanent part of the public record of these proceedings — a testament to the proposition that the Tuskegee Airmen's legacy of excellence belongs not only to history, but to the future of American aviation.*

Respectfully Submitted,

**LeRoy Gillead II**                                                      **Date: June 10, 2026**

Founder & Principal

Spanish Main International Airlines & Companies Inc.

Florida Air Express Airlines Inc.

Palm Beach International Airport | West Palm Beach, Florida

*Pro Se*

## CERTIFICATE OF SERVICE

I, LeRoy Gillead II, hereby certify that on June 10, 2026, I caused a true and correct copy of the foregoing Comprehensive Proposal for Merger, Acquisition, and Operations Assets Transfer to be filed with the United States Bankruptcy Court, Southern District of New York, and served upon counsel for the Debtors, counsel for the Official Committee of Unsecured Creditors, and the Office of the United States Trustee for Region 2, via the Court's Electronic Case Filing (ECF) system and/or first-class mail, as applicable.

_____

LeRoy Gillead II, Pro Se

Spanish Main International Airlines & Companies Inc.

Florida Air Express Airlines Inc.

In re: Spirit Aviation Holdings, Inc., et al. | Case No. 25-11897 (SHL) | U.S. Bankruptcy Court, S.D.N.Y.

Page 13