**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **SPIRIT AVIATION HOLDINGS, INC.**, *et al.*, | **Case No. 25-11897 (SHL)** |
| **Debtors.**[1] | **Jointly Administered** |

### DECLARATION OF DYLAN FRIESNER IN SUPPORT OF
### THE GSE SALE MOTION

Dylan Friesner declares and says:

1.      I am a Vice President in the Restructuring and Special Situations Group (the "**Restructuring Group**") of PJT Partners LP ("**PJT**"), which is the investment banker for Spirit Aviation Holdings, Inc. and certain of its affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, "**Spirit**," the "**Company**," or the "**Debtors**").[2]

2.      I submit this declaration (the "**Declaration**") in support of the *Motion of the Debtors for Entry of an Order (I) Authorizing the Sale of the Debtors' GSE Assets Free and Clear of Liens, Claims, Interests and Encumbrances, (II) Authorizing the Debtors to Enter Into and Perform Their Obligations Under the Purchase Agreement and (III) Granting Related Relief* (the "**GSE Sale Motion**"). I am familiar with the GSE Sale Motion and the material terms thereof.

---

[1]  The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752).  The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the GSE Sale Motion.

3.      Except as otherwise indicated, all statements set forth in this Declaration are based on: (a) my experience as a restructuring professional; (b) my personal knowledge of the Debtors' finances and Wind-Down plan; (c) information I learned from my review of relevant documents; (d) information supplied to me by members of the Debtors' management and/or their other advisors; and/or (e) information that I received from other partners or employees of PJT working directly with me or under my supervision.  I am not being compensated specifically for this testimony other than through payments received (or to be received) by PJT as a professional retained by the Debtors, subject to approval by the Court.[3]  I am over the age of 18 years and am authorized to submit this Declaration on behalf of the Debtors.  If called to testify as a witness, I could and would testify competently to the statements set forth in this Declaration.

### Qualifications

4.      PJT is a leading global financial advisory firm with more than 1,200 employees in sixteen offices in the United States, Europe, and Asia.  The firm offers integrated advisory services for mergers and acquisitions, restructuring and special situations, fund placement, and shareholder engagement.  PJT is an industry leader and has advised companies and creditors in all aspects of complex restructurings and bankruptcies. The firm has extensive experience providing financial advisory and investment banking services to financially distressed companies, including the representation of both debtors and lenders in the procurement and provision of postpetition financing.  PJT is a registered

---

[3] Pursuant to PJT's engagement letter with the Debtors, subject to Court approval thereof, PJT will be entitled to receive certain fees in connection with the transactions described herein.

broker-dealer with the United States Securities and Exchange Commission, is a member of the Securities Investor Protection Corporation, and is regulated by the Financial Industry Regulatory Authority.

5.      As discussed above, I am a Vice President in the Restructuring and Special Situations Group at PJT.  I have approximately 13 years of restructuring and finance experience.  In 2020, I joined PJT as an Associate. Prior to joining PJT, I worked at Guggenheim Partners.  I received a BA and a BS from Indiana University, a JD from the University of Pennsylvania Law School, and an MBA from the Wharton School at the University of Pennsylvania.

6.      Since joining PJT, I have worked on a broad range of transactions, advising financially distressed companies, creditors, and sponsors in chapter 11 restructurings, out-of-court workouts, and other special situations, including the following publicly-disclosed representative transactions, among others: Belk Inc., Chemical Tankers Inc., Intrado, Invited Clubs, IPC Systems, Jack Cooper, Magenta Buyer, Newfold Digital, Oregon Tool, Pennsylvania Real Estate Investment Trust, Redbox Entertainment, SVP Worldwide, Travelport Worldwide, United Road Services, Vyaire Medical Inc., and Worldstrides.

**Retention of PJT**

7.      PJT has been engaged as investment banker to the Debtors, and members of my team and I have been working closely with the Debtors, since approximately July 2, 2025.  Since its engagement, PJT rendered investment banking advisory services to the Debtors in connection with, among other things, the Debtors' evaluation of financing and strategic alternatives to right-size their financial position.  Additionally, PJT has worked with the Debtors' management and other professionals retained by the Debtors, and has

become generally familiar with the Debtors' business, including their assets, capital structure, cash flows, and liquidity. Since the Debtors ceased operations, PJT has worked with the Debtors and their other advisors to facilitate the Debtors' Wind-Down plan.

**The GSE and the Debtors' Marketing Efforts**

8. Before initiation of the Debtors' Wind-Down plan, the Debtors operated a substantial fleet of GSE, which is equipment that was used to service aircraft and support flight operations across the Debtors' network of airports. The GSE includes, among other things, all-terrain vehicles, platform lifts, fork lifts, trailers, maintenance trucks, bag carts, belt-loaders, and air-conditioning equipment.

9. Because the GSE is, by nature, deployed where Spirit operated, the equipment has remained physically located across eight different airports since the Debtors transitioned into an orderly Wind-Down of their operations. My understanding is that the GSE now largely sits idle.

10. To monetize the GSE, the Debtors, with the assistance of their advisors including PJT, solicited offers for the GSE, either in one comprehensive lot or in multiple lots, via the marketing and bidding process set forth in the Bidding Procedures. The Debtors and PJT reached out to over 100 potential purchasers that the Debtors and PJT identified as potentially having an interest in acquiring some or all of the GSE. A number of parties expressed interest in, and ultimately 19 parties submitted informal indications of interest in respect of, some or all of the GSE prior to the deadline for submission of indications of interest determined in accordance with the Bidding Procedures. Based on those indications of interest, it was clear that the Purchaser's offer was the highest and otherwise best bid, based on, among other things, the Purchase Price, the universe of GSE

included in the bid, the fact that the GSE would be acquired on an as-is, where-is basis, and the lack of other material closing contingencies. The Debtors and PJT also followed up with certain of the other bidders to clarify and confirm the terms reflected in their respective indications of interest. Based on those discussions, the Debtors and PJT determined that no other potential buyer was expected to offer terms that were, or were likely to become, competitive with or superior to the Purchaser's offer. The Debtors and PJT also engaged in continued discussions with the Purchaser to further negotiate the terms of its bid. Among other things, the Purchaser agreed to deposit the entire amount of the purchase price into escrow pending closing, which eliminated any potential financing contingency to closing.

11.     After evaluation of each proposal received and the discussions described above, the Debtors and their advisors concluded that (a) the overall structure offered by the Purchaser's bid represented the best option available to the Debtors and (b) no other potential buyer was likely to offer greater value at an auction. Based on my experience, I believe that the sale to the Purchaser would substantially benefit the Debtors' estates by enabling the Debtors not only to monetize the GSE, which the Debtors no longer need, for $11,510,000 on an "as-is, where-is" basis, but also to avoid the substantial costs that the Debtors anticipate would be associated with handling or collecting and transporting the GSE from eight different airports, thereby maximizing the value of the Debtors' estates. No other potential purchaser has indicated that it would be willing to offer a higher price or more favorable terms in respect of the GSE, and furthermore, none has offered the same protection from execution risk associated with this Transaction.

12.     The Debtors, in their sound business judgment and after extensive discussions with their advisors, concluded that a prompt sale of the GSE that locks in the terms agreed with the Purchaser will maximize value for the benefit of the Debtors' estates and creditors.

13.     After extensive arms' length negotiations and good-faith efforts by all parties, on June 23, 2026, the Purchaser and Spirit executed the Purchase Agreement in contemplation of a sale pursuant to which the Purchaser has agreed to acquire the GSE on an as-is, where-is basis.

14.     In light of the foregoing, including the good faith and arm's-length negotiation process, the price received for the GSE and the favorable economic and non-economic terms of the Purchase Agreement, I believe that the Transaction  represents the highest or otherwise best transaction involving the GSE currently available to the Debtors and their estates under the circumstances.

15.     Moreover, for the reasons discussed above and based on my experience, I believe that any further marketing process, including a court-supervised auction process, would be unlikely to result in an increased value, and furthermore may harm the Debtors' estates due to the additional cost of continuing the sale process with respect to the GSE and also by creating a risk that the Purchaser would ultimately opt not to participate in a transaction for the GSE. Notably, the Purchaser is acquiring the GSE on an as-is, where-is basis, the Purchase Price is not subject to adjustment, and the Purchaser has paid the cash portion of the Purchase Price to the Debtors' escrow account to be held in escrow pending closing of the Transaction.

16. I believe that the Debtors' decision to pursue the Transaction is supported by good and sound business reasons. The Transaction will enable the Debtors to monetize the GSE, which the Debtors no longer need, and to avoid costs that would be associated with retrieving the GSE, thereby maximizing the value of the Debtors' estates.

17. The Debtors' decision to pursue a sale without an auction is supported by the unique characteristics of this Transaction. The GSE assets have a small and highly specialized universe of potential buyers. Of the limited number of interested parties, the Purchaser has offered the most advantageous economic terms and is also the most attractive interested counterparty from the perspective of minimizing execution risk and ability to successfully close the Transaction. The Debtors engaged in extensive discussions with several other parties through the Bidding Procedures process. Despite such interest in the GSE, the Debtors have concluded that no other path is likely to maximize the value of the GSE. Given these unique circumstances, I believe that a further public bidding process or auction would unnecessarily burden the Debtors' estates for no additional benefit.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 1, 2026

*/s/ Dylan Friesner*
Dylan Friesner
Vice President
PJT Partners LP