DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard East
New York, New York 10001
Tel.: (212) 909-6000
Jasmine Ball
Elie J. Worenklein

*Fleet Counsel to the Debtors and
Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| **In re:** | **Chapter 11** |
| **SPIRIT AVIATION HOLDINGS, INC.,** *et al.*, | **Case No. 25-11897 (SHL)** |
| **Debtors.[2]** | **Jointly Administered** |

**NOTICE OF HEARING ON
DEBTORS' MOTION FOR ENTRY
OF (I) AN ORDER (A) APPROVING
BIDDING PROCEDURES AND BID PROTECTIONS
IN CONNECTION WITH THE SALE OF 27 EETC-FINANCED
AIRCRAFT, (B) APPROVING THE FORM AND MANNER OF APPLICABLE
NOTICES AND (C) SCHEDULING AN AUCTION AND SALE HEARING AND
(II) AN ORDER (A) AUTHORIZING THE SALE OF AIRCRAFT AND RELATED
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES,
AND OTHER INTERESTS AND (B) GRANTING RELATED RELIEF**

    **PLEASE TAKE NOTICE** that, on July 1, 2026, the above-captioned debtors and debtors in possession (the "**Debtors**") filed the *Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of 27 EETC-Financed Aircraft, (B) Approving the Form and Manner of Applicable Notices and (C) Scheduling an Auction and Sale Hearing and (II) an Order (A) Authorizing the Sale of Aircraft and Related*

---

[1]   All times herein are expressed in prevailing Eastern Time.

[2]   The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

*Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests and (B) Granting Related Relief* (the "**Motion**").

      **PLEASE TAKE FURTHER NOTICE** that a hearing (the "**Hearing**") has been scheduled for **10:00 a.m. on July 22, 2026**, before the Honorable Sean H. Lane, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York (the "**Court**"), to consider the relief requested in the Motion.

      **PLEASE TAKE FURTHER NOTICE** that the Hearing will be conducted via Zoom for Government. Parties wishing to appear at or attend the Hearing (whether "live" or "listen only") are required to register their appearance at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl by **4:00 p.m. on July 21, 2026**. Instructions and additional information about the Court's remote attendance procedures can be found at https://www.nysb.uscourts.gov/ecourt-appearances. The Court will circulate by email the Zoom link to the Hearing to those parties who properly made an electronic appearance prior to the Hearing.

      **PLEASE TAKE FURTHER NOTICE** that the Hearing may be continued or adjourned from time to time by an announcement of the adjourned date or dates at the Hearing or a later hearing or by filing a notice with the Court.

      **PLEASE TAKE FURTHER NOTICE** that responses or objections to the relief requested at the Hearing shall be (a) in writing, in English, and in text-searchable format, (b) filed with the Court electronically, and (c) served on the Debtors and the Sale Notice Parties (as defined in the Motion) so as to be received no later than **4:00 p.m. on July 15, 2026** (the "**Objection Deadline**"), in each case, in accordance with the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), the Court's *Order Implementing Certain Notice and Case Management Procedures* [ECF No. 61], and the Court's Chambers' Rules (available at https://www.nysb.uscourts.gov/content/judge-sean-h-lane), to the extent applicable.

      **PLEASE TAKE FURTHER NOTICE** that all objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default.

      **PLEASE TAKE FURTHER NOTICE** that, if no responses or objections are timely filed and served with respect to the Motion, the Debtors may, on or after the Objection Deadline, submit to the Court an order, substantially in the form of the proposed order attached to the Motion, under certification of counsel or certification of no objection, which order may be entered by the Court without further notice or opportunity to be heard.

      **PLEASE TAKE FURTHER NOTICE** that copies of the Motion and any other document filed publicly in the above-captioned proceedings are available free of charge at https://dm.epiq11.com/SpiritAirlines.

Dated:   July 1, 2026          DEBEVOISE & PLIMPTON LLP
New York, New York

*/s/ Jasmine Ball*

Jasmine Ball
Elie J. Worenklein
66 Hudson Boulevard East
New York, NY 10001
Tel.: (212) 909-6000

*Fleet Counsel to the Debtors and Debtors in Possession*

DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard East
New York, New York 10001
Tel.: (212) 909-6000
Jasmine Ball
Elie J. Worenklein

*Fleet Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **SPIRIT AVIATION HOLDINGS, INC.,** *et al.*, | **Case No. 25-11897 (SHL)** |
| **Debtors.**[1] | **Jointly Administered** |

**DEBTORS' MOTION FOR ENTRY OF (I) AN
ORDER (A) APPROVING BIDDING PROCEDURES AND BID
PROTECTIONS IN CONNECTION WITH THE SALE OF 27 EETC-FINANCED
AIRCRAFT, (B) APPROVING THE FORM AND MANNER OF APPLICABLE
NOTICES AND (C) SCHEDULING AN AUCTION AND SALE HEARING AND
(II) AN ORDER (A) AUTHORIZING THE SALE OF AIRCRAFT AND RELATED
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES,
<u>AND OTHER INTERESTS AND (B) GRANTING RELATED RELIEF</u>**

Spirit Aviation Holdings, Inc. and its direct and indirect subsidiaries (collectively,

the "**Debtors**," the "**Company**," or "**Spirit**"), each of which is a debtor and debtor in possession

in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby files this *Motion for*

*Entry of (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection with*

*the Sale of 27 EETC-Financed Aircraft, (B) Approving the Form and Manner of Applicable*

---

[1]   The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit
Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance
Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors'
mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

*Notices and (C) Scheduling an Auction and Sale Hearing and (II) an Order (A) Authorizing the*

*Sale of Aircraft and Related Assets Free and Clear of All Liens, Claims, Encumbrances, and Other*

*Interests and (B) Granting Related Relief* (this "**Motion**") seeking entry of:

1.    An order, substantially in the form attached hereto as <u>Exhibit A</u> (the "**Bidding Procedures Order**"):

   a.    establishing certain bidding procedures (the "**Bidding Procedures**"), substantially in the form attached hereto as <u>Exhibit 1</u> to <u>Exhibit A</u>, which will govern the sale (the "**Sale**") of Spirit's ownership interests in 27 Airbus model A320 aircraft and Airbus model A321 aircraft (each, as described more fully in the Aircraft Sale Agreement, a "**Subject Aircraft**," and collectively, the "**Subject Aircraft**"), as such assets are defined in that certain Aircraft Sale and Purchase Agreement (Spirit-EETC 2026)[2] by and between Spirit Airlines, LLC and Save 2026-B LLC, an entity controlled by certain holders of equipment notes issued in 2025 designated "Series B(R) Equipment Notes" (the "**Stalking Horse Buyer**") (such agreement, the "**Aircraft Sale Agreement**").[3]

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Aircraft Sale Agreement. The summary of the terms of the Aircraft Sale Agreement provided herein is qualified in its entirety by the Aircraft Sale Agreement. In the case of any inconsistency between this summary and the Aircraft Sale Agreement, the Aircraft Sale Agreement shall govern.

[3]   Attached hereto as <u>Exhibit 2</u> to <u>Exhibit A</u> is a substantially final form of the Aircraft Sale Agreement that the Debtors and the Stalking Horse Buyer intend to finalize and execute in the next few days and which will be filed on the docket.

  b.  approving certain bid protections in connection with the Sale, including the "**Break-Up Fee**" in the amount of $18,000,000[4] and "**Expense Reimbursement**" (each as provided in the Aircraft Sale Agreement) to be paid to the Stalking Horse Buyer in certain circumstances, all as described in greater detail below;

  c.  scheduling an auction (if necessary) to sell the Subject Aircraft (the "**Auction**") on September 9, 2026;

  d.  scheduling a hearing (the "**Sale Hearing**") on or about September 16, 2026 to approve the Sale as contemplated in the Aircraft Sale Agreement or a substantially similar purchase agreement entered into with the Successful Bidder or Successful Bidders other than the Stalking Horse Buyer at the Auction, as contemplated in the Bidding Procedures; and

  e.  approving the form and manner of notice of the Sale, the Auction, the Bidding Procedures and the Sale Hearing, substantially in the forms attached hereto as Exhibit 3 to Exhibit A (the "**Sale Notice**") and Exhibit 4 to Exhibit A (the "**Publication Notice**"); and

2.  An order, a form of which will be filed separately (the "**Sale Order**," and collectively with the Bidding Procedures Order, the "**Proposed Orders**"),

---

[4] In accordance with the Aircraft Sale Agreement, to the extent the Stalking Horse Buyer consents to the sale of any Partial Consent Assets but still consummates the Stalking Horse Bid for the remaining Subject Aircraft, the Break-Up Fee shall apply to such Partial Consent Assets, as appropriately apportioned as compared to all of the Subject Aircraft based on the Reserve Amount of the applicable Partial Consent Assets as set forth in the Aircraft Sale Agreement.

a. approving the Aircraft Sale Agreement, or substantially similar purchase agreement(s) entered into with the Successful Bidder(s), between Spirit and the Successful Bidder(s) (as defined in the Bidding Procedures) and the related Transaction Documents (as defined therein);

b. authorizing the Sale of the Subject Aircraft to the Stalking Horse Buyer (or other Successful Bidder(s) at the Auction) free and clear of all liens (excluding any Buyer's Liens), claims, encumbrances and other interests (collectively, the "**Claims**"); and

c. granting other related relief.

This Motion is supported by the *Declaration of Marc Bilbao in Support of the Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of 27 EETC-Financed Aircraft, (B) Approving the Form and Manner of Applicable Notices and (C) Scheduling an Auction and Sale Hearing and (II) an Order (A) Authorizing the Sale of Aircraft and Related Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests and (B) Granting Related Relief* (the "**Bilbao Declaration**"), to be filed separately. In further support of this Motion, the Debtors respectfully state as follows:

**Jurisdiction and Venue**

1. The United States Bankruptcy Court for the Southern District of New York (the "**Court**") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.).

2. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). The Debtors confirm their consent to the entry of a final order by the Court in connection with this Motion.

3.      Venue of the Chapter 11 Cases and related proceedings is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

**Preliminary Statement**

4.      As explained in the *Declaration of Fred Cromer in Support of (I) the Wind-Down Motions and (II) the Motion to Shorten* [ECF No. 1011], Spirit has ceased commercial passenger service and is in the process of an orderly wind-down of its business. As part of that orderly wind-down process, Spirit is currently diligently liquidating its remaining assets to maximize recoveries to its stakeholders.

5.      At present, Spirit's remaining aircraft are its most valuable remaining property available to liquidate. The Court already approved the sale of twenty of Spirit's other owned aircraft to CSDS Asset Management LLC pursuant to the *Order (A) Authorizing the Sale of Certain Aircraft Free and Clear of All Liens, Claims, Encumbrances and other Interests and (B) Granting Related Relief* [ECF No. 991]. Spirit also owns one additional aircraft which is subject to a mortgage, which aircraft Spirit anticipates will be liquidated pursuant to a separate motion.

6.      The Subject Aircraft are subject to enhanced equipment trust certificates financings originally issued in two separate transactions, one in 2015 ("**2015-1**") and one in 2017 ("**2017-1**," and collectively with the 2015-1, the "**Prior Series**," and such holders of 2015-1A Certificates, 2017-1AA Certificates and 2017-1A Certificates, the "**Senior Certificateholders**"). The 2015-1 issuance was originally of two tranches, an "A" and a B" tranche. The 2017-1 issuance was originally of three tranches, a "AA," an "A" and a "B" tranche. In March 2025, the outstanding Class B under each Prior Series were refinanced pursuant to a new issuance of enhanced equipment trust certificates (the "**2025-1**" and each holder of a 2025-1 certificate, a "**SuperB Noteholder**"),

while the more senior classes under each Prior Series remain outstanding. Upon the Sale of the Subject Aircraft, Spirit will realize material funds that will satisfy and reduce its liabilities.

7.      By this Motion, the Debtors request approval to engage in a competitive process to sell the Subject Aircraft to the Stalking Horse Buyer (or other Successful Bidder(s) as determined during the Auction). Pursuant to the Aircraft Sale Agreement, or substantially similar purchase agreement(s) entered into with one or more Successful Bidders, Spirit will sell the Subject Aircraft to the Stalking Horse Buyer or other Successful Bidder(s) free and clear of all Claims. Specifically, under the Aircraft Sale Agreement, Save 2026-B LLC, an entity controlled by certain SuperB Noteholders, will serve as the Stalking Horse Buyer to purchase the Subject Aircraft using a combination of a credit bid of 2025-1 debt and cash. The cash component of the Stalking Horse Bid (as defined in the Bidding Procedures) is $421,239,935.95[5] and will be sufficient to satisfy all amounts outstanding under the Prior Series and thereby allow the Subject Aircraft to be sold free and clear of all liens (excluding any Buyer's Liens), claims, encumbrances, and other interests. The credit bid portion of the Stalking Horse Bid is $208,741,178, which represents 90% of the principal amount of 2025-1 debt outstanding on the Subject Aircraft, plus all accrued and outstanding interest thereon to the date of payment, resulting in a total Purchase Price of no less than $629,981,113.95[6] All payments to Senior Certificateholders on account of any debt outstanding under the Prior Series (together with any debt owed by Spirit under the 2025-1, the "**EETC Debt**") will be paid in accordance with that certain Intercreditor Agreement (2015-1)

---

[5]   For the avoidance of doubt, the numbers set forth herein for the Stalking Horse Bid are inclusive of accrued and outstanding interest calculated through July 31, 2026. Accordingly, these numbers will be increased to account for any additional accrued interest through the closing date.

[6]   As set forth herein and in the Bidding Procedures, the Stalking Horse Buyer will also be responsible to bear the Debtors' costs and expenses incurred in connection with the Sale.

dated as of August 11, 2015 among Wilmington Trust, National Association as Trustee of the Spirit Airlines Pass Through Trust 2015-1A and Spirit Airlines Pass Through Trust 2015-1B, Natixis, Acting via Its New York Branch as Class A Liquidity Provider and Class B Liquidity Provider, and Wilmington Trust, National Association, as Subordination Agent (as amended, supplemented, amended and restated, or otherwise modified from time to time prior to the date hereof) (the "**2015-1 Intercreditor Agreement**") and that certain Intercreditor Agreement (2017-1) dated as of November 28, 2017 among Wilmington Trust, National Association as Trustee of the Spirit Airlines Pass Through Trust 2017-1AA, Spirit Airlines Pass Through Trust 2017-1A, and Spirit Airlines Pass Through Trust 2017-1B, Commonwealth Bank of Australia, New York Branch as Class AA Liquidity Provider, Class A Liquidity Provider and Class B Liquidity Provider, and Wilmington Trust, National Association, as Subordination Agent (as amended, supplemented, amended and restated, or otherwise modified from time to time prior to the date hereof) (the "**2017-1 Intercreditor Agreement,**" and together with the 2015-1 Intercreditor Agreement, the "**EETC Intercreditor Agreements**").

8. The Sale is an essential step in the implementation of the Debtors' wind-down plan, by efficiently liquidating Spirit's fleet through orderly sales of aircraft that are no longer needed in light of the Debtors' cessation of operations. Importantly, the Motion and Sale are supported by the Senior Certificateholders. The proposed Bidding Procedures will allow the Debtors to sell the Subject Aircraft in an efficient and value-maximizing manner. The proposed Bidding Procedures provide considerable flexibility to the Debtors to structure sales of the Subject Aircraft, subject to the Aircraft Sale Agreement and the Bidding Procedures, in a variety of transaction structures and arrangements, including sales for fewer than all the Subject Aircraft, if doing so will maximize value to the Debtors' estates. Importantly, pursuant to the terms of the Aircraft Sale Agreement

and the Bidding Procedures, either the Stalking Horse Buyer or the Successful Bidder(s) will pay or reimburse, as applicable, promptly on demand, all of Spirit's costs and expenses incurred in connection with the Sale (including reasonable legal and financial advisor fees and costs and expenses in relation to the consummation of the transactions contemplated by the Sale Order and the Bidding Procedures), thereby limiting the burden on the Debtors' estates.

**Relief Requested**

9.      By this Motion and pursuant to, inter alia, sections 363, 503 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**"), Rules 6004-1 and 6006-1 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York (the "**Local Rules**") and the *Amended Guidelines for the Conduct of Asset Sales, General Order M-383 of the Bankruptcy Court for the Southern District of New York* (the "**Sale Guidelines**"), the Debtors seek entry of the Bidding Procedures Order, substantially in the form attached hereto as Exhibit A:

    a.    approving the Bidding Procedures;

    b.    approving the Break-Up Fee and Expense Reimbursement in connection with the Sale of the Subject Aircraft, pursuant to the terms and conditions of the Aircraft Sale Agreement;

    c.    approving the form and manner of notice of the Sale, the Auction, the Bidding Procedures and the Sale Hearing via the Sale Notice and the Publication Notice;

    d.    scheduling the Auction for September 9, 2026 at 10:00 a.m. (prevailing Eastern Time); and

    e.    scheduling the Sale Hearing for September 16, 2026 at 11:00 a.m. (prevailing Eastern Time).

10.     Additionally, the Debtors respectfully request that, at the conclusion of the Sale Hearing, the Court enter the Sale Order, authorizing Spirit to:

a.      sell the Subject Aircraft free and clear of all liens (excluding any Buyer's Liens), claims, encumbrances and other interests to the Stalking Horse Buyer or the Successful Bidder(s) if such is not the Stalking Horse Buyer, as the case may be, on substantially similar terms to those set forth in the Aircraft Sale Agreement or as further modified by the Successful Bidder(s) pursuant to the Bidding Procedures; and

b.      enter into and perform the obligations under the Aircraft Sale Agreement (or a substantially similar purchase agreement entered into with the Successful Bidder(s)) pursuant to the Bidding Procedures.

### Background

**A.  General Background**

11.     On August 29, 2025 (the "**Petition Date**"), the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtors remain in possession of their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

12.     The Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b), as ordered by the Court [ECF No. 35].

13.     On September 17, 2025, the United States Trustee for the Southern District of New York (the "**U.S. Trustee**") appointed an Official Committee of Unsecured Creditors (the "**Committee**") pursuant to section 1102 of the Bankruptcy Code [ECF No. 117]. On October 29, 2025, the Court approved the appointment of Marc J. Heimowitz as examiner pursuant to 11 U.S.C. § 1104(d) [ECF No. 381].

14.     Additional information about the events leading up to the Petition Date and the Debtors' businesses, affairs, capital structure, and prepetition indebtedness can be found in the

9

*Declaration of Fred Cromer in Support of the Chapter 11 Proceedings and First Day Pleadings* [ECF No. 19].

15.     On October 27, 2025, the Debtors filed the *Notice of Election Pursuant to Section 1110(a) of the Bankruptcy Code with Respect to Spirit EETC 2015-1 Aircraft* [ECF No. 329], providing notice of the Debtors' agreement to satisfy their obligations under the financing applicable to the aircraft listed therein pursuant to section 1110(a) of the Bankruptcy Code.

16.     Also on October 27, 2025, the Debtors filed the *Notice of Election Pursuant to Section 1110(a) of the Bankruptcy Code with Respect to Spirit EETC 2017-1 Aircraft* [ECF No. 330], providing notice of the Debtors' agreement to satisfy their obligations under the financing applicable to the aircraft listed therein pursuant to section 1110(a) of the Bankruptcy Code.

17.     On May 4, 2026, the Debtors filed the *Motion of the Debtors for Entry of an Order (I) Authorizing the Debtors to Wind Down Operations, (II) Approving the Debtors' Use of Cash Collateral and Amendments to the DIP Credit Agreement and Final DIP Order, (III) Authorizing Modification or Termination of the Debtors' Employee Programs, (IV) Approving Wind-Down Incentive and Retention Plan, (V) Approving Modification of Contract Rejection Procedures, (VI) Approving Non-Fleet Assets Sale Procedures, (VII) Approving Non-Fleet Assets Abandonment Procedures, (VIII) Approving the Use of Certain Third-Party Contractors, (IX) Approving Protections for Certain Persons Implementing the Wind-Down, (X) Enforcing an Administrative Stay, (XI) Authorizing the Preemption of Applicable Laws and Ordinances for the Debtors to Effectuate the Wind-Down, (XII) Authorizing the Debtors to Take Any and All Actions Necessary to Implement the Wind-Down, and (XIII) Granting Related Relief* [ECF No. 1009] (the "**Wind-Down Motion**"), requesting approval of, and authority to implement, an orderly wind-down of

operations (the "**Wind-Down**"). The order approving the Wind-Down Motion was entered at ECF No. 1048.

18.     On the same day, the Debtors filed the *Motion for Entry of an Order (I) Authorizing the Debtors to Sell or Abandon Their Remaining Owned Aircraft, Engines and Other Related Equipment, (II) Establishing Procedures Related Thereto and (III) Granting Related Relief* [ECF No. 1013] (the "**Owned Aircraft Assets Motion**"). The order approving the Owned Aircraft Assets Order (the "**Owned Aircraft Assets Order**") was entered at ECF No. 1038. The Owned Aircraft Assets Order provides that if the Transaction Value for the sale of any one item of Owned Equipment (each as defined therein) is greater than $15,000,000, the Debtors shall file a motion with the Court requesting approval of such sale. The Subject Aircraft constitute Owned Equipment under the Owned Aircraft Assets Order and are proposed to each be sold for more than $15,000,000. Accordingly, in accordance with the terms of the Owned Aircraft Assets Order, the Debtors are required to file this Motion to effect the Sale.

### B.   The Aircraft Sale Agreement

19.     In the wake of Spirit's decision to wind down operations, it engaged with its stakeholders, including its DIP lenders (the "**DIP Lenders**") and EETC lenders, to determine the best path forward to liquidate its remaining fleet assets. As part of those discussions, Spirit reached an agreement—memorialized in the Aircraft Sale Agreement—with Save 2026-B LLC, an entity controlled by certain SuperB Noteholders, to serve as a stalking horse bidder as part of the marketing and sale process for the Subject Aircraft.

20.     Spirit believes that the transaction to be reflected in the Aircraft Sale Agreement represents the best offer for the Subject Aircraft, taken as a whole, and is in the best interests of the Debtors based upon (among other factors and without limitation) (a) the circumstances of the

Chapter 11 Cases at this juncture, (b) the purchase price provided in the Aircraft Sale Agreement, (c) the support of the holders of the debt secured by the Subject Aircraft, and (d) the expected execution benefits from placing all Subject Aircraft with a single buyer.[7]

21.     Spirit will sell, and the Stalking Horse Buyer will purchase, 27 Airbus model A320ceo aircraft and Airbus model A321ceo aircraft, together with all documents and available records pertaining thereto in Spirit's possession (the "**Records**"), in each case upon and subject to the terms and conditions of the Aircraft Sale Agreement.

22.     In accordance with the terms and conditions of the Aircraft Sale Agreement, for each Subject Aircraft, upon payment of the Purchase Price, Spirit shall, by execution and delivery to the Stalking Horse Buyer of a Bill of Sale, sell to the Stalking Horse Buyer outright good and valid title in and to such Subject Aircraft, free and clear of all liens (other than Buyer's Liens).

23.     Contemporaneously with the execution of the Aircraft Sale Agreement, the Stalking Horse Buyer shall pay to Spirit, in immediately available funds, a total amount equal to $42,123,993.60 as a purchase deposit with respect to the Subject Aircraft (the "**Initial Deposit Amount**"), which is 10% of the $421,239,935.95 cash portion of the Purchase Price. The Initial Deposit Amount shall be allocated in equal installments across the Subject Aircraft, in an amount equal to $1,560,147.91 per Aircraft (each, an "**Aircraft Specific Deposit**").

24.     For each Subject Aircraft, the total consideration payable by the Stalking Horse Buyer to Spirit at Delivery for such Aircraft shall be the Purchase Price for such Aircraft on an "as-is where-is" and "with all faults" basis which will be a combination of a credit bid pursuant to

---

[7]   As set forth herein and as further discussed below, the Bidding Procedures contemplate the ability of multiple successful bidders for portions of the Subject Aircraft to the extent such bids provide greater value to the Debtors' estates.

section 363(k) of the Bankruptcy Code and cash as set forth in the Aircraft Sale Agreement.

25.     In light of the logistics necessary to ferry and transfer 27 aircraft, and in light of the Debtors' limited remaining workforce, the Debtors anticipate delivering the Subject Aircraft to the Stalking Horse Buyer, or any other Successful Bidder(s), on an as-is where-is and with-all-faults basis at the current locations of such aircraft as set forth in the Aircraft Sale Agreement. Such "as-is where-is" and "with all faults" condition is crucial for the Debtors at this time in light of their reduced staffing levels and constrained financial resources. By selling the Subject Aircraft "as-is where-is" and "with all faults" Spirit avoids being bound by any maintenance condition and related obligations to closing. Selling the Subject Aircraft "as-is where-is" and "with all faults" will also significantly expedite closing the Sale(s) from what might typically be a months-long process, including inspections, to a matter of days, as delineated in the proposed transaction schedule included in the Bidding Procedures. This shortened closing timeline will generate key liquidity for the Debtors and expedite the Wind-Down.

26.     In addition, pursuant to the terms of the Aircraft Sale Agreement and the Bidding Procedures, either the Stalking Horse Buyer or the Successful Bidder(s), if not the Stalking Horse Buyer, will pay or reimburse, as applicable, promptly on demand, all of Spirit's costs and expenses incurred in connection with the Sale. The Aircraft Sale Agreement also requires the Stalking Horse Buyer or Successful Bidder(s) to pay to certain creditors certain other costs associated with the Subject Aircraft which payment(s) will be necessary to enable an efficient closing.

27.     Upon Delivery, with respect to each Subject Aircraft, the Stalking Horse Buyer or the Successful Bidder(s) shall pay Spirit the Purchase Price in respect of such Subject Aircraft (net of the applicable credit bid and Aircraft Specific Deposit for such Aircraft, which will be retained by Spirit and applied against the Purchase Price of such Aircraft), free and clear of and without

any deduction or withholding for or on account of tax. After Spirit's receipt of the net proceeds of the Sale, and only after payment in full of the (i) claims on account of the EETC Debt in accordance with the EETC Intercreditor Agreements, and (ii) SuperB Total Amount, Spirit will use any excess Sale proceeds, if any, to prepay the Term Loans (as defined in the DIP Credit Agreement)[8] to the extent provided by Section 2.05 of the DIP Credit Agreement in accordance with the Aircraft Purchase Agreement, the Bidding Procedures, and the Sale Order.

## Basis for Relief

### A. The Relief Sought in the Bidding Procedures Order Is in the Best Interests of the Debtors' Estates and Should Be Approved

#### i. The Bidding Procedures Are Appropriate and Will Maximize the Value Received for the Subject Aircraft

28.     Courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from the estate. *See, e.g., In re Celsius Networks LLC*, 647 B.R. 631, 647 (Bankr. S.D.N.Y 2023); *In re Ditech Holding Corp.*, 606 B.R. 544, 580 (Bankr. S.D.N.Y. 2019); and *In re Borders Group, Inc.*, 453 B.R. 477, 482 (Bankr. S.D.N.Y. 2011). Once the debtor articulates sound business reasons, "a strong presumption arises" that the debtor's directors are acting in the best interest of the company and thus that the court should approve the transaction. *In re GOL Linhas Aereas Inteligentes S.A.,* 661 B.R. 330, 339 (Bankr. S.D.N.Y. 2024).

---

[8]     "DIP Credit Agreement" is as defined in the Court's *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Senior Secured Liens and Superpriority Administrative Expense Claims; (III) Authorizing the Debtors to Utilize Cash in Encumbered Accounts; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; and (VI) Granting Related Relief* [ECF No. 384], as amended by the *Agreed Order Amending Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Senior Secured Liens and Superpriority Administrative Expense Claims; (III) Authorizing the Debtors to Utilize Cash in Encumbered Accounts; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; and (VI) Granting Related Relief* [ECF No. 643].

29.    The paramount goal in any proposed sale of property of the estate is to "maximize value to the estate." *In re Publishers Clearing House LLC*, No. 25-10694 (MG), 2025 WL 1805885, at *4 (Bankr. S.D.N.Y., June 30, 2025) (quoting *In re Metaldyne Corp.*, 409 B.R. 661, 667–68 (Bankr. S.D.N.Y. 2009); *see also, e.g., In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Resources, Inc.*, 147 B.R. 656, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting *In re Atlanta Packaging Prod., Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988)). As one court explained, "The Court's role here is to ensure that the Debtors conduct a fair bidding process that is 'likely to maximize the sale price' and to ensure that the Debtors have articulated a sound business reason for the sale." *In re Celsius Network LLC*, No. 22-10964 (MG), 2022 WL 14193879, at *10 (Bankr. S.D.N.Y. Oct. 24, 2022) (citing the Sale Guidelines).

30.    "Bidder protections are granted when a bidder provides a floor for bidding by expending resources to conduct due diligence and allowing its bid to be shopped around for a higher offer," which furthers the goal of maximizing value to the estate. *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 465 (Bankr. S.D.N.Y. 2014); *Metaldyne*, 409 B.R. at 670 (Bankr. S.D.N.Y. 2009) (finding that bid procedures that provided for a stalking horse bid would bring value to the estate by setting a floor on the price and reassuring the debtors' employees and customers that the company was entering the auction with a locked-in bid)*; Integrated Res.,* 147 B.R. 650, 659 (S.D.N.Y. 1992) (explaining that break-up fees "encourage bidding" and "maximize the value of the debtor's assets"). This Court recognizes that procedures that enhance competitive

15

bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales. This Court's Sale Guidelines provide that:

> [g]enerally, the Court will entertain a motion for approval…of proposed bidding procedures if such procedures are, as a matter of reasonable business judgment, *likely to maximize the sale price*. Such procedures must not chill the receipt of higher and better offers and must be consistent with the seller's fiduciary duties. (emphasis added)

Sale Guidelines at I.B. *See also*, *In re Celsius Network LLC*, No. 22-10964 (MG), 2022 WL 14193879, at *6 (Bankr. S.D.N.Y. Oct. 24, 2022) (citing the Sale Guidelines).

31.     The Debtors believe that the Bidding Procedures will establish the parameters under which the value of the Subject Aircraft may be tested at the Auction and approved at the Sale Hearing. The Bidding Procedures will increase the likelihood that the Debtors will receive the greatest possible consideration for the Subject Aircraft for the benefit of all stakeholders because they will ensure a competitive and fair bidding process. Subject to the Bidding Procedures, while the Aircraft Sale Agreement contemplates the sale of all 27 Subject Aircraft to one purchaser, the Bidding Procedures provide the Debtors with significant flexibility to sell the Subject Aircraft to multiple separate purchasers to the extent those transactions provide a higher or otherwise better result for the Debtors' estates.[9] At the same time, the Bidding Procedures will allow the Debtors to undertake the Auction process in as expeditious a manner as possible, which the Debtors believe is essential to maximizing the value of the Sale to their estates.

32.     The proposed Bidding Procedures will also allow the Debtors to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction. The Debtors believe that the

---

[9]     The Debtors, the Stalking Horse Buyer, and the Debtors' other stakeholders intend to continue to discuss possible modifications to the Bidding Procedures to ensure that the Debtors receive the maximum possible value on account of the Subject Aircraft.

Bidding Procedures will encourage bidding for the Subject Aircraft, that they are consistent with other procedures previously approved by bankruptcy courts, and that they are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings. *See Integrated Resources*, 147 B.R. at 659. The Debtors also submit that the proposed Bidding Procedures comply with the requirements of the Sale Guidelines.

33.     Thus, the proposed Bidding Procedures are reasonable, appropriate, and within Spirit's sound business judgment under the circumstances because they will promote active bidding from interested parties and ultimately will serve to maximize the value that Spirit will recover on account of the Sale.

### ii.     The Break-Up Fee and Expense Reimbursement Are Appropriate Under the Circumstances

34.     As discussed above, the Aircraft Sale Agreement contemplates the payment of certain bid protections to the Stalking Horse Buyer in the event the Debtors elect not to consummate the Sale with the Stalking Horse Buyer, including the payment of the Break-Up Fee and the Expense Reimbursement under certain circumstances. Any Break-Up Fee and Expense Reimbursement owed to the Stalking Horse Buyer under the Aircraft Sale Agreement shall be paid solely from the proceeds of the Sale(s).

35.     Courts in this district have approved bidding protections upon considering the following three factors: (a) whether the relationship of the parties who negotiated the bidding protections is tainted by self-dealing or manipulation; (b) whether the bidding protections hamper, rather than encourage, bidding; and (c) whether the monetary value of the bidding protections is reasonable relative to the proposed purchase price. *See, e.g., Integrated Res.*, 147 B.R. at 657 (listing factors); *see also In re Genco Shipping & Trading Ltd.*, 509 B.R. at 465 (same).

17

36.     Here, the Debtors firmly believe that the *Integrated Resources* factors are satisfied. First, the Break-Up Fee and the Expense Reimbursement are the product of significant arm's-length negotiations. Accordingly, the Debtors submit that the first inquiry is satisfied because such protections are not tainted by self-dealing or manipulation.

37.     The second factor is satisfied because the payment of the Break-Up Fee and the Expense Reimbursement to be made to the Stalking Horse Buyer under the terms and circumstances of the Aircraft Sale Agreement are a material inducement for, and a condition of, the Stalking Horse Buyer's entry into the Sale, and cover little more than the costs and expenses incurred as a result of the Stalking Horse Buyer's out-of-pocket costs related to moving the aircraft to safe locations and realigning the titled engines on the aircraft and negotiations undertaken by the Stalking Horse Buyer in connection with the Sale. Should the Stalking Horse Buyer decide not to go forward with the Sale, Spirit would lose the benefits flowing from having the Stalking Horse Bid, including higher bids that, absent such a floor, might not have otherwise been realized. In contrast, by incentivizing the Stalking Horse Buyer to serve as the stalking horse bidder by way of the bid protections built into the Aircraft Sale Agreement, Spirit is assured that, at a minimum, the Sale of the Subject Aircraft will generate a fair purchase price, while at the same time providing Spirit with the upside of even greater benefit to the estates. Thus, the Stalking Horse Buyer has provided a material benefit to Spirit and its estates by increasing the likelihood that the best possible price for the Subject Aircraft will be received.

38.     Lastly, the Debtors submit that the Break-Up Fee and Expense Reimbursement payable to the Stalking Horse Buyer in the event that the Stalking Horse Buyer is outbid are reasonable relative to the total Purchase Price under the Aircraft Sale Agreement. The Break-Up Fee contemplated under the Aircraft Sale Agreement is $18,000,000, or approximately 2.9% of

18

the Purchase Price. This percentage is meaningfully more conservative than break-up fees previously approved in other chapter 11 cases in this and other jurisdictions. *See, e.g.*, *In re Celsius Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Mar. 30, 2023) [ECF No. 2344] (approving break-up fee of approximately 11% of the initial bid); *In re Greensill Capital Inc.*, No. 21-10561 (MEW) [ECF No. 37] (Bankr. S.D.N.Y. Apr. 5, 2021) (approving break-up fee of approximately 7.2% of proposed purchase price); *In re America's Gardening Resources, Inc.*, No. 25-11180 (BLS) (Bankr. D. Del. July 10, 2025) [ECF No. 63] (approving break-up fee of 4% of the purchase price); *In re PhaseBio Pharmaceuticals, Inc.*, No. 22-10995 (LSS) (Bankr. D. Del. Nov. 28, 2022) [ECF No. 199] (approving break-up fee of 4% of the non-contingent cash consideration); *In re Evergreen Gardens Mezz LLC*, No. 21-10335 (MG) (Bankr. S.D.N.Y. Oct. 4, 2021) [ECF No. 129] (approving break-up fee equal to approximately 3.95% of the stalking horse bid). In accordance with the Aircraft Sale Agreement, to the extent the Stalking Horse Buyer consents to the sale of any Partial Consent Assets but still consummates the Stalking Horse Bid for the remaining Subject Aircraft, the Break-Up Fee shall apply to such Partial Consent Assets, as appropriately apportioned as compared to all of the Subject Aircraft based on the Reserve Amount of the applicable Partial Consent Assets as set forth in the Aircraft Sale Agreement.

39.    Based on the foregoing, the Debtors respectfully submit that the Break-Up Fee and Expense Reimbursement are in the best interests of the Debtors, their estates and creditors, and other parties in interest and should be approved pursuant to the Bidding Procedures Order.

### iii.    The Proposed Notice of the Sale, the Auction, the Bidding Procedures and the Sale Hearing Is Appropriate

40.    Under Bankruptcy Rules 2002(a) and (c), Spirit is required to notify creditors of the proposed Sale of the Subject Aircraft. Bankruptcy Rules 6004, 7004, and 9014 also provide

specific rules with respect to providing notice of a sale of assets free and clear of claims, liens and encumbrances. Additionally, the Sale Guidelines specify the list of parties in interest that should receive notice of a proposed sale.

41. To comply with these various requirements, Spirit proposes to provide notice of the Sale, the Auction, the Bidding Procedures and the Sale Hearing by serving, within one (1) business day of the entry of the Bidding Procedures Order, by first class mail, postage prepaid, copies of (i) the Bidding Procedures Order, (ii) the Bidding Procedures and (iii) a Sale Notice substantially in the form attached hereto as Exhibit 3 to Exhibit A, upon the Sale Notice Parties (as defined below). Spirit also proposes to provide notice of the Sale through the publication of the Publication Notice, substantially in the form attached hereto as Exhibit 4 to Exhibit A, in the national edition of *The New York Times* or an equivalent national publication, with any modifications necessary for ease of publication.

42. The Debtors believe that they will obtain the maximum recovery for all stakeholders if the Subject Aircraft are sold through a well-advertised auction. The Debtors expect that the Auction, subject to this Court's approval, will result in a bidding process where any party that has any interest in purchasing the Subject Aircraft will have the opportunity to come forward and participate in the Auction.

43. Spirit submits that the foregoing notice complies fully with Bankruptcy Rules 2002, 6004, 7004, and 9014, as well as the Sale Guidelines, and is reasonably calculated to provide timely and adequate notice of the Sale, the Auction, the Bidding Procedures, and the Sale Hearing to Spirit creditors and other parties in interest and also to those who have expressed an interest, or may express an interest, in bidding on the Subject Aircraft. Based upon the foregoing, Spirit respectfully requests that this Court approve the notice procedures proposed above.

**B. Approval of the Proposed Sale Is Appropriate and in the Best Interests of the Debtors' Estates**

44.    In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be by private sale or public auction. The Debtors have determined, after consultation with their advisors, that the Sale of the Subject Aircraft pursuant to the Bidding Procedures will enable it to obtain the highest or otherwise best offer for these assets and is in the best interests of Spirit, its estate and all stakeholders. It is well settled that while public marketing and auction is not required under the Guidelines, it is often the best method to locate the highest or otherwise best offer for assets for the benefit of all stakeholders. *See Bank of Am. Nat'I Trust & Sav. Ass'n. v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 457 (1999) (noting that "the best way to determine value is exposure to a market"); *Official Comm. of Unsecured Creditors v. UMB Bank, N.A. (In re Residential Capital, LLC)*, 501 B.R. 549, 603 (Bankr. S.D.N.Y. 2013) (noting that "Where […] an asset is sold in an arm's-length transaction, the fair market value of such asset is conclusively determined by the price paid"); and *In re Trans World Airlines, Inc.*, No. 01–00056, 2001 WL 1820326, *4 (Bankr. D. Del. Apr. 2, 2001) ("[I]t is worth noting that a [section] 363(b) sale transaction does not require an auction procedure. The auction procedure has developed over the years as an effective means for producing an arm's length fair value transaction.").

45.    The Aircraft Sale Agreement will document a comprehensive, arm's-length negotiation process for the Sale of the Subject Aircraft, both in terms of negotiating the Purchase Price and in determining the specific terms of the Aircraft Sale Agreement. The Sale of the Subject Aircraft pursuant to the terms of the Aircraft Sale Agreement (or a substantially similar purchase agreement entered into with the Successful Bidder(s)) will provide a greater recovery for the Debtors' estates than would be provided by any other available existing alternative. The

requirement that, pursuant to the Aircraft Sale Agreement and the Bidding Procedures, either the Stalking Horse Buyer or the Successful Bidder(s) pay and reimburse Spirit for its costs and expenses incurred in connection with the Sale represents a significant benefit to the Debtors' estates insofar as it allows Spirit to run a deliberate process to monetize the Subject Aircraft in as value-maximizing a way as possible without placing the burdens of that process on other creditors.

    **i.**    **The Sale of the Subject Aircraft Pursuant to the Aircraft Sale Agreement Outside a Plan of Reorganization Is Authorized by Section 363 of the Bankruptcy Code as a Sound Exercise of Spirit's Business Judgment**

46.    Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, the Second Circuit has required that such use, sale or lease be based upon the sound business judgment of the debtor. *See The Official Comm. of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992); *In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside the ordinary course of business); *In re Roman Catholic Diocese of Rockville Centre*, 665 B.R. 71, 82-83 (Bankr. S.D.N.Y. 2024) ("Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets so long as they can articulate a sound business justification for doing so."). In that regard, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

47.     The business judgment rule shields a debtor's management from judicial second-guessing. *Johns-Manville Corp.*, 60 B.R. at 615-16 ("a presumption of reasonableness attaches to a debtor's management decisions"). Once the debtor articulates a sound business justification, there "is a presumption that in making a business decision the [decision maker] acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company." *In re Giftcraft Ltd.*, 672 B.R. 173, 181 (Bankr. S.D.N.Y. 2025) (quoting *Integrated Res.*, 147 B.R. at 656); *In re CLST Enterprises, LLC*, No. 24-10596 (MG), 2025 WL 951298, at *4 (Bankr. S.D.N.Y, Mar. 27, 2025) (same). Put differently, "[c]ourts have made clear that a debtor's business judgment is entitled to great deference." *In re Weiss Multi-Strategy Advisers LLC*, 665 B.R. 578, 590 (Bankr. S.D.N.Y. 2024); *In re Roman Catholic Diocese of Rockville Centre,* 665 B.R. at 83 (same). Regarding the timing of a sale, it is well established in this district that a debtor may sell assets outside of a plan of reorganization pursuant to section 363(b) of the Bankruptcy Code if there is a good business reason for doing so. *See In re General Motors Corp.*, 407 B.R. 463, 489 (Bankr. S.D.N.Y. 2009) (collecting decisions).

48.     The Debtors and their advisors have engaged in a diligent marketing and negotiation process under the circumstances to identify potential purchasers in an effort to maximize the value garnered from the Sale. This effort involved discussions with existing creditors, financial buyers, and strategic buyers to discuss their interest in purchasing the Subject Aircraft, extensive due diligence, and lengthy negotiations. The Debtors have entered into the Aircraft Sale Agreement only after determining that the Stalking Horse Buyer would best serve as a stalking horse bidder to ensure a robust and competitive Auction. The Debtors believe that the value of the consideration to be received for the Subject Aircraft under the Aircraft Sale Agreement is fair and reasonable. As further assurance of value, however, the Stalking Horse Buyer's initial

23

bid will be tested through the Auction pursuant to procedures approved by the Court. The Debtors propose that Bids be due and the Auction be held only after four (4) and six (6) weeks, respectively, following entry of the Bidding Procedures Order to allow the Debtors to continue to market the Subject Aircraft and thereby maximize value to the Debtors' estates. Consequently, the fairness and reasonableness of the consideration to be paid by the Stalking Horse Buyer ultimately will be demonstrated by adequate market exposure and an open and fair auction process—the best means for establishing whether a fair and reasonable price is being paid. *See, e.g., In re Ashley River Consulting, LLC*, No. 14–13406, 2015 WL 4186130, at *8 (Bankr. S.D.N.Y. July 10, 2015) ("the Court finds that a market test through a sale process represents the best procedure to determine its value."); *In re SubMicron Systems Corp.*, 432 F.3d 448, 461 (3rd Cir. 2006) (explaining that a section 363 sale process "is premised on the notion that the market's reaction to a sale best reflects the economic realities of assets' worth" and therefore does not require an independent valuation); and *In re Virgin Orbit, LLC*, 659 B.R. 36 (Bankr. D. Del. 2024) (noting that "[t]he value of the Debtors' assets was determined by the marketplace after an open and fair sale process overseen by this Court. This valuation method is the 'gold standard.'").

49.     The Debtors respectfully submit that the Aircraft Sale Agreement, in conjunction with the Bidding Procedures and the Auction process, will provide a more robust recovery, including by limiting transaction costs, for Spirit's estate than would be provided by any other available alternative. Thus, Spirit's determination to enter into the Aircraft Sale Agreement and to sell the Subject Aircraft subject to the Auction is a valid and sound exercise of the Debtors' business judgment.

### ii. The Sale of the Subject Aircraft Free and Clear of Liens Is Authorized by Section 363(f) of the Bankruptcy Code

50. Spirit further submits that it is appropriate to sell the Subject Aircraft free and clear of Claims and interests pursuant to section 363(f) of the Bankruptcy Code, with any such Claims attaching to the net sale proceeds of the Subject Aircraft, as and to the extent applicable. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests, and encumbrances if:

a. applicable nonbankruptcy law permits sale of such property free and clear of such interests;
b. such entity consents;
c. such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;
d. such interest is in bona fide dispute; or
e. such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

51. Bankruptcy Code section 363(f) is drafted in the disjunctive. 11 U.S.C. § 363(f). As such, courts have recognized that satisfaction of any one of its five requirements will suffice to permit the sale of the Subject Aircraft "free and clear" of liens and interests. *In re Motors Liquidation Company*, 829 F.3d 135, 154 (2d Cir. 2016) ("A sale pursuant to § 363(b) may be made 'free and clear of any interest in such property' if any condition [listed under 11 U.S.C. § 363(f)] is met."); *Giftcraft*, 672 B.R. at 181; *In re Old Market Group Holdings Corp.*. No. 20-10161 (JLG), 2022 WL 4371544, at *8 (Bankr. S.D.N.Y. Sept. 21, 2022) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met.") (quoting *In re Dundee Equity Corp.,* No. 89-B-10233, 1992 WL 53743, at *4 (Bankr. S.D.N.Y. Mar. 6, 1992)). Moreover, "[a]lthough the text of the statute refers only to interests in the property itself, it is now generally agreed—including in this Circuit—that

25

this provision may more broadly extinguish claims that 'arise from the property being sold.'" *In re Williamsburg Boutique, LLC*, 663 B.R. 217, 225 (Bankr. S.D.N.Y. 2024). *See also Ind. State Police Pension Tr. v. Chrysler LLC (In re Chrysler LLC)*, 576 F.3d 108, 124 (2d Cir. 2009), *vacated as moot*, 592 F.3d 370 (2d Cir. 2010) (noting that "the trend seems to be toward a more expansive reading of 'interests in property' which 'encompasses other obligations that may flow from ownership of the property'").

52.     Here, one or more of the tests of section 363(f) are satisfied with respect to the transfer of the Subject Aircraft pursuant to the Aircraft Sale Agreement. In the first instance, the Debtors have no reason to believe that holders of Claims would not consent to the terms of the Aircraft Sale Agreement pursuant to section 363(f)(2) of the Bankruptcy Code. In addition, the Debtors believe that all holders of Claims on the Subject Aircraft could be compelled to accept a money satisfaction of their interests in legal or equitable proceedings in accordance with section 363(f)(5) of the Bankruptcy Code to the extent that such interests are sought to be discharged in the order approving the relief sought in this Motion. Accordingly, the Debtors submit that any existing encumbrances will attach to the net proceeds recognized at the Sale of the Subject Aircraft.

53.     Based upon the foregoing, the Sale free and clear of Claims should be approved by the Court upon the terms requested under section 363(f) of the Bankruptcy Code.

### iii.     The Stalking Horse Buyer Should Be Authorized to Credit Bid for the Subject Aircraft

54.     Section 363(k) of the Bankruptcy Code provides that, unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of a sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). "[I]t is beyond

peradventure that a secured creditor is entitled to credit bid its allowed claim." *In re Empire Generating Co, LLC*, 2020 WL 1330285 at *11 (S.D.N.Y. Mar. 23, 2020). The Supreme Court has explained that "[t]he ability to credit-bid helps to protect a creditor against the risk that its collateral will be sold at a depressed price. It enables the creditor to purchase the collateral for what it considers the fair market price (up to the amount of its security interest) without committing additional cash to protect the loan." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 644 n.2 (2012).

55.     As noted herein, a portion of the Purchase Price is a credit bid of the debt held by the Stalking Horse Buyer (on behalf of the SuperB Noteholders) that is secured by the Subject Aircraft. The Debtors submit that the Stalking Horse Buyer is entitled to credit bid under section 363(k) of the Bankruptcy Code in accordance with the Bidding Procedures and the Aircraft Sale Agreement.

### C. The Stalking Horse Buyer Is a Good Faith Purchaser and Is Entitled to the Full Protection of Section 363(m) of the Bankruptcy Code

56.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

57.     "Section 363(m) furthers the policy of finality in bankruptcy sales and assists bankruptcy courts in maximizing the price for assets sold in such proceedings, by providing that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal." *In re Roman*

*Catholic Diocese of Rockville Centre*, 665 B.R. at 84 (internal citations omitted). *See also In re Cooper,* 592 B.R. 469, 480 (S.D.N.Y. 2018) (noting that section 363(m) serves "to encourage finality in bankruptcy sales and to assist[] the bankruptcy court to secure the best price for the debtor's assets"); *Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal."); *In re Adv. Contracting Sol. LLC*, 582 B.R. 285, 317 (Bankr. S.D.N.Y. 2018) ("Section 363(m) is meant 'to maximize the sale price of estate assets by providing assurances to the purchaser of the finality of the sale by eliminating the prospect of litigation concerning claims to the property.'"). The Second Circuit has held that a purchaser's good faith is shown by the integrity of his or her conduct during the course of the sale process, finding that where there is a lack of such integrity, a good faith finding may not be made. *See, e.g.*, *In re Pursuit Holdings (NY), LLC*, 845 Fed. Appx. 60, 63 (2d. Cir. 2021) ("The focus of the inquiry is 'the purchaser's conduct in the course of the bankruptcy proceedings,' including 'the purchaser's action in preparation for and during the sale itself.'"); *Licensing by Paolo, Inc. v. Sinatra* (*In re Gucci*), 126 F.3d 380, 390 (2d Cir. 1997) (same).

58. The Debtors determined it was in their best interests to pursue the Sale of the Subject Aircraft as contemplated by the Aircraft Sale Agreement with the Stalking Horse Buyer after a thorough marketing process and a review of all offers. The Debtors submit that the Aircraft Sale Agreement was negotiated at arms' length and in good faith, during which both parties were represented by competent counsel of similar bargaining positions. In addition, the Debtors are not aware of any indication of any fraud, collusion, or attempt to take grossly unfair advantage of the negotiation process or similar conduct that would cause or permit the transactions to be avoided

28

under section 363(n) of the Bankruptcy Code. Therefore, the Debtors submit that the Stalking Horse Buyer is entitled to the protections of section 363(m) of the Bankruptcy Code for the Subject Aircraft it is purchasing from Spirit.

**Notice**

59.     Notice of this Motion will be provided to the following parties (or their counsel) (collectively, the "**Sale Notice Parties**"): (a) the U.S. Trustee; (b) the Committee; (c) the Securities and Exchange Commission; (d) the Internal Revenue Service; (e) the United States Attorney's Office for the Southern District of New York; (f) the state attorneys general for states in which the Debtors conduct business; (g) the Department of Transportation; (h) certain holders of the Debtors' secured notes; (i) each agent or trustee under the Debtors' secured notes indenture or revolving credit facility; (j) all entities known to have expressed a bona fide interest in a transaction with respect to the Subject Aircraft; (k) all entities known to have asserted any lien, claim, or encumbrance in or upon any of the Subject Aircraft; (l) Wilmington Trust, National Association; (m) BBAM Aviation Services Limited; (n) the Stalking Horse Buyer and its counsel; and (o) any other party that is entitled to notice under the *Court's Order Implementing Certain Notice and Case Management Procedures* [ECF No. 61]. A copy of this Motion and any order entered in respect thereto will also be made available on the Debtors' case information website located at https://dm.epiq11.com/SpiritAirlines.

60.     The Debtors will also publish the Publication Notice in substantially the form attached hereto as Exhibit 4 to Exhibit A no later than three (3) business days after entry of the Bidding Procedures Order.

61.     In light of the foregoing and the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

29

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested

herein and such other and further relief as is appropriate.

Dated:   July 1, 2026
         New York, NY

                                    DEBEVOISE & PLIMPTON LLP

                                    /s/ Jasmine Ball
                                    Jasmine Ball
                                    Elie J. Worenklein
                                    66 Hudson Boulevard East
                                    New York, NY 10001
                                    Tel.: (212) 909-6000
                                    jball@debevoise.com
                                    eworenklein@debevoise.com

                                    *Fleet Counsel to the Debtors and Debtors in
                                    Possession*

**Exhibit A**

**Bidding Procedures Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **SPIRIT AVIATION HOLDINGS, INC.,** *et al.*, | **Case No. 25-11897 (SHL)** |
| **Debtors.[1]** | **Jointly Administered** |

**ORDER (A) APPROVING BIDDING**
**PROCEDURES AND BID PROTECTIONS IN**
**CONNECTION WITH THE SALE OF 27 EETC-FINANCED**
**AIRCRAFT, (B) APPROVING THE FORM AND MANNER OF APPLICABLE**
**NOTICES, AND (C) SCHEDULING THE AUCTION AND SALE HEARING**

Upon the *Motion for Entry of (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of 27 EETC-Financed Aircraft, (B) Approving the Form and Manner of Applicable Notices and (C) Scheduling an Auction and Sale Hearing and (II) an Order (A) Authorizing the Sale of Aircraft and Related Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests and (B) Granting Related Relief* (the "**Motion**")[2] of Spirit Aviation Holdings, Inc. and its direct and indirect subsidiaries (collectively, the "**Debtors**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), for entry of an order (this "**Order**"): (i) establishing bidding procedures as set forth in Exhibit 1 hereto (the "**Bidding Procedures**") to govern the sale (the "**Sale**") of Spirit's ownership interests in the Subject Aircraft, as such assets are identified in the certain Aircraft Sale Agreement, dated July [●], 2026 (the "**Aircraft Sale Agreement**"), by

---

[1]   The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

and among Spirit and the Stalking Horse Buyer, a copy of which is attached hereto as <u>Exhibit 2</u>; (ii) approving certain bid protections in connection therewith, including the Break-Up Fee and the Expense Reimbursement (both as defined in the Aircraft Sale Agreement) to be paid to the Stalking Horse Buyer pursuant to, and solely to the extent required by, the terms and conditions set forth in the Aircraft Sale Agreement; (iii) scheduling an auction to sell the Subject Aircraft (the "**Auction**"); (iv) scheduling a hearing to approve the sale of the Subject Aircraft to the Stalking Horse Buyer or the maker(s) of the highest or otherwise best qualifying bid(s) at the Auction in accordance with the Bidding Procedures (the "**Sale Hearing**"); and (v) approving the form and manner of notice of the Sale, the Bidding Procedures, the Auction and the Sale Hearing (as described below, respectively, the "**Sale Notice**" and the "**Publication Notice**"); and the Court having determined that the legal and factual bases set forth in the Motion and the Bilbao Declaration and at the hearing to consider the relief sought in the Motion establish just cause for the relief granted herein; and after due deliberation and the Court having determined that the relief requested in the Motion is in the best interests of the Debtors and their respective estates,

**THE COURT HEREBY FINDS THAT:**[3]

I.        This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (N) and (O). Venue is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

II.        The bases for the relief requested herein are sections 363(b), 363(f) and 363(m), 503 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**") and Rules 2002, 6004,

---

[3]   The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**"),

Rules 2014-1, 6004-1 and 6006-1 of the Local Rules for the United States Bankruptcy Court for

the Southern District of New York (the "**Local Rules**") and the *Amended Guidelines for the*

*Conduct of Asset Sales, General Order M-383 of the Bankruptcy Court for the Southern District*

*of New York*.

III.    Notice of the Motion has been provided to the following parties (or their counsel)

(collectively, the "**Sale Notice Parties**"): (a) the U.S. Trustee; (b) the Committee; (c) the Securities

and Exchange Commission; (d) the Internal Revenue Service; (e) the United States Attorney's

Office for the Southern District of New York; (f) the state attorneys general for states in which the

Debtors conduct business; (g) the Department of Transportation; (h) certain holders of the Debtors'

secured notes; (i) each agent or trustee under the Debtors' secured notes indenture or revolving

credit facility; (j) all entities known to have expressed a bona fide interest in a transaction with

respect to the Subject Aircraft; (k) all entities known to have asserted any lien, claim, or

encumbrance in or upon any of the Subject Aircraft; (l) Wilmington Trust, National Association;

(m) BBAM Aviation Services Limited; (n) the Stalking Horse Buyer and its counsel; and (o) any

other party that is entitled to notice under the *Court's Order Implementing Certain Notice and*

*Case Management Procedures* [ECF No. 61]. A copy of this Motion and any order entered in

respect thereto will also be made available on the Debtors' case information website located at

https://dm.epiq11.com/SpiritAirlines.

IV.    Spirit has articulated good and sufficient reasons for this Court to grant the relief

requested in the Motion, including without limitation, approval of the Bidding Procedures, the

Break-Up Fee and the Expense Reimbursement, pursuant to the terms and conditions set forth in

the Aircraft Sale Agreement.

3

V.        The Break-Up Fee, which is only payable if a Qualifying Break-Up Fee Event has occurred, and the Expense Reimbursement, which is only payable if a Qualifying Break-Up Fee Event or Seller Cancellation Event has occurred, are (i) actual and necessary costs and expenses of preserving Spirit's estate, within the meaning of sections 503(b) and 507(a)(2) of the Bankruptcy Code; (ii) commensurate to the real and substantial benefit conferred upon Spirit's estate by the Stalking Horse Buyer; (iii) reasonable and appropriate, in light of the size and nature of the proposed sale transaction and comparable transactions, the commitments that have been made and the efforts that have been and will be expended by Spirit; and (iv) necessary to induce the Stalking Horse Buyer to continue to pursue the Sale contemplated in the Aircraft Sale Agreement and to continue to be bound by the Aircraft Sale Agreement.

VI.        Spirit's agreement to provide the Break-Up Fee and the Expense Reimbursement also induced the Stalking Horse Buyer to submit a bid that will serve as a minimum floor bid on which Spirit, its creditors and other bidders may rely. The Stalking Horse Buyer has provided a material benefit to Spirit and its creditors by increasing the likelihood that the best possible price for the Subject Aircraft will be received. Accordingly, the Break-Up Fee and the Expense Reimbursement are reasonable and appropriate and represent the best method for maximizing value for the benefit of the Debtors' estates. The Sale Notice and the Publication Notice are reasonably calculated to provide all interested parties with timely and proper notice of the Sale, the Sale Hearing and the Auction.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.        The Bidding Procedures attached hereto as <u>Exhibit 1</u> are hereby approved and incorporated herein by reference. Spirit is authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

4

2.      All objections to the relief requested in the Motion that have not been withdrawn, waived or settled as announced to the Court at the hearing on the Motion, or by stipulation filed with the Court are overruled.

3.      The following dates and deadlines are hereby approved, subject to the right of the Debtors to modify the following dates so long as notice is given in accordance with the terms of the Bidding Procedures:

| Action | Description | Deadline |
| --- | --- | --- |
| Filing of the Sale Notice | The deadline by which the Debtors will file the Sale Notice with the Bankruptcy Court. | Within one (1) business day after entry of the Bidding Procedures Order |
| Filing of the Publication Notice | The deadline by which the Debtors will publish the Publication Notice in *The New York Times* or an equivalent national publication. | Within three (3) business days after entry of the Bidding Procedures Order |
| Bid Deadline | The deadline by which all binding Bids must be actually received by Counsel to the Debtors and the Financial Advisor to the Debtors pursuant to the Bidding Procedures. | By August 27, 2026 at 4:00 p.m. (prevailing Eastern Time) |
| Determination of Qualified Bids | The deadline by which the Debtors will determine which Bids are Qualified Bids and will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder. | By August 31, 2026 at 4:00 p.m. (prevailing Eastern Time) |
| Notification of the Baseline Bid(s) | The deadline by which Spirit shall provide each Qualified Bidder (including the Stalking Horse Buyer), the Committee and the DIP Lenders with (i) written notice of the Auction and (ii) a copy of the Qualified Bid(s) that Spirit has determined constitute the highest or best offer among the Qualified Bids and with which it intends to commence the Auction with respect to the Subject Aircraft. | By September 4, 2026 at 4:00 p.m. (prevailing Eastern Time) |
| Auction (if necessary) | The date and time of the Auction, which will be held virtually by Zoom. | September 9, 2026 at 10:00 a.m. (prevailing Eastern Time) |

5

| Action | Description | Deadline |
|---|---|---|
| Notice of Successful Bidder | The deadline by which the Debtors will file on the docket a notice identifying each Successful Bidder, the Subject Aircraft subject to each Successful Bid and the key terms of the applicable agreements. | Within one (1) business day following the closing of the Auction (if any) |
| Sale Objection Deadline | The deadline for any objections to the proposed Sale to the Successful Bidder(s). | September 14, 2026, at 4:00 p.m. (prevailing Eastern Time) |
| Sale Hearing | The hearing before the Bankruptcy Court on whether to grant the relief sought in the Sale Motion. | September 16, 2026 at 11:00 a.m.(prevailing Eastern Time) |
| Outside Closing Date | Latest date by which Sale(s) of the Subject Aircraft must close. | September 30, 2026 |

4.      The Sale Notice, substantially in the form attached hereto as Exhibit 3, is hereby approved and, as provided above, will be provided within one (1) business day of entry of this Order to the Sale Notice Parties. A copy of Sale Notice will also be made available on the Debtors' case information website located at https://dm.epiq11.com/SpiritAirlines.

5.      As provided above, on or before three (3) business days of entry of this Order, Spirit shall publish the Publication Notice, substantially in the form attach hereto as Exhibit 4, in the national edition of *The New York Times* or an equivalent national publication, with any modifications necessary for ease of publication.

6.      As further described above and in the Bidding Procedures, Spirit shall conduct the Auction on September 9, 2026 at 10:00 a.m. (prevailing Eastern time) virtually by Zoom if at least one Qualifying Bid (as defined in the Bidding Procedures) in addition to the Stalking Horse Bid is timely received.

7.      The Break-Up Fee, in the amount of $18,000,000 and as apportioned in accordance with the Aircraft Sale Agreement, and the Expense Reimbursement are hereby approved solely in accordance with the terms and conditions set forth in the Aircraft Sale Agreement; *provided that*

6

notwithstanding anything to the contrary in either the 2015-1 Intercreditor Agreement or the 2017-1 Intercreditor Agreement, payment of the Break-Up Fee and Expense Reimbursement shall be subordinated to payment in cash in full of the Senior Certificates (and all other amounts contemplated by the definition of Reserve Amount). For the avoidance of doubt, the Stalking Horse Buyer is not deemed to waive the Break-Up Fee or the Expense Reimbursement by Overbidding (as defined in the Bidding Procedures) at the Auction. If the Stalking Horse Buyer Overbids at the Auction, a "credit" for the amount of the Break-Up Fee and Expense Reimbursement will automatically be added to such Overbid amount.

8.      If the Stalking Horse Buyer becomes entitled to receive the Break-Up Fee, the Expense Reimbursement or both in accordance with the terms described in the Aircraft Sale Agreement, then the Stalking Horse Buyer shall be, and hereby is, granted an allowed administrative claim in Spirit's Chapter 11 Cases equal to such amount; *provided, however*, and notwithstanding the foregoing, any Break-Up Fee or Expense Reimbursement owed to the Stalking Horse Buyer under the Aircraft Sale Agreement and this Order shall be paid solely from the proceeds of the Sale(s) and not from any other source, including any cash on the Debtors' balance sheet that constitutes collateral of the DIP Lenders.

9.      No person or entity other than the Stalking Horse Buyer shall, pursuant to the Bidding Procedures or otherwise, be entitled to any expense reimbursement, break-up fees, "topping," termination, or other similar fee or payment in connection with the Sale of the Subject Aircraft pursuant to the terms of this Order.

10.     Pursuant to the terms of the Aircraft Sale Agreement and the Bidding Procedures, either the Stalking Horse Buyer or the Successful Bidder(s) will pay or reimburse, as applicable, promptly on demand, all of Spirit's costs and expenses incurred in connection with the Sale

7

(including reasonable legal and financial advisor fees and costs and expenses in relation to the consummation of the transactions contemplated by the Sale Order and Bidding Procedures), and which payment (including of any good faith estimates provided by Spirit of such costs and expenses) shall be a condition precedent to the closing of the sale to the Stalking Horse Buyer or any other Successful Bidder(s). To the extent not previously paid, the Stalking Horse Bidder shall also be required to satisfy certain outstanding claims of Lufthansa Technik AG with respect to ESN 18678.

11.    As provided above, the Sale Hearing will be conducted on September 16, 2026, at 11:00 a.m. (prevailing Eastern time) before the Honorable Sean H. Lane. At the Sale Hearing, Spirit will seek the entry of an order of this Court approving and authorizing the Sale to the Stalking Horse Buyer or the maker(s) of the highest or otherwise best offers determined at the Auction pursuant to the Bidding Procedures, as applicable. Absent irregularities in the conduct of the Auction, or reasonable and material confusion during the bidding process, the Court will not consider bids made after the Auction has been closed. The Sale Hearing may be adjourned or rescheduled without notice other than by an announcement of the adjourned date at the Sale Hearing.

12.    Objections, if any, to the relief requested at the Sale Hearing must comply with the Bankruptcy Rules and the Local Rules and shall be filed with the Bankruptcy Court and shall be served upon the Sale Notice Parties, so as to be actually received no later than September 14, 2026, at 4:00 p.m. (prevailing Eastern time).

13.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

14.    Nothing in this Order shall alter, impair, or otherwise affect the rights and remedies

8

of the secured party under the 2015-1 or the 2017-1 under section 1110(a) of the Bankruptcy Code or under any security agreements relating to the Subject Aircraft in the event that (a) the proposed Sale(s) of the Subject Aircraft will not result in cash proceeds in an amount sufficient to (i) reimburse the subordination agent, the trustee each liquidity provider and each applicable Series 2015-1 Certificateholder, Series 2017-1A Certificateholder and Series 2017-1AA Certificateholder (together, the "**Senior Certificateholders**" and such Certificates, the "**Senior Certificates**") for fees, expenses, and other similar amounts owed under the EETC Intercreditor Agreements (including fees and expenses of the EETC Advisors (as defined in the Bidding Procedures), but for the avoidance of doubt, not including any premium, makewhole, or other similar amounts) and (ii) pay in full in accordance with the provisions of the EETC Intercreditor Agreements the remaining outstanding balances of the Senior Certificates, together with any accrued and outstanding interest thereon to the date of payment (but for the avoidance of doubt, not including any premium, makewhole, or other similar amounts); (b) the Aircraft Sale Agreement is not consistent with the terms of the cooperation agreements entered into between the Senior Certificateholders and the Class B(R) Certificates (as notified to the parties by the EETC Advisor to the Series 2015-1 Class A Trust and Series 2017-1 Class AA Trust); or (c) the closing of the Sale(s) of the Subject Aircraft has not concluded on or prior to September 30, 2026.

15.     This Court shall retain jurisdiction to resolve any dispute relating to the interpretation of the terms and conditions of the Aircraft Sale Agreement and this Order. To the extent any provisions of this Order shall be inconsistent with the Motion, the terms of this Order shall control.

9

Dated: _____, 2026

White Plains, New York

_____
THE HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE

**Exhibit 1 to Exhibit A**

**Bidding Procedures**

DEBEVOISE & PLIMPTON LLP
66 Hudson Boulevard East
New York, New York 10001
Tel.: (212) 909-6000
Jasmine Ball
Elie J. Worenklein

*Fleet Counsel to the Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **SPIRIT AVIATION HOLDINGS, INC.,** *et al.*, | **Case No. 25-11897 (SHL)** |
| **Debtors.**[1] | **Jointly Administered** |

### BIDDING PROCEDURES FOR THE SALE OF AIRCRAFT

On August 29, 2025, Spirit Aviation Holdings, Inc. and its direct and indirect subsidiaries (collectively, the "**Debtors**," the "**Company**," or "**Spirit**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Court**").

On [●], 2026, the Court entered that certain *Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of 27 EETC-Financed Aircraft, (B) Approving the Form and Manner of Applicable Notices, and (C) Scheduling an Auction and Sale Hearing* (the "**Bidding Procedures Order**"), which approved, among other things, (a) the following procedures (the "**Bidding Procedures**") [2] which will govern the sale (the "**Sale**") of Spirit's ownership interests in the Subject Aircraft, as such assets are defined in the Aircraft Sale and Purchase Agreement (the "**Aircraft Sale Agreement**"), by and among Spirit Airlines, LLC and certain

---

[1]   The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

[2]   Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Bidding Procedures Order or the *Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of 27 EETC-Financed Aircraft, (B) Approving the Form and Manner of Applicable Notices and (C) Scheduling an Auction and Sale Hearing and (II) an Order (A) Authorizing the Sale of Aircraft and Related Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests and (B) Granting Related Relief* (the "**Sale Motion**") [ECF No. [ ]], as applicable.

SuperB Noteholders (the "**Stalking Horse Buyer**); (b) approving certain bid protections in connection with the Sale, including the Break-Up Fee and the Expense Reimbursement; (c) scheduling an auction to sell the Subject Aircraft (the "**Auction**"); (d) scheduling a hearing to approve the Sale of the Subject Aircraft free and clear of all liens (excluding any Buyer's Liens), claims, encumbrances and other interests (collectively, the "**Claims**"), with such Liens attaching only to the proceeds of such transactions; and (e) approving the form and manner of notice of the Sale, the Bidding Procedures, the Auction and the Sale Hearing, substantially in the forms attached hereto as Exhibit 3 to Exhibit A (the "**Sale Notice**") and Exhibit 4 to Exhibit A (the "**Publication Notice**"). *All interested bidders should carefully read the Bidding Procedures Order and these Bidding Procedures in their entirety.*

## Bidding Procedures

These Bidding Procedures set forth the process by which the Debtors are authorized to conduct a marketing process and, if necessary, an Auction, for the Sale of the Subject Aircraft.

The Debtors will consider each Bid (as defined below) for the purchase of all or a portion of the Subject Aircraft (subject to the Reserve Amount Requirement (as defined below)) to the person or entity making the highest or best Bid(s) through the process contained in these Bidding Procedures. As contemplated by and incorporated in the Bidding Procedures Order, the Bidding Procedures provided herein shall be the exclusive mechanism governing the Sale. The Debtors will consult with their advisors, the official committee of unsecured creditors and their advisors (the "**Committee**"), the lenders providing debtor-in-possession financing for the Debtors and their advisors (the "**DIP Lenders**") and the trustee and servicer of the EETC Debt and their advisors (the "**EETC Advisors**," and together with the Committee and the DIP Lenders, the "**Consultation Parties**") with respect to the potential winning Bid(s); *provided* that the Stalking Horse Buyer and its advisors shall be a Consultation Party in all respects related to the costs associated with these Bidding Procedures, the Auction, the Sale, and anything related thereto.

## I.    KEY SALE PROCESS DATES

These Bidding Procedures provide interested parties with the opportunity to qualify for and participate in the Auction to be conducted by the Debtors and to submit competing Bids for the Subject Aircraft. The Debtors shall accept bids until August 27, 2026 at 4:00 p.m. (prevailing Eastern Time) (the "**Bid Deadline**"). The other key dates for the marketing process are as follows:

| Action | Description | Deadline |
|---|---|---|
| Filing of the Sale Notice | The deadline by which the Debtors will file the Sale Notice with the Bankruptcy Court. | Within one (1) business day after entry of the Bidding Procedures Order |
| Filing of the Publication Notice | The deadline by which the Debtors will publish the Publication Notice in *The New York Times* or an equivalent national publication. | Within three (3) business days after entry of the Bidding Procedures Order |

2

| Action | Description | Deadline |
|---|---|---|
| Bid Deadline | The deadline by which all binding Bids must be actually received by Counsel to the Debtors and the Financial Advisor to the Debtors pursuant to the Bidding Procedures. | By August 27, 2026 at 4:00 p.m. (prevailing Eastern Time) |
| Determination of Qualified Bids | The deadline by which the Debtors will determine which Bids are Qualified Bids and will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder. | By August 31, 2026 at 4:00 p.m. (prevailing Eastern Time) |
| Notification of the Baseline Bid(s) | The deadline by which Spirit shall provide each Qualified Bidder (including the Stalking Horse Buyer), the Committee and the DIP Lenders with (i) written notice of the Auction and (ii) a copy of the Qualified Bid(s) that Spirit has determined constitute the highest or best offer among the Qualified Bids and with which it intends to commence the Auction with respect to the Subject Aircraft. | By September 4, 2026 at 4:00 p.m. (prevailing Eastern Time) |
| Auction (if necessary) | The date and time of the Auction, which will be held virtually by Zoom. | September 9, 2026 at 10:00 a.m. (prevailing Eastern Time) |
| Notice of Successful Bidder | The deadline by which the Debtors will file on the docket a notice identifying each Successful Bidder, the Subject Aircraft subject to each Successful Bid and the key terms of the applicable agreements. | Within one (1) business day following the closing of the Auction (if any) |
| Sale Objection Deadline | The deadline for any objections to the proposed Sale to the Successful Bidder(s). | September 14 2026 at 4:00 p.m. (prevailing Eastern Time) |
| Sale Hearing | The hearing before the Bankruptcy Court on whether to grant the relief sought in the Sale Motion. | September 16, 2026 at 11:00 a.m. (prevailing Eastern Time) |
| Outside Closing Date | Latest date by which Sale(s) of the Subject Aircraft must close. | September 30, 2026 |

## II.    PUBLIC ANNOUNCEMENT OF AUCTION

Within one (1) business day after entry of the Bidding Procedures Order, the Debtors shall serve the Sale Notice on the Sale Notice Parties. In addition, within three (3) business days after entry of the Bidding Procedures Order (or as soon as reasonably practical thereafter), the Debtors shall (a) publish the Publication Notice in the national edition of *The New York Times* or equivalent national publication, with any modifications necessary for ease of publication, to provide notice to any other potential interested parties and (b) post the Sale Notice, the Bidding Procedures Order

3

(as entered) and the Bidding Procedures on the website of the Debtors' claims and noticing agent at https://dm.epiq11.com/SpiritAirlines.

## III.   BID SUBMISSION; DETERMINING QUALIFIED BIDS AND QUALIFIED BIDDERS

### A.   Submission of a Bid

To submit an offer, solicitation or proposal for the purchase of all or a portion of the Subject Aircraft (a "**Bid**"), a party (other than the Stalking Horse Buyer) (each such party, a "**Potential Bidder**") must submit a Bid in writing via email to Counsel to the Debtors and the Financial Advisor to the Debtors, whose contact information is below, so as to be actually received on or before the Bid Deadline, or such other date as may be agreed to by the Debtors after consulting with the Consultation Parties and the Stalking Horse Buyer's advisors.

Upon a reasonable request from a Potential Bidder, Spirit shall provide such Potential Bidder with reasonable information and due diligence regarding the Subject Aircraft; *provided*, *however*, that, (i) the Potential Bidder enters into a non-disclosure agreement with Spirit prior to receipt of any such information or due diligence; (ii) Spirit shall not be obligated to provide to any Potential Bidder more information or more extensive due diligence access than that provided to the Stalking Horse Buyer before the Stalking Horse Buyer's entry into the Aircraft Sale Agreement; and (iii) Spirit shall not be required to provide to any Potential Bidder any information or due diligence access after the Bid Deadline.

### B.   Terms and Conditions of a Qualified Bid

In order to be deemed a "**Qualified Bid**" and for a Potential Bidder (other than the Stalking Horse Buyer) to be deemed a "**Qualified Bidder**," the Bid submitted by the Potential Bidder must:

(i)   state that the Potential Bidder offers to purchase all or a portion of the Subject Aircraft ((which portion shall be for no less than five (5) Subject Aircraft unless the proposed purchase price for any number of Subject Aircraft less than five (5) is at least 10% greater than the respective Reserve Amount (as defined in the Aircraft Sale Agreement) for each individual Subject Aircraft (as defined in the Aircraft Sale Agreement) (the "**Reserve Amount Requirement**")), upon terms and conditions substantially similar to, or more favorable to Spirit than, the Aircraft Sale Agreement;[3]

(ii)   state the specific manufacturer serial number of the Subject Aircraft covered by the Bid;

---

[3]   The Reserve Amount for each individual Subject Aircraft has partial SuperB Costs built in, based on preliminary estimate of $25 million in the aggregate. As such, the exact Reserve Amount may be subject to downward or upward adjustments for actual costs incurred in connection with the Sale.

4

(iii)   provide the purchase price in U.S. dollars for the Subject Aircraft and state that the Potential Bidder is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of the specified Subject Aircraft on terms and conditions substantially similar to, and no less favorable to Spirit than, the terms and conditions contained in the Aircraft Sale Agreement (as determined by Spirit in its reasonable business judgment);

(iv)   be accompanied by a clean and duly executed modified purchase and sale agreement and a marked modified purchase and sale agreement reflecting the Potential Bidder's proposed variations from the Aircraft Sale Agreement;

(v)   state that the Potential Bidder's offer is irrevocable until the closing of the Sale if such Potential Bidder is determined at the Auction to be the Successful Bidder or the Back-Up Bidder (each as defined below);

(vi)   evidence, including audited financial statements (or such other form of financial disclosure and credit-quality support or enhancement reasonably acceptable to Spirit), sufficient to establish the financial wherewithal of the interested party to complete the contemplated transactions and, to the extent the interested party will rely upon the financial wherewithal of an affiliate, bid partner or other sponsor (the "**Sponsor**"), evidence sufficient to establish the financial wherewithal and intent of the Sponsor to provide appropriate financial support;

(vii)   represent that the Potential Bidder will not request or assert entitlement to any expense reimbursement, break-up fees, "topping," termination or other similar fees or payments in connection with the sale of the Subject Aircraft;

(viii)   fully disclose the identity of any Sponsor (if any) and each other entity that will be a purchaser of the Subject Aircraft or otherwise participate in connection with such Bid, together with the complete terms of any such participation;

(ix)   be likely to result in a value to Spirit, in Spirit's reasonable judgment after consultation with its financial and legal advisors and the Consultation Parties, that, alone or in combination with other Potential Bids, is more than the sum of (i) the Purchase Price, (ii) the Break-Up Fee in the amount of $18,000,000 and (iii) the Expense Reimbursement, pro-rated for the number of Subject Aircraft to which the Potential Bid is subject;

(x)   be free from any due diligence or financing contingencies of any kind, and include a written acknowledgment and representation that the Qualified Bidder: (a) has had an opportunity to conduct any and all due diligence regarding the Subject Aircraft prior to making its offer; (b) has relied solely

upon its own independent review, investigation, and/or inspection of any documents and/or such assets in making its Bid; and (c) did not and will not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Subject Aircraft or the completeness of any information provided in connection therewith or at an Auction;

(xi)    include a written acknowledgment and representation that the Qualified Bidder will use commercially reasonable efforts to close the sale of Subject Aircraft as soon as practicable after the Auction;

(xii)   include evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body), as well as the board of directors or comparable governing body of any Sponsor or other bid participant, with respect to the submission, execution, delivery and closing of the Sale pursuant to the terms of the Aircraft Sale Agreement (as proposed to be modified by the Potential Bid);

(xiii)  (a) include a description of all governmental, licensing, regulatory, or other approvals or consents that are required to close the proposed Sale, together with evidence satisfactory to the Debtors, of the ability to obtain such consents or approvals in a timely manner, as well as a description of any material contingencies or other conditions that will be imposed upon, or that will otherwise apply to, the obtainment or effectiveness of any such consents or approvals; and (b) set forth an estimated timeframe for (x) obtaining any required governmental, licensing, regulatory, or other approvals or consents for consummating any proposed Sale and (y) the Qualified Bidder's expected date of closing the Sale, which must be reasonably likely to be consummated, if selected, within a timeframe acceptable to the Debtors in consultation with the EETC Advisors and the Stalking Horse Buyer (and in any event prior to September 30, 2026);

(xiv)   be accompanied by a deposit at least equal to 10% of the total Purchase Price contemplated by the Aircraft Sale Agreement (the "**Good Faith Deposit**"), pro-rated for the number of Subject Aircraft to which the Potential Bid is subject;

(xv)    if the Bid is for all of the Subject Aircraft, state that the Potential Bidder is committing to pay all of the SuperB Costs (as defined below);

(xvi)   if the Bid is for all of the Subject Aircraft, an indication whether the Potential Bidder would be willing to carve out one or more Subject Aircraft from the proposal and describe the associated impact on the Potential Bidder's proposed purchase price;

6

(xvii)   if the Bid is for multiple Subject Aircraft but less than all of the Subject Aircraft, an allocation of the proposed purchase price among each Subject Aircraft;

(xviii)  provide for payment in full certain amounts asserted to be owed by Spirit to Lufthansa Technik AG with respect to ESN 18678;

(xix)    include a written acknowledgement and representation that the Bid for any Subject Aircraft is on an "as-is" basis; and

(xx)     be received by Counsel and Financial Advisor to the Debtors set forth below on or before the Bid Deadline.

**Counsel to the Debtors**.

Debevoise & Plimpton LLP
66 Hudson Boulevard East
New York, NY 10001
Attn: Jasmine Ball (jball@debevoise.com), Elie J. Worenklein (eworenklein@debevoise.com).

**Financial Advisor to the Debtors**

FTI Capital Advisors
1301 McKinney St., Suite 3500
Houston, TX 77010 USA
Attn: Marc Bilbao (Marc.Bilbao@fticonsulting.com),
Stephen Strange (Stephen.Strange@fticonsulting.com),
Scott Farnsworth (Scott.Farnsworth@fticonsulting.com).

**FOR THE AVOIDANCE OF DOUBT, POTENTIAL BIDDERS SHOULD BE AWARE THAT ANY POTENTIAL BIDDER THAT DOES NOT SUBMIT A QUALIFIED BID BY THE BID DEADLINE MAY NOT BE ALLOWED TO (1) PARTICIPATE IN THE AUCTION OR (2) SUBMIT ANY OFFER AFTER THE BID DEADLINE OR AFTER THE AUCTION.**

C.      **Right to Credit Bid**

Subject to the EETC Intercreditor Agreements, any Qualified Bidder who has a valid and perfected lien on any Subject Aircraft, including the Stalking Horse Buyer, (each, a "**Secured Creditor**") shall have the right to credit bid all or a portion of the value of such Secured Creditor's claims within the meaning of section 363(k) of the Bankruptcy Code; *provided* that a Secured Creditor shall have the right to credit bid its claim only with respect to the collateral by which such Secured Creditor is secured, subject to the terms of any credit agreement or attendant debt documents governing such Secured Creditor's right to credit bid.

7

**D.     Qualified Bidders**

### 1.  Stalking Horse Buyer

Notwithstanding anything in these Bidding Procedures to the contrary, the Stalking Horse Buyer is deemed a Qualified Bidder, and the Stalking Horse Buyer's bid, as memorialized in the Aircraft Sale Agreement, (the "**Stalking Horse Bid**") shall be deemed a Qualified Bid for all applicable purposes under these Bidding Procedures with respect to the Sale, any Auction, or otherwise. No further action or documentation shall be required from the Stalking Horse Buyer to participate in the Auction.

### 2.  Other Potential Bidders

After Spirit has determined, in consultation with the Consulting Parties, that a Bid satisfies each of the conditions set forth in part III.B., above, Spirit shall promptly notify the Potential Bidder who submitted such Qualified Bid that it has been selected as a Qualified Bidder, which notification shall occur on or before August 31, 2026 at 4:00 p.m. (prevailing Eastern Time); *provided*, *however*, that Spirit reserves the right to reject any Bid (other than the Stalking Horse Buyer's offer pursuant to the Aircraft Sale Agreement) if Spirit determines that such Bid is inadequate or insufficient or Spirit determines that such Bid is not in conformity with the requirements of the Bankruptcy Code or any related rules or is otherwise contrary to the best interests of Spirit and its estate, solely after consulting with the Consultation Parties; *provided*, *further*, that Spirit reserves the right to accept a Bid as a Qualified Bid if Spirit determines, after consulting with the Consultation Parties, that such Bid substantially complies with the requirements set forth herein.

Promptly after determining that any Potential Bidder who has submitted a Bid does not appear to qualify as a Qualified Bidder, Spirit shall notify such Potential Bidder of this determination and in good faith seek to resolve any impediment to the Potential Bidder becoming a Qualified Bidder. The determination of the Qualified Bidders shall become irrevocable and unreviewable once the Auction has commenced.

### 3.  Negotiation and Modification of Qualified Bids

Between the Bid Deadline and the Auction, Spirit may discuss, negotiate or seek clarification of any Qualified Bid from a Qualified Bidder. Without the written consent of Spirit a Qualified Bidder may not modify, amend or withdraw its Qualified Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of the Qualified Bid for Spirit, during the period that such Qualified Bid remains binding as specified herein; *provided*, *however*, that any Qualified Bid may be improved at the Auction as set forth herein.

### 4.  Evaluation of Qualified Bids

The Debtors shall evaluate all Qualified Bids in consultation with the Consultation Parties and the Stalking Horse Buyer's advisors and identify the Qualified Bid(s) that, alone or in combination with any other Qualified Bid(s), in the Debtors' judgment, constitute(s) the highest or otherwise best Qualified Bid(s) for the Subject Aircraft.

When determining the highest or otherwise best Qualified Bid(s) as compared to other Qualified Bids, the Debtors, after consultation with the Consultation Parties and the Stalking Horse Buyer's advisors, may consider the following factors in addition to any other factors that the Debtors, after consultation with the Consultation Parties and the Stalking Horse Buyer's advisors, deem appropriate:

(i)    the number of Subject Aircraft to which the Qualified Bid is subject, including with respect to the criteria provided below, alone or in combination with other Qualified Bids;

(ii)   the number, type, and nature of any changes to the form of Aircraft Sale Agreement, if any, requested by the Qualified Bidder, including the type and number of Subject Aircraft sought in the Qualified Bid;

(iii)  the amount and nature of the total consideration (which shall in all cases be an amount in cash no less than, for each individual Subject Aircraft, the Reserve Amount for such individual Subject Aircraft);

(iv)   the likelihood of the Qualified Bidder's ability to close the Sale and the timing thereof;

(v)    the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid;

(vi)   any regulatory requirements applicable to the Sale; and

(vii)  the tax consequences of such Qualified Bid.

For the avoidance of doubt, and notwithstanding anything to the contrary in these Bidding Procedures or the Aircraft Sale Agreement, the Stalking Horse Bid constitutes a bid for all of the Subject Aircraft and no Qualified Bidder may be the successful bidder for a Subject Aircraft or group of Subject Aircraft, unless Spirit has made a determination, consistent in all respects with these Bidding Procedures, that (a) there are Qualified Bids for all of the Subject Aircraft that, in the aggregate, constitute a higher or otherwise better bid than the Stalking Horse Bid and would pay all of the SuperB Costs or (b) the Stalking Horse Buyer otherwise consents to the sale of a Subject Aircraft or group of Subject Aircraft to another Qualified Bidder ("**Partial Consent Assets**"). In accordance with the Aircraft Sale Agreement, to the extent the Stalking Horse Buyer consents to the sale of any Partial Consent Assets but still consummates the Stalking Horse Bid for the remaining Subject Aircraft, the Break-Up Fee shall apply to such Partial Consent Assets, as appropriately apportioned as compared to all of the Subject Aircraft based on the Reserve Amount of the applicable Partial Consent Assets.

### 5.  No Qualified Bids

As the Debtors have entered into the Aircraft Sale Agreement with the Stalking Horse Buyer and under these Bidding Procedures, the Stalking Horse Buyer is deemed a Qualified Bidder

and the Stalking Horse Bid as provided via the Aircraft Sale Agreement is deemed a Qualified Bid with respect to the Sale, any Auction, or otherwise. If no Qualified Bids other than the Stalking Horse Bid are received in accordance with these Bidding Procedures, the Debtors shall cancel the Auction.

In such scenario, the Debtors, shall (i) promptly file with the Court a notice of cancellation of the Auction and (ii) designate the Bid of the Stalking Horse Buyer as the Successful Bid for the Subject Aircraft and pursue entry of the order approving a Sale of the Subject Aircraft to the Stalking Horse Buyer pursuant to the Aircraft Sale Agreement.

## IV.   THE AUCTION

### A.   Notice of the Auction

If the Debtors receive one (1) Qualified Bid in addition to the Stalking Horse Bid, the Auction will be held on September 9, 2026 at 10:00 a.m. (prevailing Eastern Time) virtually by Zoom.

On or before September 4, 2026 at 4:00 p.m. (prevailing Eastern Time), Spirit shall provide each Qualified Bidder (including the Stalking Horse Buyer), the Committee, the DIP Lenders, and the EETC Advisors with the following: (i) written notice of the Auction; and (ii) a copy of the Qualified Bid(s) that Spirit has determined constitute(s) the highest or best offer(s) among the Qualified Bids and with which it intends to commence the Auction with respect to the Subject Aircraft (each such Bid, a "**Baseline Bid**").

### B.   Attendance at and Participation in the Auction

The Debtors and their professionals shall direct and preside over the Auction. The Debtors shall maintain a written transcript of the Auction and all Bids made and announced at the Auction, including each Baseline Bid, all applicable Overbids, each the Successful Bid and each Back-Up Bid (each as defined below). The Debtors explicitly reserve the right, in their business judgment, in consultation with the Consultation Parties and the Stalking Horse Buyer's advisors, to exercise their discretion in conducting the Auction, including determining whether to adjourn the Auction to facilitate separate discussions between any Qualified Bidders and the Debtors, as applicable.

In addition to the Debtors and their advisors, the only parties eligible to participate in the Auction shall be: (i) the Stalking Horse Buyer and its representatives and advisors; (ii) representatives and advisors of the Committee; (iii) representatives and advisors of the DIP Lenders; (iv) representatives and advisors of the EETC Advisors, (v) those Qualified Bidders who have submitted a Qualified Bid to Spirit (as well as such Qualified Bidder's advisors and representatives); and (vi) the United States Trustee for the Southern District of New York. In addition, each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the Sale.

C.      **The Auction Process**

The Auction shall be governed by the following procedures, subject to the Debtors' right to modify such procedures in their reasonable business judgment (in consultation with the Consultation Parties and the Stalking Horse Buyer's advisors):

(i)     Spirit and its professionals shall direct and preside over the Auction;

(ii)    at the commencement of the Auction, Spirit shall announce and describe the terms of each Baseline Bid, as determined by Spirit;

(iii)   only the Stalking Horse Buyer and the Qualified Bidders shall be entitled to make any subsequent bids at the Auction;

(iv)    bidding shall commence at the amount of the Baseline Bid plus a minimum Overbid increment of $500,000 per Subject Aircraft included in such bid and shall continue with successive bids in minimum increments of $250,000 per Subject Aircraft included in such bid over the immediately preceding bid (each such bid, an "**Overbid**"); *provided*, *however*, that Spirit shall retain the right to modify the bid increment requirements at the Auction;

(v)     after the first round of bidding and between each subsequent round of bidding, the Debtors, after consultation with the Consultation Parties and the Stalking Horse Buyer's advisors, shall announce the bid that they believe in their reasonable business judgment to be the highest or otherwise best offer for the Subject Aircraft (the "**Leading Bid**") and describe the material terms thereof. Each round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a subsequent bid with full knowledge of the Leading Bid. The Stalking Horse Buyer is not deemed to waive the Break-Up Fee or the Expense Reimbursement by Overbidding at the Auction. If the Stalking Horse Buyer Overbids at the Auction, a "credit" for the amount of the Break-Up Fee and the Expense Reimbursement will automatically be added to such Overbid amount;

(vi)    all Qualified Bidders shall have the right to submit additional Overbids and make additional modifications to the Aircraft Sale Agreement at the Auction, *provided* that each such Overbid must be made within a reasonable period of time, as determined by Spirit, following the announcement of the immediately preceding Overbid; and

(vii)   for the avoidance of doubt, at the Auction, Spirit is permitted to consider Qualified Bids and Overbids for a portion of the Subject Aircraft in combination with other such Qualified Bids and Overbids, and may accept multiple such Qualified Bids or Overbids that, in sum, result in the purchase of all or a portion of the Subject Aircraft.

### V.    IDENTIFICATION OF THE SUCCESSFUL BIDDER AND ACCEPTANCE OF SUCCESSFUL BID

### A.    Identification of Each Successful Bidder and Each Back-Up Bidder

At the close of the Auction, Spirit shall evaluate all Qualified Bids and identify the Qualified Bids that are, in Spirit's business judgment, in consultation with the Committee, the DIP Lenders, the Stalking Horse Buyer, and the EETC Advisors, alone or in combination with other Qualified Bids, (i) the highest or best bid(s) (each, a "**Successful Bid**," and each such bidder, a "**Successful Bidder**") and (ii) the next highest or best bids (each, a "**Back-Up Bid**," and each such bidder, a "**Back-Up Bidder**"), all of which will be determined by considering, among other things:

(viii)    the number, type and nature of any changes to the Aircraft Sale Agreement requested by each Qualified Bidder and whether such Qualified Bid is on substantially different terms than those set forth in the Aircraft Sale Agreement; it being understood that certain modifications (including those that (a) increase the certainty of closing without delay; (b) increase certainty with respect to liquidated damages for a buyer breach; or (c) if such Qualified Bid is for a portion of the Subject Aircraft as permitted by these Bidding Procedures, result in such Qualified Bid combining with one (1) or more other such Qualified Bids to maximize value), may be viewed as improving the value of a Bid;

(ix)    the extent to which any requested modifications to the Aircraft Sale Agreement are likely to delay the closing, and the likely cost to Spirit of any such modifications or delay;

(x)    the total consideration to be received by Spirit under the terms of each Qualified Bid;

(xi)    each Qualified Bidder's ability to timely close a transaction and make any deferred payments, if applicable; and

(xii)    the net benefit to Spirit's estate (taking into account, among other things, the requirement that Spirit is obligated to pay the Stalking Horse Buyer the amount of the Break-Up Fee if a Qualifying Break-Up Fee Event occurs, and the requirement that Spirit is obligated to pay the Expense Reimbursement if a Qualifying Break-Up Fee Event occurs) and the likely timing and amount of distributions to creditors resulting from each Bid;

*provided*, that in determining the highest or otherwise best Qualified Bid or Qualified Bids, Spirit shall only be permitted to select a Qualified Bid or combination of Qualified Bids that pays an amount in cash sufficient to (a) reimburse the subordination agent and each trustee, each liquidity provider, and each applicable Series 2015-1 Certificateholder, Series 2017-1A Certificateholder and Series 2017-1AA Certificateholder for fees, expenses, and other similar amounts owed under the applicable EETC Intercreditor Agreement(s) (including fees and expenses of the EETC Advisors, but for the avoidance of doubt, not including any premium, makewhole, or other similar amounts); (b) pay in full in accordance with the provisions of the EETC Intercreditor Agreements

12

the remaining outstanding balances of the Series 2015-1 Certificates, Series 2017-1A Certificates and Series 2017-1AA Certificates, together with any accrued and outstanding interest thereon to the date of payment but for the avoidance of doubt, not including any premium, makewhole, or other similar amounts; and (c) reimburse all out-of-pocket costs and expenses incurred by the Stalking Horse Buyer and the SuperB Noteholders (the "**SuperB Costs**"), including, without limitation, in connection with the storage, maintenance, test flight, navigation, landing, ferry flights, shipping, transportation, fuel, recovery (whether or not successful), preservation, reconfiguration, modification, refurbishment, overhaul and repair expenses related to Subject Aircraft, including all expenses incurred relating to removal, installation, preservation, overhaul and repair of engines and APUs, hazmat handling, fuel offload, environmental compliance and disposal, and which includes the fees and expenses of technical and other consultants engaged in connection thereto and of independent technicians, inspectors, engineers and other experts retained for any of the foregoing purposes or generally in connection thereto, including, without limitation, the payment of any existing invoices, fees, expenses, or other costs related to the Subject Aircraft as set forth in the Aircraft Purchase Agreement, including, without limitation, Section 10.10 thereof and certain outstanding claims of Lufthansa Technik AG with respect to ESN 18678.[4]

In announcing each Successful Bid and each Back-Up Bid, Spirit shall announce the material terms of each such Bid, the basis for determining the total consideration offered and the resulting calculated benefit of each such Bid to Spirit's estate. After announcing each Successful Bidder and each Back-Up Bidder and after each Successful Bidder has submitted a fully executed Aircraft Sale Agreement memorializing the terms of their Successful Bid, Spirit shall declare the Auction closed.

If no Auction is held, then the Bid of the Stalking Horse Buyer as represented by the Aircraft Sale Agreement shall be deemed to be the Successful Bid and the Stalking Horse Buyer shall be deemed to be the Successful Bidder and Spirit will proceed to effectuate the Sale as set forth in the Aircraft Sale Agreement.

**B.      Acceptance of Bid from Successful Bidder**

Each Successful Bidder shall, within one (1) business day after the conclusion of the Auction, submit to the Debtors fully executed revised documentation memorializing the terms of their Successful Bid. A Successful Bid may not be assigned to any party without the consent of the Debtors.

As soon as reasonably practicable after closing the Auction, and in any event not less than one (1) business day following closing of the Auction, the Debtors shall cause a notice of each Successful Bid and each Successful Bidder to be filed with the Court, identifying each Successful Bidder, the Subject Aircraft to be purchased in the Sale, and the key terms of the relevant agreements.

---

[4]    For the benefit of transparency for all Potential Bidders, the SuperB Costs are estimated to be approximately $25 million in the aggregate, although the exact amount may vary slightly based on downward or upward adjustments for actual costs incurred in connection with the Sale.

13

If, and solely to the extent that, the Stalking Horse Buyer shall become entitled to the Break-Up Fee, the Expense Reimbursement, or both pursuant to the Aircraft Sale Agreement, Spirit shall pay the Break-Up Fee, the Expense Reimbursement, or both in accordance therewith *provided, however*, and notwithstanding the foregoing, any Break-Up Fee or Expense Reimbursement owed to the Stalking Horse Buyer under the Aircraft Sale Agreement shall be paid solely from the proceeds of the Sale(s) and not from any other source, including any cash on the Debtors' balance sheet that constitutes collateral of the DIP Lenders.

## C.      Sale Hearing

Spirit shall be bound by the Successful Bid only when such Bid has been approved by the Court at the Sale Hearing.

The hearing (the "**Sale Hearing**") on whether to grant the relief sought in the Sale Motion shall be held on September 16, 2026 at 11:00 a.m. (prevailing Eastern Time) or as soon thereafter as counsel may be heard, and may be adjourned from time to time without further notice other than an announcement in open court at the Sale Hearing.

At the Sale Hearing, if no other Qualified Bid was received, Spirit will seek entry of an order, *inter alia*, authorizing and approving the Sale of the Subject Aircraft to the Stalking Horse Buyer pursuant to the terms and conditions set forth in the Aircraft Sale Agreement, or, if a Qualified Bid other than the Bid of the Stalking Horse Buyer as set forth in the Aircraft Sale Agreement was identified as the Successful Bid at the Auction, to the Successful Bidder pursuant to the form of the purchase and sale agreement agreed to by Spirit with such Successful Bidder.

## VI.      BACK-UP BIDDER AND BACK-UP BID

The Back-Up Bidder will be required to keep the Back-Up Bid open, binding and irrevocable until the closing of the Sale. In the event that the Stalking Horse Buyer is the Back-Up Bidder, as provided in the Aircraft Sale Agreement, if, Spirit gives notice to the Stalking Horse Buyer on or before the date that is thirty (30) days following the entry of the Sale Approval Order stating that Spirit (A) failed to consummate the Sale with the Successful Bidder, and (B) has terminated the purchase agreement with the Successful Bidder, the Stalking Horse Buyer shall promptly consummate the transactions upon the terms and conditions as set forth in the Aircraft Sale Agreement, including the aggregate Purchase Price for the Subject Aircraft, as the same may be increased by the Stalking Horse Buyer at the Auction.

If for any reason the Successful Bidder fails to consummate the purchase of the Subject Aircraft within the time permitted in the Aircraft Sale Agreement, the Back-Up Bidder will automatically be deemed to have submitted the highest or otherwise best Bid and Spirit will be authorized, but not required, to consummate the Sale with the Back-Up Bidder without further order of the Court. At the Sale Hearing, Spirit will seek approval to sell the Subject Aircraft to the Back-Up Bidder on the terms of the Back-Up Bid without further notice or order of the Court.

If the failure to consummate the Sale with a Successful Bidder is the result of a breach by such Bidder, Spirit specifically reserves the right to seek damages from such Successful Bidder and its Sponsors and other Bid participants, if any.

14

Upon the closing of any Sale, the proceeds of such Sale shall be applied in accordance with, as applicable, that certain Intercreditor Agreement (2015-1) dated as of August 11, 2015 among Wilmington Trust, National Association a Trustee of the Spirit Airlines Pass Through Trust 2015-1A and Spirit Airlines Pass Through Trust 2015-1B, Natixis, acting via its New York Branch as Class A Liquidity Provider and Class B Liquidity Provider, and Wilmington Trust, National Association, as Subordination Agent (as amended, supplemented, amended and restated, or otherwise modified from time to time prior to the date hereof) (the "**2015-1 Intercreditor Agreement**") or that certain Intercreditor Agreement (2017-1), dated as of November 28, 2017 among Wilmington Trust, National Association a Trustee of the Spirit Airlines Pass Through Trust 2017-1AA, Spirit Airlines Pass Through trust 2017-1A, and Spirit Airlines Pass Through Trust 2017-1B, Commonwealth Bank of Australia, New York Branch as Class AA Liquidity Provider, Class A Liquidity Provider and Class B Liquidity Provider, and Wilmington Trust, National Association, as Subordination Agent (as amended, supplemented, amended and restated, or otherwise modified from time to time prior to the date hereof) (the "**2017-1 Intercreditor Agreement**," and together with the 2015-1 Intercreditor Agreement, the "**EETC Intercreditor Agreements**"); *provided* payment of any Break-Up Fee or Expense Reimbursement shall be subordinated to payment in cash in full of the Senior Certificates (and all other amounts contemplated by the definition of Reserve Amount).

## VII.    TREATMENT OF GOOD FAITH DEPOSIT

Each Good Faith Deposit shall be held by Spirit and will be forfeited to Spirit and constitute cash collateral for the EETC Debt if (a) the applicable Qualified Bidder attempts to modify, amend or withdraw its Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of the Bid for Spirit, during the time the Bid remains binding and irrevocable under these Bidding Procedures, or (b) the Qualified Bidder is selected as a Successful Bidder or a Back-Up Bidder (except where Spirit determines not to consummate the Sale with a Back-Up Bidder) and fails to consummate the purchase of the Subject Aircraft according to these Bidding Procedures. Spirit shall promptly return to any applicable Qualified Bidder any Good Faith Deposit accompanying (a) a Bid that Spirit determines not to be a Qualified Bid; (b) any Qualified Bid that Spirit does not select as a Successful Bid or a Back-Up Bid at the Auction; and (c) any Back-Up Bid, upon the closing of the Sale with each Successful Bidder.

## VIII.    RESERVATION OF RIGHTS; DEADLINE EXTENSION

The Debtors reserve their rights, including in the exercise of their fiduciary duties or obligations, to modify these Bidding Procedures, in their reasonable business judgment, in consultation with the Consultation Parties and with the consent of the Stalking Horse Buyer, such consent not to be unreasonably withheld, in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, if any, additional customary terms and conditions on the Sale of the Subject Aircraft, including, without limitation, (i) extending the deadlines set forth in these Bidding Procedures; (ii) cancelling the Auction; (iii) adjourning the Auction, including at the Auction; (iv) adjourning the Sale Hearing, including in open court, without further notice other than an announcement in open court at the Sale Hearing; (v) withdrawing from the Auction any or all of the Subject Aircraft at any time prior to or during the Auction; (vi) modifying the Bidding Procedures, including, without limitation, by adding

15

procedural rules or methods of bidding that are reasonably necessary or advisable under the circumstances for the Auction, including with respect to the portion of the Subject Aircraft that are permitted to be subject to any Bid, or modifying bidding increments; or (vii) rejecting any or all Bids, including any Qualified Bids if, in Spirit's business judgment, no such bid is for a fair and adequate price.

## IX.    CONSULTATION BY THE DEBTORS

The Debtors shall consult with the Consultation Parties or the Stalking Horse Buyer's advisors as explicitly provided for in these Bidding Procedures. Each reference in these Bidding Procedures to "consultation" (or similar phrase) with the Consultation Parties or the Stalking Horse Buyer's advisors shall mean consultation in good faith. Additionally, the Debtors shall consult with the Consultation Parties and the Stalking Horse Buyer's advisors in good faith regarding the Sale process for the Subject Aircraft, their decision-making on the matters provided in these Bidding Procedures and provide to the Consultation Parties and the Stalking Horse Buyer's advisors prompt reports concerning the Sale process on a recurring basis, including parties contacted, copies of letters of intent, drafts of material definitive agreements received from or provided to Potential Bidders, updates regarding material changes to purchase proposals, and any diligence and other information reasonably requested by the Consultation Parties or the Stalking Horse Buyer's advisors, subject to the terms of their confidentiality agreements or arrangements with the Debtors.

## X.    FIDUCIARY OUT

Nothing in these Bidding Procedures or any document filed with or entered by the Court in connection therewith shall restrain the board of directors, board of managers, or such similar governing body (including any special committee thereof) of any of the Debtors from taking any action or refraining from taking any action to the extent that such board of directors, board of managers, or such similar governing body (including any special committee thereof) determines, based on the written advice of counsel, that taking such action, or refraining from taking such action, as applicable, is required to comply with applicable law or its fiduciary obligations under applicable law.

Further, notwithstanding anything to the contrary in these Bidding Procedures, the Bidding Procedures Order, or any document filed with or entered by the Court in connection therewith, through the date of the Auction (if held), nothing in these Bidding Procedures or the Bidding Procedures Order shall diminish the right of the Debtors and their respective directors, officers, managers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives to: (a) consider, respond to, and facilitate alternate proposals for sales or other transactions involving any or all of the Subject Aircraft (each, an "**Alternate Proposal**"); (b) provide access to nonpublic information concerning the Debtors to any entity or enter into confidentiality agreements or nondisclosure agreements with any entity with respect to Alternate Proposals; (c) maintain or continue discussions or negotiations with respect to Alternate Proposals; (d) otherwise cooperate with, assist, participate in, or facilitate any inquiries, proposals, discussions, or negotiations of Alternate Proposals; or (e) enter into or continue discussions or negotiations with any person or entity regarding any Alternate Proposal.

16

Dated:   July [●], 2026
           New York, NY

                                          DEBEVOISE & PLIMPTON LLP

                                          /s/
                                          _____
                                          Jasmine Ball
                                          Elie J. Worenklein
                                          66 Hudson Boulevard East
                                          New York, NY 10001
                                          Tel.: (212) 909-6000
                                          jball@debevoise.com
                                          eworenklein@debevoise.com

                                          *Fleet Counsel to the Debtors and Debtors in
                                          Possession*

**Exhibit 2** to **Exhibit A**

**Form of Aircraft Sale Agreement**

# AIRCRAFT SALE AND PURCHASE AGREEMENT (SPIRIT-EETC 2026)

dated as of [_____], 2026

between

**SPIRIT AIRLINES, LLC**
as Seller

and

**SAVE 2026-B LLC**
as Buyer

27 Used Airbus A320 and A321 Aircraft

Aircraft SPA (SPIRIT-EETC 2026)

TABLE OF CONTENTS

**Page**

1. **Definitions & Interpretation**. ............................................................... 2
  1.1   Definitions........................................................................................ 2
  1.2   Interpretation.................................................................................... 8

2. **Agreements to Sell and Purchase**. .................................................... 9
  2.1   Sale and Purchase. ........................................................................ 9
  2.2   Deposit; Purchase Price. ................................................................ 9
  2.3   Payments. ...................................................................................... 10
  2.4   [Reserved]. .................................................................................... 10
  2.5   Removal of Excluded Equipment. ................................................. 11
  2.6   Assignment of Warranties............................................................. 11

3. **Delivery of Aircraft**. ............................................................................ 11
  3.1   Delivery Condition......................................................................... 11
  3.2   Delivery Location. ......................................................................... 11
  3.3   Delivery.......................................................................................... 11

4. **Conditions Precedent**. ....................................................................... 12
  4.1   Conditions Precedent. .................................................................. 12
  4.2   No Financing or Other Contingencies. ......................................... 13

5. **Bankruptcy Provisions**. ...................................................................... 13
  5.1   Court Approvals............................................................................. 13
  5.2   Court Filings. ................................................................................. 13
  5.3   Buyer Assistance........................................................................... 14
  5.4   Competing Bids. ............................................................................ 14
  5.5   Back-up Bidder. ............................................................................. 15
  5.6   Break-Up Fee and Reimbursement. ............................................. 15
  5.7   Bankruptcy Termination Events. ................................................... 15

6. **Termination**. ....................................................................................... 16
  6.1   Total Loss before Delivery. ........................................................... 16
  6.2   Aircraft Non-Sale Event. ............................................................... 16
  6.3   Default Provisions.......................................................................... 16
  6.4   Effect of Termination..................................................................... 17

7. **Representations and Warranties; Disclaimers and Waivers**. ............ 18
  7.1   Seller Representations and Warranties ......................................... 18
  7.2   Buyer Representations and Warranties.......................................... 19
  7.3   Disclaimers ................................................................................... 20

i

7.4    Waivers ................................................................................................ 21

8.    **Insurance**. ................................................................................................ 21

8.1    Insurances ........................................................................................... 21
8.2    Certificates, Etc. ................................................................................. 22

9.    **Transfer Taxes**. ....................................................................................... 22

9.1    Diligence. ............................................................................................ 22
9.2    Tax Indemnity. .................................................................................... 23
9.3    Cooperation. ........................................................................................ 23
9.4    Procedures, Etc. .................................................................................. 23

10.   **Miscellaneous**. ......................................................................................... 24

10.1    Entire Agreement, Amendment, Installment Contract; Time is of the
Essence. 24
10.2    [Reserved]. .......................................................................................... 24
10.3    Non-Waiver. ........................................................................................ 24
10.4    Severability. ........................................................................................ 25
10.5    Notices. ............................................................................................... 25
10.6    Governing Law & Jurisdiction. ......................................................... 26
10.7    Waiver of Jury Trial. .......................................................................... 26
10.8    Further Assurances. ............................................................................ 26
10.9    Counterparts. ....................................................................................... 27
10.10   Transaction Costs. .............................................................................. 27
10.11   Assignment, Successors and Assigns. ................................................ 27
10.12   [Reserved]. .......................................................................................... 27
10.13   Third-party Beneficiaries. .................................................................. 27
10.14   Limitation of Liability. ....................................................................... 27
10.15   Force Majeure. .................................................................................... 27
10.16   Publicity ............................................................................................. 28
10.17   Relationship of the Parties. ................................................................ 28
10.18   Brokers and other Third Parties. ........................................................ 28

EXHIBITS

Exhibit A      Description of Aircraft
Exhibit B      Delivery Condition
Exhibit C      List of Excluded Equipment
Exhibit D      [Reserved]
Exhibit E      Form of Aircraft Acceptance Certificate
Exhibit F      Form of Warranty Bill of Sale
Exhibit G      [Reserved]
Exhibit H      Form of Compliance Certification Statement

Aircraft SPA (SPIRIT-EETC 2026)

## AIRCRAFT SALE AND PURCHASE AGREEMENT
## (SPIRIT-EETC 2026)

This AIRCRAFT SALE AND PURCHASE AGREEMENT (SPIRIT-EETC 2026) (the "**Agreement**") is entered into as of [_____], 2026 by and between SPIRIT AIRLINES, LLC, a Delaware limited liability company (hereinafter referred to as "**Seller**") and SAVE 2026-B LLC, a limited liability company (hereinafter referred to as "**Buyer**") (Seller and Buyer are each a "**Party**" and, collectively, the "**Parties**").

RECITALS

WHEREAS, Seller owns 27 Airbus model A320 aircraft and Airbus model A321 aircraft (each, as described more fully on Exhibit A, but excluding Excluded Equipment, together with all documents and available records pertaining thereto in Seller's possession and set forth on Schedule 1 to Exhibit B (the "**Records**"), an "**Aircraft**" and, collectively, the "**Aircraft**");

WHEREAS, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, such Aircraft, in each case upon and subject to the terms and conditions of this Agreement;

WHEREAS, Seller and its affiliates commenced cases as debtors under the Bankruptcy Code on August 29, 2025 (the "**Chapter 11 Case**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") and are authorized to manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, on May 2, 2026, Seller announced that it ceased all operations and will be conducting an orderly wind-down and liquidation of its operations;

WHEREAS, Seller will seek the entry of order(s) by the Bankruptcy Court approving the transactions contained herein, subject to a court approved auction process;

WHEREAS, reference is made to the Pass Through Trust Agreement (the "**Pass Through Trust Agreement**"), dated as of August 11, 2015, by and between Spirit Airlines, LLC (formerly known as Spirit Airlines, Inc.) and Wilmington Trust National Association, ("**WTNA**") as Trustee, as supplemented by (a) the Trust Supplement No. 2015-1A (together with the Pass Through Trust Agreement, the "**2015 A Trust Agreement**"), dated as of August 11, 2015, by and between Spirit and WTNA, as Trustee (in such capacity, the "**2015 A Trustee**"), (b) the Pass Through Trust Agreement, as supplemented by the Trust Supplement No. 2017-1AA dated as of November 28, 2017 (together with the Pass Through Trust Agreement, the "**2017 AA Trust Agreement**"), (c) Pass Through Trust Agreement, as supplemented by the Trust Supplement No. 2017-1A dated as of November 28, 2017 (together with the Pass Through Trust Agreement, the "**2017 A Trust Agreement**", and

together with the 2015 A Trust Agreement and 2017 AA Trust Agreement, the "**Senior Trust Agreements**", the Trustee thereunder, the "**Senior Trustee**" and the Class A Certificateholders and Class AA Certificateholders thereunder, collectively the "**Senior Certificateholders**") and (d) the Trust Supplement No. 2025-1B(R) (together with the Pass Through Trust Agreement, the "**B(R) Trust Agreement**"), dated as of March 27, 2025, by and between Spirit and WTNA, as Trustee (in such capacity, the "**B(R) Trustee**").

WHEREAS, the Parties now desire to enter into this Agreement, provided that consummation of the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Approval Order under, *inter alia*, Section 363 of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, the receipt and sufficiency of which are conclusively acknowledged, the Parties hereto agree as follows:

1. **Definitions & Interpretation**.

1.1     **Definitions.**   In addition to the capitalized terms defined elsewhere herein, the following capitalized terms used herein and not otherwise defined shall have the following respective meanings for all purposes of this Agreement.

"**Affiliate**" means a Person or an entity that directly or indirectly controls, is controlled by, or is under common control with, another Person or entity, including, among the others, executive officers, directors, large stockholders, subsidiaries, parent entities and sister companies.

"**Agreement**" has the meaning given to it in the preamble.

"**Aircraft**" has the meaning given to it in the recitals.

"**Aircraft Acceptance Certificate**" means, with respect to an Aircraft, an aircraft acceptance certificate for such Aircraft substantially in the form provided in Exhibit E and executed by Buyer (or Buyer Nominee, as applicable, on behalf of Buyer and on its own behalf).

"**Aircraft Non-Sale Event**" means, with respect to any Aircraft, if Delivery of such Aircraft has not occurred on or prior to the Delivery Window Deadline for such Aircraft.

"**Aircraft Specific Deposit**" has the meaning given to it in Section 2.2.

"**Airframe**" means, with respect to each Aircraft, the related airframe (excluding the associated Engines) listed on Exhibit A. For the avoidance of doubt, the term "Airframe" does not include Records.

2

"**AMM**" means Seller's Customized Airline Aircraft Maintenance Manual.

"**Applicable Reserve Amount**" means, for an Aircraft, the amount specified for such Aircraft in the column entitled "Reserve Amount" on Exhibit A hereto; provided that, in no event will the Applicable Reserve Amount for any Aircraft be less than a pro rata allocation of the Minimum Bid Amount for such Aircraft.

"**Bankruptcy Code**" means the United States Bankruptcy Code, 11 United States Code §§ 101 *et seq.*, as amended.

"**Bankruptcy Court**" has the meaning given to it in the recitals.

"**Bankruptcy Court Orders**" has the meaning given to it in Section 5.1.

"**Bidding Procedures Order**" has the meaning given to it in Section 5.1.

"**Bill of Sale**" means, with respect to an Aircraft, a warranty bill of sale for such Aircraft substantially in the form of Exhibit F hereto.

"**Break-Up Fee**" has the meaning given to it in Section 5.6.

"**Business Day**" means a day other than a Saturday or Sunday on which the banks in New York City, New York, USA are open for the transaction of business of the type required by this Agreement.

"**Buyer**" has the meaning given to it in the preamble.

"**Buyer's Default**" means the occurrence of one or more of the following events:

(i)     with respect to any Aircraft, Buyer's (or Buyer Nominee's, as applicable) failure to accept the Delivery of such Aircraft when required to do so in accordance with all applicable terms and conditions of this Agreement (including, without limitation, failure by Buyer to accept the Bill of Sale for such Aircraft in connection with such Delivery when required to do so in accordance with all applicable terms and conditions of this Agreement) and failure to cure such default within ten (10) Business Days of Seller's written notice to Buyer;

(ii)     with respect to any Aircraft, any of the conditions precedent within the control of Buyer is not satisfied (or waived by Seller in its sole and absolute discretion) by the Delivery Window Deadline for such Aircraft and such failure is not solely due to or arising from a breach by Seller of its obligations under this Agreement and failure to cure such default within ten (10) Business Days of Seller's written notice to Buyer; or

3

Aircraft SPA (SPIRIT-EETC 2026)

(iii)   (A) any failure by Buyer to observe or perform any of its other material obligations under this Agreement if such failure continues for fifteen (15) days after Seller has delivered a written notice thereof to Buyer (provided that if the same is curable but is not capable of being cured within such 15-day period, subject to Buyer having commenced good faith efforts to cure the same, the material breach has thereafter not been cured within 45 days following receipt of Seller's written notice), or (B) the occurrence of a default by Buyer described in the foregoing clauses (i) or (ii) with respect to two or more Aircraft.

"**Buyer's Liens**" has the meaning given to it in Section 2.1(b).

"**Buyer Nominee**" means, with respect to any Aircraft, any Person designated by Buyer pursuant to Section 10.19 to accept delivery of, and acquire title to, such Aircraft in lieu of Buyer; provided that no such designation shall relieve Buyer of, or otherwise affect, any of Buyer's obligations or any of Seller's rights under this Agreement, and Buyer shall remain fully liable for the due and punctual performance of all such obligations notwithstanding any such designation.

"**Cape Town Agreements**" means the Cape Town Convention, as supplemented by the Cape Town Aircraft Protocol (in each case, the English language version).

"**Cape Town Aircraft Protocol**" means The Protocol on International Interests in Mobile Equipment, concluded in Cape Town, South Africa, on November 16, 2001 (the English language version).

"**Cape Town Convention**" means The Convention on International Interests in Mobile Equipment, concluded in Cape Town, South Africa, on November 16, 2001 (the English language version).

"**Civil Aviation Registry**" means the registry of aircraft maintained by the FAA.

"**Competing Bid**" has the meaning given to it in Section 5.4.

"**Credit Bid Amount**" means 90% of the outstanding principal amount of secured debt held by Buyer (or held by or on behalf of the beneficial owners of the Buyer) *plus* all accrued and outstanding interest thereon and any other amounts or obligations owed by Seller in connection therewith, in respect of all Aircraft which shall be part of the Purchase Price pursuant to section 363(k) of the Bankruptcy Code.

"**Delivery**" means, with respect to each Aircraft, delivery and consummation of the sale of such Aircraft pursuant to the terms of this Agreement.

"**Delivery Condition**" means, with respect to an Aircraft, the condition of such Aircraft at Delivery as provided in Section 3.1 and Exhibit B.

4

"**Delivery Date**" means, with respect to an Aircraft, the actual date on which Delivery of such Aircraft occurs.

"**Delivery Location**" has the meaning given to such term in Section 3.2.

"**Delivery Window Deadline**" shall mean September 30, 2026.

"**Dollars**", "**$**" and "**US$**" mean the lawful currency of the United States.

"**Engine**" means, with respect to an Aircraft, any one of the two aircraft engines associated with the "AC Type" of such Aircraft that are listed on Schedule 1 to Exhibit A, as selected by Seller to be associated with such Aircraft for purposes of this Agreement and the Transaction Documents for such Aircraft[, subject to any grouping of the Airframes and Engines pursuant to the Bankruptcy Court Orders (as defined below)].

"**Escrow Agent**" means McAfee & Taft, a Professional Corporation, or such other escrow agent as agreed between the Parties.

"**Excluded Equipment**" means the list of components, parts, systems and equipment solely as listed on in Exhibit C, which includes, solely to the extent set forth on such Exhibit C, the following: (a) defibrillators, enhanced emergency medical kits and other medical equipment, (b) components or systems installed on or affixed to the related airframe that are used to provide individual telecommunications, Wi-Fi and/or satellite connectivity or electronic entertainment or services to passengers aboard the Aircraft, (c) branded galley carts, beverage carts, liquor kits, food tray carriers, ice containers, oven inserts, galley inserts (other than any non-branded electrical equipment in the galley), and other branded passenger convenience or service items and (d) cargo containers.  Excluded Equipment shall not include any property abandoned pursuant to Section 2.5.

"**FAA**" means the United States Federal Aviation Administration.

"**FAA Bill of Sale**" means, with respect to an Aircraft (or, as applicable, an Airframe), an FAA Form AC 8050-2 aircraft bill of sale (or any successor form thereto established and accepted by the FAA).

"**FAA Counsel**" means the law firm of McAfee & Taft, a Professional Corporation, or such other law firm as agreed between the Parties.

"**FAA Registration Application**" means, with respect to an Aircraft (or, as applicable, an Airframe), an FAA Form AC 8050-1 aircraft registration application document (or any successor form thereto established and accepted by the FAA) required to register the Aircraft (or, as applicable, the Airframe) for operation within the United States.

5

Aircraft SPA (SPIRIT-EETC 2026)

"**Final Order**" shall mean an order or judgment of the Bankruptcy Court or other court of competent jurisdiction, as entered on its docket, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari or move for reargument, rehearing or a new trial has expired and no appeal, petition for certiorari or motion for reargument, rehearing or a new trial, respectively, has been timely filed.

"**Force Majeure**" has the meaning given to it in Section 10.15.

"**Government Entity**" means the United States government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to any such government.

"**Initial Deposit Amount**" has the meaning given to it in Section 2.2.

"**Insurance Period**" has the meaning given to it in Section 8.1.

"**Intercreditor Agreement**" means (x) the Amended and Restated Intercreditor Agreement dated as of March 31, 2025, between Wilmington Trust, National Association, not in its individual capacity but solely as the 2017-1 Subordination Agent and the pass through trustees for Series 2017-1 and the liquidity providers party thereto (the "**2017-1 Intercreditor Amendment**") and (y) the Amended and Restated Intercreditor Agreement dated as of March 31, 2025, between Wilmington Trust, National Association, not in its individual capacity but solely as the 2015-1 Subordination Agent and the pass through trustees for Series 2015-1 and the liquidity providers party thereto (the "**2015-1 Intercreditor Amendment**" and, together with the 2017-1 Intercreditor Agreement, the "**Intercreditor Agreements**").

"**International Interests**" has the meaning ascribed to the term "international interests" under the Cape Town Agreements.

"**International Registry**" has the meaning ascribed to the term "international registry" under the Cape Town Agreements.

"**Law**" means any (a) Law, statute, decree, constitution, regulation, order or directive of any Government Entity, (b) treaty, pact, compact or other agreement to which any Government Entity is a signatory or party, (c) judicial or administrative interpretation or application of any of the foregoing or (d) any binding judicial precedent having the force of Law in any Government Entity.

"**Lien**" means any lien, security interest, lease, mortgage, pledge, International Interest on the International Registry (but not any contract of sale registration on the International Registry), title retention or other charge or encumbrance or claim or interest or right of others or agreement the effect of which is the creation of security, including,

6

without limitation, rights of others under the Aircraft, Airframe, or Engine, or parts thereof, interchange, loan, or lease agreement.

"**Minimum Bid Amount**" means an amount in cash sufficient to (a) reimburse the Subordination Agent (as defined in the Intercreditor Agreements), the Senior Trustee,  the B(R) Trustee, each Liquidity Provider (each as defined in the Intercreditor Agreements) and any Senior Certificateholder for fees, expenses, and other similar amounts (including principal and interest due to the Liquidity Providers) owed under the Intercreditor Agreements and (b) pay in full in accordance with the provisions of the Intercreditor Agreements the remaining outstanding balances of the certificates held by all Senior Certificateholders, together with any accrued and outstanding interest thereon to the date of payment.  For the avoidance of doubt, the Minimum Bid Amount shall not include any premium, makewhole, or other similar amount.

"**Party**" or "**Parties**" has the meaning given to it in the preamble.

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, company, firm, trust, organization, government, or any agency or political subdivision thereof or any other entity, whether or not having a separate legal personality.

"**Plan Effective Date**" has the meaning given to it in Section 10.6(b).

"**Purchase Price**" means the sum of the Minimum Bid Amount *plus* the Credit Bid Amount.

"**Qualifying Break-Up Fee Event**" has the meaning given to it in Section 5.6.

"**Records**" has the meaning given to it in the recitals.

"**Sale Approval Order**" has the meaning given to it in Section 5.1.

"**Sale Motion**" has the meaning given to it in Section 5.1.

"**Seller**" has the meaning given to it in the preamble.

"**Seller Cancellation Event**" has the meaning given to it in Section 5.7(e).

"**Seller's Default**" means the occurrence of one or more of the following events:

> (i)     with respect to any Aircraft, Seller's failure to consummate the Delivery of such Aircraft when required to do so in accordance with all applicable terms and conditions of this Agreement, and failure to cure such default within five (5) Business Days of Buyer's written notice to Seller;

7

(ii)     with respect to any Aircraft, any of the conditions precedent within the control of Seller is not satisfied (or waived by Buyer in its sole and absolute discretion) by the Delivery Window Deadline for such Aircraft and such failure is not due to or arising from a breach by Buyer of its obligations under this Agreement, and failure to cure such default within five (5) Business Days of Buyer's written notice to Seller; or

(iii)    (A) any failure by Seller to observe or perform any of its other material obligations under this Agreement if such failure continues for fifteen (15) days after Buyer has delivered a written notice thereof to Seller (provided that if the same is curable but is not capable of being cured within such 15-day period, subject to Seller having commenced good faith efforts to cure the same, the material breach has thereafter not been cured within 45 days following receipt of Buyer's written notice), or (B) the occurrence of a default by Seller described in the foregoing clauses (i) or (ii) with respect to two or more Aircraft.

"**Seller Parent**" has the meaning given to it in Section 5.7(e).

"**Seller Parties**" means Seller, its subsidiaries and parent organizations, and each of its and their directors, officers, shareholders, members, controlling Persons, agents, employees, subsidiaries, Affiliates, successors, assigns and transferees of the foregoing parties (each, a "**Seller Party**").

"**Surviving Provisions**" has the meaning given to it in Section 3.3(b).

"**Total Loss**" means, as applicable, the actual, constructive or arranged total loss of an Aircraft.

"**Transaction Documents**" means, with respect to any Aircraft, this Agreement and the related Bill of Sale, the Aircraft Acceptance Certificate, the FAA Bill of Sale and the FAA Registration Application.

"**Transfer Taxes**" has the meaning given to it in Section 9.2.

1.2    **Interpretation.** All references in this Agreement to Exhibits, Schedules, Sections, paragraphs, subsections, clauses and other subdivisions refer to the corresponding Exhibits, Schedules, Sections, paragraphs, subsections, clauses and other subdivisions of or to this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any Sections, paragraphs, subsections, or other subdivisions of this Agreement are for convenience only, do not constitute any part of this Agreement, and shall be disregarded in construing the language hereof. The words "this Agreement,"

8

"herein," "hereby," "hereunder," and "hereof," and words of similar nature, refer to this Agreement as a whole and not to any particular Section, subsection, or other subdivision unless expressly so limited. The words "this Section," and "this subsection," and words of similar nature, refer only to the Section, or subsection hereof in which such words occur. The word "including" (in its various forms) means "including without limitation". Pronouns in masculine, feminine, or neutral genders shall be construed to state and include any other gender, and words, terms, and titles (including terms defined herein) in the singular form shall be construed to include the plural and vice versa, unless the context otherwise requires. Exhibits, Schedules and Appendices referred to herein are attached hereto. Except as otherwise provided in this Agreement, any reference herein to any Law shall be construed as referring to such Law as amended, modified, codified, or reenacted, in whole or in part, and in effect from time to time, and references to particular provisions of a Law include a reference to the corresponding provisions of any prior or succeeding Law, and any reference herein to a document includes that document as amended from time to time in accordance with its terms, and any document entered into in substitution or replacement therefor. Any reference to an amendment includes a supplement, novation, or re-enactment, and "amended" is to be construed accordingly. The word "extent" in the phrase "to the extent" means the degree to which a subject or other theory extends, and such phrase shall not simply mean "if". Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day. Any reference to any federal, state, local, or foreign Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context shall otherwise require. Reference herein to "federal" shall be construed as referring to U.S. federal.

2.   **Agreements to Sell and Purchase**.

2.1   **Sale and Purchase.**

(a) With respect to the Aircraft, Seller agrees to sell and Buyer agrees to buy the Aircraft, upon and subject to the terms and conditions of this Agreement.

(b)   Upon payment of the Purchase Price in respect of an Aircraft, Seller shall, by execution and delivery to Buyer or Buyer Nominee (as directed by Buyer) of a Bill of Sale, sell to Buyer (or Buyer Nominee, as applicable) outright good and valid title in and to such Aircraft, free and clear of all Liens (other than Liens created by, through or on behalf of Buyer or Buyer Nominee, "**Buyer's Liens**") in accordance with Section 4.1(c). With respect to each Aircraft, concurrently with Seller's delivery to Buyer (or Buyer Nominee, as applicable) of an executed Bill of Sale for such Aircraft, Buyer (or Buyer Nominee, as applicable) shall accept delivery of such Aircraft, and Buyer (or Buyer Nominee, as applicable, on behalf of Buyer and on its own behalf) shall execute and deliver an Aircraft Acceptance Certificate in respect of such Aircraft.

9

Aircraft SPA (SPIRIT-EETC 2026)

2.2     **Deposit; Purchase Price.**

(a)     Contemporaneously with the execution of this Agreement, Buyer shall pay to the Escrow Agent, in immediately available funds, a total amount equal to $42,123,993.60 as a purchase deposit with respect to the Aircraft (the "**Initial Deposit Amount**").   The Initial Deposit Amount shall be allocated in equal installments across the Aircraft, in an amount equal to $1,560,147.91 per Aircraft (each, an "**Aircraft Specific Deposit**").

(b)     The total consideration payable by Buyer to Seller at Delivery for all Aircraft shall be the Purchase Price; *provided* that the Purchase Price may be reduced by the purchase price of the Partial Consent Assets if there is a sale of a Partial Consent Assets pursuant to Section 5.4.

2.3     **Payments.**

(a)     With respect to such Aircraft, at its Delivery, Buyer shall pay Seller the Purchase Price in respect of such Aircraft (net of the Aircraft Specific Deposit for such Aircraft), free and clear of and without any deduction or withholding for or on account of tax.

(b)     Other than the Credit Bid Amount portion of the Purchase Price, payments due under this Agreement to Seller (including payments of Aircraft Specific Deposits by the Escrow Agent to Seller) shall be made in Dollars in immediately available funds to the following account (and/or, in whole or in part, to such other account(s) as Seller may notify to Buyer in writing):

**Bank Name:**
**Account Number:**
**Account Name:**
**Bank Routing Number:**
**SWIFT BIC:**
**ACH Routing #**
**Wire Routing #**
**Address:**
**International Only:**

with payment advice to: treasuryops@spirit.com; ref: Aircraft MSNs [*].

(c)     Prior to finalization of the Purchase Price calculation for all (or any Aircraft), the Seller and Buyer shall obtain an invoice from the Senior Trustee for all amounts payable as contemplated by the definition of Minimum Bid Amount.

Aircraft SPA (SPIRIT-EETC 2026)

2.4    **[Reserved].**

2.5    **Removal of Excluded Equipment.** All Excluded Equipment items listed in Exhibit C shall be removed from the Aircraft and are excluded from being part of the Aircraft at Delivery, whether or not such items are installed in the Aircraft or present at Delivery.  At Seller's option, as advised to Buyer prior to Delivery, (i) Seller shall remove all or part of the Excluded Equipment prior to Delivery, or (ii) Buyer shall remove all or any remaining Excluded Equipment items within seven (7) days following Delivery in accordance with industry, regulatory and manufacturer standards.  If applicable, the Parties shall include the list of outstanding Excluded Equipment to be removed by Buyer on each Aircraft Acceptance Certificate. Buyer shall in no event market or sell any of the Excluded Equipment.  Notwithstanding the foregoing, Seller may, upon delivery of written notice to Buyer, elect to abandon any item of Excluded Equipment, in which case title to the same shall, at Delivery of the Aircraft, transfer to Buyer at no cost or charge to either of Buyer or Seller.

2.6    **Assignment of Warranties.** Seller hereby assigns to Buyer (or Buyer Nominee, as applicable) effective as of each Delivery Date, any and all existing assignable warranties and service life policies, or other rights, remedies or claims against manufacturers, suppliers, vendors and maintenance and overhaul agencies relating to the applicable Aircraft (in the case of rights, remedies or claims, only with respect to rights, remedies or claims arising, or based on events, occurrences and circumstances occurring, on or after the Delivery of the applicable Aircraft).  Seller makes no representation or warranty as to the existence or assignability of any such warranties and rights.

3.    **Delivery of Aircraft**.

3.1    **Delivery Condition**.  Each Aircraft will be delivered in "AS-IS, WHERE-IS" and "WITH ALL FAULTS" condition.

3.2    **Delivery Location.**   The delivery location (the "**Delivery Location**") for each Aircraft shall be as set forth on Schedule 2 to Exhibit B.

3.3    **Delivery**.

(a)    With respect to each Aircraft, upon satisfaction or waiver of the conditions precedent for such Aircraft set forth in Section 4.1, Buyer shall pay the Purchase Price for such Aircraft and shall deliver the Aircraft Acceptance Certificate for such Aircraft to Seller, and Seller shall execute and concurrently deliver to Buyer (or Buyer Nominee, as applicable), the Bill of Sale for such Aircraft, whereupon risk of loss to such Aircraft shall transfer to Buyer (or Buyer Nominee, as applicable) and title to such Aircraft shall transfer to Buyer (or Buyer

11

Nominee, as applicable). To the extent commercially practicable, the Delivery of all Aircraft and payment of the Purchase Price therefor shall occur simultaneously.

(b)     For each Delivery, upon title transfer, neither Buyer nor Seller shall have any further obligation or liability to the other in respect of the applicable Aircraft, and the terms and conditions of this Agreement in respect of such Aircraft shall automatically terminate and have no force and effect except with respect to this subsection, Section 2.5 (Removal of Excluded Equipment), Section 8 (Insurance), Section 9 (Transfer Taxes), Section 10.3 (Non-Waiver), Section 10.6 (Governing Law and Jurisdiction), Section 10.10 (Transaction Costs), Section 10.13 (Third-party Beneficiaries) and Section 10.14 (Limitation of Liability), and in each case of the foregoing any provisions of this Agreement required to give meaning to the aforementioned sections (the "**Surviving Provisions**").

4.     **Conditions Precedent**.

4.1     **Conditions Precedent.**     Buyer's obligation to purchase an Aircraft and Seller's obligation to sell such Aircraft shall be subject to the following conditions; provided that it shall not be a condition precedent to the obligations of one Party that any document be delivered or action be taken that is to be delivered or be taken by the other Party or by a Person within the control of such other Party:

(a)     execution and delivery of the Transaction Documents for such Aircraft;

(b)     the Bankruptcy Court shall have entered the Sale Approval Order approving this Agreement and such order shall not have been stayed, stayed pending appeal, reversed or vacated or materially supplemented in any manner adverse to the parties as of the date of Delivery of such Aircraft and which shall be a Final Order;

(c)     such Aircraft shall be free and clear of the Liens of the Subordination Agent and/or interests of the Subordination Agent or the Seller on the International Registry (which  shall be in the process of being released and discharged) (with the FAA Counsel in advance possession of release instruments and in the process of filing the appropriate releases with the FAA);

(d)     receipt by Seller of the full Purchase Price for such Aircraft;

(e)     receipt by Seller of a duly executed copy from Buyer (or Buyer Nominee, as applicable) of the Aircraft Acceptance Certificate with respect to such Aircraft;

Aircraft SPA (SPIRIT-EETC 2026)

(f)      (1) Buyer shall have delivered to FAA Counsel a completed and executed FAA Registration Application and such other documentation required to register such Aircraft in the United States in the name of Buyer (or Buyer Nominee, as applicable), as owner, to be filed concurrently with the Bill of Sale and/or FAA Bill of Sale; and (2) Buyer shall have taken (or procured that the Buyer Nominee has taken) all actions required of it to cause the sale of such Aircraft from Seller to Buyer (or Buyer Nominee, as applicable) pursuant to this Agreement to be registered with the International Registry established pursuant to the Cape Town Agreements;

(g)      receipt by Seller of the compliance certification statement from Buyer (or Buyer Nominee, as applicable) in the form of Exhibit H;

(h)      receipt by Seller of certificates from Buyer's insurance broker evidencing Buyer's (or Buyer Nominee's, as applicable) compliance with the insurance provisions of Section 8 hereof;

(i)      receipt by Seller of evidence that all costs and expenses then due from Buyer pursuant to Section 10.10 (including amounts estimated in good faith) have been paid; and

(j)      if Buyer has designated a Buyer Nominee in respect of such Aircraft, receipt by Seller of all know your customer documentation required by Seller for such Buyer Nominee to Seller's reasonable satisfaction.

4.2      **No Financing or Other Contingencies.**   The transactions contemplated herein shall not be subject to or contingent on (i) Buyer obtaining any financing in relation to its acquisition of any Aircraft or (ii) the closing of any other transaction.

5.      **Bankruptcy Provisions**.

5.1      **Court Approvals.**  By [July 1], 2026, Seller will file with the Bankruptcy Court a motion (the "**Sale Motion**") seeking, among other things, entry of (i) an order approving the bidding protections set forth in the Sale Motion (the "**Bidding Procedures Order**"), and (ii) an order approving this Agreement and the transactions contemplated hereby should the purchase offer made by this Agreement constitute the highest and best offer for the Aircraft pursuant to the Bidding Procedures Order (the "**Sale Approval Order**", and together with the Bidding Procedures Order, the "**Bankruptcy Court Orders**"); *provided, however*, that the Bidding Procedures Order and

13

the Sale Approval Order may include changes and amendments as mutually agreed to by Seller and Buyer.

5.2     **Court Filings.**   Seller shall provide Buyer with advance drafts of all Bankruptcy Court filings relating to the Sale Motion and shall comply with the notice requirements set forth in the Bidding Procedures Order for providing notice of the entry of the Bidding Procedures Order and the hearing on the Sale Approval Order. Seller shall provide Buyer with copies of all communications from the Bankruptcy Court or third parties relating to the Sale Motion.

5.3     **Buyer Assistance.**  Buyer shall use its commercially reasonable efforts to assist Seller in obtaining entry of the Bankruptcy Court Orders.  Buyer shall not, without the prior written consent of Seller, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Aircraft.

5.4     **Competing Bids.** This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids in respect of the purchase and/or financing of all or any of the Aircraft (each, a "**Competing Bid**"), as determined in accordance with the Bidding Procedures Order. From the date of this Agreement through the completion of the Auction (as defined in the Bidding Procedures Order) with respect to the Aircraft, Seller is permitted to and to cause its representatives and any Seller's Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any person (in addition to Buyer and its Affiliates and Buyer's Representatives) in connection with any Competing Bid.  In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers for a Competing Bid and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bidding Procedures Order, or other applicable Law.  A qualified Competing Bid for any number of Aircraft less than five (5) for purposes of the Bidding Procedures Order must be for a purchase price 10% higher than the Applicable Reserve Amount for each such Aircraft.  Notwithstanding anything to the contrary herein or in the Bidding Procedures Order, this Agreement constitutes a bid for all of the Aircraft and no qualified Competing Bid may be the successful bidder for an Aircraft or group of Aircraft unless Seller has made a determination, consistent in all respects with the Bidding Procedures Order, that (a) there are no Competing Bids for all of the Aircraft that, in the aggregate, constitute a higher and better bid than this Agreement or (b) the Buyer otherwise consents to the sale of an Aircraft or group of Aircraft to another party ("**Partial Consent Assets**").  To the extent the Buyer consents to the sale of any Partial Consent Assets but still consummates this Agreement other than as to such Partial Consent Assets, the Break-Up Fee shall apply to such Partial Consent Assets, as appropriately apportioned as compared to all of the Aircraft based on the Applicable Reserve Amount of the applicable Partial Consent Assets as compared to all Aircraft.  This Agreement shall remain binding on the Parties with respect to the non-Partial Consent Assets.

Aircraft SPA (SPIRIT-EETC 2026)

5.5     **Back-Up Bidder.**  Seller and Buyer agree that, in the event that Buyer is not the winning bidder at the Auction with respect to any or all of the Aircraft, if, and only if, (i) Buyer submits the second highest or otherwise second best bid at the Auction with respect to such Aircraft and is named the "Back-Up Bidder" at the Auction for such Aircraft, in each case, as determined by Seller, and (ii) Seller gives notice to Buyer on or before 30 days following the entry of the Sale Approval Order stating that Seller (A) failed to consummate the related sale(s) with the winning bidder, and (B) has terminated the purchase agreement with the winning bidder, Buyer shall promptly consummate the transactions upon the terms and conditions as set forth herein, including the aggregate Purchase Price for such Aircraft, as the same may be increased by Buyer at the Auction.

5.6     **Break-Up Fee and Reimbursement.**     In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Seller, Seller shall pay Buyer, subject to and in accordance with the terms hereof and the Bidding Procedures Order, a break-up fee of $18,000,000, to be apportioned to the Applicable Reserve Amount of the Aircraft that become subject to a consummated Competing Bid (the "**Break-Up Fee**"), and an expense reimbursement for Buyer's actual and reasonable legal, technical and other professional or third party expenses incurred in relation to the negotiation and documentation of this Agreement and transactions contemplated by this Agreement (the "**Expense Reimbursement**", and collectively with the Break-Up Fee, the "**Bid Protections**").  The Break-Up Fee shall only be payable on the date of consummation of the applicable Competing Bid pursuant to sections 363 or 1129 of the Bankruptcy Code that would otherwise constitute or have constituted a Competing Bid at the Auction or any other process initiated by Seller if no breach by Buyer of this Agreement has occurred (a "**Qualifying Break-Up Fee Event**") or a Seller Cancellation Event (as defined below); provided, in all cases, payment of the Bid Protections shall be subject to the Bidding Procedures Order.  Upon consummation of a Competing Bid with respect to any Aircraft, this Agreement with respect to such Aircraft (but not the remaining Aircraft) shall be deemed to be terminated. The Seller shall seek the approval of the Bid Protections as set forth in this paragraph and this Agreement in each of the Sale Motion and the Bankruptcy Court Orders.

5.7     **Bankruptcy     Termination     Events.** Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated, and the transactions contemplated hereby may be abandoned at any time prior to the occurrence of the first Delivery Date of an Aircraft hereunder, as follows:

(a)     by Buyer, if the Bankruptcy Court has failed to enter the Sale Approval Order by September 30, 2026;

15

(b)      by either Seller or Buyer, if, after their respective entry, either the Bidding Procedures Order or Sale Approval Order ceases to be in full force and effect by no fault of the terminating party;

(c)      by either Seller or Buyer, if (x) the Chapter 11 Case is dismissed, or (y) a trustee under Chapter 11 of the Bankruptcy Code is appointed in the Chapter 11 Case;

(d)      by either Seller or if Buyer is not the successful bidder at the Auction for at least one (1) Aircraft and is not named the "Back-Up Bidder" for at least one (1) Aircraft at the Auction; or

(e)      by Seller if the board of directors of Spirit Aviation Holdings, Inc. (the "**Seller Parent**") determines, in consultation with outside legal counsel, in its sole and exclusive discretion that consummating the transactions contemplated hereby or failing to terminate this Agreement would be inconsistent with the board of directors of Seller Parent's fiduciary duties under applicable Law, including, without limitation, to pursue a Competing Bid (a "**Seller Cancellation Event**").

6.      **Termination**.

6.1      **Total Loss before Delivery.**  If any Aircraft suffers a Total Loss prior to Delivery, Seller shall, as soon as reasonably practicable after it has become aware of such Total Loss, notify Buyer in writing thereof and, with effect from the date of such Total Loss, Seller's obligations to sell and Buyer's obligation to purchase such Aircraft shall terminate, and Buyer shall be entitled to instruct the Escrow Agent to return the Aircraft Specific Deposit for the affected Aircraft held by the Escrow Agent to Buyer.

6.2      **Aircraft Non-Sale Event.**  Subject to the remaining terms of this Section 6, if an Aircraft Non-Sale Event occurs with respect to any Aircraft, then all remaining obligations of Seller to sell to Buyer (including to deliver the Bill of Sale to Buyer), and of Buyer to buy from Seller, with respect to such Aircraft under this Agreement and/or the other Transaction Documents will terminate; provided that Seller shall be entitled to obtain the Aircraft Specific Deposit for such Aircraft and instruct the Escrow Agent to pay the Aircraft Specific Deposit for such terminated Aircraft to the Senior Trustee for application pursuant to the Intercreditor Agreements if such Aircraft Non-Sale Event results from a Buyer's Default.

6.3      **Default Provisions.** (a)  With respect to any Aircraft, if any default described in clauses (i) or (ii) of the definition of "Buyer's Default" should occur in respect of such Aircraft, then Seller shall be entitled, in each case at Seller's sole discretion so long as such default is then continuing, to elect one or more of the following in respect of such Aircraft subject to the default, exercisable by delivering written notice to Buyer: (i) suspend performance under this Agreement with respect to such Aircraft, or

16

(ii) terminate this Agreement immediately with respect to such Aircraft effective upon such written notice to Buyer, and in each case the Aircraft Specific Deposit for such terminated Aircraft shall be paid to the Senior Trustee for application pursuant to the Intercreditor Agreements. If any default described in clause (iii) of the definition of "Buyer's Default" should occur, then Seller shall be entitled, in each case at Seller's sole discretion so long as such default is then continuing, to elect one or more of the following in respect of all of the Aircraft for which the Delivery hereunder has not yet occurred, exercisable by delivering written notice to Buyer: (i) suspend performance under this Agreement with respect to either (as specified in such notice) (y) such Aircraft or (z) all of the Aircraft for which the Delivery hereunder has not yet occurred, and/or (ii) terminate this Agreement immediately with respect to all of the Aircraft for which the Delivery hereunder has not yet occurred effective upon such written notice to Buyer, and in each case Seller shall be entitled to obtain the Aircraft Specific Deposit(s) for such terminated Aircraft and instruct the Escrow Agent to pay the Aircraft Specific Deposit for such terminated Aircraft to the A Trustee for application pursuant to the Intercreditor Agreements.

(b)      With respect to any Aircraft, if any default described in clauses (i) or (ii) of the definition of "Seller's Default" should occur in respect of such Aircraft, then Buyer shall be entitled, in each case at Buyer's sole discretion so long as such default is then continuing, to elect one or more of the following in respect of such Aircraft subject to the default, exercisable by delivering written notice to Seller: (i) suspend performance under this Agreement with respect to such Aircraft, or (ii) terminate this Agreement immediately with respect to such Aircraft effective upon such written notice to Seller. If any default described in clause (iii) of the definition of "Seller's Default" should occur, then Buyer shall be entitled, in each case at Buyer's sole discretion so long as such default is then continuing, to elect one or more of the following in respect of all of the Aircraft for which the Delivery hereunder has not yet occurred, exercisable by delivering written notice to Seller: (i) suspend performance under this Agreement with respect to either (as specified in such notice) (y) such Aircraft or (z) all of the Aircraft for which the Delivery hereunder has not yet occurred, and/or (ii) terminate this Agreement immediately with respect to all of the Aircraft for which the Delivery hereunder has not yet occurred effective upon such written notice to Seller, and in each case Buyer shall be entitled to instruct the Escrow Agent to pay the Aircraft Specific Deposit for such terminated Aircraft to Buyer.

6.4      **Effect of Termination.**      Notwithstanding the foregoing (but subject to Section 3.3(b) and Section 5.6), each party hereto may exercise any other right or remedy, if any, which may be available to it under applicable Law or the Transaction Documents in respect of such Aircraft (if they have been entered into) and each party shall retain any and all claims, if any, for damages under such Transaction Documents (if they have been entered into) or under applicable Law for any breach of any agreement, representation, warranty or covenant contained in this Agreement or such Transaction Documents (if they have been entered into).

17

7.    **Representations and Warranties; Disclaimers and Waivers**.

7.1    **Seller Representations and Warranties**.

Seller represents and warrants to Buyer that the following statements are true and accurate as of the date hereof and at each Delivery of an Aircraft:

(a)    subject to entry of the Sale Approval Order, it is duly organized and validly existing under the Laws of its jurisdiction of formation and has the power and authority to perform its obligations under the Transaction Documents to which it is a Party;

(b)    subject to entry of the Sale Approval Order, each of the Transaction Documents to which it is a Party has been (or will be, when executed) duly authorized, entered into and delivered by it and constitutes the legal, valid and binding obligation of it enforceable against it in accordance with its terms (subject to bankruptcy, insolvency, reorganization or similar Laws of general application affecting the enforcement of creditors' rights generally);

(c)    subject to entry of the Sale Approval Order, neither the execution and delivery of the Transaction Documents to which it is a Party, nor the consummation of the transactions contemplated thereby nor compliance by it with any of the terms and provisions thereof will contravene any Law applicable to it or result in any breach of, or constitute a default under any indenture, mortgage, chattel mortgage, deed of trust, conditional sales contract, bank loan or credit agreement, partnership agreement, or other agreement or instrument to which it is a Party or by which it or its properties or assets are bound or affected;

(d)    subject to entry of the Sale Approval Order, neither the execution, delivery or performance by it of the Transaction Documents to which it is a Party, nor the consummation by it of any of the transactions contemplated thereby, will require the consent or approval of, the giving of notice to, or the taking of any other action in respect of, the shareholders, or the trustee or holder of any indebtedness of it, except such as have been or will be obtained or effected, each of which approvals, consents and waivers shall be in full force and effect on the Delivery Date;

(e)    subject to entry of the Sale Approval Order, for each Aircraft, Seller has full legal and beneficial title in and to, and at Delivery of such Aircraft Seller shall convey to Buyer good and valid title to, such Aircraft, free and clear of the Liens of the Subordination Agent and/or interests of the Subordination Agent or the Seller on the International Registry that shall be in the process of being released (with the FAA Counsel in advance possession of release instruments and in the process of filing the appropriate releases with the FAA); and

18

Aircraft SPA (SPIRIT-EETC 2026)

(f)      there are no suits, actions, arbitration proceedings or claims pending or, to the knowledge of Seller, threatened against Seller arising out of or in connection with the Transaction Documents before or by any Government Entity.

7.2      <strong>Buyer Representations and Warranties.</strong>

Buyer represents and warrants to Seller that the following statements are as of the date hereof and at each Delivery true and accurate:

(a)      it is a limited liability company and has the power and authority to carry on its business as presently conducted and to perform its obligations under the Transaction Documents to which it is a Party;

(b)      each of the Transaction Documents to which it is a Party has been (or will be, when executed) duly authorized, entered into and delivered by Buyer and constitutes the legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms (subject to bankruptcy, insolvency, reorganization or similar Laws of general application affecting the enforcement of creditors' rights generally);

(c)      neither the execution and delivery of the Transaction Documents to which it is a Party, nor the consummation of the transactions contemplated thereby nor compliance by it with any of the terms and provisions thereof will contravene any Law applicable to it or result in any breach of, or constitute a default under any indenture, mortgage, chattel mortgage, deed of trust, conditional sales contract, bank loan or credit agreement, corporate charter or by-laws, or other agreement or instrument to which it is a Party or by which it or its properties or assets are bound or affected;

(d)      neither the execution, delivery or performance by it of the Transaction Documents to which it is a Party, nor the consummation by it of any of the transactions contemplated hereby or thereby, will require the consent or approval of, the giving of notice to, or the taking of any other action in respect of, the members, or the trustee or holder of any indebtedness of Buyer, except such as have been or will be obtained or effected, each of which approvals, consents and waivers shall be in full force and effect on the Delivery Date; and

(e)      there are no suits, actions, arbitration proceedings or claims pending or, to the knowledge of Buyer, threatened against Buyer arising out of or in connection with the Transaction Documents before or by any other Government Entity.

19

7.3     **Disclaimers**.

(a)     EXCEPT AS EXPRESSLY SET FORTH IN THE BILL OF SALE WITH RESPECT TO AN AIRCRAFT AS TO TITLE, EACH AIRCRAFT IS BEING SOLD ON ITS RESPECTIVE DELIVERY DATE TO BUYER (OR BUYER NOMINEE, AS APPLICABLE) IN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" CONDITION WITHOUT ANY REPRESENTATION, GUARANTEE OR WARRANTY OF THE SELLER, EXPRESS OR IMPLIED, OF ANY KIND, ARISING BY LAW OR OTHERWISE AS TO THE CONDITION THEREOF; AND

(b)     WITHOUT LIMITING THE GENERALITY OF SECTION 7.3(a), BUYER (FOR ITSELF AND EACH BUYER NOMINEE) UNCONDITIONALLY AGREES THAT EACH AIRCRAFT, AND EACH PART THEREOF ARE TO BE SOLD AND PURCHASED IN AN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" CONDITION AS AT THE RELEVANT DELIVERY DATE APPLICABLE THERETO, AND NO TERM, CONDITION, WARRANTY, REPRESENTATION OR COVENANT OF ANY KIND HAS BEEN ACCEPTED, MADE OR IS GIVEN BY SELLER, IN RESPECT OF THE AIRWORTHINESS, VALUE, QUALITY, DURABILITY, TITLE (EXCEPT AS EXPRESSLY PROVIDED IN THE APPLICABLE BILL OF SALE), CONDITION, DESIGN, OPERATION, DESCRIPTION, MERCHANTABILITY OR FITNESS FOR USE OR PURPOSE OF THE AIRCRAFT, ANY IN-SCOPE ENGINE OR ANY PART THEREOF, AS TO THE ABSENCE OF LATENT, INHERENT OR OTHER DEFECTS (WHETHER OR NOT DISCOVERABLE), AS TO THE ACCURACY, VALIDITY, TRACEABILITY, COMPLETENESS OR CONDITION OF THE AIRCRAFT RECORDS, OR AS TO THE ABSENCE OF ANY INFRINGEMENT OF ANY PATENT, COPYRIGHT, DESIGN, OR OTHER PROPRIETARY RIGHTS; AND ALL CONDITIONS, WARRANTIES AND REPRESENTATIONS (OR OBLIGATION OR LIABILITY, IN CONTRACT OR IN TORT) IN RELATION TO ANY OF THOSE MATTERS, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, ARE EXPRESSLY EXCLUDED.

(c)     EXECUTION AND DELIVERY OF AN AIRCRAFT ACCEPTANCE CERTIFICATE BY BUYER (OR BUYER NOMINEE, AS APPLICABLE) TO SELLER SHALL BE CONCLUSIVE PROOF THAT THE AIRCRAFT AND EACH PART THEREOF DESCRIBED IN SUCH AIRCRAFT ACCEPTANCE CERTIFICATE ARE IN EVERY WAY SATISFACTORY TO BUYER (AND BUYER NOMINEE, IF APPLICABLE) AND HAVE BEEN ACCEPTED BY BUYER (AND BUYER NOMINEE, IF APPLICABLE) FOR ALL PURPOSES OF THIS AGREEMENT.

20

(d)     DISCLAIMER OF APPLICATION OF C.I.S.G.  THE PARTIES HEREBY EXPRESSLY DISCLAIM THE APPLICATION OF THE UNITED NATIONS CONVENTION ON THE INTERNATIONAL SALE OF GOODS TO THE EXTENT APPLICABLE TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

7.4     **Waivers**.

(a)     BUYER (FOR ITSELF AND EACH BUYER NOMINEE) AND SELLER AGREE THAT EACH SHALL NOT BE ENTITLED TO RECEIVE AND HEREBY DISCLAIMS AND WAIVES ANY RIGHT THAT IT MAY OTHERWISE HAVE TO RECOVER OR SEEK TO RECOVER FROM THE OTHER PARTY PUNITIVE, CONSEQUENTIAL OR EXEMPLARY DAMAGES IN RESPECT OF ANY CLAIM MADE UNDER OR IN CONNECTION WITH THIS AGREEMENT.

(b)     BUYER HEREBY AGREES THAT ITS ACCEPTANCE (OR BUYER NOMINEE'S ACCEPTANCE, AS APPLICABLE) OF THE AIRCRAFT AT DELIVERY AND ITS EXECUTION AND DELIVERY (OR BUYER NOMINEE'S EXECUTION AND DELIVERY, AS APPLICABLE) OF THE AIRCRAFT ACCEPTANCE CERTIFICATE IN RESPECT OF EACH AIRCRAFT CONSTITUTE BUYER'S (AND BUYER NOMINEE'S) WAIVER OF ANY WARRANTY OF DESCRIPTION, EXPRESS OR IMPLIED, AND ANY CLAIMS BUYER MAY HAVE AGAINST SELLER OR ANY PARTY ACTING FOR OR ON BEHALF OF SELLER BASED UPON THE FAILURE OF THE AIRCRAFT TO CONFORM WITH SUCH DESCRIPTION.

(c)     DELIVERY BY BUYER (OR BUYER NOMINEE, AS APPLICABLE) TO SELLER OF THE AIRCRAFT ACCEPTANCE CERTIFICATE IN RESPECT OF EACH AIRCRAFT WILL BE CONCLUSIVE PROOF AS BETWEEN SELLER, ON THE ONE HAND, AND BUYER (AND BUYER NOMINEE, IF APPLICABLE), ON THE OTHER HAND, THAT BUYER'S TECHNICAL EXPERTS HAVE EXAMINED AND INVESTIGATED EACH AIRCRAFT (INCLUDING THE ENGINES) AND HAVE UNCONDITIONALLY AND IRREVOCABLY ACCEPTED SUCH AIRCRAFT.

8.     **Insurance**.

8.1     **Insurances**.

(a)     For the period commencing on the Delivery Date for an Aircraft and ending on the earlier of (a) the two-year anniversary of the Delivery Date of such Aircraft and (b) the completion of the next "C-check" due under the AMM for such

Aircraft SPA (SPIRIT-EETC 2026)

Aircraft (the "**Insurance Period**"), Buyer will carry or cause to be carried and maintained, comprehensive airline legal liability insurance.

(b)     All policies carried in accordance with this Section 8.1 and any policies taken out in substitution or replacement for any such policies, (i) shall include the Seller Parties as additional insureds (but not as manufacturer, repairer or servicing agent of the Aircraft, and without imposing on any such party liability to pay premiums with respect to such insurance) as respects the operation of Buyer, (ii) shall be maintained with insurers of recognized standing and normally participating in the leading international commercial aviation insurance markets (through reinsurance, if necessary) and reasonably acceptable to Seller, (iii) shall provide that if the insurers cancel such insurance for any reason, or if the same is allowed to lapse for non-payment of premium or if any material change is made in the insurance which adversely affects the interest of the Seller Parties, such lapse, cancellation or change shall not be effective as to the Seller Parties and each of them for thirty days (seven days in the case of war risk and allied perils coverage) after written notice by such insurers of such lapse, cancellation or change, provided, however, that if any notice period specified above is not reasonably obtainable, such policies shall provide for as long a period of prior notice as shall then be reasonably obtainable, (iv) shall expressly provide that all of the provisions thereof, except the limits of liability, shall operate in the same manner as if there were separate policy covering each insured, (v) provide that the insurers will waive any right to any setoff, recoupment, subrogation or counterclaim or any other deduction, by attachment or otherwise, and (vi) be primary and without right of contribution from any insurance which may be carried by the Seller Parties and any of them.

8.2     **Certificates, Etc.**  On or before the Delivery Date for each Aircraft, Buyer shall provide to Seller a certificate of insurance and letter of undertaking evidencing the coverage required pursuant to this Section 8 in form and substance acceptable to Seller (acting reasonably) and shall provide to Seller, as applicable, an updated certificate of insurance and letter of undertaking upon each renewal or replacement of the coverage required pursuant to this Section 8.

9.     **Transfer Taxes**.

9.1     **Diligence.**  Each Party is responsible for researching its own tax position in relation to the transactions contemplated by the Transaction Documents, at its own cost and for its sole benefit.

9.2     **Tax Indemnity.**  Buyer shall, on an after-tax basis, pay, indemnify and hold Seller and its Affiliates harmless from any and all sales, use, transfer, excise, personal property, ad valorem, value-added, stamp, or other taxes and fees, withholdings, imposts, levies, customs or other duties, charges, monetary transfer fees, or governmental withholdings, together with any penalties, fines, or interest thereon, imposed,

22

levied, or assessed in connection with the sale or Delivery of, or transfer of title to, each Aircraft (including the Engines associated with such Aircraft) to Buyer (or Buyer Nominee, as applicable)  hereunder, other than (i) taxes imposed on the overall net income, profits or gains of Seller in respect of the sale or Delivery of, or transfer of title to, the Aircraft to Buyer (or Buyer Nominee, as applicable); (ii) taxes to the extent imposed as result of Seller's failure to comply with the terms of this Agreement; (iii) taxes imposed, levied or assessed to the extent arising out of or in connection with the ownership, import, export, possession, operation, use, maintenance, return, or storage of the Aircraft prior to the Delivery Date, except any taxes arising out of or in connection with the sale or Delivery of, or transfer of title to, the Aircraft hereunder, or (iv) taxes to the extent arising as a result of the gross negligence or willful misconduct of Seller or its Affiliates or resulting from any inaccuracy of any representation or warranty of Seller hereunder (any or all of the foregoing, "**Transfer Taxes**").

9.3    **Cooperation.**    The Parties shall reasonably cooperate with one another to deliver to each other such certifications and other documents as may be reasonably requested in order to avail itself of any applicable exemption from Transfer Taxes.  Without limiting the foregoing, at or prior to the Delivery of each Aircraft, Buyer shall either (i) pay any Transfer Taxes imposed, levied, or assessed in connection with the sale or Delivery of, or transfer of title to, such Aircraft or (ii) provide (or procure that the Buyer's Nominee provides) to Seller a duly completed and validly executed exemption certificate, resale certificate, or other documentation satisfactory to Seller establishing a complete exemption from Transfer Taxes with respect to the sale or Delivery of, or transfer of title to, such Aircraft.

9.4    **Procedures, Etc.**.

(a)    If any Transfer Taxes for which Buyer is responsible under Section 9.2 are imposed, levied or assessed on Seller or any of its Affiliates, or Seller or any of its Affiliates are required by Law or otherwise to pay any such Transfer Taxes, Buyer shall reimburse Seller and/or its Affiliates for the full amount of such Transfer Taxes within fifteen (15) Business Days after receipt from Seller of written request for such reimbursement, accompanied by original receipts or other sufficient evidence of payment of such Transfer Taxes. (b) If a claim is made against Seller or any of its Affiliates for any Transfer Taxes for which Buyer is responsible under Section 9.2, Seller will promptly notify Buyer in writing of such claim; provided, however, that Seller's failure to provide such notice will not relieve Buyer of its obligations hereunder except to the extent such failure precludes Buyer's ability to contest the claim.  So long as (a) Buyer has provided Seller with an opinion of independent and reputable tax counsel reasonably satisfactory to Seller that a reasonable basis exists for contesting such claim and adequate reserves have been made for such Transfer Taxes or, if required, an adequate bond has been posted, and (b) such contest does not impose any risk on Seller or any of its

Aircraft SPA (SPIRIT-EETC 2026)

Affiliates of civil or criminal liability, then Seller and/or its Affiliates, at Buyer's written request and at Buyer's expense, will in good faith contest (or permit Buyer to contest in the name of Buyer or Seller and/or its Affiliates through counsel reasonably acceptable to Seller) the validity, applicability or amount of such Transfer Taxes.

10.    **Miscellaneous**.

10.1    **Entire Agreement, Amendment, Installment Contract; Time is of the Essence.**  Except as expressly provided herein, this Agreement together with the other Transaction Documents constitutes the entire agreement among the Parties relating to the subject matter hereof and thereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof.  This Agreement may not be amended except by an instrument in writing signed by or on behalf of each Party and with the consent of the Senior Trustee (or representative of the Senior Trustee) solely in respect of any amendments that adversely impact the Senior Trustee (including, for the avoidance of doubt, any amendment reducing the Purchase Price or any Aircraft Specific Deposit), such consent not to be unreasonably withheld.  The Parties acknowledge and agree that this Agreement is an installment contract, and accordingly (except in connection with a termination of this Agreement pursuant to Section 6.2 or Section 6.3, as the case may be, for all of the Aircraft for which the Delivery hereunder has not yet occurred), the inability or failure of the Delivery of any Aircraft, Airframe, or Engine, will not relieve the obligation of Seller to sell, and Buyer to buy, the remaining Aircraft, Airframes, or Engines.

The Parties agree that time shall be of the essence of this Agreement with respect to closing and delivering each Aircraft by the applicable Delivery Window Deadline.  Additionally, each of the Parties shall act in a commercially reasonable manner to effect the transactions contemplated under this Agreement in a prompt manner and in accordance with the time periods and deadlines provided herein.

10.2    **[Reserved].**

10.3    **Non-Waiver.**  Any of the terms, covenants, or conditions hereof may be waived only by a written instrument executed by or on behalf of the Party hereto waiving compliance.  No course of dealing on the part of any Party hereto, or its respective officers, employees, agents, accountants, attorneys, investment bankers, consultants, or other authorized representatives, nor any failure by a Party hereto to exercise any of its rights under this Agreement shall operate as a waiver thereof or affect in any way the right of such Party at a later time to enforce the performance of such provision.  No waiver by any Party hereto of any condition, or any breach of any term or covenant contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term or covenant.  Except as otherwise

24

provided in this Agreement, the rights of the Parties hereto under this Agreement shall be cumulative, and the exercise or partial exercise of any such right shall not preclude the exercise of any other right.

10.4   **Severability.**  In the event that any provision of this Agreement or the application thereof to any Party shall, to any extent, be invalid or unenforceable under any applicable Law, then such provision shall be deemed inoperative to the extent that it is invalid or unenforceable and the remainder of this Agreement, and the application of any such invalid or unenforceable provision to the Parties, jurisdictions or circumstances other than to whom or to which it is held invalid or unenforceable, shall not be affected thereby nor shall the same affect the validity or enforceability of this Agreement.

10.5   **Notices.**  Any notice, request or information required or permissible under this Agreement will be in writing and in the English language.  Notices must be addressed to the Parties as set forth below and delivered in person or sent by electronic mail or by expedited delivery, with a copy sent by e-mail.  Any such notice shall be effective when received.  In the case of a notice sent by expedited delivery, notice will be deemed received on the date of delivery set forth in the records of the Person which accomplished the delivery.  If any notice is sent by more than one of the above listed methods, notice will be deemed received on the earliest possible date in accordance with the above provisions.

(a)   Seller:

Spirit Airlines, LLC
1731 Radiant Drive
Dania Beach, Florida 33004

Attention: Legal Department
Telephone: (954) 447-7914 (Legal)
Email: thomas.canfield@spirit.com

Attention: Treasury Department
Telephone: (954) 447-7976 (Treasury)
Email: treasuryrisk@spirit.com

(with copies to beliu@debevoise.com and jball@debevoise.com)

(b)   Buyer:

SAVE 2026-B LLC
[_____]
Attention: [_____]

Aircraft SPA (SPIRIT-EETC 2026)

Telephone: [_____]
Email: [_____]

With a copy to
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Attention: Scott J. Greenberg, Jason Z. Goldstein; Simon Briefel
Email: SGreenberg@gibsondunn.com;
JGoldstein@gibsondunn.com; SBriefel@gibsondunn.com

10.6    **Governing Law & Jurisdiction**.

(a)    This Agreement and all ancillary agreements and documents relating hereto (including without limitation any Aircraft Acceptance Certificate, FAA Bill of Sale and Bill of Sale hereunder), shall be governed by and construed in accordance with the Laws of the State of New York, including all matters of construction, validity, and performance, without reference to principles of conflicts of Law other than sections 5-1401 and 5-1402 of the New York general obligations Law.

(b)    The Bankruptcy Court shall have exclusive jurisdiction in relation to any legal action or proceeding arising out of or in connection with this Agreement, the subject matter hereof or any of the transactions contemplated hereby; provided that, if there remain Aircraft for which the Delivery hereunder has not yet occurred as of the Plan Effective Date (as defined below) and if, following the Plan Effective Date, the Bankruptcy Court declines jurisdiction, each of the Parties hereto, to the maximum extent permitted by applicable Law, hereby (1) irrevocably submits itself to the non-exclusive jurisdiction of each of the Supreme Court of the State of New York, New York County and the United States District Court for the Southern District of New York, and other courts with jurisdiction to hear appeals from such courts and (2) waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof or any of the transactions contemplated hereby may not be enforced in or by such courts. The term "**Plan Effective Date**" shall mean the effective date of any plan filed by Seller in the Chapter 11 Case that is confirmed pursuant to Section 1129 of the Chapter 11 of Title 11 of the United States Code, as amended.

10.7    **Waiver of Jury Trial.** Each Party, to the extent permitted by Law, knowingly, voluntarily, and intentionally waives its right to a trial by jury in any action or other legal proceeding for matters, contractual, tortious, or otherwise, arising out of or relating to this Agreement and the transactions contemplated hereby.

26

10.8   **Further Assurances.**   Each Party hereto will promptly and duly execute and deliver such further documents to make such further assurances for and take such further action reasonably requested by any Party to whom such first Party is obligated, all as may be reasonably necessary to carry out more effectively the intent and purpose of this Agreement.

10.9   **Counterparts.**  This Agreement may be executed in any number of original, electronic or pdf counterparts and by any Party hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which, when taken together, shall constitute one and the same agreement.

10.10   **Transaction Costs.**  Except as otherwise expressly provided herein with respect to the Expense Reimbursement, Buyer shall bear all costs and expenses in relation to the negotiation and documentation of, and consummation of the transactions contemplated by this Agreement, and any other ancillary documents or agreement and the transactions contemplated hereby and thereby (including any costs and expenses to be reimbursed by the Buyer pursuant to the Sale Approval Order), and shall reimburse Seller on demand for its costs and expenses, including reasonable legal and other professional adviser fees and any tax thereon.  Buyer will be solely responsible for the costs of FAA Counsel and for the filing and registration of the sale of the Aircraft on the FAA's Civil Aviation Registry and on the International Registry, as applicable.

10.11   **Assignment, Successors and Assigns.**Neither Seller nor Buyer shall assign or transfer all or any of its rights and/or obligations under this Agreement without the prior written consent of the other Party, which may be withheld, conditioned, or delayed in such other Party's sole and absolute discretion; provided that, no assignment will relieve the assigning Party of any of its rights or obligations. Notwithstanding the foregoing, Buyer may designate a Buyer Nominee to take title to any Aircraft in accordance with Section 10.19, and such designation shall not constitute an assignment or transfer of Buyer's rights or obligations under this Agreement for purposes of this Section 10.11; provided that Buyer shall remain liable for the full and prompt performance of all of its obligations under this Agreement notwithstanding any such designation.  This Agreement shall bind and inure to the benefit of the Parties and any successors, and in each case permitted hereunder, assigns to the original Parties to this Agreement.

10.12   **[Reserved].**

10.13   **Third-party Beneficiaries.**  This Agreement is not intended to and shall not provide any Person not a Party hereto with any rights, of any nature whatsoever, against any of the Parties hereto, and, except as expressly provided herein with respect to the Senior Trustee, no Person or entity not a Party hereto shall have any right, power, privilege, benefit, or interest arising out of this Agreement.

27

10.14   **Limitation of Liability.**   Notwithstanding anything to the contrary in this Agreement, no Party shall be liable to the other Party under this Agreement for any exemplary, special, punitive, indirect, remote, speculative, incidental, or consequential damages of any kind (including, but not limited to, lost profits, loss of sales, loss of revenue or loss of opportunity), in each case whether in tort (including negligence or gross negligence), strict liability, by contract, statute or otherwise, even if a Party has been advised of the possibility of such damages.

10.15   **Force Majeure.**   Neither Buyer nor Seller shall be liable for any failure of or delay in the Delivery of the Aircraft at the Delivery Location, or in any other obligation hereunder for the period that such failure or delay is due to acts of God or the public enemy; war, insurrection or riots; fires, governmental actions; strikes or labor disputes; pandemic, epidemic, or quarantine mandate; inability to obtain materials, accessories, or parts from the vendors; or any other cause beyond a Party's reasonable control ("**Force Majeure**").   Each Party shall use commercially reasonable efforts to terminate or mitigate any event of Force Majeure affecting its performance under this Agreement.   Upon the occurrence of any such event, the time required for performance by an affected Party of its obligations arising under this Agreement shall be extended by a period equal to the duration of such event.   In the event that such extension continues for more than one hundred and eighty (180) days, then either Party may terminate this Agreement in respect of the purchase and sale of the Aircraft subject to such delay, and an Aircraft Non-Sale Event shall be deemed to have occurred with respect to such Aircraft.

10.16   **Publicity**.

(a)   Neither Party will issue any press release or make any public announcement relating to the subject matter of this Agreement (other than Bankruptcy Court filings as contemplated hereby) without the prior written approval of the other Party, except that either Party may make any public disclosure it believes in good faith is required by applicable Law.   Notwithstanding the foregoing, if either Party, or a third party, makes a public disclosure related to this Agreement that is false or damaging to a Party, the aggrieved Party will have the right to make a public response reasonably necessary to correct any misstatement, inaccuracies or material omissions in the initial and wrongful affirmative disclosure without prior approval of the other Party.   Neither Party will be required to obtain consent pursuant to this section for any proposed release or announcement that is consistent with information that has previously been made public without breach of its obligations under this clause.

(b)   Neither Party will, without the other Party's prior written consent in each instance (x) use in advertising, publicity or marketing communications of any kind the name or other trademarks of the other Party or any of its Affiliates, or any employee of either, or (y) represent, directly or indirectly, that any product or

28

service provided by a Party has been approved or endorsed by the other Party or any of its Affiliates.

10.17   **Relationship of the Parties.**  Nothing contained in this Agreement shall be deemed to create an association, partnership, joint venture, or relationship of principal and agent or master and servant between the Parties, or to grant either Party the right or authority to assume, create or incur any liability or obligation of any kind, express or implied, against, in the name of, or on behalf of, the other Party.

10.18   **Brokers and other Third Parties.**  Each Party represents and warrants to the other that it has not paid, agreed to pay or caused to be paid directly or indirectly in any form, any commission, percentage, contingent fee, brokerage or other similar payments of any kind in connection with this Agreement or the transactions contemplated hereby, to any Person.  Each Party agrees to indemnify and hold the other harmless from and against any and all claims, suits, damages, costs and expenses (including, but not limited to reasonable attorneys' fees and costs) asserted by any agent, broker or other third party for any commission or compensation of any nature whatsoever based upon this Agreement or the Transaction Documents or the Aircraft.

10.19   **Buyer Nominee**.  Buyer may by written notice to Seller at least five (5) Business Days before a Delivery nominate one or more U.S. owner trusts as a "Buyer Nominee" to accept title of an Aircraft from Seller directly and to be assigned all associated rights under this Agreement with respect to warranties from Seller, provided that each Buyer Nominee must be a Person which:

(a)   complies with Seller's know your customer checks, anti-money laundering checks, and due diligence, as determined by Seller (acting reasonably);

(b)   is capable of entering into the Transaction Documents to which Buyer is a party and giving the representations and warranties of the Buyer required hereunder and Buyer procures that such Buyer Nominee will comply with the terms of this Agreement; and

(c)   in the case of any Airframe, such Buyer's Nominee being eligible to re-register such Airframe with the FAA in its own name at the Delivery of such Airframe.

Any assignment pursuant to this Section shall not in any way extend the liability Seller would have had under this Agreement but for such assignment. Notwithstanding anything herein to the contrary, the Buyer shall remain responsible for any obligations owed to Seller hereunder.

[SIGNATURE PAGE FOLLOWS]

29

Aircraft SPA (SPIRIT-EETC 2026)

IN WITNESS WHEREOF, the Parties hereto have entered into this Agreement as of the day and year first above written.

SELLER:

SPIRIT AIRLINES, LLC

By: _____

Name: _____

Title: _____

BUYER:

SAVE 2026-B LLC

By: _____

Name: _____

Title: _____

Signature Page

Aircraft SPA (SPIRIT-EETC 2026)

## Exhibit A

### DESCRIPTION OF AIRCRAFT

| MSN | AC Type | ESNs | Reserve Amount |
|---|---|---|---|
| 6804 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| 6867 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| 6897 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| 6994 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| 7008 | A320-232 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| 7062 | A320-232 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |

Exhibit A

Aircraft SPA (SPIRIT-EETC 2026)

| MSN | AC Type | ESNs | Reserve Amount |
|---|---|---|---|
| 7045 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| 7021 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| 7058 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| 7135 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| 7156 | A320-232 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| 7296 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| 7106 | A321-231 | Any of the two Engines for this AC Type from | $[●] |

Exhibit A
Page 2

| MSN | AC Type | ESNs | Reserve Amount |
|---|---|---|---|
| | | Schedule 1 to this Exhibit A | |
| 7246 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| 7522 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| 8018 | A320-232 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| 8021 | A320-232 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| 8012 | A320-232 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| 8047 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |

Aircraft SPA (SPIRIT-EETC 2026)

| MSN | AC Type | ESNs | Reserve Amount |
|---|---|---|---|
| 8114 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| 8115 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| 8141 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| 8160 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| 8176 | A320-232 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| 8376 | A320-232 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| 8400 | A320-232 | Any of the two Engines for this AC Type from | $[●] |

Exhibit A
Page 4

Aircraft SPA (SPIRIT-EETC 2026)

| MSN | AC Type | ESNs | Reserve Amount |
|---|---|---|---|
| | | Schedule 1 to this Exhibit A | |
| 8434 | A320-232 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $[●] |
| Total: | | | |

Aircraft SPA (SPIRIT-EETC 2026)

**Schedule 1 to Exhibit A**

ENGINE SERIAL NUMBERS

| AC Type | ESNs |
|---|---|
| A320-232 | 18102 |
| | 18071 |
| | 18112 |
| | 18116 |
| | 18170 |
| | 18172 |
| | 18675 |
| | 18677 |
| | 18678 |
| | 18679 |
| | 18688 |
| | 18689 |
| | 18757 |
| | 18758 |
| | 18824 |
| | 18825 |
| | 18821 |
| | 18823 |
| | 18840 |
| | 18842 |

Exhibit A
Page 6

Aircraft SPA (SPIRIT-EETC 2026)

| AC Type | ESNs |
|---|---|
| A321-231 | 17899 |
| | 17946 |
| | 17988 |
| | 17990 |
| | 18024 |
| | 18022 |
| | 18064 |
| | 18072 |
| | 18075 |
| | 18114 |
| | 18088 |
| | 18092 |
| | 18083 |
| | 18089 |
| | 18149 |
| | 18164 |
| | 18249 |
| | 18256 |
| | 18243 |
| | 18245 |
| | 18307 |
| | 18309 |

Exhibit A

Page 7

Aircraft SPA (SPIRIT-EETC 2026)

| AC Type | ESNs |
|---|---|
| | 18429 |
| | 18433 |
| | 18699 |
| | 18700 |
| | 18738 |
| | 18732 |
| | 18721 |
| | 18722 |
| | 18730 |
| | 18731 |
| | 18749 |
| | 18751 |

Aircraft SPA (SPIRIT-EETC 2026)

## **Exhibit B**

## DELIVERY CONDITION

Each Aircraft will be delivered in "AS-IS, WHERE-IS" and "WITH ALL FAULTS" condition.

Exhibit B

Aircraft SPA (SPIRIT-EETC 2026)

**Schedule 1 to Exhibit B**

AIRCRAFT RECORDS[1]

DOCUMENTS FROM ORIGINAL DELIVERY (Documents available electronically via AirbusWorld)

1. Export Certificate of Airworthiness
2. Factory AD Status
3. Factory SB Status
4. Original Weighing Report
5. Sanitary Construction
6. Aircraft Inspection Report
7. Detailed Specification
8. Interior Spec
9. Significant Rework Log
10. Landing Gear Brochure
11. Engine VSLs
12. APU Transmittal
13. Electrical Load Analysis
14. Noise Certificate
15. ETOPS / RVSM / CAT / BRNAV Letters
16. Committed Airplane Changes
17. LOPA

CURRENT CERTIFICATES

1. Certificate of Airworthiness
2. Registration
3. Radio License

CERTIFIED STATUS

**(Status may include: Reports/Statements/Task Card)**

1. Airframe Times & Cycles
2. Engines Times & Cycles
3. APU Times & Cycles

---

[1]   Each item listed in this Schedule 1 to Exhibit B shall only be provided to Buyer to the extent it can be made available electronically, and it shall be Buyer's sole responsibility to arrange for access, at Buyer's sole cost, to any such item via the applicable electronic platform; provided that Seller shall provide commercially reasonable assistance in coordinating between Buyer and the applicable electronic platform.

Aircraft SPA (SPIRIT-EETC 2026)

4. Ratio of APU to Flt Hours statement (If Applicable)
5. Maintenance Check Status / History
6. Aircraft Modification Status Report
7. Airframe AD Summary
8. Appliance AD Summary
9. Service Bulletin Summary
10. Deferred Maintenance Items Report
11. Oils & Fluids Used Statement
12. Last Compass Calibration Compliance Card (Last Compliance Card)
13. Aircraft and Landing Gear Accident / Incident Statement
14. Engine Accident / Incident Statement (2)
15. APU Accident / Incident Statement
16. A/C Flight Time Report / Logs (Master Time & Cycle Log)
17. Seller Maintenance Program
18. LDND (Last Done Next Due)
19. Aircraft LLP Status Report (Certified)
20. Aircraft LLP Back to Birth Trace

INTERIOR

1. LOPA
2. Current Emergency Equipment Drawing (on LOPA)
3. Galley CMM (if available electronically via AirbusWorld)
4. Seat CMM's

AIRWORTHINESS DIRECTIVES DFP's

1. AD Airframe DFP's **(DFP compliance is a copy of original document or electronic copy showing compliance.)**
2. AD Appliance DFP's **(DFP compliance is a copy of original document or electronic copy showing compliance.)**

MODIFICATION DFP's

**(DFP compliance is a copy of original document or electronic copy showing compliance.)**

1. In-House
2. STC's
3. STC Data Packages **(Data package includes: MDL, drawings, parts list, manual supplements, instructions for continued airworthiness and Right to Use letter (if applicable)**
4. Service Bulletins

Exhibit B
Page 3

Aircraft SPA (SPIRIT-EETC 2026)

5. Service Letter (If Applicable)

## REPAIRS

1. Dent and Buckle (Repair) Mapping
2. Structural Repairs DFPs **(DFP compliance includes a copy of original document or electronic copy showing compliance (as well as any reference material required for approval (8110-3, RDAS, EO, etc.)**
3. Substantiations /SRM/FAA /EASA Approvals/ RAS, etc. and all correspondence

## AIRCRAFT MAINTENANCE RECORDS

1. Historical C Check and Heavy Check Packages
2. Flammability data for consumables used during repairs will be provided only if available

## COMPONENTS

1. Hard Time Status Report (Certified)
2. Hard Time Certificates (Tags) **(FAA 8130-3 or EASA Form 1 serviceable tags)**
3. OCCM Installed Components List (Certified) **(OCCM is operator defined. Operator Configuration Control Master - this document is Spirit's list of tracked components as approved by its CASS board)**

## NOSE GEAR S/N

1. Last Overhaul Package
2. Last Shop Visit Package
3. LLP Status (Certified)
4. LLP Back to Birth Trace

## LEFT MAIN GEAR S/N

1. Last Overhaul Package
2. Last Shop Visit Package
3. LLP Status (Certified)
4. LLP Back to Birth Trace

## RIGHT MAIN GEAR S/N

1. Last Overhaul Package
2. Last Shop Visit Package
3. LLP Status (Certified)
4. LLP Back to Birth Trace

## #1 ESN

Aircraft SPA (SPIRIT-EETC 2026)

1. Disk Sheet / LLP Status (Certified)
2. LLP Back to Birth Trace
3. AD Status (Certified)
4. SB Status (Certified)
5. Shop Visit Packages
6. List of Historical Shop Visits (Certified)
7. Engine Installation/Removal History (Certified)
8. Engine Accessory Report (Certified)
9. Trend Monitoring for the Last Year
10. Non-PMA/DER Statement for the Engine gas path/internals (substantially in the form of Schedule 1 to this Exhibit B)

#2 ESN

1. Disk Sheet / LLP Status (Certified)
2. LLP Back to Birth Trace
3. AD Status (Certified)
4. SB Status (Certified)
5. Shop Visit Packages
6. List of Historical Shop Visits (Certified)
7. Engine Installation/Removal History (Certified)
8. Engine Accessory Report (Certified)
9. Trend Monitoring for the Last Year
10. Non-PMA/DER Statement for the Engine gas path/internals (substantially in the form of Schedule 1 to this Exhibit B)

APU S/N

1. APU Logbook
2. Shop Visit Packages **(Shop Packages include Engineering Disposition Report (EDR), ARC, and Logbook copies.)**
3. AD Status (Certified) in Log Book **(AD status in the log book is acceptable with signature)**
4. SB Status (Certified) in Log Book **(SB status in the log book is acceptable with signature)**
5. LLP Status (Certified)
6. Listing of APU Installation/Removal History (certified)

MANUALS

**(Manuals may be transferred electronically and will include any supplements required by any modification)**

Exhibit B
Page 5

Aircraft SPA (SPIRIT-EETC 2026)

1. AFM with Supplements
2. Quick Reference Handbook "QRH"
3. Airplane Flight Operation Manual (FCOM)
4. Flight Crew Training Manual
5. AMM
6. IPC
7. WDM & Lists
8. SRM
9. Weight & Balance
10. Fault Isolation (TSM)
11. Power Plant Build Up
12. Dispatch Deviation Guide (DDG)
13. Master Minimum Equip. List (MMEL)
14. Current Cockpit Disk Storage Box **(Originals will be retained.)**

MISCELLANEOUS

1. Tech Logs
2. Weight & Balance Report
3. Avionics Inventory
4. ETOPS & RVSM & CAT (ILS) status (as applicable)
5. Current Aircraft Software List with the available software provided in digital format

Exhibit B
Page 6

Aircraft SPA (SPIRIT-EETC 2026)

**<u>Schedule 2 to Exhibit B</u>**

<u>DELIVERY LOCATION</u>

The Delivery Location for each Aircraft shall be [Goodyear, Arizona], [Marana, Arizona], [El Salvador Int. Airport] (in the case of N651NK), [Japan] (in the case of ESNs [ ] and [ ]) or [Houston] (in the case of ESNs [ ], [ ], and [ ]) or such other location as mutually agreed between the Parties.

Seller shall, at Buyer's expense, use commercially reasonable efforts to arrange for all relocation flights and associated flight permits to locate the Aircraft at the Delivery Location prior to Delivery.

Following Delivery of an Aircraft, Buyer shall be responsible for arranging the parking and storage of such Aircraft, and shall be responsible for the payment of all parking and storage fees for such Aircraft following its Delivery.

Aircraft SPA (SPIRIT-EETC 2026)

**[Exhibit C]**

[LIST OF EXCLUDED EQUIPMENT]

| [WI-FI PARTS] | | | |
|---|---|---|---|
| **COMPONENT NAME** | **PART NUMBER** | **QTY** | **EFFECTIVITY** |
| Tx Antenna | 187303-101/102 | 1 | All |
| Rx Antenna | 187302-101/102 | 1 | All |
| Kandu | 187300-101 | 1 | All |
| Krfu | 187301-101/102 | 1 | All |
| Waps | LV10-150801-102 | 3 | All |
| Modem | E71-200-01 | 1 | All |
| MPS, MULTI PURPOSE SERVER | 186096-103 | 1 | All |
| Radome | 187304-101/102 | 1 | All |
| Fairing | 187305-101/102 | 1 | All |
| Adapter Plate | 187306-101 | 1 | All |
| | | | |
| [CABIN & GALLEY PARTS] | | | |
| **COMPONENT NAME** | **PART NUMBER** | **QTY** | **EFFECTIVITY** |
| Emergency Medical Kit (EMK) | FAREMK | 2 | All |
| F/S Trolley | TK500009/ZK101061 | 5 | All |
| H/S Trolley | TL500001/ZL101061 | 1 | All |
| F/S Waste Trolley | TKG720018/ZK101036/TG500007 | 2 | All |
| Waste Bin for F/S Waste Trolley | WA500001 | 2 | All |
| Std Unit | BB015004 | 6 | All |

Exhibit C

Aircraft SPA (SPIRIT-EETC 2026)

## **Exhibit D**

[Reserved]

**Exhibit E**

FORM OF AIRCRAFT ACCEPTANCE CERTIFICATE

[●] ("**Buyer**")[2] hereby confirms, pursuant to the Aircraft Sale and Purchase Agreement (SPIRIT-EETC 2026), dated [_____], 2026, among SPIRIT AIRLINES, LLC ("**Seller**") and Buyer (the "**Sale and Purchase Agreement**"), that Buyer's execution of this certificate constitutes its confirmation of its absolute, irrevocable and unconditional acceptance of the Airframe and Engines and that pursuant to the Sale and Purchase Agreement, Buyer is satisfied in every way and in all respects (subject to the discrepancies listed on Annex A hereto) with the condition of the following equipment;

(i)      one (1) Airbus S.A.S. model [A320-232][3] / [A321-231][4] airframe bearing the manufacturer's serial number [number] and U.S. registration mark [N####], in "as is, where is" condition, including all parts, components, appliances, accessories, instruments, furnishings, alterations, and other items of equipment installed in, attached to or related to the Airframe, but excluding the Excluded Equipment ("**Airframe**");

(ii)     two (2) International Aero Engines AG (IAE) model [V2527-A5 Select One][5] / [V2533-A5 Select One][6] engines, bearing the manufacturer's serial numbers [ESN1 & ESN2], in "as is, where is" condition, including all parts, components, appliances, accessories, instruments, furnishings, alterations, and other items of equipment installed in, attached to or related to the Engines, but excluding the Excluded Equipment (each an "**Engine**"); and

(iii)    all Records related to the Airframe and each Engine.

Buyer acknowledges that it is purchasing the Airframe and Engines, in "AS IS", "WHERE IS" and "WITH ALL FAULTS" condition and subject to each and every agreement, exclusion, waiver and disclaimer set forth in the Sale and Purchase Agreement.

Capitalized terms used herein but not otherwise defined shall have the meanings assigned to them in the Sale and Purchase Agreement.

---

[2]      Or Buyer Nominee, if applicable.

[3]      Insert for an Airbus A320 model aircraft.

[4]      Insert for an Airbus A321 model aircraft.

[5]      Insert for an Airbus A320 model aircraft.

[6]      Insert for an Airbus A321 model aircraft.

**[●]**, as Buyer

By: _____

Name: _____

Title: _____

Aircraft SPA (SPIRIT-EETC 2026)

ANNEX A

TO THE

AIRCRAFT ACCEPTANCE CERTIFICATE

**EXCLUDED EQUIPMENT TO BE REMOVED**

[To be included as applicable]

Aircraft SPA (SPIRIT-EETC 2026)

**Exhibit F**

FORM OF WARRANTY BILL OF SALE

**WARRANTY BILL OF SALE**

**SPIRIT AIRLINES, LLC** ("**Seller**"), in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration in hand paid for by [●] ("**Purchaser**")[7], the receipt and sufficiency of which is hereby acknowledged by Seller, has granted, exchanged, sold, conveyed, transferred and delivered, and does by these presents hereby grant, exchange, sell, convey, transfer, deliver and set over unto Purchaser pursuant to that certain Aircraft Sale and Purchase Agreement (SPIRIT-EETC 2026) dated as of [_____], 2026 (the "**Sale and Purchase Agreement**"), between Seller and Purchaser good and valid title to the following described property, with all rights and privileges of ownership thereto:

(i)   one (1) Airbus S.A.S. model [A320-232][8] / [A321-231][9] airframe bearing the manufacturer's serial number [number] and U.S. registration mark [N####], in "as is, where is" condition, including all parts, components, appliances, accessories, instruments, furnishings, alterations, and other items of equipment installed in, attached to or incorporated into the Airframe, but excluding the Excluded Equipment ("**Airframe**"); and

(ii)   two (2) International Aero Engines AG (IAE) model [V2527-A5 Select One] [10] / [V2533-A5 Select One][11] engines, bearing the manufacturer's serial numbers [ESN1 & ESN2], in "as is, where is" condition, including all parts, components, appliances, accessories, instruments, furnishings, alterations, and other items of equipment installed in, attached to or incorporated into the Engines, but excluding the Excluded Equipment (each an "**Engine**");

TO HAVE AND TO HOLD the same unto Purchaser, its successors and assigns forever.

EXCEPT AS SET FORTH ABOVE, THE AIRFRAME AND EACH ENGINE IS SOLD TO PURCHASER "AS-IS, WHERE-IS" AND "WITH ALL FAULTS". SELLER MAKES NO EXPRESS OR IMPLIED WARRANTY INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR PURPOSE, AND NO REPRESENTATION OR AFFIRMATION OF FACT IS

---

[7]   Or Buyer Nominee, if applicable.

[8]   Insert for an Airbus A320 model aircraft.

[9]   Insert for an Airbus A321 model aircraft.

[10]   Insert for an Airbus A320 model aircraft.

[11]   Insert for an Airbus A321 model aircraft.

MADE, WITH RESPECT TO THE AIRCRAFT.  IN NO EVENT SHALL SELLER BE LIABLE TO PURCHASER FOR ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES SUSTAINED BY PURCHASER AS A RESULT OF THE SALE OF THE AIRCRAFT.

**[SIGNATURE PAGE FOLLOWS]**

Aircraft SPA (SPIRIT-EETC 2026)

IN WITNESS WHEREOF, this Bill of Sale has been executed on behalf of Seller by its authorized representative on _____, 202___.

Seller:

**SPIRIT AIRLINES, LLC**

By: _____

Name: _____

Title: _____

Aircraft SPA (SPIRIT-EETC 2026)

**Exhibit G**

[RESERVED]

Exhibit G

## Exhibit H

FORM OF COMPLIANCE CERTIFICATION STATEMENT

=======================

## COMPLIANCE CERTIFICATION

In connection with its activities and other transactions with [Spirit Airlines, Inc.]/[ [●]] ("Recipient") its affiliates, subsidiaries, shareholders, officers, directors, members, managers employees, agents, independent contractors and/or its other representatives, and in further consideration therefor, the undersigned (the "Company"), for itself and for and on behalf of its affiliates, subsidiaries, shareholders, officers, directors, members, managers employees, agents, independent contractors and/or its other representatives represents, warrants, certifies and agrees to the following:

1. The Company, in its dealings with Recipient and otherwise, including without limitation the resale, lease or exchange of parts and other equipment acquired or otherwise received from Recipient, will comply with all applicable laws and regulations, including all of the following as the same are applicable to the transactions and other activities engaged in with Recipient:

   a. U.S. Foreign Corrupt Practices Act and other applicable anti-corruption laws (collectively, "Anti-Corruption Laws");

   b. U.S. Government export control laws and regulations including the International Traffic in Arms Regulations (ITAR) and the Export Administration Regulations (EAR); and

   c. all trade, economic, financial sanctions or export control laws, embargoes or restrictive measures implemented, administered or enforced by any of the following (i) the United States through the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"), the U.S. Department of State, the U.S. Department of Commerce or any other U.S. government entity, and (ii) the European Union (collectively, "Sanctions").

2. The Company will not, in its dealings with Recipient or otherwise, including without limitation the resale, lease or exchange of parts and other equipment acquired or otherwise received from Recipient, transact or otherwise deal with any Person that is a target or subject of any Sanctions, including, without limitation, any Person or entity: (i) designated on a list of sanctions targets issued by OFAC or the US Department of Commerce or US Department of State and/or subject to US blocking Sanctions; (ii) designated on any list(s) of sanctions targets maintained by the European Union; (iii) located, organized or resident in a country or territory

Exhibit G

Aircraft SPA (SPIRIT-EETC 2026)

that is the subject of comprehensive country-wide or territory-wide Sanctions and/or owned or controlled by the government of any such country or territory; and/or (iv) directly or indirectly, owned or controlled, by any Person or entity falling within (i), (ii) or (iii) above, unless the Company shall have obtained prior and effective express authorization from the appropriate agency of the United States Government.  The foregoing, in addition to the laws, regulations, etc. set out in paragraph 1, are hereinafter referred to as "Trade Laws".  For purposes of this certification, "Person" is defined as any individual, agency, firm, association, partnership, joint venture, bank, financial institution, trust, corporation, company, limited liability company, government entity, committee, department, authority or any body or other entity, incorporated or unincorporated, whether having distinct legal personality or not.

3.   The Company has and will maintain policies and procedures to ensure full compliance with the foregoing provisions in paragraphs 1 and 2.

4.   The Company has in place and will maintain in place such policies, procedures and safeguards to ensure that its agents and contractors, and their respective affiliates, subsidiaries, shareholders, officers, directors, members, managers employees, agents, independent contractors and/or its other representatives adhere to the requirements set forth in this certification in connection with the activities contemplated hereby.

5.   The Company will promptly report to Recipient and will cooperate fully with Recipient to investigate and remediate any violations or alleged violations of the Trade Laws.

6.   The Company hereby certifies that all of the information and certifications the Company has provided to Recipient herein are accurate and complete.  The Company agrees that if, after the date of this certification, it becomes aware of any information that would cause such certifications or information to become inaccurate or incomplete, the Company will immediately furnish Recipient with a report detailing such changes in circumstances and will promptly remediate the same.

7.   The Company certifies that all of the facts contained in this statement are true and correct to the best of its knowledge and it does not know of any additional facts that are inconsistent with the above statements.  The Company shall promptly send a replacement statement to Recipient, disclosing any material change of facts or intentions described in this statement that occur after this statement has been prepared and delivered to Recipient.  Compliance with this statement is the Company's material obligation in order to conduct business with Recipient.

8.  The undersigned is a responsible official who has personal knowledge of the information included in this certification, and has the authority to bind the Company to the terms herein.

**[NAME OF COMPANY]**

For the Company

By: _____
    (Name)
    (Title)

Date: _____, 202\_\_

**Exhibit 3 to Exhibit A**

**Sale Notice**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| **In re:** | **Chapter 11** |
| **SPIRIT AVIATION HOLDINGS, INC.**, *et al.*, | **Case No. 25-11897 (SHL)** |
| **Debtors.**[1] | **Jointly Administered** |

### NOTICE OF PUBLIC AUCTION FOR THE
### SALE OF CERTAIN OF THE DEBTORS' AIRCRAFT

Spirit Aviation Holdings, Inc. and its direct and indirect subsidiaries (collectively, the "**Debtors**," the "**Company**," or "**Spirit**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby files this *Notice of Auction for the Sale of Certain of the Debtors' Aircraft* (the "**Sale Notice**") to provide notice of the following:

**PLEASE TAKE NOTICE** that Spirit Airlines, LLC (the "**Seller**") has entered into an Aircraft Sale and Purchase Agreement, dated July [●], 2026 (the "**Aircraft Sale Agreement**"), with Save 2026-B LLC, an entity controlled by certain SuperB Noteholders (the "**Stalking Horse Buyer**") to sell (the "**Sale**") 27 Airbus model A320 aircraft and Airbus model A321 aircraft (each, as described more fully in the Aircraft Sale Agreement, a "**Subject Aircraft**," and collectively, the "**Subject Aircraft**"), subject to the submission of higher or otherwise better offers in an auction process (the "**Auction**").

**PLEASE TAKE FURTHER NOTICE** that, on July [●], 2026, the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") entered the *Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of 27 EETC-Financed Aircraft, (B) Approving the Form and Manner of Applicable Notices and (C) Scheduling an Auction and Sale Hearing* (the "**Bidding Procedures Order**")[2], authorizing the Debtors to conduct the Auction.

---

[1] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order, the Bidding Procedures or the *Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of 27 EETC-Financed Aircraft, (B) Approving the Form and Manner of Applicable Notices and (C) Scheduling an Auction and Sale Hearing and (II) an Order (A) Authorizing the Sale of Aircraft and Related Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests and (B) Granting Related Relief* [ECF No. [●]] (the "**Sale Motion**").

**PLEASE TAKE FURTHER NOTICE** that, pursuant to the Bidding Procedures Order, any party wishing to participate in the Auction must do so in accordance with the Bidding Procedures and the Bidding Procedures Order, including the submission of a Bid meeting the criteria specified in the Bidding Procedures such that it is actually received on or before the Bid Deadline by the parties identified in the Bidding Procedures.

**PLEASE TAKE FURTHER NOTICE** that, if Spirit receives one or more Qualified Bids (excluding consideration the Aircraft Sale Agreement with the Stalking Horse Buyer) within the requirements and time frame specified by the Bidding Procedures, Spirit will conduct the Auction on September 9, 2026, at 10:00 a.m. (prevailing Eastern Time) virtually by Zoom.

**PLEASE TAKE FURTHER NOTICE** that Spirit will seek approval of the Sale before the Honorable Sean H. Lane of the United States Bankruptcy Court for the Southern District of New York, on September 16, 2026, at 11:00 a.m. (prevailing Eastern Time).

**PLEASE TAKE FURTHER NOTICE** that any objections to the proposed Sale and any other relief requested in the Sale Motion shall be shall be (a) in writing, in English, and in text-searchable format, (b) filed with the Bankruptcy Court electronically, (c) set forth the name of the objecting party, the nature and amount of any claims or interests held or asserted against the Debtors' estates, the basis for the objection and the specific grounds therefor and (d) served on the Debtors and the Sale Notice Parties specified in the Bidding Procedures Order so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on September 14, 2026 (the "**Objection Deadline**"), in each case, in accordance with the Bidding Procedures Order, Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), the Court's *Order Implementing Certain Notice and Case Management Procedures* [ECF No. 61], and the Court's Chambers' Rules (available at https://www.nysb.uscourts.gov/content/judge-sean-h-lane), to the extent applicable.

### CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE SALE ON OR BEFORE THE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS EFFECTED THEREUNDER, WITH SUCH LIENS ATTACHING ONLY TO THE PROCEEDS OF SUCH TRANSACTIONS.**

**PLEASE TAKE FURTHER NOTICE** that copies of the Sale Motion and the Bidding Procedures Order, as well as all related exhibits including the Bidding Procedures and the Aircraft Sale Agreement, may be obtained (i) from the Debtors' notice, claims and balloting agent, Epic at its website at https://dm.epiq11.com/case/spirit, by clicking on the "Dockets" link or (ii) for a fee via PACER at https://ecf.nysb.uscourts.gov/.

Dated:   [●], 2026
         New York, NY

                                        DEBEVOISE & PLIMPTON LLP

                                        /s/
                                        Jasmine Ball
                                        Elie J. Worenklein
                                        66 Hudson Boulevard East
                                        New York, NY 10001
                                        Tel.: (212) 909-6000
                                        jball@debevoise.com
                                        eworenklein@debevoise.com

                                        *Fleet Counsel to the Debtors and Debtors in
                                        Possession*

**Exhibit 4 to Exhibit A**

**Publication Notice**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **SPIRIT AVIATION HOLDINGS, INC.,** *et al.*, | **Case No. 25-11897 (SHL)** |
| **Debtors.**[1] | **Jointly Administered** |

## NOTICE OF PUBLIC AUCTION FOR THE
## SALE OF CERTAIN OF THE DEBTORS' AIRCRAFT

Spirit Aviation Holdings, Inc. and its direct and indirect subsidiaries (collectively, the "**Debtors**," the "**Company**," or "**Spirit**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), hereby provides this *Notice of Public Auction for the Sale of Certain of the Debtors' Aircraft* (the "**Publication Notice**") to provide notice of the following:

**Proposed Sale of Aircraft**. Spirit Airlines, LLC (the "**Seller**") has entered into an Aircraft Sale and Purchase Agreement, dated July [●], 2026 (the "**Aircraft Sale Agreement**"), with Save 2026-B LLC, an entity controlled by certain SuperB Noteholders (the "**Stalking Horse Buyer**") to sell (the "**Sale**") 27 Airbus model A320 aircraft and Airbus model A321 aircraft (each, as described more fully in the Aircraft Sale Agreement, a "**Subject Aircraft,**" and collectively, the "**Subject Aircraft**"), subject to the submission of higher or otherwise better offers in an auction process (the "**Auction**").

**Approval of Bidding Procedures Order**. On [●], the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") entered the *Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of 27 EETC-Financed Aircraft, (B) Approving the Form and Manner of Applicable Notices and (C) Scheduling an Auction and Sale Hearing* (the "**Bidding Procedures Order**")[2], authorizing the Debtors to conduct the Auction.

---

[1]    The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bidding Procedures Order, the Bidding Procedures or the *Debtors' Motion for Entry of (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of 27 EETC-Financed Aircraft, (B) Approving the Form and Manner of Applicable Notices and (C) Scheduling an Auction and Sale Hearing and (II) an Order (A) Authorizing the Sale of Aircraft and Related Assets Free and Clear of All Liens, Claims, Encumbrances, and Other Interests and (B) Granting Related Relief* [ECF No. [●]] (the "**Sale Motion**").

**Potential Bids**. Pursuant to the Bidding Procedures Order, any party wishing to participate in the Auction must do so in accordance with the Bidding Procedures and the Bidding Procedures Order, including the submission of a Bid meeting the criteria specified in the Bidding Procedures such that it is actually received on or before the Bid Deadline by the parties identified in the Bidding Procedures.

**Public Auction**. If Spirit receives one (1) or more Qualified Bids (excluding the Aircraft Sale Agreement with the Stalking Horse Buyer) within the requirements and time frame specified by the Bidding Procedures, Spirit will conduct the Auction on September 9, 2026, at 10:00 a.m. (prevailing Eastern Time) virtually by Zoom.

**Sale Hearing**. Spirit will seek approval of the Sale before the Honorable Sean H. Lane of the United States Bankruptcy Court for the Southern District of New York, on September 16, 2026, at 11:00 a.m. (prevailing Eastern Time).

**Filing Objections to the Sale**. Any objections to the proposed Sale and any other relief requested in the Sale Motion shall be (a) in writing, in English, and in text-searchable format, (b) filed with the Bankruptcy Court electronically, (c) set forth the name of the objecting party, the nature and amount of any claims or interests held or asserted against the Debtors' estates, the basis for the objection and the specific grounds therefor and (d) served on the Debtors and the Sale Notice Parties specified in the Bidding Procedures Order so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on September 14, 2026 (the "**Objection Deadline**"), in each case, in accordance with the Bidding Procedures Order, Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), the Court's *Order Implementing Certain Notice and Case Management Procedures* [ECF No. 61], and the Court's Chambers' Rules (available at https://www.nysb.uscourts.gov/content/judge-sean-h-lane), to the extent applicable.

**CONSEQUENCES OF FAILING TO TIMELY FILE AND SERVE AN OBJECTION**

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY FILE AND SERVE AN OBJECTION TO THE SALE ON OR BEFORE THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE BIDDING PROCEDURES ORDER SHALL BE FOREVER BARRED FROM ASSERTING ANY OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE PROPERTY FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS EFFECTED THEREUNDER, WITH SUCH LIENS ATTACHING ONLY TO THE PROCEEDS OF SUCH TRANSACTIONS.**

**Obtaining Additional Information**. Copies of the Sale Motion and the Bidding Procedures Order, as well as all related exhibits including the Bidding Procedures and the Aircraft Sale Agreement, may be obtained (i) from the Debtors' notice, claims and balloting agent, Epiq at its website at https://dm.epiq11.com/case/spirit, by clicking on the "Dockets" link or (ii) for a fee via PACER at https://ecf.nysb.uscourts.gov/.

Dated: [●], 2026
New York, NY

DEBEVOISE & PLIMPTON LLP

*/s/*_____
Jasmine Ball
Elie J. Worenklein
66 Hudson Boulevard East
New York, NY 10001
Tel.: (212) 909-6000
jball@debevoise.com
eworenklein@debevoise.com

*Fleet Counsel to the Debtors and Debtors in
Possession*

3