**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------

In re:                                                        Case No.: <u>25-11897</u>  (SHL)

                                                             Chapter  <u>  11  </u>

SPIRIT AVIATION HOLDINGS, INC., et al.,

                                      Debtors [1]              Jointly Administered

------------------------------------------------------------------

-

### <u>IHSAN AIR, LLC'S OBJECTION TO PROPOSED SALE OF LAGUARDIA SLOT INTERESTS, MOTION TO CONTINUE SALE HEARING, AND REQUEST FOR MODIFIED BIDDING PROCEDURES</u>

Ihsan Air, LLC, by and through its proposed parent and affiliated bidder, Ihsan Holdings, Inc. (collectively, "Ihsan"), hereby submits this objection (the "Objection") to the proposed sale of the Debtor's LaGuardia Airport 22 slot interests (the "LGA Slots") and moves for entry of an order continuing the sale hearing and requiring a modified process that permits fair participation by qualified new entrants. In support of this Objection, Ihsan respectfully states as follows.

**Preliminary Statement**

This sale process is moving too fast, is too narrow, and is too tilted toward incumbent carriers to satisfy the estate's duty to maximize value for one of the rarest and most strategically important aviation assets in the country. The Debtor is attempting to monetize 22 LaGuardia slot interests in a manner that appears designed to produce speed and incumbent convenience rather than genuine price discovery, competitive tension, or a public-interest-sensitive allocation of scarce airport access.

Ihsan is not objecting to create noise. Ihsan is objecting because it is a real bidder with a defined transaction concept, a rational valuation framework, an operational-readiness plan, and a community-centered airline launch thesis that is supported by management and advisory personnel identified in Ihsan's internal materials. Ihsan's current valuation is straightforward: $60,000,000 for all 22 slots, which implies a pro rata value of $2,727,272.73 per slot and approximately $16,363,636.36 for a six-slot package, subject to due diligence, documentation, regulatory approvals, and process fairness. This is not a spoiler objection. It is a value-maximizing objection.

If the Court allows a rushed or incumbent-biased process to proceed, the estate risks leaving money on the table and the traveling public risks losing the opportunity for a new entrant that is specifically designed to lower fares and broaden access at LaGuardia. That is not a record on which this Court should approve a sale.

**Jurisdiction and Basis**

This Court has jurisdiction over this contested matter pursuant to 28 U.S.C. sections 157 and 1334. This is a core proceeding under 28 U.S.C. section 157(b). Relief in a contested matter is properly sought by motion under Bankruptcy Rule 9014, and the Court must provide procedures sufficient to address disputed material facts at a meaningful hearing.

To the extent the Debtor seeks approval of a sale under section 363 of the Bankruptcy Code, the Debtor bears the burden of demonstrating an adequate basis for the transaction and a record sufficient to support the exercise of business judgment. Bankruptcy sale objections commonly focus on whether the process was structured to maximize value and whether bidders had a meaningful opportunity to participate.

**Facts Relevant to the Objection**

1. The Debtor is seeking to sell or otherwise transfer 22 LaGuardia slot interests.

2. LaGuardia slots are scarce rights with exceptional strategic value because they confer access to a constrained and high-demand airport market.

3. Federal regulations expressly contemplate that slots may be bought, sold, or leased for consideration, subject to applicable transfer rules and FAA confirmation requirements.

4. Ihsan seeks to acquire, at minimum, six of the 22 slots as the foundation for a focused new-entrant service launch at LaGuardia.

5. Ihsan values the full 22-slot package at $60,000,000, and therefore values a six-slot package at approximately $16,363,636.36 based on a straight-line pro rata allocation.

6. Ihsan is prepared to present a transaction that combines purchase price, launch commitments, service commitments, and community-benefit positioning in a manner that should be attractive to the estate and relevant public authorities.

7. Ihsan's internal materials identify a management and advisory structure aimed at airline certification, flight operations buildout, safety governance, finance, and regulatory readiness.

8. Those materials identify a Capt. from one of the major legacy carriers (name left off for confidentiality reasons) as chief executive officer of Ihsan Airlines with responsibility for FAA air-carrier certificate acquisition, Part 121 operations buildout, and launch fleet management.

9. Those materials also identify Ken Paskar as an FAA Safety Operations Advisor and target board director, and describe him as the founder of The Black Rock Group, a former chief executive of MSN Air Services, a recipient of an FAA Proficiency Award, and a lead safety representative in the FAA Safety Team network.

10. On information and belief, Mr. Paskar and his team are assisting Ihsan in evaluating operational readiness, safety, regulatory pathway issues, and the practical requirements for becoming operational if awarded slots, which further distinguishes Ihsan from a purely financial or speculative bidder.

11. The current process, on information and belief, does not adequately accommodate a bidder seeking a six-slot package or other structured alternative that preserves meaningful new-entry competition.

**Objection**

**A. The sale process is impermissibly compressed and structurally favors incumbents.**

The Court should not bless a process that is fast on paper but exclusionary in practice. New-entrant airline bidders require time to complete diligence, confirm regulatory strategy, structure financing, finalize operating assumptions, and prepare a bid that the Court can take seriously. Incumbent carriers already present at LaGuardia do not face those same barriers. A compressed timeline therefore does not operate neutrally; it functions as an incumbent preference.

That matters here because the asset is not generic equipment or fungible inventory. These are LaGuardia slots. They are scarce, strategic, and central to market entry. Where the process design effectively privileges incumbent integration over competitive bidding, the resulting auction cannot fairly be described as value maximizing.

**B. The Debtor has not shown that the proposed process will maximize estate value.**

The Debtor's job is not to close quickly. The Debtor's job is to maximize value. A process that is too rushed to permit qualified new entrants to participate meaningfully suppresses competitive tension and reduces the likelihood that the estate will see the highest or best transaction available.

Ihsan is not asking the Court to speculate about hypothetical value. Ihsan has put forward a concrete valuation framework: $60 million for all 22 slots, and $16.363636 million for six slots on a pro rata basis. That valuation is paired with an operational-readiness showing that goes beyond a bare number. Ihsan has identified personnel focused on FAA certification, Part 121 buildout, safety governance, and airline launch execution, including a Capt. from a major legacy carrier (name left off for confidentiality reasons) and Ken Paskar. That is enough, at minimum, to require the Debtor to explain why a process that forecloses or discourages a six-slot bid is reasonably calculated to produce the best result.

The Debtor should also be required to explain whether it solicited or would accept bids for subsets of slots, whether it imposed qualification standards that new entrants could realistically satisfy, and whether it has explored allocation structures that could increase both price and regulatory acceptability.

**C. Public-interest and competition concerns weigh strongly in favor of a modified process.**

LaGuardia is a constrained airport, and slot allocation directly affects market entry, consumer choice, and fare levels. When a distressed estate sells concentrated access rights at such an airport, the process should not ignore the difference between an incumbent add-on and a genuine new entrant.

Ihsan's strategy is to use at least six LaGuardia slots to launch service as a lower-fare airline positioned between the harshest ultra-low-cost model and the pricing typically associated

with legacy carriers. The point is not merely to replicate another stripped-down ULCC. The point is to create lower fares with a more disciplined, respectful, family-oriented product and a broader community mission. That is a legitimate public-interest consideration when scarce airport access is being redistributed.

Ihsan's brand guidelines emphasize fair pricing, family-friendly travel, multicultural hospitality, dignity, trust, and community partnership, and expressly reject confusing fees, poor customer service, disrespect toward families, and growth without community benefit. Those commitments strengthen, rather than weaken, the case for giving a qualified new entrant a fair chance to compete for slots at LaGuardia.

If the Debtor wants the Court to approve a transaction that further concentrates LaGuardia access, the Debtor should be required to establish why that outcome is better for the estate and the public than a process that reserves room for a credible entrant seeking six slots.

**D. The Court should require a process that permits bids for all 22 slots, subsets of slots, and structured alternatives.**

The all-or-nothing framing is part of the problem. Federal slot-transfer rules recognize that slots may be transferred in combinations and for consideration, subject to applicable requirements and FAA confirmation procedures. Nothing in the basic transfer framework requires the Debtor to sell only the entire 22-slot package to one incumbent buyer.

A properly designed process would permit:

- bids for all 22 slots;

- bids for smaller packages, including a six-slot package;

- phased-closing transactions;

- transactions paired with service commitments;

- and negotiated structures that preserve room for both value maximization and new-entry competition.

The Debtor should not be permitted to hide behind process architecture when a better architecture is available.

**E. Ihsan is a serious bidder with operational credibility, not a spoiler.**

This Court should not mistake aggression for gamesmanship. Ihsan is not here to posture. Ihsan is here to buy and operate. It seeks a fair chance to acquire at least six LaGuardia slots at a pro rata value of approximately $16.363636 million derived from a $60 million value for the full 22-slot package, with flexibility to improve structure and terms in a process that is genuinely open.

Ihsan's presence improves the process. It creates leverage for the estate, enhances competition among bidders, and opens the door to a sale framework that can better satisfy airport, regulatory, and public-interest concerns. That is especially true where Ihsan has identified personnel focused on FAA certification, safety oversight, and operational launch execution, including Ken Paskar in an FAA safety operations advisory role and a Capt. from a major legacy carrier (name left off for confidentiality) in a Part 121 buildout role.[cite:15] The estate loses

nothing by testing that value in an orderly process. The estate loses a great deal by shutting that value out.

**Requested Relief**

WHEREFORE, Ihsan respectfully requests that the Court enter an order:

1. sustaining this Objection;

2. continuing the sale hearing for a sufficient period to permit meaningful participation by qualified new entrants;

3. directing the Debtor to reopen or modify the marketing and bidding procedures for the LGA Slots;

4. requiring the Debtor to permit bids for all 22 slots, for six-slot and other subset packages, and for structured alternatives reasonably designed to maximize value;

5. requiring the Debtor to disclose the qualification standards, marketing efforts, and reasons for excluding or burdening new-entrant participation, if any;

6. prohibiting approval of any sale of the LGA Slots unless and until the Court is satisfied that the process was reasonably designed to maximize value and did not improperly foreclose credible bidding alternatives;

7. granting Ihsan standing to participate fully as a qualified bidder in any revised process;

8. and granting such other and further relief as the Court deems just and proper.

Dated: July 20, 2026
Atlanta, Georgia

Respectfully Submitted,

**THE ACE LAW, LP**

By: ___Nafisah Fudaeel_____

Bar Id 279193

*Counsel to Ihsan Holdings, Inc.*

863 Flat Shoals Rd SE Ste 197
Atlanta, Georgia 30094
Georgia Bar No: 279193
Email address:  nmf@munirahlawgroup.com
Telephone: 855-829-7623

---

[1] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.