DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Tel.: (212) 450-4000
Marshall S. Huebner
Darren S. Klein
Christopher S. Robertson

*Counsel to the Debtors and Debtors in Possession*

| | |
|---|---|
| **UNITED STATES BANKRUPTCY COURT** | **Re: ECF Nos. 1213, 1359** |
| **SOUTHERN DISTRICT OF NEW YORK** | |

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **SPIRIT AVIATION HOLDINGS, INC.,** *et al.*, | **Case No. 25-11897 (SHL)** |
| **Debtors.**[1] | **Jointly Administered** |

### DEBTORS' REPLY TO IHSAN AIR, LLC'S OBJECTION TO PROPOSED SALE OF LAGUARDIA SLOT INTERESTS, MOTION TO CONTINUE SALE HEARING, AND REQUEST FOR MODIFIED BIDDING PROCEDURES

Spirit Aviation Holdings, Inc. and its subsidiaries (collectively, the "**Debtors**" or

"**Spirit**"), each of which is a debtor and debtor in possession in the Chapter 11 Cases,[2]

respectfully submit this reply (the "**Reply**") to *Ihsan Air, LLC's Objection to Proposed Sale of*

*LaGuardia Slot Interests, Motion to Continue Sale Hearing, and Request for Modified Bidding*

*Procedures* [ECF No. 1359] (the "**Objection**"), filed by Ihsan Air, LLC by and through its

proposed parent and affiliated bidder, Ihsan Holdings (collectively "**Ihsan**") on July 20, 2026,

---

[1] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the *Debtors' Motion of the Debtors for Entry of Orders (I)(A) Approving Bidding Procedures For Sale Of The Debtors' Assets, (B) Authorizing the Potential Selection of Stalking Horse Bidder(s), (C) Approving Bid Protections, (D) Scheduling Auction(s) for, and Hearing(s) to Approve, The Sale of the Debtors' Assets, (E) Approving the Form and Manner of Notices of Sale, Auction(s), and Sale Hearing(s), And (F) Approving the Assumption and Assignment Procedures, (II)(A) Approving the Sale of the Debtors' Assets Free and Clear of Liens, Claims, Interests, and Encumbrances and (B) Authorizing Assumption And Assignment Of Executory Contracts and Unexpired Leases, and (III) Granting Related Relief* [ECF No. 1117] (the "**Bidding Procedures Motion**"), the Bidding Procedures (as defined therein and approved by order of this Court on June 22, 2026 [ECF No. 1213] (the "**Bidding Procedures Order**") or the Objection, as applicable.

and in further support of the Bidding Procedures Motion, the Bidding Procedures Order, and the transfer of the LGA Slots to JetBlue Airways Corporation ("**JetBlue**") as the Successful Bidder following an auction conducted in accordance with the Bidding Procedures,[3] and state the following:

1.      The auction for the LGA Slots was an extraordinary success.  Over the course of more than fourteen hours starting on the morning of July 16, seven U.S. airlines engaged in a robust and competitive process that ultimately produced a winning bid of $58,500,000 from JetBlue for all 22 available LGA Slots.  When the process concluded in the early morning hours of July 17, after multiple rounds of back-and-forth bids (many of which, contrary to Ihsan's baseless assertions, involved bids for less than all of the LGA Slots), the next-highest offer (from Frontier Airlines, Inc. ("**Frontier**")) stood at $57,500,000.   The auction unquestionably generated the highest and best proposal for the LGA Slots, taking into account economic and important non-economic factors, including the likelihood of closing a transaction with an operating low-cost carrier.[4]  Given the complexity of and the regulatory and other constraints implicated by the LGA Slots, the Debtors believe that the auction yielded both fair and the best available consideration.   Unsurprisingly, no creditor objects to the transaction.

2.      The process and timeline for marketing and transferring the LGA Slots was set out in detail in the Bidding Procedures Motion and the Bidding Procedures.  If Ihsan believed that the Bidding Procedures unreasonably excluded entities that only exist on paper, own no aircraft or related assets, possess no authority to operate an airline from either the Department of

---

[3] *See Notice of Auction Results and Scheduled Hearing for the LGA Slots* [ECF No. 1352].

[4] *See* Allyson Versprille, *Spirit's LaGuardia Slots Should Go to Low-Cost Carrier, FAA Says*, Bloomberg (May 28, 2026) (quoting FAA Administrator Bryan Bedford as stating that "[a]s long as the slots are going to a low-fare airline and for the public good, the FAA and DOT would support that").

Transportation ("**DOT**") or the Federal Aviation Administration ("**FAA**"), cannot demonstrate the financial or operational wherewithal to consummate a transaction of this magnitude and may never fly a single route, then it should have objected to approval of the Bidding Procedures. But it did not.

3.        Ihsan is also under at least three major misconceptions regarding the process. First, the Debtors had a clear need to conduct this process in an expeditious manner. Spirit ceased flight operations at 3:00 a.m. on May 2, 2026. Under the Congestion Management Rule for LaGuardia Airport, issued December 27, 2006, as amended and extended, a copy of which is attached hereto as **Exhibit A** (the "**FAA Order**") and applicable regulations, the LGA Slots are subject to a requirement that each slot be used at least eighty percent (80%) of the time over any given two-month reporting period. The Debtors clearly cannot comply with this "use-or-lose" requirement given that they are not operating. The FAA has approved a waiver of these usage requirements, but (for now) only through August 1, 2026. It was therefore necessary for the Debtors to move with appropriate speed to identify a transferee or transferees that could operate the LGA Slots in the near term so that the FAA would not enforce the rule and take the slots back, leaving the estate with nothing. Ihsan assert that the estate "loses nothing" by conducting a prolonged process that would allow entities like Ihsan to come into existence, acquire the assets to form an operating airline, obtain all requisite regulatory approvals, source financing, and ultimately bid on the LGA Slots. That unsupported assertion is flatly wrong.

4.        Second, at no time did the Debtors specify that a bidder had to bid for all 22 LGA Slots. In fact, many bidders placed partial bids for a subset of the LGA Slots, which was entirely consistent with the Bidding Procedures.

3

5.      Third, the auction process was lengthy and robust, producing a Successful Bid and Alternate Bid that were significantly above the value of the Starting Bid.  The Debtors believe that all of the bidders – including JetBlue and Frontier – acted and bid in good faith and in compliance with the Bid Procedures (and that none was or is an insider or affiliate of any Debtor).  Ihsan's presence would not have "improve[d] the process" or "increased leverage for the estate", as Ihsan suggests.  Objection p. 4.  Ihsan simply has not demonstrated the financial wherewithal or structural ability to consummate a transaction or the ability to operate any of the LGA Slots on any reasonable timeline.  Among myriad other deficiencies, under the FAA Order, the FAA "will not assign operating authority under the [FAA Order] to any person or entity other than a certificated U.S. or foreign air carrier with appropriate economic authority and with operating authority from FAA." The Court-approved Bidding Procedures – to which no creditor or potential bidder objected[5] – were designed to allow the Debtors not to include parties like Ihsan in the process.

6.      Moreover, Ihsan did submit a bid and sought to participate in the process.  And, as described in the declaration of Mr. Herlihy, that bid did not satisfy the requirements set forth in the Court-approved Bidding Procedures to constitute a Qualified Bid.  Among other things, Ihsan did not submit "written evidence acceptable to the Debtors, in their discretion and in consultation with the applicable Consultation Parties, demonstrating financial wherewithal, operational ability, and corporate authorization to consummate the proposed transaction."  Bidding Procedures p. 7.  This despite PJT explicitly requesting twice, in writing, that Ihsan do so.  Ihsan's submission was also not accompanied by a cash deposit in an amount equal to ten percent of the consideration set

---

[5] The Port Authority of New York & New Jersey (the "**Port Authority**") raised a limited objection [ECF No. 1152] to the Bidding Procedures that focused solely on the Port Authority's involvement in the transfer process in its role as operator of the LaGuardia Airport.

forth in connection with its bid.  Bidding Procedures p. 9.  Those multiple deficiencies were fatal.[6]  Under the Bidding Procedures, "[a] bid received from a Potential Bidder will constitute a Qualified Bid only if it includes all of the Required Bid Documents and meets all of the above requirements, as determined by the Debtors in consultation with the Consultation Parties." Bidding Procedures p. 11.  And only "representatives or agents of the Debtors, the Consultation Parties, and the Qualified Bidders . . . and the legal and financial advisors to each of the foregoing" were entitled to attend the auction.  Bidding Procedures p. 14.  Ihsan – for very good reason – was not certified as a Qualified Bidder, and it was not invited to move forward in the auction process for that reason.

7.      To the extent that Ihsan is objecting to the transaction on the grounds that its bid represents a better offer than the Successful Bid, the objection should be overruled for lack of standing.  Numerous courts have held that a potential alternative bidder or an unsuccessful bidder does not have the standing to object to a sale in a chapter 11 case. *Kabro Assocs., LLC v. Colony Hill Assocs.*, 111 F.3d 269 (2d Cir. 1997) (holding that an unsuccessful bidder, whose only pecuniary loss is the speculative profit it might have made had it succeeded in purchasing property at an auction, lacks standing to challenge a bankruptcy court's approval of a sale transaction); *Calpine Corp. v. O'Brien Envtl. Energy, Inc.*, 181 F.3d 527, 531 (3d. Cir. 1999) (noting that creditors usually have standing to challenge a bankruptcy sale, but disappointed prospective purchasers do not); *In re Quanalyze Oil & Gas Corp.*, 250 B.R. 83, 89 (Bankr. W.D. Tex. 2000) ("[a] competing bidder normally lacks standing to even challenge a sale, much less seek reconsideration of an order approving sale"); *In re Gulf States Steel, Inc. of Alabama*, 285

---

[6] In addition, by its own admission, Ihsan's proposal is "subject to due diligence."  Objection p. 1.  A bid conditioned on "the outcome of unperformed due diligence" is also not a Qualified Bid under the terms of the Bidding Procedures.  Bidding Procedures p. 8.

B.R. 739, 742–43 (Bankr. N.D. Ala. 2002) (agreeing that a competing bidder lacks standing to challenge a sale); *In re Condere Corp.*, 228 B.R. 615, 624 (Bankr. S.D. Miss. 1998) (same). Moreover, courts have recognized that bankruptcy statutes and rules governing sales operate to benefit the estate and its stakeholders, not potential purchasers. *In re HST Gathering Co.*, 125 B.R. 466, 468 (W.D. Tex. 1991) (explaining that prospective purchasers, whose only interest in the proceeding was that it desired to purchase certain assets of the estate, are "not within the 'zone of interests intended to be protected' under the bankruptcy statutes and regulations"); *In re NEPSCO, Inc.*, 36 B.R. 25, 27 (Bankr. D. Me. 1983) ("relevant bankruptcy statutes and rules were not enacted to protect prospective bidders"). Accordingly, objections from the position of a failed alternative bidder or an unsuccessful bidder should granted no credence.

8.      An unsuccessful bidder may have standing to challenge the actions of a successful bidder that "destroyed the intrinsic fairness of the transaction so that it was not a good faith purchaser." *Macquarie Rotorcraft Leasing Holdings Ltd. v. LCI Helicopters*, 607 B.R. 143, 146 (Bankr. S.D.N.Y. 2019) (internal citation omitted). However, to challenge the intrinsic fairness of a sale, "the disappointed bidder must allege that sale was tainted by fraud, bad faith, collusion, deceit, mistake or unfairness." *Id*. (internal citations omitted). There is no hint – and could be no allegation – in the Objection, or anywhere in the record, that the auction process was tainted in this manner. The rules were clear and were approved by the Court (without objection by Ihsan). And they were scrupulously followed, with a court reporter transcribing to boot. As described in the testimony of Mr. Herlihy, the Debtors and the Successful Bidder complied in all respects with the Bidding Procedures and the Bidding Procedures Order, the auction was duly noticed and was substantively and procedurally fair to all parties, and was conducted in a diligent,

6

non-collusive, fair and good-faith manner.  At the conclusion of that process, the Debtors, in their sound business judgment, selected the Successful Bidder and the Alternate Bidder for the LGA Slots.  Under the terms of the Bidding Procedures, Ihsan was unable to submit a Qualified Bid, but that in no way suggests a scintilla of intrinsic unfairness.

9.      Finally, Ihsan's Objection on its face does not suggest that the Debtors conducted a process that led to a less-than-optimal outcome.  Ihsan complains that it would have liked to have had the opportunity to bid for six of the 22 available slots at a price of $16,363,636.36, which –  they incorrectly assert with no evidence or even argument – implies a valuation of $60,000,000 for the full allotment.  This is flatly wrong, as some of the slots are far more desirable and valuable than others. The Successful Bid is in the amount of $58,500,000, from a certified air carrier that already operates at LaGuardia, and the Debtors believe that it has an extremely high certainty of closing.  It would be entirely consistent with the Bidding Procedures for the Debtors to accept a lower bid with a higher certainty of closing, and as discussed above, Ihsan's proposal is nowhere near actionable.[7]  Nor is it even higher.  At all.

10.     Moreover, Ihsan does not specify which six slots it would be interested in acquiring.  If it is interested in the most favorable arrival and departure times, the proposal would not be anywhere near value-maximizing from even a basic dollars-and-cents perspective (and ignoring all other factors).  The Debtors received and considered many bids for less than the full

---

[7] Under the terms of the Bidding Procedures, "the Debtors may, in their discretion and in consultation with the Consultation Parties, evaluate bids on any grounds, including, but not limited to, (i) the amount of the purchase price, including non-cash consideration, set forth in the bid, (ii) the value to be provided to the Debtors under the bid, including the net economic effect upon the Debtors' estates, (iii) any benefit to the Debtors' estates from any assumption of liabilities or waiver of liabilities, including the release or replacement of letters of credit, (iv) the transaction structure and execution risk, including conditions to and certainty of closing, termination provisions, availability of financing and financial wherewithal to meet all commitments, and required governmental or other approvals, (v) the anticipated timing to closing, (vi) the presence of any governmental, licensing, regulatory, or other approvals or consents in a bid, and the anticipated timing or likelihood of obtaining such approvals or consents, and (vii) any other factors the Debtors may reasonably deem relevant consistent with their fiduciary duties."  Bidding Procedures p. 11.

complement of LGA Slots. Ihsan's per-slot value of $2,727,272.73 is not the highest. It is not even close. In fact, the Debtors received multiple partial bids with higher per-slot values. Ultimately, however, the Debtors determined to accept a bid for all 22 LGA Slots, based on a combination of their evaluation of transaction risk and the simple fact that it is not necessarily value-maximizing to accept a partial bid for the most desirable slots only to have to find another party that is interested in paying a high price for the remainder.

11. There is absolutely no basis in the law, and no economic sense, to derail the transaction with the Successful Bidder so that a different and highly speculative deal with a non-qualified party that is not an airline may or may not someday come together in the future, with financing, that on its own terms may actually offer less benefit to the estate were it even remotely feasible.

12. Ihsan describes its proposal as being in the public interest (*see, e.g.,* Objection p. 4) and conducive to a more open and competitive bidding process. This unsupported claim is baseless, and is nothing more than a gambit to try to force the Debtors to abandon a truly value-maximizing transaction so that one party with nothing more than a "launch thesis" for an airline – no regulatory approvals, no financing, no aircraft, and no ability to execute – to be allowed time to the estate's extreme detriment to see if it can someday become a real bidder. The Objection <u>does not cite a single case</u>, let alone attempt to address the clear standing issues that a disappointed bidder must overcome to challenge the results of a successful sale. The request should be denied.

13. The Debtors therefore respectfully request that the Objection be overruled.

[*Remainder of Page Intentionally Left Blank*]

8

Dated:   July 21, 2026
         New York, New York

DAVIS POLK & WARDWELL LLP

By:   */s/ Christopher S. Robertson*
450 Lexington Avenue
New York, NY 10017
Tel.: (212) 450-4000
Marshall S. Huebner
Darren S. Klein
Christopher S. Robertson

*Counsel to the Debtors and Debtors in Possession*

**Exhibit A**
**FAA Order**

**ACTION:** Notice and request for comments.

**SUMMARY:** In accordance with the Paperwork Reduction Act of 1995, FAA invites public comments about our intention to request the Office of Management and Budget (OMB) approval to renew an information collection. The **Federal Register** Notice with a 60-day comment period soliciting comments on the following collection of information was published on March 14, 2024. The collection involves maintaining and recording ''the status of life-limited parts of each airframe, engine, propeller, rotor, and appliance. The information to be collected is necessary for verifying the time-life of life-limited parts and is used to ensure parts that have reached their life-limit are not installed on an aircraft, or are removed from an aircraft and properly dispositioned.

**DATES:** Written comments should be submitted by June 12, 2024.

**ADDRESSES:** Written comments and recommendations for the proposed information collection should be sent within 30 days of publication of this notice to *www.reginfo.gov/public/do/ PRAMain.* Find this particular information collection by selecting ''Currently under 30-day Review—Open for Public Comments'' or by using the search function.

**FOR FURTHER INFORMATION CONTACT:** Randy.A.Shafer by email at: *Randy.A.Shafer@faa.gov;* phone: 217– 971–8378.

**SUPPLEMENTARY INFORMATION:**
*Public Comments Invited:* You are asked to comment on any aspect of this information collection, including (a) Whether the proposed collection of information is necessary for FAA's performance; (b) the accuracy of the estimated burden; (c) ways for FAA to enhance the quality, utility and clarity of the information collection; and (d) ways that the burden could be minimized without reducing the quality of the collected information.

*OMB Control Number:* 2120–0665.
*Title:* Safe Disposition of Life-Limited Aircraft Parts.
*Form Numbers:* N/A.
*Type of Review:* Renewal of an information collection.
*Background:* The **Federal Register** Notice with a 60-day comment period soliciting comments on the following collection of information was published on March 14, 2024 (89 FR 18700). The installation of parts that have exceeded their manufacturer specified life-limit onto aircraft operating in the National Airspace (NAS) compromises the safety

of the public who fly on those aircraft. The FAA has found life-limited parts that exceeded their operating limitations installed on aircraft through accident investigations, Suspected Unapproved Parts (SUPS) reports, and routine surveillance activities. To help prevent the installation of aircraft parts that have reached their life-limit, the FAA has instituted regulations that require persons who remove parts that have reached their life limit, to properly disposition those parts. Proper disposition may include part recordkeeping, tagging, marking, segregation, mutilation, or another method approved or accepted by the FAA. Additionally, when requested by a person required to disposition a life-limited part, the holder of a type certificate or design approval for a life-limited part must provide marking instructions or must state that the part cannot be practicably marked without compromising its integrity.

*Respondents:* 22,000 aircraft maintenance providers and design approval holders.
*Frequency:* As needed.
*Estimated Average Burden per Response:* 30 minutes per response.
*Estimated Total Annual Burden:* 53,500 hours.

Issued in Washington, DC, on May 7, 2024.

**Tanya A. Glines,**
*Aviation Safety Inspector, Office of Safety Standards, Aircraft Maintenance Division, Airmen Section.*

[FR Doc. 2024–10316 Filed 5–10–24; 8:45 am]
**BILLING CODE 4910–13–P**

---

**DEPARTMENT OF TRANSPORTATION**

**Federal Aviation Administration**

**Operating Limitations at New York LaGuardia Airport**

**AGENCY:** Federal Aviation Administration (FAA), Department of Transportation (DOT).

**ACTION:** Extension to order.

**SUMMARY:** This action extends the Order Limiting Operations at New York LaGuardia Airport (LGA) published on December 27, 2006, as most recently extended October 28, 2022. The Order remains effective until October 24, 2026.

**DATES:** This action is effective on October 27, 2024.

**ADDRESSES:** Requests may be submitted by mail to Slot Administration Office, System Operations Services, AJR–0, Room 300W, 800 Independence Avenue SW, Washington, DC 20591, or by email to: *7-awa-slotadmin@faa.gov.*

**FOR FURTHER INFORMATION CONTACT:** Al Meilus, Capacity Analysis and Slot Administration, FAA ATO System Operations Services, AJR–G5, Federal Aviation Administration, 800 Independence Avenue SW, Washington, DC 20591; telephone (202) 267–2822; email *al.meilus@faa.gov.*

**SUPPLEMENTARY INFORMATION:**

**Availability of Relevant Documents**

You may obtain an electronic copy using the internet by:
(1) Searching the Federal eRulemaking Portal at *www.regulations.gov;*
(2) Visiting the FAA's Dynamic Regulatory System website at *https:// drs.faa.gov;* or
(3) Accessing the Government Publishing Office's website at *www.GovInfo.gov.*

You also may obtain a copy by sending a request to the Federal Aviation Administration, Capacity Analysis and Slot Administration Office, AJR–G5, 800 Independence Avenue SW, Washington, DC 20591, or by calling (202) 267–2822. Make sure to identify the docket number.

**Background**

The FAA historically limited the number of arrivals and departures at LGA through the implementation of the High Density Rule (HDR).[1] By statute enacted in April 2000, (the Aviation Investment and Reform Act for the 21st Century (AIR–21)), Congress terminated the HDR's applicability to LGA beginning on January 1, 2007.[2] The FAA issued the Order Limiting Operations at New York LaGuardia Airport on December 27, 2006, adopting temporary limits on scheduled and unscheduled operations at LGA pending the completion of rulemaking to address long-term limits and related policies.[3] This Order was amended on November 8, 2007, and August 19, 2008.[4] Under the amended Order, the FAA limited scheduled and unscheduled operations at the airport to prevent congestion-related delays associated with LaGuardia's limited runway capacity. The FAA extended the expiration date of the amended Order on October 7, 2009, April 4, 2011, May 14, 2013,

---

[1] 33 FR 17896 (Dec. 3, 1968). The FAA codified the rules for operating at high density traffic airports in 14 CFR part 93, subpart K. The HDR required carriers to hold a reservation, which came to be known as a ''slot,'' for each takeoff or landing under instrument flight rules at the high density traffic airports.

[2] Aviation Investment and Reform Act for the 21st Century (AIR–21), Public Law 106–181 (Apr. 5, 2000), 49 U.S.C. 41715(a)(2).

[3] 71 FR 77854.

[4] 72 FR 63224; 73 FR 48428.

March 27, 2014, May 25, 2016, September 18, 2018, September 18, 2020, and October 28, 2022.[5]

Under this Order, as amended, the FAA (1) maintains the current hourly limits of 71 for scheduled operations and three for unscheduled operations at LGA during the slot-controlled hours; (2) imposes an 80 percent minimum usage requirement for Operating Authorizations (OAs)[6] with defined exceptions; (3) provides a mechanism for withdrawal of OAs for FAA operational reasons; (4) provides for a lottery to reallocate withdrawn, surrendered, or unallocated OAs; and (5) allows for trades and leases of OAs for consideration for the duration of the Order.

The reasons for retaining the Order have not changed appreciably since its initial issuance. Despite the dynamic demand during the 2022–2024 period, runway capacity at LGA remains limited, while demand for access to LGA remains high. The FAA has determined that the operational limitations imposed by this Order are appropriate and necessary. During the effective period of this Order, the FAA will continue to monitor demand, performance, and runway capacity at LGA, to determine if changes are warranted.

In 2009, the FAA reduced the scheduling limits under this Order from 75 operations per hour to 71 per hour to provide an opportunity to improve operations.[7] The FAA did not require a reduction of historic slots to reach the new hourly limits. Instead, historic allocations were honored. However, slots voluntarily returned or withdrawn per the terms of the Order are not reallocated if the hourly totals exceed the revised 71 hourly scheduling limit. As a result of this historic practice, between 72 and 75 slots remain authorized in most slot-controlled hours. The FAA, in coordination with the Office of the Secretary of Transportation (OST), will continue to consider potential rulemaking to codify policies for slot-controlled airports.

**Pending Issues**

In extending the Orders limiting operations at LGA and John F. Kennedy International Airport (JFK) in 2018, the FAA noted that receipt of specific proposals for policy changes that would necessitate substantive modifications to the Orders.[8] Consideration of these issues is ongoing. Accordingly, the FAA is extending the expiration date of this Order until October 24, 2026. This expiration date coincides with the extended expiration date for the Order limiting scheduled operations at JFK, as also published elsewhere in the **Federal Register**.

The FAA continues to monitor demand, performance, and runway capacity at LGA in order to determine if changes are warranted during the effective period of this Order. The FAA is working with MITRE's Center for Advanced Aviation System Development on a study analyzing airport runway configurations and capacity. The continuation of this study will investigate the projected delays with alternative demand scenarios, as well as consider a number of the complexities associated with LGA operations, including interaction with other nearby airports and operational growth limitations due to the busy airspace surrounding the New York Area.

The FAA finds that notice and comment procedures under 5 U.S.C. 553(b) are impracticable, unnecessary, and contrary to the public interest, as carriers have planned schedules for the Winter 2024/2025 scheduling season and no substantive amendments are included in this action. For these reasons, the FAA also finds that it is impracticable and contrary to the public interest to delay the effective date of this action under 5 U.S.C. 553(d).

**The Amended Order**

The Order, as amended, is recited below in its entirety.

*A. Scheduled Operations*

With respect to scheduled operations at LaGuardia:

1. The Order governs scheduled arrivals and departures at LaGuardia from 6 a.m. through 9:59 p.m., Eastern Time, Monday through Friday and from 12 noon through 9:59 p.m., Eastern Time, Sunday. Seventy-one (71) Operating Authorizations are available per hour and will be assigned by the FAA on a 30-minute basis. The FAA will permit additional, existing operations above this threshold; however, the FAA will retire Operating Authorizations that are surrendered to the FAA, withdrawn for non-use, or unassigned during each affected hour until the number of Operating Authorizations in that hour reaches seventy-one (71).

2. The Order took effect on January 1, 2007, and will expire on October 24, 2026.

3. The FAA will assign operating authority to conduct an arrival or a departure at LaGuardia during the affected hours to the air carrier that holds equivalent slot or slot exemption authority under the High Density Rule of FAA slot exemption rules as of January 1, 2007; to the primary marketing air carrier in the case of AIR–21 small hub/non-hub airport slot exemptions; or to the air carrier operating the flights as of January 1, 2007, in the case of a slot held by a non carrier. The FAA will not assign operating authority under the Order to any person or entity other than a certificated U.S. or foreign air carrier with appropriate economic authority and with operating authority from FAA under 14 CFR part 121, 129 or 135.

4. For administrative tracking purposes only, the FAA will assign an identification number to each Operating Authorization.

5. An air carrier may lease or trade an Operating Authorization to another carrier for any consideration, not to exceed the duration of the Order. Notice of a trade or lease under this paragraph must be submitted in writing to the FAA Slot Administration Office, email *7-AWA-Slotadmin@faa.gov,* and must come from a designated representative of each carrier. The FAA must confirm and approve these transactions in writing prior to the effective date of the transaction. However, the FAA will approve transfers between carriers under the same marketing control up to 5 business days after the actual operation. This post-transfer approval is limited to accommodate operational disruptions that occur on the same day of the scheduled operation.

6. Each air carrier holding an Operating Authorization must forward in writing to the FAA Slot Administration Office a list of all Operating Authorizations held by the carrier along with a listing of the Operating Authorizations actually operated for each day of the two-month reporting period, within 14 days after the last day of the two-month reporting period beginning January 1 and every two months thereafter. Any Operating Authorization not used at least 80 percent of the time over a two-month period will be withdrawn by the FAA except:

A. The FAA will treat as used any Operating Authorization held by an air carrier on Thanksgiving Day, the Friday following Thanksgiving Day, and the

---

[5] 74 FR 51653; 76 FR 18616, amended by 77 FR 30585 (May 23, 2012); 78 FR 28278; 79 FR 17222; 81 FR 33126; 83 FR 47065; 85 FR 58255; and 87 FR 65159.

[6] Also referred to herein as ''slots.''

[7] 74 FR 2646 (Jan. 15, 2009).

[8] See discussion of ''Current Issues'' in 2018 JFK Order, 83 FR at 46865, and LGA Order, 83 FR at 47065.

period from December 24 through the first Saturday in January.

B. The FAA will treat as used any Operating Authorization obtained by an air carrier through a lottery under paragraph 7 for the first 120 days after allocation in the lottery.

C. The Administrator of the FAA may waive the 80 percent usage requirement in the event of a highly unusual and unpredictable condition which is beyond the control of the air carrier and which affects carrier operations for a period of five consecutive days or more.

7. In the event that Operating Authorizations are withdrawn for nonuse, are surrendered to the FAA, or are unassigned, the FAA will determine whether any of the available Operating Authorizations should be reallocated. If so, the FAA will conduct a lottery using the provisions specified under 14 CFR 93.225. The FAA may retime an Operating Authorization prior to reallocation in order to address operational needs.

8. If the FAA determines that a reduction in the number of allocated Operating Authorizations is required to meet operational needs, such as reduced airport capacity, the FAA will conduct a weighted lottery to withdraw Operating Authorizations to meet a reduced hourly or half-hourly limit for scheduled operations. The FAA will provide at least 45 days' notice unless otherwise required by operational needs. Any Operating Authorization that is withdrawn or temporarily suspended will, if reallocated, be reallocated to the air carrier from which it was taken, provided that the air carrier continues to operate scheduled service at LaGuardia.

9. The Vice President, System Operations Services, in coordination with the Chief Counsel of the FAA, is the final decision maker for determinations under this Order.

10. The FAA may modify or withdraw any provision in this Order on its own or on application by any carrier for good cause shown.

*B. Unscheduled Operations* [9]

With respect to unscheduled flight operations at LaGuardia, the FAA adopts the following:

[9] Unscheduled operations are operations other than those regularly conducted by an air carrier between LaGuardia and another service point. Unscheduled operations include general aviation, public aircraft, military, irregular charter, ferry, and positioning flights. Regularly conducted commercial flights require an Operating Authorization and may not use unscheduled operation reservations. Helicopter operations are excluded from the reservation requirement. Unscheduled flights operating under visual flight rules (VFR) may be accommodated by the local air

1. The Order applies to all operators of unscheduled flights, except helicopter operations, at LaGuardia from 6 a.m. through 9:59 p.m., Eastern Time, Monday through Friday and from 12 noon through 9:59 p.m., Eastern Time, Sunday.

2. The Order took effect on January 1, 2007, and will expire on October 24, 2026.

3. No person can operate an aircraft other than a helicopter to or from LaGuardia unless the operator has received, for that unscheduled operation, a reservation that is assigned by the David J. Hurley Air Traffic Control System Command Center's Airport Reservation Office (ARO), or for unscheduled visual flight rule operations, received clearance from ATC. Additional information on procedures for obtaining a reservation is available via the internet at *http://www.fly.faa.gov/ecvrs.*

4. Three (3) reservations are available per hour for unscheduled operations at LaGuardia. The ARO will assign reservations on a 30-minute basis.

5. The ARO receives and processes all reservation requests. Reservations are assigned on a ''first-come, first-served'' basis, determined as of the time that the ARO receives the request. A cancellation of any reservation that will not be used as assigned is required.

6. Filing a request for a reservation does not constitute the filing of an instrument flight rules (IFR) flight plan, as separately required by regulation. After the reservation is obtained, an IFR flight plan can be filed. The IFR flight plan must include the reservation number in the ''remarks'' section.

7. Air Traffic Control will accommodate declared emergencies without regard to reservations. Nonemergency flights in direct support of national security, law enforcement, military aircraft operations, or public aircraft operations will be accommodated above the reservation limits with the prior approval of the Vice President, System Operations Services, Air Traffic Organization. Procedures for obtaining the appropriate reservation for such flights are available via the internet at *http://www.fly.faa.gov/ecvrs.*

8. Notwithstanding the limits in paragraph 4, if the Air Traffic Organization determines that air traffic control, weather, and capacity conditions are favorable and significant delay is not likely, the FAA can accommodate additional reservations over a specific period. Unused operating

traffic control facilities and are not included in the hourly limits.

authorizations can also be temporarily made available for unscheduled operations. Reservations for additional operations are obtained through the ARO.

9. Reservations cannot be bought, sold, or leased.

10. The Vice President, System Operations Services, in coordination with the Chief Counsel of the FAA, is the final decision maker for determinations under this Order.

11. The FAA may modify or withdraw any provision in this Order on its own or on application by any carrier for good cause shown.

*C. Enforcement*

The FAA may enforce the Order through an enforcement action seeking a civil penalty under 49 U.S.C. 46301(a). The FAA or Department of Justice also could file a civil action in U.S. District Court, under 49 U.S.C. 46106 or 46107, respectively, seeking to enjoin any carrier from violating the terms of the Order.

Issued in Washington, DC, on May 7, 2024.

**Alyce Hood-Fleming,**

*Vice President, System Operations Services.*

[FR Doc. 2024–10298 Filed 5–10–24; 8:45 am]

**BILLING CODE 4910–13–P**

---

**DEPARTMENT OF TRANSPORTATION**

**Federal Aviation Administration**

**Operating Limitations at John F. Kennedy International Airport**

**AGENCY:** Federal Aviation Administration (FAA), Department of Transportation (DOT).

**ACTION:** Extension to order.

---

**SUMMARY:** This action extends the Order Limiting Operations at John F. Kennedy International Airport (JFK) published on January 18, 2008, and most recently extended on October 28, 2022. The Order remains effective until October 24, 2026.

**DATES:** This action is effective on October 27, 2024.

**ADDRESSES:** Requests may be submitted by mail to Slot Administration Office, System Operations Services, AJR–0, Room 300W, 800 Independence Avenue SW, Washington, DC 20591, or by email to: *7-awa-slotadmin@faa.gov.*

**FOR FURTHER INFORMATION CONTACT:** Al Meilus, Capacity Analysis and Slot Administration, FAA ATO System Operations Services, AJR–G5, Federal Aviation Administration, 800 Independence Avenue SW, Washington, DC 20591; telephone (202) 267–2822; email *al.meilus@faa.gov.*