**Hearing Date and Time: 11:00 A.M.[1] on August 19, 2026**
**Objection Deadline: 4:00 P.M. on August 12, 2026**
**Reply Deadline: 12:00 P.M. on August 17, 2026**

**DYKEMA GOSSETT PLLC**

Deborah D. Williamson
Texas Bar No. 21617500 (*Pro Hac Vice*)
112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205
Telephone: (210) 554-5500
Facsimile: (210) 226-8395
dwilliamson@dykema.com

And

Jeffrey R. Fine
New York Bar No. 5276225
Texas Bar No. 07008410
1717 Main Street, Suite 4200
Dallas, Texas 75201
Telephone: (214) 462-6455
Facsimile: (855) 230-2518
jfine@dykema.com

*Attorneys for Honeywell Aerospace US LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 25-11897 (SHL) |
| SPIRIT AVIATION HOLDINGS, INC., et al., | Chapter 11 |
| Debtors.[2] | (Jointly Administered) |

[1] All times herein are expressed in prevailing Eastern Time.

[2] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

**NOTICE OF HEARING ON HONEYWELL AEROSPACE US LLC'S MOTION TO PERMIT COLLECTION OF ITS PROPERTY FROM DEBTORS OR, ALTERNATIVELY, TO LIFT THE AUTOMATIC STAY**

**PLEASE TAKE NOTICE** that, on July 28, 2026, Honeywell Aerospace US LLC ("**Honeywell Aerospace**") filed *Honeywell Aerospace US LLC's Motion to Permit Collection of its Property from Debtors or, Alternatively, to Lift the Automatic Stay* (the "**Motion**").

**PLEASE TAKE FURTHER NOTICE** that a hearing (the "**Hearing**") on the Motion has been scheduled for **11:00 a.m. on August 19, 2026**, before the Honorable Sean H. Lane, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York (the "**Court**"), to consider the relief requested in the Motion.

**PLEASE TAKE FURTHER NOTICE** that the Hearing will be conducted via Zoom for Government. Parties wishing to appear at or attend the Hearing (whether "live" or "listen only") are required to register their appearance at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl by **4:00 p.m. on the day prior to the hearing**. Instructions and additional information about the Court's remote attendance procedures can be found at https://www.nysb.uscourts.gov/ecourt-appearances. The Court will circulate by email the Zoom link to the Hearing to those parties who properly made an electronic appearance prior to the Hearing.

**PLEASE TAKE FURTHER NOTICE** that the Hearing may be continued or adjourned from time to time by an announcement of the adjourned date or dates at the Hearing or a later hearing or by filing a notice with the Court.

**PLEASE TAKE FURTHER NOTICE** that responses or objections to the relief requested at the Hearing shall be (a) in writing, in English, and in text-searchable format, (b) filed with the Court electronically, and (c) served on Unifi via its undersigned counsel so as to be received no later than **4:00 p.m. on August 12, 2026** (the "**Objection Deadline**"), in each case, in accordance with the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), the Court's *Order Implementing Certain Notice and Case Management Procedures* [ECF No. 61], and the Court's Chambers' Rules (available at https://www.nysb.uscourts.gov/content/judge-sean-h-lane), to the extent applicable.

**PLEASE TAKE FURTHER NOTICE** that replies or responses in support to the relief requested at the Hearing shall be (a) in writing, in English, and in text-searchable format, (b) filed with the Court electronically, and (c) served on Unifi via its undersigned counsel so as to be received no later than **12:00 p.m. on August 17, 2026** (the "**Reply Deadline**"), in each case, in accordance with the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), the Court's *Order Implementing Certain Notice and Case Management Procedures* [ECF No. 61], and the Court's Chambers' Rules (available at https://www.nysb.uscourts.gov/content/judge-sean-h-lane), to the extent applicable.

**PLEASE TAKE FURTHER NOTICE** that all objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default.

**PLEASE TAKE FURTHER NOTICE** that, if no responses or objections are timely filed and served with respect to the Motion, Honeywell Aerospace may, on or after the Objection Deadline, submit to the Court an order, substantially in the form of the proposed order attached to the Motion, under certification of counsel or certification of no objection, which order may be entered by the Court without further notice or opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion and any other document filed publicly in the above-captioned proceedings are available free of charge at https://dm.epiq11.com/SpiritAirlines.

*[Remainder of page intentionally left blank]*

Dated: July 28, 2026

Respectfully submitted,

DYKEMA GOSSETT PLLC

By: *<u>/s/ Deborah D. Williamson</u>*

Deborah D. Williamson
Texas Bar No. 21617500 (*Pro Hac Vice*)
112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205
Telephone: (210) 554-5500
Facsimile: (210) 226-8395

And

Jeffrey R. Fine
New York Bar No. 5276225
Texas Bar No. 07008410
1717 Main Street, Suite 4000
Dallas, Texas 75201
Telephone: (214) 462-6455
Facsimile: (855) 230-2518

**ATTORNEYS FOR HONEYWELL AEROSPACE US LLC**

**Hearing Date and Time: 11:00 A.M.[1] on August 19, 2026**
**Objection Deadline: 4:00 P.M. on August 12, 2026**
**Reply Deadline: 12:00 P.M. on August 17, 2026**

**DYKEMA GOSSETT PLLC**

Deborah D. Williamson
Texas Bar No. 21617500 (*Pro Hac Vice*)
112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205
Telephone: (210) 554-5500
Facsimile: (210) 226-8395
dwilliamson@dykema.com

And

Jeffrey R. Fine
New York Bar No. 5276225
Texas Bar No. 07008410
1717 Main Street, Suite 4200
Dallas, Texas 75201
Telephone: (214) 462-6455
Facsimile: (855) 230-2518
jfine@dykema.com

*Attorneys for Honeywell Aerospace US LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Case No. 25-11897 (SHL) |
| SPIRIT AVIATION HOLDINGS, INC., et al., | Chapter 11 |
| Debtors.[2] | (Jointly Administered) |

[1] All times herein are expressed in prevailing Eastern Time.

[2] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004 (collectively referred to as **Spirit**).

## HONEYWELL AEROSPACE US LLC'S MOTION TO PERMIT COLLECTION OF ITS PROPERTY FROM DEBTORS OR, ALTERNATIVELY, TO LIFT THE AUTOMATIC STAY

Honeywell Aerospace US LLC ("**Honeywell Aerospace**"), by and through its undersigned counsel, respectfully submits this motion (this "**Motion**") seeking authority to collect from Debtor Spirit Aviation Holdings, Inc. and its subsidiaries (collectively, the "**Debtors**" or "**Spirit**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases, property that Honeywell Aerospace owns and that Honeywell Aerospace should be authorized to collect—before the Debtors or creditors exploit the bankruptcy process to convert that property to the $24,000,000 detriment of Honeywell Aerospace.

Honeywell Aerospace is the rightful owner of a "pool" of 259 spare aircraft parts including, among other things, cockpit voice recorders, transponders, and weather radar antennas ("**Honeywell Aerospace Spare Inventory**"), as well as five auxiliary power units[3] ("**Honeywell Aerospace APUs**") (collectively the "**Honeywell Aerospace Property**"), that it supplied to Spirit pursuant to two bailment agreements. Those agreements expressly state that Honeywell Aerospace retains title to the respective products in each agreement—259 parts in the Honeywell Aerospace Spare Inventory and five Honeywell Aerospace APUs—notwithstanding Spirit's temporary possession of those items. The agreements further require that Spirit return the Honeywell Aerospace Property upon termination of such agreements due to an event of default, including filing a voluntary petition in bankruptcy. Yet Debtors have failed to return the Honeywell

[3] An auxiliary power unit is an independent turbine. Honeywell Aerospace APUs provide: (a) start power for main engine(s), (b) pneumatic power for environmental control systems, (c) drive power for other pneumatic and hydraulic system, (d) electric and pneumatic power for ground operations and (e) backup electrical and pneumatic power for in-flight.

Aerospace Property. This Court should not allow a debtor in wind down to use the bankruptcy process to retain bailed aircraft equipment when the express terms of the relevant agreements and multiple sections of the United States Bankruptcy Code ("**Bankruptcy Code**") give the owner of the equipment the right to reclaim it.

In an effort to collect its own property, Honeywell Aerospace hereby files this Motion seeking an order, substantially in the form of the Proposed Order attached as **Exhibit A**:

i. confirming that Honeywell Aerospace—not the Debtors—holds title to the Honeywell Aerospace Property that was in Spirit's possession at the time of the Wind Down (defined below)[4] and compelling the Debtors to return the Honeywell Aerospace Property to Honeywell Aerospace;

ii. in the alternative, holding that § 1110(a) of the Bankruptcy Code allows Honeywell Aerospace to repossess the Honeywell Aerospace Property notwithstanding the automatic stay; or

iii. in the further alternative, lifting the automatic stay for cause pursuant to Section 362(d)(1) of the Bankruptcy Code and Rule 4001 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**") so Honeywell Aerospace can immediately collect the Honeywell Aerospace Property; or

iv. in the further alternative, requiring the Debtors to either assume the agreements and return the Honeywell Aerospace Property as required, or reject the agreements and permit Honeywell Aerospace to retrieve the Honeywell Aerospace Property.

---

[4] As of the filing of this Motion, both the Honeywell Aerospace APUs and the Honeywell Aerospace Spare Inventory are in the control of the Debtors. Given the sale process and/or the potential return of leased aircraft to the lessors' control (and potentially ownership) of the aircraft where the APUs are currently installed, APUs may end up being held by lessors, secured parties, or purchasers.

In support of its Motion, Honeywell Aerospace states as follows:

## I. SUMMARY OF RELIEF REQUESTED

1. To put it simply, Honeywell Aerospace just wants its property back—property with a retail value over $24,000,000—to which Honeywell Aerospace holds title. Property that Spirit never purchased. Property that the Debtors have no right to retain or otherwise dispose of.

2. Honeywell Aerospace and Spirit entered into two bailment agreements to ensure that Spirit had immediate access to a pool of 259 spare Honeywell Aerospace Spare Inventory parts and the five Honeywell Aerospace APUs that Spirit could use when corresponding parts on aircraft in Spirit's fleet had to come off wing (*i.e.*, off the aircraft) for repair or maintenance. As discussed in more detail below, these types of bailment agreements are commonplace in the aviation industry to keep aircraft flying and minimize downtime for the airlines while ensuring that Original Equipment Manufacturers ("**OEM**s") like Honeywell Aerospace retain ownership of their valuable assets.

3. Honeywell Aerospace holds title to the Honeywell Aerospace Spare Inventory pursuant to a Product & Service Agreement with Spirit dated January 19, 2022 ("**PSA**").[5] The Honeywell Aerospace Spare Inventory is titled "Consignment Inventory" in the PSA. Notwithstanding the "consignment" terminology, the PSA is a bailment agreement with respect to the 259 parts that make up the Honeywell Aerospace Spare Inventory pool because the express terms of the PSA identify Honeywell Aerospace as the titled owner of those parts and the PSA provides for redelivery of the parts to Honeywell Aerospace upon termination of the PSA. *See In re Atlantic Computer Systems, Inc.*, 135 B.R. 463, 466 (Bankr. S.D.N.Y. 1992) (defining bailment as a "delivery of personal property for some particular purpose…upon a contract, *express* or

[5] In previous filings, Dkt. Nos. 1195 and 1306 Honeywell Aerospace described the PSA as the ISS Agreement. Any prior reference to the ISS Agreement is also a reference to the PSA.

implied, and that after such purpose has been fulfilled it *shall be redelivered to the person who delivered it*, or otherwise dealt with according to his directions, or kept until he reclaims it")(emphasis added). As explained in paragraph 22 of the PSA, Honeywell Aerospace retains title to the Honeywell Aerospace Spare Inventory pool any time those parts are not installed on a Spirit aircraft, (*i.e.*, when they are at a Spirit-designated location in the pool of the excess/spare inventory from which Spirit can pull to exchange with parts that need to come off wing.) Pursuant to the PSA, Spirit must return the Honeywell Aerospace Spare Inventory to Honeywell Aerospace upon contract termination or upon an event of default, which occurred when Spirit entered voluntary bankruptcy proceedings, defaulted on its payment obligations, and failed to return a portion of the Honeywell Aerospace Property when requested.

4. Honeywell Aerospace holds title to the five Honeywell Aerospace APUs pursuant to a Maintenance Services Agreement between Honeywell Aerospace and Spirit dated April 1, 2016 ("**MSA**"). Under the MSA, Honeywell Aerospace agreed to bail Spirit five Honeywell Aerospace Model No. 131-9A Auxiliary Power Units ("**APUs**") to support Spirit's then-current fleet of Airbus A320 aircraft equipped with Spirit-owned 131-9A APUs. Similar to the Honeywell Aerospace Spare Inventory, the Honeywell Aerospace APUs were provided to Spirit so that Spirit could use them as needed when removing installed APUs from its aircraft for maintenance and repairs. The MSA explicitly states that title and ownership to the five Honeywell Aerospace APUs remains with Honeywell Aerospace, and that if Spirit commits a material breach—including amongst others, suspension of operations as has occurred here—it is required to return the Honeywell Aerospace APUs.

5. The grounds for compelling the Debtors (and any other interested parties) to permit Honeywell Aerospace to retrieve its property are clear. Honeywell Aerospace owns the Honeywell

Aerospace Spare Inventory (pursuant to the PSA) and the five Honeywell Aerospace APUs (pursuant to the MSA). The Debtors are in both payment default and performance default of the PSA and the MSA and should be compelled to immediately comply and return the Honeywell Aerospace Property. Further, the automatic stay does not prevent Honeywell Aerospace from retrieving the Honeywell Aerospace Property under section 1110(a) of the Bankruptcy Code. If the Court refrains from ordering the Debtors to comply with the agreements and holds that the automatic stay does apply, the equities support Honeywell Aerospace's relief from the automatic stay for cause. In the alternative, the Debtors should be compelled to immediately assume or reject both agreements and, in either case, permit Honeywell Aerospace to retrieve the Honeywell Aerospace Property.

## II. INTRODUCTION

6. In the aviation industry, ensuring operational efficiency is paramount, particularly given the tight profit margins and the competitive nature of airline operations. An aircraft that is out of service for any length of time adds significant pressure for the airline and has repercussions across the industry. Services that require removal of the parts are often mandatory, occur with relative frequency, and can take days to months to complete. Without spares, aircraft would be grounded for the duration of a repair, contributing to cancelled or redirected flights and ultimately impacting passengers, flight crew, the profitability of the affected airline, and the cost of air travel in general. This is why airlines maintain pools of spare parts. A common, convenient, and economical option for maintaining spare parts is for airlines to work with OEMs, such as Honeywell Aerospace, to ensure access to pools of spare parts that can be stationed at a variety of locations to maximize efficiency and minimize aircraft downtime ("**Spare Pool**").

7. Bailment agreements are a primary method of structuring Spare Pools. These can take various forms, depending on the types of parts or equipment at issue and the needs of the

airline customer. One framework allows airlines to access a specific quantity of OEM-owned spare parts and components on a revolving basis, enabling the airline to replace items going off wing without the need for substantial upfront capital investment in parts inventory. Under these arrangements, an OEM may retain ownership of the spare parts until they are installed on an aircraft. Once installed, title temporarily passes to the airline or airframe owner for the duration of the part's installation or use. If parts are removed from aircraft or are no longer in use, ownership reverts to the OEM, ensuring the availability of the entire Spare Pool across the fleet of aircraft using those parts.

8. The industry also employs bailment frameworks for equipment that may be installed on aircraft, such as APUs or engines. Under this type of agreement, even if the component is installed on an aircraft, the OEM retains title throughout the duration of the agreement. This ensures the OEM's ability to oversee servicing, recertification, and continued deployment of the component across airline fleets as needed. Such bailment arrangements are critical for balancing operational flexibility and financial feasibility in the aviation sector, particularly for carriers operating under constrained cash flows.

9. These bailment agreements establish a framework where OEMs, airlines, and airframe owners collaborate to enhance efficiency, minimize disruptions, and maximize resource availability in the aviation sector. OEMs continue to manage Spare Pools and airlines avoid investing tens of millions of dollars in creating their own parts pools. By providing stability and consistency, bailment agreements play a vital role in ensuring the reliability of airline operations and service delivery in a globally interconnected industry.

10. As detailed below, Honeywell Aerospace and Spirit entered into these very types of industry-standard arrangements so that Spirit had access to vital Honeywell Aerospace parts

and APUs—with a combined fair market value over $24,000,000—without Spirit having to expend that amount up front. As evidenced by the agreements between them, ownership of the Honeywell Aerospace Property was never intended to, and never did, transfer to Spirit.

11. Bailment agreements like those between Honeywell Aerospace and Spirit are commonly used throughout the entire aviation industry. Accordingly, the disposition of this Motion could have wide-ranging consequences. If Honeywell Aerospace, which did everything right contractually, loses ownership of the Honeywell Aerospace Property because Spirit entered bankruptcy, OEMs across the sector will reevaluate how to allocate risk to better safeguard their valuable assets. To protect themselves, OEMs may be forced to stop using bailment agreements to make spare parts available and will instead require airlines to purchase the assets outright, further stressing airlines' profit margins and potentially impairing airline operability, as well as raising the cost of air travel for consumers.

## III. JURISDICTION AND VENUE

12. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

13. The statutory predicates for the relief requested in this Motion are sections 1110(a), 362(d)(1) and 365(d)(2) of the Bankruptcy Code and Rule 4001(a) of the Bankruptcy Rules.

14. This is a core proceeding under 28 U.S.C. § 157(b)(2)(G).

## IV. BACKGROUND FACTS

### A. The PSA Agreement

15. The PSA was entered into by Spirit Airlines, LLC[6] and Honeywell Aerospace[7] on January 19, 2022, and is currently scheduled to remain in effect until after December 31, 2034. PSA at § 2 (Ex. B). The PSA has not been rejected by the Debtors. The governing law of the PSA is New York law. *Id.* at § 37. A redacted copy of the PSA is attached as **Exhibit B**.[8]

16. Pursuant to the PSA, Honeywell Aerospace created inventory Spare Pools designed to allow Spirit to temporarily place the Honeywell Aerospace Spare Inventory at various locations selected by Spirit. *Id.* at § 10, Ex. A § 1(a)-(d). When a part installed on a Spirit aircraft needed to be repaired or replaced (a "**Removed Part**"), Spirit would pull from a convenient Honeywell Aerospace Spare Inventory pool, install the Honeywell Aerospace Spare Inventory part, and send Honeywell Aerospace the Removed Part for repair. *Id.* at §§ 10, 22, Ex. A § 1(a), (c). Prior to installation on an aircraft, title to each item in the Honeywell Aerospace Spare Inventory pool was with Honeywell Aerospace. *Id.* at § 22. Once installed, title to the Honeywell Aerospace Spare Inventory part passed from Honeywell Aerospace to the owner of the airframe and title to the Removed Part sent for repair was transferred to Honeywell Aerospace. *Id.* Although the specific serial numbers for the Honeywell Aerospace Spare Inventory rotated as they were taken off aircraft and returned to the Honeywell Aerospace Spare Inventory pools, at all times Honeywell Aerospace maintained title to the Honeywell Aerospace Spare Inventory parts which, as of May 2, 2026,

[6] Debtor Spirit Airlines, LLC changed its name from Spirit Airlines, Inc. to Spirit Airlines, LLC on March 12, 2025. *See* Petitioner Spirit Airlines, LLC's Unopposed Motion to Amend the Case Caption [Dkt. No. 16] at p. 3, *Spirit Airlines, Inc. v. Transportation Security Administration*, Case No. 25-10461 (11th Cir.).

[7] The PSA was entered into by Honeywell Aerospace's predecessor Honeywell International Inc.

[8] Spirit and Honeywell Aerospace entered an Integrated Service Solution Agreement (the "**ISS Agreement**") as of January 1, 2006. The ISS Agreement was amended nine times. the ISS Agreement was combined with an Avionics Selection Agreement to create the PSA, which superseded the ISS Agreement.

totaled 259 parts as summarized in the "**Honeywell Aerospace Spare Inventory Chart**" attached as **Exhibit C**. PSA at § 22, Ex. A § 1 (Ex. B). The Honeywell Aerospace Spare Inventory Chart clearly shows that, while Spirit ordered 266 Honeywell Aerospace Spare Inventory parts, 259 of them have not been returned to Honeywell Aerospace. Honeywell Aerospace Spare Inventory Chart (Ex. C). Under the terms of the PSA, if Spirit's fleet grew or shrunk, Spirit was required to work with Honeywell Aerospace in good faith to increase or decrease the size of the Honeywell Aerospace Spare Inventory pool based on any change in the Spirit fleet size. PSA at Ex. A § 1(b)(ii) (Ex. B).

17. On information and belief, all the Honeywell Aerospace Spare Inventory parts are presently in individual boxes labelled "Honeywell Property" and can be traced back to delivery from Honeywell Aerospace under the terms of the PSA. PSA at Ex. A § 1 (Ex. B). The Honeywell Aerospace Spare Inventory was segregated and marked with tags labelled "Honeywell Property" as evidenced in correspondence between Honeywell Aerospace employees and Debtors' employees regarding the tags (the "**Tag Correspondence**") attached as **Exhibit D**.

18. Under the PSA, upon default, Spirit must return all bailed equipment to Honeywell Aerospace. PSA at § 28 (Ex. B). Debtors are in default of the PSA because they have ceased all operations. *See infra* Section IV(C); PSA at § 28 (Ex. B). Additionally, Debtors are in payment default, as evidenced by Debtors' *Notice of Potential Assumption and Assignment of Executory Contract or Unexpired Leases and Cure Amount* (Dkt. No. 1217) (the "**Cure Notice**") that listed a total amount due to Honeywell Aerospace under its contracts of $2,654,295.98. Cure Notice at p. 26. Honeywell Aerospace filed *Honeywell Aerospace US LLC's Cure Objection to Debtor's Notice of Potential Assumption and Assignment of Executory Contract or Unexpired Leases and Cure Amount and Reservation of Rights* (Dkt. No. 1306) (the "**Cure Objection**") asserting that

Debtor's proposed cure amount was incorrect and did not account for Debtors' failure to return the Honeywell Aerospace Spare Inventory (titled "Consignment Inventory" in the PSA) and the Honeywell Aerospace APUs. Cure Objection at ¶¶ 12-15. Debtors are also in default for failure to respond and work in good faith to return a portion of the Honeywell Aerospace Spare Inventory, based on Debtors' reduction in the size of their fleet, when Honeywell Aerospace requested the return of a portion of the Honeywell Aerospace Spare Inventory. *See infra* Section IV(B); PSA at Ex. A § 1(b)(ii) (Ex. B).

**B. <u>The MSA Agreement</u>**

19. The MSA was entered into by Spirit and Honeywell Aerospace on April 1, 2016, and it is scheduled to expire after December 31, 2032.[9] MSA Amend. 5 at § 1 (Ex. E). The MSA has not been rejected by Debtors. The governing law of the MSA is New York law. MSA at § 15.3, attach. C § 10 (Ex. E). A redacted copy of the MSA is attached as **Exhibit E**.[10]

20. Under the MSA, Honeywell Aerospace agreed to provide maintenance for Honeywell Model No. 131-9A APUs used by Debtors on their Airbus A320 aircraft in exchange for payment from Spirit. MSA at recitals, §§ 4.1-7.11 (Ex. E). Also in the MSA, Honeywell Aerospace agreed to bail Spirit the five Honeywell Aerospace APUs, specifically identified by serial number,[11] to support Spirit's then-current fleet of Airbus A320 aircraft equipped with Spirit-owned 131-9A APUs. MSA at § 7.3; MSA Amend. 5 at §§ 9-10, attach. A (Ex. E). Similar to the Honeywell Aerospace Spare Inventory, the Honeywell Aerospace APUs were available to

[9] The MSA was entered into between Spirit's predecessor entity, Spirit Airlines, Inc., and Honeywell Aerospace's predecessor Honeywell International Inc.

[10] The MSA has been amended five times. Exhibit E includes a redacted copy of all five amendments to the MSA. All citations to provisions of the MSA in this Motion will either be to the original MSA or Amendment No. 5 to the MSA ("**MSA Amend. 5**"). MSA amendments one through four are not relevant for this Motion but have been included for completeness.

[11] The Serial Numbers of the Honeywell Aerospace APUs are (1) P-4848, (2) P-8121, (3) P-9081, (4) P-7739, and (5) P-6835).

temporarily replace the APUs installed on a Spirit aircraft when an installed APU needed to be removed for repair or maintenance. MSA at § 7.3; MSA Amend. 5 at §§ 9-10 (Ex. E). The now-removed installed APUs would be shipped to Honeywell Aerospace or other authorized service center to be serviced, and upon completion of such service, those APUs were returned to Spirit and the Honeywell Aerospace APUs were returned to the inventory pool. MSA at §§ 6.1-6.3, 7.3; MSA Amend. 5 at §§ 9-10, attach. A (Ex. E).

21. Because the Honeywell Aerospace APUs are identified by serial number, and the MSA explicitly states that title and ownership to the five bailed APUs identified by serial number remains with Honeywell,[12] it is clear that, at all times, Honeywell Aerospace has maintained title to the Honeywell Aerospace APUs. MSA Amend. 5 at §§ 9-10, attach. A (Ex. E).

22. Under the MSA, if Spirit commits a material breach of the agreement, it is required to return the exact APUs provided by Honeywell Aerospace, as identified by serial number. MSA at §§ 9.1-9.4; MSA Amend. 5 at attach. A (Ex. E). As with the PSA, Spirit committed a material breach when it suspended operations and when it defaulted on payment. MSA at § 9.1 (Ex. E). Further, under section 7.3 of the MSA, if Spirit reduces the size of its fleet prior to the termination

---

[12] There are limited circumstances where Spirit may purchase the equipment. For example, Section 7.4 of the MSA Amend. 5 states:

> "7.4 Bailment Equipment
>
> 7.4.1 Title Transfer of Bailment Equipment. Honeywell will transfer title to Spirit at the end of the term of the Agreement the youngest five (5) consigned APUs based on Time Since New which have been in the Maintenance Agreement for a minimum of ten (10) years.
>
> 7.4.2 Remaining Bailment Equipment. Title and ownership of remaining Bailment Equipment will remain with Honeywell. Following completion of the bailment period, Honeywell offers Spirit a choice of one (1) of the following two (2) options:
>
> > (a) Spirit may return to Honeywell the Bailment Equipment in Serviceable Condition with a serviceable tag; or,
> >
> > (b) Spirit may purchase the Bailment Equipment at the lesser of a ten percent (10%) discount off of the Catalog List/Operator Prices current at the time of purchase or market value as determined by Honeywell Aerospace Trading ("HAT")."

of the MSA, Spirit is required to return a proportional amount of the bailed APUs to Honeywell. MSA Amend. 5 at § 9. On November 24, 2025, after Spirit substantially reduced the size of its fleet of aircraft, Honeywell Aerospace sent Spirit a letter requesting the return of two of the five APUs bailed by Honeywell Aerospace under the MSA as well as the return of some of the Honeywell Aerospace Spare Inventory, reflecting the proportional reduction of bailment equipment in relation to the reduction in Debtors' fleet, as required by section 7.3 of the MSA and section 1(b)(ii) of Exhibit A to the PSA (the "**Request for Return**"). Request for Return at p. 1, 3 (Ex. F); MSA Amend. 5 at § 9 (Ex. E); PSA at Ex. A § 1(b)(ii) (Ex. B). A copy of the Request for Return is attached as **Exhibit F**. Additionally, Spirit intends to further reduce the size of its fleet to essentially zero, and Spirit has not returned any Honeywell Aerospace Property.

### C. <u>The Bankruptcy And The Status Of The Honeywell Aerospace Property At The Time Of The Wind Down</u>

23. Debtors filed for bankruptcy on August 29, 2025. In Debtor's *Schedule G: Executory Contracts and Unexpired Leases* (Case No. 25-11896, Dkt. No. 10) ("**Schedule G**") Spirit lists both the PSA (contract 2.1206) and the MSA (contract 2.1204), with the MSA amendments (contracts 2.1198-2.1202), as unexpired contracts it has with Honeywell Aerospace.[13] Schedule G at p. 200-01. In Debtor's *Statement of Financial Affairs* (Case No. 25-11896, Dkt. No. 9) ("**SOFA**"), Spirit lists Honeywell Aerospace as one of the entities for which Spirit holds property for another. SOFA at p. 310.[14] Specifically in Part 11, Question 21 of the SOFA, Spirit states that it holds Honeywell Aerospace's "Aircraft Parts" at various locations and that they have an undetermined value. *Id*. Five Honeywell Aerospace APUs remain installed on aircraft that were in Spirit's fleet. MSA Amend. 5 at attach. A (Ex. E).

---

[13] Schedule G lists Honeywell Aerospace's predecessor entity, Honeywell International Inc.

[14] The SOFA lists Honeywell Aerospace's predecessor entity, Honeywell International Inc.

24. On May 2, 2026, Debtors decided to cease operations and commence an orderly wind down of their operations (the "**Wind Down**"). *See Notice of Hearing on Motion of the Debtors For Entry of an Order (I) Setting a Bar Date for Filing Proof of Claim for Pre-Wind Down Administrative Expenses Claims Against the Debtors, (II) Establishing Pre-Wind Down Administrative Expenses Claims Procedures, and (III) Granting Related Relief* (Dkt. No. 1090) at ¶ 10. Upon information and belief, all five Honeywell Aerospace APUs were installed on Debtors' aircraft, or aircraft leased by Debtors, at the time of the Wind Down.

25. The Debtors have repeatedly represented to this Court and to Honeywell Aerospace that they do not intend to sell property they do not own. Honeywell Aerospace has filed notices of its ownership of both the Honeywell Aerospace Spare Inventory parts and the Honeywell Aerospace APUs. *Honeywell International Inc.'s Notice of Ownership of Spare Parts Related to an Integrated Service Solution Agreement* (Dkt. No. 1195) and *Honeywell International Inc.'s Notice of Ownership of Auxiliary Power Units* (Dkt. No. 1196).

26. Prior to the Wind Down, Honeywell Aerospace began working with Spirit to verify the locations of all Honeywell Aerospace Property. On information and belief and as supported by the Tag Correspondence, prior to the Wind Down the segregated Honeywell Aerospace Spare Inventory was not commingled with any other spare parts and consists entirely of the same spare parts Honeywell Aerospace provided to Debtors. Since the Wind Down commenced, Debtors no longer have any use for the Honeywell Aerospace Property, as Debtors are no longer operating any aircraft.

27. Since the early days following the Wind Down, communications from Debtors regarding the status of the Honeywell Aerospace Property has become less frequent, and the safekeeping measures employed to protect and preserve the Honeywell Aerospace Property, which

has a market value of approximately $24,000,000, are almost entirely unknown to Honeywell Aerospace. Since at least the Wind Down date, Honeywell Aerospace has not been permitted to view or access the Honeywell Aerospace Property, and Debtors have not provided any reasonable assurance that it is and will remain properly stored and secured so as not to unduly depreciate the value of the Honeywell Aerospace Property. The Honeywell Aerospace Spare Inventory includes sophisticated electronics and other avionics. If not properly secured, such equipment could be susceptible to theft, and its operation could be significantly impaired or destroyed if not kept in a dry, climate-controlled environment. With a Debtor who is no longer operational, these necessary preservation conditions are certainly not guaranteed.

28. Similarly, Honeywell Aerospace does not have access or insight into the storage status of the Honeywell Aerospace APUs, which are subject to the same vulnerabilities as the Honeywell Aerospace Spare Inventory. But further, and unique to APUs, there are specific, proactive maintenance requirements that must be adhered to in order to keep them functioning and reliable for use. Amongst other service requirements described in various Honeywell Aerospace maintenance literature, Honeywell Aerospace Service Bulletin 49-8028 provides preservation requirements for APUs (the "**Service Bulletin**"). A copy of the Service Bulletin is attached hereto as **Exhibit G**. If an APU is installed on an aircraft, then it must be operated regularly, and if not so operated, then the oil is to be drained from the APUs after two to three months of idle time, depending on the storage conditions. Service Bulletin at p. 13-14 (Ex. G). If the preservation window is exceeded, or compliance with the Service Bulletin cannot be demonstrated, the Service Bulletin provides that the APU is to be returned to an authorized maintenance facility (a licensed maintenance, repair and overhaul facility) for complete disassembly and inspection for corrosion of all oil-wetted components. Any compromised components have to be repaired or replaced and

the APUs must be tested and recertified to return to service. The Honeywell Aerospace published base cost for full disassembly, repair and replacement, re-assembly, acceptance testing, and re-certification is no less than $270,400 per APU. Without access to the Honeywell Aerospace APUs or any assurance that the Service Bulletin is being adhered to, Honeywell Aerospace remains exposed to the risk of the Honeywell Aerospace APUs becoming severely impacted in value and operational capability.

29. In the event of damage, loss, or operational impact due to inadequate storage, security, and maintenance of the Honeywell Aerospace Property, Honeywell Aerospace will assert against the Debtors all costs to return the Honeywell Aerospace Property to serviceable condition.

## V. ARGUMENT

### A. Honeywell Aerospace Property Is Not Property of the Debtors and Must Be Returned Because Honeywell Aerospace Holds Title to It

30. Honeywell Aerospace holds title to the Honeywell Aerospace Spare Inventory and the five Honeywell Aerospace APUs. Honeywell Aerospace's retention of title survives both the rotation of parts through the pool and any commingling. Additionally, the governing agreements require the Debtors to return the Honeywell Aerospace Property upon Spirit's default. The Honeywell Aerospace Property must therefore be returned to Honeywell Aerospace.

#### i. Honeywell Aerospace Owns the Property, and the Agreements Require Its Return Upon Spirit's Default

31. The PSA fixes title to the Honeywell Aerospace Spare Inventory in Honeywell Aerospace at all times the parts are not installed on an aircraft: "title will pass from Supplier[15] to Spirit upon installation of the Products on any Aircraft; title shall transfer back to Supplier once the off-wing unit is made available at Spirit's facility within the Continental United States." PSA

[15] "Supplier" as used in the PSA refers to Honeywell Aerospace.

§ 22(a) (Ex. B). Because the 259 parts comprising the Honeywell Aerospace Spare Inventory are not installed, but sit in Debtors' designated facilities, title to each of them is, and at all relevant times has been, with Honeywell Aerospace. The MSA is equally explicit as to the APUs: "The Bailment Equipment is for Spirit Airline's sole use through the term of the maintenance agreement…and Honeywell will retain title." MSA Amend. 5 at § 9 (amending art. 7.3) (Ex. E).

32. The PSA and MSA also compel return. Spirit's failure to make payments, voluntary bankruptcy petition, its cessation of operations, and failure to return a proportional amount of the Honeywell Aerospace Property due to a reduction in Debtors' fleet size are material breaches providing grounds to terminate and compel the return of the Honeywell Aerospace APUs under the MSA. MSA at § 9.1; MSA Amend. 5 at § 9 (amending art. 7.3) (Ex. E). "In the event that Spirit commits a material breach of this Agreement…Spirit will return all Bailment and FOC equipment provided by Honeywell or pay the catalog list/operator price of said equipment current at the time of the breach." MSA at § 9.2 (Ex. E). The PSA likewise requires return of the Honeywell Aerospace Spare Inventory upon termination, which is triggered by "Events of Default," including failure perform any of its obligations under the PSA, and voluntary bankruptcy petition. PSA at § 28(a); Ex. A § 1(b)(ii) (Ex. B).

33. New York law gives these provisions their ordinary effect. A bailee "is estopped to deny the title of the bailor[.]" *Inc. Soc'y of St. Maria Del Buoncammino v. Lorusso*, 5 Misc. 2d 551, 554 (Sup. Ct., Kings County 1957). Furthermore, if a bailee refuses to return property with which it was entrusted, the bailee may be held liable by the bailor either under breach of contract or negligence theories. *See Clairol, Inc. v. Moore-McCormack Lines, Inc.*, 79 A.D.2d 297, 314 (1st Dept. 1981) ("[i]t is well recognized that while a bailee's liability for failure to return the property may be predicated upon breach of contract or upon negligence, a bailee may also be held liable to

the bailor in conversion for his failure to return the thing bailed")(internal citations omitted). New York courts continue to hold that a bailment turns on "lawful possession, and the duty to account for the thing as the property of another . . . whether such possession results from contract or is otherwise lawfully obtained." *Beazer v. New York City Health & Hosps. Corp.*, 76 A.D.3d 405, 407 (1st Dep't 2010). To recover the Honeywell Aerospace Property, Honeywell Aerospace "need only establish a superior possessory right in the chattel to that of the [Debtors]," and "absent a demand from a third party asserting a superior right, the subject property must be returned to the bailor." *Pivar v. Graduate Sch. of Figurative Art of the N.Y. Acad. of Art*, 290 A.D.2d 212, 213 (1st Dep't 2002). Here, Honeywell Aerospace holds title; the Debtors' possessory right has terminated; and no party asserts a right superior to Honeywell Aerospace's.

ii. **Honeywell Aerospace's Title Extends to Every Part in the Rotating Pool**

34. That the parts in the Honeywell Aerospace Spare Inventory pool rotate on and off aircraft, and that the particular parts in the pool change over time, does not diminish Honeywell Aerospace's ownership. New York has recognized for more than a century-and-a-half that an owner retains title to property held in a rotating, interchangeable pool; ownership attaches to the pool and the quantity the owner supplied, and individual units may move in and out without disturbing that title.

35. The New York Court of Appeals established the principle in *Kimberly v. Patchin*, 19 N.Y. 330 (1859). Because fungible articles "can be identified only in masses or quantities," the Court held that "as it is not possible in reason and philosophy to identify each constituent particle composing a quantity, so the law does not require such an identification." *Id.* at 333. An owner accordingly retains title to a defined quantity within a mass, and one whose goods are commingled by consent "would lose nothing by the mixture." *Id.* at 335.

36. The Court of Appeals confirmed that ownership persists through continuous rotation in *New York Security & Trust Co. v. Lipman*, 157 N.Y. 551 (1899). The bailee there held bales under open receipts and "took out old and put in new bales almost daily," yet its bailment obligation remained fully enforceable: it "did not agree to deliver any particular bales," and discharged its duty by delivering the specified quantity of "like constituent units." *Id.* at 563-64. The modern Court of Appeals applies the same rule to a shared, revolving pool. In *Murray Oil Products, Inc. v. Royal Exchange Assurance Co.*, depositors' goods were "treated as a community pool, from which all of the depositors would withdraw discrete amounts as they desired," and the Court recognized the bailee's obligation to account to each depositor and its liability for failure to deliver on demand. 21 N.Y.2d 440, 442-444 (1968). New York's intermediate courts continue to apply *Kimberly* as controlling law, describing the rule permitting ownership of interchangeable units without physical segregation as "a rule of necessity." *Kermani v. Liberty Mut. Ins. Co.*, 4 A.D.2d 603, 607-08 (3d Dep't 1957).

37. Honeywell Aerospace's claim is stronger than any of these because Honeywell Aerospace Spare Inventory is both segregated and uniquely identifiable. The parts are boxed and tagged "Honeywell Property," a designation the Debtors themselves confirmed, and Honeywell Aerospace maintains clear records of the spares quantity requested for bailment and supplied as demonstrated in the Honeywell Aerospace Spare Inventory Chart. Honeywell Aerospace Spare Inventory Chart (Ex. C); Tag Correspondence (Ex. D). Honeywell Aerospace is the sole manufacturer of these parts, each of which bears a proprietary Honeywell Aerospace part number, and every product is "manufactured under an approval granted by . . . the FAA under 14 C.F.R Part 21." PSA at § 17.17. Honeywell Aerospace thus holds title to identified, source-traceable property, not an undifferentiated share of a common mass.

iii. **The PSA Is a Bailment, Not a Consignment or a Sale**

38. Although the PSA uses the term "Consignment Inventory" from time-to-time, for the Honeywell Aerospace Spare Inventory, the agreement is a bailment, and neither the Uniform Commercial Code's consignment provisions nor the sale-versus-bailment line converts Honeywell Aerospace's retained title into property of the estate.

39. First, the arrangement is not a "consignment" or a "sale or return" under the UCC, because the parts were not delivered to Spirit "for the purpose of sale" or "for resale." N.Y. U.C.C. §§ 2-326, 9-102(a)(20)(A)(i). As stated in the PSA, the Honeywell Aerospace Spare Inventory exists "to support the 1:1 exchange of off-wing Components in an Unserviceable Condition . . . pursuant to Spirit exchange orders," PSA at Ex. A, § 1(a) (Ex. B); the parts are installed on Spirit's own fleet, not resold to third parties. The consignment regime that subjects goods to a debtor's estate is directed at a merchant that "deals in goods of that kind" by selling them, N.Y. U.C.C. § 9-102(a)(20)(A)(i); it has no application to an airline that itself uses the parts operationally. Consignment cases are inapposite for precisely this reason: they involve goods delivered to a reseller and sold under the debtor's own name. *See In re Morgansen's Ltd.*, 302 B.R. 784, 789 (Bankr. E.D.N.Y. 2003) (goods "sold under its own name" by a dealer); *Underwriters at Lloyds v. Shimer (In re Ide Jewelry Co.)*, 75 B.R. 969, 978-79 (Bankr. S.D.N.Y. 1987) (diamonds delivered to a retailer for resale).

40. Second, even if the UCC consignment framework was applied, the *Ide Jewelry* factors place this arrangement on the true-bailment side of the line. The Honeywell Aerospace Spare Inventory is segregated and marked, Honeywell Aerospace retains title to the parts, Honeywell Aerospace has the right to recall the parts on default and on fleet reduction, and Spirit has no obligation to pay a purchase price for pooled parts it does not install; those factors indicate a true bailment rather than a "consignment intended as security." *In re Ide Jewelry Co.*, 75 B.R. at

978-79. The PSA reinforces the point by disclaiming the agency relationship that characterizes a consignment: the parties are "independent contractors and no other relationship, including, without limitation, . . . principal/agent[,] is intended." PSA at § 35 (Ex. B). A true consignment, by contrast, "create[s] a principal/agent relationship." *In re Morgansen's Ltd.*, 302 B.R. at 789 n.6.

41. Third, the "Consignment Inventory" label does not control. The PSA provides that "[t]he captions and titles herein are for convenience only and are not intended to define or aid interpretation of the subject matter of the text hereof." PSA at § 44. New York courts likewise look past the label to the economic substance of the transaction. *See In re Ide Jewelry Co.*, 75 B.R., at 977 ("[the intent of the parties] is to be determined by an objective standard which takes into account the economic realities of the transaction."). The substance here, retained title tied to physical status, use rather than resale, segregation and marking, and a right of recall on default, is a bailment.

42. Fourth, the arrangement is not a sale under the bailment-versus-sale distinction. Where the owner is entitled only to "like kind" property with no right to specific or segregated goods, the transaction is a sale, and title passes to the debtor. *In re Miami Metals I, Inc.*, No. 22-cv-606 (JGK), 2023 U.S. Dist. LEXIS 32337, at *7-8 (S.D.N.Y. Feb. 27, 2023), *aff'g* 634 B.R. 249 (Bankr. S.D.N.Y. 2021). The contract in *Miami Metals* expressly provided that the returnable metal "does not pertain to specific, segregated, or identifiable metal." *Id.* at *5. The PSA is the opposite: it retains title in Honeywell Aerospace to a specific group of identifiable parts that are distinctly separate from the parts titled to Spirit: Honeywell Aerospace owns all of the off-wing Honeywell Aerospace Spare Inventory parts, while Spirit owns the parts installed on its aircraft. PSA at §§ 22(a), 28(a) (Ex. B). Applying the same "economic substance" test *Miami Metals* used,

the substance here is a bailment for operational use, not a deposit of a commodity returnable only in like kind. *In re Miami Metals I, Inc.*, 2023 U.S. Dist. LEXIS 32337, at *14.

43. Finally, the PSA's separate purchase option does not convert the arrangement into a sale. That option arises only under Section 28(b), which permits Spirit to terminate "for its sole convenience" no earlier than December 31, 2028, on nine months' notice, and in that circumstance alone allows Spirit to "purchase consigned inventory." PSA at § 28(b) (Ex. B). That convenience-termination purchase right never ripened and has no application here: this termination arises from Spirit's default, and the governing provision, Section 28(a), requires Spirit to "return all of the consigned equipment to Supplier," not to purchase it. *Id.* at § 28(a). A contingent, future option to buy on a convenience termination that never occurred does not alter the character of the parties' arrangement or Honeywell Aerospace's retained title.

### iv. Any Commingling of Spirit-Owned Parts Would Not Defeat Honeywell Aerospace's Title or Its Right to Return

44. To the extent Debtor-owned parts of the same type are present in the Honeywell Aerospace Spare Inventory bins, that fact would not defeat Honeywell Aerospace's claim; it would merely place the burden of separation on the Debtors.

45. Commingling of like goods does not alter ownership. Where property of the same kind and value is intermixed, the owner "did not lose his ownership, but remained owner of the [quantity] delivered, as though it had not been so mixed," and retains "the right, as against [the debtor], and consequently as against the [bailee], to take that amount from the common bulk." *Morgan v. Gregg*, 46 Barb. 183, 187-88 (N.Y. Sup. Ct. 1865). "[W]here the property, so mixed, is of the same kind and of equal value, and the proportionate shares are known, the loss of identity does not prevent each owner from claiming his separate share." *Id.* at 187.

46. Once Honeywell Aerospace establishes delivery of its quantity and non-return on demand, "where the [bailee] simply refuses to return the bailed property and does not provide any explanation for its refusal, the [owner] will be entitled to collect the full value, without more." *Gen. Foods Corp. v. Pittston Warehouse Corp.*, 110 A.D.2d 520, 521-522 (1st Dep't 1985). The one commingling decision that denied recovery proves the rule and confirms Honeywell Aerospace's entitlement here. In *World Exchange Bank v. Goldsmith*, a claimant to commingled fungible sugar lost because "the receipts do not show any identifying mark," so it "failed to establish that it was entitled to 3,000 specific bags," which had passed to a good-faith purchaser. 227 A.D. 299, 301-302 (1st Dep't 1929). Honeywell Aerospace's position is the inverse on both dispositive facts. Its parts are marked "Honeywell Property," tracked on the Honeywell Aerospace Spare Inventory Chart, and, because Honeywell Aerospace is the sole manufacturer, bear proprietary Honeywell part numbers that make them uniquely identifiable, the very identification whose absence defeated the claim in *Goldsmith*. And the Honeywell Aerospace Spare Inventory remains with the Debtors; no good-faith purchaser has intervened. Honeywell Aerospace Spare Inventory is not property of the estate and must be returned.

v. **The Serial-Numbered APUs Must Be Returned as the Identified Units They Are**

47. Honeywell Aerospace seeks the return of the same five APUs it provided to Debtors, not any other APUs of the same model type that might be in a similar condition to the Honeywell Aerospace APUs. These APUs are unquestionably "specific, segregated, [and] identifiable[.]" *In re Miami Metals I, Inc.*, 2023 U.S. Dist. LEXIS 32337, at *5. Honeywell Aerospace's claim to the five Honeywell Aerospace APUs does not depend on the pooling analysis at all. Honeywell Aerospace owns the Honeywell Aerospace APUs outright, MSA Amend. 5 at § 9 (Ex. E) ("Honeywell will retain title"), and each is identified by serial number. Because the Honeywell Aerospace APUs are specifically identified rather than interchangeable, they fall within

the traditional core of bailment, under which the identical items belong to Honeywell Aerospace outside any fungible-goods or like-kind analysis, and unequivocally must be returned to Honeywell Aerospace upon the end of the bailment period.

48. The bailment period for the Honeywell Aerospace APUs is over because the MSA requires return of the Honeywell Aerospace APUs if Spirit commits a material breach of the agreement. MSA at §§ 9.1-9.4; MSA Amend. 5 at attach. A (Ex. E). Spirit has materially breached by suspending operations and defaulting on payment. MSA at § 9.1 (Ex. E). The MSA further requires return of the Honeywell Aerospace APUs, including "a proportional amount of the Bailment Equipment should Spirit Airlines' fleet reduce prior to the termination of the agreement." *Id.* Spirit has substantially reduced its fleet and now approaches a fleet of zero, triggering the return obligation as to the Honeywell Aerospace APUs in full.

**B. <u>ALTERNATIVELY, Section 1110(a) Permits Honeywell Aerospace to Repossess Its Property Notwithstanding the Automatic Stay</u>**

49. If the Court does not order return of the Honeywell Aerospace Property under principles of bailment, Honeywell Aerospace is still entitled to take possession under Section 1110(a) of the Bankruptcy Code. Aircraft equipment within section 1110(a) is not subject to the automatic stay, and a secured party, lessor, or conditional vendor may repossess it. 11 U.S.C. § 1110(a)(1); *see also United Airlines, Inc. v. U.S. Bank N.A.*, 406 F.3d 918, 922 (7th Cir. 2005) (stating that aircraft are exempted from the automatic stay under section 1110(a)(1) of the Bankruptcy Code). Two elements govern here: whether the Honeywell Aerospace Property is "equipment," and whether Honeywell Aerospace is a conditional vendor. Both are satisfied.

50. Section 1110(a)(3) defines "equipment" to include a "spare part (as defined in section 40102 of title 49)" and an "aircraft engine [or] appliance." 11 U.S.C. § 1110(a)(3). The Honeywell Aerospace Spare Inventory consists of spare parts supplied to Spirit to, at some future

time and when needed, used in place of parts that have been removed from Spirit's aircraft for repair and maintenance, which is the statutory definition of a spare part. 49 U.S.C. § 40102(a)(43). The Honeywell Aerospace APUs qualify independently as an "appliance" as they are "small gas turbine[s]… [that] generate[] electricity and incorporate[] a load compressor to provide compressed air needed both to start the aircraft's main engines and to control the environment of the aircraft's cabin during flight." *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1134 (Fed. Cir. 2004); 49 U.S.C. § 40102(a)(11) (stating an appliance is an "instrument, equipment, apparatus, a part, an appurtenance, or an accessory used, capable of being used, or intended to be used, in operating or controlling aircraft in flight[.]").

51. A "conditional sales contract" is a contract under which the buyer takes possession but title vests later upon, "(i) paying any part of the purchase price; (ii) performing another condition; or (iii) the happening of a contingency." 49 U.S.C. § 40102(a)(18). The PSA and MSA fit that definition in the alternative to the bailment theory: Spirit took possession of the Honeywell Aerospace Property but is not permitted to take title unless (1) it exercises its end-of-term purchase option, and then only absent a default for the Honeywell Aerospace Spare Inventory and (2) it exercises its end-of-term purchase option or, after a default, it pays the full list price for the Honeywell Aerospace APUs. PSA at § 28(b) (Ex. B); MSA at § 9.2 (Ex. B); MSA Amend. 5 at § 10 (Ex. E). Because those contingencies (a convenience termination, available no earlier than December 31, 2028 for the Honeywell Aerospace Spare Inventory and the end of the term of the MSA (December 31, 2028) or payment of the list price after default for the Honeywell Aerospace APUs) never occurred and Spirit is in default, no title rests with Spirit for the Honeywell Aerospace Spare Inventory that is off wing and title never passed to Spirit for the Honeywell Aerospace APUs. PSA at § 28(b) (Ex. B); MSA at § 9.2 (Ex. B); MSA Amend. 5 at § 10 (Ex. E). As such,

Honeywell Aerospace stands as the conditional vendor entitled to repossess. 49 U.S.C. § 40102(a)(18); 11 U.S.C. § 1110(a)(1).

52. Because the Honeywell Aerospace Property is equipment held under a conditional sales contract, section 1110(a)(1) of the Bankruptcy Code provides that Honeywell Aerospace's right to take possession "is not limited or otherwise affected by any other provision of this title or by any power of the court," including the automatic stay. 11 U.S.C. § 1110(a)(1); *see also In re Air Vermont, Inc.*, 761 F.2d 130, 132-35 (2d Cir. 1985) (permitting repossession under Section 1110(a)(1) even on an unrecorded, unperfected interest). The section 1110(a)(2) exception, which preserves the stay only where the debtor timely cures and agrees to perform, is unavailable: the Debtors have ceased operations, are winding down, and are likely administratively insolvent, so they cannot perform. 11 U.S.C. § 1110(a)(2); *see also United Airlines*, 406 F.3d at 923-26 (noting that because the debtor was not making the required payments under the applicable lease, the exception contained in section 1110(a)(2) did not apply). Honeywell Aerospace may therefore collect the Honeywell Aerospace Property immediately, without stay relief, because the stay does not apply.

**C. <u>ALTERNATIVELY, Cause Exists to Lift the Stay Because Honeywell Aerospace's Interest Is Not Adequately Protected</u>**

53. Should the Court find section 1110(a) inapplicable, it should lift the stay for cause under Section 362(d)(1) of the Bankruptcy Code. Relief is available "for cause, including the lack of adequate protection." 11 U.S.C. § 362(d)(1). An entity with an interest in property held by the debtor "is entitled to adequate protection as a matter of right when the entity is stayed from enforcing its interest." *In re Kennewick Pub. Hosp. Dist.*, No. 17-02025-FCP9, 2017 Bankr. LEXIS 3912, at *12 (Bankr. E.D. Wash. Nov. 14, 2017). Honeywell Aerospace need only make an initial

showing of cause, after which the burden shifts to the Debtors. *Mazzeo v. Lenhart (In re Mazzeo)*, 167 F.3d 139, 142 (2d Cir. 1999).

54. Honeywell Aerospace's interest is not adequately protected, for two independent reasons. First, the Debtors have ceased operations and are likely administratively insolvent; they cannot make adequate protection payments now or in the future. *See In re Balco Ltd.*, 312 B.R. 734, 749-50 (Bankr. S.D.N.Y. 2004) (holding that a secured creditor should be granted relief from the automatic stay because the debtor was unable to make adequate protection payments to the creditor). Second, Honeywell Aerospace Property is depreciating in the Debtors' hands. See, e.g., *In re Kennewick Pub. Hosp. Dist.*, 2017 Bankr. LEXIS 3912, at *11-13 (holding that cause existed under section 362(d)(1) to lift the automatic stay in favor of a secured creditor whose equipment was depreciating in the debtor's hands). Both the Honeywell Aerospace Spare Inventory and the Honeywell Aerospace APUs are technologically advanced products that must be stored under certain conditions. For example, the Honeywell Aerospace Spare Inventory must be stored in climate-controlled environments. More acutely, the APUs are subject to very strict storage parameters if they are not operated regularly. The risk of resulting decline in value and operability is itself a lack of adequate protection.

55. Pursuant to Bankruptcy Rule 4001(a)(4), an order granting relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until after the expiration of 14 days after the entry of the order, "unless the court orders otherwise." Fed. R. Bankr. P. 4001(a)(4). Honeywell Aerospace requests that this Court provide in any order granting this Motion that the fourteen (14) day stay in Bankruptcy Rule. 4001(a)(4) shall not apply to the order.

### D. ALTERNATIVELY, the Court Should Compel the Debtors to Promptly Assume or Reject the Agreements

56. Finally, if the Court does not grant Honeywell Aerospace's relief through the mechanisms outlined above, the Court should compel the Debtors under Section 365(d)(2) to assume[16] or reject the PSA and MSA and, if they reject, to return the Honeywell Aerospace Property. Although a debtor ordinarily has until plan confirmation to decide, a counterparty may move to compel an earlier decision, and what is reasonable is committed to the Court's discretion. *See* 11 U.S.C. § 365(d)(2) ("the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease"); *In re Adelphia Commc'ns Corp.*, 291 B.R. 283, 292 (Bankr. S.D.N.Y. 2003) (noting that section 365(d)(2) gives a contract counterparty the power to request a truncated time frame within which the debtor must assume or reject). Courts weigh the non-exhaustive *Adelphia*/*Hawker Beechcraft* factors, including the balance of harms, the debtor's ability to satisfy post-petition obligations, the importance of the contract to a reorganization, and Chapter 11's rehabilitative purpose. *In re Hawker Beechcraft, Inc.*, 483 B.R. 424, 429 (Bankr. S.D.N.Y. 2012).

57. Those factors favor Honeywell Aerospace decisively. The Debtors filed in August 2025, ceased all operations in May 2026, and plainly no longer need the Honeywell Aerospace Property; they have had more than enough time to decide on these contracts and they face no prospect of rehabilitation. The harm runs entirely one way: the $24,000,000 in Honeywell Aerospace Property belongs to Honeywell Aerospace, which is losing revenue with every moment the Honeywell Aerospace Spare Inventory sits in bins at former Spirit properties and with every

---

[16] Assumption is extremely unlikely, as section 365(b)(1) requires that to assume a contract, a debtor must cure or provide adequate assurance of promptly curing any defaults and provide adequate assurance of future performance. 11 U.S.C. § 365(b)(1). As discussed in section V(C) Debtors have ceased operations and are administratively insolvent, meaning they have no money to cure past defaults, let alone offer adequate assurance of future performance. *See infra* Section V(C).

flight that third parties may be taking with aircraft equipped with Honeywell Aerospace APUs. Debtors, by their own Cure Notice, are in payment default. Cure Notice at p. 26. This means that Honeywell Aerospace is not getting money it is due, all the while its valuable property is held hostage by the Debtors. The estate takes only the Debtor's own interests. It cannot convert property lawfully owned by Honeywell Aerospace into assets for creditors, except through the Bankruptcy Code's defined avoidance and recovery powers—none of which apply here.

## VI. CONCLUSION

58. Honeywell Aerospace seeks only the return of property it owns. Beyond satisfying the legal requirements for that relief, the equities weigh entirely in its favor. Honeywell Aerospace fully performed its obligations under the PSA and the MSA, continuing to supply the Honeywell Aerospace Property for the Debtors' benefit through the Wind Down. Honeywell Aerospace took reasonable steps to protect its interests, segregating and marking the Honeywell Aerospace Spare Inventory as "Honeywell Property" and filing notices of its ownership on the docket. It has repeatedly sought to work cooperatively with the Debtors toward a consensual return. The Debtors, by contrast, no longer operate, no longer need the Honeywell Aerospace Property, and can neither maintain it nor pay for its continued use. Denying Honeywell Aerospace the return of its own property would confer an unwarranted windfall on the estate at Honeywell Aerospace's expense, to the tune of more than $24,000,000, and would unsettle the OEM spare-parts pooling framework on which the commercial aviation industry broadly relies, discouraging the very bailment model that keeps aircraft in service. The equities and the law point to the same result: the Honeywell Aerospace Property must be returned.

59. **WHEREFORE**, Honeywell Aerospace respectfully requests that the Court enter a final order:

i. confirming that Honeywell Aerospace holds title to the Honeywell Aerospace Property and compelling the Debtors to return the Honeywell Aerospace Property to Honeywell Aerospace;

ii. in the alternative, holding that section 1110(a) of the Bankruptcy Code permits Honeywell Aerospace to repossess the Honeywell Aerospace Property notwithstanding the automatic stay;

iii. in the further alternative, modifying the automatic stay under Section 362(d)(1) of the Bankruptcy Code to permit Honeywell Aerospace to collect the Honeywell Aerospace Property and holding the fourteen-day stay in Bankruptcy Rule 4001(a)(4) does not apply to this order;

iv. in the further alternative, compelling the Debtors to assume or reject the PSA and the MSA and, upon rejection, to return the Honeywell Aerospace Property; and

v. granting such other and further relief as the Court deems just and proper.

## VII. NOTICE

60. Notice of this Motion will be given to: (a) the Debtors and their counsel, (b) the U.S. Trustee, (c) the Ad Hoc Committee of Senior Secured Noteholders and DIP Lenders, (d) Citibank, N.A., as the administrative agent under the Debtors' revolving credit facility, (e) the Official Committee of Unsecured Creditors, (f) Glide Funding Limited, (g) AerCap Global Aviation Trust (Series One), (h) AerCap Ireland Capital Designated Activity Company as Regular Trustee for Series One of AerCap Global Aviation Trust, (i) Aercap Ireland Limited, (j) Wilmington Trust Company, (k) Wilmington Trust, National Association (DE based), (l) Commonwealth Bank of Australia, New York Branch, (m) UMB Bank, N.A., not in its individual capacity but solely as owner trustee, (n) SMBC Aviation Capital Limited, (o) NATIXIS, acting

via its New York Branch, (p) Wilmington Trust, National Association (MN based), (q) JSA International U.S. Holdings, LLC, and (r) any party entitled to notice pursuant to Bankruptcy Rule 2002 and the Case Management Procedures. Honeywell Aerospace submits that no other or further notices are required under the circumstances.

Dated: July 28, 2026

Respectfully submitted,

DYKEMA GOSSETT PLLC

By: *___/s/ Deborah D. Williamson________________*

Deborah D. Williamson
Texas Bar No. 21617500 (*Pro Hac Vice*)
112 E. Pecan Street, Suite 1800
San Antonio, Texas 78205
Telephone: (210) 554-5500
Facsimile: (210) 226-8395

And

Jeffrey R. Fine
New York Bar No. 5276225
Texas Bar No. 07008410
1717 Main Street, Suite 4000
Dallas, Texas 75201
Telephone: (214) 462-6455
Facsimile: (855) 230-2518

**ATTORNEYS FOR HONEYWELL AEROSPACE US LLC**

# CERTIFICATE OF SERVICE

I, Deborah D. Williamson, hereby certify that on **July 28, 2026**, I caused a true and correct copy of the foregoing to be served upon all parties that have requested notice in these Chapter 11 cases through the Court's CM/ECF system. Additionally, I caused the foregoing to be served on the Master Service List via email, where available, and on the following Standard Parties[17] and Particularized Interest Parties in the manner described below.

**VIA US MAIL:**

**Debtors**
c/o Spirit Aviation Holdings, Inc.
1731 Radiant Drive
Dania Beach, FL 33004
Attn: Legal Department

**Glide Funding Limited**
c/o AerCap Ireland Capital Limited
4450 Atlantic Ave.
Westpark, Shannon
Co. Clare, Ireland
Attention: Company Secretary

**VIA EMAIL**

**Debtors' Counsel**
Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, New York 10017
Attn: Marshall S. Huebner, Darren S. Klein, and Christopher S. Robertson
spirit.notice@davispolk.com

**Debtors' Fleet Counsel**
Debevoise & Plimpton LLP
66 Hudson Boulevard
New York, NY 10001
Attn: Jasmine Ball and Elie J. Worenklein
bamishkin@debevoise.com; jball@debevoise.com; eworenklein@debevoise.com

---

[17] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the *Order Implementing Certain Notice and Case Management Procedures* [Docket No. 61].

**Office of the U.S. Trustee**
1 Bowling Green
New York, NY 10014
Attn: Shara Cornell and Mark Bruh
Shara.cornell@usdoj.gov; Rachael.E.Siegel@usdoj.gov

**Counsel to the Committee**
Willkie Farr & Gallagher LLP
787 7th Avenue,
New York, NY 10019
Attn: Brett H. Miller and Todd M. Goren
bmiller@willkie.com; tgoren@willkie.com; jburbage@willkie.com; jgraber@willkie.com

**Counsel to the AHC**
Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Attn: Michael S. Stamer and Jason P. Rubin
mstamer@akingump.com; aqureshi@akingump.com; kzuzolo@akingump.com;
jrubin@akingump.com; rbibloblock@akingump.com

**Counsel to the RCF Administrative Agent**
Milbank LLP
55 Hudson Yards
New York, NY 10001-2163
Attn: Andrew Harmeyer and Jason Kestecher
aharmeyer@milbank.com; jkestecher@milbank.com

**Counsel to Aercap Ireland Limited**
Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street,
New York, NY 10019
Attn: Michael G. Burke and Andrew V. Alfano
michael.burke@pillsburylaw.com; andrew.alfano@pillsburylaw.com

**AerCap Global Aviation Trust (Series One)**
c/o AerCap Ireland Limited
4450 Atlantic Ave.
Westpark
Shannon, Co. Clare
Ireland
Attention: Chief Legal Officer
contractualnotices@aercap.com

**AerCap Ireland Capital Designated Activity Company as Regular Trustee for Series One of AerCap Global Aviation Trust**
c/o AerCap Ireland Limited
4450 Atlantic Ave.
Westpark
Shannon, Co. Clare
Ireland
Attention: Chief Legal Officer
Leasing Services Department
contractualnotices@aercap.com

**Counsel to SMBC Aviation Capital Limited**
Clifford Chance US LLP
Two Manhattan West
375 9th Avenue,
New York, NY 10001
Attn: Michelle McGreal
michelle.mcgreal@cliffordchance.com

**UMB Bank, N.A., not in its individual capacity but solely as owner trustee**
6440 South Millrock Drive, Ste. 400
Salt Lake City, UT 84121
Attention: Corporate Trust ServicesCorpTrustUtah@umb.com; Heather.Cottle@umb.com

**SMBC Aviation Capital Limited**
IFSC House
IFSC
Dublin 1
Ireland
Attention: Head of Customer ManagementCustomerManagement@smbc.aero

**Counsel to Wilmington Trust, National Association and Wilmington Trust Company**
Alston & Bird
90 Park Avenue, 15th Floor,
New York, NY 10016
Attn: Gerard S. Catalanello, William Hao, and Dylan Cassidy
gerard.catalanello@alston.com; william.hao@alston.com; dylan.cassidy@alston.com

**NATIXIS, acting via its New York Branch**
Attention: Vinh Nguyen
1251 Avenue of the Americas
New York, NY 10020-1128
vinh.nguyen@us.natixis.com

**NATIXIS, acting via its New York Branch**
Attention: Martha Sealy
1251 Avenue of the Americas
New York, NY 10020-1128
martha.sealy@us.natixis.com; aviationfinanceportfolio@us.natixis.com

**Counsel to the Commonwealth Bank of Australia**
WINSTON & STRAWN LLP
200 Park Ave
New York, New York 10166-4193
Attn: Mark M. Polishuk and Carrie V. Hardman
chardman@winston.com; mpolishuk@winston.com

**Counsel to JSA International U.S. Holdings, LLC**
Vedder Price P.C.
1633 Broadway, 31st Floor,
New York, New York 10019
Attn: Michael J. Edelman and William W. Thorsness
mjedelman@vedderprice.com, wthorsness@vedderprice.com

**Wilmington Trust, National Association**
50 South Sixth Street, Suite 1290
Minneapolis, MN 55402
Attention: Jeffery Rose
jrose@wilmingtontrust.com

**Counsel to Wilmington Trust, National Association (MN)**
Seward & Kissel LLP
1 Battery Park Plaza
New York, New York 10004
Attention: Gregg Bateman
bateman@sewkis.com

By: */s/ Deborah D. Williamson*
Deborah D. Williamson