# Exhibit B

DocuSign Envelope ID: 5D539EB9-760F-4E4D-9806-7369CF836BBB

# PRODUCT & SERVICE AGREEMENT

This Product and Service Agreement (together with all applicable Exhibits, “Agreement”) is entered into and effective as of the date of the later signature below (the “Effective Date”) by and between Spirit Airlines, Inc., a corporation organized and existing under the laws of Delaware, with a place of business at 2800 Executive Way, Miramar, Florida 33025 ("Spirit"), and Honeywell International Inc., a corporation, through its Aerospace business unit, having a place of business at 1944 E. Sky Harbor Circle North, Phoenix, Arizona 85034 ("Supplier"). Spirit and Supplier may hereinafter at times be referred to individually as “Party” or collectively as the “Parties.”

WHEREAS, Supplier manufacturers and sells certain equipment which Spirit wishes to purchase for use and installation by a third party on its aircrafts;

WHEREAS, Supplier provides certain services in connection with Supplier’s manufactured equipment;

WHEREAS, Supplier and Spirit entered into an Integrated Service Solution Agreement, effective as of January 1st, 2006 (as amended, supplemented, or otherwise modified prior to the date hereof, “ISS Agreement”) whereby Spirit retained services from Supplier for A320 family avionics equipment;

WHEREAS, Supplier and Spirit entered into an A320 Aircraft Avionics Selection Agreement effective as of December 19, 2015 (as amended, supplemented or otherwise modified prior to the date hereof, “Selection Agreement”) whereby Spirit purchased certain equipment from Supplier;

WHEREAS, the Parties desire to enter into this Agreement to combine the ISS Agreement and the Selection Agreement and terms and conditions for Supplier’s provisioning of products and services to Spirit for the aircraft previously contemplated within the ISS Agreement and the Selection Agreement, as well as in support of additional A320 family aircraft purchased and/or leased by Spirit; and

WHEREAS, from and after the Effective date, this Agreement will replace and supersede the ISS Agreement.

NOW, THEREFORE, in consideration of mutual promises and covenants set forth herein, and for other good and valuable considerations, the receipt and adequacy of which are hereby acknowledged, the Parties hereto agree as follows:

## Terms and Conditions

1. **Definitions**

   a. AIRCRAFT - Any of the Airbus Industry A320 family aircraft operated by Spirit.

   b. AIRCRAFT FLIGHT HOURS - The number of hours incurred by an Aircraft from the moment it first lifts off for flight until it lands.

   c. COMPONENT - Any self-contained part, combination of parts, or subassemblies of units, which perform a distinctive function necessary to the operation of a system.

   d. DAYS - Calendar days unless stated otherwise.

e. EQUIPMENT - Supplier supplied Aircraft Components and LRU's including original installed equipment, Exchange Equipment, Replenishment Equipment, Line Station Equipment, and equipment replaced for any reason

f. LINE STATION EQUIPMENT - Exchange Equipment that is provided by Supplier and stored at any of Spirit's locations (as determined by Spirit at its sole discretion)

g. PRODUCT or PRODUCTS – means the Product(s) enumerated in each applicable Exhibit attached hereto.

h. REPAIR - The disassembly, inspection, rework, or replacement of Components as necessary, and re-assembly and test as required, to return the Equipment to a Serviceable condition.

i. REPLENISHMENT EQUIPMENT - Exchange Equipment stored at a Supplier facility, available for shipment to Spirit, for the purpose of replenishment of Line Station Equipment at the Spirit's facility. The part numbers are identified in Table A0 of Exhibit A attached hereto.

2. **Term**. This Agreement shall be effective as of the Effective Date set forth above and shall continue in effect until December 31st, 2034, unless sooner terminated in accordance with the terms of this Agreement or applicable law.

3. **Products & Services**. Subject to the terms and conditions of this Agreement and throughout the Term, Supplier agrees to supply to Spirit, the products enumerated in Exhibit B (the “Products”), attached hereto and made a part hereof as Spirit may purchase from time to time throughout the Term, and the ancillary Services enumerated in Exhibit A (the “Services”) attached hereto and made a part hereof.

4. **Charges**. In full consideration of Supplier’s provisioning of any Products or Services hereunder, Spirit shall pay to Supplier, the corresponding charges set forth in each applicable exhibit attached hereto. Such pricing is expressed in the corresponding Base Year price defined in each applicable exhibit attached hereto and shall be held firm for orders placed throughout the Fixed Price Period (until December 31, 2027) defined therein. Annual escalation may be applied to the Base Year Price once on January 1st of the calendar year immediately following the Fixed Price Period, and again on January 1st of each subsequent calendar year throughout the Term. Such annual escalation amount will be determined by the Price Escalation Formula defined below, or capped at [redacted] per annum (whichever is less).

   Notwithstanding the preceding sentence, in the event the calculated escalation results in a year-over-year increase in excess of [redacted] (the “Inflation Threshold”), then Spirit and Supplier will share each percentage point of escalation that is above [redacted]. *For* [redacted] *in a given year,* [redacted] *and Honeywell will absorb the other* [redacted]-escalation will never apply during the Term of this Agreement.

<u>Price Escalation Formula</u>:

$$P = P_0\{[0.7\ (L/L_0)] + [0.3\ (M/M_0)]\}$$

Where:

P = Adjusted Price for actual date of order placement

$P_0$ = Base Price, that is, the applicable price in the year immediately preceding the year in which the price is being adjusted

L = Average hourly earnings for "Labor" for the six (6) month period ending June 30th of the year prior to the year for which the price is being adjusted

$L_0$ = Average hourly earnings for "Labor" for the six (6) month period ending June 30th two (2) years prior ot the year for which the price is being adjusted

M = Average value of wholesale prices for "Material" for the six (6) month period ending June 30th of the year prior to the year for which the price is being adjusted

$M_0$ = Average value of wholesale prices for "Material" for the six (6) month period ending June 30th two (2) years prior to the year for which the price is being adjusted.

In determining the percentage adjustment to be added to the base prices for the Products and Services to be delivered hereunder, the adjustment shall be rounded to the nearest fourth decimal place (for example, 1.33464 becomes 1.3346)

Labor and Material indices will be those published by the U.S. Department of Labor, Bureau of Labor Statistics:

Producer Price Index: Commodities

Material [redacted] [redacted]

Labor [redacted] [redacted]

If the BIS substantially revises the methodology (in contrast to benchmark adjustments or other corrections of previously released data) or discontinues an index, a substituted index shall be used to reach the same adjustment result, insofar as possible, as would have been achieved by continuing the use of the original index as it may have fluctuated had it not been revised or discontinued There shall be no retroactive price adjustments based on the mutually agreed substitute indices.

5. **Payment**. Unless otherwise indicated in the applicable Exhibit, Payment to Supplier shall be made electronically in U.S. Dollars within thirty (30) days following issuance of Supplier's properly documented invoice to ap@spirit.com or other method as the parties may mutually agree. In the event that Spirit, in good faith, disputes any invoiced amount within thirty (30) days following receipt of the invoice, Spirit will notify Supplier in writing of the disputed amount and submit payment for all undisputed amounts in accordance with this section. The unpaid disputed amount will be resolved by mutual negotiations of the parties. Spirit shall have the right to recover any amounts previously paid in error. If payment for any undisputed amount is past-due, Supplier may suspend further shipments until such amounts are paid in full (and shall be relieved of related performance guarantees), provided, however, that Supplier first provides Spirit a forty-five (45) day cure period commencing from Spirit's receipt of Supplier's advanced written notice. Supplier agrees to proceed diligently in its performance hereunder until such cure period has expired and immediately after such past-due amounts are paid in full.

6. **Technical Publications**. Upon request, Supplier will provide access to all technical publications regarding maintenance and repair manuals and technical data at no charge to Spirit, to allow the continued airworthiness of the Aircraft and normal Aircraft operations regarding maintenance and repair and normal operations. Revisions will also be provided at Supplier's sole expense.

7. **Spirit's right to use Documentation**. For all Products and Services furnished hereunder, Supplier will, at its own expense, provide proper documentation, such additional documentation as required to allow Spirit to comply with all applicable statutes, regulations and orders, and such other documentation as reasonably requested by Spirit. Spirit shall have the royalty-free right to use and disclose, for the purposes of the sale, use, operation, maintenance and lease of any of its aircraft, any oral or written documentation or information received from Supplier which is required for use in the operation and maintenance of such aircraft.

8. **Special Tooling**. Supplier will provide to Spirit at [redacted] any applicable Special Tooling in support of Spirit's operations. Honeywell will retain title to any applicable Special Tooling provided pursuant to this provision. For the purposes of this section, Special Tooling includes Supplier-specific line maintenance tooling, , and manuals to support repairs, and/or modifications in support of Spirit's operations to address a reliability or airworthiness issue attributable to Supplier's Product(s).

9. **Training**. Upon Spirit's request, Supplier shall provide reasonable training for up to [redacted] persons on proper equipment operation and maintenance that requires in-classroom attendance at Supplier's location, unless an alternative location is mutually agreed, and at no additional charge to Spirit. Each Party hereto will be responsible for all costs and expenses incurred by its personnel in connection with such training.

10. **Product Support**. So long as Spirit shall operate any aircraft with a Product installed thereon, or for at least twenty (20) years of operation measured from the date of the final aircraft delivered to Spirit with the Product(s) installed thereon, Supplier shall make available the following product support services:

    a. Suitable spares (including piece parts) in quantities sufficient to meet Spirit's needs for normal repairs, with Supplier maintaining spare parts capability to ensure reasonable reorder lead times and Aircraft on Ground (AOG) support.

    b. Product engineering support services as Spirit may request for assistance with operational problems and/or upgrades, operating practices and analysis of Product performance.

    c. Field service representatives and maintenance specialist(s) to advise Spirit on maintenance and operation of the Product.

    d. Technical data and documents revisions services, including but not limited to, Service Bulletins for the Product.

    except in situations resulting in the discontinued airworthiness of a Product(s) for reasons that are not attributable to a deficiency in the Honeywell Product or its design. For the avoidance of doubt, this article ("Product Support") shall:

    a. survive termination or expiration of this Agreement; and

    b. shall not be construed to limit the rights of either Party pursuant to Article 13 ("Force Majeure").

11. **Service Bulletins**. If a Service Bulletin is released due to a deficiency in a Product that affects airworthiness, flight safety, or is released as an optional Service Bulletin intended to solely improve

DocuSign Envelope ID: 5D539EB9-760F-4E4D-9806-7369CF836BBB

reliability and/or reestablish airworthiness of the original Product, then such Service Bulletin will be installed at Supplier's sole expense.

12. **Software.** Supplier hereby grants Spirit a perpetual, worldwide, paid up, royalty free, non-exclusive license to use Software as more particularly identified in Exhibit B in support of its operations. Supplier warrants and represents that any Software delivered hereunder, either embedded in Products described herein (host medium) or specifically designed for use in or with such Product, will (i) provide the function(s) set forth in the applicable specification (or absent a specification, as described in the applicable Service Bulletin) and (ii) does not, to the best of Supplier's knowledge at the time of execution of this Agreement, infringe on any 3rd party intellectual property rights. Changes and/or modifications to the Software shall be made by Supplier in accordance with the applicable Service Bulletin as set forth in the SSC.

    For the purposes of this section, "Software" means any software designed by Supplier (or its suppliers or subcontractors) that is either embedded in the Products or designed for use with or in support of such Products or Spirit's operations.

    Spirit agrees not to modify, reverse engineer, disassemble, or decompile the Software, or any portion thereof.

13. **Force Majeure.** It is agreed that either Party hereto will be relieved of its obligations hereunder in the event and to the extent that its performance hereof is delayed or prevented by any cause beyond its reasonable control and not caused by the Party claiming relieve hereunder, including, without limitation, acts of God, public enemies, war, insurrection, acts or orders of governmental authorities, fire flood, explosion, riots, strikes or the recovery from such cause ("Force Majeure"). A Party obtaining relief under this provision shall make best efforts to resume Services and, where applicable, to meet the timetables for the provisioning of Products or Services specified in each applicable exhibit attached hereto. The Party obtaining relief further agrees to consult with and advise the other Party of any anticipated delay or failure or the possibility thereof, whether for Force Majeure or not, and, where applicable, the re-establishment of applicable timetables. If the inability to perform continues for longer than six (6) months, either Party will have the right to terminate this Agreement by providing written notice to the other Party. However, in case of any termination for any reason, all due and owing payment obligations for Products and Services received through the date of termination must be paid in full.

14. **Currency**. All monetary amounts described in this Agreement are specified in U.S. dollars.

15. **Limit on Fees**. Suppliers acknowledges and agrees that the charges and/or fees specifically assigned to and assumed by Spirit under this Agreement establish the maximum liability of Spirit to Supplier hereunder.

16. **Regulatory Authority Compliance**. Supplier warrants that all Products and services provided hereunder will comply with all applicable laws, including without limitation, all orders or regulations of the Federal Aviation Administration ("FAA") and any other United States Regulatory Agency or body having jurisdiction over the Product or service.

17. **Certification / FAA Compliance**. Supplier acknowledges and agrees that all Products sold to Spirit hereunder are intended for installation on U.S. Federal Aviation Administration ("FAA") certified aircraft. Supplier represents and warrants that all Products are manufactured under an approval granted by accepted by the FAA under 14 C.F.R Part 21 of the Federal Aviation Regulations. Upon delivery to Spirit, Supplier shall provide with each Product, a certification that the Product has been approved or accepted by the FAA under 14 C.F.R. Part 21 (including additional copies of such certification upon Spirit's request).

DocuSign Envelope ID: 5D539EB9-760F-4E4D-9806-7369CF836BBB

Acceptable certification documents include the following:

- Federal Aviation Administration – FAA form 8130-3 Airworthiness Approval Tag
- Joint Aviation Authorities – JAA Form One Authorized Release Certificate
- Transport Canada – TC Form 24-0078 Authorized Release Certificate
- A Certificate of Conformance or Material Certification Document that lists the Product manufacturer's part number and condition and contains a signed statement certifying that the Products are aeronautical replacement parts listing the specific FAA approval or acceptance criteria applicable to the Products.

To meet the above criteria, it is permissible for Supplier to provide Spirit with copies of the certification documents originally supplied to Supplier with shipments of Products prior to the transfer of Products to Spirit. The original certification documents must meet the certification requirements stated above and the original copies, if not provided to Spirit with the shipments, must remain on file at Supplier's facility.

18. **Use of Subcontractors**. Nothing in this agreement shall create any contractual relationship between Spirit and any subcontractor, and no such subcontract shall relieve Supplier of its obligations hereunder should the subcontractor fail to perform in accordance with the provisions of this agreement. Spirit shall have no obligation to pay or to see to the payment of any money to any subcontractor.

19. **Option**. Unless otherwise specified in the applicable exhibit:
    a. all Products and Services hereunder may be ordered at Spirit's option and on a non-exclusive basis; and
    b. There are no minimum unit or dollar volume of Products or Services guaranteed to Supplier hereunder.

20. **Acceptance**. Acceptance of each Product is subject to final inspection and testing. Spirit reserves the right to inspect Products for conformance to applicable specifications for a period of thirty (30) days following Product receipt (the "Inspection Period"). In the event Products are rejected by Spirit within the Inspection Period, Spirit will return the rejected material at Supplier's sole risk and expense, and if the return is justified Supplier will repair or replace such Product(s) at no charge to Spirit. If Supplier reasonably determines that rejection was improper, Spirit will be responsible for all expenses caused by the improper rejection.

21. **Transportation**. Except as otherwise stated in each applicable exhibit, the cost of transportation shall be borne by Supplier within the continental U.S. only. The party initiating shipment will bear the risk of loss or damage to Products in transit until such time as the Products have been received by Spirit.

22. **Title / Risk of Loss**
    a. <u>For Exchange Orders</u>: For exchange Products, title will pass from Supplier to Spirit upon installation of the Products on any Aircraft; title shall transfer back to Supplier once the off-wing unit is made available at Spirit's facility within the Continental United States.

    b. <u>For Repair Orders</u>: All materials delivered to Supplier for services pursuant to a repair order hereunder shall be provided Ex Works (EXW), Spirit's facility, as defined in Incoterms 2020, whereas, in the context of the EXW Incoterm, Spirit shall fulfill the obligations of the seller and Supplier shall fulfill the obligations of the buyer (the "Delivery"). Spirit retains title to the

Products being repaired or overhauled. Should Supplier be unable to complete a repair order and as a result ships an Exchange Product to Spirit, title will pass from Supplier to Spirit upon installation of the Products on an Aircraft and title of the parts removed and originally shipped for repair will transfer to Supplier.

c. For Purchase Orders: Delivery terms are FCA (Incoterms 2020), Supplier's designated facility. Title and risk of loss or damage will pass to Spirit when Supplier places Product at Spirit's disposal at Supplier's facility.

23. **Notices.** Any notice, demand, or document that either Party is required or otherwise desires to give, deliver to or make upon the other Party hereunder shall be in writing and shall be: (i) personally delivered; (ii) sent by United States mail, registered or certified, return receipt requested, with postage prepaid; (iii) sent by prepaid overnight courier; or (iv) sent by electronic mail (e-mail) or facsimile (to the extent listed below) with confirmation of receipt, addressed as follows:

| **Notices to Spirit** | **Notices to Supplier** |
|---|---|
| [redacted]<br>Spirit Airlines, Inc.<br>[redacted]<br>2800 Executive Way Miramar FL 33025<br><br>[redacted]<br><br>Copy to:<br>[redacted] | Attn: [redacted]<br>[redacted] International, Inc.<br>[redacted]<br>1944 E. Sky Harbor Circle, Phoenix AZ 85034<br>[redacted] |

[redacted] to such other address as either Party may designate for itself by notice given to the other Party as aforesaid. Any such notice, demand or document shall be deemed to be effective upon receipt of the same by the Party to whom such notice, demand or document is addressed.

24. **Indemnity Against Patent and Copyright Infringement**. Supplier will indemnify, defend and hold Spirit and its officers, directors, agents, servants, harmless against any suit arising out of any actual or alleged patent or copyright infringement of a United States patent or copyright, to the extent based on the Product as delivered by Supplier, and indemnify for any final judgment assessed against Spirit resulting from such suit provided that Spirit notifies Supplier in writing promptly after Spirit is apprised of the third-party claim and Spirit agrees to give sole control and reasonable information and assistance (at Supplier's expense) for the defense and disposition of the claim; provided, however, that Spirit's failure to give Supplier notice as provided herein shall not relieve Supplier of its obligations under this Section 24 except to the extent Supplier is actually prejudiced by such failure to give notice Notwithstanding the foregoing, in connection with the defense of such claim, at Spirit's expense, Spirit may, at its option, participate in the defense of such claim, with its separate counsel, and at its own cost and Supplier agrees to cooperate in good faith and in all reasonable respects with such counsel. Supplier will not be responsible for any compromise or settlement made without Supplier's prior written consent. Supplier shall, however, not enter into any settlement of any such claim or lawsuit unless such settlement (A) includes a release of all covered claims pending against Spirit; (B) contains no admission of liability or wrongdoing by Spirit; and (C) does not impose any obligations upon Spirit.

Supplier will have no liability or obligation to defend and indemnify Spirit with respect to claims of infringement directly arising out of or based on (a) Products used by Spirit other than for their

DocuSign Envelope ID: 5D539EB9-760F-4E4D-9806-7369CF836BBB

intended purpose as specified in this Agreement; or (b) any combination of the Product with any article or service not furnished by Supplier; or (c) any modification of the Product other than a modification by Supplier.

25. **General Indemnification.** To the fullest extent permitted by law, each Party shall defend, indemnify and hold harmless the other Party (the "Indemnifying Party"), its officers, directors, agents, servants, (the "Indemnitee") from and against any and all third party liabilities, claims, demands, suits, causes of action (whether civil or criminal), judgments, damages, losses, costs, fines and expenses of any kind or nature whatsoever (collectively "Losses"), arising in whole or in part, or in connection with (i) any breach of this Agreement by the Indemnifying Party except for a delivery performance breach in which the delivery performance remedy or penalty is identified in Exhibit A and B of this Agreement or (ii) the negligent performance or non-performance of the Indemnifying Party's responsibilities under this Agreement (without limitation to any goods and services furnished by Supplier to Spirit hereunder) including, but not limited to injury to or death of any person whomsoever, damage to or destruction of any property, real or personal (including loss of or damage to any third party property) resulting thereby, , except to the extend caused solely by the gross negligence or willful misconduct of the Indemnitee, its officers, directors, agents, servants or employees. This section will not be construed to negate, abridge or otherwise reduce any other right or obligation of indemnity which would otherwise exist as to any party or person described in this section. The indemnification obligations of this section shall survive termination of this Agreement. The Indemnitee will promptly notify the Indemnifying Party in writing of any claim made or suit brought within the scope of this section; provided, however, that the failure of any Party entitled to indemnification hereunder to give notice as provided for herein shall not relieve the Indemnifying Party of its obligations under this Section 25 except to the extent that the Indemnifying Party is actually prejudiced by such failure to give notice. The Indemnifying Party shall not enter into any settlement of any such claim or lawsuit unless such settlement (A) includes a release of all covered claims pending against the Indemnitee; (B) contains no admission of liability or wrongdoing by the Indemnitee; and (C) does not impose any obligations upon the Indemnitee.

26. **Limitation of Liability**. EXCEPT FOR DAMAGES RESULTING OR ARISING FROM A PARTY'S VIOLATION OF THE CONFIDENTIALITY PROVISIONS CONTAINED IN SECTION 29 OF THIS AGREEMENT, IN NO EVENT WILL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE, STATUTORY, OR INDIRECT DAMAGES WHATSOEVER, (INCLUDING LOSS OF PROFITS OR BUSINESS INTERUPTION), EVEN IF INFORMED OF THE POSSIBILITY OF SUCH. WITH RESPECT TO DIRECT DAMAGES, THE AGGREGATE LIABILITY OF THE PARTIES FOR ANY CLAIMS ARISING OUT OF OR RELATED TO THIS AGREEMENT SHALL NOT EXCEED AN AMOUNT EQUAL TO THE FEES PAYABLE TO SUPPLIER FOR PRODUCTS AND SERVICE PURCHASED BY CUSTOMER WITHIN THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT(S) GIVING RISE TO THE CLAIM. TO THE EXTENT PERMITTED BY APPLICABLE LAW, THESE LIMITATIONS AND EXCLUSIONS WILL APPLY REGARDLESS OF WHETHER LIABILITY ARISES FROM BREACH OF CONTRACT, INDEMNITY, WARRANTY, TORT, OPERATION OF LAW, OR OTHERWISE. NOTWITHSTANDING THE FOREGOING, THE LIMITATIONS OF LIABILITY IN THIS SECTION 26 SHALL NOT APPLY TO ANY CLAIM OR LOSS ARISING FROM THE NEGLIGENCE OR WILLFUL MISCONDUCT OF HONEYWELL WHICH IS ALSO BY COVERED BY THE INSURANCE REQUIRED TO BE CARRIED BY THE SUPPLER PURSUANT TO SECTION 27 OF THIS AGREEMENT AND SHALL FURTHER NOT SERVE AS A LIMITATION OF SPIRITS RIGHTS AND REMEDIES UNDER PARAGRAPH 3 (DELIVERY PERFORMANCE) IN EXHIBIT A OF THIS AGREEMENT.

DocuSign Envelope ID: 5D539EB9-760F-4E4D-9806-7369CF836BBB

27. **Insurance**

a. Supplier shall have sufficient insurance coverage in respect of Injury, death, damage, loss, and third-party general liability arising out of the services performed pursuant to this Agreement.

b. Supplier shall at its own cost and expense without any contribution from the Spirit, procure and maintain in full force and effect during the term of this Agreement policies of insurance of the types and in the minimum amounts, or such higher limit as it may be carried, stated below with responsible and good credit rating insurance carriers, covering all operations of Supplier pursuant to this agreement. Supplier agrees to maintain the following minimum insurance coverage:

| Type of Insurance | Amount |
|---|---|
| Aviation Liability (Including Contractual Liability and Products and Completed Operations Liability, Hangar Keeper's Liability Personal Injury and Public Liability and Umbrella) | [redacted] per loss/occurrence |
| Comprehensive General Liability | [redacted] (Bodily Injury and/or Property Damage) |
| Automobile Liability | [redacted] |
| Workers Compensation*<br>Including Waiver of Right to Recover from Others Endorsement (WC 00 0313) where permitted by state law. | Greater of Statutory Limitation or [redacted] bodily injury for each accident and US [redacted] for bodily injury by disease. |

c. Supplier hereby agrees to include Spirit as an additional insured to the extent of the Supplier's contractual indemnity obligations in its insurance policies, including its Aviation Liability and General Liability Insurance Policy, covering liability risks assumed herein and shall deliver a Certificate of Insurance to Spirit within ten (10) days upon the execution of this Agreement reflecting the above extension of coverage. Supplier will have its insurers issue A Waiver of Subrogation Endorsement on the captioned policies in favor of the Additional Insured. Such insurance shall be primary and non-contributory to any insurance maintained by the Additional Insured.

28. **Termination**

a. <u>Default and Remedies</u>. The following events shall constitute "Events of Default" hereunder:

i. if either Party shall fail in the performance of any of its obligations contained in this Agreement and such failure continues uncured for a period of thirty (30) days following written notice from the other Party;

ii. if either Party shall file a voluntary petition in bankruptcy, shall be adjudicated as bankrupt or insolvent, shall file any petition or answer seeking any reorganization, composition, readjustment, liquidation or similar relief for itself under any present or future Law, shall seek, consent to or acquiesce in the appointment of any trustee, receiver or liquidator of itself, shall make any general assignment for the benefit of creditors or shall admit in writing its inability to pay its debts generally as they become due;

iii. if a petition shall be filed against either Party seeking any reorganization, composition, readjustment, liquidation or similar relief under any present or future Law, which petition shall remain undismissed and/or unstayed for an aggregate of thirty (30) days (whether or

DocuSign Envelope ID: 5D539EB9-760F-4E4D-9806-7369CF836BBB

not consecutive), or if any trustee, receiver or liquidator of either Party shall be appointed, which appointment shall remain unvacated and/or unstayed for an aggregate of thirty (30) days (whether or not consecutive);

iv. if any representation or warranty made by either Party herein or in any statement or certificate required or otherwise furnished hereunder or in connection herewith proves to have been untrue in any material respect as of the date of the making thereof; or

v. if any representation or warranty made by either Party herein or in any written statement furnished after the Effective Date in connection with this Agreement or the Program proves to have been made recklessly or in bad faith.

Upon the occurrence of any Event of Default, the non-defaulting Party shall be entitled to terminate this Agreement in any or all respects and shall further be entitled to all remedies available hereunder, under applicable Law or in equity, which remedies shall be cumulative and not exclusive. Notwithstanding any other provision of this Agreement, in no event shall either Party be liable for special, indirect, incidental, consequential, punitive or other similar damages in connection with any breach or default by the other Party under this Agreement. In the event of a termination not resulting from Supplier's default under this Agreement, Spirit will return all of the consigned equipment to Supplier, at Spirit's sole expense within thirty (30) days of the date of termination.

In the event of a termination resulting from Supplier's default under this Agreement, Spirit will return all of the consigned equipment to Supplier, at Supplier's sole expense, within three (3) months of the date of termination.

b. Termination for Convenience. No earlier than December 31st, 2028, Spirit reserves the right to terminate this Agreement, terminate any applicable Exhibit and/or cancel any order, in whole or in part, without cause and for its sole convenience and without penalty, upon nine (9) months prior notice to Supplier specifying the extent of the termination and the effective date thereof. In the event of such termination, Supplier shall immediately stop all work hereunder and/or thereunder. Spirit's total liability with respect to such termination shall be limited to the following and must be completed by the date of termination:

i. Spirit shall purchase consigned inventory at fifty percent (50%) of Supplier's 2022 operator catalog price for material consigned to Spirit through calendar year 2024; consignment material delivered to Spirit in 2025 or later will be purchased at then-current operator catalog price as of the effective date of termination.

For the avoidance of doubt, the effective date of any termination for convenience hereunder must be at least 9-months from the notice date, or after December 31st, 2028 (whichever is later).

29. **Confidential.** The Parties hereto further agree that, unless otherwise required by a court of competent jurisdiction, the reproduction, distribution, disclosure, divulgement, or other publication of the contents of this Agreement or any portion thereof are strictly confidential and will not be disclosed by them, or by their agents, employees, officers, directors, representatives or attorneys. Further , the Parties understand that during the course of performance of this Agreement the Parties may receive and/or have access to the other Party's "Confidential Information". For the purposes of this Agreement, "Confidential Information" shall mean any non-public information that is disclosed to one Party to the other which is, whether furnished before or after the Effective Date, whether tangible or intangible, and in whatever form or medium, which includes, but is not limited to, certain data, financial, strategic and other non-public information regarding each Party's respective business. Accordingly:

DocuSign Envelope ID: 5D539EB9-760F-4E4D-9806-7369CF836BBB

a. The receiving Party shall not disclose to any other person, firm or corporation any Confidential Information that the receiving Party receives from the disclosing Party and shall use the same degree of care to avoid disclosure of such information as the receiving Party employs with respect to disclosing Party's own proprietary and confidential information of like importance, but in no event less than the utmost reasonable care. Receiving Party also agrees not to use the Confidential Information for any purpose other than to the extent necessary to carry out the receiving Party's responsibilities under this Agreement. All Confidential Information that is in written form delivered by the disclosing Party to the receiving Party shall be and remain the property of the disclosing Party, and all such written data, and any copies thereof, shall be promptly returned to the disclosing Party upon termination and/or written request, or destroyed at the disclosing Party's option.

b. The receiving Party acknowledges that irreparable harm, for which there would be no adequate remedy at law, would arise from the violation of this Section 29. Therefore, the Party's acknowledges that a breach of this Section (Confidentiality) would give rise to a right to an injunction in favor of the disclosing Party.

c. In the event the receiving Party becomes legally compelled (by deposition, interrogatories, requests for information or documents, subpoena, civil or criminal investigatory demand, or similar process) to disclose any of the Confidential Information of the disclosing Party, then the receiving Party shall provide the disclosing Party with a prompt written notice of the request or requirement so that the disclosing Party may seek a protective order or other remedy sufficient to the disclosing Party or waive compliance with the provisions of this Agreement. If a protective order or other remedy sufficient to the disclosing Party is not obtained, or if the disclosing Party waives in writing compliance with the terms of this Agreement, then the receiving Party or receiving Party's representatives may furnish only that portion of the Confidential Information which the receiving Party is advised by written opinion of receiving Party's counsel is legally required to be disclosed.

This article shall survive the expiration or termination of this Agreement.

30. **Publicity**. Neither Party will use the name, trademarks, or service marks of the other Party for any purpose without the prior written consent of the other Party, which consent may be withheld by the other Party at its sole discretion. No announcements or publicity regarding this Agreement shall be issued except with the prior written agreement of both Parties.

31. **OSHA and Hazardous Material Requirements**

a. OSHA. To the extent required by applicable law, in the performance of this Agreement, Supplier will comply with all applicable statutes, requirements, orders and regulations of the United States federal government and other applicable jurisdictions, pertaining to the occupational safety and health including as such law may be amended, recodified, or revised, including without limitation the Occupational Safety and Health Act ("OSHA") of 1970.

b. Hazardous Material. For any shipment to Spirit hereunder, Supplier will be solely responsible for the proper handling, removal, shipping, and disposal of any and all toxic, hazardous or other materials used, provided or generated in the course of its performance under this Agreement in accordance with applicable law. Supplier hereby releases, indemnifies, and holds Spirit harmless from any liability of any kind whatsoever arising under this provision except due to the willful misconduct of Spirit.

32. **Definition of Aircraft**. "Aircraft" means any aircraft owned or operated by Spirit. "Fleet 1" and "Fleet 2", as used throughout this Agreement, are defined below:

DocuSign Envelope ID: 5D539EB9-760F-4E4D-9806-7369CF836BBB

- **Fleet 1** – refers to the one-hundred and ninety three (193) aircraft defined in Table 1 below
- **Fleet 2** – refers to a minimum of 100 new Aircraft plus future options delivered to Spirit, whether purchased or leased, throughout the Term (except those Aircraft that comprise Fleet 1)

**Table 1** - Fleet 1

| AC | Reg. | Delivered | AC | Reg. | Delivered | AC | Reg. | Delivered | AC | Reg. | Delivered |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 502 | 3/29/2005 | 50 | 622 | 10/22/2013 | 99 | 647 | 4/6/2017 | 148 | 926 | 2/20/2020 |
| 2 | 503 | 5/23/2005 | 51 | 623 | 11/25/2013 | 100 | 648 | 4/25/2017 | 149 | 929 | 2/28/2020 |
| 3 | 504 | 5/31/2005 | 52 | 624 | 12/9/2013 | 101 | 675 | 5/9/2017 | 150 | 927 | 3/13/2020 |
| 4 | 505 | 6/21/2005 | 53 | 625 | 1/31/2014 | 102 | 649 | 5/17/2017 | 151 | 930 | 3/26/2020 |
| 5 | 506 | 6/23/2005 | 54 | 626 | 3/10/2014 | 103 | 676 | 7/5/2017 | 152 | 931 | 4/7/2020 |
| 6 | 507 | 9/29/2005 | 55 | 627 | 5/5/2014 | 104 | 677 | 7/28/2017 | 153 | 928 | 4/13/2020 |
| 7 | 508 | 10/27/2005 | 56 | 628 | 7/23/2014 | 105 | 650 | 8/29/2017 | 154 | 932 | 6/19/2020 |
| 8 | 509 | 11/28/2005 | 57 | 629 | 10/16/2014 | 106 | 678 | 8/31/2017 | 155 | 933 | 8/14/2020 |
| 9 | 510 | 12/6/2005 | 58 | 630 | 10/30/2014 | 107 | 679 | 10/25/2017 | 156 | 934 | 10/1/2020 |
| 10 | 512 | 2/2/2006 | 59 | 631 | 11/4/2014 | 108 | 680 | 11/15/2017 | 157 | 935 | 10/6/2020 |
| 11 | 514 | 2/7/2006 | 60 | 633 | 11/18/2014 | 109 | 681 | 11/30/2017 | 158 | 936 | 3/11/2021 |
| 12 | 516 | 3/23/2006 | 61 | 632 | 11/25/2014 | 110 | 651 | 12/14/2017 | 159 | 937 | 3/25/2021 |
| 13 | 517 | 3/24/2006 | 62 | 634 | 12/11/2014 | 111 | 682 | 12/20/2017 | 160 | 938 | 5/12/2021 |
| 14 | 522 | 11/9/2006 | 63 | 635 | 12/19/2014 | 112 | 652 | 12/21/2017 | 161 | 941 | 6/9/2021 |
| 15 | 523 | 11/9/2006 | 64 | 636 | 1/22/2015 | 113 | 653 | 1/31/2018 | 162 | 939 | 6/24/2021 |
| 16 | 524 | 11/9/2006 | 65 | 637 | 1/28/2015 | 114 | 684 | 2/8/2018 | 163 | 942 | 6/29/2021 |
| 17 | 525 | 11/29/2006 | 66 | 638 | 2/23/2015 | 115 | 683 | 2/14/2018 | 164 | 940 | 6/30/2021 |
| 18 | 526 | 12/7/2006 | 67 | 639 | 3/5/2015 | 116 | 685 | 3/12/2018 | 165 | 944 | 7/15/2021 |
| 19 | 527 | 1/10/2007 | 68 | 640 | 3/23/2015 | 117 | 686 | 3/22/2018 | 166 | 943 | 7/22/2021 |
| 20 | 528 | 1/19/2007 | 69 | 641 | 4/30/2015 | 118 | 687 | 3/30/2018 | 167 | 945 | 7/29/2021 |
| 21 | 529 | 2/1/2007 | 70 | 642 | 5/22/2015 | 119 | 654 | 4/23/2018 | 168 | 946 | 9/01/2021 |
| 22 | 530 | 2/9/2007 | 71 | 643 | 6/8/2015 | 120 | 655 | 8/27/2018 | 169 | 947 | 11/22/2021 |
| 23 | 531 | 2/28/2007 | 72 | 657 | 7/10/2015 | 121 | 656 | 8/28/2018 | 170 | 949 | 11/23/2021 |
| 24 | 532 | 6/18/2007 | 73 | 658 | 8/11/2015 | 122 | 690 | 10/2/2018 | 171 | 948 | 12/09/2021 |
| 25 | 533 | 2/6/2008 | 74 | 659 | 9/17/2015 | 123 | 692 | 12/7/2018 | 172 | 950 | 12/14/2021 |
| 26 | 534 | 2/15/2008 | 75 | 660 | 10/22/2015 | 124 | 691 | 12/14/2018 | 173 | 951 | 12/21/2021 |
| 27 | 601 | 3/4/2010 | 76 | 661 | 11/30/2015 | 125 | 693 | 12/17/2018 | 174 | 952 | TBD |
| 28 | 602 | 4/8/2010 | 77 | 662 | 12/18/2015 | 126 | 694 | 12/17/2018 | 175 | 953 | TBD |
| 29 | 603 | 5/27/2010 | 78 | 663 | 2/26/2016 | 127 | 908 | 12/17/2018 | 176 | 954 | TBD |
| 30 | 604 | 9/14/2010 | 79 | 645 | 3/15/2016 | 128 | 910 | 12/20/2018 | 177 | 955 | TBD |
| 31 | 605 | 1/17/2011 | 80 | 646 | 3/31/2016 | 129 | 907 | 1/30/2019 | 178 | 956 | TBD |
| 32 | 606 | 2/22/2011 | 81 | 665 | 3/31/2016 | 130 | 695 | 2/1/2019 | 179 | 957 | TBD |
| 33 | 607 | 2/23/2011 | 82 | 664 | 4/12/2016 | 131 | 913 | 2/7/2019 | 180 | 958 | TBD |
| 34 | 608 | 11/17/2011 | 83 | 667 | 4/28/2016 | 132 | 912 | 2/12/2019 | 181 | 959 | TBD |
| 35 | 609 | 12/22/2011 | 84 | 668 | 5/27/2016 | 133 | 915 | 2/28/2019 | 182 | 960 | TBD |
| 36 | 611 | 1/31/2012 | 85 | 644 | 6/8/2016 | 134 | 906 | 4/3/2019 | 183 | 961 | TBD |
| 37 | 612 | 2/28/2012 | 86 | 669 | 9/7/2016 | 135 | 696 | 5/14/2019 | 184 | 962 | TBD |
| 38 | 613 | 3/6/2012 | 87 | 670 | 9/16/2016 | 136 | 916 | 9/19/2019 | 185 | 963 | TBD |

DocuSign Envelope ID: 5D539EB9-760F-4E4D-9806-7369CF836BBB

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 39 | 614 | 5/23/2012 | 88 | 901 | 10/7/2016 | 137 | 698 | 10/2/2019 | 186 | 964 | TBD |
| 40 | 615 | 6/11/2012 | 89 | 902 | 10/13/2016 | 138 | 697 | 10/14/2019 | 187 | 965 | TBD |
| 41 | 616 | 11/15/2012 | 90 | 903 | 11/9/2016 | 139 | 918 | 11/8/2019 | 188 | 966 | TBD |
| 42 | 617 | 12/5/2012 | 91 | 671 | 11/17/2016 | 140 | 917 | 11/15/2019 | 189 | 967 | TBD |
| 43 | 521 | 12/15/2012 | 92 | 904 | 12/7/2016 | 141 | 921 | 11/19/2019 | 190 | 968 | TBD |
| 44 | 618 | 1/24/2013 | 93 | 905 | 12/14/2016 | 142 | 919 | 11/26/2019 | 191 | 969 | TBD |
| 45 | 519 | 2/8/2013 | 94 | 672 | 1/31/2017 | 143 | 920 | 12/2/2019 | 192 | 970 | TBD |
| 46 | 515 | 3/15/2013 | 95 | 535 | 2/13/2017 | 144 | 923 | 12/19/2019 | 193 | 971 | TBD |
| 47 | 619 | 3/21/2013 | 96 | 536 | 2/13/2017 | 145 | 922 | 12/23/2019 | | | |
| 48 | 620 | 5/28/2013 | 97 | 673 | 2/21/2017 | 146 | 924 | 1/21/2020 | | | |
| 49 | 621 | 7/11/2013 | 98 | 674 | 3/31/2017 | 147 | 925 | 1/30/2020 | | | |

Should a decrease of the Aircraft Fleet 2 size to less than one hundred (100) Aircraft set forth above occur, Spirit and Supplier will negotiate in good faith regarding an appropriate adjustment to the rate set forth in Exhibit A with such adjustment made only through an amendment to this Agreement duly executed by both Parties. Such rate adjustments will be restricted to the amount necessary to accommodate the program impact of the Fleet 2 size changes.

33. **Survival**. Notwithstanding anything herein to the contrary, any articles or portions thereof that expressly or impliedly by operation of law survive expiration or termination shall survive the expiration or termination of this Agreement.

34. **Supplier Representations**. Supplier hereby represents, warrants, covenants, and agrees to and with Spirit as follows:

    a. Supplier is duly organized, validly existing and in good standing and has the power and authority to execute and deliver, and to perform its obligations under this Agreement. Supplier's execution and delivery of this Agreement and performance of its obligations hereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by-laws (or equivalent documents) or any law, regulation or contractual restriction binding on or affecting it or its property.

    b. This Agreement is Supplier's legal, valid and binding obligation, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

    c. Supplier has and shall maintain such Internet, electronic mail and other similar capabilities as are necessary in order to access Spirit's manuals, communicate with Spirit and otherwise transact business with Spirit electronically.

35. **Independent Contractor**. The Parties acknowledge that they are independent contractors and no other relationship, including, without limitation, partnership, joint venture, employment, franchise, master/servant, or principal/agent is intended by this Agreement. Neither Party has the right to bind or obligate the other. Each Party assumes full responsibility for any and all liability on account of bodily injury to or death of any of its own employees occurring in the course of their employment.

36. **Setoff.** Spirit will not set off or recoup invoiced amounts or any portion thereof against sums that are due or may become due from Supplier, its parents, affiliates, subsidiaries or other divisions or units, except with prior notification for setoff of Supplier payments due directly against this Agreement.

37. **Governing Law**. This Agreement shall be governed and construed in accordance with the laws of the State of New York, without regard to conflicts of law principles. Application of the Uniform Computer Information Transactions Act and United Nations Convention on Contracts for the International Sale of Goods, 1980, and any successor law to either is specifically excluded. The Federal courts of the State of New York will have exclusive jurisdiction to adjudicate any dispute arising out of or related to this Agreement and the parties hereby submit to the jurisdiction of such courts. Spirit will not bring a legal or equitable action more than three (3) year after the cause of action arose unless a shorter period is provided by applicable law.

38. **Severability**. If, for any reason, any portion of this Agreement will be unenforceable or determined by a court of competent jurisdiction to be in violation of or contrary to any applicable statue, regulation, ordinance, order, or common law doctrine, then that portion will be of no effect. Nevertheless, the balance of this Agreement will remain in full force and effect as if such provision were never included.

39. **Waiver**. Failure of either Party to enforce at any time any of the provisions of this Agreement will not be construed to be a continuing waiver those provisions.

40. **Taxes**

    a. HONEYWELL's pricing excludes taxes (including, but not limited to, sales, use, excise, value-added, and other similar taxes), duties and charges. Unless an appropriate tax exemption certificate is provided by Spirit, Spirit will pay applicable sales and/or use taxes that may be lawfully imposed upon Supplier by the Government of the United States or any state or political subdivision thereof, for the Products and Services provided to Spirit under this Agreement, provided Supplier promptly notifies Spirit of the imposition of such taxes. Supplier will cooperate with Spirit and use best efforts to have any U.S. Customs duties abated or reduced.

    b. Supplier agrees that the fees paid under this Agreement will be deemed to include any value added tax or similar tax imposed by any other government (whether such obligation is to pay or for Supplier to collect and remit payment). Spirit will not be liable to Supplier for, and Supplier will hold Spirit harmless from, any taxes based on gross receipts, revenue, income or the like, or franchise or doing business taxes.

41. **Counterparts**. This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute but one and the same instrument. Delivery of any executed counterpart by electronic transmission of a ".pdf" (or comparable) copy shall be effective as effective as delivery of an originally executed counterpart of this Agreement.

42. **Sanctions**. To the knowledge of Spirit, Spirit is not a "Sanctioned Person," meaning any person or entity : (i) named on the U.S. Department of the Treasury's Office of Foreign Assets Control's ("OFAC") list of "Specially Designated Nationals and Blocked Persons," "Sectoral Sanctions Identifications List" or other economic sanctions lists issued pursuant to a United States governmental authority, the European Union Common Foreign & Security Policy or other governmental authority; (ii) organized under the laws of, ordinarily resident in, or physically located in a jurisdiction that is the subject of sanctions administered by OFAC or the U.S. Department of State (each a "Sanctioned Jurisdiction" and including, at the time of writing, Cuba, Iran, North Korea, Syria, and the Crimea region); or (iii) owned or controlled, directly or indirectly, 50% or more in the aggregate by one or more Sanctioned Persons.

    To the best of Spirit's knowledge, Spirit is in compliance with and will continue to comply with all economic sanctions laws administered by OFAC, the U.S. Department of State, the European

Union, or the United Kingdom ("Sanctions Laws"). Spirit will not knowingly involve any Sanctioned Persons or group of Sanctioned Persons in any capacity, directly or indirectly, in any part of this transaction and performance under this transaction. Spirit will not knowingly take any action that would cause Supplier to be in violation of Sanctions Laws.

Spirit will not sell, export, re-export, divert, or otherwise transfer, any Supplier products, technology, or software: (i) to any Sanctioned Persons; or (ii) for purposes prohibited by any sanctions program enacted by the U.S Government. Spirit will not source any components, technology, software, or data for utilization in Supplier products or services: (i) from any Sanctioned Persons or Sanctioned Jurisdictions or (ii) in contravention of any Sanctions Laws.

Spirit's failure to comply with this provision will be deemed a material breach of the Agreement, and Spirit will notify Supplier immediately if it violates, or reasonably believes that it will violate, any terms of this provision. Spirit agrees that Supplier may take any and all actions required to ensure full compliance with all Sanctions Laws without Supplier incurring any liability.

43. **Assignment.** Neither Party will assign any rights or obligations under this Agreement without the advance written consent of the other Party, which consent will not be unreasonably withheld or delayed except that either Party may assign this Agreement in connection with the sale or transfer of all or substantially all of the assets of the product line or business to which it pertains. Any attempt to assign or delegate in violation of this clause will be void.

44. **Titles**. The captions and titles herein are for convenience only and are not intended to define or aid interpretation of the subject matter of the text hereof.

45. **Third Party Beneficiaries**. Except as expressly provided to the contrary in this Agreement, the provisions of this Agreement are for the benefit of the Parties to this Agreement only and not for the benefit of any third party, with the exception of Spirit's third-party Aircraft leasing companies.

46. **Order of Precedence**. The attached Exhibits A and B are incorporated herein by this reference and made a part hereof as if set forth herein in full. In the event of a conflict between the terms and conditions of such documents, the following order of precedence shall apply: (i) The applicable Exhibit A or Exhibit B, and (ii) the body of this Agreement. Notwithstanding the foregoing, unless otherwise modified by the terms of this Agreement together with all applicable Exhibits and/or where expressly noted, and as related to the Products and Services in this Agreement, the Supplier Support Conditions with the airframe manufacturer ("SSC") will control.

47. **Entire Agreement**. This Agreement, along with the Exhibits, comprises the entire understanding between the Parties with respect to the Products and Services, and expressly terminates, rescinds, replaces, and supersedes all prior and contemporaneous agreements and understandings, oral or written, between the Parties with respect to the subject matter hereof. The terms and conditions of this Agreement may be amended or modified only by a written instrument signed by duly authorized representatives of both Parties.

[Signature Page to Follow]

DocuSign Envelope ID: 5D539EB9-760F-4E4D-9806-7369CF836BBB

[redacted]

[redacted]

[redacted]

[redacted]

**EXHIBIT A** – Services

1. **MCPH Services.** All Services pursuant to this Exhibit will be ordered on an exclusive basis. Supplier shall provide to Spirit, the following services (the "Services") on an MCPH ("maintenance cost per hour") basis throughout the Term of this Appendix A, all of which shall be included within each applicable MCPH rate set forth in section 2 ("Charges") below.

   a. Consignment Inventory. Supplier shall maintain consignment inventory in the below quantities to be kept on site at Spirit. Such inventory shall be used to support the 1:1 exchange of off-wing Components in an Unserviceable Condition (a unit requiring repair, overhaul, analysis, and/or beyond economical repair) with replacement stock in a new or serviceable condition pursuant to Spirit exchange orders. All exchange units (including on-site consignment spares) must meet the following requirements:

      i. Must not be a Rogue Component
      ii. Must be of at least equal modification status as core unit
      iii. Must be recognized as equivalent component as core unit in Spirit IPC

   For the purposes of this section, "Rogue" refers to the condition of a Component that during a twelve (12) month period, the same Item and/or Component happens to be subject to three (3) or more Unscheduled Justified Removals for identical reasons; and/or ii) during a one thousand (1,000) FH period the same Item happens to be subject to five (5) or more Unscheduled Justified Removals for any reason, and the removals should not be justified through normal shop and test procedures.

**Table A0** | Dedicated Consignment Stock (On-Site at Spirit)

| Part Number(s) | Description | Spirit Qty (ea) |
|---|---|---|
| **066-50014-xxxx**<br>066-50014-1202<br>066-50014-0202 | ADF RECEIVER | 10 |
| **PG1152xxxx**<br>PG1152BC02 | ADM | 10 |
| **HG2030BExx**<br>HG2030BE04<br>HG2030BE03 | ADIRU | 10 |
| **HG2030AExx**<br>HG2030AE24<br>HG2030AE44 | ADIRU | 10 |
| **CG1151xxxx**<br>CG1151AC03 | CDU | 8 |
| **980-6032-xxx**<br>980-6032-023 | CVR | 12 |
| **066-50013-xxxx**<br>066-50013-1222<br>066-50013-1212 | DME INTERROGATOR | 10 |
| **69000942-xxx**<br>69000942-151<br>69000942-251 | EGPWS | 10 |

| Part Number(s) | Description | Spirit Qty (ea) |
|---|---|---|
| **69002602-xxxx**<br>69002602-0201 | MMR | 14 |
| **066-01212-xxxx**<br>066-01212-0102<br>066-01212-0101 | MODE S TRANSPONDER | 13 |
| **066-50007-xxxx**<br>066-50007-0432 | RADIO ALTIMETER TRANSCEIVER | 10 |
| **980-4750-xxx**<br>980-4750-009<br>980-4700-042<br>980-4750-002<br>980-4750-001 | SSFDR | 12 |
| **940-0351-xxx**<br>940-0351-005<br>940-0351-006 | TCAS II Computer | 10 |
| **965-1696-xxx**<br>965-1696-051<br>064-50000-2051 | VHF TRANSCEIVER | 10 |
| **69001410-xxx**<br>69001410-200 | VOR/MARKER BEACON | 9 |
| **930-4301-xxx**<br>930-4301-001 | WXR ANTENNA | 6 |

| | | |
|---|---|---|
| **965-1676-xxx**<br>965-1676-002 | EGPWS | 5 |
| **965-1676-xxx**<br>965-1676-003<br>965-1676-006 | EGPWS | 3 |
| **964-0453-xxx**<br>964-0453-001 | HF COUPLER | 8 |
| **964-0452-xxx**<br>964-0452-052<br>964-0452-012<br>964-0452-001 | HF TRANSCEIVER | 10 |
| D50A000-100<br>4077880-982<br>4089740-961 | MCDU | 12 |

| | | |
|---|---|---|
| **930-3000-xxx**<br>930-3000-001 | WXR ANTENNA MOUNT | 12 |
| **930-6201-xxx**<br>930-6201-002 | WXR CONTROL PANEL | 14 |
| **930-2000-xxx**<br>930-2000-020<br>930-2000-001 | WXR RDR-4000 ANTENNA DRIVE | 14 |
| **930-1005-xxx**<br>930-1005-002<br>930-1005-003<br>930-1005-tbd | WXR RDR-4000 PROCESSOR | 18 |

b. Annual Stocking Level Review. The Parties agree to work in good faith to:

i. Update the above part numbers enumerated in Table A0 as superseding part numbers become available throughout the Term and in accordance with Spirit's IPC;

ii. On an annual basis, review data and increase or decrease consignment stock quantities of each part number in accordance with Spirit's fleet growth and/or operational needs as appropriate for 8 stations; and

iii. Should Spirit request additional spares intended for more than 8 stations, the Parties shall meet and mutually agree on a commensurate adjustment

c. Replenishment. Supplier shall be responsible for scrap replacement and maintaining adequate consignment inventory at Spirit's facility, in consideration of Spirit's current operational needs and future fleet growth. The consignment stock described herein shall be replenished within the lead times specified in section 3 ("Delivery Performance") of this Exhibit A, measured from Honeywell's receipt of a Spirit exchange order.

d. Spirit Stock Locations. The Dedicated Consignment Stock quantities in Table A0 are intended for on-site spares at eight (8) Spirit stations within the continental US.

e. Repair & Analysis. All labor & material costs incurred by Supplier in connection with the repair & analysis of suspected unserviceable Components, including, without limitation bench test and/or No Fault Found ("NFF") events for all suspected unserviceable material (whether the Component was consigned to Spirit or otherwise owned by Spirit and sent to Supplier pursuant to a repair order) are deemed to be included within the applicable MCPH.

f. No Cause for Removal / No Fault Found. No Cause for Removal (NCFR) and No Fault Found (NFF) will mean the nonscheduled return of equipment by Spirit to Supplier, which is reported to be defective and which, upon examination, Supplier finds to be in conformance with its drawings and specifications, that is, no fault is found. NCFR or NFF events are included in the rate up [redacted]he event that for more than [redacted] consecutive months the number of total removals of an Equipment is [redacted] than the number of removals due to confirmed failures of the same Equipment the Parties, will work and negotiate in good faith to resolve the excessive removals. In the event that, for more than [redacted] the number of total removals of an Equipment is [redacted] greater than the number of removals due to confirmed failures of the same Equipment then Spirit Airlines will be assessed a penalty [redacted] event.

g. Customer Induced Damage/Foreign Object Damage Coverage / Missing Components. Customer Induced Damage (CID) / Foreign Object Damage (FOD) / Missing Components Coverage means repair coverage for damage caused by (1) any accident, misuse, or mishandling; or (2) an outside or foreign object or debris, substance, or element of the component resulting in damage; or (3) in the event that Components are missing from the Equipment when received from Spirit at Supplier's facility, after completion of receiving inspection

Excess Abuse is considered any maintenance, repair, modifications, testing, overhaul, installation, storage, operation or use which is improper or not in accordance with the applicable Aircraft Manufacturer's and/or OEM's written instructions, as applicable. Any defect/abuse for which physical evidence does not exist cannot be considered as Excess Abuse. Technical reasoning must be provided for Excess Abuse. Any physical internal damage, for which the reason or mode of failure is unknown, cannot be considered as Excess Abuse. Coverage for such instances is covered under this proposal up to [redacted] the annual revenue associated with this proposal. Spirit airlines shall be responsible for the Time and Material charges in excess of the [redacted] annual revenue, thereafter, Scrap replacement in accordance with this section will be as follows:

Spirit, at its sole discretion, may purchase (i) a new Component at Supplier Catalog airline net price, (ii) a new Equipment at the applicable price specified in Exhibit B, (iii) a Serviceable Component from Honeywell at fair market value; or otherwise, Spirit can supply a Serviceable Component to Honeywell.

h. Beyond Economic Repair. Repair events pursuant to a 1:1 exchange under this exhibit that are declared BER (CID, FOD, and Excess Abuse excluded) are included in the MCPH. Supplier, at its own discretion, may choose to repair or replace the Equipment with a like-configuration in accordance with part a ("Consignment Inventory") of article 1 ("MCPH Services") above at no additional cost to Spirit.

i. Out-of-Scope Repairs. Any work to be performed outside of this Agreement, either third party work directed to Supplier by Spirit, or other work as may be mutually deemed appropriate, unless otherwise agreed by Supplier and Spirit, shall be performed on a time and material basis, including any maintenance or Repair necessitated by Spirit as a condition of return of Aircraft to Spirit's Aircraft lessor.

j. SBs, ADs, SILs, TIs and WIP Inventory. Supplier will incorporate at no additional charge to Spirit Airlines those modifications determined and required by applicable FAA Airworthiness Directives ("ADs") and Supplier Alert (safety) Service Bulletins and Reliability Service Bulletins that address performance, design, and reliability deficiencies, except Service Bulletins not solely attributable to Supplier Equipment, workmanship or design. All other Service Bulletins will be complied with following Spirit Airlines' instructions and at Spirit Airlines' expense; however, Supplier reserves the right to incorporate such Service Bulletins at Supplier's expense.

Inclusion of Service Bulletin issued to improve a Component reliability will be performed at a shop visit at no additional cost to the Spirit. In the event of a scheduled retrofit, Supplier further agrees to promptly provision adequate inventory (as mutually agreed) of each applicable configuration in sufficient quantities to support the program, and Spirit's normal operational needs throughout the duration of the program (each applicable current-state and future-state configuration).

k. Approval for Return to Service. Supplier shall certify, by furnishing a properly completed FAA form 8130-3 and EASA dual certification to Spirit, that the Service was properly performed in

DocuSign Envelope ID: 5D539EB9-760F-4E4D-9806-7369CF836BBB



accordance with Spirit's instruction as set forth in the applicable Spirit RO or EO, and that the Component is approved for return to service.

l. Obsolescence. In the event a Product is no longer produced or procured for Fleet 2 Aircraft, Supplier will source, at no cost to Spirit, a suitable replacement. Such replacement shall be made available with no disruption to Spirit's operations. In case such a replacement cannot be sourced, any required re-design of the Product shall be performed, manufactured, and supported at Supplier's sole expense.

2. **Charges**. The all-inclusive MCPH ("maintenance cost per hour") rate for Fleets 1 and 2 are defined below:

**Table A1** | Fleet 1 MCPH

| **Fleet 1 MCPH** \| [redacted] |
|---|
| *Fleet 1 Products included in MCPH rate will be those described in Table A0 |

**Table A2** | Fleet 2 MCPH & Components

| SYSTEM | FUNCTION | EQUIP | MPN | SS QTY | MCPH Rate |
|---|---|---|---|---|---|
| **MCDU** | MCDU | MCDU-R | D50A000-xxx | 2 | [redacted] |
| **VHF** | VHF Transceiver (VDL Mode 2) | RTA-50D | 965-1696-xxx | 3 | [redacted] |
| **HF** | HF Voice / Data Radio | XK516D1 | 964-0452-xxx | 1 | [redacted] |
| | HF Coupler | FK516 | 964-0453-xxx | 1 | |
| **Weather Radar** | Weather Radar Antenna | FP30-1 | 930-4301-xxx | 1 | [redacted] |
| | Weather Radar Antenna Mount | DA-A1 | 930-3000-xxx | 1 | |
| | Weather Radar Control Panel | CP-2B | 930-6201-xxx | 1 | |
| | Weather Radar Transceiver | RP-1 | 930-1005-xxx | 1 | |
| | Receiver / Transmitter Unit | TR-1 | 930-2000-020 | 1 | |
| **Radio Altimeters** | Radio Altimeter Transceiver | ALA-52B | 066-50007-xxxx | 2 | [redacted] |
| **TCAS** | TCAS II Computer | TPA-100B | 940-0351-xxx | 1 | [redacted] |
| **DME** | DME Transceiver | DMA-37B | 066-50013-xxxx | 2 | [redacted] |
| **ADF** | ADF Receiver | DFA-75B | 006-50014-xxxx | 1 | [redacted] |
| **VOR** | VOR Receiver | RVA-36C | 69001410-xxx | 2 | [redacted] |
| **MMR** | IMMR | IMMR | 69002602-xxxx | 2 | [redacted] |
| **Transponder** | Mode S Transponder | TRA-100B | 066-01212-xxxx | 2 | [redacted] |
| **ADM** | Air Data Module (ADM) | - | PG1152BC02 | 8 | [redacted] |
| **ADIRU** | ADIRU | - | HG2030BExx | 3 | [redacted] |
| **EGPWS** | EGPWC - Mark 5 | - | 69000942-xxx | 1 | [redacted] |
| | | | **Fleet 2 MCPH** | | [redacted] |

a. Price Validity. The MCPH rates defined above are shall be held flat (not subject to escalation) from January 1st, 2022 until December 31st, 2027 (the "Fixed Price Period"). Thereafter, Supplier may apply annual escalation in accordance with Article 3 ("Charges") of the body of this Agreement. All BFE pricing shall be honored for Spirit purchase orders, or Aircraft leasing companies placing orders in support of the Spirit Aircraft deliveries. The

MCPH rates are based on Aircraft hours and the program assumptions in this Agreement and are offered in lieu of warranty (ILO).

b. Rate Adjustments. If a product or system is removed from this Agreement for Fleet 2 (as the Parties mutually agree), the applicable MCPH rate in Table A2 will be reduced by the corresponding percentage that comprises the total rate, as appropriate. The Parties will work in good faith to negotiate any rate adjustments associated with Fleet 1 scope changes, by an amount commensurate to the reduction in Services.

c. Interchangeable Supersedure. All pricing and rates are valid for the part numbers detailed herein, and superseding part numbers same in form, fit or function as they become available throughout the Term.

d. Flight Hour Minimum. The validity of the MCPH rates detailed above are based on a minimum annual average of [redacted] flight hours per aircraft, pro-rated based on the date each aircraft is entered into or otherwise removed from Service (permanently or temporarily in long-term storage). For the purposes of this section, Long-Term Parking starts when an aircraft has not accomplished any revenue flights for 30 consecutive days and ends after the first revenue flight upon return to service. Component repairs and exchanges for components removed from an Aircraft during long-term parking shall be charged on a T&M basis. Flight hours shall be reconciled annually to the minimums or actuals, whichever is greater. The above rates are based upon exchange/Repair of Equipment that is operated solely by Spirit under the terms of this Agreement. Spirit agrees to pay the amount of difference between the actual hours which were paid and the guaranteed annual minimum amount to Supplier upon reconciliation.

3. **Delivery Performance**

a. 24-7-365. Supplier shall provide a twenty-four (24) hour, seven (7) days a week, three-hundred sixty-five (365) days per year emergency service supply of Products to be available from Supplier's inventory.

b. Emergency Orders. Supplier shall provide acknowledgement of the emergency order and shall provide airwaybill and flight information or method of shipment to Spirit within two (2) hours for AOG orders and within twelve (12) hours for critical and expedite orders. No surcharge or additional fee of any kind shall apply to emergency orders.

c. Lead Times. Supplier agrees to make available for shipment all Products within the lead times specified below. Such lead times refer to the time elapsed between (i) the time Supplier receives Spirit's Order (exchange order) and (ii) the time shipment of the Product(s) is dispatched towards the applicable receiving location indicated on Spirit's purchase order.

**Table A3**

| Order Category | Lead Time | Service Level |
|---|---|---|
| Replenishment | 72 hours or less | 95% |
| Critical | 24 hours or less | 98% |
| AOG | 4 hours or less | 98% |

d. Service Level. Supplier will report its performance (along with supporting data) on a monthly basis, and warrants that its average performance (aggregated monthly performance data for the 6-month period that comprises each half of the calendar year) hereunder will meet or exceed the service level commitment enumerated in the table above. The first period of

measurement shall begin on the first day of the first complete calendar month immediately following the Effective Date. Service Level shall be calculated as the ratio between the total number of Orders that are fulfilled on-time during the period and the total number of Orders placed during that same Period, according to the following formula:

$$DPSL_n = \frac{OTD_n}{TD_n}$$

Where:

DPSLn = Delivery Performance Service Level during Period n.

OTDn = the total number of Orders fulfilled on-time during Period n.

TDn = the total number of Orders placed during Period n.

e. Liquidated Damages. Spirit shall be entitled to claim liquidated damages under this Agreement in the amount set forth in the table below (expressed as a percentage of the total invoiced dollar value during the corresponding evaluation period). For the avoidance of doubt, Excusable Delays (as defined below) will not be counted towards in the performance calculation hereunder. Such credit shall be issued to Spirit within 30-days following Spirit's written request.

**Table A4**

| **Service Level** | **Credit Value** (USD) [redacted] |
|---|---|
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |
| [redacted] | [redacted] |

[redacted] Return Performance. Spirit's right to collect remedies pursuant to Table A4 above is predicated upon meeting a core return performance on-time target of [redacted] or greater during the corresponding evaluation period. For the purpose of this section, a return will be deemed on-time if it is made available for pickup within seventy-two (72) hours or less from exchange order placement.

g. Excusable Delays. For the purposes of this article ("Delivery Performance"), Supplier shall be excused from delivering Product(s) hereunder to the extent that such delay is due to reasons beyond the reasonable control of Supplier (an "Excusable Delay"), provided the Excusable Delay is not occasioned by the fault or negligence of Supplier. Delays by Supplier's subcontractors shall in no event be an Excusable Delay. Any Excusable Delay shall last only as long as the event remains beyond the reasonable control of Supplier and only to the extent that it is the primary cause of the delay. Supplier shall use its best efforts to minimize the effects of any Excusable Delay and shall notify Spirit immediately upon the occurrence of such an event.

4. **Other Services**. Honeywell shall perform the following Services throughout the Term at the unit prices specified below:

   a. ELT Battery Replacement (Rescue 406 SG). Supplier shall perform battery replacements (battery P/N 51080200-1) at a unit price of [redacted] each as Spirit may request from time to time throughout the term. Such unit price shall be held flat (not subject to escalation) for repair orders placed on or before December 31st, 2027. Thereafter, Supplier may apply escalation to the base-year price annually in accordance with Article 3 ("Charges") of the body of this Agreement.

5. **Invoice Submittal for Services**

   a. Spirit will make efforts to submit to Supplier not later than the fifteenth (15th) day of each month, a written report showing actual Aircraft Flight Hours accumulated during the preceding month of operation. Supplier shall subsequently submit to Spirit, a properly documented invoice for MCPH Services to ap@Spirit.com for Services rendered in the preceding month, or such other address as Spirit may advise in writing. Supplier shall include the following information on any invoice submitted to Spirit:

   b. Detail on the Product or component and detail on Services performed (to the extent applicable for Services):

      i. Manufacturer Part Number
      ii. Component Manufacturer Serial Number
      iii. Component Description
      iv. Maintenance Provider or service order number
      v. Level of Service performed and description
      vi. Any applicable charges and all applicable labor piece parts, and subcontracted work for time & material work
      vii. Spirit's order number (repair order or exchange order)
      viii. Payment terms

   c. Payment under this section for MCPH Services will be due net 15 days from the date each invoice is submitted to Spirit. If Spirit fails to submit the Aircraft Flight Hours by the fifteenth (15th) day of each month for the preceding month, Supplier will invoice, and Spirit will pay, an amount reflecting the average monthly Aircraft Flight Hour totals for the immediately preceding 3 month period multiplied by the applicable MCPH rate.

   d. Payment and invoicing for all other Services (other than MCPH) will be due in accordance with Article 5 of the body of the Agreement. Invoices for such Services may be submitted upon shipment of Equipment to Spirit.

6. **Service Centers**. Supplier represents and warrants to Spirit that (i) its repair facilities hold FAA repair station certificates and maintain such certification throughout the Term, and (ii) Services performed under this Agreement shall meet FAA and all applicable regulatory requirements. Supplier shall further be responsible for ensuring each repair facility is equipped with instrumentation and testing capability necessary for comprehensive functional testing.

7. **Records**. For a period of at least eight (8) years following the date of any Service, Supplier shall at all times maintain a Full Records Package in connection with the performance of Service, including, without limitation, those records required of an FAR 121 air carrier and FAR 145 repair stations, all of which records shall be open to audit by Spirit or any authorized representative of Spirit or the FAA upon at least a 5-day notice during the performance of Services or during

normal business hours. Notwithstanding the foregoing, Supplier shall comply with any regulations applicable to record-retention to which Spirit or Supplier are subject.
For the purposes of this section, “Full Records Package” means all applicable documents associated with the Services, including, but not limited to, the following:

i. Copy of Spirit order (repair order or exchange order)
ii. Airworthiness approval tag, FAA Form 8130-3
iii. Copy of the Cost Estimate of Repair, if applicable
iv. Airworthiness Directive and Service Bulletin Status Sheet (to include mods incorporated, mod status in, mod status out)
v. Component Process Sheet
vi. Tear Down Report (to include preliminary findings, final findings, material usage, corrective action); and
vii. Certificate of Conformance for parts used in Services

8. **Performance Standards**. Supplier warrants and represents to Spirit that its performance under the terms and conditions of this agreement and the furnishing of all Services shall be in accordance with Spirit’s instructions as set forth in the applicable repair order (“RO”) or engineering order (“EO”), the standards, provisions and stipulations of all applicable federal, state and local laws, regulations, executive orders, and ordinances, and in conformance with the then-current OEM manuals, Component Maintenance Manuals (“CMM”), all applicable FARs, and all other requests of the FAA or any other agency or governmental body having jurisdiction over the Services or Components. In the event of a conflict, the following order of precedence shall apply:

   i. The applicable standards, provisions and stipulations of all federal, state and local laws, rules, regulations executive orders, and ordinances (including all other requests of the FAA or any other agency or governmental body having jurisdiction over the Services or components
   ii. Conformance with then-current OEM manuals

   Supplier agrees that it will promptly report to Spirit, any discrepancies between FAA requirements and Service Provider’s operations (where relevant to this agreement) as noted or reported to Service Provider by the FAA and will promptly correct any reported discrepancies or deficiencies duly reported to Spirit or Service Provider by the FAA

9. **Service Warranty.** Warranty for Services, to the extent applicable, will be governed by the then-current SSC as of the date the Services are performed.

10. **Reliability Guarantees**. The guaranteed MTBUR (mean time between unscheduled removals) and MTBF (mean time between failures) for each Product in Table A5 below are expressed in flight hours and based on the (fleet-wide) measurement on a rolling twelve (12) month basis.

**Table A5** | Reliability Guarantees

| Description | Product | MPN | MTBUR | MTBF |
|---|---|---|---|---|
| Radar R/T | RP | 930-1005-xxx | 16,000 | 19,200 |
| Transmitter/Receiver Mod | TR | 930-2000-xxx | 30,000 | 36,000 |
| Antenna Drive-Single | DA-1A | 930-3000-001 | 18,000 | 21,600 |

DocuSign Envelope ID: 5D539EB9-760F-4E4D-9806-7369CF836BBB



| | | | | |
|---|---|---|---|---|
| Antenna Drive-Dual | DA-1B | 930-3001-001 | 26,500 | 31,800 |
| Flat Plate | FP30-1 | 930-4301-001 | 320,000 | 384,000 |
| Control Panel | CP-2B | 930-6201-xxx | 28,000 | [redacted]33,600 |
| VOR/MKR Receiver | RVA-36C | 69001410-xxx | 50,000 | 60,000 |
| DME | DMA-37B | 066-50013-xxxx | 70,000 | 84,000 |
| VHF Data Radio | RTA-50D | 965-1696-xxx | 32,000 | 40,000 |
| Radio Altimeter | ALA-52B | 066-50007-xxxx | 30,000 | 35,000 |
| Altimeter Antenna | ANA-52B | 071-50026-xxxx | 25,000 | 30,000 |
| ADF Receiver | DFA-75B | 066-50014-xxxx | 40,000 | 48,000 |
| Integrated MMR | IMMR | 69002600-xxxx | 25,000 | 30,000 |
| HF Voice/Data Radio | XD516D1 | 964-0452-xxx | 30,000 | 36,000 |
| HF Antenna Coupler | FX516 | 964-0453-xxx | 20,000 | 24,000 |
| Mode S Transponder | TRA-100B | 066-01212-xxxx | 30,000 | 36,000 |
| Directional Antenna | ANT-81A | 071-50001-xxx | 50,000 | 60,000 |
| Next Generation TCAS Processor | TPA-100B | 940-0351-xxx | 15,000 | 18,000 |
| EGPWS | MKVA | 6900942-xxx | 21,250 | 25,000 |
| Pegasus Cardset | FMS | 408407X-() | 16,800 | 20,160 |
| LCD MCDU | MCDU | D50A000-100 | 24,000 | 36,700 |

The MTBUR/MTBF hours listed above are expressed in mature flight hours with maturity occurring over a three-year period beginning at [redacted] mature value at end of 1st year, [redacted] at end of 2nd year, [redacted] 3rd year. The MTBUR/MTBF hours are based upon Spirit operating the equipment within Supplier Installation, Operating and Cooling instructions and specified ARINC Specifications.

The MTBUR/MTBF hours listed above are expressed in mature flight hours with maturity occurring over a three-year period beginning at [redacted] value at end of 1st year, [redacted] at end of 2nd year, [redacted] at end of 3rd year. The MTBUR/MTBF hours are based upon Spirit operating the equipment within Supplier Installation, Operating and Cooling instructions and specified ARINC Specifications.

Supplier agrees to support Spirit in the event that MTBUR or MTBF falls below the applicable guarantee for any individual part number, as specified above. During any such remedial period, Supplier will assist Spirit, at no charge, to determine the cause of justified removals, including, but not limited to:

a. Re-engineering and modifying all affected Products, at no charge to Spirit, as required to meet the guaranteed MTBUR. Spirit shall be reimbursed for all costs associated with Product removal and reinstallation, and Supplier shall bear the cost of roundtrip transportation.
b. Fulfilling a retrofit program, upon Spirit's request.
c. Providing additional spares to Spirit at no charge in sufficient quantities to avoid potential disruption to Spirit's operations
d. Providing modifications, as necessary, to improve maintenance instructions, overhaul manuals, test equipment and test software

11. **Additional Supplier Responsibilities**

DocuSign Envelope ID: 5D539EB9-760F-4E4D-9806-7369CF836BBB



a. Allow Spirit to assign appropriate personnel to make desired inspections and quality checks of the Equipment in process at Supplier's Facility, at a mutually agreed time, and to consult with Supplier's personnel with respect to possible changes in work specifications and/or operating or maintenance and service procedures.

12. **Additional Spirit Responsibilities**

a. Make available for pick-up all removed Equipment operated by Spirit, as listed in Table A1 of Exhibit A of this Agreement, exclusively to Supplier for exchange/Repair so long as this Agreement shall remain in force and effect.

b. Spirit shall ensure that all of its line stations or designated maintenance stations adhere to this exclusivity requirement

c. Allow authorized Supplier personnel reasonable access to Equipment covered by this Agreement, as well as those operational and F AAl1AA required maintenance records maintained by Spirit.

d. Maintain adequate facilities for Serviceable Equipment that comply with applicable CMM requirements. Operate and maintain the Equipment in accordance with the Aircraft flight manual issued by the Aircraft manufacturer and comply with the requirements of applicable FAA Airworthiness Directives.

**EXHIBIT B** – Products

1. **Buyer Furnished Equipment** (BFE)

   a. Option. For operational spares, all Products will be ordered on a non-exclusive basis, as Spirit may request from time to time throughout the Term.

   b. Interchangeable Supersedure. All pricing and rates are valid for the part numbers detailed herein, and superseding part numbers same in form, fit or function throughout the Term.

   c. Exclusivity. Spirit commits to taking delivery of those selectable Products described in Table A2 of Exhibit A (subject to such option remaining available from Airbus and continued airworthiness of the Products in the airspace that Spirit operates) for Fleet 2 deliveries received from Airbus through first quarter of 2028.

   d. Invoice Submittal for Products. At or following shipment of each Product, Supplier shall submit to Spirit, a Properly Documented Invoice to ap@spirit.com. Payment to Supplier shall be in accordance with Article 5 of the body of this Agreement.

   e. BFE Software. The software in Table B1 will be supplied [redacted] for all new Aircraft deliveries throughout the Term.

**Table B1** | Fleet 2 AOC Software

| ATSU AOC Part | 3.5" Diskette Media PN | CD Media PN | Spirit UNP |
|---|---|---|---|
| ATSU AOC S/W | SWM998-2459-513 | SWM69002375-513 | [redacted] |
| Standard AOC DB (lbs.) | SWM998-2449-510 | SWM69002381-510 | [redacted] |
| Standard AOC DB (kg) | SWM998-6393-510 | SWM69002380-510 | [redacted] |

*To order 69002375-513 or 998-2459-513 ATSU AOC SW and compatible AOC Database, the "SWM" prefix is required to order the parts on physical media. If no "SWM" prefix is used, the SW and Database will be delivered electronically from the Honeywell Aerospace Software Distribution System.

   f. Portable ELT. Should Spirit select Supplier's Portable ELT for its Fleet 2 new Aircraft Deliveries, Supplier agrees to supply such BFE provisioning at the unit prices set forth in Table B2 below.

**Table B2 |** Fleet 2 Portable ELT (BFE)

| Part Number | Description | SS Qty | UNP (ea) |
|---|---|---|---|
| 51090368-1 | Portable ELT with SG Antenna | 1 | [redacted] |
| 51090370-1 | SG Bracket | 1 | [redacted] |
| | **Total Per Shipset** (BFE) | | [redacted] |

   g. Fleet 1. Supplier will continue to deliver all BFE Products for Fleet 1 at the unit prices specified in Table B3:

**Table B3 |** Fleet 1 BFE

| MPN | Description | SS Qty | Fleet 1 UNP |
|---|---|---|---|
| 51090136-1 | Aircraft Identification Module + NAV (NAIM) | 1 | [redacted] |
| 1153008-1 | Remote control panel | 1 | [redacted] |
| 51090130-2 | Emergency Locator Transmitter (ELT) | 1 | [redacted] |
| 51090368-1 | Emergency Locator Transmitter portable (ELT) | 1 | [redacted] |
| 51090370-1 | Emergency Locator Transmitter (ELT) bracket | 1 | [redacted] |

| | | | |
|---|---|---|---|
| SWM69002381-510 or 998-2449-509 | AOC database diskette for ATSU | 1 | [redacted] |
| SWM69002375-512 or 998-2459-512 | AOC application software diskette for ATSU | 1 | [redacted] |

2. **Operational Spares**. The unit prices in Table B4 are valid for the purchase of operational spares as Spirit may purchase from time to time throughout the Term, either in addition to or in lieu of the inventory consigned to Spirit pursuant to Exhibit A (at Spirit's discretion). Spirit may purchase a quantity of up to a maximum of [redacted] its fleet size per LRU (quantity of LRUs installed on each aircraft x the quantity of aircraft) at these unit prices in total throughout the term.

**Table B4** | Operational Spares

| Equip. | Description | MPN | 2023 Est. Operator UNP | Spirit Fixed UNP (2023 - 2027) |
|---|---|---|---|---|
| RP-1 | Radar Processor | 930-1005-002 | [redacted] | [redacted] |
| TR-1 | Radar Transmitter/Receiver | 930-2000-020 | [redacted] | [redacted] |
| DA-1A | Radar Antenna Drive | 930-3000-001 | [redacted] | [redacted] |
| FP30-1 | Radar Flat Plate | 930-4301-001 | [redacted] | [redacted] |
| CP-2B | Radar Control Panel | 930-6201-002 | [redacted] | [redacted] |
| MT-3 | Radar Mount | 930-7002-001 | [redacted] | [redacted] |
| RVA-36B | VOR | 69001410-200 | [redacted] | [redacted] |
| DMA-37B | DME | 066-50013-1222 | [redacted] | [redacted] |
| RTA-50D | VHF Data Radio | 965-1696-051 | [redacted] | [redacted] |
| ALA-52B | Radio Altimeter | 066-50007-0432 | [redacted] | [redacted] |
| ANA-52B | Altimeter Antenna | 071-50026-0400 | [redacted] | [redacted] |
| DFA-75B | ADF Receiver | 066-50014-1202 | [redacted] | [redacted] |
| IMMR | IMMR | 69002602-0201 | [redacted] | [redacted] |
| XK516-D1 | HF Voice/Data Radio | 964-0452-052 | [redacted] | [redacted] |
| FK-516 | HF Antenna Coupler | 964-0453-001 | [redacted] | [redacted] |
| TRA-100B | Mode S Transponder | 066-01212-0102 | [redacted] | [redacted] |
| ANT-81A | TCAS Antenna | 071-50001-8104 | [redacted] | [redacted] |
| TPA-100B | TCAS Processor | 940-0351-006 | [redacted] | [redacted] |
| LCD MCDU-R | FMS LCD MCDU | D50A000-100 | [redacted] | [redacted] |
| Mk V-A | EGPWS | 69000942-251 | [redacted] | [redacted] |

3. **Lead Times**. For the purposes of this agreement, all lead times are expressed in calendar days and refer to the time elapsed between (i) the day Supplier receives Spirit's purchase order and (ii) the day such Products are shipped to the applicable receiving location indicated on Spirit's purchase order. Except as otherwise stated within this Agreement or mutually agreed in writing, Supplier agrees to deliver Products within the applicable lead times described below:

   a. <u>BFE Orders</u>. Supplier shall deliver all BFE orders (orders for Products that are purchased by Spirit and intended for direct shipment to the airframe manufacturer) within a lead time to meet the applicable production schedule with the airframe manufacturer. Spirit will provide updated delivery forecasts from time to time upon request.

   b. <u>Spare Orders with Routine Priority</u>. Supplier shall fulfill routine, spare orders (orders placed with routine priority and intended for delivery at a Spirit receiving location) within the

applicable lead time specified in the SSC (or catalog lead time at the time of order placement, in cases where the SSC doesn't define a lead time).

c. Emergency Orders. Supplier shall provide a twenty-four (24) hour, seven (7) days a week, three-hundred sixty-five (365) days per year emergency service supply of Products to be available from Supplier's stores. Lead times for such Products are:

i. Four (4) hours after receipt of an AOG order
ii. Twenty-Four hours after receipt of a critical or work stoppage order; and
iii. Four (4) calendar days after receipt of an expedited order

Supplier shall provide acknowledgement of the emergency order and shall provide airwaybill and flight information or method of shipment to Spirit within four (4) hours for AOG orders and as soon as reasonably possible for critical and expedite orders. No surcharge or additional fee of any kind shall apply to emergency orders.

d. **Liquidated Damages**. In the event Supplier fails to deliver in accordance with the applicable lead times or delivery schedule, then Spirit shall have the right to claim a penalty from Supplier. This penalty shall equal [redacted] of the total invoice price times the number of calendar days, up to a [redacted] of the unit price of the Product. Spirit must send this notification to Supplier within six (6) months of the Product delivery due date for purchases, or Spirit waives its right to claim this credit. Spirit may apply credit memos to outstanding invoices payable to Supplier. Prior to applying the credit memo, Spirit must provide written notice to Honeywell which includes specific invoice numbers intended to be paid via the credit memo application. Credit memos expire one (1) calendar year after its issuance date. Supplier further agrees to reimburse Spirit for (i) any charges, costs or expenses levied on Spirit by the airframe manufacturer for any delay in the delivery to Spirit of an aircraft when the cause of such delay is solely attributable to Supplier's performance associated with delivering BFE Products hereunder.

4. **Other Discounts and Incentives**

a. AOC Software GSE

**Table B5**

| AOC Software GSE | PN | Concession |
|---|---|---|
| ART | 998-2663-519 | [redacted] |
| AIRSIM | 998-2470-538 | |

b. GSE Training. Supplier will provide Spirit with [redacted] memo in 2022 or 2023 as requested by Spirit to offset the cost of Honeywell ART/AIRSIM training at a Spirit facility or virtually by the Honeywell Datalink engineering team. Credit memos expire one (1) calendar year after its issuance date. Spirit will provide at least a three (3) month advanced written notice for training requests.

c. Optional AOC Retrofit. Should Spirit elect to upgrade its AOC software from MPN 998-2459-512 to 69002375-513 on quantities of Fleet 1 Aircraft, Supplier will offer a unit price that will [redacted] per Aircraft, valid for orders placed on or before December 31st, 2022. Further discounts are subject to mutual agreement between the Parties.

d. RDR-4000 Hazard Version 2.0 free of charge. Spirit will receive [redacted] licenses for Hazard Version 2.0 to be installed on three (3) Aircraft that were received previously with Hazard Version 1.0 from Airbus under Honeywell Service Bulletin 930-1005-34-4.

e. EGPWS Terrain Data Base (TDB). Supplier will provide two (2) years of Supplier EGPWS Terrain Database Enhanced services (6 Terrain Database Updates per year) [redacted] starting on January 01, 2022. Supplier further agrees to provide to Spirit, [redacted] discount off then-current subscription fees for any renewal terms as Spirit may purchase throughout the Term. Alternatively, Spirit may continue to receive up to [redacted]

f. Navigation Databases Should Spirit elect to execute a *processing only subscription* with Honeywell for the Navigation Database Services related to Fleet 1 and Fleet 2 no later than December 31, 2022, Supplier will provide Spirit with the following annual price escalation protection on a not-to-exceed basis, as per the table below:

| 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 | 2031 | 2032 | 2033 | 2034 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

g. Avionics Equipment Training. Spirit shall be entitled to two (2) free-of-charge student places for each applicable product course per Supplier's published training schedule with classes to be taken within two (2) years of delivery of the first aircraft in this Proposal. Spirit Airlines will be responsible for all expenses associated with attending the training. All free-of-charge entitlement training will be conducted at the training facility operated by Supplier's training service provider.

h. Optional ELT Retrofit Pricing

**Table B6** | Portable ELT (retrofit)

| Part Number | Description | SS Qty | UNP (ea) |
|---|---|---|---|
| 51090368-1 | Emergency Locator Transmitter (ELT) | 1 | [redacted] |
| 51090370-1 | ELT Bracket | 1 | [redacted] |
| [redacted] | Adapter Plate (retrofit only) | 1 | [redacted] |

5. **Product Warranty**. Warranty for Products, to the extent applicable, will be governed by the then-current SSC as of the date the Products are delivered.