# Exhibit E

# MAINTENANCE SERVICE AGREEMENT

# between

# SPIRIT AIRLINES, INC.

# and

# HONEYWELL INTERNATIONAL INC.

Agreement Number SAL20150904

Date: 24 August, 2015

**PROPRIETARY DOCUMENT**

HONEYWELL - CONFIDENTIAL: This document and all information and expression contained herein are the property of Honeywell International Inc., are provided in confidence, and may not, in whole or in part, be disclosed to others for any purpose without prior written permission from Honeywell International Inc. All rights reserved.

# MAINTENANCE SERVICE AGREEMENT

This Maintenance Service Agreement (this "**Agreement**") is entered into and effective as of 1 April 2016 (the "**Effective Date**") by and between Honeywell International Inc., a Delaware corporation, acting through its Aerospace Air Transport and Regional business, with an office located at 1944 East Sky Harbor Circle, Phoenix Arizona 85034 ("**Honeywell**") and Spirit Airlines, Inc., with offices at 2800 Executive Way, Miramar, Florida 33025 ("**Spirit**").

## RECITALS

WHEREAS, Honeywell is engaged in, among other things, the business of manufacturing, selling, and servicing aircraft components and desires to establish a business relationship with Spirit; and

WHEREAS, Spirit desires to purchase certain equipment and/or services identified herein for its use from Honeywell; and

WHEREAS, Spirit has selected from Airbus the 131-9A auxiliary power unit for its fleet of 83 new A320 family aircraft which are scheduled to be entered into airline service by Spirit between 2016 and 2021;

WHEREAS, the Parties desire that the terms and conditions of this Agreement will apply to all orders covering equipment and/or services specified in Attachment A, of this Agreement, sold to Spirit by Honeywell for Spirit's use.

NOW, THEREFORE, in consideration of the foregoing and of the mutual covenants contained in this Agreement, the Parties agree as follows:

## 1. DEFINITIONS

The following definitions apply to terms used in this Agreement:

1.1 Abuse means (i) the failure to comply with all requirements regarding the proper removal, installation, maintenance, Repair and/or modifications of the Equipment as specified by the Aircraft maintenance manual; or (ii) any operation, testing, use or storage of Equipment which is not in accordance with the applicable Honeywell and/or Aircraft manufacturer publications; or (iii) any accident, misuse, mishandling, or chemical exposure (including but not limited to Skydrol or glycol) resulting in damage, fatigue or unusual wear to Equipment; or (iv) any damage precipitated by failure of a Component not supplied by Honeywell.

1.2 Aircraft means all A320 series aircraft operated by Spirit.

1.3 Aircraft Operating Hours means the number of hours incurred by an Aircraft from the moment it first moves for flight until it comes to rest at its intended destination, at the next point of landing or returns to its departure point prior to takeoff.

1.4 Auxiliary Power Unit ("**APU**") means Honeywell Model No. 131-9A auxiliary power unit.

1.5 APU Operating Hours means APU operating time from start up to shut down.

1.6 Beyond Economical Repair ("BER") means Equipment for which the sum of standard Repair charges, exclusive of Abuse, exceeds 65% of Honeywell's then-current new catalog price or, for Equipment no longer available new, the then-current market value of like Serviceable Equipment.

1.7 Component means any self-contained part, combination of parts, or subassemblies of units, which perform a distinctive function necessary to the operation of a system.

1.8 Cycle means an event commencing with APU start and ending at shutdown.

1.9 Days means calendar days unless stated otherwise.

1.10 Equipment means part numbers identified in Attachment A of this Agreement including the associated Components.

1.11 Exchange means a swapping of Spirit's Unserviceable Equipment for like Serviceable Equipment with the Equipment returned to Spirit having a different serial number from the Equipment sent to Honeywell for Repair.

1.12 Facility means any factory, plant, or repair and overhaul facility operated by Honeywell; or repair and overhaul facility operated by Spirit.

1.13 Field Arising LRU means an LRU removed from the APU in the field and sent in for Repair separately from the APU.

1.14 Flight Hours means the number of hours incurred by an Aircraft from the moment it first lifts off for flight until the next point of landing.

1.15 Foreign Object Damage ("FOD") means damage to any portion of the Equipment caused by an outside or foreign object, debris, or substance.

1.16 Line Replaceable Unit ("LRU") means a Component which may normally be removed from the APU and replaced without the removal of the APU from the Aircraft.

1.17 No Cause For Return ("NCFR") means Equipment returned by Spirit and reported to be defective upon analysis or test by Honeywell is found to be Serviceable.

1.18 Obsolete means Equipment has been so declared by Honeywell, at its sole discretion, based on Equipment becoming superseded, discontinued, reduced in manufacture, or the cost to procure parts becoming prohibitive.

1.19 Repair means the disassembly, inspection, rework, or replacement of Components as necessary, and re-assembly and test as required, to return the Equipment to a Serviceable condition.

1.20 Serviceable means a condition in which Equipment is in reasonable operating condition within the limits defined in Honeywell's then-current maintenance manuals, documentation and/or publications.

1.21 TAT Exclusion means Equipment which Honeywell is reasonably delayed in servicing or cannot service due to Excusable Delays as defined in Attachment C Section 7 and delays due to (i) Abuse (ii) FOD, (iii) accidents (iv) BER, (v) Obsolete Equipment, (vi) Spirit requested modifications, or (vii) any Spirit-caused reason, including, but not limited to (a) special instructions from Spirit, (b) special investigations or engineering analysis, (c) absence of repair orders with removal reasons, (d) missing parts, (e) missing or incomplete documentation, (f) failure to comply with all requirements regarding the proper removal, installation, maintenance, repair and/or modifications of the Equipment as specified by the aircraft maintenance manual (g) any operation, testing, use or storage of Equipment which is not in accordance with the applicable Honeywell and/or aircraft manufacturer publications; (h) time waiting for Spirit's instructions; (i) misuse; (j) mishandling; (k) any damage precipitated by failure of a component not supplied by Honeywell; or (l) Spirit requests to maintain Equipment integrity.

1.22 Test and Certify ("T&C") means Equipment returned by Spirit with a request for it to be tested and certified for its altitude system function to FAR Part 43 Appendix F, or with any other request for Test and Certify, calibration or software load.

1.23 Time and Material ("T&M") means charges which may be quoted on an itemized basis or as a standard or flat fixed price, without either labor or materials or both itemized; the term "T&M" charge, fee, repair, rate, quotation, or price, is synonymous with "Over and Above" or "Out of Scope" charge, fee, repair, rate, quotation, or price.

1.24 Unserviceable means a state in which Equipment is not in reasonable operating condition within the limits defined in Honeywell's then-current maintenance manuals, documentation, and/or publications.

## 2. EXCLUSIVITY AND SCOPE

Honeywell will be the exclusive provider of all services and purchases of the Equipment listed in Attachment A during the term of this Agreement. Aircraft listed in Attachment D shall be excluded from this Agreement.

## 3. TERM OF AGREEMENT

This Agreement will commence on the Effective Date above and remain in full force and effect thereafter through 31 March 2026 unless earlier terminated in accordance with the terms of this Agreement.

## 4. HONEYWELL RESPONSIBILITIES

During the term of this Agreement, Honeywell will assume the responsibilities set forth in this Agreement and will:

4.1 Analyze and Repair Unserviceable Equipment to return such Equipment to a Serviceable condition in accordance with Honeywell's then-current maintenance program, as defined by its Air Agency Certificate, FAR 145, Honeywell's Component Maintenance Manuals and FAA approved and/or accepted Honeywell written instructions for non-published Honeywell proprietary repairs in effect at the time the Equipment is received by Honeywell (collectively, the "Honeywell Maintenance Program"). The Honeywell Maintenance Program complies with the relevant sections of Spirit's continuous airworthiness maintenance program ("**CAMP**"), and Honeywell is hereby authorized to work to the Honeywell Maintenance Program.

4.2 Provide and use new or reworked Components, as appropriate, to restore Equipment to a Serviceable condition.

4.3 Maintain an inventory of Components at Honeywell Facilities for the purpose of providing the necessary Repair services on Equipment for Spirit. Transfer of ownership of Components occurs at the point of removal/installation on the Equipment (i.e. Honeywell takes ownership of the removed Component and Spirit takes ownership of the installed Component).

4.4 Keep and maintain current files on all necessary specifications furnished by Spirit's engineering, applicable Honeywell publications as well as service bulletin data which is applied and incorporated into Equipment received by Honeywell.

4.5 Send representatives, as mutually agreed, to call on Spirit at its primary maintenance base to confer with and assist Spirit with specific technical and/or Equipment problems.

4.6 Subject to conditions of confidentiality, allow Spirit to (i) assign appropriate personnel to make desired inspections and quality checks of the Equipment in process at Honeywell's Facility, at a

mutually agreed time, and (ii) consult with Honeywell's personnel with respect to possible changes in work specifications and/or operating or maintenance and service procedures.

4.7 Repair or Exchange Equipment, of equivalent or better condition or modification status, subjected to FOD not involving chemicals up to [redacted] of units per year, and Repair or Exchange Equipment of equivalent or better condition or modification status declared BER; in either case, Exchanged Equipment may be used Serviceable Equipment.

4.8 Contact Spirit when Equipment is declared Obsolete and enter good faith negotiations to amend this Agreement per Section 12 below.

4.9 For Time and Material repairs, provide Spirit with a written quote for such repairs and follow Spirit's instructions to repair, scrap, or return the Equipment to Spirit. In the event Spirit does not reply within 10 days of receiving Honeywell's quote, Honeywell may return the Equipment in as-is condition, at Spirit's sole expense, and Spirit will pay Honeywell a diagnostic fee associated with Honeywell's tear-down and evaluation of such Equipment.

4.10 Honeywell will not maintain Components integrity. Components may be exchanged during Repair with Components of an equal or higher modification standard. Honeywell will provide full traceability on LLPs.

4.11 After evaluation of service needed, Honeywell will proceed with Repair service on Equipment and will not provide Spirit with a quotation unless Time and Materials charges, as described herein, apply.

4.12 Honeywell will be responsible for Field Arising LRU's listed in Attachment A and removed during line maintenance and sent to Honeywell for Repair.

4.13 Abide by Honeywell's other responsibilities as set forth in this Agreement.

4.14 Within the first two (2) years of this Agreement, Honeywell will provide tuition-free APU line maintenance training for up to [redacted] employees of Spirit at Honeywell's Aerospace Academy located in Phoenix, Arizona, USA, subject to class availability and scheduling.

## 5. CUSTOMER RESPONSIBILITIES

During the term of this Agreement, Spirit will assume the responsibilities set forth in this Agreement and will:

5.1 Deliver all removed Equipment operated by Spirit exclusively to Honeywell for Repair within 5 days of such removal; Spirit will ensure that all of its line stations and designated maintenance stations adhere to this exclusivity requirement.

5.2 Allow authorized Honeywell personnel reasonable access to Equipment/On-Site Equipment covered by this Agreement and operating and applicable Governmental agencies required maintenance records maintained by Spirit.

5.3 Warrant that all data recorded in the Aircraft logbooks is accurate and in compliance with FAA requirements and Spirit's FAA approved maintenance program.

5.4 Utilize Honeywell approved shipping containers, adapters, inlet plugs, and covers for Equipment returned to Honeywell for Exchange/Repair.

5.5 Implement on-wing requirements in accordance with Honeywell's required service bulletins and operate and maintain the Equipment in accordance with the applicable manufacturer-provided Aircraft maintenance manual and Honeywell's then-current maintenance manuals, and comply with the requirements of FAA Airworthiness Directives.

5.6 Provide concurrent with return of Equipment to Honeywell, data which specifies: (1) Aircraft/APU Operating Hours and Cycles, (2) Equipment installation date, (3) Equipment removal date, and reason for Equipment removal, (4) Time Since Overhaul (TSO) or Time Since Repair (TSR), (5) Aircraft tail number, and (8) the APU serial number from which the field–arising LRU was removed. In the event the Equipment is received without the required data specified above in this Section 4.8, Honeywell will notify Spirit of missing data and provide Spirit five (5) days to provide the missing data. If Honeywell does not receive the required data within those five (5) days, Honeywell may return the Equipment to Spirit in "as-is" condition.

5.7 Warrant that all Aircraft Flight Hours, Aircraft Operating Hours, APU Operating Hours and Cycles reported to Honeywell are correct.

5.8 Report in writing at the time of return to Honeywell's Facility all known or suspected Abuse, FOD and accidents.

5.9 Pay Honeywell's NCFR and then current time & material charges, as applicable, for Equipment services.

5.10 By January 30 of each subsequent year of this Agreement, submit the Aircraft Fleet/Operational Parameters data set forth in Section 7 below, in a form acceptable to Honeywell for Honeywell to verify Equipment usage for the prior calendar year (or portion thereof), via electronic format to [redacted]

5.11 Provide skilled and knowledgeable line maintenance personnel in the performance of Aircraft Equipment maintenance in order to minimize occurrences of NCFR.

5.12 Notify Honeywell of any material change to financial status or any pending litigation or other action that might materially affect Spirit's credit rating or ability to continue this Agreement.

5.13 Implement and use Honeywell's Predictive Trend Monitoring and Diagnostics ("PTMD") tool throughout the term of this Agreement and will incorporate and adhere to Honeywell's reasonable recommendations generated by the PTMD analysis within the time specified. PTMD is defined as a Honeywell Web-based diagnostic system that predicts failures and provides improved support. Honeywell's recommendations that result from the analysis performed by the PTMD tool include APU trending, recommended removal dates, and LRU maintenance recommendations. All APUs included in this Agreement are covered by the PTMD program and, when removed, will be sent to Honeywell for repair and overhaul services. Any flight deck modifications, upgrades, or data transmit fees required or associated with the installation and operation of PTMD will be at Customer's expense. Additionally, subsequent upgrades to any of the interface systems within the flight deck that become necessary for the continued successful operation of PTMD will also be at Customer's expense.

5.14 Fulfill the following conditions in the event Equipment becomes subject to rental or lease to a third party:

a) Provide prior written notification to Honeywell regarding Equipment, which will become the subject of a loan, rental, or lease;

b) Report all third party flight hours and flight cycles; these hours will be included in the price charged to Spirit at the time of an APU shop visit in accordance with Section 7; and

c) Agree with Honeywell and document the conditions under which the Equipment continues under this Agreement.

Failure to adhere to any of the above conditions will be considered a default, and Section 9 will apply relative to the Equipment concerned.

5.15 Remove Equipment only with cause, meaning product failure or in accordance with Honeywell's recommendations pursuant to PTMD analysis;

5.16 For any Equipment submitted for Repair that is not operated by Spirit or on its Aircraft covered by this Agreement, declare such Equipment status on the related purchase or repair orders submitted with the Equipment.

5.17 Spirit will not disclose any specific terms of this Agreement to any third party without Honeywell's prior written consent.

5.18 Abide by Spirit's other responsibilities as set forth in this Agreement.

**6. OPERATION AND MAINTENANCE**

6.1 Selection and Operation. Spirit hereby agrees to: 1) select the model 131-9A APU for all, but no less than 83, new Aircraft required to be delivered to Spirit from April 1, 2016 prior to March 31, 2026; 2) operate each model 131-9A APU in its fleet for ten (10) years, except for as described in subsection 6.2; and 3) deliver all APU's exclusively to Honeywell for Repair. Spirit understands and agrees that the incentives provided by Honeywell in this Agreement assume Spirit's compliance with the requirements of this section. Spirit's obligation to operate each 131-9A APU for the term described in this section will survive termination or expiration of this Agreement to the extent required for Spirit to satisfy such obligation.

6.2 Spirit may, at any time during the term of this Agreement and without penalty, remove up to 10 percent of its aggregate number of aircraft from this Agreement. Nothing in this Agreement shall prevent Spirit from direct leasing aircraft that do not carry 131-9A APU. Any direct leases will not be awarded credits under section 7.5.

6.3 Ownership and Authority. Spirit represents and warrants that upon delivery to it of each Aircraft subject to this Agreement it will be the sole owner and operator of each such Aircraft and that it possesses all authority necessary to enter into this Agreement with respect to each such Aircraft. Further, Spirit covenants that it will remain the sole owner or operator of each such Aircraft during the term of this Agreement. Honeywell agrees that the existence of lien holders whose rights arise from the financing of the acquisition of the Aircraft (including Sales-Leaseback arrangements) will not prevent Spirit from being considered as the sole owner of such Aircraft for purposes of this section.

6.4 The following provisions will apply to Equipment as it exists as of the Effective Date or as may be acquired by Spirit after the Effective Date:

a) Serviceable Equipment, not Honeywell repaired. If the last Repair of such Equipment was not performed at one of Honeywell's Facilities, Spirit is responsible, at time of first shop visit under this Agreement, for all Time and Material charges necessary to Repair the Equipment and bring it up to the then-current Honeywell standard. The "then-current Honeywell standard" wherever used means the Equipment is brought up to the latest minimum required hardware and software configuration (i.e. all mandatory service bulletins incorporated); such Time and Material charges will be in addition to the APU Operating Hour payments due hereunder.

b) Serviceable Equipment, Honeywell repaired. If the last Repair of such Equipment was performed at one of Honeywell's Facilities:

i. Spirit will be responsible for all Time and Material charges necessary to Repair or replace all shop replaceable units that have been exchanged within the Equipment since the last shop visit, and

ii. At the time of the next access to the affected area(s), if applicable and contingent upon the availability of the necessary hardware, Spirit will be responsible for all Time and Material charges necessary to bring the Equipment up to the then-current Honeywell standard; such Time and Material charges will be in addition to the APU Operating Hour payments due hereunder.

c) Serviceable Equipment, new. If Equipment is new and unused it will automatically be covered by this Agreement at no additional expense to Spirit other than the APU Operating Hour payments due hereunder.

d) Unserviceable Equipment. Notwithstanding anything else in this Agreement, Unserviceable Equipment will not be covered by this Agreement until it has been Repaired and brought up to the then-current Honeywell standard. Spirit is responsible for all Time and Material charges applicable to such Repair and updating.

6.5 Honeywell reserves the right to audit Spirit's data to the extent necessary to verify the accuracy of Spirit's data submittal.

6.6 The parties will mutually agree upon any changes (additions or deletions) to the Equipment listed in Attachment A. If the parties agree to add or delete Equipment to this Agreement, the parties will amend this Agreement by incorporating such Equipment with associated prices into Attachment A via an amendment to this Agreement.

6.7 Honeywell will make an appropriate adjustment to the rate set forth in this Agreement when there is change greater than + or - 10% in the Aircraft Fleet/Operational Parameters set forth below. Any such rate adjustment will be made in an amount commensurate with and proportional to the degree to which the change in the operational parameter adversely affects Honeywell. This rate adjustment calculation will be based on parametric comparisons to baseline pricing and assumptions, and nothing in this clause will necessitate the review of actual cost data by the parties.

**Aircraft Fleet/Operational Parameters**

| | |
|---|---|
| Additions to Fleet each year<br>(Pricing assumes all prior additions remain in service) | 2016 8<br>2017 +20<br>2018 +11<br>2019 +13<br>2020 +13<br>2021 +18 |
| Aircraft Flight Hours* | 3875 per Aircraft per year |
| APU Operating Hours * | 1400 per Aircraft per year |

* Based upon Aircraft fleet average data over 12 months.

6.8 The primary method for establishing the APU Operating Hour rate is the operating profile as determined by the actual APU operating hours as verified by the APU Data Memory Module ("DMM"). Spirit will report the following DMM information to Honeywell on a quarterly basis: Cycles and APU Operating Hours. Honeywell will compare the monthly APU Operating Hours

reported by Spirit to the actual APU Operating Hours and reconcile the prior invoices, if applicable.

6.9 If, during the term of this Agreement, Spirit operates an Aircraft using an electronic taxi system, Honeywell will make an appropriate adjustment to the APU Operating Hour rate set forth in this Agreement in an amount commensurate with and proportional to the degree to which the electronic taxi system adversely affects Honeywell.

6.10 Honeywell's Maintenance Standard is established in accordance with Honeywell's then-current Component Maintenance Manuals and FAA approved Honeywell written instructions for non-published Honeywell proprietary repairs and will be used in the Repair of all Equipment applicable to this Agreement.

6.11 Spirit has the right to review Honeywell's Component Maintenance Manuals when deemed necessary by Spirit's engineering group.

6.12 Honeywell will incorporate, at no additional cost to Spirit, those Equipment modifications required by FAA airworthiness directives only in such instances where it has been conclusively determined that the cause of the directive has been solely attributed to Honeywell's Equipment resulting in Honeywell-issued alert service bulletins. All other service bulletins that have been issued by Honeywell may be incorporated by Honeywell at its discretion and expense, unless Spirit indicates on their Order that service bulletins are not to be incorporated for such Equipment. Should Honeywell elect not to incorporate a service bulletin, then Spirit may have such service bulletin incorporated at its direction and expense.

6.13 Honeywell will provide a Turn-Around-Time ("TAT") of [redacted] days or less for Repair of Equipment.

The TAT begins the day after the Equipment is received at Honeywell's designated repair facility, and ends on the day the Equipment is made available for return shipment to Spirit. TAT does not apply to Equipment with a TAT Exclusion. For Equipment received by Honeywell with a TAT Exclusion, Honeywell will not be liable for any of the performance guarantees or remedies contained in this Agreement for such Equipment.

In the event Honeywell is unable to meet the TAT specified herein and (i) Spirit is faced with a zero spares situation, (ii) such delay is not the result of any TAT Exclusion, and (iii) Spirit has properly provisioned in accordance with Honeywell's provisioning requirements and retains access to such provisioning units, Honeywell will provide a [redacted] to the Spirit, based on availability, upon execution of Honeywell's standard Equipment bailment agreement.

## 7. PRICE

7.1 The following in lieu of warranty rate(s) are applicable to all Flight Hours flown by all Aircraft operated by Spirit during the term of this Agreement. Rates are expressed in United States dollars, based upon 2016 economic conditions, and are subject to adjustment as set out below and on January 1 each year in accordance with the price adjustment formula in Attachment B.

| Aircraft | 2016 APU Hour Rate |
|---|---|
| A320 series | Year 1 - [redacted]<br>Year 2 - [redacted]<br>Year 3 - [redacted]<br>Year 4 - [redacted] |



Honeywell Confidential
(See restrictions on cover)

| | |
|---|---|
| | Year 5 - [redacted]<br>Year 6+ - [redacted] |

Each piece of Equipment will be billed at the rate corresponding to the year of its entry into service; for example, Equipment on a new Aircraft entering into service on June 1, 2016 will bill at the Year 1 rate for the months of June, 2016 through May, 2017 inclusive. For used Equipment, its entry into service will correspond to its manufacturing date. One rate will apply to all hours in a calendar month; if the entry into service date is in the first fifteen days of the month, that month will be the first month of service, but if the entry into service date is on or after the 16th, the subsequent month will be the first month of service.

The rate specified above will be multiplied by a factor based on the ratio of APU Cycles to APU Operating Hours according to the following table:

| **Spirit Airlines** | |
|---|---|
| APU Cycles / APU Operating Hours | Hourly Rate Multiplier |
| 1.51-1.70 | [redacted] |
| 1.71-1.90 | [redacted] |
| 1.91-2.10 | [redacted] |
| 2.11-2.30 | [redacted] |

Ratios will be based on overall fleet average over a 12 month period

7.2 Honeywell will allow Spirit to purchase up to 8 APU retrofits at [redacted] as noted in Attachment A and including ECB; pricing is in 2015$ and subject to escalation pursuant to Attachment B. Equipment must be ordered to lead time.

7.3 Free of Charge Auxiliary Power Unit (APU) Support. Following the Parties' execution of Honeywell's standard Bailment Agreement and Spirit's submission of a free-of-charge Order pursuant to the terms and conditions of this Agreement, Honeywell will provide to Spirit the equipment set forth in Attachment A (the "Bailment Equipment") to support Spirit's then current Aircraft fleet size, on a no charge loan basis. The Bailment Equipment will be provided to Spirit at a date as mutually agreed but in no event prior to delivery of the Aircraft triggering the provision of the Bailment Equipment as set out in Attachment A. Spirit will notify Honeywell at least one hundred eighty (180) days in advance of the date of delivery/retrofit of such Aircraft.

7.4 Title and ownership to the Bailment Equipment will remain with Honeywell. Following the completion of the bailment period, Honeywell offers Spirit a choice of one (1) of the following two (2) options:

a) Spirit may return to Honeywell the Bailment Equipment in Serviceable Condition with a serviceable tag; or,

b) Spirit may purchase the Bailment Equipment at the lesser of a [redacted] percent ([redacted]%) discount off of the Catalog List/Operator Prices current at the time of purchase or market value as determined by Honeywell Aerospace Trading ("HAT").

Spirit will notify Honeywell in writing within thirty (30) days after the completion of the bailment period which option is selected. If Spirit does not select either (a) or (b) above within thirty (30) days after the completion of the bailment period, Spirit will be deemed to have selected option (a). Upon receipt of payment by Honeywell from Spirit for the Bailment Equipment, title and ownership of the Bailment Equipment will pass to Spirit.

7.5 Purchase Credits. For each Aircraft purchased directly by Spirit from Airbus after the Effective Date with a 131-9A APU installed, Honeywell will provide Spirit with a MCV (Merchandise Credit Voucher) in the amount of $[redacted]USD. Each $[redacted]purchase credit is expressly conditioned upon Spirit's purchase and receipt of the respective Aircraft with which it is associated. After delivery of the relevant Aircraft, and within sixty (60) days after receipt by Honeywell from Spirit of Spirit's invoice for such Aircraft (which shall include the aircraft manufacturer's serial number, delivery date of the Aircraft, and the APU and associated ECB serial numbers), Honeywell will issue a $[redacted]USD purchase credit to Spirit. However said invoice must be submitted by Spirit to Honeywell within six (6) months of such Aircraft's delivery to Spirit or Spirit waives their rights to claim such purchase credit. Merchandise credits may only be used toward future purchases in this Agreement or future purchases of Honeywell Aerospace products. Merchandise credits may not be used towards service or service related invoices (e.g. repair and/or overhaul, Maintenance Service Agreement (MSA), Charge per Aircraft Landing (CPAL), Navigation Database (NavDB), training). Any MCV issued against this Agreement may be used by Spirit towards the purchase of any parts from Honeywell and will expire one (1) calendar year after date of issuance of such credits.

7.6 Following Spirit's receipt of its first Aircraft with a 131-9A APU installed OR retrofit and entry into service of Spirit's Aircraft with a 131-9A APU installed and Spirit's submission of a free-of-charge Order pursuant to the terms and conditions of this Agreement, Honeywell will ship the FOC Equipment ordered consistent with Honeywell's then current lead-times or a schedule as mutually agreed upon. The FOC Equipment provided to Spirit under the terms of this Agreement are for the exclusive use of Spirit and will not be used in the overhaul or service of third party equipment; nor may the equipment be sold, traded or otherwise transferred by Spirit to a third party.

7.7 In the event specified minimum quantities are not purchased by Spirit for the minimum number of aircraft specified by the date noted in the schedule, Spirit will reimburse Honeywell its investments consisting of (a) the difference in price between Honeywell's then-current Operator Price and the price Spirit actually paid for all Equipment and other items purchased under this Agreement (including free-of-charge Equipment and items), plus (b) the then-current value of all credits issued to Spirit under this Agreement plus (c) the value of any training Honeywell provided. Training will be valued at the then-current amount Honeywell would charge for non-contract related training.

7.8 In addition to payment of the Flight Hour Rate set forth above, Spirit is responsible for paying Time and Material charges if Equipment has been found by Honeywell to have either:

a) been exposed or subjected to:

i. any maintenance, Repair, installation, storage, operation or use by Spirit which is not in compliance with Honeywell's then-current maintenance manuals, documentation and/or publications and Spirit's FAA/EASA approved maintenance program;

ii. removal without cause, meaning removal contrary to Honeywell's recommendations pursuant to PTMD analysis absent product failure; or

iii. any alteration, modification or Repair by anyone other than Honeywell or those specifically authorized by Honeywell to perform Repair on that particular Component; or

b) BER other than as described above, Abuse, or FOD in excess of 5% of units per year.

7.9 Spirit will submit to Honeywell not later than the tenth (10th) day of each month a written report showing actual APU Operating Hours for each Aircraft accumulated during the preceding month of operation specifying each Aircraft's date of service, including a summary appropriate for use in creating an acceptable invoice; Honeywell reserves the right to require submission of information on a Honeywell form, and may generate an invoice for administrative purposes. Based upon the reported information, Spirit will make payment not later than the 15th day of each month, on a self-invoicing basis, an amount equal to that month's APU Operating Hours, multiplied by the applicable rate above for that type of Aircraft. If Spirit fails to submit the APU Operating Hours for the preceding month and submit payment within 15 days of the end of the month, Honeywell will invoice, and Spirit will pay, an amount reflecting 110% of the previous month's APU Operating Hours. Upon receiving the standard report of the actual APU Operating Hours from Spirit, HON will calculate the difference between the interim 110% billing and the corrected actual hours billing and issue a credit memo for the difference or submit an incremental invoice for payment. To accommodate this reconciliation process, Spirit must submit the actual APU Operating Hours within 60 days of the original due date per the terms stated above.

7.10 Any services requested but not covered by the Flight Hour Rate hereunder, either third party work directed to Honeywell by Spirit or other work as may be mutually deemed appropriate, will be performed on a Time and Material basis, including any maintenance or Repair necessitated by Spirit as a condition of return of Aircraft to Spirit's Aircraft lessor.

7.11 Any credit memo issued to Spirit will be applicable toward the purchase of any part listed in Honeywell's then-current catalog and shall expire 1 calendar year after date of issuance of such credit.

## 8. WARRANTY

8.1 Subject to Section 8.2 below, this Agreement supersedes and is in lieu of all Honeywell's applicable express and implied warranties and guarantees for all Equipment covered by this Agreement including Honeywell's applicable Original Equipment Manufacturer's ("OEM") warranties and Honeywell's applicable repair warranties.

8.2 At the expiration of this Agreement, Customer will be entitled to obtain the remaining coverage, if any, of Honeywell's then-current commercial repair warranty, or if longer, 12 months from date of shipment.

## 9. TERMINATION

9.1 This Agreement may be terminated, subject to the provisions of this Section, by giving written notice thereof to the other party, specifying the grounds for termination and the date on which the Agreement will be deemed terminated, upon the occurrence of any of the following events:

a) the other party materially breaches this Agreement and fails to remedy the breach within 60 calendar days after receipt of written notice that specifies the grounds for the material breach;

b) the other party fails to make any payment required to be made under this Agreement when due, and fails to remedy the breach within 10 calendar days after receipt of written notice of non-payment;

c) any insolvency or suspension of the other party's operations or any petition filed or proceeding made by or against the other party under any state, federal or other applicable law relating to bankruptcy, arrangement, reorganization, receivership or assignment for the benefit of creditors or other similar proceedings; or

d) any material change in the nature, or any dissolution or discontinuance, of the business of Spirit.

Termination does not affect any debt, claim or cause of action accruing to any party against the other before the termination. The rights of termination provided in this clause are not exclusive of other remedies that either party may be entitled to under this Agreement or in law or equity.

9.2 Remedy for Breach. In the event that Spirit commits a material breach of this Agreement, in addition to any other remedy available to Honeywell, Spirit will return all Bailment and FOC equipment provided by Honeywell or pay the catalog list/operator price of said equipment current at the time of the breach. Upon receipt of payment by Honeywell from Spirit for the Bailment and/or FOC equipment, title and ownership will pass to Spirit. Additionally, Spirit will be required to reimburse Honeywell the full amount of any purchase credits issued to Spirit. Finally, for any equipment purchased by Spirit at a discount during the term of this Agreement, Spirit will be required to pay Honeywell the difference between the Catalog List/Operator Price listed in the Honeywell Commercial Spare Parts Catalog current at the time of purchase and the price actually paid by Spirit. Additionally, Spirit will be required to reimburse Honeywell a pro-rated amount of the total value of the concessions as detailed in Section 7 (i.e. purchase credits, discounts), issued by Honeywell to Spirit, such that the amount due Honeywell at the time of breach shall be the total sum of all purchase credits and discounts issued by Honeywell and utilized by Spirit during the life time of this Agreement, less ten percent (10%) for each full year in which Spirit performed its obligations hereunder.

9.3 Remedy for Transfer or Sale of an Aircraft. Subject to the exception set forth in subsection 6.2, in the event that, prior to satisfaction of its obligations to operate each aircraft for ten (10) years and have the equipment repaired exclusively at Honeywell, Spirit desires to transfer, sell, or otherwise no longer operate any one of its new or retrofitted Aircraft or 131-9A APUs for which Honeywell has given purchase credits, Spirit shall be required to immediately notify Honeywell in writing and reimburse Honeywell a pro-rated amount of the purchase credits issued by Honeywell for the Aircraft or APU to be taken by Spirit out of revenue service, such that the amount due Honeywell at the time of removal and/or transfer shall be 10% less for each full year in which Spirit performed its obligations with respect to that Aircraft or APU under this Agreement.

9.4 If Honeywell terminates this Agreement pursuant to Sections 9.1(a) through 9.1(c), the parties recognize that the damages Honeywell would suffer would be difficult and impractical to determine or anticipate. Therefore, in lieu of actual damages, the following formula will calculate liquidated damages Spirit will pay to Honeywell within 30 days from the date of termination, as a reasonable approximation of damages pursuant to the following:

$$(N \bullet 0.25) \bullet H \bullet R$$

where:

N = Number of months between the effective date of termination by Honeywell and the date on which the term of this Agreement would have expired in accordance with Section 3 "Term of Agreement."

H = Actual average monthly APU Operating Hours for the three (3) months preceding termination by Honeywell.

R = The then-current APU Operating Hour rate.

In addition, Spirit will pay Honeywell an aggregate investment reimbursement fee consisting of

a) the difference in price between (i) the Time and Material charges Spirit would have been charged by Honeywell, in the absence of this Agreement, during the period from the Effective Date through the termination date for the services and parts provided hereunder with respect to actual maintenance events; less (ii) the amounts paid under this Agreement (Flight Hour payments, NCFR charges, T&C charges, Time and Material charges, etc.) during the same period; plus

b) the total value of all credits issued to Spirit under this Agreement.

## 10. PAYMENT TERMS

10.1 Excluding Flight Hour fees, payment terms are net 30 days from the date of the invoice.

10.2 Spirit's remittance will be in US currency and directed by electronic fund transfer to:

[redacted]

10.3 On or before the date of such electronic fund transfer(s), Spirit will reference Honeywell invoice number(s), if applicable, and Spirit's payment amount on all Spirit remittance and correspondence and e-mail to [redacted] fax to [redacted] 5032.

10.4 Honeywell may without notice modify or withdraw credit terms including, but not limited to, requiring advance payment, guarantees, or other security. If Spirit is delinquent in its payment to Honeywell, then until all delinquent amounts and late interest, if any, are paid, Honeywell may, at its discretion: (a) be relieved of its obligations with respect to guarantees, including without limitation, TAT, spares support and delivery lead times; (b) refuse to process any credit to which Spirit may be entitled; (c) set off any credit or sum owed by Honeywell to Spirit against any amount owed by Spirit to Honeywell that has not been disputed in writing; (d) withhold future shipments to Spirit; (e) declare Spirit's performance in breach and terminate this Agreement and any related order for default; (f) repossess equipment for which payment has not been made; (g) deliver future shipments on a cash-with-order or cash-in-advance basis; (h) charge storage or inventory carrying fees on Spirit's equipment in Honeywell's possession; (i) if Spirit is on a payment schedule, accelerate all remaining payments and declare the total outstanding balance then due and owing; (j) charge interest on delinquent amounts at a rate of 1.5% per month or the maximum rate permitted by law, if lower, for each month or part thereof; (k) recover all costs of collection including, without limitation, reasonable attorneys' fees; or (l) combine any of the above rights and remedies as may be permitted by applicable law. The above remedies are in addition to all other remedies available at law or in equity.

## 11. DELIVERY, TITLE and RISK OF LOSS

11.1 Spirit will, at its sole expense and risk, deliver Equipment to be Repaired to Honeywell's designated Facility. After completion of Repair, Honeywell will ship Equipment to Spirit's

designated Facility EXW Honeywell's facility (Incoterms 2010). Honeywell reserves the right to impose additional charges for any special routing, packing, labeling, handling or insurance requested by Spirit.

11.2 Honeywell and Spirit each warrant that its title is free and clear of all encumbrances for Exchange Equipment; and each will deliver to the other such documents as may be necessary to transfer title and release any encumbrances affecting said Equipment. If Spirit's interest is that of a lessee or the Equipment is subject to encumbrances, Spirit will obtain the consent of the owner or encumbrance holder of the Equipment in a form satisfactory to Honeywell.

11.3 Honeywell will be responsible for risk or loss or damage while Equipment is in the possession or control of Honeywell. Spirit will be responsible for risk of loss at all other times.

## 12. OBSOLESCENCE

12.1 Obsolete Equipment will be removed from the Agreement, or the parties may amend the Agreement to replace the Obsolete Equipment and adjust the pricing, if applicable. Honeywell will have no liability for Equipment declared Obsolete.

## 13. LIMITATION OF LIABILITY

13.1 IN NO EVENT WILL HONEYWELL BE LIABLE FOR ANY INCIDENTAL CONSEQUENTIAL, SPECIAL, PUNITIVE, STATUTORY, OR INDIRECT DAMAGES, LOSS OF PROFITS, REVENUES, OR USE, OR THE LOSS OR CORRUPTION OF DATA, EVEN IF INFORMED OF THE POSSIBILITY OF THESE DAMAGES AND NOTWITHSTANDING THE FAILURE OF THE ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. THE AGGREGATE LIABILITY OF HONEYWELL FOR ANY CLAIMS ARISING OUT OF OR RELATED TO THIS AGREEMENT IS LIMITED TO DIRECT DAMAGES NOT TO EXCEED THE AMOUNT PAID FOR THE SPECIFIC EQUIPMENT OR SERVICE THAT GIVES RISE TO THE CLAIM. TO THE EXTENT PERMITTED BY APPLICABLE LAW, THESE LIMITATIONS AND EXCLUSIONS WILL APPLY REGARDLESS OF WHETHER LIABILITY ARISES FROM BREACH OF CONTRACT, INDEMNITY, WARRANTY, TORT, OPERATION OF LAW, OR OTHERWISE.

## 14. NOTICES

14.1 Except as otherwise provided in this Agreement and the attachments hereto, notices, requests and other communications hereunder will be in writing in the English language and may be delivered personally or sent by first certified or express mail, addressed as follows:

To Honeywell: [redacted]

To Spirit:

14.2 Such notices, requests and other communications sent by either party as provided herein will be deemed received by the other party.

a) Two (2) calendar days after mailing by certified mail, return receipt requested and postage prepaid; or

b) One (1) business day after deposit for next day delivery with a commercial overnight carrier provided the carrier obtains a written verification of receipt from the receiving party.

14.3 A party hereto may change its address by giving notice to the other party in conformity with this Section.

**15. ENTIRETY**

15.1 The provisions contained herein constitute the entire agreement between the parties in respect to the subject matter hereof and supersede all previous agreements, communications, representations, either verbal or written between the parties relating to the subject matter of this Agreement. This Agreement may not be changed, altered, supplemented or added to at any time except by supplemental written contract signed by authorized representatives of both parties.

15.2 Spirit's purchase orders and/or repair orders are for administrative purposes only, and the terms and conditions contained therein do not apply to Equipment covered by this Agreement. Honeywell will not be deemed to have agreed to any Spirit purchase order or repair order terms and conditions if it fails to object to provisions appearing on, incorporated by reference in, or attached to Spirit's purchase order forms, which provisions are hereby expressly rejected.

15.3 All Attachments described in the body of this Agreement will be deemed incorporated in and made a part of this Agreement, except that if there is any inconsistency between the body of this Agreement and the provisions of any Attachment, the provisions of the body of this Agreement will control. Terms used in an Attachment and also used in the body of this Agreement will have the same meaning in the Attachment as in the body of this Agreement.

**16. EXECUTION**

16.1 This Agreement is offered to Spirit and is valid for execution by Spirit through 31 October 2015.

16.2 This Agreement may be signed in counterparts (including faxed and any electronic or digital format), each of which will be deemed one and the same original. Reproductions of this executed original (with reproduced signatures) will be deemed to be original counterparts of this Agreement.

**17. SIGNATURE**

IN WITNESS WHEREOF, the Parties have caused this Agreement to be duly executed by their authorized representatives.

Accepted and agreed to:

**SPIRIT AIRLINES, INC.**

Signature: [redacted]

Name:

Title:

Date: 10/26/15

**HONEYWELL INTERNATIONAL INC.**
acting through its Aerospace Air Transport and Regional business

Signature [redacted]

Name:

Title:

Date: Oct 27, 2015

Honeywell

AT&R Airlines

## ATTACHMENT A
## EQUIPMENT, NCFR, AND CONSIGNMENT LIST
Table A-1 Equipment List

| Part Number | Part Description | Location |
|---|---|---|
| 3800708-1 | 131-9A APU | Phoenix |
| 160494-1 | OIL COOLER | Phoenix |
| 3886188-3 | ACTUATOR, IGV | Phoenix |
| 3888058-5 | EXCITER IGNITION | Phoenix |
| 4131020-4 | OIL LUBE MODULE | Phoenix |
| 441921-5 | FUEL CONTROL UNIT | Phoenix |
| 3876287-1 | DATA MEMORY MODULE | Phoenix |
| 3888394-221204 | ECB | Phoenix |
| 2704506-2 | STARTER MOTOR | Phoenix |
| 3291238-2 | VALVE, SURGE CONTROL | Phoenix |
| 3291432-1 | VALVE, LOAD CONTROL | Phoenix |
| 3616140-10 | FAN ASSY,OIL COOLING | Phoenix |
| 3830416-1 | NOZZLE-FUEL INJECTIO | Phoenix |
| 3876132-13 | IGNITION CABLE ASSY | Phoenix |
| 3876145-1 | HEATER-OIL | Phoenix |
| 3876223-1 | SPEED SENSOR | Phoenix |
| 3876225-2 | SENSOR-INLET PRESSURE | Phoenix |
| 3876226-1 | SENSOR-TOTAL PRESSURE | Phoenix |
| 3876227-2 | SENSOR-DIFFERENTIAL | Phoenix |
| 3876255-2 | SWITCH-LOW OIL PRESS | Phoenix |
| 3876271-1 | EXHAUST GAS TEMPERAT | Phoenix |
| 305766-4 | IGNITER PLUG | Phoenix |
| 3876330-2 | SWITCH-LOW OIL LEVEL | Phoenix |
| 3883830-1 | TEE-FLOW DIVIDER | Phoenix |
| 3884971-1 | PROBE ASSY-TOTAL PRE | Phoenix |
| 692546-4 | VALVE, SOLENOID | Phoenix |

**Table A-2**

**Field Arising LRU and Consignment List**

| Part Number | Part Description | Test/NCFR Price (2015$) |
|---|---|---|
| 3800708-1 | 131-9A APU | [redacted] |
| 160494-X | OIL COOLER | |
| 3886188-X | ACTUATOR, IGV | |
| 3888058-X | EXCITER IGNITION | |
| 4131020-X | OIL LUBE MODULE | |
| 441921-X | FUEL CONTROL UNIT | |
| 3876287-X | DATA MEMORY MODULE | |
| 3888394-221204 | ECB | |
| 2704506-X | STARTER MOTOR | |
| 3291238-X | VALVE, SURGE CONTROL | |
| 3291432-X | VALVE, LOAD CONTROL | |
| 3616140-X | FAN ASSY,OIL COOLING | |

**Consignment/Bailment Equipment Schedule**

| Fleet Size | Consignment Equipment QTY* |
|---|---|
| 1-16 Aircraft | [redacted] |
| 17 – 32 Aircraft | |
| 33 – 48 Aircraft | |
| 49 – 80 Aircraft | |
| >80 Aircraft | |

- Spirit may purchase up to 8 APU retrofits at $[redacted] ($2015) each including ECB.
- In the event Spirit is in need of an additional spare APU (not due to any fault of Honeywell), Honeywell agrees to provide a rental engine at 50% off of its then-current published monthly rental rate under its standard terms.
- All prices are subject to escalation in accordance with Attachment B.

# ATTACHMENT B
# PRICE ADJUSTMENT

All prices set forth in this Agreement, exclusive of any allowances, concessions, and deductions, are base prices in the year which this Agreement is made effective, and will be escalated on January 1 of each subsequent year during the term hereof, in accordance with the following procedures.

Any annual price escalation in excess o[redacted]will be shared equally by the parties. For example, in the case that the escalation formula computes an escalation of [redacted] for any one year, the price would be increased by [redacted]

The escalation formula uses indices published by the US Bureau of Labor Statistics ("**BLS**").

Labor – [redacted] "Labor Index" means National Employment, Hours, and Earnings Industry: Aerospace Equipments and Parts Manufacturing [redacted]

Material – [redacted] "Material Index" means Producer Price Index: Commodities Group: Transportation Equipment [redacted]

The prices set forth in this Agreement will be subject to escalation as follows:

$P_N$ = $P_C$ X CI

CI = $[0.3\ (L_C/L_P) + 0.7\ (M_C/M_P)]$; if $\leq 1.0$ then no escalation will apply

Where:

| | | |
|---|---|---|
| $P_N$ | = | Escalated price |
| $P_C$ | = | Base price, that is, the rate at the time prior to being escalated |
| $L_C$ | = | Average hourly earnings for Labor Index for the 6-month period ending June 30th of the year prior to the year in which the price is being escalated |
| $L_P$ | = | Average hourly earnings for Labor Index for 6-month period ending June 30th two (2) years prior to the year in which the price is being escalated. For the 2nd year of calculated escalation and beyond, the value of $L_P$ will be equal to the prior year's value of $L_C$. |
| $M_C$ | = | Average value of wholesale prices for Materials Index for the 6-month period ending June 30th one year prior to the year in which the price is being escalated |
| $M_P$ | = | Average value of wholesale prices for Materials Index for the 6-month period ending June 30th two (2) years prior to the year in which the price is being escalated. For the 2nd year of calculated escalation and beyond, the value of $M_P$ will be equal to the prior year's value of $M_C$. |

(a) The Composite Index ("CI") will be determined to the nearest third decimal place. If the next succeeding place is 5 or more, the preceding decimal place will be raised to the next higher figure. Prices will be rounded to the nearest penny.
(b) In determining the amount to be added to the base rates, the percentage of escalation will be calculated to the nearest one-tenth of one percent. If the next succeeding place is 5 or more, the preceding decimal place will be raised to the next higher figure. The value for $P_N$ for a given year will become the value for $P_C$ for the subsequent year.
(c) The CI for a given year as defined above will be the BLS's first published final figures for the applicable period for the two applicable indices. Once established, prices will be firm for deliveries in the applicable year.
(d) If any such final figure for any such index has not been published by the BLS at the time required by Honeywell to invoice, Honeywell's estimate of the actual CI first published final figures for the applicable period will be used to calculate an interim CI for the applicable rate. Such interim CI will be used as a substitute for the CI for

such year in the formula set forth above for such orders until the BLS's first published final index is published, whereupon Honeywell will adjust its interim invoice(s) accordingly.

(e) If, for any reason, Customer believes Honeywell has incorrectly calculated the escalated price (including but not limited to using the wrong index, BLS change, or a mathematical error), Customer has 2 months from the date the escalated price goes into effect to notify Honeywell of such error and request a credit or Customer waives their right to claim such credit. Any credits issued against this Agreement will be applicable toward the future purchase of any parts listed in Honeywell's then-current catalog and will expire one (1) calendar year after date of issuance of such credits.

(f) In the event the BLS discontinues or alters its methods of calculation of any index used in the above escalation formula, Honeywell will make appropriate adjustments to place the changed indices on a comparable basis with the indices calculated before the change. There will be no retroactive price adjustments based on the substitute indices.

## ATTACHMENT C
## CONDITIONS OF SALE

### 1. APPLICABILITY

Any Customer purchase order covering the sale or service of any Equipment ("**Order**") will be governed solely by this Agreement, whether or not this Agreement is referenced in the Order. Except as provided in the "Orders" section below, all provisions on Customer's Order and all other documents submitted by Customer are expressly rejected. Honeywell reserves the right to reject any Order submitted for its acceptance.

### 2. ORDERS

Orders should specify: (1) Purchase Order number; (2) Honeywell's part number including a general description of the Equipment; (3) requested delivery dates; (4) price; (5) quantity; (6) location to which the Equipment is to be shipped; (7) any special routing, packing, labeling, handling or insurance requested by Customer, if applicable; (8) location to which invoices will be sent for payment; and (9) the end-use and end-user, if known, of the Equipment ordered and whether the Equipment will be used for a military or quasi-military purposes. Customer's Orders are subject to Honeywell's minimum order requirements, if any, and Honeywell's acceptance. Honeywell reserves the right to limit order quantities for certain Equipment. Honeywell's order acknowledgment will not constitute acceptance. Any additional or conflicting terms on an Order will not apply unless specifically agreed to in writing by Honeywell.

### 3. ACCEPTANCE

Equipment is presumed accepted unless Honeywell receives written notice of rejection from Customer explaining the basis for rejection within ten (10) calendar days after delivery. Customer must disposition rejected Equipment to Honeywell in accordance with Honeywell's written instructions. Honeywell will have a reasonable opportunity to repair or replace rejected Equipment, at its option. Subject to the terms of Section 16 (Taxes), Honeywell assumes shipping costs in an amount not to exceed actual reasonable direct freight charges to Honeywell's designated facility for the return of properly rejected Equipment. Customer will provide copies of freight invoices to Honeywell upon request. Following initial delivery, the party initiating shipment will bear the risk of loss or damage to Equipment in transit. If Honeywell reasonably determines that rejection was improper, Customer will be responsible for all expenses caused by the improper rejection.

### 4. CHANGES

Honeywell may, at its sole discretion, incorporate changes to Equipment that do not alter form, fit or function, and make changes to Equipment that do not alter the part number being repaired. These changes may consist of the incorporation of Service Bulletins (SB), repairs defined in Overhaul Repair Instructions (ORI) or equivalent, repairs defined in maintenance manuals, modifications, or upgrades. Such changes may be made to Equipment previously delivered to Customer.

### 5. SETOFF

Customer may not set off any invoiced amounts against sums that are due from Honeywell, its parents, affiliates, subsidiaries or other divisions or units.

### 6. PRODUCT WARRANTY

"**Nonconformance**" means failure to comply with, or failure to operate due to noncompliance with, applicable Honeywell drawings or having defects in workmanship or material. Normal wear and tear and the need for regular overhaul and periodic maintenance do not constitute a Nonconformance.

For the purposes of this section the term Equipment includes end items, line replaceable units and components thereof including those returned for exchange.

Honeywell warrants that at time of shipment to Customer its Equipment will comply with applicable Honeywell drawings, and will be free from defects in workmanship and material for a the period specified in Section 8 of the Agreement. These warranties run to Customer, its successors, permitted assigns, and customers.

Customer must notify Honeywell in writing during the warranty period of a Nonconformance and, within 30 calendar days of discovery of the Nonconformance, disposition the Equipment in accordance with Honeywell's written instructions.

Honeywell's obligation and Customer's sole remedy under this warranty is repair or replacement, at Honeywell's election, of any Equipment Nonconformance. All Equipment repaired or replaced are warranted only for the unexpired portion of the original warranty period.

Honeywell assumes round trip shipping costs for Nonconforming Equipment in an amount not to exceed actual reasonable direct freight charges to and from Honeywell's nearest warranty repair facility for such Equipment. Customer will provide copies of freight invoices to Honeywell upon request. Round trip shipping costs expressly exclude freight forwarding charges, taxes, duties and tariffs. The party initiating transportation bears the risk of loss or damage to Equipment in transit. If Honeywell reasonably determines that a Nonconformance does not exist and there are no defects in workmanship or material (normal wear and tear excepted), then Customer will pay all expenses related to the improper return including, but not limited to, analysis and shipping charges.

Honeywell will not be liable under this warranty if the Equipment has been exposed or subjected to any:

(1) maintenance, repair, installation, handling, packaging, transportation, storage, operation or use that is improper or otherwise not in compliance with Honeywell's instruction;

(2) alteration, modification or repair by anyone other than Honeywell or those specifically authorized by Honeywell;

(3) accident, contamination, corrosion, foreign object damage, abuse, neglect or negligence after shipment to Customer;

(4) damage caused by failure of a Honeywell-supplied product not under warranty or by any hardware or software not supplied by Honeywell;

(5) use of counterfeit or replacement parts that are neither manufactured nor approved by Honeywell for use in Honeywell-manufactured Equipment;

(6) products not manufactured by Honeywell (Honeywell will pass the manufacturer's warranty through to Customer to the extent permitted); or

(7) products normally consumed in operation or which have a normal life inherently shorter than the foregoing warranty period including, but not limited to, consumables (e.g., flashtubes, lamps, batteries, storage capacitors, filters, membranes).

If Honeywell reasonably determines that a Nonconformance does not exist and the Equipment have been exposed or subjected to any of items 1 through 7 in the prior sentence, Honeywell will notify Customer and await instructions on whether to return the Equipment or quote a price to repair the Equipment. If Customer does not reply within 7 days of receiving Honeywell's notification of such Abuse, Honeywell will return the Equipment in "as-is" condition and Customer will pay Honeywell an evaluation fee. Upon Customer's request and in accordance with these Terms, Honeywell will provide Customer with a written service estimate and follow Customer's instructions to repair, scrap, or return the Equipment to Customer.

Honeywell has no obligation under this warranty unless Customer maintains records that accurately document operating time, maintenance performed and the nature of the unsatisfactory condition of Honeywell's Equipment. Upon Honeywell's request, Customer will give Honeywell access to these records for substantiating warranty claims.

THESE WARRANTIES ARE EXCLUSIVE AND IN LIEU OF ALL OTHER WARRANTIES, WHETHER WRITTEN, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, AND FITNESS FOR PARTICULAR PURPOSE. IN NO EVENT WILL HONEYWELL BE LIABLE FOR ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL, OR INDIRECT DAMAGES, EVEN IF INFORMED OF THE POSSIBILITY OF SUCH DAMAGES AND NOTWITHSTANDING THE FAILURE OF THE ESSENTIAL PURPOSE OF ANY LIMITED REMEDY. NO EXTENSION OF THIS WARRANTY WILL BE BINDING UPON HONEYWELL UNLESS SET FORTH IN WRITING AND SIGNED BY HONEYWELL'S AUTHORIZED REPRESENTATIVE.

**7. EXCUSABLE DELAY OR NONPERFORMANCE**

Honeywell will not be liable to Customer for any failure to meet its obligations due to any cause beyond its reasonable control including, but not limited to: government embargoes or any other government acts that interfere with performance; blockades; seizure or freeze of assets; delays or refusals to grant an export license or the

suspension or revocation thereof; fires, earthquakes, floods, tropical storms, hurricanes, tornadoes, severe weather conditions or any other acts of God; quarantines or regional medical crisis; labor strikes or lockouts; riots, strife, insurrection, civil disobedience, landowner disturbances, armed conflict, terrorism or war, declared or not (or impending threat of any of the foregoing, if such threat might reasonably be expected to cause injury to people or property); and shortages or inability to obtain materials or components. The due date of any performance affected by such an event will be extended by the period of time that Honeywell is actually delayed. If the inability to perform continues for longer than six (6) months, either party may terminate the affected Order by providing written notice to the other party and Customer will pay Honeywell for Equipment delivered and services performed prior to termination.

## 8. CANCELLATION

Customer may cancel any Order or portion of an Order by giving Honeywell written notice specifying the detailed reason for the cancellation only if: (1) Honeywell fails to correct a breach of this Agreement within sixty (60) calendar days of written notice from Customer of the breach; or (2) any insolvency or suspension of Honeywell's operations or any petition filed or proceeding commenced by or against Honeywell under any state or federal law relating to bankruptcy, arrangement, reorganization, receivership or assignment for the benefit of creditors.

## 9. DISPUTES

Any dispute arising out of or relating to this Agreement, including the breach, termination or validity thereof (**"Dispute"**), will be finally resolved by arbitration. The arbitration will be conducted in English.

If Customer is incorporated in the United States (or is otherwise a United States proprietorship, partnership, limited liability company or other business entity), a single arbitrator will apply the Center for Public Resources Institute for Dispute Resolution Rules for Non-Administered Arbitration then currently in effect to finally resolve the Dispute. The arbitration will be governed by the Federal Arbitration Act, 9 U.S.C. secs. 1-16, and judgment upon on the award rendered by the arbitrator may be entered by any court having jurisdiction thereof. The place of arbitration will be New York City, New York.

If Customer is not incorporated in the United States (or is otherwise not a United States proprietorship, partnership, limited liability company or other business entity), a panel of three arbitrators will apply the International Chamber of Commerce ("ICC") Rules for Arbitration to finally resolve the Dispute. The place of arbitration will be Brussels, Belgium.

Any award will be payable in U.S. dollars, and judgment on the award rendered by the arbitrator(s) may be entered by any court having competent jurisdiction thereof. Either party may apply to the arbitrator(s) seeking injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved. Either party also may, without waiving any remedy under this Agreement, seek from any court having competent jurisdiction any interim or provisional relief that is necessary to protect the rights or property of that party, pending the arbitrator's determination of the merits of the controversy.

If any dispute, or response to any dispute, includes an allegation that potentially concerns whether any intellectual property right owned, controlled or licensable by either party is invalid, unenforceable or infringed or misappropriated, or is otherwise limited in scope or application, then either party may, in its sole discretion, elect to have that dispute adjudicated before a court of competent jurisdiction and this section will not be binding on either party with respect to that dispute in its entirety or any related dispute, including any portions of a dispute that do not concern intellectual property rights.

## 10. APPLICABLE LAW

These Agreement will be governed by the laws of the State of New York, U.S.A. without regard to conflict of law principles. Application of the Uniform Computer Information Transactions Act and United Nations Convention on Contracts for the International Sale of Goods, 1980, and any successor law to either is specifically excluded. The Federal courts within the State of New York, U.S.A. will have exclusive jurisdiction to adjudicate any dispute arising out of or related to this Agreement. Customer will not bring a legal or equitable action more than one year after the cause of action arose unless a shorter period is provided by applicable law.

## 11. NONDISCLOSURE AND NON-USE OF HONEYWELL'S CONFIDENTIAL DATA AND INFORMATION

These Agreement do not supersede any confidentiality agreement executed by Customer and Honeywell that otherwise applies to products, services, technical data or other information delivered in connection with an Order. In the absence of such an agreement, Customer may use Honeywell's confidential information only in the normal operation of Honeywell's Equipment. Further, Customer may disclose Honeywell's confidential information only to its employees on a need-to-know basis, will protect against inadvertent disclosure, and will not disclose such information to any third party without Honeywell's prior written consent.

**12. INDEMNITY AGAINST PATENT AND COPYRIGHT INFRINGEMENT**

Honeywell will defend Customer against any suit arising out of any actual or alleged patent or copyright infringement of a valid patent or copyright, to the extent based on the Equipment as delivered by Honeywell, and indemnify for any final judgment assessed against Customer resulting from such suit provided that Customer notifies Honeywell as soon as it is aware of the third-party claim, and agrees to give sole and complete authority, information and assistance (at Honeywell's expense) for the defense and disposition of the claim. Honeywell will not be responsible for any compromise or settlement made without Honeywell's prior written consent.

Honeywell will have no obligation or liability with respect to: (1) Equipment provided pursuant to Customer's designs, drawings or manufacturing specifications; (2) Equipment used other than for their ordinary purpose; (3) claims of infringement resulting from combining any Equipment furnished hereunder with any article not furnished by Honeywell; or (4) any modification of the Equipment other than a modification by Honeywell. Because Honeywell has exclusive control of resolving infringement claims hereunder, in no event will Honeywell be liable for Customer's attorney fees or costs.

Further, Customer agrees to indemnify and defend Honeywell to the same extent and subject to the same restrictions set forth in Honeywell's obligations to Customer as set forth in this "Indemnity Against Patent and Copyright Infringement" section for any suit against Honeywell based upon a claim of infringement resulting from (1), (2), (3), or (4) of the preceding paragraph.

If a claim is brought or if Honeywell believes that a claim is likely, Honeywell may, at its option, and at its expense, (1) procure for Customer the right to continue using the Equipment; (2) replace or modify the Equipment so that it becomes non-infringing; or (3) accept return of the product or terminate Customer's license to use the allegedly infringing Equipment and grant Customer a credit for the purchase price or license fee paid for such Equipment, less a reasonable depreciation for use, damage, and obsolescence. Further, Honeywell may cease shipping the subject Equipment without being in breach of this Agreement.

Any liability of Honeywell under this "Indemnity Against Patent and Copyright Infringement" is subject to the provisions of the "Limitation of Liability" section of this Agreement.

This "Indemnity Against Patent and Copyright Infringement" section states the parties' entire liability, sole recourse and their exclusive remedies with respect to infringement. All other warranties against infringement of any intellectual property rights, statutory, express, or implied are hereby disclaimed.

**13. SOFTWARE LICENSE**

"**Licensed Software**" means software, including all related updates, changes, revisions and documentation, if any, that Customer is entitled to use under this Agreement and which is not subject to a separate software license between the parties.

Subject to Customer's compliance with this Agreement, Honeywell grants to Customer and Customer accepts a nontransferable, nonexclusive license, without the right to sublicense, to use the Licensed Software in the ordinary and normal operation of the Equipment on which it is installed or with which it is intended to be used under this license.

Honeywell (and its licensors, if applicable) retains all title to the intellectual property related to all material and software provided under this Agreement.

Under no circumstance will a licensee be authorized to transfer the licensed software and/or Airline Database to a third party. Such license will be granted only by Honeywell under a separate license agreement between Honeywell and the third party and relevant fees will apply.

Unless specifically authorized by Honeywell in writing, Customer is prohibited from making copies of Licensed Software except for backup purposes. Customer will reproduce and include all Honeywell proprietary and copyright notices and other legends both in and on every copy made.

Customer may not directly or indirectly make any effort to deconstruct the software provided, including, but not limited to: translating, decompiling, disassembling, reverse assembling, reverse engineering, creating derivative works or compilations, or performing any other operation to obtain any portion of its contents. Customer will take all reasonable actions necessary to prevent unauthorized access, disclosure or use of the software provided.

Notwithstanding the warranties provided elsewhere herein, Customer acknowledges that Licensed Software may be product, aircraft, or sensor specific and, as such, may require reasonable adjustment or refinement to suit Customer's specific requirements. Subject to the receipt of adequate written notice and reasonable aid from Customer, Honeywell will make reasonable, commercial efforts to accomplish reasonable adjustments or refinements for up to 90 calendar days after initial delivery of the Licensed Software.

Except as expressly granted herein, no license or right, including sublicensing rights, either expressly, implicitly, by estoppel, conduct of the parties, or otherwise, is granted by Honeywell to Customer.

**14. SPECIAL TOOLING AND DATA**

Special tooling includes, but is not limited to, jigs, dies, fixtures, molds, patterns, special taps, special gauges, special test equipment, other special equipment and manufacturing aids and replacements items, now existing or hereafter created. Honeywell owns all rights to special tooling including specifications, drawings, engineering instructions, data, material, equipment, software, processes, and facilities, except to the extent that title is specifically transferred in writing from an authorized representative of Honeywell to Customer. Honeywell retains all rights, title and interest in drawings, engineering instructions, specifications, and all other written data, if any furnished with the products.

**15. EXPORT**

Honeywell will apply for United States Government export authorizations required for delivery of any goods, services or technical data under an Order. Customer will promptly provide all information required by Honeywell to complete the authorization application. Customer will apply for all other necessary import, export or re-export approvals. Customer will comply with all applicable export and import control laws and regulations, including the United States Export Administration Regulation (EAR) and the United States International Traffic in Arms Regulations (ITAR), and will retain documentation evidencing such compliance. Customer is aware that U.S. export law may impose restrictions on Customer's use of the goods, services, or technical data, or on their transfer to third parties. Customer will immediately notify Honeywell and cease distribution activities with regard to the transaction in question if Customer knows or has a reasonable suspicion that the products, technical data, plans, or specifications may be redirected to other countries in violation of export control laws.

Honeywell will not be liable to Customer for any breach resulting from government actions which impact Honeywell's ability to perform, including but not limited to: (1) refusal to grant export or re-export license; (2) cancellation of export or re-export license; (3) any subsequent interpretation of United States export laws and regulations, after the date of Honeywell's acceptance of an Order, that limits or has a material adverse effect on the cost of Honeywell's performance under an Order; or (4) delays due to Customer's failure to follow applicable import, export, transfer, or re-export laws and regulations.

If Customer designates the freight forwarder to be used for export shipments from the United States, then Customer's freight forwarder will export on Customer's behalf and Customer will be responsible for any failure of Customer's freight forwarder to comply with all applicable export requirements. Honeywell will provide Customer's designated freight forwarder with required commodity information.

**16. TAXES**

Honeywell's pricing excludes all taxes (including, but not limited to, sales, use, excise, value-added or other similar taxes), duties and charges (collectively, "**Taxes**"). Customer will pay all Taxes resulting from an Order or Honeywell's performance, whether imposed, levied, collected, withheld or assessed now or later. If Honeywell is required to impose, levy, collect, withhold or assess any Taxes on any transaction under an Order, then in addition to the purchase price, Honeywell will invoice Customer for the Taxes unless, at the time of Order placement, Customer


**Honeywell Confidential**
(See restrictions on cover)

furnishes Honeywell with an exemption certificate or other documentation sufficient to verify exemption from the Taxes.

If any Taxes are required to be withheld from amounts paid or payable to Honeywell under an Order: (1) such withholding amount will not be deducted from the amounts due Honeywell as originally priced; (2) Customer will pay the Taxes on behalf of Honeywell to the relevant taxing authority in accordance with applicable law, and (3) Customer will forward to Honeywell within 60 days of payment proof of Taxes paid sufficient to establish the withholding amount and the recipient.

In no event will Honeywell be liable for Taxes paid or payable by Customer.

**17. GENERAL PROVISIONS**

**Assignment.** Neither Party will assign any rights or obligations under this Agreement without the advance written consent of the other Party, which consent will not be unreasonably withheld. Either Party may assign this Agreement in connection with the sale or transfer of all or substantially all of the assets of the product line or business to which it pertains. Any attempt to assign or delegate in violation of this clause will be void.

**Commercial Use.** Customer represents and warrants that all purchases of Equipment hereunder will not be used in the performance of a contract or subcontract with any government in a manner so as to affect Honeywell rights to data, technology, software or other intellectual property supplied by Honeywell.

**Independent Contractor.** The parties acknowledge that they are independent contractors and no other relationship, including without limitation partnership, joint venture, employment, franchise, master/servant or principal/agent is intended by this Agreement. Neither party has the right to bind or obligate the other.

**Headings.** Headings and captions are for the convenience of reference only and do not alter the meaning or interpretation of this Agreement.

**Severability.** If any provision or portion of a provision of this Agreement is determined to be illegal, invalid, or unenforceable, that portion or provision will be stricken and the validity and enforceability of the remaining provisions will not be affected.

**Survival.** Provisions of this Agreement that by their nature should continue in force beyond the completion or termination of this Agreement will remain in force.

**Third Party Beneficiaries.** Except as expressly provided to the contrary in this Agreement, the provisions of this Agreement are for the benefit of the parties to this Agreement only and not for the benefit of any third party.

**Waiver.** Failure of either party to enforce at any time any of the provisions of this Agreement will not be construed to be a continuing waiver of any provisions hereunder.

## ATTACHMENT D

Aircraft Excluded From the Agreement

| AIRCRAFT TAIL NUMBER |
|---|
| |
| |
| |
| |
| |
| |
| |

Honeywell

**AMENDMENT NO. 1**

to

**MAINTENANCE SERVICE AGREEMENT**

between

**HONEYWELL INTERNATIONAL INC.**

and

**SPIRIT AIRLINES, INC.**

---

Honeywell International Inc., a Delaware corporation, acting through its Aerospace business with its primary office at 1944 E. Sky Harbor Circle, Phoenix, AZ 85034 ("**Honeywell**") and Spirit Airlines, Inc. with offices at 2800 Executive Way, Miramar, florida 33025 ("**Spirit**") entered into a Maintenance Service Agreement effective 1 April, 2016 (the "**Main Agreement**") and now desire to amend the Main Agreement by this Amendment No. 1 to the Main Agreement (this "**Amendment**") as follows:

**BACKGROUND**

The parties entered into the Maintenance ServiceAgreement effective 1 April, 2016 (the "**Agreement**") for servicing of Spirit's 131-9A auxiliary power units on its A320 fleet. Capitalized terms used in this Amendment and not otherwise defined have the meaning assigned to them in the Agreement.

**AMENDMENT**

The parties now desire to amend the Agreement with this Amendment as follows:

1. The following offers are added to Attachment A of the Main Agreement and will be valid from the date this Amendment is fully executed through 31 December, 2019:

   A. Honeywell will provide Spirit with a [redacted]% discount to the then current operator price on up to [redacted] new 131-9A APU's.

   B. Spirit may purchase up to 10 131-9A APU retrofits at $[redacted](USD 2017 rate) including the ECB. This price is subject to yearly escalation as noted in Attachment B of the Main Agreement.

   C. At Spirit's option, Spirit may return an APS3200 for each 131-9A purchased for a retrofit and Honeywell will offer Spirit a one-time merchandise credit voucher valued at $[redacted] USD in each instance. Spirit must return an APS3200 within 90 days of delivery of the purchased 131-9A to qualify for this credit. The merchandise credit will be available for use upon written notification from Spirit to Honeywell of return of the unit. Spirit must send this notification to Honeywell within three (3) months following the return of the equipment or Spirit waives their rights to claim such merchandise credit. Merchandise credits may only be used toward future purchases in this Agreement or future purchases of Honeywell Aerospace products. Merchandise credits may not be used towards service or service related invoices (e.g. repair and/or overhaul, Maintenance Service Agreement (MSA), Charge per Aircraft Landing (CPAL), Navigation Database (NavDB), training). Merchandise credits may only be utilized if identified at the time of future purchase order placement. Merchandise credits expire one (1) calendar year after date of issuance of such credits.

HONEYWELL - CONFIDENTIAL: This document and all information and expression contained herein are the property of Honeywell International Inc., are provided in confidence, and may not, in whole or in part, be disclosed to others for any purpose without prior written permission from Honeywell International Inc. All rights reserved.

**Honeywell**

D. The standard lead time for the purchase of a new APU is 12 months. This lead time may be shortened with a mutually agreed purchase or retrofit schedule.

2. This Amendment is valid for execution by Buyer and must be received by Honeywell on or before 14 July 2017.

3. Unless otherwise set forth herein, all other terms and conditions of the Agreement are and remain unchanged. In case of any conflict between a provision in the Main Agreement and a provision in this Amendment, the provision in this Amendment will control.

4. The Main Agreement, as amended hereby, represents the entire agreement and understanding between the parties with respect to the matters contained herein and therein.

The signature of authorized representatives of the parties in the spaces below signifies acceptance to this Amendment, which is incorporated as part of the Main Agreement.

Accepted and agreed to:

**SPIRIT AIRLINES, INC.**

Signature: [redacted]
Name:
Title:
Date: 7/12/17

**HONEYWELL INTERNATIONAL INC.**
acting through its Aerospace business

Signature: [redacted]
Name:
Title:
Date: 29 June 2017

HONEYWELL - CONFIDENTIAL: This document and all information and expression contained herein are the property of Honeywell International Inc., are provided in confidence, and may not, in whole or in part, be disclosed to others for any purpose without prior written permission from Honeywell International Inc. All rights reserved.



Honeywell Internal

**AMENDMENT NO. 2**

**to**

**MASTER SERVICE AGREEMENT**

**between**

**HONEYWELL INTERNATIONAL INC.**

**and**

**SPIRIT AIRLINES INC.**

---

Honeywell International Inc., a Delaware corporation, acting through its Aerospace business with its primary office at 1944 E. Sky Harbor Circle, Phoenix, AZ 85034 ("**Honeywell**") and Spirit Airlines Inc., with its primary office at 2800 Executive Way, Miramar Florida 33025 ("**Buyer**" or "**Spirit**") entered into a Master Service Agreement effective April 1, 2016 (the "**Main Agreement**"). The parties now desire to amend the Main Agreement by this Amendment 2 (this "**Amendment**") as entered into as of the date of last signature below (the' Effective Date") as follows:

**AMENDMENT**

1. Section 6.7 of the Main Agreement is hereby amended as follows to add an additional 14 Aircraft:

6.7 Honeywell will make an appropriate adjustment to the rate set forth in this Agreement when there is change greater than + or - 10% in the Aircraft Fleet/Operational Parameters set forth below. Any such rate adjustment will be made in an amount commensurate with and proportional to the degree to which the change in the operational parameter adversely affects Honeywell. This rate adjustment calculation will be based on parametric comparisons to baseline pricing and assumptions, and nothing in this clause will necessitate the review of actual cost data by the parties.

**Aircraft Fleet/Operational Parameters**

| | |
|---|---|
| Additions to Fleet each year<br>(Pricing assumes all prior additions remain in service) | 2016 17<br>2017 +20<br>2018 +13<br>2019 +17<br>2020 +20<br>2021 +19 |
| Aircraft Flight Hours* | 3875 per Aircraft per year |
| APU Operating Hours * | 1400 per Aircraft per year |

* Based upon Aircraft fleet average data over 12 months.

*REMAINDER OF PAGE INTENTIONALLY BLANK*

HONEYWELL - CONFIDENTIAL: This document and all information and expression contained herein are the property of Honeywell International Inc., are provided in confidence, and may not, in whole or in part, be disclosed to others for any purpose without prior written permission from Honeywell International Inc. All rights reserved.



DS

Honeywell
THE POWER OF **CONNECTED**

2. ~~This Amendment is valid for execution by Buyer and must be received by Honeywell on or before September 14, 2018~~ DS

3. Unless otherwise set forth herein, all other terms and conditions of the Main Agreement are and remain unchanged. In case of any conflict between a provision in the Main Agreement and a provision in this Amendment, the provision in this Amendment will control.

4. The Main Agreement, as amended hereby, represents the entire agreement and understanding between the parties with respect to the matters contained herein and therein.

The signature of authorized representatives of the parties in the spaces below signifies acceptance to this Amendment, which is incorporated as part of the Main Agreement.

Accepted and agreed to:

**SPIRIT AIRLINES INC.**

Signature: [redacted]

Name:

Title:

Date: 10/10/18

**HONEYWELL INTERNATIONAL INC.**
acting through its Aerospace business

DocuSigned by:

Signature: [redacted]

Name:

Title:

Date: October 10, 2018

HONEYWELL - CONFIDENTIAL: This document and all information and expression contained herein are the property of Honeywell International Inc., are provided in confidence, and may not, in whole or in part, be disclosed to others for any purpose without prior written permission from Honeywell International Inc. All rights reserved.

Honeywell

**AMENDMENT NO. 3**

**to**

**MASTER SERVICE AGREEMENT**

**between**

**HONEYWELL INTERNATIONAL INC.**

**and**

**SPIRIT AIRLINES INC.**

---

Honeywell International Inc., a Delaware corporation, acting through its Aerospace business with its primary office at 1944 E. Sky Harbor Circle, Phoenix, AZ 85034 ("**Honeywell**") and Spirit Airlines Inc., with its primary office at 2800 Executive Way, Miramar Florida 33025 ("**Buyer**" or "**Spirit**") entered into a Master Service Agreement effective April 1, 2016 (the "**Main Agreement**"). The parties now desire to amend the Main Agreement by this Amendment 3 (this "**Amendment**") as entered into as of the date of last signature below (the "**Effective Date**") as follows:

**AMENDMENT**

1. For the avoidance of doubt, Honeywell and Buyer acknowledge and agree that as of the Effective Date of this Amendment, subject to Section 6.4(a) of the Main Agreement, the following APU serial numbers ("S/N") owned by Spirit are eligible Equipment under the Main Agreement:

   - APU S/N P-4496; MSN* 4305
   - APU S/N R-2691; MSN 4270

   *MSN = Manufacturer Serial Number

2. This Amendment is valid for execution by Buyer and must be received by Honeywell on or before ~~June 21, 2019~~. February 1, 2020

3. Unless otherwise set forth herein, all other terms and conditions of the Main Agreement are and remain unchanged. In case of any conflict between a provision in the Main Agreement and a provision in this Amendment, the provision in this Amendment will control.

4. The Main Agreement, as amended hereby, represents the entire agreement and understanding between the parties with respect to the matters contained herein and therein.

The signature of authorized representatives of the parties in the spaces below signifies acceptance to this Amendment, which is incorporated as part of the Main Agreement.

Accepted and agreed to:

**SPIRIT AIRLINES INC.**

Signature: [redacted]

Name:

Title:

Date: 1/29/2020

**HONEYWELL INTERNATIONAL INC.**
acting through its Aerospace business

Signature: [redacted]

Name:

Title:

Date: 29-Jan-2020

HONEYWELL - CONFIDENTIAL: This document and all information and expression contained herein are the property of Honeywell International Inc., are provided in confidence, and may not, in whole or in part, be disclosed to others for any purpose without prior written permission from Honeywell International Inc. All rights reserved

Honeywell

**AMENDMENT NO. 4**

**to**

**MAINTENANCE SERVICE AGREEMENT**

**between**

**HONEYWELL INTERNATIONAL INC.**

**and**

**SPIRIT AIRLINES, INC.**

Honeywell lnterrnational Inc., a Delaware corporation, acting through its Aerospace business with its primary office at 1944 E. Sky Harbor Circle, Phoenix, AZ 85034 ("Honeywell") and Spirit Airlines, Inc. with offices at 2800 Executive Way, Miramar, Florida 33025 ("Spirit") entered into a Maintenance Service Agreement effective 1 April, 2016 (the "Main Agreement") and now desire to amend the Main Agreement by this Amendment No. 4 to the Main Agreement (this "Amendment") as follows:

**AMENDMENT**

1. Article 3 is deleted in its entirety and replaced with the following:

   TERM OF AGREEMENT
   This Agreement will commence on the Effective Date above and remain in full force and effect thereafter through 31 December 2030 unless earlier terminated in accordance with the terms of this Agreement.

2. Article 7.1 is deleted in its entirety and replaced with the following:

   7.1 The following in lieu of warranty rate(s) are applicable to all Flight Hours flown by all Aircraft operated by Spirit during the term of this Agreement. Rates are expressed in United States dollars, based upon 2020 economic conditions, and are subject to adjustment as set out below and on January 1 each year in accordance with the price adjustment formula in Attachment B.

| APU Hour Rate | 2020 Rates |
|---|---|
| Year 1 | [redacted] |
| Year 2 | $[redacted] |
| Year 3 | $[redacted] |
| Year 4 | $[redacted] |
| Year 5 | $[redacted] |

   As of January 1, 2024 and dependent upon the number of retrofits which have occurred per Attachment E, the 2024 APU Hour Rates will be based on the applicable Scenario as defined in Table 3 of Attachment E.

3. ATTACHMENT E “Retrofit Program” is added to the Main Agreement.

4. This Amendment is valid for execution by Spirit through October 1, 2020.

5. Unless otherwise set forth herein, all other terms and conditions of the Agreement are and remain unchanged. In case of any conflict between a provision in the Main Agreement and a provision in this Amendment, the provision in this Amendment will control.

6. The Main Agreement, as amended hereby, represents the entire agreement and understanding between the parties with respect to the matters contained herein and therein.

HONEYWELL - CONFIDENTIAL: This document and all information and expression contained herein are the property of Honeywell International Inc., are provided in confidence, and may not, in whole or in part, be disclosed to others for any purpose without prior written permission from Honeywell International Inc. All rights reserved.

Honeywell

The signature of authorized representatives of the parties in the spaces below signifies acceptance to this Amendment, which is incorporated as part of the Main Agreement.

Accepted and agreed to:

**SPIRIT AIRLINES, INC.**

[redacted] DocuSigned by: [redacted]
FFAEC5B81DE64FA...

Name: [redacted]

Title: [redacted]

Date: 9/30/2020 | 4:03 PM EDT

**HONEYWELL INTERNATIONAL** [redacted]

[redacted]
B698A78983024B2...

Name: [redacted]

Title: [redacted]

Date: 10/2/2020 | 8:52 AM PDT

HONEYWELL - CONFIDENTIAL: This document and all information and expression contained herein are the property of Honeywell International Inc., are provided in confidence, and may not, in whole or in part, be disclosed to others for any purpose without prior written permission from Honeywell International Inc. All rights reserved.

Honeywell

**ATTACHMENT E**
**Retrofit Program**

1. **Retrofit Price.** Spirit intends to replace APS3200 APUs currently installed on their Airbus Aircraft. To support each such replacement, Honeywell will provide to Spirit the following:

| Table 1 | | | |
|---|---|---|---|
| **Product** | **Retrofit Price $2020-2023** | **Minimum Retrofits** | **Honeywell Performing Site** |
| New 131-9A auxiliary power unit (*PN 3800708-1) including Electronic Control Box (*PN 3888579-201) and APU stand *or latest PNs | [redacted] | 39 | Phoenix |

For clarity, the Retrofit Price is not escalated from 2020 through 2023. Pricing is based on the minimum quantity set forth in Article 3 below and is contingent on each APU entering the maintenance program in accordance with this Agreement.

2. **APS3200 Auxiliary Power Unit Return.** In exchange for each retrofit, Spirit will return to Honeywell, on a one for one basis, a used APS3200 APU in as-removed condition, which could be unserviceable. Unless otherwise agreed, such exchange APUs will be provided to Honeywell within sixty (60) days of the first APU Operating Hour of each new 131-9A installed on each retrofit aircraft and shall include the below listed items.

   - Logbook (electronic acceptable)
   - LLP cards (electronic acceptable)
   - Operation and removal history
   - ECB
   - Non-incident statement
   - Commercial trace to airline
   - APU Stand

3. **Minimum Commitment.** Spirit intends to retrofit thirty-nine (39) with the option of up to seventy-two (72) Aircraft to Honeywell's model 131-9A auxiliary power units by December 31, 2023. In the event Spirit does not retrofit a minimum of thirty five (35) Aircraft to the Honeywell 131-9A auxiliary power units by December 31, 2023, Spirit will pay Honeywell an aggregate investment reimbursement fee consisting of:
   (1) the Reimbursement Fee as outlined in Table 2 below ; plus
   (2) the difference in the APU Hour Rate in the amended paragraph 7.1 of the main body and the corresponding Adjusted APU Hour Rate in Table 3 multipled by all APU Operating Hours for each stepped rate since the effective date of this Amendment.
   For clarity, accumulated APU Operating Hours include all Honeywell APU Operating Hours, both the retrofit APUs as well as all other APUs subject to this Agreement.

   Spirit will pay the reimbursement fee within thirty (30) calendar days from the date of Honeywell's written claim to Spirit for payment.

HONEYWELL - CONFIDENTIAL: This document and all information and expression contained herein are the property of Honeywell International Inc., are provided in confidence, and may not, in whole or in part, be disclosed to others for any purpose without prior written permission from Honeywell International Inc. All rights reserved.

Honeywell

| Table 2 | | |
|---|---|---|
| Scenario | Total Quantity Retrofit by December 31, 2023 | Reimbursement Fee* (per Retrofit APU purchased) |
| 1 | 1 – 9 | [redacted] |
| 2 | 10 - 19 | [redacted] |
| 3 | 20 - 27 | [redacted] |
| 4 | 28 - 34 | [redacted] |

| Table 3<br>Adjusted APU Hour Rate ($2020**) for each scenario as defined in Table 2 above | | | | |
|---|---|---|---|---|
| Year | Scenario 1 | Scenario 2 | Scenario 3 | Scenario 4 |
| 1 | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |
| [redacted] | [redacted] | [redacted] | [redacted] | [redacted] |

*Reimbursement Fee will not be escalated
**All APU Hour Rates shall be adjusted in accordance with Attachment B, Price Escalation

4. **Maintenance Program.** Immediately upon retrofit, each APU shall join and remain as part of the Agreement under the same terms and condition for a period of at least six (6) years.

5. **2020 Purchase Commitment.** Spirit shall purchase a minimum of [redacted] new 131-9A APUs and ECBs with delivery scheduled prior to December 31, 2020 at the Retrofit Price listed in Article 1 above.

6. **Shipping.** Honeywell will ship the new 131-9A APU and ECB to Spirit's designated Facility EXW Honeywell's facility (Incoterms 2010). Spirit will, at its sole expense and risk, deliver the removed APS3200 to Honeywell's designated Facility.

7. **Spares Discount.** Honeywell offers Spirit a discount for the purchase of up to [redacted] new spare 131-9A APUs, at a [redacted] discount of then current Honeywell operator pricing, for purchase through December 31, 2022.

HONEYWELL - CONFIDENTIAL: This document and all information and expression contained herein are the property of Honeywell International Inc., are provided in confidence, and may not, in whole or in part, be disclosed to others for any purpose without prior written permission from Honeywell International Inc. All rights reserved.

Honeywell

8. **Retrofit Schedule.** The retrofit schedule, for planning purposes only, is outlined in Table 4 below. The minimum lead-time is sixty (60) days from receipt of Spirit purchase order ("PO").

**Table 4**
(for planning purposes only, the Parties will mutually agree on changes to this schedule)

| **Month** | **Total Planned Retrofit/ APU Delivery Schedule** |
|---|---|
| Dec-20 | 5 |
| Jan-21 | 1 |
| Feb-21 | 1 |
| Mar-21 | 1 |
| Apr-21 | 1 |
| May-21 | 2 |
| Jun-21 | 2 |
| Jul-21 | 2 |
| Aug-21 | 3 |
| Sep-21 | 2 |
| Oct-21 | 2 |
| Nov-21 | 2 |
| Dec-21 | 3 |
| Jan-22 | 2 |
| Feb-22 | 2 |
| Mar-22 | 2 |
| Apr-22 | 3 |
| May-22 | 3 |
| **Total** | 39 |

HONEYWELL - CONFIDENTIAL: This document and all information and expression contained herein are the property of Honeywell International Inc., are provided in confidence, and may not, in whole or in part, be disclosed to others for any purpose without prior written permission from Honeywell International Inc. All rights reserved.

Honeywell

**AMENDMENT NO. 5**

**to**

**MAINTENANCE SERVICE AGREEMENT**

**between**

**HONEYWELL INTERNATIONAL INC.**

**and**

**SPIRIT AIRLINES, INC.**

Honeywell International Inc., a Delaware corporation, acting through its Aerospace business with its primary office at 1944 E. Sky Harbor Circle, Phoenix, AZ 85034 ("Honeywell") and Spirit Airlines, Inc. with offices at 2800 Executive Way, Miramar, Florida 33025 ("Spirit") entered into a Maintenance Service Agreement effective 1 April, 2016 (the "Main Agreement") and now desire to amend the Main Agreement by this Amendment No. 5 to the Main Agreement (this "Amendment") as entered into as of the date of last signature below (the "Effective Date") as follows:

**AMENDMENT**

1. Article 3 is deleted in its entirety and replaced with the following:

   TERM OF AGREEMENT
   This Agreement will commence on the Effective Date above and remain in full force and effect thereafter through 31 December 2032 unless earlier terminated in accordance with the terms of this Agreement.

2. Article 4.14 is deleted in its entirety and replaced with the following:
   4.14 Maintenance Training. Honeywell will provide tuition-free APU line maintenance training for up to twenty-five (25) additional employees above the quantity trained prior to this Amendment's Effective Date. This training entitlement shall remain available for up to ten (10) years after delivery of the first new aircraft to Spirit, or no later than the expiration date of the Agreement. This APU line maintenance training is available from FlightSafety International (https://resources.flightsafety.com/maintenance-honeywell-aerospace/) where FlightSafety can provide certified technical training to Spirit mechanics and engineers.

3. Article 5.9 is deleted in its entirety and replaced with the following:

   5.9 Pay Honeywell's then-current NCFR rate when more than ten percent (10%) of the total returns for each individual base part number as listed in Attachment A, Table A-1 are determined as NCFR within a twelve (12) month period commencing with the Effective Date of this Amendment. This payment shall be determined and paid within 30 days following the close of each respective twelve (12) month period.

4. APU Hour Minimum. The validity of the MCPH rates detailed above are based on a minimum annual average of 1,400 APU hours per Honeywell APU operated on Spirit Airlines aircraft, pro-rated based on the date each aircraft is entered into or otherwise removed from Service (permanently or temporarily in long-term storage). For the purposes of this section, Long-Term Parking starts when an aircraft has not accomplished any revenue flights for 30 consecutive days and ends after the first revenue flight upon return to service. Component repairs and exchanges for components removed from an Aircraft during long-term parking shall be charged on a T&M basis. APU hours shall be reconciled annually to the minimums or actuals, whichever is greater. The above rates are based upon exchange/Repair of Equipment that is operated solely by Spirit under the terms of this Agreement. Spirit agrees to pay the amount of difference between the actual hours which were paid and the guaranteed annual minimum amount to Supplier upon reconciliation.

5. The following paragraph is added to the end of Article 6.12:

For clarity, Honeywell will incorporate Service Bulletins (SB) 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 and 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 at no additional charge to Spirit. These two (2) SB's provide for the implementation of High Efficiency Mode (HEM).

6. Article 6.13 is deleted in its entirety and replaced with the following:
Honeywell will provide a Turn-Around-Time ("TAT") of thirty (30) days or less for Repair of Equipment.

The TAT begins the day after the Equipment is received at Honeywell's designated repair facility, and ends on the day the Equipment is made available for return shipment to Spirit. TAT does not apply to Equipment with a TAT Exclusion. For Equipment received by Honeywell with a TAT Exclusion, Honeywell will not be liable for any of the performance guarantees or remedies contained in this Agreement for such Equipment.

In the event Honeywell is unable to meet the TAT specified herein and (i) Spirit has less than four (4) spares, (ii) such delay is not the result of any TAT Exclusion, and (iii) Spirit has properly provisioned in accordance with Honeywell's provisioning requirements and retains access to such provisioning units, Honeywell will provide a free of charge loaner to Spirit, based on availability, upon execution of Honeywell's standard Equipment bailment agreement.

Should loan or exchange equipment not be readily available, Honeywell will advise Spirit and provide written authorization for Spirit to lease from a third party. Honeywell will reimburse Spirit Airlines for all rental and usage fees in the form of a credit memo in an amount not to exceed 100% of the Honeywell's then-current in-network monthly lease rate. Spirit must send this lease documentation to Honeywell within three (3) months or Spirit waives its right to claim this credit. Spirit may apply credit memos to outstanding invoices payable to Honeywell. Prior to applying the credit memo, Spirit must provide written notice to Honeywell which includes specific invoice numbers intended to be paid via the credit memo application. Credit memos expire one (1) calendar year after its issuance date.

7. Article 6.14 and 6.15 are added to the Agreement.

6.14 Rental Discount. In the event Spirit is in need of an additional spare APU (not due to any fault of Honeywell), Honeywell agrees to provide a rental engine at [redacted]% off of its then-current published monthly rental rate under Honeywell's standard terms and conditions

6.15 Low Time Removal Remedy. Honeywell will provide Spirit with a financial remedy for every APU removed with a confirmed failure with less two thousand (2,000) APU Operating Hours since last shop visit or since new. The remedy will be in form of a [redacted] ($[redacted]) dollar credit memo. Spirit Airlines must submit the claim and request the credit memo within six (6) months of the APUs return, or Spirit Airlines will waive its right to claim this credit. Spirit may apply credit memos to outstanding invoices payable to Honeywell. Prior to applying the credit memo, Spirit must provide written notice to Honeywell which includes specific invoice numbers intended to be paid via the credit memo application. Credit memos expire one (1) calendar year after its issuance date.

8. Article 7.1 is deleted in its entirety and replaced with the following:

7.1 The following in lieu of warranty rate(s) are applicable to all Honeywell APU Hours for Honeywell APUs operated by Spirit during the term of this Agreement. Rates are expressed in United States dollars, based upon 2022 economic conditions, and are subject to adjustment as set out below and on January 1 each year in accordance with the price adjustment formula in Attachment B.

| APU Hour Rate | 2022 Rates |
|---|---|
| Year 1 | $[redacted] |
| Year 2 | $[redacted] |
| Year 3 | $[redacted] |
| Year 4 | $[redacted] |
| Year 5 | [redacted] |

Each piece of Equipment will be billed at the rate corresponding to the year of its entry into service; for example, Equipment on a new Aircraft entering into service on June 1, 2023 will bill at the Year 1 rate for the months of June 2023 through May 2024 inclusive. For used Equipment, its entry into service will correspond to it manufacturing date. One rate will apply to all hours in a calendar month; if the entry into service date is in the first fifteen days of the month, that month will be the first month of service, but if the entry into service date is on or after the 16th, the subsequent month will be the first month of service.

The rate specified above will be multiplied by a factor based on the ration of APU Cycles to APU Operating Hours according to the following table:

| APU Cycles / APU Operating Hours | MSA Hourly Rate Multiplier |
|---|---|
| <1.91 | [redacted] |
| 1.91-2.10 | [redacted] |
| 2.11-2.30 | [redacted] |
| 2.31-2.50 | [redacted] |
| >2.50 | [redacted] |

APU Cycle to APU Operating Hour ratios are based on overall fleet average over a twelve (12) month.

As of January 1, 2026, and dependent upon the number of retrofits which have occurred per Attachment E, the 2026 APU Hour Rates will be based on the applicable Scenario as defined in Table 3 of Attachment E.

9. The following paragraph is added to end of Article 7.3 Free of Charge Auxiliary Power United (APU) Support

The Bailment Equipment is for Spirit Airlines' sole use through the term of the maintenance agreement. Spirit Airlines will be responsible for maintenance of the Bailment Equipment, and Honeywell will retain title. Spirit Airlines may position the Bailment Equipment at any location, at its sole discretion. Spirit Airlines shall return a proportional amount of the Bailment Equipment should Spirit Airlines' fleet reduce prior to the termination of the agreement.

10. Article 7.4 is deleted in its entirety and replaced with the following:

7.4 Bailment Equipment
7.4.1 Title Transfer of Bailment Equipment. Honeywell will transfer title to Spirit at the end of the term of the Agreement the youngest five (5) consigned APUs based on Time Since New which have been in the Maintenance Agreement for a minimum of ten (10) years.
7.4.2 Remaining Bailment Equipment. Title and ownership of remaining Bailment Equipment will remain with Honeywell. Following completion of the bailment period, Honeywell offers Spirit a choice of one (1) of the following two (2) options:
(a) Spirit may return to Honeywell the Bailment Equipment in Serviceable Condition with a serviceable tag; or,
(b) Spirit may purchase the Bailment Equipment at the lesser of a [redacted] discount off of the Catalog List/Operator Prices current at the time of purchase or market value as determined by Honeywell Aerospace Trading ("HAT").

11. Article 7.5 Purchase Credits is deleted in its entirety.

12. The following paragraph is added to the end of Article 7.10:

The following not-to-exceed ("NTE") Repair prices will apply exclusive of Abuse, FOD, PMA parts, and DER repairs not approved by Honeywell.

| Service Scope | 2022 NTE Price* |
|---|---|
| Including LLP replacement | $[redacted] |
| Excluding LLP replacement | $[redacted] |

**subject to annual escalation per Attachment B*

13. Article 7.12 and 7.13 are added the Agreement

7.12 APU Spare Discount. Honeywell will provide Spirit with a [redacted] ([redacted]%) percent discount off the Honeywell operator price in effect at the time of delivery for the purchase of a new 131-9A for a quantity of up to [redacted] 131-9A APU spares during the term of the agreement. This discount on up to [redacted] APUs does not include any spare APUs purchased prior to the effective date of this Amendment.
7.13 LRU Spare Discount. Honeywell will provide Spirit with a [redacted] ([redacted]%) percent discount off the Honeywell operator price in effect at the time of delivery for the purchase of APU LRUs which are sold directly by Honeywell listed in Table A-3 of Attachment A, up to a quantity of [redacted] each.

14. Article 11.1 is deleted in its entirety and replaced with the following:

Honeywell will be responsible for all shipping costs incurred in shipping the equipment to and from Honeywell within continental US.

Delivery terms are EXW Honeywell's facility (Incoterms 2010), with the exception that Honeywell is responsible for obtaining the export license and completing all export clearance documents. Spirit Airlines is responsible for all duties, taxes, tariffs, and other charges payable upon export.

15. Article 12. OBSOLESCENCE is deleted in its entirety and replaced with the following:

12.1 Obsolete Equipment. In the event a Product is no longer produced or procured, Honeywell will source, at no cost to Spirit, a suitable replacement. Such replacement shall be made available with no disruption to Spirit's operations. In case such a replacement cannot be sourced, any required re-design of the Product shall be performed, manufactured, and supported at Honeywell's sole expense.

12.2 Product Support. For so long as Spirit shall operate any aircraft with a Product installed thereon, or for at least twenty (20) years of operation measured from the date of the final aircraft delivered to Spirit with the Product(s) installed thereon, Supplier shall make available the following product support services:

a. Suitable spares (including piece parts) in quantities sufficient to meet Spirit's needs for normal repairs, with Supplier maintaining spare parts capability to ensure reasonable reorder lead times and Aircraft on Ground (AOG) support.

b. Product engineering support services as Spirit may request for assistance with operational problems and/or upgrades, operating practices, and analysis of Product performance.

c. Field service representatives and maintenance specialist(s) to advise Spirit on maintenance and operation of the Product.

d. Technical data and documents revisions services, including but not limited to, Service Bulletins for the Product.

For the avoidance of doubt, this section ("Product Support") will survive termination or expiration of this agreement, with the exception of an event as outlined in Section XX, "Force Majeure", or discontinued airworthiness of a component(s) for reasons that are not attributable to a deficiency in the Honeywell component or its design, or if Spirit chooses to remove the Product.

16. INSURANCE is hereby added as Article 18 to the Main Agreement as follows:

a. Supplier shall have sufficient insurance coverage in respect of Injury, death, damage, loss, and third-party general liability arising out of the services performed pursuant to this Agreement.

b. Supplier shall at its own cost and expense without any contribution from the Spirit, procure and maintain in full force and effect during the term of this Agreement policies of insurance of the types and in the minimum amounts, or such higher limit as it may be carried, stated below with responsible and good credit rating insurance carriers, covering all operations of Supplier pursuant to this agreement. Supplier agrees to maintain the following minimum insurance coverage:

| Type of Insurance | Amount |
|---|---|
| Aviation Liability (Including Contractual Liability and Products and Completed Operations Liability, Hangar Keeper's Liability Personal Injury and Public Liability and Umbrella) | [redacted] per loss/occurrence |
| Comprehensive General Liability<br>Automobile Liability | [redacted] (Bodily Injury and/or Property Damage) |
| Workers Compensation Including Waiver of Right to Recover from Others Endorsement (WC 00 0313) where permitted by state law. | Greater of Statutory Limitation or [redacted] bodily injury for each accident and US [redacted] aggregate for bodily injury by disease. |

c. Supplier hereby agrees to include Spirit as an additional insured to the extent of the Supplier's contractual indemnity obligations in its insurance policies, including its Aviation Liability and General Liability Insurance Policy, covering liability risks assumed herein and shall deliver a Certificate of Insurance to Spirit within ten (10) days upon the execution of this Agreement reflecting the above extension of coverage. Supplier will have its insurers issue A Waiver of Subrogation Endorsement on the captioned policies in favor of the Additional Insured. Such insurance shall be primary and non-contributory to any insurance maintained by the Additional Insured.

17. ATTACHMENT A *EQUIPMENT, NCFR and CONSIGNMENT LIST* is deleted in its entirety and replaced with ATTACHMENT A *EQUIPMENT, NCFR and CONSIGNMENT LIST* in this Amendment.

18. ATTACHMENT B *PRICE ESCALATION* is deleted in its entirety and replaced with ATTACHMENT B *PRICE ESCALATION* in this Amendment.

19. The following paragraph of ATTACHMENT E Retrofit Program is added to the end of Article 1 Retrofit Price:

Should Spirit desire to retrofit APUs in years 2024 through 2026, the retrofit price will be escalated per Attachment B of the current agreement with 2020 as the base year pricing. Spirit Airlines may retrofit up to 72 Aircraft under this special retrofit pricing and program.

20. The first paragraph of Article 3, Minimum Commitment, of ATTACHMENT E *Retrofit Program* is deleted in its entirety and replaced with the following:

Spirit intends to retrofit thirty-nine (39) with the option of up to seventy-two (72) Aircraft to Honeywell's model 131-9A auxiliary power units by December 31, 2026. In the event Spirit does not retrofit a minimum of thirty-five (35) Aircraft to the Honeywell 131-9A auxiliary power units by December 31, 2026, Spirit will pay Honeywell an aggregate investment reimbursement fee consisting of:

21. This Amendment is valid for execution by Spirit through February 28, 2022

22. Unless otherwise set forth herein, all other terms and conditions of the Agreement are and remain unchanged. In case of any conflict between a provision in the Main Agreement and a provision in this Amendment, the provision in this Amendment will control.

23. The Main Agreement, as amended hereby, represents the entire agreement and understanding between the parties with respect to the matters contained herein and therein.

The signature of authorized representatives of the parties in the spaces below signifies acceptance to this Amendment, which is incorporated as part of the Main Agreement.

Accepted and agreed to:

**SPIRIT AIRLINES, INC.**

Signature: [redacted]

Name:

Title:

Date: 2/18/22

**HONEYWELL INTERNATIONAL INC.**
acting thro[redacted]

DocuSigned by:

Signature:

Name:

Title:

Date: 22-Feb-2022

**ATTACHMENT A**
**EQUIPMENT, NCFR, AND CONSIGNMENT LIST**

**Table A-1 Equipment List and NCFR**

| Base Part Number | Latest Dash Number | Part Description | Alternate PNs | Test/NCFR Price (2022$)* |
|---|---|---|---|---|
| 3800708 | 3800708-1 | 131-9A APU | | $[redacted] |
| 160494 | 160494-1 | Oil Cooler | | $[redacted] |
| 305766 | 305766-4 | Igniter Plug | | $[redacted] |
| 441921 | 441921-5 | Fuel Control Unit | 70722492-1 or 70722365-2 | $[redacted] |
| 692546 | 692546-4 | Valve, Solenoid | | $[redacted] |
| 2704506 | 2704506-5 | Starter Motor | | $[redacted] |
| 3291238 | 3291238-2 | Surge Control Valve | | $[redacted] |
| 3291432 | 3291432-2 | Load Control Valve | | $[redacted] |
| 3616140 | 3616140-11 | Cooling Fan Assembly | | $[redacted] |
| 3830416 | 3830416-1 | Nozzle - Fuel Injection | | $[redacted] |
| 3860864 | 3860864-1 | Starter Gear Clutch Assembly | | [redacted] |
| 3876132 | 3876132-13 | Ignition Cable Assy | | $[redacted] |
| 3876223 | 3876223-1 | Speed Sensor | | $[redacted] |
| 3876225 | 3876225-2 | Sensor - Inlet Pressure | | $[redacted] |
| 3876226 | 3876226-1 | Sensor - Total Pressure | | $[redacted] |
| 3876227 | 3876227-2 | Sensor - Differential | | $[redacted] |
| 3876255 | 3876255-2 | Switch - Low Oil Press | | $[redacted] |
| 3876271 | 3876271-1 | Exhaust Gas Temperature | | $[redacted] |
| 3876287 | 3876287-1 | Data Memory Module | 304643-1 | $[redacted] |
| 3876330 | 3876330-2 | Switch - Low Oil Level | | $[redacted] |
| 3883830 | 3883830-1 | Tee - Flow Divider | | $[redacted] |
| 3884971 | 3884971-1 | Probe Assy - Total Pressure | | $[redacted] |
| 3886188 | 3886188-3 | Actuator IGV | | $[redacted] |
| 3888058 | 3888058-7 | Exciter Ignition | 3888058-5; 70721353-1 in dev | $[redacted] |
| 3888438 | 3888438-1 | APU Wire Harness | | [redacted] |
| 4131020 | 4131020-4 | Oil Lube Module | | $[redacted] |
| 4141028 | 4141028-4 | De-oil / De-prime Solenoid | | $[redacted] |
| 3888394-221204 | 3888394-221204 | ECB | 3888579-201 and -202 | $[redacted] |

Test for LRUs which are not repairable is included within the respective MSA rates; Replacement of any test only LRUs removed during line maintenance is excluded.
*All prices are subject to escalation in accordance with Attachment B.

**ATTACHMENT A**
**EQUIPMENT, NCFR, AND CONSIGNMENT LIST**

**Table A-2 Consignment/Bailment Equipment Schedule**
**Aircraft deliveries years 2016 through 2022**

| Consignment/Bailment Equipment Schedule | |
|---|---|
| Fleet Size | Consignment Equipment QTY* |
| [redacted] Aircraft | [redacted] |
| [redacted] Aircraft | |
| [redacted] Aircraft | |
| [redacted] Aircraft | |
| [redacted] Aircraft | |

The Parties acknowledge as effective date of this Amendment the consigned APUs and FOC LRUs outlined in Table A-2 have been delivered to Spirit. The consigned APU SNs previously provided are P-6835, P-7739, P-8121, P-9081, and P-4848 and will be extended through the Term of the Agreement.

**Table A-3 Consignment Part Number**
**Aircraft deliveries years 2016 through 2022**

| Part Number | Part Description |
|---|---|
| 3800708-1 | 131-9A APU |
| 160494-X | OIL COOLER |
| 3886188-X | ACTUATOR, IGV |
| 3888058-X | EXCITER IGNITION |
| 4131020-X | OIL LUBE MODULE |
| 441921-X | FUEL CONTROL UNIT |
| 3876287-X | DATA MEMORY MODULE |
| 3888394-221204 | ECB |
| 2704506-X | STARTER MOTOR |
| 3291238-X | VALVE.SURGE CONTROL |
| 3291432-X | VALVE LOAD CONTROL |
| 3616140-X | FAN ASSY,OIL COOLING |

**Table A-4 Consignment Schedule and Part Numbers**
**Aircraft deliveries 2023 through the Term of the Agreement**

| Dash Number* | Part Description |
|---|---|
| 3800708-1** | 131-9A APU |
| 160494-1 | Oil Cooler |
| 70722365-2 | Fuel Control Unit |
| 2704506-5 | Starter Motor |
| 3291238-2 | Surge Control Valve |
| 3291432-2 | Load Control Valve |
| 3616140-11 | Cooling Fan Assembly |
| 3860864-1 | Starter Gear Clutch Assembly |
| 3876287-1 | Data Memory Module |
| 3886188-3 | Actuator IGV |
| 3888058-7 | Exciter Ignition |
| 3888438-1 | APU Wire Harness |
| 3888579-202 | ECB |

* Latest or equivalent part number at time of consignment
** Consigned or Spare APUs are shipped complete with all LRUs installed except the Electronic Control Box (ECB) which is located remotely from the APU.

Honeywell will provide Spirit [redacted] Serviceable consigned 131-9A APU for every [redacted] new Aircraft delivered between 2023 and 2028, up to a maximum of [redacted] APUs for the first [redacted] new Aircraft. Upon delivery of additional optional new Aircraft, Honeywell will provide Spirit with an additional [redacted] consigned 131-9A for every [redacted] new optional Aircraft up to a maximum of [redacted] consigned APUs for up to a total of [redacted] new Aircraft.

Honeywell will provide [redacted]-of-charge serviceable consigned shipset of LRUs for every [redacted] new Aircraft delivered, up to a maximum of [redacted] LRUs listed in Table A-3 above. The consignment of these LRUs is not applicable should Spirit Airlines execute the Component Service Solution (CSS) outlined Attachment F of this Amendment.

**ATTACHMENT B**
**PRICE ADJUSTMENT**

All pricing set forth in this Proposal, exclusive of any allowances, concessions, and deductions, are base prices in the year which the anticipated Agreement is made effective, and will be adjusted on 1 January of each subsequent year during the term hereof, in accordance with the following procedures.

Any annual price escalation will be adjusted per the formula below up to [redacted]. In the event the annual pricing is greater than [redacted], then Honeywell and Spirit will equally share the increase above [redacted] Spirit will not be responsible for any escalation between [redacted]

For example, in the case that the escalation formula computes an escalation of [redacted] percent, the prices would be increased by [redacted]

The escalation formula uses indices published by the US Bureau of Labor Statistics (BLS).

Labor – [redacted] "Labor Index" means National Employment, Hours, and Earnings

[redacted]

Material – [redacted] "Material Index" means Producer Price Index: Commodities

[redacted]

The prices set forth in this Proposal/Agreement will be subject to adjustment for economic fluctuations according to the following:

$P_N$ = $P_C$ X CPI

CPI = $[0.3 (L_C/L_P) + 0.7 (M_C/M_P)]$; if $\leq 1.0$ then no escalation will apply

Where:

| | | |
|---|---|---|
| $P_N$ | = | Escalated price |
| $P_C$ | = | Base price, that is, the rate at the time prior to being escalated |
| $L_C$ | = | Average hourly earnings for Labor Index for the 6-month period ending 30 June of the year prior to the year in which the price is being escalated |
| $L_P$ | = | Average hourly earnings for Labor Index for 6-month period ending 30 June two (2) years prior to the year in which the price is being escalated. For the 2nd year of calculated escalation and beyond, the value of $L_P$ will be equal to the prior year's value of $L_C$ |
| $M_C$ | = | Average value of wholesale prices for Materials Index for the 6-month period ending 30 June one year prior to the year in which the price is being escalated |
| $M_P$ | = | Average value of wholesale prices for Materials Index for the 6-month period ending 30 June two (2) years prior to the year in which the price is being escalated. For the 2nd year of calculated escalation and beyond, the value of $M_P$ will be equal to the prior year's value of $M_C$. |

a. The Composite Price Index (CPI) will be determined to the nearest third decimal place. If the next succeeding place is 5 or more, the preceding decimal place will be raised to the next higher figure. Prices will be rounded to the nearest penny.
b. In determining the adjustment to be added to the base rates, the percentage of adjustment will be calculated to the nearest one-tenth of one percent. If the next succeeding place is 5 or more, the preceding decimal place will be raised to the next higher figure. The value for $P_N$ for a given year will become the value for $P_C$ for the subsequent year.
c. The CPI for a given year as defined above will be the BLS's first published final figures for the applicable period for the two applicable indices. Once established, prices will be firm for deliveries in the applicable year.
d. If any such final figure for any such index has not been published by the BLS at the time required by Honeywell to invoice, Honeywell's estimate of the actual CPI first published final figures for the applicable period will be used to calculate an interim CPI for the applicable rate. Such interim CPI will be used as a substitute for the CPI for such year in the formula set forth above for such orders until the BLS's first published final index is published, whereupon Honeywell will adjust its interim invoice(s) accordingly.
e. If, for any reason, Operator believes Honeywell has incorrectly calculated the escalated price (including but not limited to using the wrong index, BLS change, or a mathematical error), Operator has 2 months from the date the escalated price goes into effect to notify Honeywell of such error and request a credit or Operator waives their right to claim such credit. Any credits issued against this Agreement

will be applicable toward the future purchase of any parts listed in Honeywell's then-current catalog and will expire one (1) calendar year after date of issuance of such credits.

f. In the event the BLS discontinues or alters its methods of calculation of any index used in the above escalation formula, Honeywell will make appropriate adjustments to place the changed indices on a comparable basis with the indices calculated before the change. There shall be no retroactive price adjustments based on the substitute indices.