**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **SPIRIT AVIATION HOLDINGS, INC.,** ***et al.*****,** | **Case No. 25-11897 (SHL)** |
| **Debtors.**[1] | **Jointly Administered** |

**NOTICE OF AUCTION RESULTS AND SCHEDULED HEARING FOR**
**THE DEIDENTIFIED DATA**

**PLEASE TAKE NOTICE** that the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York (the "**Court**") on August 29, 2025.

**PLEASE TAKE FURTHER NOTICE** that on June 22, 2026, the Court entered the *Order (I)(A) Approving Bidding Procedures for Sale of the Debtors' Assets, (B) Authorizing the Potential Selection of Stalking Horse Bidder(s), (C) Approving Bid Protections, (D) Scheduling Auction(s) for, and Hearing(s) to Approve, the Sale of the Debtors' Assets, (E) Approving the Form and Manner of Notices of Sale, Auction(s), and Sale Hearing(s), and (F) Approving the Assumption and Assignment Procedures* [ECF No. 1213] (the "**Bidding Procedures Order**")[2] by which the Court, among other things, approved procedures (the "**Bidding Procedures**") to be used in connection with one or more transfers of the Debtors' assets free and clear of all liens, claims, encumbrances, and other interests.

**PLEASE TAKE FURTHER NOTICE** that, in accordance with the Bidding Procedures and the Bidding Procedures Order, the Debtors conducted a virtual Auction with respect to the Deidentified Data on **Friday, August 14, 2026**.

**PLEASE TAKE FURTHER NOTICE** that, at the Auction, the Debtors (after consulting with the Consultation Parties) selected the following bid from Google LLC (the "**Successful Bidder**") as the highest and best bid (the "**Successful Bid**") and the following bid from Mercor.io Corporation (the "**Alternate Bidder**") as the Alternate Bid, subject to entry of an order by the Court (the "**Order**") approving the transaction with the Successful Bidder (or, if the Successful Bidder fails to consummate the transactions in accordance with the Bidding Procedures, the Alternate Bidder).

---

[1] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

[2] Capitalized terms used but not defined herein are defined in the Bidding Procedures Order.

| Successful Bidder | Alternate Bidder |
|---|---|
| Google LLC<br>Total Consideration (USD): $10,000,000 | Mercor.io Corporation<br>Total Consideration (USD): $7,500,000 |

**PLEASE TAKE FURTHER NOTICE** that the form of the sale agreement (the "**Sale Agreement**") in connection with the Successful Bid for the Deidentified Data is attached hereto as Exhibit A.

**PLEASE TAKE FURTHER NOTICE** that the form of the sale agreement (the "**Alternate Sale Agreement**") in connection with the Alternate Bid for the Deidentified Data is attached hereto as Exhibit B.

**PLEASE TAKE FURTHER NOTICE** that a hearing to consider approval of the sale of the Deidentified Data to the Successful Bidder (the "**Hearing**") is scheduled for **11:00 a.m. on August 19, 2026**[3] before the Honorable Sean H. Lane, United States Bankruptcy Judge, in the United States Bankruptcy Court for the Southern District of New York.

**PLEASE TAKE FURTHER NOTICE** that the Hearing will be conducted via Zoom for Government. Parties wishing to appear at or attend the Hearing (whether "live" or "listen only") are required to register their appearance at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl by **11:00 a.m. on August 18, 2026**. Instructions and additional information about the Court's remote attendance procedures can be found at https://www.nysb.uscourts.gov/ecourt-appearances. The Court will circulate by email the Zoom link to the Hearing to those parties who properly made an electronic appearance prior to the Hearing.

**PLEASE TAKE FURTHER NOTICE** that the Hearing may be continued or adjourned from time to time by an announcement of the adjourned date or dates at the Hearing or a later hearing or by filing a notice with the Court.

**PLEASE TAKE FURTHER NOTICE** that responses or objections to the relief requested at the Hearing shall be (a) in writing, in English, and in text-searchable format, (b) filed with the Court electronically, and (c) served on the Debtors and the Sale Notice Parties (as defined in the Motion) so as to be received no later than **4:00 p.m. on August 17, 2026** (the "**Objection Deadline**"), in each case, in accordance with the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), the Court's *Order Implementing Certain Notice and Case Management Procedures* [ECF No. 61], and the Court's Chambers' Rules (available at https://www.nysb.uscourts.gov/content/judge-sean-h-lane), to the extent applicable.

[3] All times herein are expressed in prevailing Eastern Time.

**PLEASE TAKE FURTHER NOTICE** that all objecting parties are required to attend the Hearing, and failure to appear may result in relief being granted upon default.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bidding Procedures Order, the Bidding Procedures, this notice, and all other documents publicly filed with the Court can be accessed free at https://dm.epiq11.com/SpiritAirlines.

*[Remainder of page intentionally left blank]*

Dated: August 14, 2026
New York, New York

DAVIS POLK & WARDWELL LLP

By: *_/s/ Darren S. Klein_*
450 Lexington Avenue
New York, NY 10017
Tel.: (212) 450-4000
Marshall S. Huebner
Darren S. Klein
Christopher S. Robertson

*Counsel to the Debtors and Debtors in Possession*

# Exhibit A

## Sale Agreement

# BILL OF SALE

This Bill of Sale (this "**Agreement**") is entered into as of [●], 2026, by and among Google LLC, a Delaware limited liability company ("**Buyer**"), and Spirit Airlines, LLC, a Delaware limited liability company (together with each of its affiliated debtors and debtors-in-possession in the Bankruptcy Cases, collectively, the "**Seller**"). Buyer and the Seller are sometimes referred to herein collectively as the "**Parties**" and individually as a "**Party**."

WHEREAS, on August 29, 2025, Spirit Airlines, LLC and its affiliates each commenced voluntary cases (the "**Bankruptcy Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, Buyer has agreed to purchase from the Seller, and the Seller has agreed to sell to Buyer, all of the Assets (as defined below), free and clear of all liens, claims, encumbrances and other interests of any kind (collectively, "**Claims**"), upon the terms and subject to the conditions set forth in this Agreement (collectively, the "**Transaction**");

WHEREAS, the Parties intend to effectuate the Transaction through a sale of the Assets pursuant to section 363 of the Bankruptcy Code and the authorization granted by the Bankruptcy Court pursuant to the Wind Down Order[1] and/or the Bidding Procedures Order,[2] as applicable; and

WHEREAS, Buyer and the Seller now desire to consummate the Transaction as set forth herein by the execution and delivery of this Agreement in order to give immediate effect thereto.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

---

[1] "**Wind Down Order**" means the *Order (I) Authorizing the Debtors to Wind Down Operations, (II) Approving the Debtors' Use of Cash Collateral and Amendments to the DIP Credit Agreement and Final DIP Order, (III) Authorizing Modification or Termination of the Debtors' Employee Programs, (IV) Approving Wind-Down Incentive and Retention Plan, (V) Approving Modification of Contract Rejection Procedures, (VI) Approving Non-Fleet Assets Sale Procedures, (VII) Approving Non-Fleet Assets Abandonment Procedures, (VIII) Approving the Use of Certain Third-Party Contractors, (IX) Approving Protections for Certain Persons Implementing the Wind-Down, (X) Enforcing an Administrative Stay, (XI) Authorizing the Preemption of Applicable Laws and Ordinances for the Debtors to Effectuate the Wind-Down, (XII) Authorizing the Debtors to Take Any and All Actions Necessary to Implement the Wind-Down, and (XIII) Granting Related Relief* [ECF No. 1048].

[2] "**Bidding Procedures Order**" means the *Order (I)(A) Approving Bidding Procedures for Sale of the Debtors' Assets, (B) Authorizing the Potential Selection of Stalking Horse Bidder(s), (C) Approving Bid Protections, (D) Scheduling Auction(s) for, and Hearing(s) to Approve, the Sale of the Debtors' Assets, (E) Approving the Form and Manner of Notices of Sale, Auction(s), and Sale Hearing(s), and (F) Approving the Assumption and Assignment Procedures, and (II) Granting Related Relief* [ECF No. 1213].

Section 1. *Asset Transfer*.

(a) The Seller hereby irrevocably sells, assigns, transfers and conveys to Buyer, and Buyer hereby purchases, acquires and takes assignment from the Seller of, all of the Seller's right, title and interest in, to and under all of the assets set forth on **<u>Exhibit A</u>** hereto (the "**Assets**") for an aggregate purchase price equal to Ten Million U.S. Dollars ($10,000,000.00) (the "**Purchase Price**"), with delivery of the Assets to be made in deidentified form in accordance with <u>Section 1(a)(ii)</u> following, and in no event prior to, the satisfaction (or waiver) of the conditions set forth in <u>Section 3</u>; *provided that*:

(i) it is the express intention of the Parties that the Assets *shall not* include information that relates to, describes, or is reasonably capable of being associated with a consumer or is otherwise considered "personal data", "personal information", "nonpublic personal information" or other similar term under applicable data protection laws (such information, "**Personal Data**," *provided that*, for the avoidance of doubt, the definition of Personal Data does not include Deidentified Data (as defined below));

(ii) prior to the transfer of the Assets to Buyer, the Seller shall first deliver, at Buyer's direction, all or a portion of the data set forth in **<u>Exhibit A</u>** to one or more third parties acceptable to or designated by Buyer (such a third party, a "**Deidentification Agent**") in order to: (A) take reasonable measures as set forth in <u>Section 3(c)</u> below to remove or transform certain data elements such that the data cannot be associated with, reasonably used to infer information about, or otherwise linked to, a particular consumer (such transformed data, "**Deidentified Data**," and the process of such transformation, "**Deidentification**" or "**Deidentifying**"); and (B) migrate such data in a format that is reasonably acceptable to Buyer for further delivery to Buyer;

(iii) Buyer shall be solely responsible for any and all costs and expenses incurred in connection with Deidentifying the Assets in accordance with <u>Section 1(a)(ii)</u>; *provided that*, for the avoidance of doubt, any such costs and expenses shall not reduce the amount of the Purchase Price; and

(iv) delivery of the Assets by the Seller to Buyer, or by a Deidentification Agent to Buyer, as applicable, in deidentified form consistent with <u>Section 3(c)Section 3</u>, shall be deemed delivery by the Seller to Buyer for all purposes of this Agreement.

(b) Notwithstanding anything herein to the contrary:

(i) The Assets shall not include any communications, documents, or other information protected by any attorney-client privilege, work product or similar protection (the foregoing items, "**Privileged Materials**"). To the extent that, following the transfer of the Assets, the Seller determines that the transferred Assets contain any Privileged Materials inadvertently transferred or not removed by the Seller prior to the transfer of the Assets to Buyer: (A) this Agreement or

such transfer of such Privileged Materials to Buyer shall not result in the loss of any attorney-client privilege, work product or other similar protection; and such protections shall continue to belong solely to, and will solely be controlled by, the Seller (and Buyer shall not assert otherwise); (B) the Seller shall notify Buyer of such inadvertent transfer or failure to remove such Privileged Materials; and (C) Buyer shall return to the Seller or destroy (at the Seller's election) such identified Privileged Materials promptly following Buyer's receipt of such notice (it being understood that any such destruction will conform to the requirements set forth in the Confidentiality Agreement dated as of June 18, 2026 between Buyer and Spirit Aviation Holdings, Inc.).

(ii) The Seller shall have the right to retain copies of any and all data included in the Assets solely for purposes of winding down the Seller's business or complying with applicable law or statutory requirements in connection therewith. For the avoidance of doubt, the Seller shall not sell, assign or transfer the Assets or any interest in the Assets to any purchaser other than Buyer or to any other third-party, and shall not use the Assets for any commercial or other purpose than the administration of the winding down of the Seller's business or compliance with applicable law or statutory requirements; *provided* that the Seller may sell its customer data list, which includes individual traveler spend aggregated by year, to third-parties in hospitality or travel industries.

(c) Buyer publicly commits (i) to maintain and use the Deidentified Data in deidentified form, and (ii) that it will not intentionally associate the Deidentified Data with any person or household. If Buyer has not made such a commitment in a broadly accessible public document (*e.g.*, Buyer's publicly posted privacy notice), Buyer acknowledges and agrees that the commitments, representations, warranties and agreements made through this Agreement constitute a public commitment as required under applicable data protection laws. For the avoidance of doubt, Buyer shall have the right to transfer Deidentified Data to third parties, *provided* that Buyer contractually obligates such transferees to comply with the provisions of this Section 1(c).

Section 2. *Payment of Purchase Price*. Contemporaneously with the delivery of the Assets to Buyer in accordance with Section 1, Buyer shall deliver the Purchase Price in immediately available funds by transfer to the account of the Seller set forth on **Exhibit B** hereto.

Section 3. *Conditions Precedent*. The respective obligations of each Party to consummate the Transaction are subject to the satisfaction (or waiver by the Parties) of the following conditions:

(a) receipt of duly executed signature pages from each Party;

(b) the requisite Bankruptcy Court approval for consummation of the Transaction shall have been obtained, including, without limitation, (i) the entry of an order of the Bankruptcy Court approving the sale and the transfer of the Assets (the "**Sale**

**Order**") or (ii) the expiration of any applicable notice period (if any) under the Wind Down Order;

(c) each designated Deidentification Agent (or the Seller, to the extent any Assets are transferred directly by the Seller to Buyer) shall have certified to Buyer's reasonable satisfaction that the Assets have been deidentified in accordance with applicable laws (including, to the extent applicable to U.S. consumers, using the standard for de-identification set forth under the California Consumer Privacy Act, as amended, regardless of whether such statute does, or does not, apply to the Assets, and for any "protected health information" or other consumer health-related data, using the standard for de-identification set forth under 45 C.F.R. § 164.514) and prevailing industry standards for data deidentification, in each case, while preserving referential integrity across the data set;

(d) the Assets are capable of being transferred to Buyer in the format and manner specified on **Exhibit A** hereto; and

(e) except for the Deidentification process described in clause (c) above, no portion of the Assets has been deleted, modified or removed other than (i) in the ordinary course of business consistent with the Seller's past practice, and (ii) *de minimis* amounts of data removed by the Seller as reasonably necessary to preserve the Seller's attorney-client privilege, work product or other similar protections.

Section 4. *Further Assurances*. Each of the Parties shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things, reasonably necessary, proper or advisable under applicable laws, regulations and agreements or otherwise to consummate and make effective the transactions contemplated by this Agreement. Without limiting the generality of the foregoing, the Seller shall (a) execute and deliver any instruments of conveyance, bills of sale, assignments or other documents reasonably requested by Buyer to effectuate the transfer of the Assets free and clear of all Claims; (b) at Buyer's expense, cooperate with Buyer in good faith and use commercially reasonable efforts to assist Buyer in obtaining possession and control of the Assets, including, without limitation, any credentials or access keys necessary for Buyer's use of the Assets (if any); and (c) provide Buyer with a reasonable opportunity to review and comment on the Deidentification process (whether conducted by the Seller or any Deidentification Agent) and give good faith consideration to Buyer's comments to ensure the Deidentification process is reasonably satisfactory to Buyer; *provided*, that if any data or proprietary software, computer program or application set forth on **Exhibit A** hereto is not in the possession or control of Buyer as of the execution and delivery hereof, the Seller shall use commercially reasonable efforts to obtain possession or control of, and deliver or cause to be delivered to Buyer, such data or proprietary software, computer program or application as promptly as reasonably practicable following receipt of such request.

Section 5. *Assignment and Assumption of Contracts*. Notwithstanding anything to the contrary in this Agreement, no contracts, agreements, licenses or other arrangements of the Seller shall be assumed by or assigned to Buyer pursuant to this Agreement or the

transactions contemplated hereby, and Buyer shall have no liability or obligation with respect to any such contracts, agreements, licenses or other arrangements.

Section 6. *Representations and Warranties*. The Seller represents and warrants to Buyer that:

(a) the Seller is the sole and exclusive owner of the Assets and has good and valid title to, and the full right to sell, assign, transfer, convey and deliver, the Assets, free and clear of all Claims;

(b) the Seller has all requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby, and no further consents or approvals are required for the Seller to consummate the Transaction, except as otherwise set forth herein or in connection with the Bankruptcy Cases;

*provided*, *however*, that the representations and warranties of the Seller contained in this Section 6 are made as of the date hereof and again as of the date of delivery of the Assets, and shall not survive the consummation of the Transaction in accordance with the terms and conditions set forth in Section 1, Section 2 and Section 3; *provided*, *further*, that notwithstanding anything in this Agreement to the contrary (including Section 7), nothing in this Agreement shall limit, waive or release any claim based on fraud.

Section 7. *Disclaimers*. BUYER ACKNOWLEDGES AND AGREES THAT THE SELLER IS CONVEYING THE ASSETS WITHOUT REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED AT COMMON LAW, BY STATUTE, OR OTHERWISE (ALL OF WHICH THE SELLER HEREBY DISCLAIMS), RELATING TO (a) THE MERCHANTABILITY, DESIGN, OR QUALITY OF ASSETS, (b) THE FITNESS OF THE ASSETS FOR ANY PARTICULAR PURPOSE, (c) NON-INFRINGEMENT, (d) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE OR COMMUNICATED TO BUYER OR ITS AFFILIATES, OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO OR (e) ANY OTHER MATTER WHATSOEVER (INCLUDING THE ACCURACY OR COMPLETENESS OF ANY INFORMATION PROVIDED TO BUYER), IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES THAT BUYER WILL BE DEEMED TO BE OBTAINING THE ASSETS IN THEIR PRESENT STATUS, CONDITION AND STATE OF REPAIR, "AS IS" AND "WHERE IS" WITH ALL FAULTS AND THAT BUYER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS AS BUYER DEEMS APPROPRIATE AND BUYER IRREVOCABLY WAIVES ANY AND ALL CLAIMS IT MAY HAVE AGAINST THE SELLER OR ANY AFFILIATE OF THE SELLER ASSOCIATED WITH THE ASSETS.

Section 8. *Notices*. All notices, waivers and other communications under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered by hand (with written confirmation of receipt), (b) when sent by email (with read

receipt received), (c) one business day following the day sent by overnight courier (with written confirmation of receipt), or (d) when received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses and representatives (if applicable) set forth below (or to such other addresses and representatives as a Party may designate by notice to the other Parties):

(i) If to the Seller, then to:

Spirit Airlines, LLC
1731 Radiant Drive
Dania Beach, FL 33004
Attn: legaldepartment@spirit.com

and

PJT Partners LP
280 Park Avenue
New York, New York 10017
Attn: soar_asset_sales@pjtpartners.com

with a copy (which will not constitute notice) to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attn: Marshall S. Huebner (marshall.huebner@davispolk.com)
Darren S. Klein (darren.klein@davispolk.com)
Christopher S. Robertson (christopher.robertson@davispolk.com)
Joseph W. Brown (joseph.w.brown@davispolk.com)

(ii) If to Buyer:

Google LLC
1600 Amphitheatre Parkway
Mountain View, CA 94043
Attn: M&A Legal
E-mail: ma-notice@google.com

with a copy (which will not constitute notice) to:

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
Attn: Sean O'Neal (soneal@cgsh.com)
Glenn McGrory (gmcgrory@cgsh.com)

Charles Allen (callen@cgsh.com)

Section 9. *Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver*.

(a) Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement will be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto.

(b) Without limitation of any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes, which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such proceeding; *provided* that, if the Bankruptcy Cases are closed pursuant to Section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York or any New York state court located in the Borough of Manhattan, New York, New York, and any appellate court from any thereof for the resolution of any such claim or dispute. The Parties each hereby irrevocably waive, to the fullest extent permitted by applicable laws, the defense of an inconvenient forum to the maintenance of any such Proceeding. The Parties each consent to service of process by mail (in accordance with <u>Section 8</u>) or any other manner permitted by law.

(c) THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF ANY PARTY OR SUCH PARTY'S REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

Section 10. *Headings*. The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

Section 11. *Counterparts*. This Agreement may be executed in one (1) or more counterparts, each of which will be deemed to be an original of this Agreement and all of which, when taken together, will constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by email attachment will be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

Section 12. *Miscellaneous*. The terms and provisions of this Agreement are intended solely for the benefit of the Parties and their respective successors and assigns, and nothing in this Agreement is intended or shall be construed to give any other person any legal or equitable right, remedy or claim under, or in respect of, this Agreement or any provision contained herein. This Agreement will inure to the benefit of and bind the respective successors and assigns of the Parties. This Agreement may be terminated, amended or modified, and any of the terms, covenants or conditions hereof may be waived, only by a writing signed by each of the Parties or, in the case of a waiver, by the Party or Parties waiving compliance. Each term and provision of this Agreement is intended to be severable, and if any term or provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable for any reason whatsoever, that term or provision shall be ineffectual and void and the validity of the remainder of this Agreement shall not be adversely affected thereby. Each of the Parties has been represented by its own counsel and acknowledges that it has participated in the drafting of this Agreement, and any applicable rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not be applied in connection with the construction or interpretation of this Agreement.

[*Remainder of this page is intentionally left blank*]

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties herein have executed this Bill of Sale as of the date set forth in the first paragraph hereof.

BUYER:

GOOGLE LLC

By: ______________________________
Name:
Title:

THE SELLER:

[SPIRIT AIRLINES, LLC]

By: ______________________________
Name:
Title:

# EXHIBIT A

Assets

All of the Seller's right, title and interest in, to and under the following:

1. All data consisting of (i) productivity and collaboration data (including, without limitation, email data, calendar data, chat, collaboration and messaging data, documents, presentations, spreadsheets, knowledge repositories and wikis); (ii) core business systems and business applications data (including, without limitation, employee behavior and productivity data, revenue and yield management (inventory) data and aircraft operations and logistics); and (iii) workflow and process data (including, without limitation, marketing data (*e.g.*, campaigns, content and demand generation data), support, HR and legacy operations data, strategy and operations and project management data, transaction data, revenue accounting or financial data (e.g., analyst workflows, audits and corporate finance and fraud data)), in each case of the foregoing (i)-(iii), together with all related documentation, including without limitation the data designated as "Included" in the schedule of assets attached to this Exhibit A (the "**Assets Schedule**") but excluding the data designated as "Not Included" in the Assets Schedule.

2. All software, computer programs and applications owned by the Seller that have been developed by the Seller, including, without limitation, all associated source code, object code, architecture, software models, plugins, data files, algorithms, libraries, compilers, subroutines, tools and APIs, as well as all data and documentation relating to the development, use, operation and maintenance of such software, computer programs and applications (including, without limitation, technical specifications, user manuals, training materials and system documentation).

For the avoidance of doubt and notwithstanding anything to the contrary:

3. Pursuant to Section 1(a) of the Agreement, the Assets shall not include any Personal Data (it being understood that, accordingly, the Assets shall not include the Seller's customer list).

4. Pursuant to Section 1(b) of the Agreement, the Assets shall not include any Privileged Materials.

**Assets Schedule**

| SPIRIT DATA CATEGORIES | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Category / Description** | | **Spirit/SAAS** | **Metric** | **Volume** | **Age** | **System** | **Google's Data Purchase Request** | **Data Format** |
| **Customer Behavior** | **Classification** | | | | | | Not Included | **For Microsoft 365 Data:** Retain and transfer all emails, OneDrive, SharePoint, and Teams data within the native Microsoft 365 environment.<br><br>**For Non-Microsoft 365 Document Data (e.g., SAP, Navitaire, UKG):** Export and share in standard, easily restorable, and machine-readable formats (such as CSV, JSON, or native SQL dumps). |
| Customer Insights | | Spirit | | | From 5/2017 | Navitaire | Not Included | |
| Customer Profiles | Customer Data | | Passengers | 97,500,000 | | | Not Included | |
| Loyalty | | Spirit | | | From 12/2020 | Navitaire Loyalty | Not Included | |
| Savers Club | Customer Data | | Members | 2,200,000 | | | Not Included | |
| Free Spirit Members | Customer Data | | Members | 50,200,000 | | | Not Included | |
| Total Earned Miles | Customer Data | | Miles | 44,000,000 | | | Not Included | |
| CC Holders | Customer Data | | Members | 740,000 | | | Not Included | |
| BOA CC Members | Customer Data | | Members | 70%* | | | Not Included | |
| Email Behavior | | Spirit | | | From 10/2024 | Oracle Reponsys | Not Included | |
| Active Email Addresses | Customer Data | | Addresses | 13,700,000 | | | Not Included | |
| Email Activity | Customer Data | | Campaigns YTD | 2,700 | | | Not Included | |
| Social Media | Customer Data | Spirit | Posts | | From 3/2022 | Sprinklr | Not Included | |
| Surveys | | Spirit | | | From 12/2023 | Qualtrics/Popplo | Not Included | |
| Brand Tracker Survey | Customer Data | | Surveys Taken | 1,650 | | | Not Included | |
| Post-Purchase Survey | Customer Data | | Surveys Taken | 1,446,033 | | | Not Included | |
| NPS | | | | | | | Not Included | |
| GSAT (Airport, Call Center, ect) | | | | | | | Not Included | |
| Chat | Customer Data | Spirit | | | From 1/2024 | Quiq | Not Included | |
| Handled Chat Sessions | | | Sessions | 15,784,473 | | | Not Included | |
| Calls | Customer Data | Spirit | | | From 1/2021 | Calabrio/Cresta | Not Included | |
| Handled Calls | | | Call Recordings | 30,865,471 | | | Not Included | |
| Phone Numbers | | Spirit | Telephone numbers | 7,341,857 | | | Not Included | |
| **eCommerce** | | | | | | | Not Included | |
| Website Analytics | Customer Data | Spirit | | | From 7/2024 | GA4/DataBricks | Not Included | |
| Unique Users | | | YTD | 43,117,864 | | | Not Included | |
| Searches | | | YTD | 41,414,953 | | | Not Included | |
| Purchases | | | YTD | 2,418,201 | | | Not Included | |
| **Finance & Accounting** | | | | | | | Included | |
| AP & Vendor information | Business Systems | Spirit | Vendor ID | 97,603 | | SAP | Included | |
| | | | | | | | Included | |
| Invoice and PO Information | Business Systems | Spirit | | | From 1/2019 | Coupa | Included | |
| Invoices | | | Documents | 851,590 | | | Included | |
| Revenue Accounting | Business Systems | Spirit | | | | SAP | Included | |
| Cost Accounting | Business Systems | Spirit | | 1,849,736 | | SAP | Included | |
| Treasury | Business Systems | Spirit | | | | SAP | Included | |
| Financial models/forecasting files | | | | | | | Included | |
| Presentations related to a range of topics, including capital projects, budget walkthroughs, BOD approvals, and BOD financial updates | | | | | | | Included | |
| Corp Dev documents (Deal pipelines, company and industry analyses, data room materials, DD review reports, investment committee reports, lender materials; m&A fairness opinions etc.) | | | | | | | Included | |
| **Ops** | | | | | | | Included | |
| Airline Operations (Movement Manager) | Business Systems | Spirit | | | From 4/2023 | Movement Manager | Included | |
| Spirit Flights | | | Flights Flown | 763,391 | | | Included | |
| Airline Operations Benchmark (OA) | Business Systems | Spirit | | | From 1/2017 | MAS | Included | |
| Flown Stats (MAS) | | | Flight Count | 74,163,945 | | | Included | |
| Scheduled Flights (Airline Data) | | | Flight Count | 57,362,400 | | | Included | |
| Crew Base | | | Number of Crew | 4,600 | | | Included | |
| Crew Pairing Information | Business Systems | Spirit | | | From 1/2021 | CrewTrac | Included | |
| Pairings | | | Count | 5,014,676 | | | Included | |
| IROP (ITS) | Business Systems | Spirit | Reaccooms | 3,000,347,472 | From 2/2018 | ITS | Included | |
| | | | | | | | Included | |
| MRO | Business Systems | Spirit | | | | TRAX | Included | |
| Parts Received | | | Parts | 787,452 | | | Included | |
| Scheduled Tasks | | | Tasks | 459,828 | | | Included | |
| Parts Transferred | | | Transfers | 313,646 | | | Included | |
| Fuel Data | Business Systems | Spirit | FuelSlips | 1,239,196 | From 6/2021 | SkyMetrix | Included | |
| | | | | | | | Included | |
| **Customer/DOT** | | | | | | | Not Included | |
| Disability | Regulatory | Spirit | | | From 7/2023 | Navitaire | Not Included | |
| Disability SSRs | | | SSRs | 2,491,715 | | | Not Included | |
| DOT Complaints | | | Complaints | 7,790 | | | Not Included | |
| MBR | Regulatory | Spirit | | | From 3/2025 | Netracer | Not Included | |
| DOT Complaints | | | Complaints | 338,531 | | | Not Included | |
| | | | | | | | Not Included | |
| Denied Boarding | Regulatory | Spirit | | | From 1/2024 | Custom spirit app | Not Included | |
| | | | | | | | Not Included | |
| Guest Complaints/Comments (Dynamics) | Regulatory | SaaS | | | From | Dynamics | Not Included | |
| | | | | | | | Not Included | |
| **Revenue** | | | | | | | Included | |
| Pricing | Business Systems | Spirit | | | | Navitaire | Included | |
| Base Fare (PROS) | | | Count | 24,510,638 | From 7/2025 | | Included | |
| Booking Curve | Business Systems | Spirit | | | From 1/2023 | Navitaire/Kambr | Included | |
| Farebasis Observations | | | Count | 3,530,769,431 | | | Included | |
| Base Fare Pricing Competitor (Infare) | Business Systems | Spirit | | | From 1/2021 | Infare | Included | |
| Flight Observations | | | Count | 7,250,630,887 | | | Included | |
| Packages | Business Systems | Spirit | | | From | Priceline | Included | |
| Hotel | | | Count | 56,517 | | | Included | |
| Car | | | Count | 231,049 | | | Included | |
| On Board Purchasing | Business Systems | Spirit | | | From 10/2021 | Retail in Motion | Included | |
| Purchases | | | Count | 29,000,147 | | | Included | |
| Revenue Data | Business Systems | Spirit | | | From 5/2008 | Navitaire | Included | |
| PNRs (confirmation) | | | Count | 190,312,864 | | | Included | |
| Transactions | | | Count | 7,510,221,520 | | | Included | |
| Elavon | Business Systems | Spirit | | | From 12/2022 | Elavon | Included | |
| Transactions | | | Count | 78,432,834 | | | Included | |
| Wifi Sales | Business Systems | Spirit | | | From 10/2021 | Thales | Included | |
| Inflight Purchases | | | Wifi Codes | 6,064,052 | | | Included | |
| Advanced Purchases | | | Wifi Codes | 5,118,977 | | | Included | |
| | | | | | | | Included | |
| Refunds | Business Systems | Spirit | | | From 3/2020 | Navitaire | Included | |
| Issued Refunds | | | Count | 9,292,480 | | | Included | |
| Credit Shells | Business Systems | Spirit | | | From 3/2020 | Navitaire | Included | |
| Issued Credit Shells | | | Count | 18,244,428 | | | Included | |
| Vouchers | Business Systems | Spirit | | | From 3/2009 | Navitaire | Included | |
| Issued Vouchers | | | Count | 12,139,319 | | | Included | |
| **Team Member** | | | | | | | Included | |
| Time Card Information | | Sprit/SaaS | Count | 1,092,000 | From 12/2012 | Kronos | Included | |
| | | | | | | | Included | |
| Employee Data | Business Systems | Spirit | | | From 8/1986 | UKG | Included | |
| Employee Records | | | Employees | 175,658 | | | Included | |
| Cobus | Business Systems | SaaS | | | | | Included | |
| Employee Business Travel Records | | | Travel Requests | | | Custom App | Included | |
| Concur | Business Systems | | | | | Concur | Included | |
| | | | | | | | Included | |
| Training | Business Systems | | | | | | Included | |
| Corporate Employee Training Records | | SaaS | EmployeeTrainings | | | SumTotal | Included | |
| Crew Training Records | | | Crew Trainings | | | Mint | Included | |
| iCims | Business Systems | | | | | Icims | Included | |
| **Documents** | | | | | | | Included | |
| Payroll Records | Regulatory | Spirit | Count | 3,426,618 | From 6/2016 | UKG | Included | |
| | | | | | | | Included | |
| Employee Tax Forms | Regulatory | Spirit | Count | 148,018 | From 6/2016 | UKG | Included | |
| | | | | | | | Included | |
| Employee Documents | Productivity | Spirit | | | From 2018 | Microsoft | Included | |
| Emails | | | Count | 100,000,000 | | | Included | |
| Email Accounts | | | Count | 80,000 | | | Included | |
| OneDrive | | | Count | 17,082,644 | | | Included | |
| Sharepoint | | | Count | 20,577,677 | | | Included | |
| Teams | | | Count | 500,000,000 | | | Included | |
| IT Tickets | Productivity | Spirit | Count | 667,563 | | Service Now | Included | |
| Incorporation Documents | Regulatory | Spirit | Count | | From Jan 2023 | Sharpoint/OneDrive | Included | |
| | | | | | | | Included | |
| Corporate Tax Documents | Regulatory | Spirit | Count | 500 | From Jan 2023 | Sharpoint/OneDrive | Included | |
| | | | | | | | Included | |
| **Code Data** | | | | | | | Included | - Bare Git repositories or Git bundle files for repository content (one zipfile per repo containing the output of "git clone" on the repo)<br>- JSONL for metadata (commits, PRs, Issues, comments). |
| Source code repos: web, mobile, and backend | | | | 516 repos; ~30M Lines of Code | | | Included | |
| Pull Request & Merged Pull Request (including metadata such as descriptions, comments, and review threads) | | | | 43,170 | | | Included | |
| Commit History: Full git history including commit messages, diffs, author info, and timestamps. | | | | 372,585 | | | Included | |
| Issues: Bug reports/issues and associated discussion threads | | | | | | | Included | |
| Test & Build Artifacts: Continuous Integration/Continuous Deployment (CI/CD) pipeline logs, automated test execution results, and code coverage reports | | | | | | | Included | |
| **Legal Data** | | | | | | | Included | |
| Legal Forms & Templates | | | | | | | Included | |
| Legal Memos & Policies (including product counsel or IP counsel reviews to business docs etc.) | | | | | | | Included | |
| Litigation Case Files | | | | | | | Included | |
| Agreements/ Templates incl. redlined or versioning "draft to final contract" histories | | | | | | | Included | **Preferred format:** .pdfs or .JSON files |
| - Commercial Agreements (e.g.. Licenses, Master Service Agreements) | | | | | | | Included | |
| - M&A contracts (e.g., Sales Purchase Agremeents, Asset Purchase Agreements) | | | | | | | Included | |
| - Employeement Contracts (e.g., NDAs, Invention Assignment Agreements) | | | | | | | Included | |

# EXHIBIT B

The Seller Wire Instructions

[To be provided]

# **Exhibit B**

## **Alternate Sale Agreement**

# BILL OF SALE

This Bill of Sale (this "**Agreement**") is entered into as of [●], 2026, by and among Mercor.io Corporation, a Delaware corporation ("**Buyer**"), and Spirit Airlines, LLC, a Delaware limited liability company (together with each of its affiliated debtors and debtors-in-possession in the Bankruptcy Cases, collectively, the "**Seller**"). Buyer and the Seller are sometimes referred to herein collectively as the "**Parties**" and individually as a "**Party**."

WHEREAS, on August 29, 2025, the Seller and its affiliates each commenced voluntary cases (the "**Bankruptcy Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**");

WHEREAS, Buyer has agreed to purchase from the Seller, and the Seller has agreed to sell to Buyer, all of the Assets (as defined below), free and clear of all liens, claims, encumbrances and other interests of any kind (collectively, "**Claims**"), upon the terms and subject to the conditions set forth in this Agreement (collectively, the "**Transaction**");

WHEREAS, the Parties intend to effectuate the Transaction through a sale of the Assets pursuant to section 363 of the Bankruptcy Code and the authorization granted by the Bankruptcy Court pursuant to the Wind Down Order[1] and/or the Bidding Procedures Order,[2] as applicable; and

WHEREAS, Buyer and the Seller now desire to consummate the Transaction as set forth herein by the execution and delivery of this Agreement in order to give immediate effect thereto.

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

---

[1] "**Wind Down Order**" means the *Order (I) Authorizing the Debtors to Wind Down Operations, (II) Approving the Debtors' Use of Cash Collateral and Amendments to the DIP Credit Agreement and Final DIP Order, (III) Authorizing Modification or Termination of the Debtors' Employee Programs, (IV) Approving Wind-Down Incentive and Retention Plan, (V) Approving Modification of Contract Rejection Procedures, (VI) Approving Non-Fleet Assets Sale Procedures, (VII) Approving Non-Fleet Assets Abandonment Procedures, (VIII) Approving the Use of Certain Third-Party Contractors, (IX) Approving Protections for Certain Persons Implementing the Wind-Down, (X) Enforcing an Administrative Stay, (XI) Authorizing the Preemption of Applicable Laws and Ordinances for the Debtors to Effectuate the Wind-Down, (XII) Authorizing the Debtors to Take Any and All Actions Necessary to Implement the Wind-Down, and (XIII) Granting Related Relief* [ECF No. 1048].

[2] "**Bidding Procedures Order**" means the *Order (I)(A) Approving Bidding Procedures for Sale of the Debtors' Assets, (B) Authorizing the Potential Selection of Stalking Horse Bidder(s), (C) Approving Bid Protections, (D) Scheduling Auction(s) for, and Hearing(s) to Approve, the Sale of the Debtors' Assets, (E) Approving the Form and Manner of Notices of Sale, Auction(s), and Sale Hearing(s), and (F) Approving the Assumption and Assignment Procedures, and (II) Granting Related Relief* [ECF No. 1213].

Section 1. *Asset Transfer*.

(a) The Seller hereby irrevocably sells, assigns, transfers and conveys to Buyer, and Buyer hereby purchases, acquires and takes assignment from the Seller of, all of the Seller's right, title and interest in, to and under all of the assets set forth on **Exhibit A** hereto (the "**Assets**") for an aggregate purchase price equal to Seven Million Five Hundred Thousand U.S. Dollars ($7,500,000.00) (the "**Purchase Price**"), with delivery of the Assets to be made in deidentified form in accordance with Section 1(a)(ii) following, and in no event prior to, the satisfaction (or waiver) of the conditions set forth in Section 3; *provided that*:

(i) it is the express intention of the Parties that the Assets *shall not* include information that relates to, describes, or is reasonably capable of being associated with a consumer or is otherwise considered "personal data", "personal information", "nonpublic personal information" or other similar term under applicable data protection laws (such information, "**Personal Data**," *provided that*, for the avoidance of doubt, the definition of Personal Data does not include Deidentified Data (as defined below));

(ii) prior to the transfer of the Assets to Buyer, the Seller shall first deliver, at Buyer's direction, all or a portion of the data set forth in **Exhibit A** to one or more third parties acceptable to or designated by Buyer (such a third party, a "**Deidentification Agent**") in order to: (A) take reasonable measures as set forth in Section 3(c) below to remove or transform certain data elements such that the data cannot be associated with, reasonably used to infer information about, or otherwise linked to, a particular consumer (such transformed data, "**Deidentified Data**," and the process of such transformation, "**Deidentification**" or "**Deidentifying**"); and (B) migrate such data in a format that is reasonably acceptable to Buyer for further delivery to Buyer;

(iii) Buyer shall be solely responsible for any and all costs and expenses incurred in connection with Deidentifying the Assets in accordance with Section 1(a)(ii); *provided that*, for the avoidance of doubt, any such costs and expenses shall not reduce the amount of the Purchase Price; and

(iv) delivery of the Assets by the Seller to Buyer, or by a Deidentification Agent to Buyer, as applicable, in deidentified form consistent with Section 3(c)Section 3, shall be deemed delivery by the Seller to Buyer for all purposes of this Agreement.

(b) Notwithstanding anything herein to the contrary:

(i) The Assets shall not include any communications, documents, or other information protected by any attorney-client privilege, work product or similar protection (the foregoing items, "**Privileged Materials**"). To the extent that, following the transfer of the Assets, the Seller determines that the transferred Assets contain any Privileged Materials inadvertently transferred or not removed

by the Seller prior to the transfer of the Assets to Buyer: (A) this Agreement or such transfer of such Privileged Materials to Buyer shall not result in the loss of any attorney-client privilege, work product or other similar protection; and such protections shall continue to belong solely to, and will solely be controlled by, the Seller (and Buyer shall not assert otherwise); (B) the Seller shall notify Buyer of such inadvertent transfer or failure to remove such Privileged Materials; and (C) Buyer shall return to the Seller or destroy (at the Seller's election) such identified Privileged Materials promptly following Buyer's receipt of such notice (it being understood that any such destruction will conform to the requirements set forth in the Confidentiality Agreement dated as of June 18, 2026 between Buyer and Spirit Aviation Holdings, Inc.).

(ii) The Seller shall have the right to retain copies of any and all data included in the Assets solely for purposes of winding down the Seller's business or complying with applicable law or statutory requirements in connection therewith. For the avoidance of doubt, the Seller shall not sell, assign or transfer the Assets or any interest in the Assets to any purchaser other than Buyer or to any other third-party, and shall not use the Assets for any commercial or other purpose than the administration of the winding down of the Seller's business or compliance with applicable law or statutory requirements; *provided* that the Seller may sell its customer data list, which includes individual traveler spend aggregated by year, to third-parties in hospitality or travel industries.

(c) Buyer publicly commits (i) to maintain and use the Deidentified Data in deidentified form, and (ii) that it will not intentionally associate the Deidentified Data with any person or household. If Buyer has not made such a commitment in a broadly accessible public document (*e.g.*, Buyer's publicly posted privacy notice), Buyer acknowledges and agrees that the commitments, representations, warranties and agreements made through this Agreement constitute a public commitment as required under applicable data protection laws. For the avoidance of doubt, Buyer shall have the right to transfer Deidentified Data to third parties, *provided* that Buyer contractually obligates such transferees to comply with the provisions of this Section 1(c).

Section 2. *Payment of Purchase Price*. Contemporaneously with the delivery of the Assets to Buyer in accordance with Section 1, Buyer shall deliver the Purchase Price in immediately available funds by transfer to the account of the Seller set forth on **Exhibit B** hereto.

Section 3. *Conditions Precedent*. The respective obligations of each Party to consummate the Transaction are subject to the satisfaction (or waiver by the Parties) of the following conditions:

(a) receipt of duly executed signature pages from each Party;

(b) the requisite Bankruptcy Court approval for consummation of the Transaction shall have been obtained, including, without limitation, (i) the entry of an order of the Bankruptcy Court approving the sale and the transfer of the Assets (the "**Sale**

**Order**") or (ii) the expiration of any applicable notice period (if any) under the Wind Down Order;

(c) each designated Deidentification Agent (or the Seller, to the extent any Assets are transferred directly by the Seller to Buyer) shall have certified to Buyer's reasonable satisfaction, that the Assets have been deidentified in accordance with applicable laws (including, to the extent applicable to U.S. consumers, using the standard for de-identification set forth under the California Consumer Privacy Act, as amended, regardless of whether such statute does, or does not, apply to the Assets, and for any "protected health information" or other consumer health-related data, using the standard for de-identification set forth under 45 C.F.R. § 164.514) and prevailing industry standards for data deidentification, in each case, while preserving referential integrity across the data set;

(d) the Assets are capable of being transferred to Buyer in the format and manner specified on **Exhibit A** hereto; and

(e) except for the Deidentification process described in clause (c) above, no portion of the Assets has been deleted, modified or removed other than (i) in the ordinary course of business consistent with the Seller's past practice, and (ii) *de minimis* amounts of data removed by the Seller as reasonably necessary to preserve the Seller's attorney-client privilege, work product or other similar protections.

Section 4. *Further Assurances*. Each of the Parties shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things, reasonably necessary, proper or advisable under applicable laws, regulations and agreements or otherwise to consummate and make effective the transactions contemplated by this Agreement. Without limiting the generality of the foregoing, the Seller shall: (a) execute and deliver any instruments of conveyance, bills of sale, assignments or other documents reasonably requested by Buyer to effectuate the transfer of the Assets free and clear of all Claims; (b) at Buyer's expense, cooperate with Buyer in good faith and use commercially reasonable efforts to assist Buyer in obtaining possession and control of the Assets, including, without limitation, any credentials or access keys necessary for Buyer's use of the Assets (if any) as well as Buyer's completion of the data extraction processes set forth on **Exhibit C** hereto; and (c) provide Buyer with a reasonable opportunity to review and comment on the Deidentification process (whether conducted by the Seller or any Deidentification Agent) and give good faith consideration to Buyer's comments to ensure the Deidentification process is reasonably satisfactory to Buyer; *provided*, that if any data or proprietary software, computer program or application set forth on **Exhibit A** hereto is not in the possession or control of Buyer as of the execution and delivery hereof, the Seller shall use commercially reasonable efforts to obtain possession or control of, and deliver or cause to be delivered to Buyer, such data or proprietary software, computer program or application as promptly as reasonably practicable following receipt of such request.

Section 5. *Assignment and Assumption of Contracts*. Notwithstanding anything to the contrary in this Agreement, no contracts, agreements, licenses or other arrangements of the Seller shall be assumed by or assigned to Buyer pursuant to this Agreement or the

transactions contemplated hereby, and Buyer shall have no liability or obligation with respect to any such contracts, agreements, licenses or other arrangements.

Section 6. *Representations and Warranties*. The Seller represents and warrants to Buyer that:

(a) the Seller is the sole and exclusive owner of the Assets and has good and valid title to, and the full right to sell, assign, transfer, convey and deliver, the Assets, free and clear of all Claims;

(b) the Seller has all requisite power and authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby, and no further consents or approvals are required for the Seller to consummate the Transaction, except as otherwise set forth herein or in connection with the Bankruptcy Cases;

*provided*, *however*, that the representations and warranties of the Seller contained in this Section 6 are made as of the date hereof and again as of the date of delivery of the Assets, and shall not survive the consummation of the Transaction in accordance with the terms and conditions set forth in Section 1, Section 2 and Section 3; *provided*, *further*, that notwithstanding anything in this Agreement to the contrary (including Section 7), nothing in this Agreement shall limit, waive or release any claim based on fraud.

Section 7. *Disclaimers*. BUYER ACKNOWLEDGES AND AGREES THAT THE SELLER IS CONVEYING THE ASSETS WITHOUT REPRESENTATION OR WARRANTY, EITHER EXPRESS OR IMPLIED AT COMMON LAW, BY STATUTE, OR OTHERWISE (ALL OF WHICH THE SELLER HEREBY DISCLAIMS), RELATING TO (a) THE MERCHANTABILITY, DESIGN, OR QUALITY OF ASSETS, (b) THE FITNESS OF THE ASSETS FOR ANY PARTICULAR PURPOSE, (c) NON-INFRINGEMENT, (d) ANY OTHER MATERIALS OR INFORMATION THAT MAY HAVE BEEN MADE AVAILABLE OR COMMUNICATED TO BUYER OR ITS AFFILIATES, OR ITS OR THEIR EMPLOYEES, AGENTS, CONSULTANTS, REPRESENTATIVES OR ADVISORS IN CONNECTION WITH THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT OR ANY DISCUSSION OR PRESENTATION RELATING THERETO OR (e) ANY OTHER MATTER WHATSOEVER (INCLUDING THE ACCURACY OR COMPLETENESS OF ANY INFORMATION PROVIDED TO BUYER), IT BEING EXPRESSLY UNDERSTOOD AND AGREED BY THE PARTIES THAT BUYER WILL BE DEEMED TO BE OBTAINING THE ASSETS IN THEIR PRESENT STATUS, CONDITION AND STATE OF REPAIR, “AS IS” AND “WHERE IS” WITH ALL FAULTS AND THAT BUYER HAS MADE OR CAUSED TO BE MADE SUCH INSPECTIONS AS BUYER DEEMS APPROPRIATE AND BUYER IRREVOCABLY WAIVES ANY AND ALL CLAIMS IT MAY HAVE AGAINST THE SELLER OR ANY AFFILIATE OF THE SELLER ASSOCIATED WITH THE ASSETS.

Section 8. *Notices*. All notices, waivers and other communications under this Agreement must be in writing and will be deemed to have been duly given (a) when delivered by hand (with written confirmation of receipt), (b) when sent by email (with read

receipt received), (c) one business day following the day sent by overnight courier (with written confirmation of receipt), or (d) when received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses and representatives (if applicable) set forth below (or to such other addresses and representatives as a Party may designate by notice to the other Parties):

(i) If to the Seller, then to:

Spirit Airlines, LLC
1731 Radiant Drive
Dania Beach, FL 33004
Attn: legaldepartment@spirit.com

and

PJT Partners LP
280 Park Avenue
New York, New York 10017
Attn: soar_asset_sales@pjtpartners.com

with a copy (which will not constitute notice) to:

Davis Polk & Wardwell LLP
450 Lexington Avenue
New York, NY 10017
Attn: Marshall S. Huebner (marshall.huebner@davispolk.com)
Darren S. Klein (darren.klein@davispolk.com)
Christopher S. Robertson (christopher.robertson@davispolk.com)

(ii) If to Buyer:

Mercor.io Corporation
181 Fremont St., Fl 33
San Francisco, CA 94105
Attention: Arek Wardak, General Counsel
Email: legal@mercor.com

with a copy (which will not constitute notice) to:

Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025
Attention: Mark W. Seneca; John Harrison
Email: mseneca@orrick.com; johnharrison@orrick.com

and

Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019-6142
Attention: Evan C. Hollander
E-mail: echollander@orrick.com

Section 9. *Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver*.

(a) Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement will be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto.

(b) Without limitation of any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court will retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes, which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing will be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such proceeding; *provided* that, if the Bankruptcy Cases are closed pursuant to Section 350 of the Bankruptcy Code, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York or any New York state court located in the Borough of Manhattan, New York, New York, and any appellate court from any thereof for the resolution of any such claim or dispute. The Parties each hereby irrevocably waive, to the fullest extent permitted by applicable laws, the defense of an inconvenient forum to the maintenance of any such Proceeding. The Parties each consent to service of process by mail (in accordance with Section 8) or any other manner permitted by law.

(c) THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF ANY PARTY OR SUCH PARTY'S REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

Section 10. *Headings*. The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

Section 11. *Counterparts*. This Agreement may be executed in one (1) or more counterparts, each of which will be deemed to be an original of this Agreement and all of which, when taken together, will constitute one and the same instrument. Delivery of an

executed counterpart of a signature page to this Agreement by email attachment will be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

Section 12. *Miscellaneous*. The terms and provisions of this Agreement are intended solely for the benefit of the Parties and their respective successors and assigns, and nothing in this Agreement is intended or shall be construed to give any other person any legal or equitable right, remedy or claim under, or in respect of, this Agreement or any provision contained herein. This Agreement will inure to the benefit of and bind the respective successors and assigns of the Parties. This Agreement may be terminated, amended or modified, and any of the terms, covenants or conditions hereof may be waived, only by a writing signed by each of the Parties or, in the case of a waiver, by the Party or Parties waiving compliance. Each term and provision of this Agreement is intended to be severable, and if any term or provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable for any reason whatsoever, that term or provision shall be ineffectual and void and the validity of the remainder of this Agreement shall not be adversely affected thereby. Each of the Parties has been represented by its own counsel and acknowledges that it has participated in the drafting of this Agreement, and any applicable rule of construction to the effect that ambiguities are to be resolved against the drafting Party shall not be applied in connection with the construction or interpretation of this Agreement.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties herein have executed this Bill of Sale as of the date set forth in the first paragraph hereof.

BUYER:

MERCOR.IO CORPORATION

By: ______________________________
Name:
Title:

THE SELLER:

[SPIRIT AIRLINES, LLC]

By: ________________________________
Name:
Title:

# EXHIBIT A

## Assets

All of the Seller's right, title and interest in, to and under the following:

1. All data consisting of (i) productivity and collaboration data (including, without limitation, email data, calendar data, chat, collaboration and messaging data, documents, presentations, spreadsheets, knowledge repositories and wikis); (ii) core business systems and business applications data (including, without limitation, employee behavior and productivity data, revenue and yield management (inventory) data and aircraft operations and logistics); and (iii) workflow and process data (including, without limitation, marketing data (*e.g.*, campaigns, content and demand generation data), support, HR and legacy operations data, strategy and operations and project management data, transaction data, revenue accounting or financial data (e.g., analyst workflows, audits and corporate finance and fraud data)), in each case of the foregoing (i)-(iii), together with all related documentation, including without limitation the data designated as "Included" in the schedule of assets attached to this Exhibit A (the "**Assets Schedule**") but excluding the data designated as "Not Included" in the Assets Schedule.

2. All software, computer programs and applications owned by the Seller that have been developed by the Seller, including, without limitation, all associated source code, object code, architecture, software models, plugins, data files, algorithms, libraries, compilers, subroutines, tools and APIs, as well as all data and documentation relating to the development, use, operation and maintenance of such software, computer programs and applications (including, without limitation, technical specifications, user manuals, training materials and system documentation).

For the avoidance of doubt and notwithstanding anything to the contrary:

3. Pursuant to Section 1(a) of the Agreement, the Assets shall not include any Personal Data (it being understood that, accordingly, the Assets shall not include the Seller's customer list).

4. Pursuant to Section 1(b) of the Agreement, the Assets shall not include any Privileged Materials.

**Assets Schedule**

**SPIRIT DATA CATEGORIES**

| Category / Description | Classification | Spirit/SAAS | Metric | Volume | Age | System | Google's Data Purchase Request | Data Format |
|---|---|---|---|---|---|---|---|---|
| **Customer Behavior** | **Classification** | | | | | | Not Included | **For Microsoft 365 Data:** Retain and transfer all emails, OneDrive, SharePoint, and Teams data within the native Microsoft 365 environment.<br><br>**For Non-Microsoft 365 Document Data (e.g., SAP, Navitaire, UKG):** Export and share in standard, easily restorable, and machine-readable formats (such as CSV, JSON, or native SQL dumps). |
| Customer Insights | | Spirit | | | From 5/2017 | Navitaire | Not Included | |
| Customer Profiles | Customer Data | | Passengers | 97,500,000 | | | Not Included | |
| Loyalty | | Spirit | | | From 12/2020 | Navitaire Loyalty | Not Included | |
| Savers Club | Customer Data | | Members | 2,200,000 | | | Not Included | |
| Free Spirit Members | Customer Data | | Members | 50,200,000 | | | Not Included | |
| Total Earned Miles | Customer Data | | Miles | 44,000,000 | | | Not Included | |
| CC Holders | Customer Data | | Members | 740,000 | | | Not Included | |
| BOA CC Members | Customer Data | | Members | 70%* | | | Not Included | |
| Email Behavior | | Spirit | | | From 10/2024 | Oracle Reponsys | Not Included | |
| Active Email Addresses | Customer Data | | Addresses | 13,700,000 | | | Not Included | |
| Email Activity | Customer Data | | Campaigns YTD | 2,700 | | | Not Included | |
| Social Media | Customer Data | Spirit | Posts | | From 3/2022 | Sprinklr | Not Included | |
| Surveys | | Spirit | | | From 12/2023 | Qualtrics/Popplo | Not Included | |
| Brand Tracker Survey | Customer Data | | Surveys Taken | 1,650 | | | Not Included | |
| Post-Purchase Survey | Customer Data | | Surveys Taken | 1,446,033 | | | Not Included | |
| NPS | | | | | | | Not Included | |
| GSAT (Airport, Call Center, ect) | | | | | | | Not Included | |
| Chat | Customer Data | Spirit | | | From 1/2024 | Quiq | Not Included | |
| Handled Chat Sessions | | | Sessions | 15,784,473 | | | Not Included | |
| Calls | Customer Data | Spirit | | | From 1/2021 | Calabrio/Cresta | Not Included | |
| Handled Calls | | | Call Recordings | 30,865,471 | | | Not Included | |
| Phone Numbers | | Spirit | Telephone numbers | 7,341,857 | | | Not Included | |
| **eCommerce** | | | | | | | Not Included | |
| Website Analytics | Customer Data | Spirit | | | From 7/2024 | GA4/DataBricks | Not Included | |
| Unique Users | | | YTD | 43,117,864 | | | Not Included | |
| Searches | | | YTD | 41,414,953 | | | Not Included | |
| Purchases | | | YTD | 2,418,201 | | | Not Included | |
| **Finance & Accounting** | | | | | | | Included | |
| AP & Vendor information | Business Systems | Spirit | Vendor ID | 97,603 | | SAP | Included | |
| | | | | | | | Included | |
| Invoice and PO Information | Business Systems | Spirit | | | From 1/2019 | Coupa | Included | |
| Invoices | | | Documents | 851,590 | | | Included | |
| Revenue Accounting | Business Systems | Spirit | | | | SAP | Included | |
| Cost Accounting | Business Systems | Spirit | | 1,849,736 | | SAP | Included | |
| Treasury | Business Systems | Spirit | | | | SAP | Included | |
| Financial models/forecasting files | | | | | | | Included | |
| Presentations related to a range of topics, including capital projects, budget walkthroughs, BOD approvals, and BOD financial updates | | | | | | | Included | |
| Corp Dev documents (Deal pipelines, company and industry analyses, data room materials, DD review reports, investment committee reports, lender materials; m&A fairness opinions etc.) | | | | | | | Included | |
| **Ops** | | | | | | | Included | |
| Airline Operations (Movement Manager) | Business Systems | Spirit | | | From 4/2023 | Movement Manager | Included | |
| Spirit Flights | | | Flights Flown | 763,391 | | | Included | |
| Airline Operations Benchmark (OA) | Business Systems | Spirit | | | From 1/2017 | MAS | Included | |
| Flown Stats (MAS) | | | Flight Count | 74,163,945 | | | Included | |
| Scheduled Flights (Airline Data) | | | Flight Count | 57,362,400 | | | Included | |
| Crew Base | | | Number of Crew | 4,600 | | | Included | |
| Crew Pairing Information | Business Systems | Spirit | | | From 1/2021 | CrewTrac | Included | |
| Pairings | | | Count | 5,014,676 | | | Included | |
| IROP (ITS) | Business Systems | Spirit | Reaccooms | 3,000,347,472 | From 2/2018 | ITS | Included | |
| | | | | | | | Included | |
| MRO | Business Systems | Spirit | | | | TRAX | Included | |
| Parts Received | | | Parts | 787,452 | | | Included | |
| Scheduled Tasks | | | Tasks | 459,828 | | | Included | |
| Parts Transferred | | | Transfers | 313,646 | | | Included | |
| Fuel Data | Business Systems | Spirit | FuelSlips | 1,239,196 | From 6/2021 | SkyMetrix | Included | |
| | | | | | | | Included | |
| **Customer/DOT** | | | | | | | Not Included | |
| Disability | Regulatory | Spirit | | | From 7/2023 | Navitaire | Not Included | |
| Disability SSRs | | | SSRs | 2,491,715 | | | Not Included | |
| DOT Complaints | | | Complaints | 7,790 | | | Not Included | |
| MBR | Regulatory | Spirit | | | From 3/2025 | Netracer | Not Included | |
| DOT Complaints | | | Complaints | 338,531 | | | Not Included | |
| | | | | | | | Not Included | |
| Denied Boarding | Regulatory | Spirit | | | From 1/2024 | Custom spirit app | Not Included | |
| | | | | | | | Not Included | |
| Guest Complaints/Comments (Dynamics) | Regulatory | SaaS | | | From | Dynamics | Not Included | |
| | | | | | | | Not Included | |
| **Revenue** | | | | | | | Included | |
| Pricing | Business Systems | Spirit | | | | Navitaire | Included | |
| Base Fare (PROS) | | | Count | 24,510,638 | From 7/2025 | | Included | |
| Booking Curve | Business Systems | Spirit | | | From 1/2023 | Navitaire/Kambr | Included | |
| Farebasis Observations | | | Count | 3,530,769,431 | | | Included | |
| Base Fare Pricing Competitor (Infare) | Business Systems | Spirit | | | From 1/2021 | Infare | Included | |
| Flight Observations | | | Count | 7,250,630,887 | | | Included | |
| Packages | Business Systems | Spirit | | | From | Priceline | Included | |
| Hotel | | | Count | 56,517 | | | Included | |
| Car | | | Count | 231,049 | | | Included | |
| On Board Purchasing | Business Systems | Spirit | | | From 10/2021 | Retail in Motion | Included | |
| Purchases | | | Count | 29,000,147 | | | Included | |
| Revenue Data | Business Systems | Spirit | | | From 5/2008 | Navitaire | Included | |
| PNRs (confirmation) | | | Count | 190,312,864 | | | Included | |
| Transactions | | | Count | 7,510,221,520 | | | Included | |
| Elavon | Business Systems | Spirit | | | From 12/2022 | Elavon | Included | |
| Transactions | | | Count | 78,432,834 | | | Included | |
| Wifi Sales | Business Systems | Spirit | | | From 10/2021 | Thales | Included | |
| Inflight Purchases | | | Wifi Codes | 6,064,052 | | | Included | |
| Advanced Purchases | | | Wifi Codes | 5,118,977 | | | Included | |
| | | | | | | | Included | |
| Refunds | Business Systems | Spirit | | | From 3/2020 | Navitaire | Included | |
| Issued Refunds | | | Count | 9,292,480 | | | Included | |
| Credit Shells | Business Systems | Spirit | | | From 3/2020 | Navitaire | Included | |
| Issued Credit Shells | | | Count | 18,244,428 | | | Included | |
| Vouchers | Business Systems | Spirit | | | From 3/2009 | Navitaire | Included | |
| Issued Vouchers | | | Count | 12,139,319 | | | Included | |
| **Team Member** | | | | | | | Included | |
| Time Card Information | | Sprit/SaaS | Count | 1,092,000 | From 12/2012 | Kronos | Included | |
| | | | | | | | Included | |
| Employee Data | Business Systems | Spirit | | | From 8/1986 | UKG | Included | |
| Employee Records | | | Employees | 175,658 | | | Included | |
| Cobus | Business Systems | SaaS | | | | | Included | |
| Employee Business Travel Records | | | Travel Requests | | | Custom App | Included | |
| Concur | Business Systems | | | | | Concur | Included | |
| | | | | | | | Included | |
| Training | Business Systems | | | | | | Included | |
| Corporate Employee Training Records | | SaaS | EmployeeTrainings | | | SumTotal | Included | |
| Crew Training Records | | | Crew Trainings | | | Mint | Included | |
| iCims | Business Systems | | | | | Icims | Included | |
| **Documents** | | | | | | | Included | |
| Payroll Records | Regulatory | Spirit | Count | 3,426,618 | From 6/2016 | UKG | Included | |
| | | | | | | | Included | |
| Employee Tax Forms | Regulatory | Spirit | Count | 148,018 | From 6/2016 | UKG | Included | |
| | | | | | | | Included | |
| Employee Documents | Productivity | Spirit | | | From 2018 | Microsoft | Included | |
| Emails | | | Count | 100,000,000 | | | Included | |
| Email Accounts | | | Count | 80,000 | | | Included | |
| OneDrive | | | Count | 17,082,644 | | | Included | |
| Sharepoint | | | Count | 20,577,677 | | | Included | |
| Teams | | | Count | 500,000,000 | | | Included | |
| IT Tickets | Productivity | Spirit | Count | 667,563 | | Service Now | Included | |
| Incorporation Documents | Regulatory | Spirit | Count | | From Jan 2023 | Sharpoint/OneDrive | Included | |
| | | | | | | | Included | |
| Corporate Tax Documents | Regulatory | Spirit | Count | 500 | From Jan 2023 | Sharpoint/OneDrive | Included | |
| | | | | | | | Included | |
| **Code Data** | | | | | | | Included | - Bare Git repositories or Git bundle files for repository content (one zipfile per repo containing the output of "git clone" on the repo)<br>- JSONL for metadata (commits, PRs, Issues, comments). |
| Source code repos: web, mobile, and backend | | | | 516 repos; ~30M Lines of Code | | | Included | |
| Pull Request & Merged Pull Request (including metadata such as descriptions, comments, and review threads) | | | | 43,170 | | | Included | |
| Commit History: Full git history including commit messages, diffs, author info, and timestamps. | | | | 372,585 | | | Included | |
| Issues: Bug reports/issues and associated discussion threads | | | | | | | Included | |
| Test & Build Artifacts: Continuous Integration/Continuous Deployment (CI/CD) pipeline logs, automated test execution results, and code coverage reports | | | | | | | Included | |
| **Legal Data** | | | | | | | Included | |
| Legal Forms & Templates | | | | | | | Included | |
| Legal Memos & Policies (including product counsel or IP counsel reviews to business docs etc.) | | | | | | | Included | |
| Litigation Case Files | | | | | | | Included | |
| Agreements/ Templates incl. redlined or versioning "draft to final contract" histories | | | | | | | Included | **Preferred format:** .pdfs or .JSON files |
| - Commercial Agreements (e.g.. Licenses, Master Service Agreements) | | | | | | | Included | |
| - M&A contracts (e.g., Sales Purchase Agreeements, Asset Purchase Agreements) | | | | | | | Included | |
| - Employeement Contracts (e.g., NDAs, Invention Assignment Agreements) | | | | | | | Included | |

**EXHIBIT B**

The Seller Wire Instructions

[To be provided]

# EXHIBIT C

Data Extraction

The Seller shall facilitate Buyer's completion, as promptly as practicable following the date of the entry of the Sale Order, the extraction of the Assets using the following method: the Seller's personnel (or Seller's third-party vendors, at the Seller's direction) shall transmit complete data exports, after the Deidentification process has been completed, to Buyer through Buyer's secure upload facility at data.mercor.com, in the export formats native to the applicable source system.