**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF
NEW YORK**

| | |
|---|---|
| In re: | Case No. 25-11897 (SHL) |
| SPIRIT AVIATION HOLDINGS, INC., *et al.*,[1] | Chapter 11 |
| Debtors. | (Jointly Administered) |

**LIMITED OBJECTION OF THE ASSOCIATION OF FLIGHT ATTENDANTS-CWA, AFL-CIO TO THE PROPOSED SALE OF THE DEIDENTIFIED DATA**

The Association of Flight Attendants-CWA, AFL-CIO ("AFA"), the certified collective bargaining representative of the flight attendants employed by Spirit Airlines, LLC, submits this limited objection (this "Objection") to approval of the sale of the Deidentified Data described in the *Notice of Auction Results and Scheduled Hearing for the Deidentified Data* [ECF No. 1463] (the "Notice"), and respectfully states as follows:

## PRELIMINARY STATEMENT

1. AFA does not seek to disrupt the Debtors' sale process, to unwind the Auction, or to prevent the estates from monetizing data assets. AFA's objection is narrow. As drafted, the proposed sale would transfer to Google LLC (and, in the alternative, to Mercor.io Corporation) substantially the entire employment and workplace record of Spirit Airlines, including decades of payroll, timekeeping, training, travel, and recruiting files, together with approximately 100 million emails, 80,000 email accounts, 17,082,644 OneDrive items, 20,577,677 SharePoint items, and 500,000,000 Teams items, subject to a single content-based screen: the removal or transformation of data elements that would permit the information to be linked to a consumer.

[1] A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/case/spirit/info. The location of Debtor Spirit Aviation Holdings, Inc's principal place of business is 1731 Radiant Drive, Dania Beach, Florida, 33004.

2. That screen was designed to solve a different problem. Deidentification addresses whether a record can be traced to a named individual. It does not address whether the contents of the record are confidential. A flight attendant's disciplinary correspondence, a crew training deficiency, a leave or accommodation request, an internal Teams exchange about staffing or scheduling grievances, and a payroll adjustment history each remain sensitive employment information whether or not the employee's name has been stripped from it. The Sale Agreement nowhere requires that anyone screen for, segregate, or restrict the use of confidential employee information as such.

3. The Assets Schedule confirms the mismatch. Nearly every consumer-facing category, including Customer Profiles, loyalty and Free Spirit data, active email addresses, chat sessions, call recordings, telephone numbers, website analytics, DOT complaints, is designated "Not Included." Nearly every category under the heading "Team Member," time card information, employee data and employee records, employee business travel records, corporate and crew training records, payroll records, employee tax forms, and employee documents, is designated "Included." The privacy architecture of this transaction is consumer-facing; its payload is disproportionately employee-facing. Hence, the employee data is far more confidential than the customer data, yet receives far less protection than the customer data.

4. Two provisions sharpen the concern. First, the Deidentification is to be performed "while preserving referential integrity across the data set," Sale Agreement § 3(c); that is, the linkages that allow records to be followed across systems are to be maintained by design. Second, the Debtors have affirmatively covenanted that "no portion of the Assets has been deleted, modified or removed" other than through Deidentification, ordinary-course changes, and "de minimis" removals to preserve the *Debtors'* own privilege. *Id.* § 3(e). As drafted the agreement

not only omits an employee-confidentiality screen, but it functionally forecloses one—necessitating a court-ordered carve-out permitting removal, redaction, and segregation of employee-confidential content.

## BACKGROUND

6. On August 14, 2026, the Debtors conducted an Auction for the Deidentified Data and selected Google LLC (the "Successful Bidder") as the successful bidder at $10,000,000, with Mercor.io Corporation as Alternate Bidder at $7,500,000. Notice at 1–2. The forms of bill of sale are annexed to the Notice as Exhibits A and B (together, the "Sale Agreement"); their operative terms are materially identical in all respects relevant here. The Hearing is scheduled for August 19, 2026.

7. The Assets are defined to include productivity and collaboration data, core business systems data (expressly including "employee behavior and productivity data"), and workflow and process data including "HR and legacy operations data," together with the categories marked "Included" on the Assets Schedule. Sale Agreement, Ex. A ¶ 1.

8. The Assets Schedule designates as "Included", among other things: time card information (1,092,000 records, from December 2012); employee data and employee records (175,658 records, from August 1986); employee business travel records; corporate employee training records and *crew training records*; applicant-tracking documents; payroll records (3,426,618 records, from June 2016); employee tax forms (148,018 records, from June 2016); and "Employee Documents," comprising 100,000,000 emails, 80,000 email accounts, 17,082,644 OneDrive items, 20,577,677 SharePoint items, and 500,000,000 Teams items. The Schedule also designates as "Included" Crew Base information (4,600 crew) and Crew Pairing Information (5,014,676 pairings, from January 2021), as well as litigation case files and employment contracts.

As to Microsoft 365 data, the Schedule directs the Debtors to "[r]etain and transfer all emails, OneDrive, SharePoint, and Teams data within the native Microsoft 365 environment."

9. The Sale Agreement excludes Personal Data, defined as information "that relates to, describes, or is reasonably capable of being associated with a consumer" or that constitutes personal information under applicable data protection laws, while expressly *excluding* Deidentified Data from that definition. § 1(a)(i). It excludes Privileged Materials, subject to a clawback that protects the *Debtors'* privilege. § 1(b)(i). Deidentification is to be performed by one or more agents "acceptable to or designated by Buyer," § 1(a)(ii), certified "to Buyer's reasonable satisfaction" under the California Consumer Privacy Act standard (and, for health data, 45 C.F.R. § 164.514), § 3(c), with the Buyer entitled to "review and comment on the Deidentification process," § 4(c). The Buyer commits not to "intentionally associate the Deidentified Data with any person or household" and may "transfer Deidentified Data to third parties, provided that Buyer contractually obligates such transferees to comply with the provisions of this Section 1(c)." § 1(c). The Sale Agreement confers no third-party beneficiary rights. § 12.

## OBJECTION

### A. The Proposed Sale Does Not Adequately Protect Confidential Flight-Attendant Information.

10. The exclusion of Personal Data, the exclusion of Privileged Materials, the CCPA-based certification requirement, and the Buyer's public commitment against re-association are real and were not obviously required. But each of them is calibrated to identification, and the flight attendants' interest is in confidentiality. Those are different things, and the Code recognizes the difference: section 107(b) protects "confidential . . . commercial information" without regard to whether any individual is identifiable, 11 U.S.C. § 107(b)(1); *see Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24, 27–28 (2d Cir. 1994).

11. The definitional architecture of the Sale Agreement is consumer-facing throughout. Personal Data is measured by association with a "consumer"; Deidentification is measured by whether data can be "associated with, reasonably used to infer information about, or otherwise linked to, a *particular consumer*"; the governing standard is drawn from a state *consumer* privacy statute, applied "regardless of whether such statute does, or does not, apply to the Assets"; and the Buyer's covenant runs to "any person or household." §§ 1(a)(i)–(ii), 1(c), 3(c). That framing mirrors the Bankruptcy Code's own consumer orientation: section 363(b)(1) conditions the sale of "personally identifiable information" on consistency with the debtor's privacy policy or the appointment of a consumer privacy ombudsman, and section 101(41A) defines that term by reference to information an individual provides to the debtor in connection with obtaining a product or service. 11 U.S.C. §§ 101(41A), 332, 363(b)(1). AFA does not contend that section 363(b)(1) is triggered here. The point is the opposite one: the statutory scheme the parties borrowed from was built for customers, and no comparable screen has been applied to the employment record that this transaction actually conveys.

12. The consequence is that information whose sensitivity has nothing to do with names will pass through untouched. A pseudonymized dataset can still disclose which crew bases generated grievances, how a small subset of flight attendants performed on recurrent training, which employees were subject to investigation, what compensation adjustments followed which events, and what employees said to one another about management, staffing, or their union. The Assets Schedule includes free-form materials, including 100 million emails, 500 million Teams items, OneDrive and SharePoint repositories, litigation case files, and employment contracts, whose confidentiality inheres in their substance and context. A process that removes identifiers

from structured fields is a poor instrument for that content, and the Sale Agreement does not purport to review it.

13. AFA does not make a technical claim that any particular record can be re-identified, and it does not need to. It notes only what the Sale Agreement says. The Deidentification must preserve "referential integrity across the data set," § 3(c), meaning the joins among timekeeping, pairing, training, payroll, and communications data are to be retained. The Crew Base population is 4,600. Where a small, highly structured population is described across linked operational and communications datasets spanning more than a decade, the risk that information about identifiable individuals or small identifiable groups can be inferred is not speculative, and the Buyer's covenant reaches only *intentional* association. § 1(c).

14. Two further features compound the problem. First, the Buyer may transfer the Deidentified Data onward to third parties on nothing more than a contractual pass-through of Section 1(c)'s restrictions. § 1(c). Those transferees are unidentified and unlimited in number; the flight attendants, who are not parties and are expressly denied third-party beneficiary status, § 12, would have no practical means of monitoring or enforcing compliance at any point in that chain. Second, the transfer is irreversible. Once decades of employment records are delivered, in the Alternate Bidder's case, by upload to the Buyer's own facility, Ex. C, no later order can meaningfully recall them. That counsels in favor of modest safeguards now, not litigation later.

15. Finally, the process the Sale Agreement establishes gives the Buyer, and only the Buyer, a voice in how Deidentification is performed: the Deidentification Agent must be "acceptable to or designated by Buyer," § 1(a)(ii); certification runs "to Buyer's reasonable satisfaction," § 3(c); and the Buyer is entitled to review and comment on the process, § 4(c). The Debtors, meanwhile, have covenanted that "no portion of the Assets has been deleted, modified or

removed" except through Deidentification, ordinary-course changes, and de minimis privilege redactions. § 3(e). Whatever else that structure accomplishes, it leaves no room for the Debtors to withhold confidential employee information even if they wished to.

**B. The Sale Should Be Conditioned on Excluding Confidential Information of Spirit Airlines Flight Attendants.**

16. Section 363(b)(1) permits a sale outside the ordinary course only "after notice and a hearing," and the Court must find an articulated business justification, considering "all salient factors pertaining to the proceeding" and the interests of the parties affected. *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983). The same authority that permits approval permits approval on terms. *See* 11 U.S.C. §§ 105(a), 363(e); *see also In re Trans World Airlines, Inc.*, 322 F.3d 283, 285–90 (3d Cir. 2003) (employee-related rights constituted "interests" subject to section 363(f) and to the court's treatment in the sale order). Conditioning approval is an ordinary exercise of that authority and is routinely how courts in this District reconcile a value-maximizing sale with the legitimate concerns of parties who are not at the negotiating table.

17. AFA therefore requests that the Court decline to approve the Transaction unless and until the Sale Order and Sale Agreement expressly and unequivocally provide that (a) all Spirit Airlines flight attendant information are excluded from the Assets and from any transfer, licensing, access, or use by the Successful Bidder, the Alternate Bidder, or any third party; (b) the Assets definition and the Assets Schedule are revised to exclude, without limitation, time card information, flight attendant data and flight attendant records, flight attendant business travel records, flight attendant training records, flight attendant payroll records, flight attendant tax forms, flight attendant documents, crew base information, crew pairing information, litigation case

files pertaining to flight attendants, and any Microsoft 365 content that contains or reflects flight attendant information.

18. Alternatively, if the Court does permit the sale to move forward it should only approve the sale until at a minimum the same protections extended to consumers are extended to former Spirit flight attendants. This includes:

(a) that the Deidentification process include a review or segregation protocol directed specifically at confidential employee and labor-related information, including, without limitation, personnel, payroll, tax, grievance, disciplinary, investigatory, medical, leave, accommodation, training, performance, and union or collective-bargaining related records, communications, and other materials, rather than relying solely on the removal of consumer identifiers;

(b) that, with respect to employee email, Teams, OneDrive, and SharePoint content, the Debtors and the Successful Bidder implement reasonable measures appropriate to free-form communications, and that Section 3(e) not be construed to preclude the removal of employee-related content required by the Sale Order;

(c) that the Successful Bidder be prohibited from using the Assets to analyze, profile, evaluate, score, or draw conclusions regarding any individual Spirit flight attendant or any identifiable group or subgroup of Spirit flight attendants, and from attempting to re-associate the Deidentified Data with any Spirit employee;

(d) that any onward transfer of employee-related Assets under Section 1(c) be subject to the same restrictions, imposed in writing and enforceable by the Debtors or their successors, with notice to AFA of the categories of employee-related Assets so transferred; and

(e) such other protections as the Court determines appropriate.

18. None of these conditions requires the Debtors to forgo consideration, to reopen the Auction, or to disturb the Successful Bid. The Deidentification has not yet occurred; the protocol remains to be designed; and the Buyer already bears its cost without any reduction in the Purchase Price. §§ 1(a)(ii)–(iii). AFA has attempted to resolve these issues consensually and remains available to do so before the Hearing.

## RESERVATION OF RIGHTS

19. AFA reserves all rights, including the right to supplement or amend this Objection, to conduct discovery, to be heard at the Hearing, and to object to the form of any proposed Sale Order. Nothing herein constitutes a waiver of any right, claim, or defense of AFA or the flight attendants it represents, including under the parties' collective bargaining agreement, the Railway Labor Act, or applicable law, or an admission regarding the Debtors' authority to sell any particular asset.

## CONCLUSION

20. For the foregoing reasons, AFA respectfully requests that the Court deny approval unless the Sale Order and Sale Agreement expressly and categorically exclude all flight attendant information from the Assets and prohibit any transfer, licensing, access, or use of such data by the buyer or any third party.

Dated: August 18, 2026
New York, New York

Respectfully submitted,

/s/ Charles M. Rubio
Charles M. Rubio
100 Park Avenue, Suite 1600
New York, NY 10017
Email: crubio@parkinsrubio.com
Phone: 713-715-1660

*Counsel to the Association of Flight Attendants-CWA, AFL-CIO*