**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SPIRIT AVIATION HOLDINGS, INC., et al. | Case No. 25-11897 (SHL) |
| Debtors.[1] | Jointly Administered |
| | Hearing: September 9, 2026 |

**LIMITED OBJECTION OF AIR LINE PILOTS ASSOCIATION, INTERNATIONAL TO THE DEBTORS' PROPOSED SALE OF DEIDENTIFIED DATA**

Air Line Pilots Association, International ("ALPA"), a creditor and collective bargaining representative of pilots of the Debtor Spirit Airlines, Inc. ("Spirit"), respectfully submits this objection to the approval of the sale of Deidentified Data (the "Data Sale") described in the *Notice of Auction Results and Scheduled Hearing for the Deidentified Data* [ECF No. 1463] (the "Sale Notice"). In support of the objection, ALPA states:

**PRELIMINARY STATEMENT**

1. ALPA is the collective bargaining agent representing 80,000 pilots at 42 U.S. and Canadian air carriers and the world's largest non-governmental aviation safety organization. ALPA has represented Spirit pilots since 1996. ALPA and Spirit are parties to a collective bargaining agreement negotiated after Spirit filed this case and approved by the Court on

[1] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

December 29, 2025 [Dkt. 642] (the "CBA").[2] The CBA contains specific requirements that pilot employment-related information be maintained in confidence. These include pilot and training records, as well as pilot reports of fatigue and documents and associated data.

2. In addition, ALPA and Spirit are parties under the auspices of the Federal Aviation Administration ("FAA") to agreements under which Spirit pilots and ALPA voluntarily provided information concerning Spirit flight operations to improve the safety of the airline's operations. This information, as well as copies, modifications, analyses and derivatives thereof, together with associated records concerning pilot training protocols and individual records of pilot training, were stored on Spirit's computer and data storage systems and were almost certainly contained in internal and external communications in Spirit's possession.

3. In the regular course of its operations, Spirit maintained documents relating to pilot hiring, training, terms and conditions of employment generally, as well as pilot disciplinary and other employment-related documents almost certainly reviewed on its computer and data storage systems and were almost certainly contained in internal and external communications in Spirit's possession.

4. All this information apparently would be sold to Google LLC under the Sale Agreement with the Debtor regardless of whether it is entitled to confidentiality under the labor agreement or otherwise.

5. The Sale Agreement's deidentification protection is directed towards the protection of the identity of Spirit's customers but not its pilots or other employees. Even were

[2] The CBA – together with various letters of agreement and memoranda of agreement – remains in full force and effect under Section 1113(f) of the Code as it has not been rejected under Section 1113 of the Code. 11 U.S.C. § 1113(f); *see In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 990 (2d Cir. 1990).

the proposed Sale Agreement to provide for protection of the identity of individual employees in the data to be sold,[3] it does not provide any protection to the confidentiality of the information itself. In fact, because the Sale Agreement requires that referential integrity across the data sets acquired be preserved, and as the data sets extend across the breadth and scope of Spirit's operations, not only will confidential information be sold, it is almost certain that individual pilots and others will be identifiable from the data. This is especially so with respect to flight operations information provided, reviewed, and analyzed pursuant to contractually negotiated safety programs where the information is legally protected from disclosure. Inasmuch as the data will likely become accessible to the public through available large language model artificial intelligence programs, confidentiality of pilot data will almost certainly be compromised to the detriment of flight safety, which depends on the voluntary sharing of information and data concerning safety-related events.

6. ALPA has raised its concerns with the Debtor and is engaged in discussions to obtain additional information with an eye towards resolving the outstanding issues it has with the Sale Agreement. This objection outlines the breadth of the concerns ALPA has with the proposed sale. In the event those issues are not resolved before the September 9 hearing or the hearing not adjourned to facilitate continued discussions, ALPA objects to approval of the Sale Agreement to the extent that confidential pilot information – especially flight safety program data and information and information explicitly entitled to confidentiality by contract – are not excluded from the sale.

[3] In this connection it is not all clear what "deidentification" of the data would entail and what protections it would afford to pilots whose confidential information is otherwise to be transferred under the Sale Agreement. For example, there is no indication of how or whether metadata associated with electronically stored documents is to be treated.

## BACKGROUND

7. On June 22, 2026, the Court entered its *Order (I)(A) Approving Bidding Procedures for Sale of the Debtors' Assets, (B) Authorizing the Potential Selection of Stalking Horse Bidder(s), (C) Approving Bid Protections, (D) Scheduling Auction(s) for, and Hearing(s) to Approve, the Sale of the Debtors' Assets, (E) Approving the Form and Manner of Notices of Sale, Auction(s), and Sale Hearing(s), and (F) Approving the Assumption and Assignment Procedures and (II) Granting Related Relief* [ECF No. 1213] (the "Sale Procedures Order"). Under the sales procedures, the Debtors filed the Sale Notice on August 14, 2026. Appended to the Sale Notice as Exhibit A is a proposed Sale Agreement between the Debtors and Google LLC ("Google").

8. The Sale Agreement would transfer to Google:

> All data consisting of (i) productivity and collaboration data (including, without limitation, email data, calendar data, chat, collaboration and messaging data, documents, presentations, spreadsheets, knowledge repositories and wikis); (ii) core business systems and business applications data (including, without limitation, employee behavior and productivity data, revenue and yield management (inventory) data and aircraft operations and logistics); and (iii) workflow and process data (including, without limitation, marketing data (*e.g.*, campaigns, content and demand generation data), support, HR and legacy operations data, strategy and operations and project management data, transaction data, revenue accounting or financial data (e.g., analyst workflows, audits and corporate finance and fraud data)), in each case of the foregoing (i)-(iii), together with all related documentation, including without limitation the data designated as "Included" in the schedule of assets attached to this Exhibit A (the "**Assets Schedule**") but excluding the data designated as "Not Included" in the Assets Schedule.

Sale Notice, Ex. A § 1 (b)(ii) (Sale Agreement).

9. The referenced Assets Schedule includes "Ops" data, defined to include "Airline Operations (Movement Manager)," "Spirit Flights", "Flown Stats (MAS)", "Crew Base", "Crew Pairing Information", and "IROP" (i.e., irregular operations). It also includes "Team Member" data, defined to include: "Employee Data", "Employee Records," and "Training". It also

includes other "Documents", including "Emails" "Email Accounts", "OneDrive", "Sharepoint" and "Teams" materials, among other things.

10. While the Sale Agreement requires the data set to be acquired to be "Deidentified," that is defined as the result of "reasonable measures … to remove or transform certain data elements such that the data cannot be associated with, reasonably used to infer information about, or otherwise linked to, **a particular consumer**." Sale Agreement § 1(a)(ii) (emphasis added). The deidentification process if applied to employee data would, in any event, be a limited protection, as there is a requirement Spirit "preserv[e] referential integrity across the data set" transferred thereby permitting review and analysis of data that could be expected to identify individual pilots or groups of pilots. *Id.* § 3(c).

11. Numerous provisions of the Spirit-ALPA CBA require that documents and records be maintain confidentially.

12. Training Records. Training records are apparently included among the items to be acquired. *See* ¶ 9, *supra.* Pilots are required to complete flight training upon hire as well as training to transition to a different aircraft or to upgrade (from First Officer to Captain), and periodic recurrent training. Pilot training records would include evaluations of pilot proficiency and would include records concerning review of an individual's progress in training. Pilots have a reasonable expectation of confidentiality with respect to their individual training records. The CBA itself provides for a confidential process where pilot trainees could "critique and provide confidential feedback regarding the training program in general and the performance of individual Training Pilots[.]". CBA § 11.J.1.[4]

[4] Excerpts of the Spirit-ALPA CBA are attached as Exhibit 1 hereto.

13. Medical Records and Fatigue Reports. Medical records of pilots can reasonably be expected to be included within "Team Member" or "Employee Records" files that are a part of the Assets Schedule. *See* ¶ 9, *supra.* Pilots are entitled to confidential treatment of their medical records. For example, under CBA § 13.C.6, Spirit could (and did) require pilots seeking family/medical leave requests to provide medical certification for the request and periodic medical updates. The CBA requires Spirit to keep this information confidential in accordance with applicable law.

14. Additionally, there is a process under Section 15 of the CBA for the company to require a pilot to submit to medical examination. Spirit is required to maintain confidentiality of pilot medical records and other information, such as physician reports, generated as part of that contractual process. CBA § 15.C.7. They are available to "management, medical, and clerical personnel as are responsible for pilot medical qualification supervision and record keeping." *Id*. As such it can reasonably be expected that such employee records would have been stored electronically and shared using Spirit's email server and other electronic databases, such as MS Teams or SharePoint, all of which are part of the sale. Medical privacy would be lost were these records sold and made available on a large language model AI program. This would pose the risk that through cyberattacks or otherwise someone could identify an individual within a data set.

15. By law a pilot is required to assess fitness to operate prior to every flight. Pursuant to a Letter of Agreement ("LOA"), Spirit pilots who determined that they were not able to complete a flight duty assignment due to a reduced level of awareness that would affect the safety of the assignment were required to submit fatigue reports providing relevant details. Fatigue Policy and Procedures LOA, § A.1.(d).[5] Those reports were reviewed by a fatigue

[5] A copy of the Fatigue Policy and Procedures LOA is attached as Exhibit 2 hereto.

management committee ("FRC") to determine the root cause of the incident. *Id.* § B.2. Those fatigue reports "shall be considered confidential" and Spirit was barred from disclosing the identity of a pilot filing a fatigue report determined to be the result of circumstances "beyond the control of the pilots or required by law." *Id.* § B.2, .3. It is highly likely that those reports were saved (together with associated analysis and other relevant documents) to relevant Spirit electronic databases, including SharePoint. Those reports could and were shared beyond the FRC when the root cause of the incident was determined and would, in the ordinary course, be expected to have been transmitted, discussed and reviewed through Spirit's email and other electronic communications systems and to reside in pilot employment, training or medical files. Deidentified reports could be expected to be linked to the pilot by reference to flight operations records (among other things).

16. As shown below, this possibility is particularly concerning with respect to data maintained as part of FAA-approved voluntary flight operations reporting systems under agreements between ALPA and Spirit.

17. Flight Safety Programs. Spirit is party to FAA-approved flight operations safety reporting programs: Aviation Safety Action Program ("ASAP"), the Flight Operations Quality Assurance Program ("FOQA") and Line Operations Safety Audit ("LOSA"). Under Title 49 of the United States Code (49 U.S.C.), section 40123, certain voluntarily provided safety and security information is protected from disclosure in order to encourage persons to provide safety-related information to the FAA.[6]

---

[6] Section 40123(a) states:

> In General. – Notwithstanding any other provision of law, including section 552(b)(3)(B) of title 5, neither the Administrator of the Federal Aviation Administration, nor any agency or third party receiving information from the

18. ASAP. An ASAP report is created specifically to provide a means for pilots (and other employees) to report safety-related events. Pilots who do so are provided with enforcement incentives. As the FAA describes it,

> The ASAP provides for the collection, analysis, and retention of the safety data obtained through the reporting process. ASAP participants use ASAP safety data, much of which would otherwise be unobtainable, to develop corrective actions for identified safety concerns, and to educate the appropriate parties to prevent a recurrence of the same type of safety event.

FAA Advisory Circular 120-66C (2020) (available at: https://www.faa.gov/documentLibrary/media/Advisory_Circular/AC_120-66C_(Edit).pdf). The FAA's policy (except in limited defined circumstances) is to forgo enforcement actions when a violation is detected, disclosed to the FAA, and where prompt corrective action is taken to ensure that the same or similar violations do not recur.

19. Spirit and ALPA joined with the FAA and other unions in establishing an ASAP covering Spirit's pilots. Under the program, pilot reports of safety-related incidents "are analyzed in order to develop mitigation strategies and employee corrective actions if necessary to help solve safety issues[.]" ASAP Memorandum of Understanding ("MOU") ¶ 3.[7] As the FAA notes "[e]ach ASAP report must contain sufficiently detailed information about a safety event so that it can be identified by a third party." FAA Order 8000.82 ¶. 6(b)(2) (Sept. 3, 2003) (available at

---

> Administrator, shall disclose voluntarily-provided safety or security related information if the Administrator finds that –
>
> > (1) the disclosure of the information would inhibit the voluntary provision of that type of information and that the receipt of that type of information aids in fulfilling the Administrator's safety and security responsibilities; and
> >
> > (2) withholding such information from disclosure would be consistent with the Administrator's safety and security responsibilities.

[7] A copy of the ASAP MOU is attached as Exhibit 3 hereto.

https://www.faa.gov/document Library/media/Order/Order_8000_82.pdf). As an example, "[i]f the report is submitted by a flight crewmember, and the safety event involves a deviation from an [air traffic control] clearance, the ASAP report would include the date, time, place, altitude, flight number, and ATC frequency, along with a description of the safety-related event." *Id.*

20. The information provided by these reports can be expected to appear in multiple locations and to have been shared electronically.[8] ASAP reports are reviewed and discussed by an Event Review Committee ("ERC") composed of a management representative, ALPA representative, and a "specifically qualified FAA inspector from the appropriate Flight Standards office for Spirit Airlines[.]" ASAP MOU ¶ 9. The ASAP manager at Spirit "in coordination with the ERC, publishes pertinent event recaps, data, and trend information derived from filed and processed reports, and ASAP analysis[.]". *Id.* ¶ 11. All of this would be expected to be maintained on Spirit's various databases (e.g., email, Teams or SharePoint) and would apparently be transferred to Google under the Sale Agreement.

21. As the FAA notes, information obtained through ASAP "is considered to be confidential by the participating [airline] and their employees who are involved in the program." FAA Order 8000-82 ¶ 6(c)(1). As such, FAA generally protects from disclosure to third parties information it receives through ASAP. *Id.* ¶¶ 7 & 5(b). The rationale is simple:

> Withholding ASAP information from disclosure is consistent with the FAA's safety and security responsibilities because, unless the FAA can provide assurance that it will not be disclosed, the FAA will not receive the information.

[8] Because the safety of flight operations is involved in any ASAP report, it could be expected that the underlying event would (in addition to the report) have been discussed in internal communications between and among the pilot(s) involved, cabin crew members and flight operations staff and management, including supervisory pilots (e.g., Assistant Chief Pilots) or training pilots. In addition to Spirit's email server, those communications would likely have been conducted using text messaging application(s) on company owned cellular telephones or tablets provided to management. It is unclear whether data on those devices is or in not covered by the Sale Agreement.

> If the FAA does not receive the information, the FAA and the public will be deprived of the opportunity to make the safety improvements that receipt of the information otherwise enables.

*Id.* ¶ 6(e)(1).

22. FOQA Program. Aircraft are equipped with airborne data recording systems that acquire and capture necessary in-flight information through onboard sensors that measure significant aspects of aircraft operation. That data is collected and analyzed and are displayed to pilots during flight or on the ground and transmitted through various data buses. Spirit's aircraft were equipped with an Aircraft Communications Addressing and Reporting System ("ACARS"). ACARS is an air/ground data link that uses VHF frequency locations to relay (among other things) aircraft operational control messages between ground-based organizations and the flight deck. That ACARS data was retained by the airline.

23. In a FOQA program, flight operations data are periodically retrieved and sent to the airline's FOQA office for analysis. Events are isolated from the data based on parameters or threshold values (e.g., descent rates on approach) determined by the airline's operating specifications or the aircraft manufacturer's specifications for the aircraft operated. Under a LOA establishing the FOQA program at Spirit, a Monitoring Team made up of ALPA and management representatives was responsible for reviewing and analyzing flight and data events and identifying and recommending and monitoring corrective action. FOQA LOA ¶ A.15.[9] FOQA data may be used to evaluate a host of operational issues including "Crew performance" and "Training programs". *Id.* ¶ E.4.

24. The FOQA LOA protects the confidentiality of FOQA data, including "[a]ny data or combination of data which allows recorded or collected flight data to be associated with a

---

[9] A copy of the FOQA LOA is attached as Exhibit 4 hereto.

specific crew member." *Id.* ¶ A.20. The FOQA LOA prohibits the disclosure of any FOQA program information whether identified or deidentified to "any third party except appropriate government agencies". *Id.* ¶ C.4.

25. Under paragraph B.4 of the FOQA LOA any disclosure of crew member identity "shall be cause for [ALPA] to withdraw its participation in the FOQA program. It shall further cause the nullification of this agreement and the immediate termination of the FOQA program and destruction of all data." *See also* FOQA LOA ¶ D.2 (triggering termination of program and destruction of data in the event "any employee/agent divulges any identifying data to any individual" except an authorized Gatekeeper). Because the Sale Agreement includes Ops. data (Assets Schedule), FOQA date is apparently among the data sets to be acquired.

26. Cross Talk MOU. In addition, the ASAP MOU and FOQA LOA, ALPA and Spirit are parties to a separate MOU that governs information sharing between the two programs, the FOQA Data Sharing ("Cross Talk") MOU.[10] Under the Cross Talk MOU, FOQA data may be shared with the ERC once an ASAP report has been accepted where the ERC determines by consensus that FOQA data may aid in understanding the cause of the events covered by the ASAP report. Cross Talk MOU ¶ B.1.a. Thus, where a crew member has voluntarily reported a safety-related event through an ASAP report, the ERC can request and would be provided with associated FOQA data concerning the flight operation in question. All of this would expected to be housed in SharePoint and other data bases transferred under the Sale Agreement.

27. LOSA. In this program a trained observer occupies the jumpseat in the aircraft cockpit during regularly scheduled flights to collect safety-related data, including with respect to

[10] A copy of the Cross Talk MOU is attached as Exhibit 5 hereto. Spirit has not rejected the Cross Talk MOU.

flight crew performance. In the MOU creating the LOSA program, the parties recognize that "[c]onfidentiality of data and non-jeopardy assurance for pilots are fundamental to the program's success." LOSA MOU ¶ B.1.[11] To that end, LOSA program information is required to be "stored in a manner to protect the confidentiality of participants and data, and to restrict access to the data." *Id*. ¶ B.9. In particular, the parties agreed that this confidential data "will be stored on the Safety Department SharePoint LOSA folder." *Id.* Spirit's data stored on SharePoint are included in the Asset Sale. Sale Agreement, Ex. A (Asset Schedule)).

**ARGUMENT**

28. As shown in the Limited Objection of the Association of Flight Attendants-CWA, AFL-CIO to the Proposed Sale of the Deidentified Data [ECF No. 1489] ("AFA Objection"), the Debtors' proposed sale would transfer substantially all of the airline's employee-related data with deidentification required only with respect to Spirit's customers. Because the proposed sale requires that linkages between the data sets sold must be maintained, Sale Agreement § 3(c), the risks that confidential employee information will be disclosed is heightened because such linkages would facilitate identification of specific employees or groups of employees, even if employee names were redacted. ALPA adopts and will not repeat AFA's showing that the proposed sale should not be approved unless the Court requires that confidential employee information is excluded. ALPA instead notes how the Sale Agreement conflicts with the confidentiality required under the CBA and, particularly with respect to operational data and voluntary pilot reports of safety-related events.

29. The Assets Schedule in the Sales Agreement includes databases that would include materials required by the CBA to be maintained in confidence. "Ops" data, defined to

[11] The LOSA MOU is attached as Exhibit 6 hereto.

include “Airline Operations (Movement Manager),” “Spirit Flights”, “Flown Stats (MAS)”, “Crew Base”, “Crew Pairing Information”, and “IROP” (i.e., irregular operations) would be expected to include pilot training records and critiques of pilot training. The inclusion of “Employee Data”, “Employee Records,” “Training” and “Emails” “Email Accounts”, “OneDrive”, “Sharepoint” and “Teams” materials, would also include pilot training records, as well as fatigue reports and medical records, all of which are entitled to confidentiality. *See supra* at ¶¶ 9, 12, 13.

30. The Sale Agreement also clearly encompasses Flight Operations Data in connection with the Spirt-ALPA ASAP, FOQA and LOSA programs which are confidential. The Assets Schedule includes “Ops” data, defined to include “Airline Operations (Movement Manager),” “Spirit Flights”, “Flown Stats (MAS)”, “Crew Base”, “Crew Pairing Information”, and “IROP” (i.e., irregular operations). FOQA, ACARS and LOSA data and their analysis are clearly comprehended by these data sets. The inclusion of “Team Member” data, defined to include: “Employee Data”, “Employee Records,” “Training” and “Emails” “Email Accounts”, “OneDrive”, “Sharepoint” and “Teams” materials among other things, comprehends ASAP reports, the consideration and deliberation of the ERC all of which would be expected to have been included in, discussed or shared internally using Spirit’s email and Teams and SharePoint databases. So, too, the sale of Spirit’s SharePoint data base would include the dedicated LOSA SharePoint folder, which is also protected from disclosure. LOSA MOU ¶ B.9.

31. The ASAP, FOQA and LOSA safety programs are premised on the voluntary disclosure by pilots of confidential information concerning safety-related events gathered from airline operations to designated ALPA, management and FAA personnel. As FAA recognizes, unless the confidentiality of data received by these programs is assured, information will not be

provided, to the detriment of the safety of flight operations. Disclosure of confidential flight operations data through the Sale Agreement can be expected to chill voluntary compliance by pilots across the industry as it becomes known that such data can be sold to third parties with no expertise or interest in aviation safety and presumably included in data bases accessible by the public using artificial intelligence software.

32. The magnitude of the confidentiality issues presented can be illustrated by a relatively simple hypothetical. The ASAP incentivizes pilots to voluntarily report safety-related events by eliminating the risk of FAA enforcement action (and employer discipline).[12] If a pilot reports, say, an improper rate of descent on landing in an ASAP report, that report must provide sufficient identifying information such as the date, time, place, altitude, and flight number. Even assuming the ASAP report were deidentified, the identity of the pilot(s) involved could easily be determined by examining the supporting information in the report which, in the ordinary course of business could be expected to have been saved in multiple data sets subject to the Sale Agreement (e.g., email, Teams or SharePoint) and if not found there, included in flight records and pairing information – all of which is "Ops" data subject to the Sale Agreement.

33. FOQA data relevant to the ASAP report could be expected to include information concerning rates of descent of flights conducted with, e.g., the same aircraft type, the same airport(s) or meteorological conditions. All of this flight operations data is apparently included in the Sale Agreement. Because the Sale Agreement requires that linkages between the acquired data sets be maintained, Sale Agreement, § 3(c), the identification disclosure of confidential information, including the identity of the pilots involved, through artificial intelligence software is readily apparent.

---

[12] *See* CBA § 26 KK, events reported through ASAP may not be the predicate for discipline.

34. As FAA notes, information obtained through ASAP "is considered to be confidential by the participating [airline] and their employees who are involved in the program." FAA Order 8000-82 at ¶ 6(c)(1). The FOQA LOA prohibits the disclosure of any FOQA program information or data whether identified or deidentified to "any third party except appropriate governmental agencies". FOQA LOA ¶ C.4. And it requires the destruction of all FOQA data where any of it has been improperly disclosed. *Id.* ¶ B.4. The LOSA MOU also requires that data collected in those audits of line operations be maintained in confidence on a dedicated SharePoint folder. LOSA MOU ¶ B.9. Those protections are required to encourage voluntary participation by pilots in programs to advance the safety of airline operations.

35. Section 107(b) of the Code requires a bankruptcy court to protect "confidential research, development or commercial information" at the request of a party in interest. 11 U.S.C. § 107(b). *See*, *e.g.*, *In re Borders, Inc.*, 462 B.R. 42 (Bankr. S.D.N.Y. 2011). The court may also act "on its own" initiative to protect confidential information. Bankr. R. 9018. The Sale Agreement, if approved, would transfer data required to be maintained in confidence under multiple provisions of the CBA including confidential flight safety-related information similarly protected from disclosure, to preserve the sanctity of these critical components of aviation safety.

**CONCLUSION**

36. ALPA has supported Spirit's restructuring, including through substantial economic concessions to pilot pay and benefits negotiated at the outset of this case. While ALPA does not seek to bar the sale of assets of the estate, the confidentiality of pilot employment data and, specifically, data and information protected by the CBA and its various voluntary safety-related agreements must be preserved. As shown above, the Sale Agreement would apparently transfer confidential data. ALPA has engaged in discussions with Spirit that it hopes will lead to

enforceable representations that none of the data outlined in this objection will be part of the sale. In the event those discussions have not concluded, the Court should consider a further adjournment of the hearing to approve the Sale Agreement. In any event, this Court should not approve the Sale Agreement until and unless such data and information are excluded from the assets to transferred or otherwise protected.

Dated: September 4, 2026.
McLean, Virginia

Respectfully submitted,

AIR LINE PILOTS ASSOCIATION,
INTERNATIONAL
LEGAL DEPARTMENT

*/s Thomas N. Ciantra*
Thomas N. Ciantra
Joshua J. Ellison
7950 Jones Branch Drive, Suite 400S
McLean, VA 22102
Tel. (703) 481-2468
Fax (703) 481/2478
*Thomas.Ciantra@alpa.org*
*Joshua.Ellison@alpa.org*

*Attorneys for Creditor Air Line Pilots Association, International*