**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **SPIRIT AVIATION HOLDINGS, INC.,** ***et al.*****,** | **Case No. 25-11897 (SHL)** |
| **Debtors.**[1] | **Jointly Administered** |

**ORDER (A) AUTHORIZING
THE SALE OF 23 EETC-FINANCED AIRCRAFT FREE
AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES,
AND OTHER INTERESTS AND (B) GRANTING RELATED RELIEF**

Upon the *Motion for Entry of (I) an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of 27 EETC-Financed Aircraft, (B) Approving the Form and Manner of Applicable Notices and (C) Scheduling an Auction and Sale Hearing and (II) an Order (A) Authorizing the Sale of Aircraft and Related Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests and (B) Granting Related Relief* (the "**Sale Motion**") [ECF No. 1251], of Spirit Aviation Holdings, Inc. and its direct and indirect subsidiaries (collectively, the "**Debtors**" or "**Spirit**"), each of which is a debtor and debtor in possession in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), for entry of an order: (i) approving the Amended and Restated Aircraft Sale and Purchase Agreement, dated September 22, 2026 (the "**Aircraft Sale Agreement**"),[2] by and among Spirit and Save 2026-B LLC (the "**Stalking Horse Buyer**"), to sell (the "**Sale**") Spirit's ownership interests in 23 Airbus model A320 aircraft and

---

[1] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Aircraft Sale Agreement.

Airbus model A321 aircraft (each as set forth on **Exhibit A** hereto, and as described more fully in the Aircraft Sale Agreement attached hereto as **Exhibit B**, together with the Records but excluding Excluded Equipment, a "**Subject Aircraft**," and collectively, the "**Subject Aircraft**"); (ii) authorizing the Sale of the Subject Aircraft free and clear of all liens (excluding any Buyer's Liens), claims, Encumbrances (as defined herein) and other interests (collectively, and as further described in the Aircraft Sale Agreement, the "**Claims**"); and (iii) granting other related relief. After due deliberation and having determined that the relief requested in the Sale Motion, which is supported by the Bilbao Declaration and the Supplemental Bilbao Declaration, is in the best interests of the Debtors and their respective estates,

**THE COURT HEREBY FINDS THAT:**

A. The findings and conclusions set forth herein constitute the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C. This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Rule 7054 of the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy**

**Rules**"), the Court expressly finds that there is no just reason for delay in the implementation of this Order.

D. The predicates for the relief requested in the Sale Motion are sections 105(a), 363(b), (f), and (m) of title 11 of the United States Code (the "**Bankruptcy Code**") and Bankruptcy Rules 2002(a)(2), 6004(a), (b), (c), (e), (f) and (h), 6006(a), (c) and (d), 9007 and 9014.

E. Actual written notice (the "**Sale Notice**") of the Sale, the Sale Motion, the Auction, the Bidding Procedures Order and the hearing to approve the sale transactions contemplated in the Aircraft Sale Agreement (the "**Sale Hearing**"), and a reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein, has been afforded to all interested persons and entities, including, but not limited to the following parties (or their counsel) (collectively, the "**Sale Notice Parties**"): (a) the U.S. Trustee; (b) the Committee; (c) the Securities and Exchange Commission; (d) the Internal Revenue Service; (e) the United States Attorney's Office for the Southern District of New York; (f) the state attorneys general for states in which the Debtors conduct business; (g) the Department of Transportation; (h) certain holders of the Debtors' secured notes; (i) each agent or trustee under the Debtors' secured notes indenture or revolving credit facility; (j) all entities known to have expressed a bona fide interest in a transaction with respect to the Subject Aircraft; (k) all entities known to have asserted any lien, claim, or encumbrance in or upon any of the Subject Aircraft; and (l) any other party that is entitled to notice under the *Court's Order Implementing Certain Notice and Case Management Procedures* [ECF No. 61].

F. Spirit published notice (the "**Publication Notice**") of the Sale, the Sale Motion, the Auction, the Bidding Procedures Order and the Sale Hearing in the national edition of the *New York Times* on July 30, 2026 [ECF No.1427].

G. As evidenced by the affidavits of service previously filed with this Court, proper, timely, adequate and sufficient notice of the Sale, the Sale Motion, the Auction, the Bidding Procedures Order and the Sale Hearing has been provided in accordance with sections 102(1) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014. Spirit also has complied with all obligations to provide notice of the Sale, the Sale Motion, the Auction, the Bidding Procedures Order and the Sale Hearing. The foregoing notice described in paragraphs E through G was good, sufficient and appropriate under the circumstances, and no other or further notice of the Sale, the Sale Motion, the Auction, the Bidding Procedures Order, or the Sale Hearing is or was required.

H. The disclosures made by Spirit concerning the Aircraft Sale Agreement, the Sale, and the Sale Hearing were good, complete and adequate.

I. The Stalking Horse Buyer is purchasing the Subject Aircraft in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that: (a) the Stalking Horse Buyer recognized that Spirit was free to deal with any other party interested in acquiring the Subject Aircraft; (b) the Stalking Horse Buyer complied with the provisions in the Bidding Procedures Order; (c) the Stalking Horse Buyer agreed to subject its bid to the competitive bidding procedures set forth in the Bidding Procedures Order; (d) the Stalking Horse Buyer did not attempt to limit the Debtors' freedom to deal with any other party interested in acquiring the Subject Aircraft; (e) all payments to be made by the Stalking Horse Buyer and other agreements or arrangements entered into by the Stalking Horse Buyer in connection with the Sale have been disclosed; (f) the Stalking Horse Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (g) no common identity of directors or

controlling stockholders exists between the Stalking Horse Buyer and Spirit; and (h) the negotiation and execution of the Aircraft Sale Agreement and any other agreements or instruments related thereto were at arms'-length and in good faith.

J. On the terms and subject to the conditions contained in the Aircraft Sale Agreement, the Stalking Horse Buyer agreed to provide, as aggregate consideration for the Subject Aircraft, the Purchase Price, which is the sum of (i) the Minimum Bid Amount for the Subject Aircraft and (ii) the Credit Bid Amount pursuant to section 363(k) of the Bankruptcy Code, as well as reimbursement of all of the Debtors' costs and expenses incurred in connection with the Sale. The Stalking Horse Buyer, at the direction of the SuperB Noteholders, has the right under section 363(k) of the Bankruptcy Code to credit bid the full amount of the 2025-1 debt.

K. The Stalking Horse Buyer determined that it was not going to submit an Overbid for Lot 6. Debtors, consistent with the Bidding Procedures and in consultation with the Consultation Parties and the Stalking Horse Buyer's advisors, exercised their discretion in connection with the Auction and cancelled the Auction (after previously adjourning the Auction twice).

L. The Aircraft Sale Agreement constitutes the highest and best offer for the Subject Aircraft, and will provide a greater recovery for Spirit's estate than would be provided by any other available alternative. Spirit's determination that the Aircraft Sale Agreement constitutes the highest and best offer for the Subject Aircraft constitutes a valid and sound exercise of Spirit's business judgment.

M. The Aircraft Sale Agreement represents a fair and reasonable offer to purchase the Subject Aircraft under the circumstances of these Chapter 11 Cases. No other person or entity or

group of entities has offered to purchase the Subject Aircraft for greater economic value to Spirit's estate than the Stalking Horse Buyer has offered.

N. Approval of the Sale Motion and the Aircraft Sale Agreement and the consummation of the transactions contemplated thereby is in the best interests of Spirit, its creditors, its estates and other parties in interest.

O. Spirit has demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization.

P. The consideration provided by the Stalking Horse Buyer pursuant to the Aircraft Sale Agreement for its purchase of the Subject Aircraft, which is anticipated to be $320,501,935.95 of cash, a credit bid of $195,364,079.30 (which represents 90% of the principal amount of 2025-1 debt outstanding on the 27 EETC-financed aircraft plus all accrued and outstanding interest thereon to the date of payment) and reimbursement of Spirit's costs and expenses incurred in connection with the Sale, constitutes reasonably equivalent value and fair consideration (as those terms are defined in each of the Uniform Voidable Transactions Act (formerly the Uniform Fraudulent Transfer Act), Uniform Fraudulent Conveyance Act, and section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia; *provided* that in all cases the cash purchase price, when taken together with the cash proceeds from the sale of Lot 6, shall be an amount sufficient to satisfy the Minimum Bid Amount. The Aircraft Sale Agreement was not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession, or the District of Columbia. Neither the Debtors nor the Stalking Horse Buyer is fraudulently entering into the transactions contemplated by the Aircraft

Sale Agreement under any law, including, without limitation, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims.

Q. On the terms and subject to the conditions contained in the Aircraft Sale Agreement, the Stalking Horse Buyer agreed to provide, as aggregate consideration for the Subject Aircraft, the Purchase Price as provided under Section 2.2 of the Aircraft Sale Agreement.

R. Spirit has full corporate power and authority to execute and deliver the Aircraft Sale Agreement and all other documents contemplated thereby, and no further consents or approvals are required for Spirit to consummate the transactions contemplated by the Aircraft Sale Agreement, except as otherwise set forth in the Aircraft Sale Agreement.

S. The Debtors are the sole and lawful owners of the Subject Aircraft. The Subject Aircraft constitute property of the Debtors' estates and title to the Subject Aircraft is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code. The transfer of each of the Subject Aircraft to the Stalking Horse Buyer will be as of the Delivery thereof a legal, valid and effective transfer of such assets, and vests or will, as of the closing, vest the Stalking Horse Buyer with all right, title, and interest of Spirit to the Subject Aircraft free and clear of all Claims accruing, arising or relating to any time prior to the closing. The Stalking Horse Buyer would not enter into the Aircraft Sale Agreement to acquire the Subject Aircraft if the sale of the Subject Aircraft were not free and clear of all Claims. A sale of the Subject Aircraft other than one free and clear of all Claims would adversely impact the Debtors' estates, and would yield substantially less value for the Debtors' estates with less certainty than the Sale. Therefore, the Sale contemplated by the Aircraft Sale Agreement is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

T. One or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied and, therefore, Spirit may sell the Subject Aircraft free and clear of all liens (excluding for the avoidance of doubt any Buyer's Liens) claims, defenses (including rights of setoff and recoupment), and interests, in each case, in, on, or related to the Subject Aircraft, including, but not limited to, in respect of the following: (i) all mortgages, deeds of trust, and security interests of whatever kind or nature, conditional sales or title retention agreements, pledges, hypothecations, mechanics' and materialman's liens, assignments, preferences, debts, easements, charges, suits, licenses, options, rights of recovery, judgments, orders and decrees of any court or foreign or domestic governmental entity, taxes (including foreign, state, and local taxes), licenses, covenants, restrictions, indentures, instruments, leases, options, off-sets, causes of action, contract rights, and claims, to the fullest extent of the law, in each case, of any kind or nature in, on, or related to the Subject Aircraft (including all claims as defined in section 101(5) of the Bankruptcy Code), known or unknown, whether prepetition or postpetition, secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, perfected or unperfected, liquidated or unliquidated, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, statutory or non-statutory, matured or unmatured, legal or equitable, including any and all such liabilities, causes of action, contract rights, and claims arising out of the Debtors' continued operations following the closing; (ii) any pension, welfare, compensation, or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plan of the Debtors; (iii) any other employee, worker's compensation, occupation disease, unemployment, or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act,

(c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the WARN Act, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state discrimination laws, (k) state unemployment compensation laws or any other similar state laws, or (l) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors; (iv) any bulk sales or similar law to the maximum extent permitted by Law; (v) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (vi) any environmental laws, including any Environmental, Health and Safety Requirement(s); and (vii) any theories of successor or transferee liability (collectively, "**Encumbrances**"). Any holders of Claims against Spirit, its estate or any of the Subject Aircraft who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented thereto pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of such Claims who did object (such holder, an "**Objecting Lienholder**") fall within one or more of the other subsections of section 363(f) and are adequately protected by having their Claims, if any, in each instance against Spirit, its estate or any of the Subject Aircraft, attach to the cash proceeds from the Sale ultimately attributable to the Subject Aircraft in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses Spirit and its estate and the Stalking Horse Buyer may possess with respect thereto; *provided*, *however*, that any such interest in the cash proceeds from the Sale granted to an Objecting Lienholder shall be solely to the extent of such Objecting Lienholder's objection.

U. Good and sufficient reasons for approval of the Aircraft Sale Agreement and the transactions to be consummated in connection therewith have been articulated, and the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest. The Debtors have demonstrated compelling circumstances and good, sufficient, and sound business purposes and justifications for the Sale outside the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code, before, and outside of, a plan of reorganization, in that, among other things, the immediate consummation of the Sale provides the means for the Debtors to reduce ongoing expenses and maximize distributions to creditors. The Sale does not constitute a sub rosa or de facto plan of reorganization or liquidation as it does not propose to (i) impair or restructure existing debt of, or equity interests in, the Debtors, (ii) impair or circumvent voting rights with respect to any plan that may be proposed by the Debtors, (iii) circumvent chapter 11 safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code, or (iv) classify claims or equity interests or extend debt maturities. Accordingly, the Sale neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a chapter 11 plan for the Debtors.

V. By virtue of the consummation of the transactions contemplated under the Aircraft Sale Agreement, (i) the Stalking Horse Buyer is not a continuation of any Debtor and its respective estate, there is not substantial continuity between the Stalking Horse Buyer and the Debtors, and there is no continuity of enterprise between the Debtors and the Stalking Horse Buyer; (ii) the Stalking Horse Buyer is not holding itself out to the public as a continuation of the Debtors or their respective estates; (iii) the transactions do not amount to a consolidation, merger, or de facto merger of the Stalking Horse Buyer and the Debtors and/or the Debtors' estates; and (iv) the Buyer is not a successor of the Debtors or their estates for any purpose, including, without limitation,

under any federal, state, or local statute or common law, or revenue, pension, ERISA, tax, labor, employment, environmental, escheat, or unclaimed property laws, or other law, rule, or regulation (including, without limitation, filing requirements under any such law, rule, or regulation), or under any products liability law or doctrine with respect to the Debtors' liability under such law rule, regulation, doctrine, or common law, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule, regulation, or doctrine, and the Buyer shall have no liability or obligation under the Workers Adjustment and Retraining Act (the "**WARN Act**"), 929 U.S.C §§ 210 et seq., or the Comprehensive Environmental Response Compensation and Liability Act and shall not be deemed to be a "successor employer" for purposes of the Internal Revenue Code of 1986, Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act, the Americans with Disability Act, the Family Medical Leave Act, the National Labor Relations Act, the Labor Management Relations Act, the Older Workers Benefit Protection Act, the Equal Pay Act, the Civil Rights Act of 1866 (42 U.S.C. 1981), the Employee Retirement Income Security Act, the Multiemployer Pension Protection Act, the Pension Protection Act, and/or the Fair Labor Standards Act. Accordingly, the Stalking Horse Buyer is not and shall not be deemed a successor to any of the Debtors or their respective estates as a result of the consummation of the Sale pursuant to the Aircraft Sale Agreement and this Order. The transfer of the Subject Aircraft to the Stalking Horse Buyer does not and will not subject the Stalking Horse Buyer to any liability whatsoever with respect to the operations of the Debtors' business before the closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based on, in whole or in part, directly or indirectly, any theory of law or equity, including, without limitation, any theory of antitrust or successor or transferee liability.

W. To maximize the value of the Subject Aircraft it is essential that the Sale occur within the time constraints set forth in the Aircraft Sale Agreement. Time is of the essence in consummating the Sale.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. The relief requested in the Sale Motion is granted and approved, and the Sale contemplated by the Aircraft Sale Agreement for the Subject Aircraft is approved each as set forth in this Order.

2. All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived or settled as announced to the Court at the Sale Hearing or by stipulation, and all reservations of rights included therein, are, except as provided in other orders of the Court, hereby overruled on the merits or the interests of such objections have been otherwise satisfied or adequately provided for.

3. Notice of the Sale Hearing was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006, and the Sale Motion shall be deemed to provide sufficient notice as to the Sale of the Subject Aircraft free and clear of all Claims in accordance with Rule 6004-1 of the Local Bankruptcy Rules.

4. The Court's findings of fact and conclusions of law in the Bidding Procedures Order, including the record of the hearing to approve the Bidding Procedures Order, are incorporated herein by reference.

5. The Aircraft Sale Agreement and all other ancillary documents, and all of the terms and conditions thereof, are hereby approved.

6. The credit bid portion of the Purchase Price set forth in the Aircraft Sale Agreement is hereby approved pursuant to section 363(k) of the Bankruptcy Code.

7. The Stalking Horse Buyer is designated as the Back-Up Bidder for Lot 6 in accordance with the Bidding Procedures Order and the Aircraft Sale Agreement.

8. Pursuant to sections 363(b) and 363(f) of the Bankruptcy Code, Spirit is authorized, empowered, and directed to take any and all actions necessary or appropriate to (a) consummate the Sale of the Subject Aircraft to the Stalking Horse Buyer pursuant to and in accordance with the terms and conditions of the Aircraft Sale Agreement and this Order, (b) close the Sale as contemplated in the Aircraft Sale Agreement and this Order, (c) transfer and assign all rights, title, and interest to all assets, property, licenses, and rights of the Debtors to be conveyed in accordance with the terms and conditions of the Aircraft Sale Agreement, (d) satisfy and pay-off in full the claims of the Senior Certificateholders and all other components of the Minimum Bid Amount (which, for the avoidance of doubt, includes all Liquidity Obligations owed to each Liquidity Provider) in accordance with the EETC Intercreditor Agreements and this Order, and (e) execute and deliver, perform under, consummate, implement and close fully the Aircraft Sale Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Aircraft Sale Agreement and the Sale, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Aircraft Sale Agreement and such other ancillary documents; *provided*, *however*, that Spirit and the Stalking Horse Buyer shall have no obligation to proceed with the closing until all conditions precedent to their obligations to do so (as expressly set forth in the Aircraft Sale Agreement) have been met, satisfied or waived.

9. The terms and provisions of this Order shall inure to the benefit of the Stalking Horse Buyer, Spirit, the Senior Certificateholders, and their respective successors and assigns, including but not limited to any chapter 11 or chapter 7 trustee that may be appointed in the Debtors' cases and shall be binding in all respects upon the Stalking Horse Buyer and Spirit, any trustees thereof, their respective estates, all creditors and shareholders of Spirit, all interested parties and their respective successors and assigns.

10. Notwithstanding anything to the contrary in this Order, the Bidding Procedures Order, or the Aircraft Sale Agreement, the Debtors are authorized to fully pay and satisfy with the Sale proceeds the claims held by the Senior Certificateholders, the SuperB Noteholders, and all other components of the Minimum Bid Amount (which, for the avoidance of doubt, includes all Liquidity Obligations owed to each Liquidity Provider) that are secured by the Subject Aircraft, as applicable. Any payment of the EETC Debt (including all Liquidity Obligations) as provided hereunder shall (a) be non-refundable, irrevocable, and received free and clear of any claim, charge, assessment, or other liability, whether asserted or assessed by, through, or on behalf of any Debtors, and (b) not be recoverable or subject to any contest, attack, rejection, defense, avoidance, reduction, setoff, recoupment, recharacterization, subordination (whether equitable contractual, or otherwise), disallowance, impairment, claim, counterclaim, cross-claim, or any other challenge under the Bankruptcy Code, any applicable law, or regulation by any person or entity. Upon closing of the Sale and payment in full of, or provision for payment in accordance with the applicable Intercreditor Agreement and Trust Agreement of, the Senior Certificates, the Debtors shall deliver to the applicable Liquidity Provider a certificate signed by a Responsible Officer

(each as defined in the 2017-1AA Revolving Credit Agreement[3]), certifying that all of the applicable Certificates have been paid in full, provision has been made for such payment in accordance with the applicable Intercreditor Agreement and Trust Agreement, or such Certificates are otherwise no longer entitled to the benefits of the applicable Liquidity Facility.

11. Immediately following payment in full of the Purchase Price and application of the Minimum Bid Amount in accordance with paragraph 8 of this Order, (a) the Senior Trust Agreements will automatically terminate, except that all provisions thereof that survive termination will remain enforceable in accordance with their terms and (b) the Senior Trustee will be discharged from all of their obligations under the Senior Trust Agreements and any other related agreements; *provided*, *however*, that the foregoing shall not discharge any obligations owed to any Liquidity Provider under or in connection with the Liquidity Facilities until all Liquidity Obligations have been paid in full.

12. Notwithstanding anything to the contrary in this Order, the amount of $158,941.98 from the proceeds of the Sale, after satisfaction of payment of amounts set forth in the definition of Minimum Bid Amount, shall be set aside by the Debtors in a segregated account (such account may be the same account as the one established under paragraph 11 of the sale order docketed at ECF No. 991) as adequate protection for any year 2026 business personal property ad valorem tax claims of Grapevine-Colleyville ISD, City of Grapevine and Tarrant County (the "**Texas Tax Authorities**") that may be owed by the Debtors on account of the Subject Aircraft and the Aircraft from Lot 6 being purchased by the FTAI Buyer (as defined below) (collectively, the "**EETC-**

[3] "2017-1AA Revolving Credit Agreement" is defined as that certain Revolving Credit Agreement (2017-1AA) dated as of November 28, 2017, by and between, inter alia, Wilmington Trust National Association, as Subordination Agent, as agent and trustee for the trustee of Spirit Airlines Pass Through Trust 2017-1AA, as Borrower, and Commonwealth Bank of Australia, New York Branch, as Liquidity Provider.

**Financed Aircraft**"). The valid liens, if any, of the Texas Tax Authorities shall attach to these proceeds to the same extent and with the same priority as any liens held against the EETC-Financed Aircraft; *provided* that, for the avoidance of doubt, the Texas Tax Authorities shall have no claim or recourse against the Stalking Horse Buyer other than the segregated proceeds. These funds shall be on the order of adequate protection and shall constitute neither (a) the allowance of any claims of the Texas Tax Authorities, (b) an admission as to (i) the amount of any such claims of the Texas Tax Authorities or (ii) the validity, priority or extent of any liens of the Texas Tax Authorities, nor (c) a cap on the amounts the Texas Tax Authorities may be entitled to receive (if any). Furthermore, any purported claims and liens of the Texas Tax Authorities shall remain subject to any objections the Debtors or any other party in interest would otherwise be entitled to raise as to the priority, validity or extent of such claims and/or liens. These funds may be distributed upon agreement between the Texas Tax Authorities, the Debtors and the Stalking Horse Buyer, or by subsequent order of the United States Bankruptcy Court, duly noticed to the Texas Tax Authorities.

13. Notwithstanding anything to the contrary in this Order, after Spirit's receipt of the net proceeds of the Sale, only after payment in full of (i) the claims on account of the EETC Debt (including all Liquidity Obligations) in accordance with the EETC Intercreditor Agreements, and (ii) the SuperB Total Amount pursuant to the Aircraft Purchase Agreement and the Bidding Procedures, and the setting aside of proceeds of the Sale as provided in paragraph 12 of this Order to serve as adequate protection for any year 2026 business personal property ad valorem tax claims of the Texas Tax Authorities, Spirit will use such excess proceeds, if any, to prepay the Term

Loans (as defined in the DIP Credit Agreement)[4] to the extent provided by Section 2.05 of the DIP Credit Agreement.

14. In accordance with the Aircraft Sale Agreement, the transfer of the Subject Aircraft will be "as-is, where-is" and "with all faults".

15. Pursuant to the terms of the Aircraft Sale Agreement and the Bidding Procedures, the Stalking Horse Buyer shall pay or reimburse, as applicable, promptly on demand, all of Spirit's costs and expenses incurred in connection with the Sale (including reasonable legal and financial advisor fees and costs and expenses in relation to the consummation of the transactions contemplated by this Order and Bidding Procedures), which payment (including of any good faith estimates provided by Spirit of such costs and expenses) shall be a condition precedent to the closing of the sale to the Stalking Horse Buyer. To the extent not previously paid, the Stalking Horse Bidder shall also be required to satisfy certain outstanding claims of Lufthansa Technik AG with respect to ESN 18678. For the avoidance of doubt, in the event any fee or cost that is required to be paid or reimbursed to the Debtors under the Aircraft Sale Agreement is not known prior to

[4] "DIP Credit Agreement" is as defined in the Court's *Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Senior Secured Liens and Superpriority Administrative Expense Claims; (III) Authorizing the Debtors to Utilize Cash in Encumbered Accounts; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; and (VI) Granting Related Relief* [ECF No. 384] (the "**Final DIP Order**"), as amended by the *Agreed Order Amending Final Order (I) Authorizing the Debtors to Obtain Postpetition Financing; (II) Granting Senior Secured Liens and Superpriority Administrative Expense Claims; (III) Authorizing the Debtors to Utilize Cash in Encumbered Accounts; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; and (VI) Granting Related Relief* [ECF No. 643] and *Order (I) Authorizing the Debtors to Wind Down Operations, (II) Approving the Debtors Use of Cash Collateral And Amendments to the DIP Credit Agreement and Final DIP Order, (III) Authorizing Modification or Termination of the Debtors Employee Programs, (IV) Approving Wind-Down Retention Plan, (V) Approving Modification of Contract Rejection Procedures, (VI) Approving Non-Fleet Assets Sale Procedures, (VII) Approving Non-Fleet Assets Abandonment Procedures, (VIII) Approving the Use of Certain Third Party Contractors, (IX) Approving Protections for Certain Persons Implementing the Wind-Down, (X) Enforcing an Administrative Stay, (XI) Authorizing the Preemption of Applicable Laws and Ordinances for the Debtors to Effectuate the Wind-Down, (XII) Authorizing the Debtors to Take Any and All Actions Necessary to Implement the Wind-Down, and (XIII) Granting Related Relief* [ECF No. 1048].

closing and/or the estimated payment proves insufficient, the Stalking Horse Buyer shall promptly pay Spirit post-closing in accordance with the Aircraft Sale Agreement.

16. In accordance with the Aircraft Sale Agreement, the Stalking Horse Buyer shall pay, indemnify and hold the Debtors and their affiliates harmless from any and all sales, use, transfer or other tax obligations imposed, levied, or assessed in connection with the Sale or delivery of, or transfer of title to, each Subject Aircraft.

17. Pursuant to section 363(f) of the Bankruptcy Code, Spirit is authorized to transfer the Subject Aircraft to the Stalking Horse Buyer in accordance with the Aircraft Sale Agreement and this Order. Such Subject Aircraft shall be transferred to the Stalking Horse Buyer upon and as of the closing notwithstanding any requirement for approval or consent by any person and vests the Stalking Horse Buyer with all right, title and interest of Spirit in and to the Subject Aircraft and such transfer shall constitute a legal, valid, binding and effective transfer of the Subject Aircraft and, upon Spirit's receipt of the Purchase Price and satisfaction or waiver of all conditions precedent set forth in the Aircraft Sale Agreement, shall be free and clear of all Claims and other interests of any kind or nature whatsoever, whether arising on, before or after the Petition Date, with all such Claims and other interests to attach to the net proceeds of the Sale with the same validity, priority, force and effect that they now have as against such Subject Aircraft, subject to any claims and defenses Spirit and its estates may possess with respect thereto. For the avoidance of doubt, any claims regarding the breach of the Aircraft Sale Agreement shall not be released pursuant to this Order.

18. Except as expressly permitted or otherwise specifically provided by the Aircraft Sale Agreement or this Order, all persons and entities holding Claims or interests in the Subject Aircraft arising under or out of, in connection with, or in any way relating to Spirit, the Subject

Aircraft or the transfer of the Subject Aircraft to the Stalking Horse Buyer, hereby are forever barred, estopped and permanently enjoined from asserting against the Stalking Horse Buyer or its successors or assigns, their property or the Subject Aircraft, such persons' or entities' interests in and to the Subject Aircraft. On the closing, each creditor is authorized to execute such documents and take all other actions as may be necessary to release Claims on the Subject Aircraft, if any, as provided for herein, as such Claims may have been recorded or may otherwise exist.

19. All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of Spirit to sell and transfer the Subject Aircraft to the Stalking Horse Buyer in accordance with the terms of the Aircraft Sale Agreement and this Order.

20. All persons and entities that are in possession of some or all of the Subject Aircraft on the date of closing are directed to surrender possession of such Subject Aircraft to the Stalking Horse Buyer at such time thereafter as the Stalking Horse Buyer may request.

21. All of the Debtors' interests in the Subject Aircraft to be acquired by the Stalking Horse Buyer under the Aircraft Sale Agreement and this Order shall be, as of the closing and upon the occurrence of the closing (including, as provided in the Aircraft Sale Agreement, Spirit's delivery of each required Bill of Sale to the Stalking Horse Buyer and the Stalking Horse Buyer's execution and delivery of each required Aircraft Acceptance Certificate to Spirit), transferred to and vested in the Stalking Horse Buyer. Upon the occurrence of the closing, subject to the terms of this Order, this Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Subject Aircraft acquired by the Stalking Horse Buyer under the Aircraft Sale Agreement, and transfer to the Stalking Horse Buyer of the Debtors' interests in the Subject Aircraft shall be effective as a determination that, as of the

date of closing, all Claims or other interest of any kind or nature whatsoever existing as to the Subject Aircraft prior to closing, excluding any Buyer's Liens, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been effected. This Order shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease, and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Aircraft Sale Agreement. A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any Claims and other interests of record, excluding any Buyer's Liens.

22. Except as otherwise expressly provided for in this Order or the Aircraft Sale Agreement, the Stalking Horse Buyer shall not have any liability or other obligation of Spirit arising under or related to the Subject Aircraft related to the period before the closing (other than the obligations set forth in the Aircraft Sale Agreement regarding payment of Spirit's costs and expenses). No bulk sales law, or similar law of any state or other jurisdiction, shall apply in any way to the Sale, the Motion and this Order.

23. The transactions contemplated by the Aircraft Sale Agreement are undertaken by the Stalking Horse Buyer without collusion and in good faith, as that term is defined in section

363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale, unless such authorization and consummation of such Sale are duly stayed pending such appeal. The Stalking Horse Buyer is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code. The Sale approved by this Order is not subject to avoidance under section 363(n) of the Bankruptcy Code. The Stalking Horse Buyer is not an "insider" as that term is defined in section 101(31) of the Bankruptcy Code.

24. Pursuant to Bankruptcy Rules 7062, 9014, 6004(h) and 6006(d), this Order shall be effective immediately upon entry and Spirit and the Stalking Horse Buyer are authorized to close the Sale immediately upon entry of this Order.

25. There are no brokers involved in consummating the Sale and no brokers' commissions are due.

26. The failure specifically to include any particular provision of the Aircraft Sale Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Aircraft Sale Agreement be authorized and approved in its entirety.

27. The Aircraft Sale Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms thereof and the DIP Documents (as defined in the amended Final DIP Order) (as applicable), without further order of the Court; *provided* that any modification, amendment, or supplement that has a material adverse effect on the Debtors' estates or materially changes the economic substance of the transactions shall be filed on the docket and served on the master service list, and parties in interest shall have five (5) days to object to any such amendment. Absent any

such objection, such modification, amendment, or supplement shall be binding and any timely objection shall be heard by the Court on an expedited basis.

28. The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors solely to the extent necessary to allow the Stalking Horse Buyer and the Debtors to deliver any notice provided for in the Aircraft Sale Agreement, allow the Stalking Horse Buyer and the Debtors to take any and all actions permitted under the Aircraft Sale Agreement, and allow the Stalking Horse Buyer to enforce any of its remedies or exercise any of its rights under the Aircraft Sale Agreement and any other related document, in each case in accordance with the terms and conditions thereof and this Order.

29. The transactions contemplated by the Aircraft Sale Agreement and this Order, and the execution, delivery, and/or recordation of any and all documents or instruments necessary or desirable to consummate the Sale, are exempt from any and all document recording tax, stamp tax, conveyance fee, intangibles, or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing, or recording fee, regulatory filing or fee, or other similar tax, fee, or governmental assessment incurred or assessed by any federal, state, local, or foreign taxing authority (including interest and penalties, if any) to the maximum extent permitted by law.

30. The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Aircraft Sale Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which Spirit is a party or which has been assigned by Spirit to the Stalking Horse Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.

31. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

32. To the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion in these Chapter 11 Cases, the terms of this Order shall govern.

33. To the extent there are any inconsistencies between the terms of this Order and the Aircraft Sale Agreement (including all ancillary documents executed in connection therewith), the terms of this Order shall control.

[*Signature Page Follows*]

Dated: September 23, 2026
White Plains, New York

***/s/ Sean H. Lane***
UNITED STATES BANKRUPTCY JUDGE

# Exhibit A

## Subject Aircraft

| Subject Aircraft Lots | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Lot** | **MSN** | **Aircraft Model[1]** | **Manufacture Date** | **Registration No.** | **ESN** | **ESN** | **Purchase Price** |
| 1 | 7008 | A320-232C | 3/15/2016 | N645NK | 18699 | 18116 | $18,451,000 |
| | 7156 | A320-232C | 6/8/2016 | N644NK | 18751 | 18102 | $23,970,000 |
| | 7062 | A320-232C | 3/31/2016 | N646NK | 18842 | 18677 | $18,948,000 |
| 2 | 8018 | A320-232C | 12/14/2017 | N651NK | 18689 | 18083 | $23,504,000 |
| | 8021 | A320-232C | 12/21/2017 | N652NK | 18089 | 18679 | $24,845,000 |
| | 8012 | A320-232C | 1/31/2018 | N653NK | 18112 | 18678 | $23,555,000 |
| 3 | 8176 | A320-232C | 4/23/2018 | N654NK | 18064 | 18309 | $25,837,000 |
| | 8376 | A320-232C | 8/27/2018 | N655NK | 17946 | 18172 | $24,620,000 |
| | 8400 | A320-232C | 8/28/2018 | N656NK | 18170 | 18824 | $24,891,000 |
| | 8434 | A320-232C | 10/2/2018 | N690NK | 18840 | 18024 | $25,600,000 |
| 4 | 6804 | A321-231C | 10/22/2015 | N660NK | 18738 | 18722 | $19,746,000 |
| | 6994 | A321-231C | 2/26/2016 | N663NK | 18749 | 18732 | $21,346,000 |
| | 7058 | A321-231C | 4/28/2016 | N667NK | 18688 | 18675 | $21,564,000 |
| 5 | 7296 | A321-231C | 9/7/2016 | N669NK | 18825 | 18758 | $23,368,000 |
| | 6897 | A321-231C | 12/18/2015 | N662NK | 18731 | 18307 | $23,928,000 |
| | 7135 | A321-231C | 5/27/2016 | N668NK | 18075 | 18823 | $23,526,000 |
| 7 | 8047 | A321-231C | 2/8/2018 | N684NK | 18071 | 18757 | $26,294,000 |
| | 7021 | A321-231C | 4/12/2016 | N664NK | 18429 | 18433 | $28,950,000 |
| | 7522 | A321-231C | 1/31/2017 | N672NK | 18088 | 18256 | $27,138,000 |
| | 8160 | A321-231C | 3/30/2018 | N687NK | 17988 | 18730 | $27,156,000 |
| 8 | 8114 | A321-231C | 2/14/2018 | N683NK | 17899 | 18245 | $30,150,000 |
| | 8115 | A321-231C | 3/12/2018 | N685NK | 17990 | 18022 | $29,452,000 |
| | 8141 | A321-231C | 3/22/2018 | N686NK | 18114 | 18092 | $30,552,000 |

[1] All Subject Aircraft are manufactured by Airbus.

**Exhibit B**

**Aircraft Sale Agreement**

EXECUTION VERSION

# AMENDED AND RESTATED AIRCRAFT SALE AND PURCHASE AGREEMENT (SPIRIT-EETC 2026)

dated as of September 22, 2026

between

**SPIRIT AIRLINES, LLC**
as Seller

and

**SAVE 2026-B LLC**
as Buyer

Up to 27 Used Airbus A320 and A321 Aircraft

TABLE OF CONTENTS


**Page**

1. **Definitions & Interpretation**. 2
    1.1 Definitions. 2
    1.2 Interpretation. 9
2. **Agreements to Sell and Purchase**. 9
    2.1 Sale and Purchase. 9
    2.2 Deposit; Purchase Price. 10
    2.3 Payments. 11
    2.4 Additional Equipment. 12
    2.5 Removal of Excluded Equipment. 12
    2.6 Assignment of Warranties. 12
3. **Delivery of Aircraft**. 12
    3.1 Delivery Condition. 12
    3.2 Delivery Location. 12
    3.3 Delivery. 13
4. **Conditions Precedent**. 13
    4.1 Conditions Precedent. 13
    4.2 No Financing or Other Contingencies. 14
5. **Bankruptcy Provisions**. 14
    5.1 Court Approvals. 14
    5.2 Court Filings. 15
    5.3 Buyer Assistance. 15
    5.4 Competing Bids. 15
    5.5 Back-up Bidder. 16
    5.6 Break-Up Fee and Reimbursement. 16
    5.7 Bankruptcy Termination Events. 17
6. **Termination**. 18
    6.1 Total Loss before Delivery. 18
    6.2 Aircraft Non-Sale Event. 18
    6.3 Default Provisions. 18
    6.4 Effect of Termination. 19
7. **Representations and Warranties; Disclaimers and Waivers**. 19
    7.1 Seller Representations and Warranties 19
    7.2 Buyer Representations and Warranties. 20
    7.3 Disclaimers 21
    7.4 Waivers 22

8. **Insurance**. 23
8.1 Insurances 23
8.2 Certificates, Etc. 24
9. **Transfer Taxes**. 24
9.1 Diligence. 24
9.2 Tax Indemnity. 24
9.3 Cooperation. 24
9.4 Procedures, Etc. 25
10. **Miscellaneous**. 25
10.1 Entire Agreement, Amendment, Installment Contract; Time is of the Essence. 25
10.2 [Reserved]. 26
10.3 Non-Waiver. 26
10.4 Severability. 26
10.5 Notices. 26
10.6 Governing Law & Jurisdiction. 27
10.7 Waiver of Jury Trial. 28
10.8 Further Assurances. 28
10.9 Counterparts. 28
10.10 Transaction Costs. 28
10.11 Assignment, Successors and Assigns. 29
10.12 [Reserved]. 29
10.13 Third-party Beneficiaries. 29
10.14 Limitation of Liability. 29
10.15 Force Majeure. 29
10.16 Publicity 30
10.17 Relationship of the Parties. 30
10.18 Brokers and other Third Parties. 30
10.19 Buyer Nominee. 30
10.20 Amendment and Restatement of Original APA. 30

EXHIBITS

Exhibit A Description of Aircraft
Exhibit B Delivery Condition
Exhibit C List of Excluded Equipment
Exhibit D List of Additional Equipment
Exhibit E Form of Aircraft Acceptance Certificate
Exhibit F Form of Warranty Bill of Sale
Exhibit G [Reserved]
Exhibit H Form of Compliance Certification Statement

# AMENDED AND RESTATED AIRCRAFT SALE AND PURCHASE AGREEMENT
# (SPIRIT-EETC 2026)

This AMENDED AND RESTATED AIRCRAFT SALE AND PURCHASE AGREEMENT (SPIRIT-EETC 2026) (the "**Agreement**") is entered into as of September 22, 2026 by and between SPIRIT AIRLINES, LLC, a Delaware limited liability company (hereinafter referred to as "**Seller**") and SAVE 2026-B LLC, a limited liability company (hereinafter referred to as "**Buyer**") (Seller and Buyer are each a "**Party**" and, collectively, the "**Parties**").

RECITALS

WHEREAS, Seller owns 27 Airbus model A320 aircraft and Airbus model A321 aircraft (each, as described more fully on Exhibit A, but excluding Excluded Equipment, together with all documents and available records pertaining thereto in Seller's possession and set forth on Schedule 1 to Exhibit B (the "**Records**"), an "**Aircraft**" and, collectively, the "**Aircraft**");

WHEREAS, subject to the provisions of Sections 5.4(b) and 5.5, Seller desires to sell to Buyer, and Buyer desires to purchase from Seller, such Aircraft, in each case upon and subject to the terms and conditions of this Agreement;

WHEREAS, Seller and its affiliates commenced cases as debtors under the Bankruptcy Code on August 29, 2025 (the "**Chapter 11 Case**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") and are authorized to manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, on May 2, 2026, Seller announced that it ceased all operations and will be conducting an orderly wind-down and liquidation of its operations;

WHEREAS, Seller will seek the entry of order(s) by the Bankruptcy Court approving the transactions contained herein, subject to a court approved auction process;

WHEREAS, reference is made to the Pass Through Trust Agreement (the "**Pass Through Trust Agreement**"), dated as of August 11, 2015, by and between Spirit Airlines, LLC (formerly known as Spirit Airlines, Inc.) and Wilmington Trust National Association, ("**WTNA**") as Trustee, as supplemented by (a) the Trust Supplement No. 2015-1A (together with the Pass Through Trust Agreement, the "**2015 A Trust Agreement**"), dated as of August 11, 2015, by and between Spirit and WTNA, as Trustee (in such capacity, the "**2015 A Trustee**"), (b) the Pass Through Trust Agreement, as supplemented by the Trust Supplement No. 2017-lAA dated as of November 28, 2017 (together with the Pass Through Trust Agreement, the "**2017 AA Trust Agreement**"), (c) Pass Through Trust Agreement,

as supplemented by the Trust Supplement No. 2017-lA dated as of November 28, 2017 (together with the Pass Through Trust Agreement, the "**2017 A Trust Agreement**", and together with the 2015 A Trust Agreement and 2017 AA Trust Agreement, the "**Senior Trust Agreements**", the Trustee thereunder, the "**Senior Trustee**" and the Class A Certificateholders and Class AA Certificateholders thereunder, collectively the "**Senior Certificateholders**") and (d) the Trust Supplement No. 2025-1B(R) (together with the Pass Through Trust Agreement, the "**B(R) Trust Agreement**"), dated as of March 27, 2025, by and between Spirit and WTNA, as Trustee (in such capacity, the "**B(R) Trustee**" and the Class B(R) Certificateholders thereunder, the "**Junior Certificateholders**");

WHEREAS, Seller and Buyer previously entered into that certain Aircraft Sale and Purchase Agreement (SPIRIT-EETC 2026), dated as of July 27, 2026 (the "**Original APA**"), and the Parties now desire to amend and restate the Original APA in its entirety as set forth herein;

WHEREAS, the consummation of the transactions set forth in this Agreement are subject to, among other things, the entry of the Sale Approval Order under, *inter alia*, Section 363 of the Bankruptcy Code;

WHEREAS, Seller has entered into that certain Aircraft Sale and Purchase Agreement (SPIRIT-FTAI 2026), dated as of September 18, 2026 (the "**FTAI APA**"), with FTAI Aircraft Leasing Bermuda (2026) Ltd. ("**FTAI**"), with respect to the Aircraft listed on Schedule 2 to Exhibit A hereto (such Aircraft, the "**Partial Consent Assets**", and each, a "**Partial Consent Asset**"), and Buyer has consented to Seller entering into the FTAI APA with respect to such Partial Consent Assets;

NOW, THEREFORE, in consideration of the mutual promises and covenants herein contained, the receipt and sufficiency of which are conclusively acknowledged, the Parties hereto agree as follows:

1. **Definitions & Interpretation**.

1.1 **Definitions.** In addition to the capitalized terms defined elsewhere herein, the following capitalized terms used herein and not otherwise defined shall have the following respective meanings for all purposes of this Agreement.

"**Additional Equipment**" means the components, parts, systems and equipment listed on Exhibit D, which includes, solely to the extent set forth on such Exhibit D, the following: (a) branded galley carts, beverage carts, food tray carriers, ice containers, oven inserts, galley inserts (other than any non-branded electrical equipment in the galley), and other branded passenger convenience or service items and (b) cargo containers.

"**Affiliate**" means a Person or an entity that directly or indirectly controls, is controlled by, or is under common control with, another Person or entity, including, among

the others, executive officers, directors, large stockholders, subsidiaries, parent entities and sister companies.

"**Agreement**" has the meaning given to it in the preamble.

"**Aircraft**" has the meaning given to it in the recitals.

"**Aircraft Acceptance Certificate**" means, with respect to an Aircraft, an aircraft acceptance certificate for such Aircraft substantially in the form provided in Exhibit E and executed by Buyer (or Buyer Nominee, as applicable, on behalf of Buyer and on its own behalf).

"**Aircraft Non-Sale Event**" means, with respect to any Aircraft, if Delivery of such Aircraft has not occurred on or prior to the Delivery Window Deadline for such Aircraft.

"**Aircraft Specific Deposit**" has the meaning given to it in Section 2.2.

"**Airframe**" means, with respect to each Aircraft, the related airframe (excluding the associated Engines) listed on Exhibit A. For the avoidance of doubt, the term "Airframe" does not include Records.

"**Airframe Warranties Assignment**" means an assignment or replacement controlling party notice in respect of any existing airframe warranties among Seller, Buyer (or Buyer Nominee, as applicable) and Airbus S.A.S.

"**AMM**" means Seller's Customized Airline Aircraft Maintenance Manual.

"**Applicable Reserve Amount**" means, for an Aircraft, the amount specified for such Aircraft in the column entitled "Reserve Amount" on Exhibit A hereto; provided that, in no event will the Applicable Reserve Amount for any Aircraft be less than a pro rata allocation of the Minimum Bid Amount for such Aircraft.

"**Bankruptcy Code**" means the United States Bankruptcy Code, 11 United States Code §§ 101 *et seq*., as amended.

"**Bankruptcy Court**" has the meaning given to it in the recitals.

"**Bankruptcy Court Orders**" has the meaning given to it in Section 5.1.

"**Bidding Procedures Order**" has the meaning given to it in Section 5.1.

"**Bill of Sale**" means, with respect to an Aircraft, a warranty bill of sale for such Aircraft substantially in the form of Exhibit F hereto.

"**Business Day**" means a day other than a Saturday or Sunday on which the banks in New York City, New York, USA are open for the transaction of business of the type required by this Agreement.

"**Buyer**" has the meaning given to it in the preamble.

"**Buyer's Default**" means the occurrence of one or more of the following events:

(i) with respect to any Aircraft, Buyer's (or Buyer Nominee's, as applicable) failure to accept the Delivery of such Aircraft when required to do so in accordance with all applicable terms and conditions of this Agreement (including, without limitation, failure by Buyer to accept the Bill of Sale for such Aircraft in connection with such Delivery when required to do so in accordance with all applicable terms and conditions of this Agreement) and failure to cure such default within ten (10) Business Days of Seller's written notice to Buyer;

(ii) with respect to any Aircraft, any of the conditions precedent within the control of Buyer is not satisfied (or waived by Seller in its sole and absolute discretion) by the Delivery Window Deadline for such Aircraft and such failure is not solely due to or arising from a breach by Seller of its obligations under this Agreement and failure to cure such default within ten (10) Business Days of Seller's written notice to Buyer; or

(iii) (A) any failure by Buyer to observe or perform any of its other material obligations under this Agreement if such failure continues for fifteen (15) days after Seller has delivered a written notice thereof to Buyer (provided that if the same is curable but is not capable of being cured within such 15-day period, subject to Buyer having commenced good faith efforts to cure the same, the material breach has thereafter not been cured within 45 days following receipt of Seller's written notice), or (B) the occurrence of a default by Buyer described in the foregoing clauses (i) or (ii) with respect to two or more Aircraft.

"**Buyer's Liens**" has the meaning given to it in Section 2.1(b).

"**Buyer Nominee**" means, with respect to any Aircraft, any Person designated by Buyer pursuant to Section 10.19 to accept delivery of, and acquire title to, such Aircraft in lieu of Buyer; provided that no such designation shall relieve Buyer of, or otherwise affect, any of Buyer's obligations or any of Seller's rights under this Agreement, and Buyer shall remain fully liable for the due and punctual performance of all such obligations notwithstanding any such designation.

"**Cape Town Agreements**" means the Cape Town Convention, as supplemented by the Cape Town Aircraft Protocol (in each case, the English language version).

"**Cape Town Aircraft Protocol**" means The Protocol on International Interests in Mobile Equipment, concluded in Cape Town, South Africa, on November 16, 2001 (the English language version).

"**Cape Town Convention**" means The Convention on International Interests in Mobile Equipment, concluded in Cape Town, South Africa, on November 16, 2001 (the English language version).

"**Civil Aviation Registry**" means the registry of aircraft maintained by the FAA.

"**Competing Bid**" has the meaning given to it in Section 5.4.

"**Credit Bid Amount**" means 90% of the outstanding principal amount of secured debt held by Buyer (or held by or on behalf of the beneficial owners of the Buyer) *plus* all accrued and outstanding interest thereon and any other amounts or obligations owed by Seller in connection therewith, in respect of all Aircraft which shall be part of the Purchase Price pursuant to section 363(k) of the Bankruptcy Code.

"**Delivery**" means, with respect to each Aircraft, delivery and consummation of the sale of such Aircraft pursuant to the terms of this Agreement.

"**Delivery Condition**" means, with respect to an Aircraft, the condition of such Aircraft at Delivery as provided in Section 3.1 and Exhibit B.

"**Delivery Date**" means, with respect to an Aircraft, the actual date on which Delivery of such Aircraft occurs.

"**Delivery Location**" has the meaning given to such term in Section 3.2.

"**Delivery Window Deadline**" shall mean September 30, 2026; *provided, however*, that if there is any unresolved objection that results in the Sale Approval Order not becoming a Final Order by such date, then the Delivery Window Deadline shall mean the date on which such Sale Approval Order becomes a Final Order.

"**Dollars**", "**$**" and "**US$**" mean the lawful currency of the United States.

"**Engine**" means, with respect to an Aircraft, any one of the two aircraft engines associated with the "AC Type" of such Aircraft that are listed on Schedule 1 to Exhibit A, as selected by Seller to be associated with such Aircraft for purposes of this Agreement and the Transaction Documents for such Aircraft, subject to any grouping of the Airframes and Engines pursuant to the Bankruptcy Court Orders (as defined below).

"**Engine Warranties Assignment**" means an assignment or replacement controlling party notice in respect of any existing engine warranties, among Seller, Buyer (or Buyer Nominee, as applicable) and the manufacturer of the Engines.

"**Escrow Agent**" means McAfee & Taft, a Professional Corporation, or such other escrow agent as agreed between the Parties.

"**Excluded Equipment**" means the list of components, parts, systems and equipment solely as listed on in Exhibit C, which includes, solely to the extent set forth on such Exhibit C, the following: (a) defibrillators, enhanced emergency medical kits and other medical equipment and (b) components or systems installed on or affixed to the related airframe that are used to provide individual telecommunications, Wi-Fi and/or satellite connectivity or electronic entertainment or services to passengers aboard the Aircraft. Excluded Equipment shall not include any property abandoned pursuant to Section 2.5 or any Additional Equipment.

"**FAA**" means the United States Federal Aviation Administration.

"**FAA Bill of Sale**" means, with respect to an Aircraft (or, as applicable, an Airframe), an FAA Form AC 8050-2 aircraft bill of sale (or any successor form thereto established and accepted by the FAA).

"**FAA Counsel**" means the law firm of McAfee & Taft, a Professional Corporation, or such other law firm as agreed between the Parties.

"**FAA Registration Application**" means, with respect to an Aircraft (or, as applicable, an Airframe), an FAA Form AC 8050-1 aircraft registration application document (or any successor form thereto established and accepted by the FAA) required to register the Aircraft (or, as applicable, the Airframe) for operation within the United States.

"**Final Order**" shall mean an order or judgment of the Bankruptcy Court or other court of competent jurisdiction, as entered on its docket, that has not been reversed, stayed, modified or amended, and as to which the time to appeal, petition for certiorari or move for reargument, rehearing or a new trial has expired and no appeal, petition for certiorari or motion for reargument, rehearing or a new trial, respectively, has been timely filed.

"**Force Majeure**" has the meaning given to it in Section 10.15.

"**FTAI APA**" has the meaning given to it in the recitals.

"**FTAI**" has the meaning given to it in the recitals.

"**Government Entity**" means the United States government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory, or administrative functions of or pertaining to any such government.

"**Initial Deposit Amount**" has the meaning given to it in Section 2.2.

"**Insurance Period**" has the meaning given to it in Section 8.1.

"**Intercreditor Agreement**" means (x) the Amended and Restated Intercreditor Agreement dated as of March 31, 2025, between Wilmington Trust, National Association, not in its individual capacity but solely as the 2017-1 Subordination Agent and the pass through trustees for Series 2017-1 and the liquidity providers party thereto (the "**2017-1 Intercreditor Amendment**") and (y) the Amended and Restated Intercreditor Agreement dated as of March 31, 2025, between Wilmington Trust, National Association, not in its individual capacity but solely as the 2015-1 Subordination Agent and the pass through trustees for Series 2015-1 and the liquidity providers party thereto (the "**2015-1 Intercreditor Amendment**" and, together with the 2017-1 Intercreditor Agreement, the "**Intercreditor Agreements**").

"**International Interests**" has the meaning ascribed to the term "international interests" under the Cape Town Agreements.

"**International Registry**" has the meaning ascribed to the term "international registry" under the Cape Town Agreements.

"**Law**" means any (a) Law, statute, decree, constitution, regulation, order or directive of any Government Entity, (b) treaty, pact, compact or other agreement to which any Government Entity is a signatory or party, (c) judicial or administrative interpretation or application of any of the foregoing or (d) any binding judicial precedent having the force of Law in any Government Entity.

"**Lien**" means any lien, security interest, lease, mortgage, pledge, International Interest on the International Registry (but not any contract of sale registration on the International Registry), title retention or other charge or encumbrance or claim or interest or right of others or agreement the effect of which is the creation of security, including, without limitation, rights of others under the Aircraft, Airframe, or Engine, or parts thereof, interchange, loan, or lease agreement.

"**Minimum Bid Amount**" means an amount in cash sufficient to (a) reimburse the Subordination Agent (as defined in the Intercreditor Agreements), the Senior Trustee, the B(R) Trustee, each Liquidity Provider (each as defined in the Intercreditor Agreements) and any Senior Certificateholder for fees, expenses, and other similar amounts (including principal and interest due to the Liquidity Providers) owed under the Intercreditor Agreements and (b) pay in full in accordance with the provisions of the Intercreditor Agreements the remaining outstanding balances of the certificates held by all Senior Certificateholders, together with any accrued and outstanding interest thereon to the date of payment. For the avoidance of doubt, the Minimum Bid Amount shall not include any premium, makewhole, or other similar amount.

"**Non-Transferable Additional Equipment**" means (a) the Excluded Equipment specified in Exhibit C and (b) any other item of Additional Equipment that cannot be legally transferred by Seller to Buyer (or Buyer Nominee, as applicable) due to applicable Law, including (x) defibrillators, enhanced emergency medical kits and other medical equipment and (y) any food or alcohol.

"**Party**" or "**Parties**" has the meaning given to it in the preamble.

"**Partial Consent Assets**" has the meaning given to it in the recitals.

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, association, joint stock company, company, firm, trust, organization, government, or any agency or political subdivision thereof or any other entity, whether or not having a separate legal personality.

"**Plan Effective Date**" has the meaning given to it in Section 10.6(b).

"**Purchase Price**" means, subject to the provisions of Section 2.2(b), the sum of the Minimum Bid Amount *plus* the Credit Bid Amount (which sum, for the avoidance of doubt, includes consideration for the Additional Equipment).

"**Records**" has the meaning given to it in the recitals.

"**Sale Approval Order**" has the meaning given to it in Section 5.1.

"**Sale Motion**" has the meaning given to it in Section 5.1.

"**Seller**" has the meaning given to it in the preamble.

"**Seller's Default**" means the occurrence of one or more of the following events:

(i) with respect to any Aircraft, Seller's failure to consummate the Delivery of such Aircraft when required to do so in accordance with all applicable terms and conditions of this Agreement, and failure to cure such default within five (5) Business Days of Buyer's written notice to Seller;

(ii) with respect to any Aircraft, any of the conditions precedent within the control of Seller is not satisfied (or waived by Buyer in its sole and absolute discretion) by the Delivery Window Deadline for such Aircraft and such failure is not due to or arising from a breach by Buyer of its obligations under this Agreement, and failure to cure such default within five (5) Business Days of Buyer's written notice to Seller; or

(iii) (A) any failure by Seller to observe or perform any of its other material obligations under this Agreement if such failure continues for fifteen (15) days after Buyer has delivered a written notice thereof to Seller (provided that if the same is curable but is not capable of being cured within such 15-day period, subject to Seller having commenced good faith efforts to cure the same, the material breach has thereafter not been cured within 45 days following receipt of Buyer's written notice), or (B) the occurrence of a default by Seller described in the foregoing clauses (i) or (ii) with respect to two or more Aircraft.

"**Seller Parent**" has the meaning given to it in Section 5.7(e).

"**Seller Parties**" means Seller, its subsidiaries and parent organizations, and each of its and their directors, officers, shareholders, members, controlling Persons, agents, employees, subsidiaries, Affiliates, successors, assigns and transferees of the foregoing parties (each, a "**Seller Party**").

"**Surviving Provisions**" has the meaning given to it in Section 3.3(b).

"**Total Loss**" means, as applicable, the actual, constructive or arranged total loss of an Aircraft.

"**Transaction Documents**" means, with respect to any Aircraft, this Agreement and the related Bill of Sale, the Aircraft Acceptance Certificate, the Airframe Warranty Assignment, the Engine Warranty Assignment, the FAA Bill of Sale and the FAA Registration Application.

"**Transfer Taxes**" has the meaning given to it in Section 9.2.

1.2 **Interpretation.** All references in this Agreement to Exhibits, Schedules, Sections, paragraphs, subsections, clauses and other subdivisions refer to the corresponding Exhibits, Schedules, Sections, paragraphs, subsections, clauses and other subdivisions of or to this Agreement unless expressly provided otherwise. Titles appearing at the beginning of any Sections, paragraphs, subsections, or other subdivisions of this Agreement are for convenience only, do not constitute any part of this Agreement, and shall be disregarded in construing the language hereof. The words "this Agreement," "herein," "hereby," "hereunder," and "hereof," and words of similar nature, refer to this Agreement as a whole and not to any particular Section, subsection, or other subdivision unless expressly so limited. The words "this Section," and "this subsection," and words of similar nature, refer only to the Section, or subsection hereof in which such words occur. The word "including" (in its various forms) means "including without limitation". Pronouns in masculine, feminine, or neutral genders shall be construed to state and include any other gender, and words, terms, and titles (including terms defined herein) in the

singular form shall be construed to include the plural and vice versa, unless the context otherwise requires. Exhibits, Schedules and Appendices referred to herein are attached hereto. Except as otherwise provided in this Agreement, any reference herein to any Law shall be construed as referring to such Law as amended, modified, codified, or reenacted, in whole or in part, and in effect from time to time, and references to particular provisions of a Law include a reference to the corresponding provisions of any prior or succeeding Law, and any reference herein to a document includes that document as amended from time to time in accordance with its terms, and any document entered into in substitution or replacement therefor. Any reference to an amendment includes a supplement, novation, or re-enactment, and "amended" is to be construed accordingly. The word "extent" in the phrase "to the extent" means the degree to which a subject or other theory extends, and such phrase shall not simply mean "if". Whenever this Agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified. Whenever any action must be taken hereunder on or by a day that is not a Business Day, then such action may be validly taken on or by the next day that is a Business Day. Any reference to any federal, state, local, or foreign Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context shall otherwise require. Reference herein to "federal" shall be construed as referring to U.S. federal. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Bankruptcy Court Orders.

## 2. **Agreements to Sell and Purchase**.

### 2.1 **Sale and Purchase.**

(a) With respect to the Aircraft, Seller agrees to sell and Buyer agrees to buy the Aircraft, upon and subject to the terms and conditions of this Agreement.

(b) Upon payment of the Purchase Price in respect of an Aircraft, Seller shall, by execution and delivery to Buyer or Buyer Nominee (as directed by Buyer) of a Bill of Sale, sell to Buyer (or Buyer Nominee, as applicable) outright good and valid title in and to such Aircraft, free and clear of all Liens (other than Liens created by, through or on behalf of Buyer or Buyer Nominee, "**Buyer's Liens**") in accordance with Section 4.1(c). With respect to each Aircraft, concurrently with Seller's delivery to Buyer (or Buyer Nominee, as applicable) of an executed Bill of Sale for such Aircraft, Buyer (or Buyer Nominee, as applicable) shall accept delivery of such Aircraft, and Buyer (or Buyer Nominee, as applicable, on behalf of Buyer and on its own behalf) shall execute and deliver an Aircraft Acceptance Certificate in respect of such Aircraft.

### 2.2 **Deposit; Purchase Price.**

(a) Contemporaneously with the execution of this Agreement, Buyer shall pay to the Escrow Agent, in immediately available funds, a total amount equal

to $42,123,993.60 as a purchase deposit with respect to the Aircraft (the "**Initial Deposit Amount**"). The Initial Deposit Amount shall be allocated in equal installments across the Aircraft, in an amount equal to $1,560,147.91 per Aircraft (each, an "**Aircraft Specific Deposit**").

(b) The total consideration payable by Buyer to Seller at Delivery for all Aircraft shall be the Purchase Price; *provided* that (i) the Purchase Price shall be reduced by the Applicable Reserve Amount of any Partial Consent Asset if a sale of such Partial Consent Asset is completed pursuant to Section 5.4(b), and (ii) if the Purchase Price was previously reduced pursuant to the preceding clause (i) but the sale of the related Partial Consent Asset is not consummated on or prior to the termination of such Partial Consent Asset under the FTAI APA, the Purchase Price shall be correspondingly increased by the Applicable Reserve Amount of any such Partial Consent Asset. The Parties acknowledge and agree that, provided that the sale of all of the Partial Consent Assets is completed pursuant to Section 5.4(b), the total Purchase Price amounts to $567,391,000.

2.3 **Payments.**

(a) With respect to such Aircraft, at its Delivery, Buyer shall pay Seller the Purchase Price in respect of such Aircraft (net of the Aircraft Specific Deposit for such Aircraft), free and clear of and without any deduction or withholding for or on account of tax.

(b) Other than the Credit Bid Amount portion of the Purchase Price, payments due under this Agreement to Seller (including payments of Aircraft Specific Deposits by the Escrow Agent to Seller) shall be made in Dollars in immediately available funds to the following account (and/or, in whole or in part, to such other account(s) as Seller may notify to Buyer in writing):

**Bank Name:**
**Account Number:**
**Account Name:**
**Bank Routing Number:**
**SWIFT BIC:**
**ACH Routing #**
**Wire Routing #**
**Address:**
**International Only:**

with payment advice to: treasuryops@spirit.com; ref: Aircraft MSNs [*].

(c) Prior to finalization of the Purchase Price calculation for all (or any Aircraft), the Seller and Buyer shall obtain an invoice from the Senior Trustee for all amounts payable as contemplated by the definition of Minimum Bid Amount.

2.4 **Additional Equipment.** All Additional Equipment items listed in Exhibit D are excluded from the definition of Aircraft but shall be included in the sale of each Aircraft, and title to any Additional Equipment installed in or present on an Aircraft at Delivery, the transfer of which is not prohibited by applicable Law, shall transfer to Buyer (or Buyer Nominee, as applicable) upon Delivery of such Aircraft at no additional cost (the consideration for such Additional Equipment being included in the Purchase Price for such Aircraft). For the avoidance of doubt, the sale of Additional Equipment pursuant to this Section 2.4 shall be on an "AS-IS, WHERE-IS" and "WITH ALL FAULTS" basis and shall be subject to the disclaimers and waivers set forth in Sections 7.3 and 7.4 and the Bill of Sale. Buyer (or Buyer Nominee, as applicable) shall return any Non-Transferable Additional Equipment that has been installed on an Aircraft to Seller within sixty (60) days following the Delivery Date for the applicable Aircraft, in accordance with industry, regulatory and manufacturer standards, at Seller's cost and expense.

2.5 **Removal of Excluded Equipment.** All Excluded Equipment items listed in Exhibit C shall be removed from the Aircraft and are excluded from being part of the Aircraft at Delivery, whether or not such items are installed in the Aircraft or present at Delivery. At Seller's option, as advised to Buyer prior to Delivery, (i) Seller shall remove all or part of the Excluded Equipment prior to Delivery, or (ii) Buyer shall remove all or any remaining Excluded Equipment items within seven (7) days following Delivery in accordance with industry, regulatory and manufacturer standards. If applicable, the Parties shall include the list of outstanding Excluded Equipment to be removed by Buyer on each Aircraft Acceptance Certificate. Buyer shall in no event market or sell any of the Excluded Equipment. Notwithstanding the foregoing, Seller may, upon delivery of written notice to Buyer, elect to abandon any item of Excluded Equipment, in which case title to the same shall, at Delivery of the Aircraft, transfer to Buyer at no cost or charge to either of Buyer or Seller.

2.6 **Assignment of Warranties.**

(a) Seller hereby assigns to Buyer (or Buyer Nominee, as applicable) effective as of each Delivery Date, any and all existing assignable warranties and service life policies, or other rights, remedies or claims against manufacturers, suppliers, vendors and maintenance and overhaul agencies relating to the applicable Aircraft (in the case of rights, remedies or claims, only with respect to rights, remedies or claims arising, or based on events, occurrences and circumstances occurring, on or after the Delivery of the applicable Aircraft). Seller makes no representation or warranty as to the existence or assignability of any such warranties and rights.

(b) Subject to paragraph (a) above, as soon as practicable following the Delivery Date, Seller shall use commercially reasonable efforts to enter into the Airframe Warranties Assignment and the Engine Warranties Assignment with respect to the applicable Aircraft, at Buyer's cost and expense.

3. **Delivery of Aircraft**.

3.1 **Delivery Condition**. Each Aircraft will be delivered in "AS-IS, WHERE-IS" and "WITH ALL FAULTS" condition.

3.2 **Delivery Location.** The delivery location (the "**Delivery Location**") for each Aircraft shall be as set forth on Schedule 2 to Exhibit B.

3.3 **Delivery**.

(a) With respect to each Aircraft, upon satisfaction or waiver of the conditions precedent for such Aircraft set forth in Section 4.1, Buyer shall pay the Purchase Price for such Aircraft and shall deliver the Aircraft Acceptance Certificate for such Aircraft to Seller, and Seller shall execute and concurrently deliver to Buyer (or Buyer Nominee, as applicable), the Bill of Sale for such Aircraft, whereupon risk of loss to such Aircraft shall transfer to Buyer (or Buyer Nominee, as applicable) and title to such Aircraft shall transfer to Buyer (or Buyer Nominee, as applicable). To the extent commercially practicable, the Delivery of all Aircraft and payment of the Purchase Price therefor shall occur simultaneously.

(b) For each Delivery, upon title transfer, neither Buyer nor Seller shall have any further obligation or liability to the other in respect of the applicable Aircraft, and the terms and conditions of this Agreement in respect of such Aircraft shall automatically terminate and have no force and effect except with respect to this subsection, Section 2.4 (Additional Equipment), Section 2.5 (Removal of Excluded Equipment), Section 2.6 (Assignment of Warranties), Section 8 (Insurance), Section 9 (Transfer Taxes), Section 10.3 (Non-Waiver), Section 10.6 (Governing Law and Jurisdiction), Section 10.10 (Transaction Costs), Section 10.13 (Third-party Beneficiaries) and Section 10.14 (Limitation of Liability), and in each case of the foregoing any provisions of this Agreement required to give meaning to the aforementioned sections (the "**Surviving Provisions**").

4. **Conditions Precedent**.

4.1 **Conditions Precedent.** Buyer's obligation to purchase an Aircraft and Seller's obligation to sell such Aircraft shall be subject to the following conditions; provided that it shall not be a condition precedent to the obligations of one Party that any document be delivered or action be taken that is to be delivered or be taken by the other Party or by a Person within the control of such other Party:

(a) execution and delivery of the Transaction Documents for such Aircraft (other than the Airframe Warranties Assignment and the Engine Warranties Assignment);

(b) the Bankruptcy Court shall have entered the Sale Approval Order approving this Agreement and such order shall not have been stayed, stayed pending appeal, reversed or vacated or materially supplemented in any manner adverse to the parties as of the date of Delivery of such Aircraft and which shall be a Final Order;

(c) such Aircraft shall be free and clear of the Liens of the Subordination Agent and/or interests of the Subordination Agent or the Seller on the International Registry (which shall be in the process of being released and discharged) (with the FAA Counsel in advance possession of release instruments and in the process of filing the appropriate releases with the FAA);

(d) receipt by Seller of the full Purchase Price for such Aircraft;

(e) receipt by Seller of a duly executed copy from Buyer (or Buyer Nominee, as applicable) of the Aircraft Acceptance Certificate with respect to such Aircraft;

(f) (1) Buyer shall have delivered to FAA Counsel a completed and executed FAA Registration Application and such other documentation required to register such Aircraft in the United States in the name of Buyer (or Buyer Nominee, as applicable), as owner, to be filed concurrently with the Bill of Sale and/or FAA Bill of Sale; and (2) Buyer shall have taken (or procured that the Buyer Nominee has taken) all actions required of it to cause the sale of such Aircraft from Seller to Buyer (or Buyer Nominee, as applicable) pursuant to this Agreement to be registered with the International Registry established pursuant to the Cape Town Agreements;

(g) receipt by Seller of the compliance certification statement from Buyer (or Buyer Nominee, as applicable) in the form of Exhibit H;

(h) receipt by Seller of certificates from Buyer's insurance broker evidencing Buyer's (or Buyer Nominee's, as applicable) compliance with the insurance provisions of Section 8 hereof;

(i) receipt by Seller of evidence that all costs and expenses then due from Buyer pursuant to Section 10.10 (including amounts estimated in good faith) have been paid;

(j) if Buyer has designated a Buyer Nominee in respect of such Aircraft, receipt by Seller of all know your customer documentation required by Seller for such Buyer Nominee to Seller's reasonable satisfaction;

(k) the representations and warranties of Seller set forth in Section 7.1 being true and accurate in all material respects as of the Delivery Date for such Aircraft; and

(l) no material damage to such Aircraft having occurred between the date of this Agreement and the Delivery Date for such Aircraft.

4.2 **No Financing or Other Contingencies.** The transactions contemplated herein shall not be subject to or contingent on (i) Buyer obtaining any financing in relation to its acquisition of any Aircraft or (ii) the closing of any other transaction.

5. **Bankruptcy Provisions**.

5.1 **Court Approvals.** On July 1, 2026, Seller filed with the Bankruptcy Court a motion [ECF No. 1251] (the "**Sale Motion**") seeking, among other things, entry of (i) an order approving the bidding protections set forth in the Sale Motion (the "**Bidding Procedures Order**"), and (ii) an order approving this Agreement and the transactions contemplated hereby should the purchase offer made by this Agreement constitute the highest and best offer for the Aircraft pursuant to the Bidding Procedures Order (the "**Sale Approval Order**", and together with the Bidding Procedures Order, the "**Bankruptcy Court Orders**"); *provided, however*, that the Bidding Procedures Order and the Sale Approval Order may include changes and amendments as mutually agreed to by Seller and Buyer.

5.2 **Court Filings.** Seller shall provide Buyer with advance drafts of all Bankruptcy Court filings relating to the Sale Motion and shall comply with the notice requirements set forth in the Bidding Procedures Order for providing notice of the entry of the Bidding Procedures Order and the hearing on the Sale Approval Order. Seller shall provide Buyer with copies of all communications from the Bankruptcy Court or third parties relating to the Sale Motion.

5.3 **Buyer Assistance.** Buyer shall use its commercially reasonable efforts to assist Seller in obtaining entry of the Bankruptcy Court Orders. Buyer shall not, without the prior written consent of Seller, file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Aircraft.

5.4 **Competing Bids.**

(a) This Agreement is subject to approval by the Bankruptcy Court and the consideration by Seller of higher or better competing bids in respect of the purchase and/or financing of all or any of the Aircraft (each, a "**Competing Bid**"), as determined in accordance with the Bidding Procedures Order. From the date of this Agreement through the completion of the Auction with respect to the Aircraft, Seller is permitted to and to cause its representatives and any Seller's Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any person (in addition to Buyer and its Affiliates and Buyer's Representatives) in connection with any Competing Bid. In addition, Seller shall have the responsibility and obligation to respond to any inquiries or offers for a Competing Bid and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Bidding Procedures Order, or other applicable Law. A qualified Competing Bid must be an offer to purchase either (a) all of the Aircraft, (b) a specific Lot or Lots, or (c) specific individual Aircraft, in which case the proposed purchase price for each such individual Aircraft must be at least 10% greater than the Applicable Reserve Amount for such Aircraft; *provided* that any Competing Bid for individual Aircraft may not be considered by Seller to the extent there are qualified Competing Bids (other than the Bid of Buyer) for the Lot(s) corresponding to such individual Aircraft or for all of the Aircraft. Notwithstanding anything to the contrary herein or in the Bidding Procedures Order, this Agreement constitutes a bid for all of the Aircraft and no qualified Competing Bid may be the successful bidder for an Aircraft, a Lot, or a group of Aircraft other than a Lot unless Seller has made a determination, consistent in all respects with the Bidding Procedures Order, that (a) there are Competing Bids for all of the Aircraft that, in the aggregate, constitute a higher and better bid than this Agreement or (b) the Buyer otherwise consents to the sale of an Aircraft, a Lot(s), or a group of Aircraft other than a Lot to another party.

(b) Buyer and Seller acknowledge and agree that the FTAI APA constitutes a successful Competing Bid for purposes of this Agreement and Buyer hereby confirms that it has consented to the sale of each Partial Consent Asset to FTAI pursuant to the FTAI APA. For the avoidance of doubt, except as expressly set forth in Section 5.5, no Partial Consent Asset shall be included in the sale of Aircraft contemplated by this Agreement, and the Partial Consent Assets shall not otherwise be subject to, or governed by, this Agreement. This Agreement shall remain binding on the Parties with respect to the non-Partial Consent Assets.

5.5 **Back-Up Bidder.** Seller and Buyer acknowledge and agree that Buyer is not the winning bidder at the Auction with respect to the Partial Consent Assets. If Seller gives notice to Buyer on or before 30 days following the entry of the Sale Approval Order stating that Seller (A) failed to consummate the sale of any Partial Consent Asset with FTAI, and (B) has terminated the FTAI APA with respect to any such Partial Consent Asset, such Partial Consent Asset shall automatically be deemed to be an

Aircraft for all purposes of this Agreement, and Buyer shall promptly consummate the transactions contemplated by this Agreement with respect to such Partial Consent Asset.

5.6 **Break-Up Fee and Reimbursement.** Seller and Buyer acknowledge and agree that notwithstanding anything to the contrary in the Original APA or the Bidding Procedures Order, Buyer will not be entitled to any Break-Up Fee or Expense Reimbursement (each as defined in the Original APA) from Seller.

5.7 **Bankruptcy Termination Events.** Notwithstanding anything to the contrary in this Agreement, this Agreement may be terminated, and the transactions contemplated hereby may be abandoned at any time prior to the occurrence of the first Delivery Date of an Aircraft hereunder, as follows:

(a) by Buyer, if the Bankruptcy Court has failed to enter the Sale Approval Order by the Delivery Window Deadline;

(b) by either Seller or Buyer, if, after their respective entry, either the Bidding Procedures Order or Sale Approval Order ceases to be in full force and effect by no fault of the terminating party;

(c) by either Seller or Buyer, if (x) the Chapter 11 Case is dismissed, or (y) a trustee under Chapter 11 of the Bankruptcy Code is appointed in the Chapter 11 Case;

(d) by either Seller or Buyer if Buyer is not the successful bidder at the Auction for at least one (1) Aircraft and is not named the "Back-Up Bidder" for at least one (1) Aircraft at the Auction; or

(e) by Seller if the board of directors of Spirit Aviation Holdings, Inc. (the "**Seller Parent**") determines, in consultation with outside legal counsel, in its sole and exclusive discretion that consummating the transactions contemplated hereby or failing to terminate this Agreement would be inconsistent with the board of directors of Seller Parent's fiduciary duties under applicable Law, including, without limitation, to pursue a Competing Bid.

6. **Termination**.

6.1 **Total Loss before Delivery.** If any Aircraft suffers a Total Loss prior to Delivery, Seller shall, as soon as reasonably practicable after it has become aware of such Total Loss, notify Buyer in writing thereof and, with effect from the date of such Total Loss, Seller's obligations to sell and Buyer's obligation to purchase such Aircraft shall terminate, and Buyer shall be entitled to instruct the Escrow Agent to return the Aircraft Specific Deposit for the affected Aircraft held by the Escrow Agent to Buyer.

6.2 **Aircraft Non-Sale Event.** Subject to the remaining terms of this Section 6, if an Aircraft Non-Sale Event occurs with respect to any Aircraft, then all remaining obligations of Seller to sell to Buyer (including to deliver the Bill of Sale to Buyer), and of Buyer to buy from Seller, with respect to such Aircraft under this Agreement and/or the other Transaction Documents will terminate; provided that Seller shall be entitled to obtain the Aircraft Specific Deposit for such Aircraft and instruct the Escrow Agent to pay the Aircraft Specific Deposit for such terminated Aircraft to the Senior Trustee for application pursuant to the Intercreditor Agreements if such Aircraft Non-Sale Event results from a Buyer's Default.

6.3 **Default Provisions.** (a) With respect to any Aircraft, if any default described in clauses (i) or (ii) of the definition of "Buyer's Default" should occur in respect of such Aircraft, then Seller shall be entitled, in each case at Seller's sole discretion so long as such default is then continuing, to elect one or more of the following in respect of such Aircraft subject to the default, exercisable by delivering written notice to Buyer: (i) suspend performance under this Agreement with respect to such Aircraft, or (ii) terminate this Agreement immediately with respect to such Aircraft effective upon such written notice to Buyer, and in each case the Aircraft Specific Deposit for such terminated Aircraft shall be paid to the Senior Trustee for application pursuant to the Intercreditor Agreements. If any default described in clause (iii) of the definition of "Buyer's Default" should occur, then Seller shall be entitled, in each case at Seller's sole discretion so long as such default is then continuing, to elect one or more of the following in respect of all of the Aircraft for which the Delivery hereunder has not yet occurred, exercisable by delivering written notice to Buyer: (i) suspend performance under this Agreement with respect to either (as specified in such notice) (y) such Aircraft or (z) all of the Aircraft for which the Delivery hereunder has not yet occurred, and/or (ii) terminate this Agreement immediately with respect to all of the Aircraft for which the Delivery hereunder has not yet occurred effective upon such written notice to Buyer, and in each case Seller shall be entitled to obtain the Aircraft Specific Deposit(s) for such terminated Aircraft and instruct the Escrow Agent to pay the Aircraft Specific Deposit for such terminated Aircraft to the A Trustee for application pursuant to the Intercreditor Agreements.

(b) With respect to any Aircraft, if any default described in clauses (i) or (ii) of the definition of "Seller's Default" should occur in respect of such Aircraft, then Buyer shall be entitled, in each case at Buyer's sole discretion so long as such default is then continuing, to elect one or more of the following in respect of such Aircraft subject to the default, exercisable by delivering written notice to Seller: (i) suspend performance under this Agreement with respect to such Aircraft, or (ii) terminate this Agreement immediately with respect to such Aircraft effective upon such written notice to Seller. If any default described in clause (iii) of the definition of "Seller's Default" should occur, then Buyer shall be entitled, in each case at Buyer's sole discretion so long as such default is then continuing, to elect one or more of the following in respect of all of the Aircraft for which the Delivery hereunder has not yet occurred, exercisable by delivering written notice to Seller: (i)

suspend performance under this Agreement with respect to either (as specified in such notice) (y) such Aircraft or (z) all of the Aircraft for which the Delivery hereunder has not yet occurred, and/or (ii) terminate this Agreement immediately with respect to all of the Aircraft for which the Delivery hereunder has not yet occurred effective upon such written notice to Seller, and in each case Buyer shall be entitled to instruct the Escrow Agent to pay the Aircraft Specific Deposit for such terminated Aircraft to Buyer.

6.4 **Effect of Termination.** Notwithstanding the foregoing (but subject to Section 3.3(b) and Section 5.6), each party hereto may exercise any other right or remedy, if any, which may be available to it under applicable Law or the Transaction Documents in respect of such Aircraft (if they have been entered into) and each party shall retain any and all claims, if any, for damages under such Transaction Documents (if they have been entered into) or under applicable Law for any breach of any agreement, representation, warranty or covenant contained in this Agreement or such Transaction Documents (if they have been entered into).

7. **Representations and Warranties; Disclaimers and Waivers**.

7.1 **Seller Representations and Warranties**.

Seller represents and warrants to Buyer that the following statements are true and accurate as of the date hereof and at each Delivery of an Aircraft:

(a) subject to entry of the Sale Approval Order, it is duly organized and validly existing under the Laws of its jurisdiction of formation and has the power and authority to perform its obligations under the Transaction Documents to which it is a Party;

(b) subject to entry of the Sale Approval Order, each of the Transaction Documents to which it is a Party has been (or will be, when executed) duly authorized, entered into and delivered by it and constitutes the legal, valid and binding obligation of it enforceable against it in accordance with its terms (subject to bankruptcy, insolvency, reorganization or similar Laws of general application affecting the enforcement of creditors' rights generally);

(c) subject to entry of the Sale Approval Order, neither the execution and delivery of the Transaction Documents to which it is a Party, nor the consummation of the transactions contemplated thereby nor compliance by it with any of the terms and provisions thereof will contravene any Law applicable to it or result in any breach of, or constitute a default under any indenture, mortgage, chattel mortgage, deed of trust, conditional sales contract, bank loan or credit agreement, partnership agreement, or other agreement or instrument to which it is a Party or by which it or its properties or assets are bound or affected;

(d) subject to entry of the Sale Approval Order, neither the execution, delivery or performance by it of the Transaction Documents to which it is a Party, nor the consummation by it of any of the transactions contemplated thereby, will require the consent or approval of, the giving of notice to, or the taking of any other action in respect of, the shareholders, or the trustee or holder of any indebtedness of it, except such as have been or will be obtained or effected, each of which approvals, consents and waivers shall be in full force and effect on the Delivery Date;

(e) subject to entry of the Sale Approval Order, for each Aircraft, Seller has full legal and beneficial title in and to, and at Delivery of such Aircraft Seller shall convey to Buyer good and valid title to, such Aircraft, free and clear of the Liens of the Subordination Agent and/or interests of the Subordination Agent or the Seller on the International Registry that shall be in the process of being released (with the FAA Counsel in advance possession of release instruments and in the process of filing the appropriate releases with the FAA);

(f) there are no suits, actions, arbitration proceedings or claims pending or, to the knowledge of Seller, threatened against Seller arising out of or in connection with the Transaction Documents before or by any Government Entity;

(g) at the time of Delivery, each Aircraft will be in a fully-assembled configuration, with all parts, components, appliances, accessories, instruments, furnishings, Additional Equipment (other than any Non-Transferable Additional Equipment) and other items of equipment that comprise the Aircraft installed thereon, and with each Engine installed on and attached to the Airframe of such Aircraft; and

(h) from the date hereof until the Delivery Date for each Aircraft, Seller shall not remove, and shall not permit any Person to remove, any parts, components, Engines, Additional Equipment or other items of equipment from any Aircraft, without the prior written consent of Buyer, such consent not to be unreasonably withheld or delayed.

### 7.2 **Buyer Representations and Warranties.**

Buyer represents and warrants to Seller that the following statements are as of the date hereof and at each Delivery true and accurate:

(a) it is a limited liability company and has the power and authority to carry on its business as presently conducted and to perform its obligations under the Transaction Documents to which it is a Party;

(b) each of the Transaction Documents to which it is a Party has been (or will be, when executed) duly authorized, entered into and delivered by Buyer and constitutes the legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms (subject to bankruptcy, insolvency, reorganization or similar Laws of general application affecting the enforcement of creditors' rights generally);

(c) neither the execution and delivery of the Transaction Documents to which it is a Party, nor the consummation of the transactions contemplated thereby nor compliance by it with any of the terms and provisions thereof will contravene any Law applicable to it or result in any breach of, or constitute a default under any indenture, mortgage, chattel mortgage, deed of trust, conditional sales contract, bank loan or credit agreement, corporate charter or by-laws, or other agreement or instrument to which it is a Party or by which it or its properties or assets are bound or affected;

(d) neither the execution, delivery or performance by it of the Transaction Documents to which it is a Party, nor the consummation by it of any of the transactions contemplated hereby or thereby, will require the consent or approval of, the giving of notice to, or the taking of any other action in respect of, the members, or the trustee or holder of any indebtedness of Buyer, except such as have been or will be obtained or effected, each of which approvals, consents and waivers shall be in full force and effect on the Delivery Date; and

(e) there are no suits, actions, arbitration proceedings or claims pending or, to the knowledge of Buyer, threatened against Buyer arising out of or in connection with the Transaction Documents before or by any other Government Entity.

7.3 **Disclaimers**.

(a) EXCEPT AS EXPRESSLY SET FORTH IN THE BILL OF SALE WITH RESPECT TO AN AIRCRAFT AS TO TITLE, EACH AIRCRAFT IS BEING SOLD ON ITS RESPECTIVE DELIVERY DATE TO BUYER (OR BUYER NOMINEE, AS APPLICABLE) IN "AS IS", "WHERE IS" AND "WITH ALL FAULTS" CONDITION WITHOUT ANY REPRESENTATION, GUARANTEE OR WARRANTY OF THE SELLER, EXPRESS OR IMPLIED, OF ANY KIND, ARISING BY LAW OR OTHERWISE AS TO THE CONDITION THEREOF; AND

(b) WITHOUT LIMITING THE GENERALITY OF SECTION 7.3(a), BUYER (FOR ITSELF AND EACH BUYER NOMINEE) UNCONDITIONALLY AGREES THAT EACH AIRCRAFT, AND EACH PART THEREOF ARE TO BE SOLD AND PURCHASED IN AN "AS IS", "WHERE

IS" AND "WITH ALL FAULTS" CONDITION AS AT THE RELEVANT DELIVERY DATE APPLICABLE THERETO, AND NO TERM, CONDITION, WARRANTY, REPRESENTATION OR COVENANT OF ANY KIND HAS BEEN ACCEPTED, MADE OR IS GIVEN BY SELLER, IN RESPECT OF THE AIRWORTHINESS, VALUE, QUALITY, DURABILITY, TITLE (EXCEPT AS EXPRESSLY PROVIDED IN THE APPLICABLE BILL OF SALE), CONDITION, DESIGN, OPERATION, DESCRIPTION, MERCHANTABILITY OR FITNESS FOR USE OR PURPOSE OF THE AIRCRAFT, ANY IN-SCOPE ENGINE OR ANY PART THEREOF, AS TO THE ABSENCE OF LATENT, INHERENT OR OTHER DEFECTS (WHETHER OR NOT DISCOVERABLE), AS TO THE ACCURACY, VALIDITY, TRACEABILITY, COMPLETENESS OR CONDITION OF THE AIRCRAFT RECORDS, OR AS TO THE ABSENCE OF ANY INFRINGEMENT OF ANY PATENT, COPYRIGHT, DESIGN, OR OTHER PROPRIETARY RIGHTS; AND ALL CONDITIONS, WARRANTIES AND REPRESENTATIONS (OR OBLIGATION OR LIABILITY, IN CONTRACT OR IN TORT) IN RELATION TO ANY OF THOSE MATTERS, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, ARE EXPRESSLY EXCLUDED.

(c) EXECUTION AND DELIVERY OF AN AIRCRAFT ACCEPTANCE CERTIFICATE BY BUYER (OR BUYER NOMINEE, AS APPLICABLE) TO SELLER SHALL BE CONCLUSIVE PROOF THAT THE AIRCRAFT AND EACH PART THEREOF DESCRIBED IN SUCH AIRCRAFT ACCEPTANCE CERTIFICATE ARE IN EVERY WAY SATISFACTORY TO BUYER (AND BUYER NOMINEE, IF APPLICABLE) AND HAVE BEEN ACCEPTED BY BUYER (AND BUYER NOMINEE, IF APPLICABLE) FOR ALL PURPOSES OF THIS AGREEMENT.

(d) DISCLAIMER OF APPLICATION OF C.I.S.G. THE PARTIES HEREBY EXPRESSLY DISCLAIM THE APPLICATION OF THE UNITED NATIONS CONVENTION ON THE INTERNATIONAL SALE OF GOODS TO THE EXTENT APPLICABLE TO THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.

7.4 **Waivers**.

(a) BUYER (FOR ITSELF AND EACH BUYER NOMINEE) AND SELLER AGREE THAT EACH SHALL NOT BE ENTITLED TO RECEIVE AND HEREBY DISCLAIMS AND WAIVES ANY RIGHT THAT IT MAY OTHERWISE HAVE TO RECOVER OR SEEK TO RECOVER FROM THE OTHER PARTY PUNITIVE, CONSEQUENTIAL OR EXEMPLARY DAMAGES IN RESPECT OF ANY CLAIM MADE UNDER OR IN CONNECTION WITH THIS AGREEMENT.

(b) BUYER HEREBY AGREES THAT ITS ACCEPTANCE (OR BUYER NOMINEE'S ACCEPTANCE, AS APPLICABLE) OF THE AIRCRAFT AT DELIVERY AND ITS EXECUTION AND DELIVERY (OR BUYER NOMINEE'S EXECUTION AND DELIVERY, AS APPLICABLE) OF THE AIRCRAFT ACCEPTANCE CERTIFICATE IN RESPECT OF EACH AIRCRAFT CONSTITUTE BUYER'S (AND BUYER NOMINEE'S) WAIVER OF ANY WARRANTY OF DESCRIPTION, EXPRESS OR IMPLIED, AND ANY CLAIMS BUYER MAY HAVE AGAINST SELLER OR ANY PARTY ACTING FOR OR ON BEHALF OF SELLER BASED UPON THE FAILURE OF THE AIRCRAFT TO CONFORM WITH SUCH DESCRIPTION.

(c) DELIVERY BY BUYER (OR BUYER NOMINEE, AS APPLICABLE) TO SELLER OF THE AIRCRAFT ACCEPTANCE CERTIFICATE IN RESPECT OF EACH AIRCRAFT WILL BE CONCLUSIVE PROOF AS BETWEEN SELLER, ON THE ONE HAND, AND BUYER (AND BUYER NOMINEE, IF APPLICABLE), ON THE OTHER HAND, THAT BUYER'S TECHNICAL EXPERTS HAVE EXAMINED AND INVESTIGATED EACH AIRCRAFT (INCLUDING THE ENGINES) AND HAVE UNCONDITIONALLY AND IRREVOCABLY ACCEPTED SUCH AIRCRAFT.

8. **Insurance**.

8.1 **Insurances**.

(a) For the period commencing on the Delivery Date for an Aircraft and ending on the earlier of (a) the two-year anniversary of the Delivery Date of such Aircraft and (b) the completion of the next "C-check" due under the AMM for such Aircraft (the "**Insurance Period**"), Buyer will carry or cause to be carried and maintained, comprehensive airline legal liability insurance.

(b) All policies carried in accordance with this Section 8.1 and any policies taken out in substitution or replacement for any such policies, (i) shall include the Seller Parties as additional insureds (but not as manufacturer, repairer or servicing agent of the Aircraft, and without imposing on any such party liability to pay premiums with respect to such insurance) as respects the operation of Buyer, (ii) shall be maintained with insurers of recognized standing and normally participating in the leading international commercial aviation insurance markets (through reinsurance, if necessary) and reasonably acceptable to Seller, (iii) shall provide that if the insurers cancel such insurance for any reason, or if the same is allowed to lapse for non-payment of premium or if any material change is made in the insurance which adversely affects the interest of the Seller Parties, such lapse, cancellation or change shall not be effective as to the Seller Parties and each of them for thirty days (seven days in the case of war risk and allied perils coverage) after written notice by such insurers of such lapse, cancellation or change, provided,

however, that if any notice period specified above is not reasonably obtainable, such policies shall provide for as long a period of prior notice as shall then be reasonably obtainable, (iv) shall expressly provide that all of the provisions thereof, except the limits of liability, shall operate in the same manner as if there were separate policy covering each insured, (v) provide that the insurers will waive any right to any setoff, recoupment, subrogation or counterclaim or any other deduction, by attachment or otherwise, and (vi) be primary and without right of contribution from any insurance which may be carried by the Seller Parties and any of them.

8.2 **Certificates, Etc.** On or before the Delivery Date for each Aircraft, Buyer shall provide to Seller a certificate of insurance and letter of undertaking evidencing the coverage required pursuant to this Section 8 in form and substance acceptable to Seller (acting reasonably) and shall provide to Seller, as applicable, an updated certificate of insurance and letter of undertaking upon each renewal or replacement of the coverage required pursuant to this Section 8.

9. **Transfer Taxes**.

9.1 **Diligence.** Each Party is responsible for researching its own tax position in relation to the transactions contemplated by the Transaction Documents, at its own cost and for its sole benefit.

9.2 **Tax Indemnity.** Buyer shall, on an after-tax basis, pay, indemnify and hold Seller and its Affiliates harmless from any and all sales, use, transfer, excise, personal property, ad valorem, value-added, stamp, or other taxes and fees, withholdings, imposts, levies, customs or other duties, charges, monetary transfer fees, or governmental withholdings, together with any penalties, fines, or interest thereon, imposed, levied, or assessed in connection with the sale or Delivery of, or transfer of title to, each Aircraft (including the Engines associated with such Aircraft) to Buyer (or Buyer Nominee, as applicable) hereunder, other than (i) taxes imposed on the overall net income, profits or gains of Seller in respect of the sale or Delivery of, or transfer of title to, the Aircraft to Buyer (or Buyer Nominee, as applicable); (ii) taxes to the extent imposed as result of Seller's failure to comply with the terms of this Agreement; (iii) taxes imposed, levied or assessed to the extent arising out of or in connection with the ownership, import, export, possession, operation, use, maintenance, return, or storage of the Aircraft prior to the Delivery Date, except any taxes arising out of or in connection with the sale or Delivery of, or transfer of title to, the Aircraft hereunder, or (iv) taxes to the extent arising as a result of the gross negligence or willful misconduct of Seller or its Affiliates or resulting from any inaccuracy of any representation or warranty of Seller hereunder (any or all of the foregoing, "**Transfer Taxes**").

9.3 **Cooperation.** The Parties shall reasonably cooperate with one another to deliver to each other such certifications and other documents as may be reasonably requested in order to avail itself of any applicable exemption from

Transfer Taxes. Without limiting the foregoing, at or prior to the Delivery of each Aircraft, Buyer shall either (i) pay any Transfer Taxes imposed, levied, or assessed in connection with the sale or Delivery of, or transfer of title to, such Aircraft or (ii) provide (or procure that the Buyer's Nominee provides) to Seller a duly completed and validly executed exemption certificate, resale certificate, or other documentation satisfactory to Seller establishing a complete exemption from Transfer Taxes with respect to the sale or Delivery of, or transfer of title to, such Aircraft.

9.4 **Procedures, Etc.**.

(a) If any Transfer Taxes for which Buyer is responsible under Section 9.2 are imposed, levied or assessed on Seller or any of its Affiliates, or Seller or any of its Affiliates are required by Law or otherwise to pay any such Transfer Taxes, Buyer shall reimburse Seller and/or its Affiliates for the full amount of such Transfer Taxes within fifteen (15) Business Days after receipt from Seller of written request for such reimbursement, accompanied by original receipts or other sufficient evidence of payment of such Transfer Taxes. (b) If a claim is made against Seller or any of its Affiliates for any Transfer Taxes for which Buyer is responsible under Section 9.2, Seller will promptly notify Buyer in writing of such claim; provided, however, that Seller's failure to provide such notice will not relieve Buyer of its obligations hereunder except to the extent such failure precludes Buyer's ability to contest the claim. So long as (a) Buyer has provided Seller with an opinion of independent and reputable tax counsel reasonably satisfactory to Seller that a reasonable basis exists for contesting such claim and adequate reserves have been made for such Transfer Taxes or, if required, an adequate bond has been posted, and (b) such contest does not impose any risk on Seller or any of its Affiliates of civil or criminal liability, then Seller and/or its Affiliates, at Buyer's written request and at Buyer's expense, will in good faith contest (or permit Buyer to contest in the name of Buyer or Seller and/or its Affiliates through counsel reasonably acceptable to Seller) the validity, applicability or amount of such Transfer Taxes.

10. **Miscellaneous**.

10.1 **Entire Agreement, Amendment, Installment Contract; Time is of the Essence.** Except as expressly provided herein, this Agreement together with the other Transaction Documents constitutes the entire agreement among the Parties relating to the subject matter hereof and thereof and supersedes any and all previous agreements and understandings, oral or written, relating to the subject matter hereof and thereof. This Agreement may not be amended except by an instrument in writing signed by or on behalf of each Party and with the consent of the Senior Trustee (or representative of the Senior Trustee) solely in respect of any amendments that adversely impact the Senior Trustee (including, for the avoidance of doubt, any amendment reducing the Purchase Price or any Aircraft Specific Deposit), such consent not to be unreasonably withheld. The

Parties acknowledge and agree that this Agreement is an installment contract, and accordingly (except in connection with a termination of this Agreement pursuant to Section 6.2 or Section 6.3, as the case may be, for all of the Aircraft for which the Delivery hereunder has not yet occurred), the inability or failure of the Delivery of any Aircraft, Airframe, or Engine, will not relieve the obligation of Seller to sell, and Buyer to buy, the remaining Aircraft, Airframes, or Engines.

The Parties agree that time shall be of the essence of this Agreement with respect to closing and delivering each Aircraft by the applicable Delivery Window Deadline. Additionally, each of the Parties shall act in a commercially reasonable manner to effect the transactions contemplated under this Agreement in a prompt manner and in accordance with the time periods and deadlines provided herein.

10.2 **[Reserved].**

10.3 **Non-Waiver.** Any of the terms, covenants, or conditions hereof may be waived only by a written instrument executed by or on behalf of the Party hereto waiving compliance. No course of dealing on the part of any Party hereto, or its respective officers, employees, agents, accountants, attorneys, investment bankers, consultants, or other authorized representatives, nor any failure by a Party hereto to exercise any of its rights under this Agreement shall operate as a waiver thereof or affect in any way the right of such Party at a later time to enforce the performance of such provision. No waiver by any Party hereto of any condition, or any breach of any term or covenant contained in this Agreement, in any one or more instances, shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or a waiver of any other condition or of any breach of any other term or covenant. Except as otherwise provided in this Agreement, the rights of the Parties hereto under this Agreement shall be cumulative, and the exercise or partial exercise of any such right shall not preclude the exercise of any other right.

10.4 **Severability.** In the event that any provision of this Agreement or the application thereof to any Party shall, to any extent, be invalid or unenforceable under any applicable Law, then such provision shall be deemed inoperative to the extent that it is invalid or unenforceable and the remainder of this Agreement, and the application of any such invalid or unenforceable provision to the Parties, jurisdictions or circumstances other than to whom or to which it is held invalid or unenforceable, shall not be affected thereby nor shall the same affect the validity or enforceability of this Agreement.

10.5 **Notices.** Any notice, request or information required or permissible under this Agreement will be in writing and in the English language. Notices must be addressed to the Parties as set forth below and delivered in person or sent by electronic mail or by expedited delivery, with a copy sent by e-mail. Any such notice shall be effective when received. In the case of a notice sent by expedited delivery, notice will

be deemed received on the date of delivery set forth in the records of the Person which accomplished the delivery. If any notice is sent by more than one of the above listed methods, notice will be deemed received on the earliest possible date in accordance with the above provisions.

(a) Seller:

Spirit Airlines, LLC
1731 Radiant Drive
Dania Beach, Florida 33004

Attention: Legal Department
Telephone: (954) 447-7914 (Legal)
Email: thomas.canfield@spirit.com

Attention: Treasury Department
Telephone: (954) 447-7976 (Treasury)
Email: treasuryrisk@spirit.com

(with copies to beliu@debevoise.com and jball@debevoise.com)

(b) Buyer:

SAVE 2026-B LLC
6617 Mainsail Court, Burke, VA 22015
Attention: James Aloezos
Telephone: 703-401-7623
Email: jaloezos@gmail.com

With a copy to
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Attention: Scott J. Greenberg, Jason Z. Goldstein; Madalyn M. Miller
Email: SGreenberg@gibsondunn.com; JGoldstein@gibsondunn.com; MMiller@gibsondunn.com

10.6 **Governing Law & Jurisdiction**.

(a) This Agreement and all ancillary agreements and documents relating hereto (including without limitation any Aircraft Acceptance Certificate, FAA Bill of Sale and Bill of Sale hereunder), shall be governed by and construed in accordance with the Laws of the State of New York, including all matters of

construction, validity, and performance, without reference to principles of conflicts of Law other than sections 5-1401 and 5-1402 of the New York general obligations Law.

(b) The Bankruptcy Court shall have exclusive jurisdiction in relation to any legal action or proceeding arising out of or in connection with this Agreement, the subject matter hereof or any of the transactions contemplated hereby; provided that, if there remain Aircraft for which the Delivery hereunder has not yet occurred as of the Plan Effective Date (as defined below) and if, following the Plan Effective Date, the Bankruptcy Court declines jurisdiction, each of the Parties hereto, to the maximum extent permitted by applicable Law, hereby (1) irrevocably submits itself to the non-exclusive jurisdiction of each of the Supreme Court of the State of New York, New York County and the United States District Court for the Southern District of New York, and other courts with jurisdiction to hear appeals from such courts and (2) waives, and agrees not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof or any of the transactions contemplated hereby may not be enforced in or by such courts. The term "**Plan Effective Date**" shall mean the effective date of any plan filed by Seller in the Chapter 11 Case that is confirmed pursuant to Section 1129 of the Chapter 11 of Title 11 of the United States Code, as amended.

10.7 **Waiver of Jury Trial.** Each Party, to the extent permitted by Law, knowingly, voluntarily, and intentionally waives its right to a trial by jury in any action or other legal proceeding for matters, contractual, tortious, or otherwise, arising out of or relating to this Agreement and the transactions contemplated hereby.

10.8 **Further Assurances.** Each Party hereto will promptly and duly execute and deliver such further documents to make such further assurances for and take such further action reasonably requested by any Party to whom such first Party is obligated, all as may be reasonably necessary to carry out more effectively the intent and purpose of this Agreement.

10.9 **Counterparts.** This Agreement may be executed in any number of original, electronic or pdf counterparts and by any Party hereto in separate counterparts, each of which when so executed shall be deemed to be an original and all of which, when taken together, shall constitute one and the same agreement.

10.10 **Transaction Costs.** Buyer shall bear all costs and expenses in relation to the negotiation and documentation of, and consummation of the transactions contemplated by this Agreement, and any other ancillary documents or agreement and the transactions contemplated hereby and thereby (including any costs and expenses to be reimbursed by the Buyer pursuant to the Sale Approval Order), and shall

reimburse Seller on demand for its costs and expenses, including reasonable legal and other professional adviser fees and any tax thereon. Buyer will be solely responsible for the costs of FAA Counsel and for the filing and registration of the sale of the Aircraft on the FAA's Civil Aviation Registry and on the International Registry, as applicable.

10.11 **Assignment, Successors and Assigns.**Neither Seller nor Buyer shall assign or transfer all or any of its rights and/or obligations under this Agreement without the prior written consent of the other Party, which may be withheld, conditioned, or delayed in such other Party's sole and absolute discretion; provided that, no assignment will relieve the assigning Party of any of its rights or obligations. Notwithstanding the foregoing, Buyer may designate a Buyer Nominee to take title to any Aircraft in accordance with Section 10.19, and such designation shall not constitute an assignment or transfer of Buyer's rights or obligations under this Agreement for purposes of this Section 10.11; provided that Buyer shall remain liable for the full and prompt performance of all of its obligations under this Agreement notwithstanding any such designation. This Agreement shall bind and inure to the benefit of the Parties and any successors, and in each case permitted hereunder, assigns to the original Parties to this Agreement.

10.12 **[Reserved].**

10.13 **Third-party Beneficiaries.** This Agreement is not intended to and shall not provide any Person not a Party hereto with any rights, of any nature whatsoever, against any of the Parties hereto, and, except as expressly provided herein with respect to the Senior Trustee, no Person or entity not a Party hereto shall have any right, power, privilege, benefit, or interest arising out of this Agreement.

10.14 **Limitation of Liability.** Notwithstanding anything to the contrary in this Agreement, no Party shall be liable to the other Party under this Agreement for any exemplary, special, punitive, indirect, remote, speculative, incidental, or consequential damages of any kind (including, but not limited to, lost profits, loss of sales, loss of revenue or loss of opportunity), in each case whether in tort (including negligence or gross negligence), strict liability, by contract, statute or otherwise, even if a Party has been advised of the possibility of such damages.

10.15 **Force Majeure.** Neither Buyer nor Seller shall be liable for any failure of or delay in the Delivery of the Aircraft at the Delivery Location, or in any other obligation hereunder for the period that such failure or delay is due to acts of God or the public enemy; war, insurrection or riots; fires, governmental actions; strikes or labor disputes; pandemic, epidemic, or quarantine mandate; inability to obtain materials, accessories, or parts from the vendors; or any other cause beyond a Party's reasonable control ("**Force Majeure**"). Each Party shall use commercially reasonable efforts to terminate or mitigate any event of Force Majeure affecting its performance under this Agreement. Upon the occurrence of any such event, the time required for performance by

an affected Party of its obligations arising under this Agreement shall be extended by a period equal to the duration of such event. In the event that such extension continues for more than one hundred and eighty (180) days, then either Party may terminate this Agreement in respect of the purchase and sale of the Aircraft subject to such delay, and an Aircraft Non-Sale Event shall be deemed to have occurred with respect to such Aircraft.

10.16 **Publicity**.

(a) Neither Party will issue any press release or make any public announcement relating to the subject matter of this Agreement (other than Bankruptcy Court filings as contemplated hereby) without the prior written approval of the other Party, except that either Party may make any public disclosure it believes in good faith is required by applicable Law. Notwithstanding the foregoing, if either Party, or a third party, makes a public disclosure related to this Agreement that is false or damaging to a Party, the aggrieved Party will have the right to make a public response reasonably necessary to correct any misstatement, inaccuracies or material omissions in the initial and wrongful affirmative disclosure without prior approval of the other Party. Neither Party will be required to obtain consent pursuant to this section for any proposed release or announcement that is consistent with information that has previously been made public without breach of its obligations under this clause.

(b) Neither Party will, without the other Party's prior written consent in each instance (x) use in advertising, publicity or marketing communications of any kind the name or other trademarks of the other Party or any of its Affiliates, or any employee of either, or (y) represent, directly or indirectly, that any product or service provided by a Party has been approved or endorsed by the other Party or any of its Affiliates.

10.17 **Relationship of the Parties.** Nothing contained in this Agreement shall be deemed to create an association, partnership, joint venture, or relationship of principal and agent or master and servant between the Parties, or to grant either Party the right or authority to assume, create or incur any liability or obligation of any kind, express or implied, against, in the name of, or on behalf of, the other Party.

10.18 **Brokers and other Third Parties.** Each Party represents and warrants to the other that it has not paid, agreed to pay or caused to be paid directly or indirectly in any form, any commission, percentage, contingent fee, brokerage or other similar payments of any kind in connection with this Agreement or the transactions contemplated hereby, to any Person. Each Party agrees to indemnify and hold the other harmless from and against any and all claims, suits, damages, costs and expenses (including, but not limited to reasonable attorneys' fees and costs) asserted by any agent, broker or other third party for any commission or compensation of any nature whatsoever based upon this Agreement or the Transaction Documents or the Aircraft.

10.19 **Buyer Nominee**. Buyer may by written notice to Seller at least five (5) Business Days before a Delivery nominate one or more U.S. owner trusts as a "**Buyer Nominee**" to accept title of an Aircraft from Seller directly and to be assigned all associated rights under this Agreement with respect to warranties from Seller, provided that each Buyer Nominee must be a Person which:

(a) complies with Seller's know your customer checks, anti-money laundering checks, and due diligence, as determined by Seller (acting reasonably);

(b) is capable of entering into the Transaction Documents to which Buyer is a party and giving the representations and warranties of the Buyer required hereunder and Buyer procures that such Buyer Nominee will comply with the terms of this Agreement; and

(c) in the case of any Airframe, such Buyer's Nominee being eligible to re-register such Airframe with the FAA in its own name at the Delivery of such Airframe.

Any assignment pursuant to this Section shall not in any way extend the liability Seller would have had under this Agreement but for such assignment. Notwithstanding anything herein to the contrary, the Buyer shall remain responsible for any obligations owed to Seller hereunder.

**10.20 Amendment and Restatement of Original APA.** The Original APA is hereby amended and restated in its entirety by this Agreement. From and after the date hereof, all references to the Original APA in any Transaction Document or other document or instrument shall be deemed to refer to this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the Parties hereto have entered into this Agreement as of the day and year first above written.

SELLER:

SPIRIT AIRLINES, LLC

By: ______________________________

Name: ______________________________

Title: ______________________________

BUYER:

SAVE 2026-B LLC

By: ______________________________

Name: ______________________________

Title: ______________________________

Signature Page

# Exhibit A

DESCRIPTION OF AIRCRAFT

| MSN | AC Type | ESNs | Reserve Amount[1] |
|---|---|---|---|
| 6804 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $19,746,000 |
| 6867 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $25,687,000 |
| 6897 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $23,928,000 |
| 6994 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $21,346,000 |
| 7008 | A320-232 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $18,451,000 |
| 7062 | A320-232 | Any of the two Engines for this AC Type from | $18,948,000 |

1 The Reserve Amounts may be subject to downward or upward adjustments for actual costs incurred in connection with the Sale pursuant to the Bankruptcy Court Orders.

| MSN | AC Type | ESNs | Reserve Amount[1] |
|---|---|---|---|
| | | Schedule 1 to this Exhibit A | |
| 7045 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $25,766,000 |
| 7021 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $28,950,000 |
| 7058 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $21,564,000 |
| 7135 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $23,526,000 |
| 7156 | A320-232 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $23,970,000 |
| 7296 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $23,368,000 |

| MSN | AC Type | ESNs | Reserve Amount[1] |
|---|---|---|---|
| 7106 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $24,557,000 |
| 7246 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $24,728,000 |
| 7522 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $27,138,000 |
| 8018 | A320-232 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $23,504,000 |
| 8021 | A320-232 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $24,845,000 |
| 8012 | A320-232 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $23,555,000 |
| 8047 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $26,294,000 |

| MSN | AC Type | ESNs | Reserve Amount[1] |
|---|---|---|---|
| 8114 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $30,150,000 |
| 8115 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $29,452,000 |
| 8141 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $30,552,000 |
| 8160 | A321-231 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $27,156,000 |
| 8176 | A320-232 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $25,837,000 |
| 8376 | A320-232 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $24,620,000 |
| 8400 | A320-232 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $24,891,000 |

| **MSN** | **AC Type** | **ESNs** | **Reserve Amount**[1] |
|---|---|---|---|
| 8434 | A320-232 | Any of the two Engines for this AC Type from Schedule 1 to this Exhibit A | $25,600,000 |
| **Total:** | | | **$668,129,000** |

**Schedule 1 to Exhibit A**

ENGINE SERIAL NUMBERS

| AC Type | ESNs |
|---|---|
| A320-232 | 18102 |
| | 18071 |
| | 18112 |
| | 18116 |
| | 18170 |
| | 18172 |
| | 18675 |
| | 18677 |
| | 18678 |
| | 18679 |
| | 18688 |
| | 18689 |
| | 18757 |
| | 18758 |
| | 18824 |
| | 18825 |
| | 18821 |
| | 18823 |
| | 18840 |
| | 18842 |

| AC Type | ESNs |
|---|---|
| A321-231 | 17899 |
| | 17946 |
| | 17988 |
| | 17990 |
| | 18024 |
| | 18022 |
| | 18064 |
| | 18072 |
| | 18075 |
| | 18114 |
| | 18088 |
| | 18092 |
| | 18083 |
| | 18089 |
| | 18149 |
| | 18164 |
| | 18249 |
| | 18256 |
| | 18243 |
| | 18245 |
| | 18307 |
| | 18309 |

| AC Type | ESNs |
|---|---|
| | 18429 |
| | 18433 |
| | 18699 |
| | 18700 |
| | 18738 |
| | 18732 |
| | 18721 |
| | 18722 |
| | 18730 |
| | 18731 |
| | 18749 |
| | 18751 |

**Schedule 2 to Exhibit A**

PARTIAL CONSENT ASSETS

| MSN | AC Type | ESNs | Aircraft Specific Purchase Price |
|---|---|---|---|
| 6867 | A321-231 | V18072 and V18149 | $25,687,000 |
| 7045 | A321-231 | V18164 and V18821 | $25,766,000 |
| 7106 | A321-231 | V18243 and V18700 | $24,557,000 |
| 7246 | A321-231 | V18249 and V18721 | $24,728,000 |
| **Total:** | | | **$100,738,000** |

# Exhibit B

## DELIVERY CONDITION

Each Aircraft will be delivered in "AS-IS, WHERE-IS" and "WITH ALL FAULTS" condition.

**Schedule 1 to Exhibit B**

AIRCRAFT RECORDS[2]

DOCUMENTS FROM ORIGINAL DELIVERY (Documents available electronically via AirbusWorld)

1. Export Certificate of Airworthiness
2. Factory AD Status
3. Factory SB Status
4. Original Weighing Report
5. Sanitary Construction
6. Aircraft Inspection Report
7. Detailed Specification
8. Interior Spec
9. Significant Rework Log
10. Landing Gear Brochure
11. Engine VSLs
12. APU Transmittal
13. Electrical Load Analysis
14. Noise Certificate
15. ETOPS / RVSM / CAT / BRNAV Letters
16. Committed Airplane Changes
17. LOPA

CURRENT CERTIFICATES

1. Certificate of Airworthiness
2. Registration
3. Radio License

CERTIFIED STATUS

**(Status may include: Reports/Statements/Task Card)**

1. Airframe Times & Cycles
2. Engines Times & Cycles
3. APU Times & Cycles

[2] Each item listed in this Schedule 1 to Exhibit B shall only be provided to Buyer to the extent it can be made available electronically, and it shall be Buyer's sole responsibility to arrange for access, at Buyer's sole cost, to any such item via the applicable electronic platform; provided that Seller shall provide commercially reasonable assistance in coordinating between Buyer and the applicable electronic platform.

4. Ratio of APU to Flt Hours statement (If Applicable)
5. Maintenance Check Status / History
6. Aircraft Modification Status Report
7. Airframe AD Summary
8. Appliance AD Summary
9. Service Bulletin Summary
10. Deferred Maintenance Items Report
11. Oils & Fluids Used Statement
12. Last Compass Calibration Compliance Card (Last Compliance Card)
13. Aircraft and Landing Gear Accident / Incident Statement
14. Engine Accident / Incident Statement (2)
15. APU Accident / Incident Statement
16. A/C Flight Time Report / Logs (Master Time & Cycle Log)
17. Seller Maintenance Program
18. LDND (Last Done Next Due)
19. Aircraft LLP Status Report (Certified)
20. Aircraft LLP Back to Birth Trace

<u>INTERIOR</u>

1. LOPA
2. Current Emergency Equipment Drawing (on LOPA)
3. Galley CMM (if available electronically via AirbusWorld)
4. Seat CMM's

<u>AIRWORTHINESS DIRECTIVES DFP's</u>

1. AD Airframe DFP's **(DFP compliance is a copy of original document or electronic copy showing compliance.)**
2. AD Appliance DFP's **(DFP compliance is a copy of original document or electronic copy showing compliance.)**

<u>MODIFICATION DFP's</u>

**(DFP compliance is a copy of original document or electronic copy showing compliance.)**

1. In-House
2. STC's
3. STC Data Packages **(Data package includes: MDL, drawings, parts list, manual supplements, instructions for continued airworthiness and Right to Use letter (if applicable)**
4. Service Bulletins

5. Service Letter (If Applicable)

<u>REPAIRS</u>

1. Dent and Buckle (Repair) Mapping
2. Structural Repairs DFPs **(DFP compliance includes a copy of original document or electronic copy showing compliance (as well as any reference material required for approval (8110-3, RDAS, EO, etc.)**
3. Substantiations /SRM/FAA /EASA Approvals/ RAS, etc. and all correspondence

<u>AIRCRAFT MAINTENANCE RECORDS</u>

1. Historical C Check and Heavy Check Packages
2. Flammability data for consumables used during repairs will be provided only if available

<u>COMPONENTS</u>

1. Hard Time Status Report (Certified)
2. Hard Time Certificates (Tags) **(FAA 8130-3 or EASA Form 1 serviceable tags)**
3. OCCM Installed Components List (Certified) **(OCCM is operator defined. Operator Configuration Control Master - this document is Spirit's list of tracked components as approved by its CASS board)**

<u>NOSE GEAR S/N</u>

1. Last Overhaul Package
2. Last Shop Visit Package
3. LLP Status (Certified)
4. LLP Back to Birth Trace

<u>LEFT MAIN GEAR S/N</u>

1. Last Overhaul Package
2. Last Shop Visit Package
3. LLP Status (Certified)
4. LLP Back to Birth Trace

<u>RIGHT MAIN GEAR S/N</u>

1. Last Overhaul Package
2. Last Shop Visit Package
3. LLP Status (Certified)
4. LLP Back to Birth Trace

<u>#1 ESN</u>

1. Disk Sheet / LLP Status (Certified)
2. LLP Back to Birth Trace
3. AD Status (Certified)
4. SB Status (Certified)
5. Shop Visit Packages
6. List of Historical Shop Visits (Certified)
7. Engine Installation/Removal History (Certified)
8. Engine Accessory Report (Certified)
9. Trend Monitoring for the Last Year
10. Non-PMA/DER Statement for the Engine gas path/internals (substantially in the form of Schedule 1 to this Exhibit B)

<u>#2 ESN</u>

1. Disk Sheet / LLP Status (Certified)
2. LLP Back to Birth Trace
3. AD Status (Certified)
4. SB Status (Certified)
5. Shop Visit Packages
6. List of Historical Shop Visits (Certified)
7. Engine Installation/Removal History (Certified)
8. Engine Accessory Report (Certified)
9. Trend Monitoring for the Last Year
10. Non-PMA/DER Statement for the Engine gas path/internals (substantially in the form of Schedule 1 to this Exhibit B)

<u>APU S/N</u>

1. APU Logbook
2. Shop Visit Packages **(Shop Packages include Engineering Disposition Report (EDR), ARC, and Logbook copies.)**
3. AD Status (Certified) in Log Book **(AD status in the log book is acceptable with signature)**
4. SB Status (Certified) in Log Book **(SB status in the log book is acceptable with signature)**
5. LLP Status (Certified)
6. Listing of APU Installation/Removal History (certified)

<u>MANUALS</u>

**(Manuals may be transferred electronically and will include any supplements required by any modification)**

1. AFM with Supplements
2. Quick Reference Handbook "QRH"
3. Airplane Flight Operation Manual (FCOM)
4. Flight Crew Training Manual
5. AMM
6. IPC
7. WDM & Lists
8. SRM
9. Weight & Balance
10. Fault Isolation (TSM)
11. Power Plant Build Up
12. Dispatch Deviation Guide (DDG)
13. Master Minimum Equip. List (MMEL)
14. Current Cockpit Disk Storage Box **(Originals will be retained.)**

MISCELLANEOUS

1. Tech Logs
2. Weight & Balance Report
3. Avionics Inventory
4. ETOPS & RVSM & CAT (ILS) status (as applicable)
5. Current Aircraft Software List with the available software provided in digital format

**Schedule 2 to Exhibit B**

DELIVERY LOCATION

The Delivery Location for each Aircraft shall be Goodyear, Arizona, Marana, Arizona, Mitsubishi Heavy Industries (MHI) in Japan (solely for ESN 18114 and 18022) or such other location as mutually agreed between the Parties.

Seller shall, at Buyer's expense, use commercially reasonable efforts to arrange for all relocation flights and associated flight permits to locate the Aircraft at the Delivery Location prior to Delivery.

Following Delivery of an Aircraft, Buyer shall be responsible for arranging the parking and storage of such Aircraft, and shall be responsible for the payment of all parking and storage fees for such Aircraft following its Delivery.

**Exhibit C**

LIST OF EXCLUDED EQUIPMENT

| WI-FI PARTS | | | |
|---|---|---|---|
| **COMPONENT NAME** | **PART NUMBER** | **QTY** | **EFFECTIVITY** |
| Tx Antenna | 187303-101/102 | 1 | All |
| Rx Antenna | 187302-101/102 | 1 | All |
| Kandu | 187300-101 | 1 | All |
| Krfu | 187301-101/102 | 1 | All |
| Waps | LV10-150801-102 | 3 | All |
| Modem | E71-200-01 | 1 | All |
| MPS, MULTI PURPOSE SERVER | 186096-103 | 1 | All |
| Radome | 187304-101/102 | 1 | All |
| Fairing | 187305-101/102 | 1 | All |
| Adapter Plate | 187306-101 | 1 | All |
| | | | |
| **CABIN & GALLEY PARTS** | | | |
| **COMPONENT NAME** | **PART NUMBER** | **QTY** | **EFFECTIVITY** |
| Emergency Medical Kit (EMK) | FAREMK | 2 | All |

**Exhibit D**

LIST OF ADDITIONAL EQUIPMENT

| CABIN & GALLEY PARTS | | | |
|---|---|---|---|
| **COMPONENT NAME** | **PART NUMBER** | **QTY** | **EFFECTIVITY** |
| F/S Trolley | TK500009/ZK101061 | 5 | All |
| H/S Trolley | TL500001/ZL101061 | 1 | All |
| F/S Waste Trolley | TKG720018/ZK101036/TG500007 | 2 | All |
| Waste Bin for F/S Waste Trolley | WA500001 | 2 | All |
| Std Unit | BB015004 | 6 | All |

# **Exhibit E**

## FORM OF AIRCRAFT ACCEPTANCE CERTIFICATE

[●] ("**Buyer**")[3] hereby confirms, pursuant to the Amended and Restated Aircraft Sale and Purchase Agreement (SPIRIT-EETC 2026), dated September 22, 2026, among SPIRIT AIRLINES, LLC ("**Seller**") and Buyer (the "**Sale and Purchase Agreement**"), that Buyer's execution of this certificate constitutes its confirmation of its absolute, irrevocable and unconditional acceptance of the Airframe, Engines and Additional Equipment (other than Non-Transferable Additional Equipment) and that pursuant to the Sale and Purchase Agreement, Buyer is satisfied in every way and in all respects (subject to the discrepancies listed on Annex A hereto) with the condition of the following equipment;

(i) one (1) Airbus S.A.S. model [A320-232][4] / [A321-231][5] airframe bearing the manufacturer's serial number [number] and U.S. registration mark [N####], in "as is, where is" condition, including all parts, components, appliances, accessories, instruments, furnishings, alterations, and other items of equipment installed in, attached to or related to the Airframe, but excluding the Excluded Equipment ("**Airframe**");

(ii) two (2) International Aero Engines AG (IAE) model [V2527-A5 Select One] [6] / [V2533-A5 Select One][7] engines, bearing the manufacturer's serial numbers [ESN1 & ESN2], in "as is, where is" condition, including all parts, components, appliances, accessories, instruments, furnishings, alterations, and other items of equipment installed in, attached to or related to the Engines, but excluding the Excluded Equipment (each an "**Engine**");

(iii) all Records related to the Airframe and each Engine; and

(iv) all Additional Equipment installed in or present on the Airframe or Engines at the time of Delivery, as listed on Exhibit D to the Sale and Purchase Agreement, other than any Non-Transferable Additional Equipment.

Buyer acknowledges that it is purchasing the Airframe, Engines and Additional Equipment (other than Non-Transferable Additional Equipment), in "AS IS", "WHERE IS" and

---

[3] Or Buyer Nominee, if applicable.

[4] Insert for an Airbus A320 model aircraft.

[5] Insert for an Airbus A321 model aircraft.

[6] Insert for an Airbus A320 model aircraft.

[7] Insert for an Airbus A321 model aircraft.

"WITH ALL FAULTS" condition and subject to each and every agreement, exclusion, waiver and disclaimer set forth in the Sale and Purchase Agreement.

Capitalized terms used herein but not otherwise defined shall have the meanings assigned to them in the Sale and Purchase Agreement.

**[●]**, as Buyer

By: ________________________________

Name: ______________________________

Title: _______________________________

ANNEX A

TO THE

AIRCRAFT ACCEPTANCE CERTIFICATE

**EXCLUDED EQUIPMENT TO BE REMOVED**

[To be included as applicable]

# Exhibit F

FORM OF WARRANTY BILL OF SALE

## WARRANTY BILL OF SALE

**SPIRIT AIRLINES, LLC** ("**Seller**"), in consideration of the sum of Ten Dollars ($10.00) and other valuable consideration in hand paid for by **[●]** ("**Purchaser**")[8], the receipt and sufficiency of which is hereby acknowledged by Seller, has granted, exchanged, sold, conveyed, transferred and delivered, and does by these presents hereby grant, exchange, sell, convey, transfer, deliver and set over unto Purchaser pursuant to that certain Amended and Restated Aircraft Sale and Purchase Agreement (SPIRIT-EETC 2026) dated as of September 22, 2026 (the "**Sale and Purchase Agreement**"), between Seller and Purchaser good and valid title to the following described property, with all rights and privileges of ownership thereto:

(i) one (1) Airbus S.A.S. model [A320-232][9] / [A321-231][10] airframe bearing the manufacturer's serial number [number] and U.S. registration mark [N####], in "as is, where is" condition, including all parts, components, appliances, accessories, instruments, furnishings, alterations, and other items of equipment installed in, attached to or incorporated into the Airframe, but excluding the Excluded Equipment ("**Airframe**");

(ii) two (2) International Aero Engines AG (IAE) model [V2527-A5 Select One][11] / [V2533-A5 Select One][12] engines, bearing the manufacturer's serial numbers [ESN1 & ESN2], in "as is, where is" condition, including all parts, components, appliances, accessories, instruments, furnishings, alterations, and other items of equipment installed in, attached to or incorporated into the Engines, but excluding the Excluded Equipment (each an "**Engine**");

(iii) all Records related to the Airframe and each Engine; and

(iv) all Additional Equipment installed in or present on the Airframe or Engines at the time of Delivery, as listed on Exhibit D to the Sale and Purchase Agreement, other than any Non-Transferable Additional Equipment,

---

8 Or Buyer Nominee, if applicable.

9 Insert for an Airbus A320 model aircraft.

10 Insert for an Airbus A321 model aircraft.

11 Insert for an Airbus A320 model aircraft.

12 Insert for an Airbus A321 model aircraft.

TO HAVE AND TO HOLD the same unto Purchaser, its successors and assigns forever. Seller hereby warrants and represents that Seller has full legal and beneficial title to the Airframe, each Engine, the Additional Equipment (other than Non-Transferable Additional Equipment) and the Records described above, and that Seller has not created, permitted or suffered to exist any Lien of any kind or nature whatsoever on or against the Airframe, any Engine or any Additional Equipment (other than Non-Transferable Additional Equipment) (other than Liens created by, through or on behalf of Purchaser and other than Liens that have been released and discharged pursuant to the Sale Approval Order). Seller shall warrant and defend title to the Airframe, each Engine and the Additional Equipment (other than Non-Transferable Additional Equipment) unto Purchaser, its successors and assigns, against all claims and demands of all Persons whomsoever claiming by, through or under Seller.

EXCEPT AS SET FORTH ABOVE WITH RESPECT TO TITLE, THE AIRFRAME, EACH ENGINE AND THE ADDITIONAL EQUIPMENT (OTHER THAN NON-TRANSFERABLE ADDITIONAL EQUIPMENT) IS SOLD TO PURCHASER "AS-IS, WHERE-IS" AND "WITH ALL FAULTS". SELLER MAKES NO EXPRESS OR IMPLIED WARRANTY INCLUDING, WITHOUT LIMITATION, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR PURPOSE, AND NO REPRESENTATION OR AFFIRMATION OF FACT IS MADE, WITH RESPECT TO THE AIRCRAFT OR THE ADDITIONAL EQUIPMENT. FOR THE AVOIDANCE OF DOUBT, NOTHING IN THIS PARAGRAPH SHALL LIMIT OR MODIFY THE WARRANTY OF TITLE SET FORTH ABOVE. IN NO EVENT SHALL SELLER BE LIABLE TO PURCHASER FOR ANY INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES SUSTAINED BY PURCHASER AS A RESULT OF THE SALE OF THE AIRCRAFT OR THE ADDITIONAL EQUIPMENT.

[**SIGNATURE PAGE FOLLOWS**]

IN WITNESS WHEREOF, this Bill of Sale has been executed on behalf of Seller by its authorized representative on __________________, 202___.

Seller:

**SPIRIT AIRLINES, LLC**

By: ______________________________________

Name: ____________________________________

Title: _____________________________________

**Exhibit G**

[RESERVED]

## Exhibit H

FORM OF COMPLIANCE CERTIFICATION STATEMENT

======================

### COMPLIANCE CERTIFICATION

In connection with its activities and other transactions with [Spirit Airlines, Inc.]/[ [●]] ("Recipient") its affiliates, subsidiaries, shareholders, officers, directors, members, managers employees, agents, independent contractors and/or its other representatives, and in further consideration therefor, the undersigned (the "Company"), for itself and for and on behalf of its affiliates, subsidiaries, shareholders, officers, directors, members, managers employees, agents, independent contractors and/or its other representatives represents, warrants, certifies and agrees to the following:

1. The Company, in its dealings with Recipient and otherwise, including without limitation the resale, lease or exchange of parts and other equipment acquired or otherwise received from Recipient, will comply with all applicable laws and regulations, including all of the following as the same are applicable to the transactions and other activities engaged in with Recipient:

    a. U.S. Foreign Corrupt Practices Act and other applicable anti-corruption laws (collectively, "Anti-Corruption Laws");

    b. U.S. Government export control laws and regulations including the International Traffic in Arms Regulations (ITAR) and the Export Administration Regulations (EAR); and

    c. all trade, economic, financial sanctions or export control laws, embargoes or restrictive measures implemented, administered or enforced by any of the following (i) the United States through the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"), the U.S. Department of State, the U.S. Department of Commerce or any other U.S. government entity, and (ii) the European Union (collectively, "Sanctions").

2. The Company will not, in its dealings with Recipient or otherwise, including without limitation the resale, lease or exchange of parts and other equipment acquired or otherwise received from Recipient, transact or otherwise deal with any Person that is a target or subject of any Sanctions, including, without limitation, any Person or entity: (i) designated on a list of sanctions targets issued by OFAC or the US Department of Commerce or US Department of State and/or subject to US blocking Sanctions; (ii) designated on any list(s) of sanctions targets maintained by the European Union; (iii) located, organized or resident in a country or territory

that is the subject of comprehensive country-wide or territory-wide Sanctions and/or owned or controlled by the government of any such country or territory; and/or (iv) directly or indirectly, owned or controlled, by any Person or entity falling within (i), (ii) or (iii) above, unless the Company shall have obtained prior and effective express authorization from the appropriate agency of the United States Government. The foregoing, in addition to the laws, regulations, etc. set out in paragraph 1, are hereinafter referred to as "Trade Laws". For purposes of this certification, "Person" is defined as any individual, agency, firm, association, partnership, joint venture, bank, financial institution, trust, corporation, company, limited liability company, government entity, committee, department, authority or any body or other entity, incorporated or unincorporated, whether having distinct legal personality or not.

3. The Company has and will maintain policies and procedures to ensure full compliance with the foregoing provisions in paragraphs 1 and 2.

4. The Company has in place and will maintain in place such policies, procedures and safeguards to ensure that its agents and contractors, and their respective affiliates, subsidiaries, shareholders, officers, directors, members, managers employees, agents, independent contractors and/or its other representatives adhere to the requirements set forth in this certification in connection with the activities contemplated hereby.

5. The Company will promptly report to Recipient and will cooperate fully with Recipient to investigate and remediate any violations or alleged violations of the Trade Laws.

6. The Company hereby certifies that all of the information and certifications the Company has provided to Recipient herein are accurate and complete. The Company agrees that if, after the date of this certification, it becomes aware of any information that would cause such certifications or information to become inaccurate or incomplete, the Company will immediately furnish Recipient with a report detailing such changes in circumstances and will promptly remediate the same.

7. The Company certifies that all of the facts contained in this statement are true and correct to the best of its knowledge and it does not know of any additional facts that are inconsistent with the above statements. The Company shall promptly send a replacement statement to Recipient, disclosing any material change of facts or intentions described in this statement that occur after this statement has been prepared and delivered to Recipient. Compliance with this statement is the Company's material obligation in order to conduct business with Recipient.

8. The undersigned is a responsible official who has personal knowledge of the information included in this certification, and has the authority to bind the Company to the terms herein.

**[NAME OF COMPANY]**

For the Company

By: ________________________
(Name)
(Title)

Date: ______, 202__