**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| SPIRIT AVIATION HOLDINGS, INC., *et al.*, | : | Case No. 25-11897-SHL |
| | : | (Jointly Administered) |
| Debtors.[1] | : | |

**CONSUMER PRIVACY OMBUDSMAN**
**SUPPLEMENTAL REPORT TO THE COURT**
**ON THE SALE OF DEIDENTIFIED DATA**

October 5, 2026

Lucy L. Thomson
Consumer Privacy Ombudsman

The Willard, Suite 400
1455 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(703) 212-8770
lucythomson_cpo@earthlink.net

[1] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

## I. Bankruptcy Code Privacy Framework and Recommendations

Pursuant to Bankruptcy Code section 332(b), Lucy L. Thomson, the Consumer Privacy Ombudsman ("CPO" or "Ombudsman") appointed in this case, submitted her Report to the Court on September 8, 2026 to advise the Court on the issues related to privacy and the protection of personally identifiable information (PII) of the consumers/ passengers of Spirit Aviation Holdings, Inc. d/b/a Spirit Airlines, LLC ("Debtors" or "Spirit"). (Doc. No. 1581)

The CPO Report focused on the factors set forth in the Bankruptcy Code that the Ombudsman may address, including information relating to:

- The Debtors' Privacy Policy;
- Potential losses or gains of privacy to consumers if the sale is approved;
- Potential costs or benefits to consumers if the sale is approved; and
- Possible alternatives that would mitigate potential privacy losses or costs to consumers.

11 U.S.C. § 332.

This Supplement provides observations and recommendations for the Court's consideration in deciding whether to approve the sale of the deidentified data.[2]

As a result of ongoing discussions among the Debtors, the successful bidder, Google, and the Ombudsman, the parties have taken consequential steps to protect the privacy of the personal data of the Spirit consumers:

- Revised the scope of the consumer personal data to be included in the sale of the deidentified data.
- Excluded passenger databases from the sale to eliminate much of the Spirit passenger PII.

[2] This filing supplements and does not supersede the September 8, 2026 CPO Report to the Court, which the Ombudsman incorporates by reference, and addresses developments since that date.

- Hired a Deidentification Agent, Tonic.ai, to deidentify unstructured data such as corporate e-mails that may contain consumer personal information.

These changes will significantly reduce the potential risk of harm to the 97 million consumers who provided their personal data to Spirit for the purpose of booking airline travel. By excluding the structured Spirit passenger systems from the sale, that data will not be subject to deidentification and will not be provided to the successful bidder in any form, deidentified or not.

Unstructured consumer personal data that may be present in corporate systems such as e-mail will be deidentified before it is transferred to the successful bidder. (Discussed in section II. B. *infra*). As proposed by the Debtors, prior to any transfer of the Spirit data to the successful bidder, and for every transfer thereafter from the Debtors to the successful bidder, the third party expert (the Deidentification Agent) will deliver to the Debtors, for filing with the Court, a certification that the Court-approved procedures were performed and that, in the Agent's professional opinion, the transferred data is deidentified. The certification should include a general description of the deidentified data. The Ombudsman recommends that it should also provide a description of the scope and number of individual Spirit passengers in the unstructured data whose personal information was detected and deidentified.

In conclusion, the Ombudsman recommends to the Court that from a privacy perspective, approval of the sale of the deidentified data would be appropriate.[3] The potential privacy losses or costs to consumers have been eliminated or mitigated.[4] The sale would not violate any applicable non-bankruptcy laws.

---

[3] The Ombudsman did not investigate or reach any conclusion about whether the data offered for sale or the deidentification process to be followed presents any risks to affected employees or third parties.

[4] As discussed in the September 8, 2026 CPO Report to the Court, this bankruptcy sale presents challenging issues in which law and technology are interrelated. It illustrates that with respect to the protection of personal data and deidentification, technology has far outpaced the law, potentially putting consumers at risk of significant harm if their deidentified personal data is reidentified and misused or stolen, or if AI makes inferences about individuals

## II. Digital Assets to Be Sold – Deidentified Spirit Passenger Data

Through an initial auction completed on Friday, August 13, 2026,[5] the Debtors proposed to sell enterprise data derived from the company's operations that include "deidentified data" pertaining to approximately 190 million airline flights taken by Spirit passengers, including productivity and collaboration data, core business systems, and workflow and process data.[6]

Debtors' counsel advised the Ombudsman that the categories of enterprise data originally planned for this sale included eight systems that had multiple processing purposes, some of which may have involved the processing of personal data, but others did not.[7]

---

based on combining deidentified data with data from other sources, and that information is disclosed without authorization. While properly deidentified data has a very low risk of re-identification, combining it with external datasets or using insufficient deidentification methods can potentially reveal individual identities.

[5] Notice of Auction Results and Scheduled Hearing for the Deidentified Data (Doc. No. 1463, filed 8/14/26). The Debtors selected Google LLC (the "Successful Bidder") as the highest and best bid and Mercor.io Corporation (the "Alternate Bidder") as the Alternate Bid.

**Google LLC** is a multi-national technology company that offers hundreds of products and services spanning search, consumer software, enterprise cloud, mobile operating systems, and hardware.

**Mercor.io** is an AI data and recruiting startup founded in 2023 that connects specialized human experts with top AI labs and enterprises to train advanced AI models.

**micro1**, a human-data and intelligence platform for AI training, filed a Notice of Intent to Submit a competing and superior bid for the deidentified data. (Doc. No. 1556, filed 9/3/26).

[6] The original list of the assets included within the Deidentified Data can be found in the Asset Schedule attached to the Notice of Auction Results and Scheduled Hearing for the Deidentified Data. Sale Agreement between Google LLC and Spirit Airlines, LLC, Section 1(c) (attached as Exhibit A, Doc. No. 1463 at 18).

[7] The enterprise data assets encompass the following types of information:

- **Productivity & collaboration data,** including email and calendar data, document repositories (e.g., SharePoint/ OneDrive), chat and collaboration messages, and wikis/ knowledge base.
- **Core business systems**, including customer behavior (CRM), employee behavior and productivity data, revenue and yield management (inventory) data, and aircraft operation and logistics data.
- **Workflow & process data**, including finance, marketing, support/HR/ legacy, strategy and operations, and project management data.

**Eight systems that might include customer data**:

- Revenue Transactions / PNR Data (confirmation numbers), Refunds, Inflight Purchases, Timecard information, WiFi Sales, Corporate emails (includes employee data and possibly marginal consumer data).

**Systems that would include employee data**: Concur, Employee business travel records.

The deidentified data does not include, and is not being derived from, databases relating to customer insights, customer profiles, Free Spirit member data, savers club data, social media data, and survey data. No biometric or geolocation data will be included in the sale.

### A. Databases Excluded to Eliminate Consumer PII from the Sale

The parties have made significant changes to the digital assets offered for sale. The Debtors and Google, the successful bidder, have agreed to exclude from the scope of the sale transaction key databases that contain consumer personal data.

The following datasets will not be part of the sale transaction and will not be provided to Google in any form (deidentified or otherwise): [8]

**B.** Consumer Transaction Systems – i.e., Transactions, Passenger Name Record (PNR)

**C.** Refund systems

**D.** Inflight/Onboard Purchases

**E.** WiFi sales

**F.** Others TBD

### A. Deidentification of Unstructured Data that May Contain Personal Data

Unstructured personal data is information about an identifiable person that does not have a predefined format, data model, or organization, making it difficult to search. Examples of unstructured personal data include:

- ***Text and Communications*****:** Emails, text messages, direct messages, workplace chat logs, and customer support notes containing names, complaints, or personal stories.
- ***Multimedia*****:** Voice recordings, customer service call audio, videos, and photographs or security footage that capture an individual's likeness or voice.
- ***Social Media*****:** User posts, comments, and profile biographies that reveal personal habits, locations, or opinions.

---

[8] The Ombudsman has been provided a draft revised asset schedule reflecting these changes. She has been assured that while this list is still subject to change, any system designated as excluded (*i.e.,* not included) will remain excluded and will not be moved back into scope.

- ***Documents and Files*:** Resumes, Word documents, PDF reports, and handwritten notes that mention personal details

Corporate emails that include employee data and possibly consumer personal data will be included in the sale. Debtors structured the bid process so that systems included in the sale that contain personal data will be subject to a deidentification process designed to remove personal data *prior to* transmission to the successful bidder.

The process for deidentification of the unstructured consumer data the Debtors have adopted is designed to meet the latest professional standards. Debtors have hired Tonic.ai ("Deidentification Agent") to conduct the data deidentification.[9] https://www.tonic.ai/solutions/use-case/company-data-de-identification. The Ombudsman was provided an opportunity to meet with the vendor and learn about the process that will be followed.

- **Deidentification Standards**

In a letter dated August 5, 2026, Debtors' counsel advised the Ombudsman that in the interest of protecting consumer privacy, Spirit intends voluntarily to apply "the deidentification standards enunciated by the modern state privacy laws and the FTC" and reflected in the Sale Agreement. Specifically, the Debtors and the successful bidder have voluntarily agreed to follow the deidentification standard adopted in the California Consumer Privacy Act ("CCPA") (Cal. Civ. Code § 1798.140(m)) for the deidentification process for this sale. They intend to –

(1) take reasonable measures to ensure that data cannot be associated with a natural person,

(2) require a purchaser to publicly commit to maintaining and using deidentified data without attempting reidentification, and

[9] The Ombudsman did not investigate or reach any conclusion about whether the data offered for sale or the deidentification process to be followed presents any risks to affected employees or third parties.

(3) contractually prohibit a purchaser from onward transferring deidentified data to a third party unless the third party enters into a similar public commitment.

The Successful Bid expressly incorporates the three requirements set forth under that standard for deidentification, and will require an independent third party to conduct the deidentification based upon industry standards and practice.

- **Verification of Deidentification and Certification**

It is critical that before any Spirit passenger data is transferred to Google, an independent third party, the Deidentification Agent, has assured the Court that the personal data has been appropriately deidentified using a standard that is reasonably designed to prevent reidentification. The Deidentification Agent shall perform and document quality-control testing reasonably designed to assess whether individuals may remain identifiable through direct identifiers, indirect identifiers, free-text content, unique characteristics, record linkage, or other means.

The certified completion of this deidentification is a closing condition under the Sale Agreement, meaning that the sale will only occur and thus data will only be transferred to Google if and when the data is deidentified (meaning it no longer contains personal data).

Prior to any transfer, and for every transfer thereafter, the third party expert will file an affidavit with the Court certifying that the data transferred has been deidentified. The affidavit will include a general description of the deidentified data. The Ombudsman recommends that it should also provide the number of individual Spirit passengers in the unstructured data whose personal information was detected and deidentified.

**B. Protection of Children and Teens**

The decision to exclude the Consumer Transaction Systems from the sale means that personal data related to children and teens will not be transferred to the successful bidder. Therefore, any privacy risks to children and teens no longer exist.

**C. Restrictions on Reidentification of the Deidentified Data**

The Sale Agreement requires the successful bidder publicly to commit to maintaining and using deidentified data without attempting reidentification.

**D. Reasonable and Appropriate Security in the AI Training Environment**

The successful bidder must provide reasonable and appropriate security for the deidentified personal data it receives. The U.S. Department of Transportation (DOT) has found that mishandling the private information of consumers may be considered an unfair or deceptive practice.

Google has published a paper titled *Our Approach to Protecting AI Training Data* that outlines its approach to cybersecurity for AI training data, highlights best practices in data protection, and describes how Google applies them in its systems.[10]

**E. Other Bidders**

The Notice of Auction Results and Scheduled Hearing for the Deidentified Data (Doc. No. 1463, filed 8/14/26) advised that Mercor.io Corporation was selected as the Alternate Bid for this sale. **Mercor.io** is an AI data and recruiting startup that connects specialized human experts with top AI labs and enterprises to train advanced AI models. In early 2026, the company experienced a supply chain security incident. If the Court decides to consider the company as the successful bidder, the Ombudsman requests an opportunity to conduct further research into the circumstances

[10] *Our Approach to Protecting AI Training Data*, GOOGLE, https://research.google/pubs/our-approach-to-protecting-ai-training-data/

of this data breach, https://www.mercor.com/blog/update-on-mercor-security-incident/, and whether Mercor.io is an appropriate, qualified buyer. It must be determined if Mercor.io is willing to take steps sufficient to protect the privacy interests of Spirit's consumers.

**micro1**, a human-data and intelligence platform for AI training, filed a Notice of Intent to Submit a competing and superior bid for the deidentified data. (Doc. No. 1556, filed 9/3/26). The Debtors have structured the sale transaction so that a key component is having an independent expert conduct the deidentification of Spirit data. micro1 proposed to conduct the deidentification themselves and not to use an independent party. If the Court considers the company as the successful bidder, the Ombudsman requests an opportunity to conduct further research into their proposal and whether Micro1 is an appropriate, qualified buyer. It must be determined if Microl is willing to take steps sufficient to protect the privacy interests of Spirit's consumers.

III. **Conclusion**

The issues related to the sale of the deidentified data of the more than 97 million Spirit passengers required under sections 332 and 363 of the Bankruptcy Code have been addressed for consideration by the Court, including compliance with the privacy policy, the application of non-bankruptcy laws, and the losses or gains, and costs or benefits to consumers, if the sale is approved.

The CPO provided recommendations regarding practical steps the parties can take to protect the privacy of the Spirit consumers, many of which have been adopted. The CPO believes the Recommendations in this CPO Report strike an appropriate balance between the privacy rights of consumers and practical considerations associated with this bankruptcy sale. She stands ready to provide whatever further analysis or recommendations the Court deems appropriate.

Respectfully submitted,

*Lucy L. Thomson*

Consumer Privacy Ombudsman