**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SPIRIT AVIATION HOLDINGS, INC., *et al.*, | Case No. 25-11897 (SHL) |
| Debtors. | (Jointly Administered) |

**EXHIBIT A**

**PROPOSED STATEMENT OF AMICUS CURIAE OF SKYWEST INFLIGHT ASSOCIATION CONCERNING EMPLOYEE PRIVACY IN THE PROPOSED SALE OF DEIDENTIFIED DATA**

## I. Interest of Amicus Curiae

1. SkyWest InFlight Association ("SIA") is an independent labor organization and, for over three decades, the exclusive recognized representative, under the Railway Labor Act, of the approximately 5,000 flight attendants employed by SkyWest Airlines, Inc., the largest regional airline in the United States. SkyWest, Inc., Annual Report (Form 10-K), Item 1 (Feb. 17, 2026), https://www.sec.gov/Archives/edgar/data/793733/000110465926016358/skyw-20251231x10k.htm. SIA's responsibilities include negotiating and administering employment agreements, representing flight attendants in workplace matters, and protecting their legitimate employment-related interests.

2. SIA submits this Statement to address the potential implications of the proposed sale of airline employee data for regional-airline flight attendants and the broader aviation workforce. It takes no position on the commercial merits of the sale, the purchaser's proposed business activities generally, or the Debtors' broader restructuring efforts.

3. The concerns identified below extend well beyond Spirit Airlines. They implicate how confidential employee information may be collected, retained, combined, deidentified, and ultimately transferred whenever an employer's assets are sold in bankruptcy, and they are

particularly acute in the airline industry, where employment records are tied to federally regulated training, qualification, and safety functions and to operational data that can identify individual crewmembers.

**II. The Regional-Airline Industry Presents Distinct Privacy Considerations**

4. Regional airlines are an essential component of the United States air transportation system. As the Government Accountability Office has observed, "[t]he regional airline industry plays a key role in the broader domestic passenger airline industry." U.S. Gov't Accountability Off., GAO-26-107856, *Aviation Workforce: FAA Could Strengthen Regional Pilot Pipeline by Establishing Timelines for Training Initiatives*, at 2 (Apr. 30, 2026), https://files.gao.gov/reports/GAO-26-107856/index.html. In fiscal year 2025, regional carriers carried approximately 140 million domestic passenger enplanements. Fed. Aviation Admin., *FAA Aerospace Forecast Fiscal Years 2026–2046*, at 14 (2026), https://www.faa.gov/data_research/aviation/aerospace_forecasts/2026_FAA_Aerospace_Forecasts_FY2026-2046-2.pdf. The FAA also identifies the persistent movement of regional flight crews toward mainline carriers as a factor affecting regional-airline operations. *Id.*

5. The GAO similarly reports that regional airlines operated approximately one-third of domestic flights in 2024, serving as connections between larger airports and smaller communities. GAO-26-107856, *supra*, at 2–3.

6. These industry characteristics are relevant to employee-data privacy. Regional operations may involve relatively small crew complements, limited base populations, distinctive scheduling patterns, and frequent connections with particular airports or airline partners. Combining such information with employment histories or publicly available information can increase the possibility of identifying individual employees or deriving otherwise confidential information about them. Regional carriers operate about one-third of domestic flights, and they do

so with smaller aircraft and smaller cabin crews. An airplane with 50 or fewer passenger seats requires no more than one flight attendant, and one with 51 to 100 seats requires two. 14 C.F.R. § 121.391(a). Where a flight carries a single flight attendant, the crew record for that flight is that flight attendant's record, whether or not it bears a name. Any training result, disciplinary note, or incident or safety report linked to that record belongs to one identifiable person, and anyone who learns who worked the flight, from a crew schedule, a coworker, or a passenger, can restore the name.

7. Accordingly, the removal of names, employee identification numbers, or other direct identifiers does not necessarily eliminate privacy risks. A combination of operational records, training histories, seniority information, and crew assignments may permit a particular employee or small group to be singled out or associated with sensitive events.

8. These concerns deserve particular attention where the proposed purchaser may have access to substantial datasets or analytical tools that can be used to combine information from multiple sources.

## III. Aviation Safety and Employment Records Require Particular Care

9. Air carriers operating under Part 121 of the Federal Aviation Regulations and their crews are subject to extensive training, qualification, and recordkeeping requirements. Among other things, 14 C.F.R. § 121.417 addresses crewmember emergency training, § 121.433 establishes initial and recurrent training requirements, and § 121.683 requires maintenance of crewmember and dispatcher records reflecting applicable qualifications, training, and compliance.

10. Compliance with these requirements necessarily involves the creation and retention of information associated with individual employees. Such information can be sensitive for reasons extending beyond conventional personally identifying information. In particular, records reflecting training outcomes, qualification deficiencies, performance assessments, or employment-related

investigations may have consequences if disclosed, misinterpreted, or used outside their original context.

11. SIA does not contend that the FAA regulations independently prohibit transfer of this information in bankruptcy. Rather, the federally regulated character of airline operations underscores the importance of evaluating the sensitivity of the records themselves, as distinguished from merely determining whether obvious personal identifiers have been removed.

12. The Court should therefore consider whether sufficient procedures exist to identify and protect sensitive crewmember records and related employment information before such information is transferred to third parties for unrelated commercial uses.

**IV. Deidentification Does Not Necessarily Prevent Reidentification or Sensitive Inferences**

13. The Consumer Privacy Ombudsman's reports do not assess these risks as they apply to employees. The Consumer Privacy Ombudsman "did not investigate or reach any conclusion about whether the data offered for sale or the deidentification process to be followed presents any risks to affected employees or third parties." ECF No. 1684, at 3 n.3. Following that report, the Debtors have advised that the treatment of "personally identifiable or sensitive employee information" remains the subject of ongoing discussions. ECF No. 1695, at 2.

14. As Professor Paul Ohm has explained, apparently anonymized information may become identifiable when combined with other information. Paul Ohm, *Broken Promises of Privacy: Responding to the Surprising Failure of Anonymization*, 57 UCLA L. Rev. 1701, 1701 (2010) (computer scientists "can often 'reidentify' or 'deanonymize' individuals hidden in anonymized data with astonishing ease").

15. See Aloni Cohen & Kobbi Nissim, *Towards Formalizing the GDPR's Notion of Singling Out*, 117 Proc. Nat'l Acad. Sci. 8344, 8344 (2020) (describing "singling out" as finding a description "matching exactly one row" in a dataset, and noting that traditional disclosure-

limitation techniques "often fall short"); Alicia Solow-Niederman, *Information Privacy and the Inference Economy*, 117 Nw. U. L. Rev. 357, 357 (2022) (explaining that "aggregated data that is neither personal nor identifiable can be used to make inferences about" individuals)

16. These principles have particular practical significance for airline employment data. Crew assignments, base locations, training dates, scheduling patterns, and other operational characteristics may, in combination, permit inferences about employees or relatively small groups even where names and direct identifiers have been removed. As noticed, the assets to be sold include crew base information covering 4,600 crew and 5,014,676 crew pairings, and the Sale Agreement requires deidentification "while preserving referential integrity across the data set." ECF No. 1463, at 9 (Sale Agreement § 3(c)), 18 (Assets Schedule).

17. The risk is not confined to intentional reidentification by the purchaser. It may also arise through analysis of the information as delivered, subsequent combinations with external datasets, or further transfers to third parties.

18. Consequently, a contractual promise not to intentionally reidentify particular employees, such as the purchaser's undertaking here, *see* ECF No. 1463, at 8 (Sale Agreement § 1(c)), is useful but may not fully address the risks associated with downstream analysis, sensitive inferences, and further dissemination.

**V. Regional-Airline Bankruptcies Demonstrate That These Concerns Are Recurring**

19. Bankruptcy proceedings involving regional airlines are not unusual historical anomalies. During the past decade, documented examples include PenAir and Island Air in 2017, Ravn Air Group in 2020, ExpressJet Airlines in 2022, and Silver Airways and its affiliate Seaborne Airlines in 2024.[1]

[1]Documented examples include: (1) Peninsula Airways, Inc. (PenAir), Chapter 11 petition filed August 6, 2017, *In re Peninsula Airways, Inc.*, No. 17-00282 (Bankr. D. Alaska); (2) Hawai'i

20. SIA recognizes that these carriers' financial circumstances differed and does not suggest that any of them engaged in employee-data sales comparable to the Proposed Sale. Rather, their bankruptcies establish that the issue of handling employee records upon financial distress or the cessation of airline operations is a recurring and foreseeable one. SIA's interest in the issue is industry-wide and does not arise from the circumstances of its members' own employer. SkyWest, Inc. reported net income of $322 million on operating revenues of $3.23 billion for the first nine months of 2026, held $569 million in cash and marketable securities at September 30, 2026, repurchased approximately $75 million of its common stock in the third quarter of 2026, and continues to take delivery of new E175 aircraft, anticipating "over 300 E175 aircraft in its fleet" by the end of 2027.[2]

---

Island Air, Inc. (Island Air), Chapter 11 petition filed October 16, 2017, subsequently converted to Chapter 7, *see also In re Hawai'i Island Air, Inc.* (*Kane v. PaCap Aviation Fin., LLC*), Nos. 24-5683, 24-6024 (9th Cir. Sept. 29, 2026), https://cdn.ca9.uscourts.gov/datastore/opinions/2026/09/29/24-6024.pdf; (3) Ravn Air Group, Inc., Chapter 11 petition filed April 5, 2020, *In re Ravn Air Group, Inc.*, No. 20-10755 (Bankr. D. Del.); (4) ExpressJet Airlines LLC, operating its relaunched service under the aha! brand, Chapter 11 petition filed August 23, 2022, *In re ExpressJet Airlines LLC*, No. 22-10787 (Bankr. D. Del.); and (5) Silver Airways LLC and affiliate Seaborne Virgin Islands, Inc. (Seaborne Airlines), Chapter 11 proceedings commenced in December 2024, subsequently converted to Chapter 7 in July 2025, *In re Silver Airways LLC*, No. 24-23623 (Bankr. S.D. Fla.), Order Converting Cases, ECF No. 824 (July 28, 2025), https://documents.elevenflo.com/uuid_database_8_14_23/b96e7786-bd9d-48bb-a6a9-90c4c8013804.pdf. *See also Connecting Rural America to the National Airspace System: Hearing Before the Subcomm. on Aviation of the H. Comm. on Transp. & Infrastructure*, 119th Cong. 13 (June 4, 2026) (prepared statement of Faye Malarkey Black, President & CEO, Regional Airline Association) (Figure 2, "Thirteen Regional Airline Bankruptcies or Liquidations Since 2009"), https://www.govinfo.gov/content/pkg/CHRG-119hhrg64295/pdf/CHRG-119hhrg64295.pdf. This list is illustrative rather than exhaustive and excludes carriers that merely ceased operations without an identified bankruptcy filing. These examples do not establish that any of the identified carriers sold employee information during their bankruptcy proceedings.

[2] SkyWest, Inc., Current Report (Form 8-K), Ex. 99.1, *SkyWest, Inc. Announces Third Quarter 2026 Profit* (Oct. 29, 2026), https://www.sec.gov/Archives/edgar/data/793733/000110465926120182/skyw-ex99d1.htm.

21. The Court's treatment of employee-data safeguards in these proceedings may therefore have significance beyond the immediate interests of the Debtors and the proposed purchaser.

22. SIA acknowledges the substantial hardships experienced by employees when airlines cease operations, including lost income, disrupted careers, and uncertainty about future employment. SIA respectfully submits that preserving the confidentiality and appropriate use of employees' historical records is one modest but important means of protecting their interests during those transitions.

## VI. Appropriate Safeguards Would Serve Employee Interests Without Necessarily Preventing the Sale

23. SIA does not seek to prevent the estates from realizing legitimate value from assets that may lawfully be transferred. Rather, SIA respectfully asks the Court to consider whether approval of the Proposed Sale should be conditioned on reasonable safeguards addressing the distinct sensitivity of airline employment records.

24. Those safeguards could include:

a. An express requirement to identify, review, and appropriately exclude or segregate sensitive employee records, including individual training evaluations, disciplinary and investigative records, confidential grievance information, and materials concerning safety-related reporting.

b. A deidentification protocol that evaluates not only direct identifiers but also the reasonable possibility of identifying employees through combinations of crew, scheduling, base, training, and operational information.

c. Independent review or certification of the treatment of sensitive employment information before transfer.

d. Restrictions on reidentification, sensitive employment-related profiling, unauthorized disclosure, and further transfer inconsistent with the protections imposed by the Court.

e. Appropriate procedures for addressing material deficiencies discovered after transfer, including enforceable obligations concerning further use or dissemination of affected information.

25. These proposed safeguards are intended to be proportionate to the risks and the nature of the information involved. SIA recognizes that the Court must also consider the practical feasibility of any safeguards, the costs of implementing them, and the legitimate objectives of the bankruptcy estate.

26. The essential distinction is between information that is commercially valuable and information that may lawfully and appropriately be transferred without exposing employees to unnecessary privacy risks. The existence of the former does not eliminate the need to examine the latter.

## VII. Conclusion

27. SIA respectfully submits that the Proposed Sale presents concerns extending beyond conventional consumer-data protection and that airline employment records warrant particular consideration because of the operational, regulatory, and employment-related information they may contain.

28. Regional-airline operations may make it possible to identify employees or infer sensitive facts through combinations of otherwise deidentified records. Applicable FAA training and recordkeeping requirements illustrate the nature and potential sensitivity of some of the information involved.

29. SIA therefore respectfully requests that the Court consider appropriate employee-data protections before authorizing the transfer of such information and, to the extent practicable, impose safeguards addressing both reidentification and the disclosure or misuse of sensitive employment information.

Dated: November 3, 2026

Respectfully submitted,

/s/ Gregg M. Formella
Gregg M. Formella (pro hac vice motion pending, ECF No. 1773)
Formella Law, PLLC
300 State Street, P.O. Box 92141
Southlake, TX 76092
Tel: 817-798-1010
Email: Gregg.Formella@gmail.com
Counsel for SkyWest InFlight Association