PILLSBURY WINTHROP SHAW PITTMAN LLP
Michael G. Burke
31 West 52nd Street
New York, NY 10019
Tel: (212) 858-1000
michael.burke@pillsburylaw.com

*Counsel to GE Aerospace and CFM International, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **In re:**<br><br>**SPIRIT AVIATION HOLDINGS, INC.,** ***et al.,***<br><br>**Debtors.**[1] | **Chapter 11**<br><br>**Case No. 25-11897 (SHL)**<br><br>**Jointly Administered** |

**LIMITED OBJECTION AND RESERVATION OF RIGHTS TO THE DEBTORS' PROPOSED SALE ORDER AND SALE OF THE DEIDENTIFIED DATA**

GE Aerospace ("**GEA**") and CFM International, Inc., a 50/50 joint venture between GEA and Safran Aircraft Engines ("**CFM**" and together with GEA, the "**Engine OEMs**"), by and through their undersigned counsel, hereby file this limited objection and reservation of rights (the "**Limited Objection**") to the Debtors' request for approval of the sale of the "Deidentified Data" as proposed in the *Notice of Auction Results and Scheduled Hearing for the Deidentified Data* [ECF No. 1463] (the "**Data Sale**") and the *Notice of Filing of (A) Revised Proposed Sale Order, (B) Revised Sale Agreement and (C) Ancillary Agreements in Connection With the*

[1] The Debtors' names and last four digits of their respective employer identification numbers are as follows: Spirit Aviation Holdings, Inc. (1797); Spirit Airlines, LLC (7023); Spirit Finance Cayman 1 Ltd. (7020); Spirit Finance Cayman 2 Ltd. (7362); Spirit IP Cayman Ltd. (4732); and Spirit Loyalty Cayman Ltd. (4752). The Debtors' mailing address is 1731 Radiant Drive, Dania Beach, FL 33004.

*Proposed Sale of the Deidentified Data* [ECF No. 1802] (as may be further modified, the "**Proposed Sale Order**") filed on November 9, 2026.[2]

In support of this Limited Objection, the Engine OEMs respectfully state as follows:

## INTRODUCTION[3]

1. The Engine OEMs do not seek to block the proposed sale of the Deidentified Data in its entirety. They seek only to ensure that (i) the proposed Data Sale to Google LLC ("**Google**" or the "**Successful Bidder**") does not disclose any proprietary, commercially sensitive, or confidential information and data of or regarding the Engine OEMs, potentially including information subject to U.S. export control laws and regulations (such confidential and/or proprietary information and data, the "**OEM Data**"), and (ii) the Data Treatment Procedures[4] proposed by the Debtors and Tonic AI, Inc. (the "**Deidentification Agent**") are sufficient to ensure that OEM Data is not transferred to, or disclosed by, Google, whether directly, inadvertently, or otherwise, including through an artificial intelligence model trained on or given access to the OEM Data that is able to infer or reveal that information.

2. The Proposed Sale Order, filed on November 9, 2026, references and includes a number of agreements and documents that are being made available for the first time,[5] and

[2] The Proposed Sale Order filed on November 9, 2026 is materially different from the version that was filed on August 17, 2026 [ECF No. 1469], and the Debtors attach documents that have not previously been filed with the Court. *See* ECF No. 1802, Exs. A-1, B-1 (blacklines). Moreover, GE did not receive notice of the Motion or the Notice of Auction Results and retained counsel only after reading various press reports on the Data Sale. As such, this Limited Objection should not be considered untimely. The Engine OEMs reserve the right to supplement this Limited Objection after a more fulsome review of the Proposed Sale Order and related documents.

[3] Capitalized terms used but not defined herein have the meanings given to them in the Proposed Sale Order and the revised Bill of Sale attached to the Proposed Sale Order as Exhibit B (the "**Revised Sale Agreement**").

[4] The "**Data Treatment Procedures**" are attached as Schedule 1 to the Proposed Sale Order. The Engine OEMs' proposed modifications to the Data Treatment Procedures are addressed in Section D *infra*.

[5] The Proposed Sale Order attaches—for the first time—(i) the Data Treatment Procedures (Sch. 1); (ii) the Master De-Identification Services Agreement between Spirit Airlines, LLC and the Deidentification Agent, including the Initial Statement of Work and its exhibits (among them, the Targeted Exclusion Protocol and the De-Identification Protocol) and the Data Processing Agreement (Ex. C); and (iii) the Designated Recipient Agreement between the Deidentification Agent and Google (Ex. D).

contemplates certain protections for employee and consumer personal data and the Debtors' privileged materials, but not comparable protections to ensure that the proprietary, commercially sensitive, and confidential information of the Engine OEMs and similarly situated parties will not be sold, used, disclosed, or made public, which would cause potentially significant harm to their businesses. These concerns are heightened because Google has said it is acquiring the data to improve its AI models and products.[6]

3. Over the past few months, the Engine OEMs, including their employees with extensive artificial intelligence and information technology experience, and counsel, have (i) participated in numerous discussions with the Debtors, the Deidentification Agent, Google and its counsel regarding, among other things, the Data Treatment Procedures, (ii) provided—more than four (4) weeks ago—data elements, including search terms and domain names, to assist in extracting OEM Data from the data proposed to be sold to Google, and (iii) provided the Deidentification Agent with markups of the Data Treatment Procedures and of various revised forms of proposed sale orders. Despite the Engine OEMs' extensive involvement in this process over the last two-plus months, significant issues remain open in respect of, among other things, the Proposed Sale Order and the Data Treatment Procedures that are necessary to ensure that OEM Data is not transferred, used, or disclosed—inadvertently or otherwise.

4. Although the Debtors acknowledge in the Proposed Sale Order and Revised Sale Agreement that the OEM Data is not an asset being sold, assigned, transferred, or conveyed to the Successful Bidder (*see* Proposed Sale Order ¶ 14; Revised Sale Agreement, Ex. A ¶¶ D–E), the Proposed Sale Order and Data Treatment Procedures do not (i) ensure that the OEM Data will not

---

[6] *See* James Nani, Google Aims to Boost AI With Purchase of Spirit Airlines Data, Bloomberg Law (Aug. 17, 2026, 12:22 P.M. EDT), https://news.bloomberglaw.com/bankruptcy-law/google-aims-to-boost-ai-with-purchase-of-spirit-airlines-data.

be transferred to the Successful Bidder or that OEM Data will not be used and/or disclosed by the Successful Bidder and (ii) provide any meaningful recourse for the Engine OEMs if any OEM Data is transferred to the Successful Bidder and/or used and disclosed by the Successful Bidder. For example, under the Proposed Sale Order,

(a) the work of identifying and removing OEM Data by the Deidentification Agent does not begin until *after* the Court enters a sale order, so the Debtors are incapable of representing to the Engine OEMs today (or at the hearing on the Proposed Sale Order) whether all OEM Data will be excluded from the transfer and the Proposed Sale Order offers little, if any, meaningful post-order protection to the Engine OEMs;

(b) rather than certifying to this Court that no OEM Data will be transferred, the Proposed Sale Order effectively flips the burden to the Engine OEMs by requiring them to provide search terms that are "reasonably necessary and narrowly tailored" or else be barred from objecting to any transfer of their confidential data in the sale, *see* Proposed Sale Order ¶¶ 2, 20, 25;

(c) prior to the transfer of data to Google, the Engine OEMs will not be entitled to any individualized report on the scope and nature of the data that has been searched and removed, and the exclusion manifest will only be provided on a non-individualized basis upon request after the Deidentification Agent's certification is filed and without the ability to challenge the search and removal process, *id.* ¶ 27; and

(d) if OEM Data is nevertheless transferred, the Engine OEMs must find it themselves (which they cannot do without purchasing Google's products), identify it "with specificity," and ask Google to make "reasonable efforts" to remove it, *id.* ¶¶ 15–17, while the Proposed Sale Order strips away recourse against the Debtors, the Deidentification Agent, and Google, *id.* ¶¶ 2, 18–19, 31–32, 34.

5. In other words, the Proposed Sale Order unfairly shifts the burden of protecting commercially sensitive and confidential information onto the third parties whose data is being sold. The Debtors are the sellers; they have sole dominion and control over the data that will be sold and, along with the Deidentification Agent, are the only parties able to examine, search, and remove data. At best, the Debtors offer that the Deidentification Agent will use reasonable efforts to remove OEM Data and that, if the Deidentification Agent makes a mistake or the search terms

fail, the Engine OEMs may request that Google delete it. That is not adequate protection for the Engine OEMs, and it is precisely why the modifications described in Section D below are necessary.

6. That burden-shifting is especially troubling because the Debtors propose to sell the data to Google free and clear of all liens, claims, and interests, leaving the Engine OEMs without a meaningful remedy if OEM Data is transferred to Google, used in its AI models and products, and made public.

7. This Court—in this chapter 11 case and many other aviation-related chapter 11 cases—has consistently protected the commercially sensitive and confidential information of OEMs and aircraft parties through sealing, redaction, and similar orders, and the Engine OEMs ask the Court to do so again here. The Engine OEMs provided the OEM Data under contractual arrangements, designations, and assurances and never agreed to its disclosure or sale to any third party; they should not bear the risk that it becomes available to their competitors, customers, or others.

8. Lastly, the Debtors are no longer an operating airline and have laid off tens of thousands of employees, raising significant concern that they lack the staff to vet the mountain of data proposed to be sold to Google. While the Debtors, as a liquidating company, may not be harmed by disclosure of third parties' confidential information, the Data Sale poses significant risks to parties that provided such information to the Debtors over the years, because Google may use or disclose it through its AI products.

9. The Engine OEMs will continue working with the Debtors, the Deidentification Agent, and Google to attempt to resolve their concerns consensually, but no comprehensive resolution has been reached. Accordingly, absent satisfactory resolution of the Data Treatment

Procedures and the Proposed Sale Order governing the protection of OEM Data, the Engine OEMs respectfully request that the Court deny the Data Sale unless the protections described in Section D *infra* are implemented.

## BACKGROUND

10. The Engine OEMs are leaders in the design and manufacturing of commercial jet engines, integrated engine components, and avionics systems. Through their subsidiaries, they provide a broad suite of services that accommodate an aircraft operator's full range of engine maintenance, repair, and overhaul needs.

11. At various points prior to the commencement of these chapter 11 cases, the Engine OEMs were in confidential negotiations with the Debtors regarding, among other things, the sale of aircraft engines and engine-related maintenance and other services, which were subject to confidentiality agreements and arrangements by and between the Engine OEMs and the Debtors.

12. The Revised Sale Agreement excludes from the Data Sale, among other things, (i) the "Excluded Third-Party Data" and (ii) the intellectual property rights of the Specified Third Parties. Each of GEA and CFM is a "Specified Third-Party." *See* Revised Sale Agreement, Ex. A at A-2 n.4. The OEM Data falls squarely within the Excluded Third-Party Data. The Revised Sale Agreement defines the "Excluded Third-Party Data" as consisting of, among other things, (i) confidential contracts between the Seller and any Specified Third-Party; (ii) confidential communications between the Seller and any Specified Third-Party; (iii) confidential information of a Specified Third-Party that is subject to certain sealing or redaction orders of this Court; and (iv) other information identified as confidential information of a Specified Third-Party pursuant to an Existing Third-Party Agreement (*see id.*, Ex. A ¶ D).

# OBJECTION

## A. The OEM Data Is Not Property of the Debtors' Estates

13. A debtor cannot convey property that it does not own. Section 363(b)(1) of the Bankruptcy Code authorizes the sale, outside the ordinary course of business, only of "property of the estate." *See* 11 U.S.C. § 363(b)(1). Under Section 541(a)(1), the estate includes only a debtor's legal or equitable interests in property, and the estate takes such property subject to the same restrictions that bound the debtor prepetition. *See* 11 U.S.C. § 541(a)(1).

14. Although the OEM Data may be stored on the Debtors' electronic systems, the Debtors do not have a property interest in the OEM Data. The mere possession of information by a debtor does not transform that information into property of the estate. The Engine OEMs own their proprietary information and have not granted the Debtors permission to transfer or disclose such OEM Data to any other party. The Revised Sale Agreement contemplates the transfer of email data, documents, presentations, aircraft operations and logistics data, operations data, transaction data, and revenue data. *See* Revised Sale Agreement, Ex. A & Assets Schedule.

15. Each of these categories is likely to contain OEM Data, including engine pricing and the terms of the Engine OEMs' confidential maintenance and services arrangements. To the extent any such data constitutes OEM Data, such information is not property of the Debtors' estates and cannot lawfully be conveyed in the Data Sale. The Debtors do not appear to dispute this point; they represent that they do not intend to sell third-party confidential and proprietary information such as the OEM Data, and the Revised Sale Agreement purports to exclude such information from the assets being sold. But an exclusion is only as meaningful as the mechanism that enforces it. Because the Debtors will not identify or remove OEM Data until *after* the sale order is entered, and the Proposed Sale Order places the burden of identifying that data on the Engine OEMs

through search terms, the exclusion provides no assurance that OEM Data will not, in fact, be transferred.

### B. Confidentiality Restrictions Cannot Be Extinguished Through a Sale "Free and Clear" Under Section 363(f)

16. Even if the OEM Data were property of the Debtors' estates, the Debtors cannot sell it "free and clear" of the Engine OEMs' confidentiality rights. Section 363(f) permits a sale free and clear of "any interest in such property" only if one of five conditions is satisfied: (1) applicable nonbankruptcy law permits the sale free and clear; (2) the interest holder consents; (3) the interest is a lien and the sale price exceeds the aggregate value of all liens; (4) the interest is in bona fide dispute; or (5) the interest holder could be compelled to accept a money satisfaction of its interest in a legal or equitable proceeding. *See* 11 U.S.C. § 363(f)(1)–(5). None of these conditions is met here.

17. *First*, no provision of nonbankruptcy law permits the Debtors to sell confidential, proprietary information belonging to a third party free and clear of that party's rights. *See In re DeCurtis Holdings LLC*, No. 23-10548 (JKS), 2023 WL 5153645, at *26 (Bankr. D. Del. Aug. 9, 2023) (permanently enjoining a debtor's attempted sale pursuant to Section 363(f) where the property in question contained confidential business information of a third party). To the contrary, state contract law protects proprietary commercial information from unauthorized disclosure. *Id.* at *23–25. *Second*, the Engine OEMs do not consent to the sale of their OEM Data. *Third*, the confidentiality restrictions are not liens, rendering Section 363(f)(3) inapplicable. *Fourth*, there is no bona fide dispute as to the existence or validity of the Engine OEMs' confidentiality rights—the Debtors received the OEM Data pursuant to contractual arrangements, designations, or assurances that expressly imposed confidentiality obligations. *Fifth*, and finally, the Engine OEMs cannot be compelled in any legal or equitable proceeding to accept monetary compensation in lieu

of their confidentiality protections; confidential commercial information, once disclosed, cannot be made confidential again, and damages would be an inadequate remedy. *See, e.g.*, *Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd.*, 783 N.Y.S.2d 758, 769 (Sup. Ct. N.Y. Cnty. 2004) ("A contract to retain the confidentiality of certain matters which should be kept in confidence will be enforced by injunction.") (citing *Karpinski v. Ingrasci*, 28 N.Y.2d 45 (1971)).

### C. Disclosure of the OEM Data Would Cause Potentially Significant Harm to the Engine OEMs

18. The OEM Data is proprietary and commercially sensitive in nature. Disclosure of such information to Google or any other party would cause potentially significant harm to the Engine OEMs and their businesses. The OEM Data includes, for example, pricing information and the terms of business arrangements that the Engine OEMs have consistently designated as proprietary and confidential. The ability of competitors or customers of the Engine OEMs to access such data, through AI or otherwise, could impair the Engine OEMs' ability to compete for business with potential customers. This Court—in this chapter 11 case and in many other aviation-related chapter 11 cases—has consistently recognized the importance of the non-disclosure of proprietary, commercially sensitive, and confidential information of OEMs and aircraft financing parties by entering orders to seal and for other protections against the disclosure of such information. *See Motion to File Under Seal* [ECF No. 134] and *Order Authorizing the Debtors to Redact Commercially Sensitive Information* [ECF No. 246].[7]

---

[7] *See, e.g.*, *In re Spirit Aviation Holdings, Inc.*, No. 25-11897 (SHL) (Bankr. S.D.N.Y. Oct. 10, 2025) [ECF No. 246]; *In re Azul S.A.*, No. 25-11176 (SHL) (Bankr. S.D.N.Y. Aug. 15, 2025) [ECF No. 499]; *In re GOL Linhas Aéreas Inteligentes S.A.*, No. 24-10118 (MG) (Bankr. S.D.N.Y. Mar. 7, 2024) [ECF No. 233]; *In re SAS AB*, No. 22-10925 (MEW) (Bankr. S.D.N.Y. July 17, 2024) [ECF No. 2855]; *In re Grupo Aeroméxico*, *S.A.B. de C.V.*, No. 20-11563 (SCC) (Bankr. S.D.N.Y.) [ECF Nos. 397, 649, 983, 1093, 1146, 1159, 1569–71, 1576, 1692, 1758, 1890, 1931, 1933, 1938, 1940, 2003, 2005, 2023, 2050, 2066, 2075, 2081, 2127, 2129, 2131–32, 2396, 2398, 2535, 2543, 2545, 2556, 2558, 2560, 2562, 2564, 2566, 2568, 2570] (granting sealing motions in connection with aircraft transaction documents and usage stipulations for leased aircraft or equipment).

19. Permitting the sale of such information and data—or its potential disclosure or use in artificial intelligence or other analytical models—would severely disadvantage the Engine OEMs in future business negotiations.

**D. The Proposed Sale Order and Data Treatment Procedures Must Provide Sufficient Protections to the Engine OEMs**

20. As previously mentioned, the Proposed Sale Order and the Data Treatment Procedures must provide sufficient protection to the Engine OEMs to ensure that the OEM Data is not transferred, used, or disclosed. To that end, the Engine OEMs request that the Court condition any approval on the following modifications to the Proposed Sale Order, or, alternatively, deny the Data Sale:

(a) ***Report and dispute mechanisms before transfer.*** Consistent with the protections provided for consumer and employee data in paragraph 9 of the Proposed Sale Order, the sale order should require that, at the conclusion of Phase 4 under the Deidentification Agent's Statement of Work, the Deidentification Agent (i) provide each Specified Third-Party with an individualized exclusion report, including the quality-assurance measurements relating to the exclusion of Excluded Third-Party Data, and (ii) produce a quantitative statistical assessment (*e.g.*, stochastic modeling, Monte Carlo simulations, etc.) of the probability that any Excluded Third-Party Data was not identified and removed, using a methodology subject to review and approval by the Specified Third Parties. The Deidentification Agent should also report regularly to the Engine OEMs on its efforts to extract the OEM Data, and the Engine OEMs should have the right to review and object to any report. No data should be delivered to Google until all such disputes are resolved.

(b) ***Independent verification.*** Paragraph 9 of the Proposed Sale Order should further provide that the Verification Agent, which shall have experience and expertise in the aviation and aerospace industries, verify that the assessment described in subparagraph (a) above was performed in accordance with its stated methodology and that its results are accurately reported.

(c) ***Improve the Third-Party Search Term Dispute standard.*** The Proposed Sale Order should require that Third-Party Search Terms be reasonably designed to ensure the exclusion of confidential information and include that, in any Third-Party Search Term Dispute, the Court may consider whether the Third-Party Search Terms are reasonably sufficient to prevent information that is confidential pursuant to an Existing Third-Party Agreement (including information that can reasonably be used to infer information about, or otherwise

be linked to, a particular Specified Third-Party) from being transferred to, or used or disclosed by, the Successful Bidder.

(d) ***Place the burden appropriately on the Debtors.*** The Proposed Sale Order should require that the Debtors bear the burden in any Third-Party Search Term Dispute of establishing that the Third-Party Search Terms and Data Treatment Procedures will exclude all confidential information.

(e) ***Condition or defer the Court's findings on the deidentification process.*** The Proposed Sale Order should strike, or make expressly without prejudice to the Specified Third Parties, the findings that the Data Treatment Procedures are reasonable and lawful and that the sale does not include third-party confidential information, *see* Proposed Sale Order ¶¶ 4, U-V, until the exclusion process has been completed and reported.

(f) ***Make post-delivery obligations absolute and require reasonable testing.*** Upon notice or upon becoming aware that confidential information was delivered, the obligation for Google to prevent public disclosure and delete such information should be absolute and not limited to "reasonable efforts." In addition, Google should be required, if requested, to run reasonable inquiries in its products to determine whether confidential information has been disclosed or inferred by its artificial intelligence models.

## RESERVATION

21. The Engine OEMs reserve the right to supplement, modify, or amend this Limited Objection, including the right to assert additional objections, prior to or at the hearing on the Data Sale, as they receive additional information and engage in further discussions with the Debtors and Google regarding the Data Sale.

*[remainder of page left blank]*

**WHEREFORE**, the Engine OEMs respectfully request that the Court (i) deny the Data Sale unless it excludes any and all OEM Data and provides sufficient protections to prevent the transfer, use, and disclosure of OEM Data, and (ii) grant such other and further relief as the Court deems just and proper.

Dated: November 12, 2026
New York, NY

PILLSBURY WINTHROP SHAW PITTMAN LLP

*/s/ Michael G. Burke*
Michael G. Burke
31 West 52nd Street
New York, NY 10019
Tel: (212) 858-1000
Fax: (212) 858-1500
michael.burke@pillsburylaw.com

*Counsel to GE Aerospace and CFM International, Inc.*

## CERTIFICATE OF SERVICE

I, Michael Stavros, hereby certify that, on November 12, 2026, I caused a true and correct copy of the foregoing to be served through the Court's Case Management/Electronic Case Filing (CM/ECF) System.

*/s/ Michael Stavros*
Michael Stavros